Jeffery D. McFarland
California Bar No. 157628
jmcfarland@mckoolsmithhennigan.com
MCKOOL SMITH HENNIGAN P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1010
Fax: (213) 694-1234

*(additional counsel listed on next page)*

**Attorneys for Plaintiff**
**BLOCKCHAIN INNOVATION, LLC**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLOCKCHAIN INNOVATION, LLC, | CASE NO. 3:21-cv-8787 |
| *Plaintiff,* | **ORIGINAL COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| FRANKLIN RESOURCES, INC. d/b/a FRANKLIN TEMPLETON, FT FINTECH HOLDINGS, LLC, JENNIFER JOHNSON, AND ROGER BAYSTON, | |
| *Defendants.* | |

Gary Cruciani (*Pro Hac Vice* to be submitted)
Texas Bar No. 05177300
Lew LeClair
California Bar No. 77136
gcruciani@mckoolsmith.com
lleclair@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000

Brent N. Bumgardner (*Pro Hac Vice* to be submitted)
Texas Bar No. 00795272
Carder W. Brooks (*Pro Hac Vice* to be submitted)
Texas Bar No. 24105536
brent@nelbum.com
carder@nelbum.com
NELSON BUMGARDNER CONROY P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Telephone: (817) 377-9111

Patrick J. Conroy (*Pro Hac Vice* to be submitted)
Texas Bar No. 24012448
pat@nelbum.com
NELSON BUMGARDNER CONROY P.C.
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201
Telephone: (214) 446-4954

**Attorneys for Plaintiff
BLOCKCHAIN INNOVATION, LLC**

Plaintiff Blockchain Innovation, LLC, as assignee of the causes of action belonging to Onsa, Inc. ("Onsa"), brings this action against Franklin Resources, Inc. d/b/a Franklin Templeton ("Franklin Resources"), FT Fintech Holdings, LLC ("FT Fintech"), (Franklin Resources and FT Fintech Holdings, LLC, collectively, "Franklin Templeton"), Jennifer Johnson ("Johnson"), and Roger Bayston ("Bayston") (collectively, "Defendants") seeking monetary damages and injunctive relief related to Defendants' breaches of fiduciary duties, trade secret misappropriation, conversion, unjust enrichment, breach of contract, and other wrongful conduct.

## INTRODUCTION

1.      The core of this lawsuit is a series of blatant and egregious breaches of fiduciary duties by Defendants that effectively killed Plaintiff's predecessor, Onsa. Plaintiff's damages are enormous as Onsa was a uniquely positioned company in a white-hot sector of the economy that has recently seen comparable companies do IPOs that have resulted in market valuations measured in the ***billions*** of dollars. Plaintiff seeks damages from Defendants for their value-destroying conduct and an injunction to prevent Franklin Templeton from using the technology it misappropriated from Onsa.

2.      Onsa was a promising startup company whose founders (Aaron Travis and Austin Trombley) are successful Silicon Valley entrepreneurs. Onsa was "FinTech" company that developed breakthrough blockchain technology to tokenize financial assets. The tokenization of financial assets is the unmistakable wave of the future and promises to revolutionize the financial services industry.

3.      Franklin Templeton manages one of the world's largest money market funds but was a lumbering giant with antiquated technology that had fallen far behind its peers in its financial performance. In March 2018, Franklin Templeton acquired another of Travis's and Trombley's highly successful startup companies, Random Forest Capital. Through the Random Forest Capital acquisition, Franklin Templeton learned of Onsa and its technology.

4.      In October 2019, Franklin Templeton invested in Onsa through a Stock Purchase Agreement. Franklin Templeton acquired approximately one-quarter of Onsa's stock. Critically, Franklin Templeton also acquired control of Onsa and appointed Franklin Templeton's Senior Executive, Roger Bayston, as Onsa's sole director.

5.      Bayston was a clearly conflicted director with divided loyalties to Onsa and Franklin Templeton. As subsequent events would show, Bayston abandoned his fiduciary duties to Onsa by conspiring with other Franklin Templeton executives, including Jennifer Johnson (Franklin Templeton's CEO), to destroy Onsa in a scheme to enrich Franklin Templeton.

6.      From October 2019 through July 2020, Onsa continued to develop its groundbreaking technology with a team of software engineers paid for by Onsa. Onsa had successfully beta tested its technology, which involved creation of the world's first SEC-approved, "tokenized" money market fund for Franklin Templeton. Onsa and Franklin Templeton were seemingly on track to obtain SEC approval for Franklin Templeton's money market token and launch Onsa's platform for trading tokenized financial assets.

7.      All seemed well with the relationship until July 2020. That is when Defendants struck without warning. Bayston terminated Onsa's CEO and all other significant employees; Bayston terminated Onsa's software engineers and coders. These terminations were without notice and without cause. Franklin Templeton would later rehire key Onsa personnel to work on the very technology that Franklin Templeton misappropriated from Onsa. All of this was done without any notice or explanation to Onsa's non-Franklin Templeton shareholders. Franklin Templeton is now on the precipice of releasing Onsa's technology under the Franklin Templeton banner.

8.      On November 23, 2020, Defendants summarily put Onsa into liquidation mode by instituting an Assignment for Benefit of Creditors or "ABC" under California law. The ABC transferred all of Onsa's tangible and intangible assets, including legal claims held by Onsa, to the liquidator and assignee, BLKCHN, LLC. By initiating the ABC, Franklin Templeton was hoping to deliver the *coup de grâce* to Onsa as a competitor in the booming FinTech market for blockchain products while insulating Defendants from any legal exposure for their egregious conduct.

9.      Defendants' scheme likely would have succeeded but for one crucial fact: when made aware of potential claims, BLKCHN investigated them. Rather than simply liquidating the company and allowing Defendants to quickly and quietly sweep their misconduct under the rug, BLKCHN discussed the allegations in this Complaint with the non-Franklin Templeton shareholders and their representatives, as

well as with Franklin Templeton and its representatives. Ultimately, BLKCHN agreed to sell Onsa's tangible and intangible assets to Plaintiff, a company formed by the majority of Onsa's non-Franklin Templeton shareholders. These non-Franklin Templeton shareholders "stepped up" to pay Onsa's unsecured creditor claims *in full*, and in return acquired Onsa's assets, so that the legal claims asserted herein could be pursued against Defendants.

## SUMMARY OF FACTUAL ALLEGATION

10.     The asset management business has undergone a series of rapid technological changes. Innovations like exchange traded funds (ETFs), the revolution in retail trading capabilities, and most recently, blockchain-based technology have disrupted traditional active asset management businesses.[1] Franklin Templeton—one of the world's largest asset managers—largely failed to capitalize on ETFs and retail trading capabilities and was recently crowned "the worst-selling investment manager" for its history of missteps.[2] And even with respect to blockchain-based technology, Franklin Templeton was again asleep at the innovation wheel.

11.     As Jennifer Johnson—Franklin Templeton's newly promoted CEO—put it in 2018: "Blockchain will be my grandkids' problem."[3] But as Johnson soon realized, her executive judgment could not have been more wrong. Instead, after a corporate presentation from Citi Business Advisory Services in 2018, Johnson and other Franklin Templeton executives were awakened to blockchain-based technology as the next major innovation in asset management. And, again, Franklin Templeton was already behind.

12.     Blockchain technology was Johnson's clear and present problem, not her "grandkids' problem." Rather than expend the time and resources to develop its own blockchain-based asset management platform by incentivizing the best engineers and industry innovators to join it, Franklin Templeton decided to take a short cut: it decided to breach fiduciary duties, misappropriate the technology

---

[1] As discussed in more detail below, blockchain technology uses a distributed ledger to record and verify financial transactions. Bitcoin is a well-known use of blockchain technology.

[2] *Franklin Templeton named worst-selling fund manager of 2020*, Financial Times (Jan. 28, 2021), https://www.ft.com/content/b1e6078c-bf72-4ef0-ad4b-2970f3b17e36

[3] Jennifer Johnson is also a Franklin Templeton board member.

that it needed, and commit other tortious, illegal acts to put the technology's actual inventors out of business.

13.     Onsa was an innovative Silicon Valley financial technology ("FinTech") company that developed technology to enable traditional financial assets (*i.e.*, stocks, bonds, funds, etc.) to be traded on a blockchain-based trading platform.[4] Onsa's plan included the creation of the world's first SEC-approved, "tokenized" money market fund. Tokenizing a financial asset creates a digital representation of the financial asset's value to enable associated financial transactions to be authenticated and recorded on a blockchain using principles of cryptography.

14.     As manager of one of the world's largest money market funds, Johnson and other Franklin Templeton executives decided that Franklin Templeton—and not one of its competitors—should be the first asset management company to unveil an SEC-approved, tokenized money market fund and move its expensive and antiquated transfer agent system to a blockchain-based system of trading, authentication, and recording.

15.     To be the first to market, Defendants misled Onsa into believing that Franklin Templeton wanted to invest in and partner with Onsa. But upon acquiring control of Onsa, Franklin Templeton abused Onsa's independence, managed Onsa solely for the benefit of Franklin Templeton, usurped Onsa's business opportunities, misappropriated Onsa's technology for Franklin Templeton's own use, and improperly liquidated Onsa without any notice or explanation to Onsa's other shareholders. Franklin Templeton is now on the cusp of launching the technology it took from Onsa under the Franklin Templeton banner, hoping to change its image as a technological dinosaur and to generate enormous financial benefits that flow from Onsa's innovative technology.

---

[4] Onsa, Inc. was formerly called TokenVault, Inc. before its name was changed. TokenVault, Inc. acquired all assets of its predecessor TokenVault, LLC in connection with an Asset Purchase Agreement dated October 28, 2019. Unless otherwise specified, "Onsa" refers to Onsa, Inc./TokenVault, Inc., or its predecessor company, TokenVault, LLC.

16.     Franklin Templeton and Onsa's founders became acquainted in connection with a previous transaction whereby Franklin Templeton acquired a company called Random Forest.[5] Leveraging this prior relationship, and under the premise of a good-faith equity investment in Onsa,[6] senior Franklin Templeton executives, such as Johnson, Bayston (Executive Vice President and Director of Quantitative and FinTech Strategies), Sonal Desai (Executive Vice President and Chief Investment Officer), and others convinced Onsa's founders to make a deal with Franklin Templeton concerning Onsa.

17.     In hindsight, Defendants did not operate in good faith when the due diligence process began. For example, representatives of Franklin Templeton and Onsa had numerous meetings, but in an unusual move, Franklin Templeton and Bayston demanded that Onsa share its source code for "due diligence" purposes. Such a request was surprising—as Franklin Templeton knew, Onsa's technology included proprietary and confidential computer code (and accompanying know-how) that was designed to enable the blockchain-based trading platform that Franklin Templeton so desired.[7] However, assuming good faith on Franklin Templeton's part, and subject to Franklin Templeton's agreement regarding confidentiality, Onsa agreed to share portions of its source code.[8] But instead of engaging in a good faith due diligence process, Franklin Templeton dragged out the diligence process for many months all the while knowing that Onsa's cash reserves were quickly depleting.

---

[5] Aaron Travis, Austin Trombley, and Kevin Farrelly founded Random Forest. Farrelly went to work for Franklin Templeton in connection with the acquisition.

[6] Unlike Franklin Templeton's investment in Onsa, Franklin Templeton acquired 100% of Random Forest.

[7] As discussed further below, Onsa diligently protected its code throughout development, such as by storing the code in encrypted and password-protected repositories only accessible to Onsa and its developers. Onsa further maintained secrecy regarding material related to its source code, such as know-how, commercialization strategies, confidential business information, and other information. Onsa understood the significant value derived from keeping such material from prying eyes, as access to its secret information would provide a huge advantage to any competitor, for example, attempting to tokenize money market funds using the Stellar blockchain.

[8] Franklin Templeton and TokenVault executed a Mutual Confidentiality and Non-Disclosure Agreement on September 11, 2019, which memorializes the parties' agreement regarding confidentiality, including the confidentiality of TokenVault information disclosed prior to the execution date.

18.     Once it became clear that Onsa required additional funds to continue development, Onsa informed Franklin Templeton that it intended to seek outside investment in the company. Franklin Templeton and Bayston threatened to pull the plug on the proposed transaction if Onsa took such steps. Instead, Franklin Templeton offered to purchase $1.5 million of convertible notes from Onsa. Conveniently, this step enabled Franklin Templeton to acquire an even greater percentage of Onsa than the deal terms under discussion because the notes were to convert to additional equity at the deal's closing. Franklin Templeton then used its new leverage to demand that it review *any additional* code that Onsa had written since the due diligence process began. After one of the code reviews, a Franklin Templeton employee (Michael Muir) remarked that, having had access to Onsa's proprietary technology and code, Franklin Templeton had learned enough to build the tokenized money market fund without Onsa. This statement would prove prescient.

19.     Franklin Templeton fully reviewed most, if not all, of Onsa's propriety technology, and it liked what it saw. In October 2019, Franklin Templeton, Onsa, and Trombley (one of Onsa's founders) closed a stock purchase agreement whereby FT FinTech (a Franklin Templeton subsidiary) obtained Onsa's control shares and approximately twenty-five percent of Onsa's common stock. Onsa's founders were reluctant to sell Onsa's control shares to Franklin Templeton, but Franklin Templeton insisted on having voting control and provided assurances concerning the future relationship between Franklin Templeton and Onsa, assurances that would prove to be false.

20.     For example, Franklin Templeton repeatedly reassured Onsa that post-investment, Onsa would function as an independent company and have an independent board of directors. However, post-investment, Franklin Templeton replaced Trombley with Bayston (a senior Franklin Templeton executive), who was Franklin Templeton's director nominee.

21.     Franklin Templeton also promised that Onsa would function as an independent technology company that could maximize the value of its technology by seeking customers other than Franklin Templeton. For example, Onsa envisioned that its platform would trade Franklin Templeton's money market token (and future Franklin Templeton tokenized assets) alongside other financial companies'

tokenized offerings, tokenized stocks, cryptocurrencies, and currencies. But after closing the transaction, Franklin Templeton refused to allow Onsa to seek other customers.

22.     Franklin Templeton also promised to finalize and sign a master services agreement ("MSA"), whereby Franklin Templeton would compensate Onsa for use of Onsa's technology. This promise is reflected in Franklin Templeton's September 3, 2019 filing with the SEC, which references a "blockchain administrator" (i.e., Onsa) that would be compensated via a "Blockchain Administration Agreement" with Franklin Templeton (i.e., the MSA).[9] Although Franklin Templeton and Bayston repeatedly assured Onsa that it would finalize the MSA, it never did.

23.     Onsa worked hard to keep its end of the bargain. Between October 2019 and July 2020, Onsa worked diligently to continue developing its own technology, focusing specifically on facilitating Franklin Templeton's tokenized money market fund so it could trade, authenticate, and record the fund's financial transactions using the Stellar blockchain.[10] Onsa also diligently worked on development of an app capable of trading the Franklin Templeton money market token alongside other tokenized financial assets, such as stocks, currencies, and cryptocurrencies. There were frequent meetings, at times daily, between Onsa and Franklin Templeton concerning Onsa's platform and how to customize that platform for Franklin Templeton's needs.

24.     Illustrating this close, strategic relationship is the fact that several Onsa employees were given Franklin Templeton employee badges as they regularly met with Franklin Templeton employees at Franklin Templeton offices. The Onsa team spent so much time at Franklin Templeton that certain Franklin Templeton employees mistakenly believed that the Onsa employees worked for Franklin Templeton.

25.     Onsa devoted significant resources to develop its platform, processes, and code, taking special care to ensure that its technology would specifically work with Franklin Templeton's antiquated

---

[9] The September 3, 2019 SEC filing was made shortly before Franklin Templeton's investment in Onsa. Franklin Templeton's next SEC filing on the money market token was made on March 25, 2020, which was after Franklin Templeton's investment in Onsa. This subsequent SEC filing removed any reference to compensating a "blockchain administrator" (i.e., Onsa) for services to Franklin Templeton. Franklin Templeton's false promises were the classic bait and switch.

[10] Stellar is a third-party blockchain provider that offers its blockchain to other FinTech companies.

internal systems. Onsa also assisted Franklin Templeton with filing for regulatory approval with the SEC and European regulators, including drafting much of the necessary disclosure and documentation. To obtain regulatory approval, Onsa proposed that Franklin Templeton run the tokenized money market fund for a period of six months alongside its legacy transfer agent to establish the security and accuracy of the new platform.

26. The tokenized money market fund was initially planned to launch in Fall 2020. The Onsa team continued to work on fine-tuning the product through the beginning of Summer 2020. During this time, Onsa also worked to finalize the fee structure with Franklin Templeton. Onsa expected to charge a platform fee of three to five basis points (.03% to .05%) of assets under management and also anticipated a share of the distribution fees and redemption fees that Franklin Templeton would collect. Onsa also anticipated a $1/account/month fee associated with each user of the platform.

27. In contrast to Onsa's good faith, Franklin Templeton, Johnson, and Bayston ran Onsa solely for the benefit of Franklin Templeton, making critical decisions that intentionally undermined Onsa. In the end, Franklin Templeton misappropriated Onsa's technology, hired back Franklin Templeton employees that it had planted at Onsa, and liquidated Onsa's remaining assets in a pseudo-bankruptcy proceeding that was designed to insulate Franklin Templeton from liability to Onsa and its non-Franklin Templeton shareholders.

28. Franklin Templeton's misconduct in managing Onsa began shortly after its investment. For example, Onsa recognized that it was in Onsa's best interest to raise additional capital from strategic, third-party investors, who might ultimately become customers of the Onsa platform. Franklin Templeton and Bayston shut down these efforts and falsely assured Onsa that Franklin Templeton would fully support it financially. In retrospect, it is clear that Franklin Templeton did not want its competitors or other third parties involved with Onsa. It did not want Onsa to gain traction as a standalone entity.

29. Onsa also made plans to approach other companies to be customers of Onsa's tokenization platform. Some of the world's largest global asset managers expressed interest in learning more about Onsa and trading their financial products on Onsa's platform. Pre-investment, Franklin Templeton, Johnson and Bayston agreed that Onsa would be allowed to seek out customers beyond Franklin Templeton. But post-

investment, Franklin Templeton shut down these efforts. In retrospect, Franklin Templeton wanted the Onsa technology for its exclusive use.

30. Obviously, if Onsa's non-Franklin Templeton shareholders or other FinTech startups that Franklin Templeton was trying to invest in learned about the way Franklin Templeton treated Onsa post-investment, Franklin Templeton's reputation would suffer and Johnson's technology acquisition efforts on behalf of Franklin Templeton would suffer. Thus, Bayston and Franklin Templeton deliberately kept Onsa's shareholders in the dark. Post investment, the Franklin-Templeton-controlled Onsa *never once* updated Onsa's other shareholders. Even worse, the Franklin Templeton-controlled Onsa refused to substantively respond to numerous shareholders' *direct requests* for information concerning Onsa's operations and plans.[11] And to this day, Onsa's non-Franklin Templeton shareholders—who own approximately seventy-five percent of Onsa's non-voting, common stock—have never been given *any explanation* as to why Franklin Templeton abruptly terminated Onsa.

31. For example, on July 20, 2020, an Onsa shareholder, PJ Lee, emailed Onsa and complained about its lack of transparency. Onsa's CFO, Lou Mohn, responded on August 14, 2020 that "Onsa management is currently conducting a business review in consultation with our Board of Directors" and that an update would be forthcoming. Mohn's response was false, as he knew that Franklin Templeton had already decided to terminate Onsa and take Onsa's technology in-house. Lee followed up multiple times, most recently on October 5, 2020, but no update was ever provided.

32. Post-investment, Franklin Templeton publicly misrepresented Onsa's technology as its own. On March 25, 2020, Franklin Templeton made an SEC filing regarding the money market token. Franklin Templeton's SEC filing details Onsa's technology, but unlike its previous SEC filing, the March 25, 2020 filing makes no mention of the "blockchain administrator" or Onsa. These references were

---

[11] Many of the shareholder's requests for updates were fielded by Lou Mohn. Prior to formally joining Onsa, Mohn was a financial analyst at Franklin Templeton. After Franklin Templeton's investment in Onsa, Bayston hired Mohn as Onsa's CFO, and for a period of time Mohn worked simultaneously for Onsa and Franklin Templeton. Sometime in early 2020, Mohn became a full-time employee of Onsa. When Franklin Templeton began the process of liquidating Onsa, Bayston appointed Mohn as Onsa's interim CEO. After the winding down of Onsa was complete, Franklin Templeton re-hired Mohn.

1  stripped from Franklin Templeton's post-investment SEC filings. Additionally, the SEC filing also

2  describes the dual recording structure proposed by Onsa using the Stellar blockchain. Franklin Templeton's

3  SEC filing falsely implies that Onsa's strategic vision and technological innovation should be credited to

4  Franklin Templeton.

5      33.    Notwithstanding Franklin Templeton's deletion of references to the "blockchain

6  administrator," the March 25, 2020 SEC filing continues to reference an "App" that would trade the

7  Franklin Templeton token. This is a reference to the application that was being developed by Onsa in

8  connection with its platform.[12] Franklin Templeton and Onsa considered naming this app "Benji."

9      34.    Despite many roadblocks imposed by Franklin Templeton, Onsa's team raced forward with

10  the creation of the Onsa platform and its future continued to look very bright in the white-hot FinTech

11  landscape. During this time, Onsa continued to diligently protect its code and other trade secrets, granting

12  access only to its developers and Franklin Templeton, Onsa's controlling shareholder. By June 2020,

13  Onsa's new CEO (a former Amazon executive) had Onsa well on its way to developing what he described

14  as a "world changing" technology. Onsa had approximately eight months of cash reserves to operate and

15  the ability to fundraise. It had made substantial progress with respect to its technological development,

16  most notably the tokenized money market fund and asset custody features. Onsa was ready and waiting for

17  SEC approval to launch the Franklin Templeton tokenized money market fund. Onsa anticipated a public

18  launch of its cryptocurrency trading platform in approximately October 2020. Onsa was testing its point of

19  sale system for launch in early 2021.

20      35.    On July 22, 2020, Franklin Templeton filed an updated SEC filing concerning its

21  blockchain-based money market fund using Onsa's technology and app.[13] Like other post-investment SEC

22  filings, this filing omits any reference to a "blockchain administrator" (i.e., Onsa), and the filing once again

23

24  [12]  In later SEC filings, Franklin Templeton misrepresents that Onsa was a Franklin Templeton

25  "acquisition," when in truth Onsa was a company whose cap table included over fifty non-Franklin
    Templeton shareholders.  Franklin Templeton was just one of many stockholders in Onsa.

26  [13]  SEC Form   N-1A   as   filed   by   Franklin   Templeton   on   July   22,   2020,

27  https://www.sec.gov/Archives/edgar/data/1786958/000178695820000018/franklinonchain-pro.htm.

28

gives the false impression that Franklin Templeton should be credited with the idea and execution of using blockchain to record and verify money market fund transactions.

36.     As Onsa continued to develop its technology throughout the summer of 2020, its future was boundless. Having devoted significant time and resources in developing and maintaining proprietary computer code, business strategies, and necessary infrastructure, Onsa was positioned as a pioneer in the tokenized money market space, aimed at revolutionizing an industry (and a company) ripe for revitalization. Then, without any notice, Franklin Templeton, Johnson, and Bayston abruptly shuttered Onsa. Bayston and Mohn terminated Onsa's newly hired CEO and General Counsel. They also fired all of Onsa's staff, fired Onsa's development team, and withdrew all outstanding offers to individuals that planned to start their employment with Onsa in the second half of 2020. At the time Franklin Templeton decided to terminate Onsa, the company had no significant creditors and very valuable infrastructure, trade secrets, and other intellectual property according to Onsa's own financial statements and recent third-party valuations. When rumors of Franklin Templeton's liquidation reached Onsa's non-Franklin Templeton shareholders, they were utterly shocked.

37.     On November 23, 2020, Defendants' scheme to strip Onsa of all value, misappropriate Onsa's prized intellectual property for Franklin Templeton, and attempt to insulate Defendants from all legal liability for their egregious misconduct was unveiled. With Franklin Templeton's full blessing, Bayston liquidated Onsa, causing it to execute a California General Assignment for Benefit of Creditors ("ABC") to transfer "all assets of Onsa, Inc. and all assets of Onsa LLC, whether real or personal, and whether tangible or intangible" to BLKCHN.

38.     Now, with Onsa off the board and a path cleared, Franklin Templeton is on the cusp of launching the technology it misappropriated from Onsa.[14] In a recent interview, Johnson bragged that

---

[14] *See generally* Franklin Templeton, *Summary Prospectus, Franklin OnChain U.S. Government Money Fund*, April 6, 2021, https://www.sec.gov/Archives/edgar/data/0001786958/000137949121001250/filing222856581.htm; *see also* Banerjee, Devin, *'The power has shifted': Franklin Templeton CEO Jenny Johnson on hybrid work, how to embrace uncertainty, and what's keeping her up at night*, Human Capital (Aug. 20, 2021), https://www.linkedin.com/pulse/power-has-shifted-franklin-templeton-ceo-jenny-hybrid-banerjee-cfa/ ("We [Franklin Templeton] were the first to launch a regulated stablecoin [e.g., tokenized fund]—a money market fund with a stablecoin. We're in a pilot mode with it right now, working with the SEC. They appreciate it because

1   Franklin Templeton is in "pilot mode" with the money market token, and that Franklin Templeton will

2   soon "launch other types of similar products."[15] This is the exact technology that Franklin Templeton took

3   from Onsa.

4          39.     The ABC that Defendants orchestrated was done with no advance notice or input from any

5   of Onsa's other shareholders, who were left in the dark and completely blindsided by the ABC. To this

6   day, Defendants have never provided *any* update to Onsa's non-Franklin Templeton shareholders, or even

7   attempted to explain to these shareholders why the ABC was initiated. Furthermore, prior to initiating the

8   ABC, neither Franklin Templeton, Johnson, nor Bayston reached out to any of Onsa's shareholders

9   regarding Franklin Templeton's decision to terminate Onsa or attempted to explore alternatives to filing an

10  ABC.

11         40.     Notably, Onsa's shareholders include numerous individuals with significant startup,

12  blockchain, venture capital, financial services, and other relevant expertise. Defendants *never* approached

13  these shareholders regarding other options for Onsa. Franklin Templeton's intentions are clear—quietly

14  shutter Onsa through the ABC process, be released from its wrongdoing, and misappropriate Onsa's

15  technology for itself.

16         41.     The ABC states that the "Assignee intends to liquidate assets and wind down Onsa" and

17  that "there is no guarantee regarding distributions, if any, to unsecured creditors." Upon information and

18  belief, Franklin Templeton initiated the ABC to avoid liability for their numerous breaches of fiduciary

19  duty and other misconduct.[16]

20         42.     Franklin Templeton's scheme did not go as planned. Instead of burying the company,

21  BLKCHN initiated an auction of Onsa's assets. In the auction process, the non-Franklin Templeton

22

23  we've learned together step by step as they try to figure out how to regulate this world. After that, we'll
    look to launch other types of similar products"—Jenny Johnson).

24  [15] *Supra* at fn. 14.

25  [16] For example, before Defendants decided to initiate the ABC, Mohn created a presentation to Onsa's

26  board (which was comprised only of Bayston) in August 2020. The presentation identified "litigation risk,"
    "minority stockholders," and "D&O tail risk" as three of the main risks facing Defendants if they continued

27  with Onsa's liquidation.

28

shareholders "stepped up" to pay Onsa's unsecured creditor claims ***in full***, and in return acquired Onsa's assets, so that the legal claims asserted herein could be pursued against Franklin Templeton, Johnson, and Bayston. In connection with the purchase of Onsa's assets, Plaintiff also obtained access to some of Onsa's internal documents and emails, which include correspondence involving Johnson, Bayston, and other high level Franklin Templeton employees. These documents, some of which are referenced in this Complaint, shed light on Defendants' egregious breach of fiduciary duties to Onsa.

43.     Plaintiff Blockchain Innovation, LLC, as the owner of the asserted Onsa's causes of action as well as the vast majority of Onsa's shareholders' causes of action, bring this action against (i) FT Fintech, (ii) FT Fintech's parent, Franklin Resources, Inc., (iii) Johnson, who at relevant times was the COO or CEO of Franklin Templeton as well as a Franklin Templeton board member, and (iv) Bayston, who at relevant times was both Onsa's sole director and a Franklin Templeton senior executive.

## PARTIES

44.     Plaintiff Blockchain Innovation, LLC is a Delaware limited liability company whose registered agent is The Corporation Trust Company, located at 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. In the ABC proceeding, Onsa transferred "all assets of Onsa, Inc. and all assets of Onsa LLC, whether real or personal, and whether tangible or intangible" to BLKCHN LLC ("BLKCHN"). This assignment included the causes of action asserted herein. Plaintiff purchased these same assets from BLKCHN, and is now the legal owner of the causes of action that are asserted herein.

45.     Defendant Franklin Resources Inc., doing business as Franklin Templeton, is a Delaware corporation whose registered agent is United Agent Group Inc., located at 4640 Admiralty Way, 5th Floor, Marina del Rey, CA 90292. Franklin Resources is an asset management company incorporated in Delaware. As the controlling shareholder of FT Fintech Holdings, LLC, its control of 100% of Onsa's voting stock, and the only shareholder whose interests have been represented by Onsa's sole conflicted director, Franklin Templeton owed fiduciary duties to Onsa and its shareholders.

46.     Defendant FT Fintech Holdings, LLC is a Delaware limited liability company whose registered agent is United Agent Group Inc., located at 4640 Admiralty Way, 5th Floor, Marina del Rey, CA 90292. FT Fintech Holdings, LLC is the nominal owner of 100% of Onsa's issued and outstanding

1   voting common stock and nominal owner of approximately one-quarter of Onsa's issued and outstanding

2   non-voting common stock.

3       47.     Upon information and belief, Defendant Jennifer Johnson is a resident of California and is

4   the President and Chief Executive Officer of Franklin Templeton. Johnson is also a Franklin Templeton

5   board member. As president and CEO, Johnson is responsible for the operation of all aspects of Franklin

6   Templeton's business. Johnson was responsible for catalyzing Franklin Templeton's equity investment in

7   Onsa. Johnson had direct involvement with Franklin Templeton's investment in Onsa. Johnson was also

8   directly involved with operational aspects of Onsa, including direct communications with Onsa's CEO

9   concerning Onsa's operations. And finally, Johnson was directly involved with the decision to terminate

10  Onsa and extinguish it via the ABC. At all relevant times, Johnson was responsible for aiding and abetting

11  Defendants' breaches of fiduciary duties and other tortious conduct.

12      48.     Upon information and belief, Defendant Roger Bayston is a resident of California. Bayston

13  has worked at Franklin Templeton for approximately 30 years, including while he was the sole member of

14  Onsa's board of directors. In September 2019 Bayston was retitled at Franklin Templeton as the Executive

15  Vice President – Director of Quantitative & FinTech Strategies. Bayston was at all times a senior Franklin

16  Templeton executive while also serving as Onsa's sole board member. Like Johnson, Bayston was directly

17  involved in Franklin Templeton's investment in Onsa, Franklin Templeton's management of Onsa, and the

18  decision to terminate Onsa.

19                              **JURISDICTION AND VENUE**

20      49.     This Court has subject matter jurisdiction over the Defend Trade Secret Act claim under 28

21  U.S.C. § 1331 and 18 U.S.C. § 1836(c). This Court has subject matter jurisdiction over state law claims

22  asserted herein under 28 U.S.C. § 1367 because the claims are so related to the federal Defend Trade

23  Secrets Act claim that they form part of the same case or controversy and further because the state law

24  claims arise from a common nucleus of operative facts.

25      50.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of

26  the events or omissions giving rise to the claims in this action occurred in this District. Venue is also proper

27

28

in this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in California and some, if not all, of Defendants reside in this District, as is discussed in the next four paragraphs.

51.     This Court has personal jurisdiction over Defendant Franklin Resources, Inc., in accordance with due process and/or the California Long Arm Statute because Franklin Resources, Inc.'s principal place of business is located at 1 Franklin Parkway, San Mateo, California 94403. Venue is proper in this District over Franklin Resources, Inc. under 28 U.S.C. § 1391(b)(1), (c), and (d) because it resides in this District due to its principal place of business being located in this District.

52.     This Court has personal jurisdiction over FT Fintech Holdings, LLC, in accordance with due process and/or the California Long Arm Statute because FT Fintech Holdings, LLC's principal place of business is located at 1 Franklin Parkway, San Mateo, California 94403. Venue is proper in this District over FT Fintech Holdings, LLC under 28 U.S.C. § 1391(b)(1), (c), and (d) because it resides in this District due to its principal place of business being located in this District.

53.     This Court has personal jurisdiction over Defendant Johnson, in accordance with due process and/or the California Long Arm Statute because, because she is a resident of and is domiciled in California. Venue is proper in this District over Johnson under 28 U.S.C. § 1391(b)(1) because all defendants in this case are residents of California and both Franklin Resources, Inc. and FT Fintech Holdings, LLC reside in this District.

54.     This Court has personal jurisdiction over Defendant Bayston, in accordance with due process and/or the California Long Arm Statute because he is a resident of and is domiciled in California. Venue is proper in this District over Johnson under 28 U.S.C. § 1391(b)(1) because all defendants in this case are residents of California and both Franklin Resources, Inc. and FT Fintech Holdings, LLC reside in this District.

## **DETAILED FACTUAL ALLEGATIONS**

55.     This case concerns claims for (1) breaches of fiduciary duties by Franklin Templeton and Bayston; (2) trade secret misappropriation; (3) conversion; (4) unjust enrichment; (5) breach of contract, and (6) aiding and abetting breaches of fiduciary duty, and other tortious conduct.

**I.      Onsa Develops Its Innovative Technology to Tokenize Financial Assets.**

56.      Onsa's predecessor (TokenVault) was founded in 2017 as a FinTech company focused on using blockchain technology to create, issue, and trade tokenized financial instruments.

57.      Blockchain technology uses a distributed ledger to record and verify financial transactions.[17] The conversion of financial assets into digital tokens that can be stored and managed on a distributed ledger platform such as a blockchain is referred to as tokenization. Tokenizing a traditional security (*e.g.*, an exchange traded fund or ETF) requires creating a security token that represents an ownership interest in the security or underlying assets.

58.      Onsa developed a platform to tokenize and trade security tokens and other digital assets. Such platform has obvious use in interstate and foreign commerce, facilitating financial asset transactions. The platform utilized a third-party open-source blockchain provider called Stellar. Together, the two technologies enabled Onsa to provide a cutting edge and elegant customer-facing user interface. By Spring 2018, Onsa had developed a beta version of its financial platform that looked substantially like the following:

---

[17] The Stellar website explains that "blockchain provides a way for people around the world to collectively maintain a database without relying on a central authority." As data comes into the network, it is grouped together in "blocks" of information for verification and recording. Once a block is accepted by the computers connected to the network as valid, the block is appended to the past history of validated blocks. In other words, the blocks are "chained" together. Cryptographic functions protect the integrity of the blockchain.



**Actual screenshots of current Beta version

59.     Onsa diligently protected its trade secrets, including via agreements between Onsa and Franklin Templeton, agreements between Onsa and developers, encrypted code repositories, and limiting access rights to secret information to need-to-know personnel. Onsa's technology was particularly valuable to traditional asset managers like Franklin Templeton. The technology provided an efficient and unified solution to setting up and managing investment funds by tokenizing the assets in a way that allowed all associated financial transactions to be authenticated and recorded on a distributed ledger.

60.     Onsa's technology had tremendous advantages over Franklin Templeton's antiquated and costly approach to running these funds. For example, the cost to set up a single money market fund may exceed tens of millions of dollars depending on the amount of assets involved. Likewise, the cost of providing consumer access to those funds is substantial. Onsa's technology would decrease these costs dramatically. Onsa's proprietary and confidential code, know-how, etc. derives significant independent economic value from its secrecy, as was acknowledged by Franklin Templeton in writing during its relationship with Onsa. Onsa's trade secrets provide users thereof with a huge competitive advantage, serving as a foundation to realize tokenized financial assets.

61.     Separate and apart from Onsa's intrinsic value, Onsa represented a game-changing opportunity for Franklin Templeton—a bridge from its antiquated business to a new technological frontier, and the profits flowing therefrom.

## II.     Franklin Templeton Fails to Innovate and Its Business Continues to Struggle.

62.     While Franklin Templeton was trying to reach a deal to invest in Onsa, it was public knowledge that the financial institution was struggling to respond to changes in the asset management industry.

63.     In June 2019, the Financial Times reported that $1.2 billion of hedge fund investments were betting against Franklin Templeton as "the US fund manager grapples with fundamental challenges to the business of asset management."[18] The report highlighted the fact that short sellers constituted "12% of all of Franklin Templeton's freely available stock." The bet against Franklin Templeton reflected "confidence among hedge funds that the stock of [Franklin Templeton] is vulnerable to a drop, given a secular shift away from actively managed products in favor of low-cost funds that passively track indices."

64.     In October 2019, Bloomberg published a story about Franklin Templeton that summarized the state of Franklin Templeton as follows:

> *Its business model is out of fashion*. Its fund family has suffered six straight years of outflows. Its stock has the lowest Wall Street ratings of any major money manager. *No wonder Franklin Resources Inc.'s shares are down 48% in the last five years*, and the firm, which oversaw $693 billion as of Sept. 30, has lost almost a quarter of a trillion dollars in assets since its 2014 peak.[19]

65.     While there are many reasons for the negative sentiment, chief among them appears to be Franklin Templeton's failure to innovate at many of the asset management industry's critical junctures.

66.     Indeed, Franklin Templeton was not perceived in the marketplace as a "forward thinking" financial institution. It missed the boat on the movement towards ETFs, which allowed its competitors to

---

[18] *Short sellers swarm over outflows – hit Franklin Templeton*, Financial Times (June 28, 2019), https://www.ft.com/content/b92d15f2-9919-11e9-9573-ee5cbb98ed36

[19] *Franklin Pins Its Hopes for a Turnaround on Technology and Deals*, By John Gittelsohn, Bloomberg (October 11, 2019), https://www.bloomberg.com/news/articles/2019-10-11/franklin-pins-its-hopes-for-a-turnaround-on-technology-and-deals

achieve a substantial advantage in this segment of the financial services industry. Franklin Templeton also failed to pursue retail trading capabilities, such as those offered by Fidelity and eTrade, but its competitors capitalized on the opportunity to directly interact with customers and grow their business.

67.    Additionally, despite having one of the largest money market funds in the world, Franklin Templeton was behind the times in maintaining and managing these funds. Franklin Templeton used an antiquated and costly transfer agent system for its money market fund. In contrast, its competitors outsourced their transfer agent requirements, which was quicker and more cost effective.

68.    Jennifer Johnson was appointed Franklin Templeton's CEO in 2020. Her strategy for turning around Franklin Templeton relied significantly on acquiring more innovative companies in order to change the market's perception of Franklin Templeton. In her first earnings call, Johnson was asked to highlight her priorities as Franklin Templeton's newly appointed CEO, and to identify directional changes for her company. Johnson's response underscores the importance and value of Onsa (formerly known as TokenVault) and its technology:

> I think we would all be foolish not to believe that the technology industrial revolutions that's existing today is going to have disruption on our businesses. So making sure that we're investing in things that maybe won't be meaningful or material in even the next five years, but that we think could be very disruptive to the business over the long run. And so that's - - *you see some of the investments that we're doing in things like a token vault [TokenVault]*, and also our innovation lab, which really just enables us to keep an eye on where the industry is evolving.[20]

---

[20] *Franklin Resources Inc. (BEN) Q1 2020 Earnings Call Transcript*, Motley Fool (January 30, 2020), https://www.fool.com/earnings/call-transcripts/2020/01/30/franklin-resources-inc-ben-q1-2020-earnings-call- t.aspx; *see also Jennifer Johnson is the new heiress of Franklin Templeton legacy*, Financial Times (Nov. 25, 2019) https://www.ft.com/content/3e42708e-fa64-400e-8bfb-61d7cf78ba58 ("One of her main priorities when becoming chief executive will be to incorporate disruptive technology across the business to improve efficiency and meet client needs. 'I will take full advantage of being headquartered near the heart of Silicon Valley, with direct access to some of the top innovators in the fintech space,' she added. The company recently filed an application with the Securities and Exchange Commission to launch a fund that uses blockchain, an emergent technology that has captured Ms. Johnson's imagination.").

Franklin Templeton promoted to the market and its shareholders the idea that Onsa's technology would provide the much-needed boost to redefine its image and stop the sell-off and shorting of its stock in the public market.[21]

**III.    Franklin Templeton Acquires Random Forest Capital and Becomes Interested in Onsa.**

69.    Onsa's founders were also the founders of another startup called Random Forest Capital ("RFC"). RFC is a FinTech company that developed technology related to machine learning for unsecured credit markets.

70.    Before Onsa was on Franklin Templeton's radar, Franklin Templeton became interested in acquiring RFC. Franklin Templeton approached its founders concerning a potential acquisition. After performing due diligence, the parties reached a deal in 2018 and Franklin Templeton acquired RFC for a substantial sum. Upon information and belief, the RFC acquisition has yielded substantial financial benefits for Franklin Templeton.

71.    In connection with the RFC acquisition, Onsa's founders advised Johnson and others at Franklin Templeton of Onsa and its business plan. At this time, Johnson declined to explore the opportunity because Franklin Templeton was unfamiliar with blockchain technologies. As Johnson put it, "blockchain will be my grandkids' problem."

**IV.    Franklin Templeton Wakes up to Blockchain-Based Asset Management as the Future.**

72.    In June 2018, Trombley (one of Onsa's co-founders) and numerous Franklin Templeton executives attended a presentation by Sandy Kaul, Global Head of Business Advisory Services for Citi Bank, concerning technological developments in the financial industry. Citi had just released a detailed survey indicating that blockchain technology was the most significant emerging technology in asset management.

73.    For example, Citi's study laid out how financial technology "could be combined to create a digital token that combines financial rights, ownership rights and utilization rights to create a new type of

---

[21] *Jennifer Johnson is the new heiress of Franklin Templeton legacy*, Financial Times (Nov. 25, 2019) https://www.ft.com/content/3e42708e-fa64-400e-8bfb-61d7cf78ba58 ("Franklin Templeton was on the cusp of joining the much-coveted trillion-dollar club with $922bn of assets, but after leading the global worst-seller list for several years, its assets are down by a quarter while its share price has halved.").

liquid Ownership Unit or 'Ownit'." Citi's presentation explained that tokens "could allow individuals to build highly diversified portfolios that span not only equities and bonds, but art, infrastructure, wine, intellectual property rights and more."

74.     Citi's presentation on tokenized securities was a theoretical explanation of what Onsa was already developing with tokenization. Johnson and Franklin Templeton realized they were wrong about blockchain and that Franklin Templeton was already behind.

75.     Immediately after the meeting with Citi, Franklin Templeton executives Johnson, Bayston, and Joe Boerio (Franklin Templeton's CTO) pulled Trombley into a meeting to discuss Onsa. These executives expressed interest in partnering with and/or acquiring Onsa just as they had done with RFC. The executives were specifically interested in tokenizing Franklin Templeton's money market fund. Moving the company's transfer agent capabilities to blockchain technology was very appealing to the executives. Among other things, the opportunity would allow Franklin Templeton to significantly reduce substantial expenses associated with Franklin Templeton's Investar system for clearing trades.

76.     Johnson and Franklin Templeton's other executives were enamored with the idea of being at the forefront of the financial industry's embrace of blockchain technologies. Such an embrace was consistent with Franklin Templeton's broader objective of leaving its antiquated technology behind by acquiring other FinTech companies. Franklin Templeton hoped that being the first to market with an SEC-approved, money market token would allow Franklin Templeton to expand this technology to its other financial instruments, and even allow Franklin Templeton to offer these blockchain services to competitors. Additionally, Onsa's trading platform would allow Franklin Templeton to interface directly with retail investors.

**V.      Franklin Templeton Invests In Onsa with False Assurances.**

77.     Franklin Templeton quickly decided that it must have what Onsa offered and began serious negotiations with Onsa's founders.

78.     Johnson and Bayston were personally involved in Franklin Templeton's investment in Onsa. Johnson, Bayston, and other Franklin Templeton executives met with Onsa's founders on multiple occasions to discuss Franklin Templeton's plans for Onsa. To assuage Onsa's founders' fears, Johnson and

other Franklin Templeton executives represented that post-investment Onsa would have a three-person board that would include someone affiliated with Onsa prior to the acquisition, a Franklin Templeton member, and an independent member approved by both. During these discussions, Johnson and Bayston personally assured Onsa's founders that the company would function as a standalone entity that would be able to seek customers other than Franklin Templeton. This assurance was extremely important to Onsa's founders and several of Onsa's key shareholders. Johnson and Bayston further assured Onsa's founders that Franklin Templeton would provide Onsa with all necessary financing. These assurances were false.

79.     Franklin Templeton performed substantial due diligence prior to closing the deal with Onsa. Bayston and Sheffield Nolan (Franklin Templeton's lead engineer and developer) led the due diligence efforts. Many other Franklin Templeton employees were involved.

80.     Franklin Templeton sent Onsa its first set of due diligence questions in or around July 2018. The due diligence included exhaustive code reviews, whereby Franklin Templeton demanded to have access to Onsa's code. The due diligence team, including Nolan and Bayston, all had access to and reviewed Onsa's code (which was stored in an encrypted and password-protected GitHub repository).

81.     Defendants agreed that Franklin Templeton's review would be solely used for due diligence and that any code copied for the purposes of their due diligence would be treated as confidential.

82.     Instead of completing its due diligence in a reasonable amount of time, Franklin Templeton took an alternative approach: It dragged out its due diligence process for many months, placing Onsa in a financial squeeze.

83.     Notably, Franklin Templeton's due diligence and code review was subject to a September 11, 2019 Mutual Confidentiality and Non-Disclosure Agreement. This agreement states that "each party shall…use the other party's Confidential Information only to carry out its obligations and exercise its rights under this Agreement directly related to the Purpose," with the "Purpose" defined as "the sole purpose of the evaluation of a potential investment by Franklin in a company which would purchase certain Company assets." The agreement also requires, with respect to a party in receipt of source code (and, in some cases, with respect solely to Franklin Templeton): "(iii) any downloaded copies shall be deleted immediately after completion of such source code review and (iv) [the receiving party] shall provide reasonable evidence that

such source code has been deleted from the computers of the individuals with access to such source code. Pursuant to clause (iv) of the preceding sentence, Franklin agrees to take the following actions: (1) Franklin shall provide print screens of the file deletion process confirming the deletion of the source code files; (2) Franklin shall provide written confirmation from a witness independent of the operator who downloaded the files, that such files have been deleted; and (3) Franklin shall send to Austin Trombley at the Company the print screens and the written confirmation."[22] Franklin Templeton never complied with these contractual obligations.

84.     Once it became clear that Onsa badly needed additional cash to continue operating, Franklin Templeton offered to purchase $1.5 million of convertible notes from Onsa. This enabled Franklin Templeton to acquire an even greater percentage of Onsa than Onsa's founders had initially agreed to because the notes were to convert to additional equity when the deal finally closed. Franklin Templeton then used its new leverage to demand that it review *any additional* code that Onsa had written since the due diligence process began.

85.     After one of the code reviews, a Franklin employee (Michael Muir) indicated that Franklin Templeton's access to Onsa's technology would allow Franklin Templeton to develop Onsa's technology on its own without Onsa. Onsa's founders and others who witnessed this statement were justifiably shocked. Muir's cavalier statement was directly contrary to Franklin Templeton's agreements to keep Onsa's valuable trade secrets confidential and to use them solely for due diligence purposes in connection with a potential transaction. Ultimately, Franklin Templeton proceeded to do just what Muir had suggested—misappropriate Onsa's intellectual property.

86.     Franklin Templeton applied other heavy-handed tactics during its negotiations. In connection with Franklin Templeton's acquisition of RFC, Trombley and another one of RFC's co-founders, Kevin Farrelly, became employees of Franklin Templeton, but only with respect to the RFC line of business. Notwithstanding this agreement, Johnson, Bayston, and Franklin Templeton encouraged Trombley's non-Franklin Templeton activities with respect to Onsa, hoping that Trombley would quickly

---

[22] To this day, Franklin Templeton has never confirmed deletion of Onsa's source code, in explicit violation of the Mutual Confidentiality and Non-Disclosure Agreement in place between the parties.

develop Onsa's technology. Despite a clear understanding that Trombley's work with Onsa was in his capacity as an Onsa founder, during negotiation of the SPA, Bayston threatened Onsa's founders that Franklin Templeton would simply take Onsa's valuable code and trade secrets under the guise that Trombley's work for Onsa was actually on behalf of Franklin Templeton. In retrospect, Bayston's threats indicate that Franklin Templeton merely wanted to use Onsa as a conduit for developing mission-critical technology for Franklin Templeton.

87.     In retrospect, another "red flag" during negotiation of Franklin Templeton's investment in Onsa concerned Johnson's request that the newly formed Onsa, Inc. maintain redemption rights for minority shareholders. And shortly after Onsa and Franklin Templeton entered into the SPA—whereby Franklin Templeton acquired approximately a quarter of Onsa's non-voting stock—Johnson complained that Franklin Templeton did not own a large enough percentage of Onsa. These complaints were surprising to Onsa's founders because Franklin Templeton obviously knew the percentage of Onsa stock it was acquiring. Documents obtained by Plaintiff in connection the purchase of Onsa's assets indicate that, after Franklin Templeton entered into the SPA, Franklin Templeton explored numerous alternatives to achieve an even larger share of Onsa than it bargained for in the SPA. These documents indicate that Franklin Templeton was especially fixated on recapturing shareholder interest ***from Onsa's founders***. Franklin Templeton's bad faith quest to obtain a greater percentage of Onsa's shareholder ownership interest contradicts the agreement Franklin Templeton signed (i.e., the SPA) and evidences Franklin Templeton's ill motives when in entering into the agreement.

88.     In October 2019, Franklin Templeton's due diligence activities culminated in two agreements: (1) an Asset Purchase Agreement between TokenVault, Inc. (*i.e.*, Onsa's former name) and TokenVault LTD (the "APA") and (2) a Stock Purchase Agreement between TokenVault, Inc., Trombley, and FT Fintech Holdings, LLC (the "SPA"). The purpose of the APA was to transfer assets of TokenVault LTD (a Singapore company) to TokenVault, Inc. (a Delaware corporation), which was ultimately rebranded as Onsa, Inc. The crux of the deal was as follows: (1) Trombley, who owned 100% of Onsa's voting stock, would sell his voting stock to Franklin Templeton; and (2) Franklin Templeton would buy $5.5 million worth of non-voting common stock from Onsa and control approximately one-quarter of

Onsa's total outstanding stock after the deal. Pursuant to the SPA, Franklin Templeton would appoint Bayston as Onsa's sole director and "Interim President, Interim Secretary, Interim Treasurer, and Interim Chief Executive Officer."

89.     While Onsa's founders and other shareholders were reluctant to give up control of Onsa, Franklin Templeton insisted that a deal could not get done unless Franklin Templeton received full control. To assuage these concerns, Johnson promised that she would recruit a more experienced board to manage Onsa such that the company could realize its full potential. But, as explained below, no experienced board members were ever recruited. And instead of helping Onsa achieve its potential, Defendants mismanaged Onsa for Franklin Templeton's benefit, took its valuable technology, and ultimately shut it down.

**VI.     Defendants Breach Their Fiduciary Duties and Manage Onsa For Franklin Templeton's Benefit**

90.     It is settled law that directors, officers, and controlling shareholders owe fiduciary duties of care and loyalty to the company and shareholders at large. Defendants wholly disregarded these obligations from the get-go. At every step of the way, Defendants managed Onsa for the benefit of Franklin Templeton and to the detriment of Onsa and its shareholders.

91.     As part of the SPA, Bayston became the sole director of Onsa. At all relevant times, Bayston was both a full-time senior executive in Franklin Templeton's Fixed Income Group and the sole director of Onsa. The Fixed Income Group operates money market funds that Franklin Templeton had assured Onsa's founders would be for Onsa to tokenize with Franklin Templeton being one of Onsa's first customers.

92.     Johnson continued to stay actively involved in the management of Onsa. After Franklin Templeton's investment in Onsa closed in October 2019, Johnson and her executive team, including Mohn and Muir, regularly met with Onsa's founders (Trombley and Travis) and other Onsa representatives at Franklin Templeton's offices to discuss various aspects of Onsa's technology and Franklin Templeton's plans to integrate its operations with Onsa's technology.  For example, Johnson and her team were interested in planning out how Franklin Templeton's client funds would be distributed through the

blockchain and how Franklin Templeton would manage relationships with providers such as Edward Jones and UBS that Franklin partnered with to launch new funds.

93.     As mentioned above, prior to entering the SPA, Onsa and Franklin Templeton agreed that Franklin Templeton would appoint an independent board and independent management. This is reflected in Bayston's appointment as "interim" CEO, President, Secretary and Treasurer pursuant to the SPA. After the close of Franklin Templeton's investment, Travis agreed that it would be in Onsa's best interest for a more experienced CEO to step in and continue Onsa's rapid progress.

94.     As Johnson's right-hand senior executive, Bayston was under the misimpression that he was going to be the CEO of Onsa. But in private, Johnson indicated that she lacked confidence in Bayston's abilities and temperament to run Onsa, so Onsa continued to search for a more suitable CEO. Johnson personally interviewed many, if not all, of the proposed CEO candidates. The CEO opening for Onsa drew interest from many notable figures. Ultimately, the CEO search resulted in Onsa hiring a talented former Amazon executive, Tauseef Bashir, to lead Onsa in February 2020.

95.     Bayston was not happy with the hiring of Bashir. Upon appointment as Onsa's sole director, Bayston almost immediately started hiring Franklin Templeton employees to fill as many significant roles at Onsa as possible. For example, he hired Sheffield Nolan (a Franklin Templeton Blockchain Technical Head) as Onsa's lead engineer, Kevin Farrelly (a Franklin Templeton Vice President of Data Science) as Onsa's Chief Operating Officer, and Mohn (a Franklin Templeton Senior Financial Analyst) as Onsa's Chief Financial Officer. Bayston maintained his role as Onsa's sole director.

96.     Bashir was surrounded by Franklin Templeton affiliated management whose true loyalties were with Franklin Templeton. Although Bashir described Onsa as a "world changing opportunity," he complained that Bayston's involvement with Onsa was "micromanaging" to an extent he had never seen before. Bashir complained that Bayston's management style created a bad sentiment that was detrimental to the company. The real problem all along was that Bayston and Franklin Templeton managed Onsa solely for Franklin Templeton's benefit, and that Bayston perceived Bashir as an "outsider."

97.     For example, Onsa knew it was critical that Onsa raise additional funds from strategic investors to continue to make progress on its vision. Onsa attempted to set up meetings with potential

investors interested in investing in Onsa. Defendants shut down these efforts and falsely assured Onsa that Franklin Templeton would provide all necessary financial support.

98.     Onsa also knew the importance of Onsa attracting other companies as potential customers of Onsa's tokenization platform. In fact, some of the world's largest global asset managers had expressed interest in learning more about Onsa's technological offerings and using Onsa's platform to trade their financial products.

99.     In much the same way Visa became the credit card behemoth through alliances with the world's top banks, Onsa's founders believed Onsa could thrive by attracting notable customers in the financial services industry to use Onsa's platform and services. Prior to the SPA, the issue of Onsa seeking customers other than Franklin Templeton was specifically addressed with Johnson and Bayston. Both assured Onsa's founders that Onsa would be allowed to seek customers other than Franklin Templeton. However, after the SPA was executed, Franklin Templeton refused to allow Onsa to seek other customers for its tokenization platform. Franklin Templeton wanted the platform for itself. This self-serving decision was not in Onsa's best interest, but rather, Franklin Templeton's.

100.     Prior to entering into the SPA, Franklin Templeton also assured Onsa that it would promptly enter into a MSA in order to compensate Onsa for its development, and Franklin Templeton's use, of Onsa's technology. This promise is reflected in Franklin Templeton's September 3, 2019 SEC Prospectus filing titled, "Franklin Blockchain Enabled U.S. Government Money Fund." In this ***pre-investment SEC filing***, Franklin Templeton described Onsa's compensation and role with respect to the money market token in a section titled "Blockchain Administrator":

> **Blockchain Administrator**. [ ], a Delaware limited liability company, is expected to be retained as the blockchain administrator (Blockchain Administrator) of the Fund, and will serve in such role pursuant to a master software as a service ("SAAS") agreement and SAAS statement of work (collectively, the "Blockchain Administration Agreement") to be entered into by and between the Trust on the Fund's behalf and the Blockchain Administrator.
>
> The services to be provided by the Blockchain Administrator will include technical and administrative functions in connection with the issuance and "permissioning" of the shares for the Fund on the blockchain (e.g., limiting the parties who can transact on the blockchain), as well as reporting services relating to the Fund and shareholders. The Blockchain

Administrator will work with Investor Services to record share issuance and redemption on the Stellar ledger.

The Blockchain Administrator will also be responsible for the creation and maintenance of the App. The fees payable to the Blockchain Administrator are based on its standard schedule of fees charged by the Blockchain Administrator for similar services, as set forth in the Blockchain Administration Agreement. The Blockchain Administrator will be responsible for any network fees paid to the Stellar network in connection with the issuance and redemption of shares as well as any distributions paid on shares to the extent that such distributions are automatically reinvested in new shares.

But in Franklin Templeton's first **post-investment SEC filing**, Franklin Templeton removed all references to Onsa's role as the "Blockchain Administrator."[23] And indeed, after signing the SPA, Defendants continually stonewalled regarding financial terms and refused to finalize the MSA. In fact, Franklin Templeton shuttered Onsa almost immediately after Onsa pressed this issue with Franklin Templeton. The timing of these events demonstrates that Franklin Templeton's true intentions were not genuine when it entered into the SPA.

101.    Additionally, Onsa required a broker-dealer to operate its business and had an agreement in principle to acquire one.[24] But Defendants misrepresented that Onsa's efforts in this regard were not necessary because Franklin Templeton already had a broker-dealer that could be transferred to Onsa. Despite these assurances regarding a mission critical piece of Onsa's business plan, Franklin Templeton never transferred a broker dealer to Onsa.

102.    Onsa also required a transfer agent to execute its business plan. Defendants initially told Onsa that it could use Franklin Templeton's transfer agent. Later, Defendants told Onsa that it would not allow Onsa to use its transfer agent but would assist Onsa to obtain transfer agent status. Both representations were false. Upon information and belief, Franklin Templeton instructed Onsa's attorneys to discontinue necessary steps to obtaining transfer agent status. Franklin Templeton's actions with respect

---

[23] This SEC Prospectus was filed on March 25, 2020.

[24] A broker-dealer is an entity in the business of buying and selling securities for its own account, or on behalf of its customers.  It is a valuable asset because it must generally register with the SEC but acquiring registration can be costly and difficult.

to the broker dealer and transfer agent demonstrate that Franklin Templeton's true intentions were not genuine when it entered into the SPA.

103.    At every critical juncture after Franklin Templeton's initial investment in Onsa, Defendants repeatedly and misleadingly told Onsa's management and its founders to not worry about tying any loose ends with Franklin Templeton—be they the MSA, acquiring a broker dealer, acquiring additional customers, or otherwise—because Franklin Templeton will provide all that was needed for Onsa to succeed and the focus should instead be on building Onsa's products and, in particular, the necessary technology that would allow Franklin Templeton to launch its tokenized money market token using the Stellar blockchain.

104.    Documents obtained by Plaintiff in connection with the purchase of Onsa's assets reflect that Johnson (Franklin Templeton's CEO), Sonal Desai (Franklin Templeton's Executive Vice President and Chief Investment Officer), Joseph Boerio (Franklin Templeton's CTO), and Franklin Templeton's legal department were actively involved in Onsa's management. Additionally, Chuck Johnson—former Franklin Templeton CEO and Jennifer Johnson's brother—was actively involved in Onsa's decision making and served as a conduit, and perhaps insulator, between Jennifer Johnson and Onsa.

105.    Throughout this time, Onsa worked very hard to tokenize Franklin Templeton's money market fund. There were frequent meetings (at times daily) between Onsa and Franklin Templeton concerning Onsa's platform and its integration into Franklin Templeton's antiquated recording system to tokenize Franklin Templeton's money market fund.

106.    Certain Franklin Templeton executives, however, were not happy about the investment in Onsa and were not eager to have Franklin Templeton rely on Onsa for Franklin Templeton's technological needs.

107.    Boerio (Franklin Templeton's CTO), for example, did not believe that Franklin Templeton should partner with Onsa and its founders. He maintained the position that Franklin Templeton should have developed Onsa's technology in-house at Franklin. And even after Franklin Templeton invested in Onsa, Boerio thought he should be the one to lead Onsa.

108.    Bayston, too, would make comments to Onsa's founders about his displeasure with Franklin Templeton's investment in Onsa. For example, Bayston would make comments such as "I can't believe I am making you guys rich all over again," (a reference to Random Forest) and would regularly try to diminish Onsa's technological accomplishments, all the while insisting that he should have a lead management role within Onsa, even as Onsa's next CEO.

109.    Franklin Templeton's and Bayston's bait-and-switch approach is illustrated in email correspondence between one of the Random Forest co-founders and Franklin Templeton's legal department. In such correspondence, the Random Forest co-founder complained that "I am devoted to multiple causes at Franklin Templeton and I have given both projects every ounce of effort that a person could give while dealing with defensive, territorial people in the fixed income group including my former boss [Bayston] who wanted nothing to do with me from day 1. ***[Franklin Templeton] wanted the code and they wanted me gone***…. I sold my company and it was put in the hands of a man [Bayston] who didn't value me." Unfortunately, a similar experience would play out again with respect to Onsa.

110.    By April 2020, Onsa had completed a business plan demonstrating that its work with respect to Franklin Templeton's money market fund was on track and that Onsa was making substantial progress as to other aspects of its technology, which was poised to release in a few short months. Onsa's business plan specifically referenced continuing development on Franklin Templeton's dual ledger system in the same manner as Franklin Templeton's SEC prospectus:

| Onsa Business Plan | Franklin's SEC Filing[25] |
|---|---|
| Work with Franklin Templeton to launch tokenized MMF on aTune [Onsa] app,[26] which will be <u>shadowed on Stellar</u>. Continue blockchain with Franklin Templeton's <u>Investar system as the single source of truth</u>. | Although the Fund's transfer agent will maintain the official record of share ownership in book-entry form, the ownership of the Fund's shares <u>will also be recorded on the Stellar network's blockchain.</u> The use of blockchain technology is untested for mutual funds. In the event of a conflict between the blockchain record and the record held by the transfer agent, <u>the transfer agent's record will be determinative</u>. |

111. Onsa's April 2020 business plan contained detailed structural diagrams that expressly referenced the server-side architecture used by Franklin Templeton's tokenized money market fund to integrate the Stellar blockchain and a digital asset custody system called Curv with Franklin Templeton's internal Investar mainframe system. A high-level overview of this architecture is depicted below:



112. Notably, the code base for the backend API for "integration with Franklin Investar" was specifically included in the APA and it was apparent that the knowledge and Onsa work product for

---

[25] SEC Form N-1A as filed by Franklin Templeton on September 3, 2019, https://www.sec.gov/Archives/edgar/data/0001786958/000113743919000429/fttn1a092019.htm

[26] When TokenVault was renamed Onsa, aTune was another name under consideration.

integrating Curv, the Stellar blockchain, and Franklin Templeton's Investar system with Onsa's platform was a highly valuable trade secret belonging to Onsa.

113.    Onsa's trade-secreted technology, including without limitation the platform and app, is exemplified by detailed sequence diagrams, process flowcharts, pseudocode, system architecture schematics, infrastructure designs, messaging protocols, communications framework, stack deployment schemes, source code, testing protocols, systems integration configurations, and other information. Such secret and valuable information related to and complimented, for example, Onsa's developed code, such as that found in the following code repositories:

- angular.3C7
- api.3c7
- api.vaultbank.io
- aws-handler-daily-dividends
- dividends-data-gen
- android-vaultbank
- io.tokenvault.android
- ios-vaultbank
- io.tokenvault.ios
- curv-wallet
- custody.android
- io.tokenvault.android-biometric
- ios.biometric
- ETF.sol

114.    Franklin Templeton accessed and, on information and belief, used and continues to use Onsa's trade secrets such as those described above to facilitate its money market fund token and related tokenized financial asset technologies.

115.    Tellingly, out of the numerous blockchains that Franklin Templeton could have used for its tokenized money market fund, Franklin Templeton chose the Stellar blockchain.[27] As discussed above, many of Onsa's core trade secrets revolved around integration of Onsa's platform with the Stellar blockchain for purposes of trading tokenized financial assets.

---

[27] *Supra* at fn. 14.

116.   Onsa also had copyrights in the computer code it used to develop its technology, including the tokenized money market fund, throughout the duration of Franklin Templeton's misappropriation, copying, and false assumption of credit for Onsa's technology.

**VII.   Franklin Templeton Attempts to Misappropriate Onsa's Technology, Shut Down Its Operations, and Sell Its Assets.**

117.   In July 2020, Onsa's platform was very close to ready to "go live." In particular, Onsa's efforts towards launching Onsa's tokenized money market fund were substantially complete. At that same time, without any explanation, Onsa was unceremoniously and unexpectedly shut down.

118.   Bayston (as sole director of Onsa) and Franklin Templeton (as controlling shareholder of Onsa) owed Onsa and the non-Franklin Templeton shareholders fiduciary duties, but Defendants blatantly disregarded these fiduciary duties.

119.   Defendant viewed Onsa as a Franklin Templeton entity that was at its disposal. For all practical purposes, Franklin Templeton viewed Onsa as part of Franklin Templeton. This is reflected in Franklin Templeton's SEC 10K filing, which improperly refers to Onsa as a Franklin Templeton *acquisition* rather than a Franklin Templeton *investment*. That is, the SEC 10K states: "During the fiscal year 2020, we completed additional *acquisitions* with a total purchase consideration of $94.8 million in cash, ***including the acquisitions of*** Pennsylvania Trust Company, AdvisorEngine Inc., Athena Capital Advisors, LLC and ***Onsa, Inc***." The SEC 10K further states: "Additionally, impairments of intangible assets and goodwill increased $42.1 million primarily related to assets recognized from ***the acquisitions of*** BSP and ***Onsa, Inc., (formally known as TokenVault, Inc.)***."

120.   The above statements from Franklin Templeton's SEC 10K are false. Onsa was not an acquisition of Franklin Templeton. It was an investment. Franklin Templeton owned approximately twenty-five percent of Onsa's common stock, and persons and entities unaffiliated with Franklin Templeton owned the other seventy-five percent.

121.   Bayston also viewed Onsa as a Franklin Templeton's entity that was at his disposal. At all relevant times Bayston was a senior executive of Franklin Templeton and was substantially compensated

by Franklin Templeton.[28] Bayston has worked for Franklin Templeton for approximately 30 years. At all relevant times while acting as Onsa's sole board member, Bayston made decisions that were in Franklin Templeton's best interest, not Onsa's.

122.    When it came to Onsa, Johnson also believed that she could do what she pleased. Johnson's and her family's loyalties were with Franklin Templeton. Johnson's grandfather, Rupert, founded Franklin Templeton in 1947 and his son, Charles, took over as CEO a decade later. Charles Johnson's three children (Jennifer, Gregory, and a son also named Charles, who went by "Chuck") were next in line to lead Franklin Templeton. Jenny Johnson and Gregory Johnson both sit on the Franklin Templeton board of directors. In 2020, Jennifer Johnson was named Franklin Templeton's CEO. Chuck Johnson was a former Franklin Templeton senior executive and board member. It is estimated that the Johnson family owns 44% of outstanding Franklin Templeton shares.[29] As with Bayston, Jennifer Johnson's decisions with respect to Onsa were made to benefit the family business, Franklin Templeton, rather than Onsa.

123.    Prior to his recent death, Chuck Johnson was deeply involved in Onsa. His loyalties were also with Franklin Templeton. Although Franklin Templeton discussed appointment of Chuck Johnson to the Onsa's board of directors, it does not appear that his appointment to the board of directors was ever formalized. Despite uncertainty concerning Chuck Johnson's status as an Onsa board member, Onsa emails reflect that he was held out as an Onsa board member, and Franklin Templeton ran critical decisions concerning Onsa past Chuck Johnson. Chuck Johnson, in turn, would run these decisions by Jennifer Johnson and Franklin Templeton for approval.

124.    On or about July 29, 2020, Bayston abruptly terminated Bashir's employment as Onsa's CEO. Bayston also terminated most all of Onsa's other employees, except himself and Mohn. Additionally, soon-to-be employees of Onsa were contacted and told that their services were not needed. These terminations were in connection with Franklin Templeton's internal decision to "wind down" and liquidate Onsa.

---

[28] In contrast, Bayston did not receive compensation from Onsa.

[29] *Franklin Templeton scion appointed CEO as brother steps aside*, Portfolio Adviser (Nov. 19, 2021), https://portfolio-adviser.com/franklin-templeton-scion-appointed-ceo-as-brother-steps-aside/

125.    Yet, at the time the winding down process was commenced, Onsa had no significant creditors and very valuable intellectual property that, according to Onsa's own financial statements and recent third-party valuations, left it with many millions of dollars in positive equity—to say nothing of the company's significant intrinsic value and prospective value. Internal Onsa documents indicate that large portions of Onsa's platform were either complete or far along in the development process. Additionally, integral components of its business plan—such as obtaining valuable money transmitter licenses in every state requiring them—were largely complete.

126.    In describing the decision to liquidate, Franklin Templeton's most recent SEC 10K states: "The Company recognized $23.7 million of impairment of goodwill directly attributable to the Company's decision to wind-down Onsa, Inc. which was acquired on October 24, 2019 and had not been integrated into the Company." Once again, the SEC 10K incorrectly refers to Onsa as an "acquisition."  It was not.

127.    Liquidating Onsa was not in Onsa's or its non-Franklin Templeton shareholders' best interest. Indeed, the decision to wind down Onsa was made without ever giving Onsa or its non-Franklin Templeton shareholders the opportunity to take Onsa's valuable platform to market. Franklin Templeton and Bayston never gave Onsa the opportunity to raise capital from other sources or seek customers other than Franklin Templeton. To this day, Defendants have not explained to the non-Franklin Templeton shareholders why they killed Onsa.

128.    At the time Franklin Templeton began the process of winding down Onsa, the company was fully capable of raising money in the open market, marketing its technology to other customers, and bringing its platform to market. Prior to Franklin Templeton's inexplicable decision to terminate Onsa, it was an extremely valuable company in the lucrative FinTech marketplace. Similar companies at arguably earlier stages of development raised substantial capital at valuations in the hundreds of millions, and even billions, of dollars.

129.    While Franklin Templeton, as Onsa's largest shareholder, and Bayston, as Onsa's sole director, evaluated how best to get rid of Onsa, others at Franklin Templeton saw this as an opportunity to take control of Onsa's technology. For example, Boerio communicated to Johnson and others at Franklin Templeton that it was in Franklin Templeton's best interest to take Onsa's technology in-house. Upon

information and belief, key individuals that worked on Onsa's platform are now part of Franklin Templeton's new blockchain group. Throughout this time, Boerio refused to communicate with Onsa's shareholders and deliberately kept them in the dark about Franklin Templeton's plans.

130.   Franklin Templeton's plan succeeded. Defendants, on information and belief, are on the cusp of launching Franklin Templeton's tokenized money market fund using Onsa's technology.

131.   On September 3, 2020, Franklin Templeton filed an updated SEC prospectus for its tokenized money market fund. The prospectus makes no mention of Onsa but again implies that the strategic vision and technological innovation should be credited to Franklin Templeton.

132.   On September 4, 2020, Franklin Templeton filed for trademark protection on the mark "Benji" for blockchain- and finance-related software and/or services.[30] Adding insult to injury, the name "Benji" was the very same name Franklin Templeton and Onsa intended to use.

133.   On November 23, 2020, Onsa's shareholders received an email from the law firm Elkins Kalt. The email attached a Notice of Assignment for the Benefit of Creditors (the "Notice") and a Proof of Claim form. The Notice claimed that Onsa, Inc., a Delaware corporation and Onsa, LLC, a California limited liability company, had made a General Assignment for the Benefit of Creditors to BLKCHN LLC.[31] Under California law, a valid General Assignment for the Benefit of Creditors would assign all of Onsa's assets that are transferable and not exempt from enforcement of a money judgment to BLKCHN.

134.   On November 30, 2020, some of Onsa's shareholders received a message from Gregg Yorkison, the managing member of BLKCHN, indicating that Onsa's assets were to be liquidated. Onsa's shareholders reached out to Yorkison to discuss with him Defendants' misconduct that forms the basis of this lawsuit.

135.   In connection with the ABC process, certain Onsa documents were made available to prospective purchasers of Onsa's assets. These documents confirm Franklin Templeton's wrongdoing. For

---

[30]   Trademark Electronic Search System (TESS), BENJI, Oct. 5, 2021, https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4804:yiij24.2.1.

[31]   The Notice claims that Onsa, LLC was a California limited liability company, which appears to be incorrect since Onsa, LLC is filed as a Delaware limited liability company.

1    example, an August 17, 2020 "Onsa Business Update" board presentation by Lou Mohn (who was a

2    Franklin Templeton employee prior to joining Onsa, and who has since rejoined Franklin Templeton)

3    confirms that many aspects of Onsa's platform and work for Franklin Templeton's tokenized money market

4    were substantially complete. Other aspects of Onsa's platform were very far along:

# Milestone Update: Schedule A*

| Milestone | Deliverables Detail | Progress | Status |
|---|---|---|---|
| DeX (Decentralized Exchange) and P2P Payments live | a) UI/UX completed and approved by Purchaser<br>b) 3rd party penetration tests completed with no finding or issues<br>c) Compliance certification completed for mobile and web apps<br>d) Biometric Authentication integrated into mobile and web apps<br>e) Customer Service model operational (either by internally developed team or third-party provider)<br>f) Engaged and contracted with liquidity providers<br>g) P2P, USD and Crypto payments live on DeX. | a. Design Team final wireframe delivery this month<br>b. Will be doing pen tests and ethical hacks on mobile apps 09/16/20. Got 25% off from Veracode. Have not signed yet due to terms. Will get security exemption from Mike Muir for Day 1 FT internal launch.<br>c. See b above.<br>d. Leveraging native device biometric if available (Face ID, Touch ID, Fingerprint)  / no web apps<br>e. Email support via Zendesk. FT reviewing Zendesk MSA.<br>f. Kevin getting us on-boarded with B2C2.<br>g. Completed on test network only / USD live requires banking API. We are working on a direct relationship with Evolve bank so we can possibly go direct (no SynapseFI) and save $30K per month. Will be integrating Plaid for the customers' retail bank authentication. | a) 60%<br>b) 10%<br>c) 10%<br>d) 100%<br>e) 75%<br>f) 50%<br>g) 80% |
| "Day 1" TA | a) Develop and complete interface capabilities with Purchaser's TA system and/or third-party provider(s). Complete end to end testing of the workflow to support the foundational efforts to enable the tokenized money fund<br>b) Enroll and engage regulators with proof of concept; obtain approval for the use of the record keeping system in support of tokenized product offerings.<br>c) Operational and customer support established for Stellar and incumbent recordkeeping systems prior to launch. | a) FT 10 user beta August 11th<br>b) Completed April 2019<br>c) Working with Mike Greene (FT) on support integration and customer handoff to FT for MMF specific support incidents per FT. Email support via Zendesk. FT reviewing Zendesk MSA. | a) 70%<br>b) 100%<br>c) 70% |

ᴑnsa

# Milestone Update: Schedule A* (Continued)

| Milestone | Deliverables Detail | Progress | Status |
|---|---|---|---|
| Custody Enablement | a) Obtain or develop cold storage capability and digital wallet insurance prior to public launch<br>b) Digital Asset Custody Production ready for public launch<br>c) Penetration tests completed with no major issues or findings<br>d) Compliance certificate and third-party audits completed for security infrastructure.  SOC-2 Type 1 audit successfully completed with no major findings on internal technology developed, internal business processes and any 3rd party dependent service components. | a) Contracted Curv for digital wallet / Curv is adding us onto their $5M policy on June 1st at no additional cost. Curv has presented a cold storage solution that we are evaluating prior to acceptance.<br>b) Curv integration working with BTC/ETH/LTC testnets. Buying real BCH for tests as Curv does not support BCH testnet<br>c) Will be doing pen tests and ethical hacks on mobile apps 09/16/20. Got 25% off from Veracode. Have not signed yet due to terms. Will get security exemption from Mike Muir for Day 1 FT internal launch<br>d) Our SOC 2 Type 1 audit fieldwork has been completed and the service auditor's report will reflect an unmodified (clean) opinion | a) 100%<br>b) 90%<br>c) 10%<br>d) 95% |
| Tokenized Money Fund | a) Review of all components required to support mutual fund offering on the platform<br>b) Establish a development plan and timeline commitment<br>c) Public filing submitted and accepted by the SEC<br>d) Full functionality supported across all major architectural components | a) Completed for MMF<br>b) Completed for FT MMF<br>c) Formally filed with SEC on September 3rd, 2019. Response filing with SEC on March 25th, 2020.<br>d) In progress | a) 100%<br>b) 100%<br>c) 90%<br>d) 80% |

ᴑnsa

1  The presentation also confirms that Onsa was ready to beta test the money market token.

2  136.    Even though the presentation evidenced substantial progress in completing Onsa's platform

3  for launch, the August 17, 2020 Onsa Business Update presentation reflects that Onsa was "paus[ing] [] all

4  business operations" and "eliminat[ing] [] all go-to-market positions."

5  137.    Despite making the decision to "wind down" Onsa and liquidate Onsa's assets, the August

6  17, 2020 Onsa Business Update details a "path forward" for Onsa's valuable computer code, **which**

7  **involves Franklin Templeton's design team needing to "reengage."** The presentation makes other highly

8  suspicious references to **"cleaning"** Onsa's code. The presentation makes no mention of preserving

9  valuable company assets, such as Onsa's money transmitter licenses.

10  138.    Despite representing to the SEC and investing public that Onsa was an acquisition, seventy-

11  five percent of Onsa's non-voting, common shareholders were unaffiliated with Franklin Templeton. The

12  August 17, 2020 Business Update presentation identifies "litigation risk," "minority shareholders," and

13  "D&O tail risk" as three of the main risks facing Defendants if they continued with Onsa's liquidation.

14  Despite these "risks" (*i.e.*, legal duties and obligations to Onsa and its non-Franklin Templeton

15  shareholders), Franklin Templeton, Johnson, and Bayston proceeded with Onsa's liquidation and theft of

16  Onsa's intellectual property.

17  139.    Because an ABC under California law transfers a corporation's assets to the ABC entity, in

18  this case BLKCHN, Onsa's assets were transferred to BLKCHN by operation of law. These assets include

19  Onsa's causes of action for harms done to the company. Upon information and belief, as part of its due

20  diligence into the assigned causes of action, BLKCHN's representatives reached out to Franklin Templeton

21  to discuss the nature of the allegations of wrongdoing that had been brought to BLKCHN's attention by

22  the non-Franklin Templeton shareholders. After interviewing representatives of both sides of this dispute,

23  BLKCHN conducted an auction of Onsa's assets. Ultimately, BLKCHN sold Onsa's assets, including

24  Onsa's causes of action against Defendants for their fiduciary duty violations, to Plaintiff Blockchain

25  Innovation LLC. Over fifty of the non-Franklin Templeton shareholders of Onsa are members of Plaintiff

26  Blockchain Innovation LLC. In exchange for acquiring Onsa's legal claims and other assets, Blockchain

27  Innovation LLC has paid Onsa's unsecured creditors in full.

28

140.    As further evidence of Franklin Templeton's attempts to quickly and secretly take what it needed from Onsa and shut it down, Defendants failed to invite Trombley to attend *any* of Onsa's board meetings post-investment, including the board meeting where they decided to liquidate Onsa, even though the SPA required Franklin Templeton to invite Trombley to all of Onsa's board meetings. In fact, Trombley's board observer rights were critical to bringing transparency to Franklin Templeton's intentions with respect to Onsa.

141.    To date, Trombley has never been invited by Defendants to attend any of Onsa's board meetings. This failure is in direct breach of the terms of the SPA between Trombley and Franklin Templeton. It has now become clear why Defendants thought it in their best interest to breach this provision and keep the non-Franklin Templeton shareholders in the dark.

142.    On April 6, 2021, Franklin Templeton filed a summary prospectus with the SEC, titled "Franklin Onchain U.S. Government Money Fund." The summary prospectus details Franklin Templeton's FOCGX token that will be traded on the Stellar blockchain, and notes that the token will require use of an "App" named "Benji."[32] On or around April 6 of 2021, Franklin Templeton moved around one million of the FOCGX tokens into circulation on the Stellar blockchain.[33]

143.    On August 20, 2021, Johnson gave an interview that confirms Franklin Templeton's use of Onsa's intellectual property, as well as the technology's importance to Franklin Templeton:

> In my 30-plus years in this business, I've never experienced the pressure for change as I'm experiencing now…. We're going to need to leverage things like the blockchain and tokenization. We were the first to launch a regulated stablecoin — a money market fund with a stablecoin. We're in pilot mode with it now, working with the SEC. They appreciate it because we've learned together step by step as they try to figure out how to regulate this world. After that, we'll look to launch other types of similar products.[34]

144.    Review of the limited, publicly available information regarding the FOGCX token on the Stellar blockchain points to Franklin Templeton's misappropriation of Onsa's intellectual property. For

---

[32] *Supra* at fn. 14.

[33] *Supra* at fn. 14.

[34] *Supra* at fn. 14.

example, the FOCGX token's daily dividend reflects Onsa's development and tokenization scheme; asset authorization flags for the FOCGX token mirrors the token setup developed by Onsa; and the FOCGX token's authorization key setup mirrors the setup developed by Onsa.

145. Defendants' willful and egregious actions left Onsa's shareholders no choice but to purchase Onsa's legal claims and direct Blockchain Innovation LLC to file this action. Plaintiff seeks to hold Defendants to account for their breaches of fiduciary duties and associated wrongful conduct.

**VIII. Behind the Scenes Defendants Were Always Acting Solely for the Benefit of Franklin Templeton.**

146. As mentioned above, Franklin Templeton, Johnson, and Bayston have never attempted to explain or justify the killing of Onsa to Onsa's other shareholders.  This silence is telling given that many of the non-Franklin Templeton shareholders directly requested updates, only to be met with stall tactics or outright silence.

147. After acquiring Onsa's control shares in October 2019, and installing Bayston as Onsa's sole director, Defendants ran Onsa solely for the benefit of Franklin Templeton and deliberately kept Onsa's non-Franklin Templeton shareholders in the dark at every critical juncture. Internal documents and other information obtained by Plaintiff in connection with the purchase of Onsa's assets indicate that, at least as early as June 2020, Defendants were scheming behind the scenes and plotting Onsa's demise.

148. Documents generated just prior to Defendants' decision to liquidate Onsa reflect that the company was in good shape. For example, on June 26, 2020, a month before Defendants fired all Onsa employees, Onsa was prepared to send a shareholder update touting Onsa's substantial progress, including: (1) the hiring of Tauseef Bashir, Norman Reed and other "strategic hires"; (2) the name change from TokenVault to Onsa; (3) the passing of the SOC2 Type 1 security and compliance audit; (4) and *the imminent "beta/internal launch of the Franklin OnChain US Government Money Market Fund in partnership with Franklin Templeton," which would be "the first of its kind to track mutual fund shareholders' records on the Stellar Blockchain."* This is the same fund that Franklin Templeton is on the precipice of launching. But this shareholder update was never sent.

149.    Indeed, the internal email circulating this draft shareholder update reflects that Franklin Templeton was up to no good. Kevin Farrelly, Onsa's COO and also Franklin Templeton employee, remarked that: "not sure we want to send [the shareholder update] out until we get Clarity from franklin [sic] on what we are going to do. *These might not be our investors.*" Onsa's new General Counsel chimed in: "That's a good point. Agreed. *Our world might be changing.*" Lou Mohn, Onsa's CFO, also agreed that the shareholder update should not be sent due to uncertainty concerning Franklin Templeton's intentions with respect to Onsa. The update was never sent.

150.    While Franklin Templeton was plotting behind the scenes, paralyzing Onsa's management as to the direction of the company, shareholder requests for updates went unanswered. For example, on July 6, 2020, one of Onsa's shareholders, Jared Rhodes, emailed the Company for an update. Not knowing Franklin Templeton's intentions, Onsa's in-house counsel replied that it was "currently working hard developing products" and that Onsa would get back to the shareholders in the near future. No substantive update was ever provided.

151.    Similarly, on July 20, 2020, another Onsa shareholder, PJ Lee, complained that Onsa was keeping investors in the dark and requested an update. Mohn responded on August 14, 2020 that "Onsa management is currently conducting a business review in consultation with our Board of Directors" and that an update is forthcoming. No update was ever provided.

152.    In fact, no update would ever come. By late June, Franklin Templeton's plans to terminate Onsa and take its valuable intellectual property were in full swing. On June 20, 2020, Sheffield Nolan (a former Franklin Templeton Blockchain Technical Head that Bayston had installed at Onsa) left Onsa and returned to Franklin Templeton.[35] Today, Nolan's LinkedIn page states that he is an "Enterprise Architect" for Franklin Templeton's "FinTech Innovation" group.[36]

---

[35] Nolan's Employment Transition and Separation Agreement with Onsa lists his termination date as June 19, 2020.  However, Nolan did not sign this agreement until July 20, 2020.

[36] Nolan's LinkedIn page states that he was "Blockchain Technical Head" for Franklin Templeton from December 2018 through January 2020. This is the time period he performed due diligence on Onsa for Franklin Templeton. Nolan's LinkedIn page does not list employment from January 2020 to August

153.    On June 30, 2020, Franklin Templeton sent an email to Onsa, stating that Bayston requested a list of employees, salary information, and financial projections from Onsa. Internally, this request caused Mohn to write: "This series of requests has me raising my eyebrows."

154.    Around this time, there was a scramble to determine whether Bayston (as sole director of Onsa) and other Onsa executives were covered by Franklin Templeton's D&O policy.

155.    On July 8, 2020, Jennifer Johnson sent a "Privileged & Confidential" email to Bayston, Chuck Johnson, Les Kratter (Senior Vice President at Franklin Templeton), Meredith Gibbons (Senior Vice President at Franklin Templeton), and Joe Boerio (Chief Technology Officer at Franklin Templeton). The subject of the email was "TokenVault," which was Onsa's name before it was changed. In her email, Johnson asks to set up a conference call to discuss "*issues around TokenVault and coordinating next steps.*"

156.    By mistake, Johnson also included Onsa's CEO, Tauseef Bashir, on this email. This was apparently pointed out to Johnson, who then replied to her own email by telling Bashir that "I think it is best that TokenVault [Onsa] is not present on the call. Chuck & Roger can update you on anything relevant to TokenVault following the call." Johnson's exclusion of Onsa's CEO from the call is remarkable given that her original email sought to discuss "***issues around [Onsa] and coordinating next steps***." Apparently, in Johnson's mind, Onsa's CEO was not relevant to a discussion regarding Onsa's future. By this time, there can be no mistake that the highest levels of Franklin Templeton were plotting the demise of Onsa.

157.    Around this time, Norman Reed (Onsa's General Counsel) and Tauseef Bashir (Onsa's CEO) apparently grew suspicious of Franklin Templeton's intentions. Reed complained that "if [Franklin] won't approve our funding we are silly to keep working on their project."  Bashir chimed in, "[a]bsolutely, their team wants us to just be their support for weekly calls" and "[e]veryone is furthering their own agendas." Reed responded that Franklin Templeton was asking Onsa to trust Franklin Templeton to "do the right thing" but that Reed did not "trust [Franklin Templeton] to look out for [Onsa]." Reed's suspicions were well founded.

---

2020—*the very time period he held himself out as Onsa's lead engineer*. Now, Nolan is apparently working for FT Fintech, Onsa's controlling shareholder.

158.   On July 23, 2020, Onsa's outside counsel (Clement Roberts, from the Orrick law firm) wrote an email to Onsa's CEO, providing "some bullets regarding your upcoming conversation with [Chuck Johnson]." Onsa's outside counsel encouraged Onsa's CEO to: (1) insist that Franklin Templeton provide an update; (2) share any concerns; and (3) *remind Franklin Templeton that Onsa has fiduciary obligations to shareholders other than Franklin Templeton*.

159.   On July 28, 2020, preparations were made for terminating Tauseef Bashir (Onsa's CEO) and Norman Reed (Onsa's General Counsel). Internal documents confirm that the terminations were *without cause*.

160.   On or about July 29, 2020, Bayston abruptly terminated Bashir's employment as Onsa's CEO and Reed's employment as General Counsel. Bayston also terminated substantially all other Onsa employees except himself and Mohn. Additionally, soon-to-be employees of Onsa were contacted and told that their services were not needed. These terminations were in connection with Franklin Templeton's decision to "wind down" and liquidate Onsa. Shortly thereafter, Mohn was appointed interim CEO.

161.   On July 29, 2020, Mohn met with Bayston and Franklin Templeton's in-house counsel and outside counsel. The notes from this legal meeting confirm that Franklin Templeton was up to no good. For example, the notes question "what is the end goal?" Apparently, Franklin Templeton had not even shared its intentions with Onsa's newly appointed, Interim CEO, Lou Mohn. The notes question whether the liquidation was legally proper ("confirm entity or officer that *has rights to take these actions*."). The notes acknowledge that shareholders were not provided any notice of Franklin Templeton's plans to liquidate Onsa, let alone the opportunity explore other alternatives for Onsa ("Letter to shareholders?"). No letter was ever sent. The notes reflect the obvious "[r]isks around minority shareholder lawsuit[s]." The notes confirm that that Franklin Templeton intended to take Onsa's valuable intellectual property for its own use ("Code since March 1 developed by HTEC [one of Onsa's contracted developers]. *Does HTEC stay on for the project with FT?  Will FT be buying this code?*"). And finally, the notes reflect Mohn's concerns with serving as Franklin Templeton's hatchet man: "*What are my liabilities as board appointed interim – CEO now? I want indemnification. This isn't a one man show. Where is my help/resourcing going to come from to pull this off*?"

162.     Shortly after this meeting, Bayston and Mohn greenlighted an agreement whereby Onsa indemnified Mohn for his role in liquidating Onsa. Obviously, Onsa indemnifying Mohn for his role in liquidating Onsa was not in Onsa's best interest.

163.     After his appointment as Onsa's Interim CEO, Bayston, Mohn, and Franklin Templeton worked hand-in-hand to liquidate Onsa. This group was particularly concerned with avoiding liability to Onsa and its non-Franklin Templeton shareholders. Notes prepared in advance of an August 17, 2020 meeting between Franklin Templeton's attorneys, Bayston, Joe Boerio (Franklin Templeton's CTO), Les Kratter (Senior Vice President of Franklin Templeton) and Mohn reflect that this group was slated to discuss "legal aspects of dissolution in Delaware, D&O risk, minority shareholders, litigation risk, [and Onsa's] IP." The notes further reflect that Mohn requested FT Fintech Holdings to provide its "opinion on the status of milestones" such that Onsa would be disqualified from further payments from Franklin Templeton. At this stage, there can be little question that Bayston and Franklin Templeton had no regard for Onsa and were principally concerned with escaping liability and absconding with Onsa's intellectual property.

164.     On August 3, 2020, Bayston contacted Sierra Constellation, an interim management and advisory firm, regarding assistance in liquidating Onsa's assets. Sierra Constellation's first concern was whether there was D&O coverage in place. Lawrence Perkins of Sierra Constellation recommended that, "notwithstanding the D&O policy issues, which I'm sure we can sort out," that he should be appointed as an "independent director" to handle the "blocking and tackling of the wind down." Perkins provided an estimate, subject to there not being a "huge amount of litigation." Upon information and belief, Bayston remained the sole director.

165.     On August 28, 2020, Bayston and Mohn discussed performing an Assignment for the Benefit of Creditors with attorneys. Once again, correspondence indicates that Bayston and Mohn were particularly concerned with "mak[ing] sure that current and former Onsa directors and officers would continue to be protected under either the FT D&O policy or under a 'tail' policy … [for] claims which may be made even after service has ended."  Ultimately, Bayston and Franklin Templeton decided to proceed with the liquidation of Onsa via an Assignment for the Benefit of Creditors.

166.    Upon completing his Interim CEO duties in connection with Onsa's liquidation, Franklin Templeton re-hired Mohn in September 2021. Additionally, Bayston (at all relevant times Onsa's sole board member) continues to work at Franklin Templeton as Executive Vice President—Director of Quantitative & FinTech Strategies. Kevin Farrelly (formerly Onsa's COO) continues to work at Franklin Templeton as Vice President and Director of Digital Assets. And as previously mentioned, Nolan (formerly Onsa's lead engineer) was re-hired by Franklin Templeton as Enterprise Architect - FinTech Innovation.

167.    Documents obtained in connection with the purchase of Onsa's assets are notable for what they do not include. There is no correspondence to Onsa's non-Franklin Templeton shareholders explaining the decision to liquidate. And there are no documents exploring alternatives to liquidation. Franklin Templeton had Onsa's technology and it wanted Onsa gone.

### COUNT I

### (Claim Against FT Fintech and Franklin Resources as
### Controlling Shareholder for Breaches of Fiduciary Duty)

168.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

169.    Plaintiff asserts claims for breaches of fiduciary duty against FT Fintech and Franklin Resources.

170.    By virtue of owning 100% of the voting stock of Onsa, FT Fintech and Franklin Resources constituted the controlling shareholder of Onsa and had fiduciary duties not to abuse its power and accrue benefits to itself at the expense of Onsa and other shareholders. For example, FT Fintech and Franklin Resources had the duties of due care, good faith, and loyalty to Onsa and its shareholders.

171.    By the acts alleged herein, FT Fintech and Franklin Resources breached its fiduciary duties. For example, FT Fintech and Franklin Resources breached the duties of due care, good faith, and loyalty to Onsa and its shareholders by making management decisions that were not in the company's best interest (*e.g.*, disallowing fundraising, disallowing Onsa to have non-Franklin Templeton customers, terminating Bashir and other Onsa employees, liquidating Onsa), allowing and facilitating the misappropriation of Onsa's intellectual property by Franklin Templeton, by wasting Onsa's valuable assets, and "winding

down" Onsa at a point in time where Onsa was far along in its business plan, capable of raising money, and extremely valuable.

172.    FT Fintech and Franklin Resources generated substantial benefits for themselves at the expense of Onsa and its shareholders.

173.    FT Fintech and Franklin Resources' breaches of their duties caused Plaintiff substantial harm by depriving Onsa of substantial value and opportunities and depriving Onsa's shareholders of the fair value of their stock, for which they are liable to Plaintiff.

**COUNT II**

**(Claim for Breach of Fiduciary Duty Against Bayston)**

174.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

175.    Plaintiff asserts claims for breaches of fiduciary duty against Bayston.

176.    Onsa's sole director, Bayston, owed fiduciary duties to Onsa.

177.    Bayston breached his fiduciary duties and generated profits for himself and his affiliates, including Franklin Templeton, at the expense of Onsa and its shareholders, while also depriving them of the fair value of their stock, for which they are liable to Plaintiff. For example, Bayston breached the duties of due care, good faith, and loyalty to Onsa and its shareholders by making management decisions that were not in the company's best interest (*e.g.*, disallowing fundraising, disallowing Onsa to have non-Franklin Templeton customers, terminating Bashir and other Onsa employees), allowing and facilitating the misappropriation of Onsa's intellectual property by Franklin Templeton, wasting Onsa's valuable assets, and "winding down" Onsa at a point in time where Onsa was far along in its business plan, capable of raising money, and extremely valuable.

178.    As a result, Onsa has been damaged and Plaintiff is entitled to recover all of Onsa's damages resulting from Bayston's breaches of fiduciary duties.

**COUNT III**

**(Conversion)**

179.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

180.    Plaintiff asserts a claim for conversion under applicable state law.

181.    As detailed above, Defendants breached their fiduciary duties to Onsa and its shareholders by, among other things, managing Onsa for the benefit of Franklin Templeton, stealing Onsa's technology and trade secrets, and attempting to shut down Onsa.

182.    Despite their knowledge of Onsa's rights and interests, Defendants improperly took possession of and interfered with Onsa's technology in derogation of the rights and interests of Onsa.

183.    As a result, Onsa has been damaged and Plaintiff is entitled to recover all of Onsa's damages resulting from conversion, plus interest and attorneys' fees.

184.    Additionally, Defendants' actions were willful and sufficiently gross and wanton to warrant imposing punitive damages.

## COUNT IV

### (Unjust Enrichment)

185.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

186.    Plaintiff asserts a claim for unjust enrichment under applicable state law.

187.    Onsa has been impoverished by the wrongful conduct of Defendants, who were unjustly enriched through the wrongful conduct set forth herein.

188.    There is a direct relationship between the unjust enrichment these Defendants received and the impoverishment that Onsa has suffered since both arise from the wrongful conduct described herein.

189.    The wrongful conduct alleged herein was continuous, connected and ongoing throughout the period of the misconduct described herein and resulted in ongoing harm to Onsa.

190.    Plaintiff seeks damages including disgorgement for Defendants' unjust enrichment.

## COUNT V

### (The Federal Defend Trade Secrets Act)

191.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

192.    Plaintiff asserts a claim under the Defend Trade Secrets Act (the "DTSA") based on misappropriation of trade secrets against Defendants.

193.    Onsa developed and owned trade secrets including one or more of the following: financial, business, scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, in tangible and/or intangible forms.

194.  Onsa developed and owned trade secrets in connection with its blockchain software, systems, and platform; tokenization software, systems, and platform; storage software, systems, and platform; trading software, systems, and platform; and payment software, systems, and platform. Onsa developed applications, programs, code, architecture, workflow, processes, systems, interfaces, routines, and/or modules used in connection with its blockchain software, systems, and platform; tokenization software, systems, and platform; storage software, systems, and platform; trading software, systems, and platform; and payment software, systems, and platform.

195.  The code Onsa developed and owned is a trade secret.

196.  Onsa developed and owned trade secrets in connection with frontend or user-facing applications, programs, architecture, workflow, processes, systems, interfaces, routines, and/or modules for its blockchain software, systems, and platform; tokenization software, systems, and platform; storage software, systems, and platform; trading software, systems, and platform; and payment software, systems, and platform.

197.  Onsa developed and owned trade secrets in connection with its backend or server-side applications, programs, architecture, workflow, processes, systems, interfaces, routines, and/or modules for its blockchain software, systems, and platform; tokenization software, systems, and platform; storage software, systems, and platform; trading software, systems, and platform; and payment software, systems, and platform.

198.  Onsa developed and owned trade secrets in connection with specialized applications, programs, architecture, workflow, processes, systems, interfaces, routines, and/or modules for the Investar system, Curv system for digital asset security, and the Stellar blockchain.

199.  Onsa took reasonable measures to keep its trade secrets secret.

200.  For example, Onsa's employees were subject to confidentiality obligations as a result of their employment with Onsa. Additionally, Onsa protected disclosure of its trade secrets by confidentiality agreements.

201.   Onsa also protected the code, which includes Onsa trade secrets, through encrypted and password-protected repositories on GitHub. Onsa limited the employees that had access to the Code through GitHub. GitHub provides additional security systems and procedures which Onsa reasonably expected would protect the Code.[37]

202.   Onsa's trade secrets derive independent economic value from being secret.

203.   Onsa expended significant time, energy, and expense in developing its trade secrets. If discovered by others, they would save the time, energy, and expense Onsa spent developing its trade secrets.

204.   Defendants misappropriated Onsa's trade secrets, knew or should have known that they acquired access to Onsa's trade secrets improperly, and disclosed and used Onsa's trade secrets without Onsa's express or implied consent, causing damages to Onsa.

205.   Plaintiff seeks all damages and remedies available to Onsa under the DTSA for the misappropriation of its trade secrets from Defendants, including the actual loss caused by the misappropriation of its trade secrets, injunctive relief to prevent Defendants from accessing, distributing, or using Onsa's trade secrets, precluding Franklin Templeton from proceeding with the tokenized money market fund and other tokenized assets and/or blockchain-related financial assets using the technology developed by Onsa, and exemplary damages and attorney's fees for the willful and malicious misappropriation of its trade secrets by Defendants.

206.   Additionally, Plaintiff seeks damages for any unjust enrichment caused by the misappropriation of Onsa's trade secrets that is not addressed in computing damages for actual loss, or in the alternative, the imposition of liability for a reasonable royalty for the unauthorized disclosure or use of the trade secret by Defendants.

## **COUNT VI**

### **(Aiding and Abetting Against All Defendants)**

207.   Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

---

[37] GitHub, Inc., Security at GitHub, https://github.com/security

208.    Defendants committed tortious conduct described in this Complaint.

209.    Defendants were aware of or had knowledge of the tortious conduct of described in this Complaint.

210.    Defendants provided substantial assistance to each other with respect to the tortious conduct described in this Complaint.

211.    For example, Bayston committed the tortious conduct described in this complaint. Franklin Templeton and Johnson were aware of and had knowledge of Bayston's tortious conduct. Franklin Templeton and Johnson provided substantial assistance with respect to Bayston's tortious conduct.

212.    As another example, Franklin Templeton committed the tortious conduct described in this Complaint. Johnson and Bayston were aware of and had knowledge of Franklin Templeton's tortious conduct. Johnson and Bayston provided substantial assistance with respect to the tortious conduct by failing to comply with Franklin Templeton's fiduciary duties as the controlling shareholder of Onsa despite being Franklin Templeton's CEO / board member and Executive Vice President, respectively.

213.    The tortious conduct of Defendants described herein, which was aided and abetted by the other Defendants, proximately caused damage to Onsa, for which Plaintiff is entitled to recover.

## COUNT VII

### (Breach of Contract)

214.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

215.    A contract exists between Plaintiff and Defendants as described in this Complaint.

216.    Plaintiff performed its duties and met its obligations with respect to the contract.

217.    Defendants failed to perform duties and meet their obligations with respect to the contract and materially breached the contract.

218.    Plaintiff has been damaged by Defendants' breach.

219.    Upon information and belief, Defendants continue to retain, access, and use Plaintiff's confidential information in violation of the Mutual Confidentiality and Non-Disclosure Agreement dated September 11, 2019. Additionally, Defendants have failed to provide Plaintiff with confirmation of deletion of Plaintiff's source code in violation of the agreement.

1

## COUNT VIII

2

### (Injunctive Relief)

3        220.    Plaintiff repeats and realleges each of the preceding allegations as if fully set forth herein.

4        221.    Plaintiff seeks injunctive relief to prevent Defendants from accessing, distributing, and/or

5    using Onsa's trade secrets, and precluding Franklin Templeton from proceeding with the tokenized money

6    market fund and other tokenized assets and/or blockchain-related financial assets using the technology

7    developed by Onsa. On information and belief, Defendants intend to make imminent and/or continued use

8    of Plaintiff's trade secrets and confidential information, such that Plaintiff will suffer irreparable harm in

9    the absence of injunctive relief precluding Franklin Templeton from proceeding with the tokenized money

10   market fund and other tokenized assets and/or blockchain-related financial assets using the technology

11   developed by Onsa. The balance of equities favors such injunction, as a comparison of the interests of the

12   parties reveals irreparable harm to Plaintiff, while Defendants would still be capable of conducting business

13   as they currently are. Enjoining Defendants is also in the public interest. Requiring Defendants to protect

14   Plaintiff's trade secrets from further misuse benefits the public. Requiring Defendants to be held

15   accountable for their breaches of fiduciary duties benefits the public. Preventing further unlawful use of

16   confidential information in violation of the Mutual Confidentiality and Non-Disclosure Agreement benefits

17   the public. Preventing Defendants from profiting from their conversion, unjust enrichment, breach of

18   fiduciary duties, breach of contract, and other tortious conduct benefits the public.

19

### JURY DEMAND

20        Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby requests a trial by jury on all issues

21   triable by a jury.

22

### PRAYER FOR RELIEF

23        WHEREFORE, Plaintiff demands relief in its favor, and against Defendants, as follows:

24        A.    Awarding Plaintiff damages against all Defendants, jointly and severally, including the

25   value that Onsa would have been worth but for Defendants' willful destruction of Onsa which is likely in

26   the *billions* of dollars based upon the market value of other comparable companies to Onsa;

27

28

1     B.     Awarding Plaintiff damages including the profits generated by Defendants and their

2 fiduciaries, aiders and abettors, and their affiliates as a result of the breaches of fiduciary duty and the lost

3 opportunities to obtain the value of Plaintiff's shares;

4     C.     Awarding Plaintiff restitution and ordering disgorgement of all illicit profits, benefits, and

5 other compensation obtained as a result of Defendants' actions alleged herein;

6     D.     Awarding Plaintiff the costs and disbursements of this action, including attorneys' and

7 experts' fees and expenses;

8     E.     Awarding Plaintiff pre-judgment and post-judgment interest;

9     F.     Enjoining Defendants and all those in active concert with them from accessing, distributing,

10 and/or using Onsa's trade secrets, and precluding Franklin Templeton from proceeding with the tokenized

11 money market fund (which on information and belief involves the FOCGX token) and other tokenized

12 assets and/or blockchain-related financial assets using the technology developed by Onsa;

13     G.     Enjoining Defendants and all those in active concert with them from distributing, trading,

14 creating, or otherwise commercializing its "Benji" mobile application and/or web platform, as well as any

15 and all other forms of blockchain and/or cryptocurrency-related software;

16     H.     Enjoining Defendants and all those in active concert with them from accessing, distributing,

17 or using Onsa's trade secrets in any other manner; and

18     I.     Granting such other and further relief as this Court deems just and proper.

Dated:  November 12, 2021                          Respectfully submitted,

                                                   */s/ Jeffery D. McFarland*
                                                   Jeffery D. McFarland
                                                   California Bar No. 157628
                                                   jmcfarland@mckoolsmithhennigan.com
                                                   MCKOOL SMITH HENNIGAN P.C.
                                                   300 South Grand Avenue, Suite 2900
                                                   Los Angeles, California 90071
                                                   Telephone: (213) 694-1010
                                                   Fax: (213) 694-1234

                                                   Gary Cruciani (*Pro Hac Vice* to be submitted)
                                                   Texas Bar No. 05177300
                                                   Lew LeClair
                                                   California Bar No. 77136
                                                   gcruciani@mckoolsmith.com
                                                   lleclair@mckoolsmith.com
                                                   MCKOOL SMITH P.C.
                                                   300 Crescent Court, Suite 1500
                                                   Dallas, Texas 75201
                                                   Telephone: (214) 978-4000

                                                   Brent N. Bumgardner (*Pro Hac Vice* to be submitted)
                                                   Texas Bar No. 00795272
                                                   Carder W. Brooks (*Pro Hac Vice* to be submitted)
                                                   Texas Bar No. 24105536
                                                   brent@nelbum.com
                                                   carder@nelbum.com
                                                   NELSON BUMGARDNER CONROY P.C.
                                                   3131 West 7th Street, Suite 300
                                                   Fort Worth, Texas 76107
                                                   Telephone: (817) 377-9111

                                                   Patrick J. Conroy (*Pro Hac Vice* to be submitted)
                                                   Texas Bar No. 24012448
                                                   pat@nelbum.com
                                                   NELSON BUMGARDNER CONROY P.C.
                                                   2727 N. Harwood Street, Suite 250
                                                   Dallas, Texas 75201
                                                   Telephone: (214) 446-4954

                                                   **Attorneys for Plaintiff**
                                                   **BLOCKCHAIN INNOVATION, LLC**