# EXHIBIT A

**CERTIFICATE OF SECRETARY**
**OF**
**TOKENVAULT, INC.**

The undersigned, Alina Jais, hereby certifies as follows:

1.      She is the duly elected, qualified and acting Secretary of TokenVault, Inc., a Delaware corporation (the "Company").

2.      Attached hereto as Exhibit A is a true and correct copy of the Company's Amended and Restated Certificate of Incorporation in the form approved by the Company's stockholders and Board of Directors and filed with the Secretary of State of the State of Delaware on October 25, 2019 (the "Restated Certificate"); such Restated Certificate has not been modified or rescinded since its adoption and remains in full force and effect.

3.      Attached hereto as Exhibit B is a true and correct copy of the Company's Bylaws as in effect on the date hereof.

4.      Attached hereto as Exhibit C is a true and correct copy of the resolutions of the Company's Board of Directors, adopted by unanimous written consent and dated October 25, 2019, approving, among other things, the adoption of the Restated Certificate of Incorporation, the execution and delivery of the Stock Purchase Agreement of even date herewith by and between the Company, Austin Trombley and FT Fintech Holdings, LLC (the "Purchase Agreement") and the taking of other actions related to the sale and issuance of the Company's Class A Non-Voting Common Stock to FT Fintech Holdings, LLC and the transactions contemplated under the Purchase Agreement; such resolutions have not been modified or rescinded since their adoption and remain in full force and effect.

5.      Attached hereto as Exhibit D is a true and correct copy of the resolutions duly adopted by the Company's sole stockholder, adopted by written consent and dated October 25, 2019, approving the Restated Certificate; such resolutions have not been modified or rescinded since their adoption and remain in full force and effect.

IN WITNESS WHEREOF, the undersigned has executed this Certif cate this 28th day of  October, 2019.

By: _____

Alina Uais
Secretary

<u>Exhibit A</u>

Amended and Restated Certificate of Incorporation

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
TOKENVAULT, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

TokenVault, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

1.      That the name of this corporation is TokenVault, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on September 25, 2019.

2.      That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is TokenVault, Inc. (the "**Corporation**").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801.  The name of its registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:**    The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 1,000 shares of Voting Common Stock, $0.001 par value per share ("**Voting Common Stock**"), (ii) 8,385,909 shares of Class A Non-Voting Common Stock, $0.001 par value per share ("**Class A Non-Voting Common Stock**") and (iii) 3,914,162 shares of Class B Non-Voting Common Stock, $0.001 par value per share ("**Class B Non-Voting Common Stock**", and together with the Class A Non-Voting Common Stock, the "**Non-Voting Common Stock**").  The Voting Common Stock and Non-Voting Common Stock are referred to herein as the "**Common Stock**".

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.    VOTING COMMON STOCK

1.    <u>Voting</u>.  The holders of the Voting Common Stock are entitled to one vote for each share of Voting Common Stock held at all meetings of stockholders (and written actions in lieu of meetings).

2.    <u>Redemption</u>.  Shares of the Voting Common Stock shall not be subject to any redemption by the Corporation.

B.    NON-VOTING COMMON STOCK

1.    <u>Voting</u>.  The holders of the Non-Voting Common Stock shall not be entitled to any vote on any matters of the Corporation, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.    <u>Redemption</u>.

2.1    <u>Redemption of Class A Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall only be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors of the Corporation determines that it is a securities law violation for one or more holders of the Class A Non-Voting Common Stock to hold such shares.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.2    <u>Redemption of Class B Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors so elects, in its sole discretion, to effectuate such redemption.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.3    <u>Redemption Price; Terms of Payment</u>.  Unless prohibited by Delaware law governing distributions to stockholders, any shares of Non-Voting Common Stock to be redeemed in accordance with this Section 2 (such shares, "**Shares Subject to Redemption**") shall be redeemed by the Corporation at a price equal to their original issue price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**").  The date of payment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date.**"  On the Redemption Date, the Corporation shall redeem all outstanding shares of Non-Voting Common Stock constituting Shares Subject to Redemption for cash.  If on any Redemption Date, Delaware law governing distributions to stockholders or other applicable law prevents the Corporation from redeeming all Shares Subject to Redemption, then the Corporation shall redeem the maximum number of shares that it may redeem consistent with such law, which shall be effectuated on a pro rata basis based upon the number of shares held by each holder of Non-Voting

2

Common Stock constituting Shares Subject to Redemption, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

2.4     Redemption Notice.  The Corporation shall send written notice of the mandatory redemption (the "**Redemption Notice**") to each holder of record of Shares Subject to Redemption not less than thirty (30) days prior to the applicable Redemption Date.  Each Redemption Notice shall state:

(a)     the number of shares of Non-Voting Common Stock held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)     the Redemption Date and the Redemption Price; and

(c)     for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Non-Voting Common Stock to be redeemed.

2.5     Surrender of Certificates; Payment.  On or before the applicable Redemption Date, each holder of shares of Non-Voting Preferred Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.  In the event less than all of the shares of Non-Voting Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Non-Voting Common Stock shall promptly be issued to such holder.

2.6     Rights Subsequent to Redemption.  If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Non-Voting Common Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Non-Voting Common Stock so called for redemption shall not have been surrendered, any dividends with respect to such shares of Non-Voting Common Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such  certificate or certificates therefor.

3.     Redeemed or Otherwise Acquired Shares.  Any shares of Non-Voting Common Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued,

3

sold or transferred.  Neither the Corporation nor any of its subsidiaries may exercise any rights granted to the holders of Non-Voting Common Stock following redemption.

4.      <u>Waiver</u>.  Any of the rights, powers, preferences and other terms of the Common Stock set forth herein may be waived on behalf of all holders of Common Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of Voting Common Stock then outstanding.

5.      <u>Notices</u>.  Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Common Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

6.      <u>Other Rights, Preferences and Privileges</u>.  Except as expressly set forth in Section 2 of this Article Fourth, Part B, with respect to redemption, the rights, preferences and privileges of the Class A Non-Voting Common Stock and the Class B Non-Voting Common Stock shall be identical.

C.      PAYMENTS TO HOLDERS OF COMMON STOCK UPON LIQUIDATION.

1.      <u>General</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Common Stock shall be distributed upon the holders of Common Stock, pro rata based upon the number of shares held by each such holder.

2.      <u>Deemed Liquidation Event</u>.  For purposes of Section 1 above, each of the following events shall be deemed to be a liquidation, dissolution or winding up of the Corporation: (a) a merger or consolidation in which the Corporation is a constituent party; (b) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation; except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (c) (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

4

**FIFTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation; provided, that the number of directors shall be no less than one (1) and no greater than three (3). Each director shall be entitled to one vote on each matter presented to the Board of Directors.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

ACTIVE 250108714v.2

**ELEVENTH:**  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding anything to the contrary contained elsewhere in this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the shares of the Voting Common Stock the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

**TWELFTH:**  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Amended and Restated Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any

ACTIVE 250108714v.2

other consent required under this Amended and Restated Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code).  Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

*   *   *

**3.**     That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

**4.**     That this Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 24th day of October, 2019.

By:   /s/ Aaron Travis
      Aaron Travis, President

7

<u>Exhibit B</u>

Bylaws

**BYLAWS**
**OF**
**TokenVault, Inc.,**
**A DELAWARE CORPORATION**

## Table of Contents

Page

**ARTICLE I**

Offices ................................................................................................................................1

**ARTICLE II**

Stockholders Meetings .........................................................................................................1

**ARTICLE III**

Board of Directors................................................................................................................6

**ARTICLE IV**

Officers ...............................................................................................................................9

**ARTICLE V**

Stock Certificates and Transfers .......................................................................................10

**ARTICLE VI**

Notices ...............................................................................................................................11

**ARTICLE VII**

Indemnification ..................................................................................................................13

**ARTICLE VIII**

General................................................................................................................................16

**Bylaws**
**of**
**TokenVault, Inc.,**

**a Delaware corporation**

## ARTICLE I

Offices

**Section 1.1.** The registered office of TokenVault, Inc., a Delaware corporation (the "***Corporation***"), shall be in the County of New Castle, State of Delaware.

**Section 1.2.** The corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the corporation may require.

## ARTICLE II
Stockholders Meetings

**Section 2.1.** <u>Annual Meetings</u>.  An annual meeting of stockholders shall be held for the election of directors and the transaction of such other business as may properly be brought before the meeting in accordance with these Bylaws at such date, time and place, if any, as may be fixed by resolution of the Board of Directors of the Corporation from time to time.  The Board of Directors may, in its sole discretion, determine that the meeting shall not be held at any place, but shall be held solely by means of remote communication, subject to such guidelines and procedures as the Board of Directors may adopt, as permitted by applicable law.

**Section 2.2.** <u>Special Meetings</u>.  Special meetings of stockholders for any purpose or purposes may be called at any time only by the Chairman of the Board, if any, or pursuant to a resolution approved by a majority of the whole Board of Directors or by a committee of the Board of Directors authorized to call such meetings and by no other person.  The Board of Directors may, in its sole discretion, determine that the special meeting shall not be held at any place, but shall be held solely by means of remote communication, subject to such guidelines and procedures as the Board of Directors may adopt, as permitted by applicable law.  The business transacted at a special meeting of stockholders shall be limited solely to matters relating to the purpose or purposes stated in the Corporation's notice of meeting.

**Section 2.3.** <u>Notice of Meetings</u>.  A written notice of each annual or special meeting of stockholders shall be given stating the place, if any, date and time of the meeting, the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called.  Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, such notice of meeting shall be given not less than ten nor more than 60 days before the date of the meeting to each stockholder of record entitled to vote at such meeting, personally, by mail or, to the extent and in the manner permitted by applicable law, by electronic facsimile or internet transmission; provided, however, a stockholder may direct the Corporation, in a writing delivered to the Secretary of the Corporation, to not send any  notices of meeting by electronic or other transmission, and agrees that if such stockholder provides the Corporation with an internet address at

which the stockholder can receive electronic communications the Corporation may send all such notices to such internet address unless the Stockholder advises the Corporation in writing of a change in address or that such stockholder no longer is willing to accept delivery of notices of meetings through electronic transmission.  If mailed, such notice shall be deemed to be given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation.

Section 2.4.  <u>Adjournments</u>.  Any annual or special meeting of stockholders may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the date, time and place, if any, thereof and the means of remote communication, if any, by which stockholders and proxyholders may be deemed present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting any business may be transacted which might have been transacted at the original meeting.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the adjourned meeting in accordance with Section 2.3.

Section 2.5.  <u>Quorum</u>.  Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the presence in person or by proxy of the holders of stock having a majority of the votes which could be cast by the holders of all outstanding stock entitled to vote at the meeting shall constitute a quorum at each meeting of stockholders.  In the absence of a quorum, the stockholders so present may, by the affirmative vote of the holders of stock having a majority of the votes which could be cast by all such holders, adjourn the meeting from time to time in the manner provided in Section 2.4 of these Bylaws until a quorum is present.  If a quorum is present when a meeting is convened, the subsequent withdrawal of stockholders, even though less than a quorum remains, shall not affect the ability of the remaining stockholders lawfully to transact business.

Section 2.6.  <u>Conduct; Remote Communication</u>.

(a)  Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or, if there is none or in his or her absence, by the President, or in his or her absence, by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen at the meeting.  The Secretary shall act as secretary of the meeting, but in his or her absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

(b)  If authorized by the Board of Directors in accordance with these Bylaws and applicable law, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication, (1) participate in a meeting of stockholders and (2) be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

**Section 2.7.** <u>Voting</u>.

(a)  Except as otherwise provided by the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by such stockholder which has voting power on the matter in question.

(b)  Voting at meetings of stockholders need not be by written ballot and need not be conducted by inspectors of election unless so determined by the holders of stock having a majority of the votes which could be cast by the holders of all outstanding stock entitled to vote which are present in person or by proxy at such meeting.  Unless otherwise provided in the Certificate of Incorporation, directors shall be elected by a plurality of the votes cast in the election of directors.  Each other question shall, unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, be decided by the vote of the holders of stock having a majority of the votes which could be cast by the holders of all stock entitled to vote on such question which are present in person or by proxy at the meeting.

(c)  Stock of the Corporation standing in the name of another corporation and entitled to vote may be voted by such officer, agent or proxy as the Bylaws or other internal regulations of such other corporation may prescribe or, in the absence of such provision, as the board of directors or comparable body of such other corporation may determine.

(d)  Stock of the Corporation standing in the name of a deceased person, a minor, an incompetent or a debtor in a case under Title 11, United States Code, and entitled to vote may be voted by an administrator, executor, guardian, conservator, debtor-in-possession or trustee, as the case may be, either in person or by proxy, without transfer of such shares into the name of the official or other person so voting.

(e)  A stockholder whose voting stock of the Corporation is pledged shall be entitled to vote such stock unless on the transfer records of the Corporation the pledgor has expressly empowered the pledgee to vote such shares, in which case only the pledgee, or such pledgee's proxy, may represent such shares and vote thereon.

(f)  If voting stock is held of record in the names of two or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety or otherwise, or if two or more persons have the same fiduciary relationship respecting the same shares, unless the Secretary is given written notice to the contrary and is furnished with a copy of the instrument or order appointing them or creating the relationship wherein it is so provided, their acts with respect to voting shall have the following effect: (i) if only one votes, such act binds all; (ii) if more than one vote, the act of the majority so voting binds all; and (iii) if more than one votes, but the vote is evenly split on any particular matter each faction may vote such stock proportionally, or any person voting the shares, or a beneficiary, if any, may apply to the Court of Chancery of the State of Delaware or such other court as may have jurisdiction to appoint an additional person to act with the persons so voting the stock, which shall then be voted as determined by a majority of such persons and the person appointed by such court.  If the instrument so filed shows that any such tenancy is held in unequal interests, a majority or even split for the purpose of this subsection shall be a majority or even split in interest.

(g)  Stock of the Corporation belonging to the Corporation, or to another corporation a majority of the shares entitled to vote in the election of directors of which are held by the

Corporation, shall not be voted at any meeting of stockholders and shall not be counted in the total number of outstanding shares for the purpose of determining whether a quorum is present.  Nothing in this Section 2.7 shall limit the right of the Corporation to vote shares of stock of the Corporation held by it in a fiduciary capacity.

**Section 2.8.**  Proxies.

(a)  Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy filed with the Secretary before or at the time of the meeting.  No such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing with the Secretary an instrument in writing revoking the proxy or another duly executed proxy bearing a later date.

(b)  A stockholder may authorize another person or persons to act for such stockholder as proxy (i) by executing a writing authorizing such person or persons to act as such, which execution may be accomplished by such stockholder or such stockholder's authorized officer, director, partner, employee or agent (or, if the stock is held in a trust or estate, by a trustee, executor or administrator thereof) signing such writing or causing his or her signature to be affixed to such writing by any reasonable means, including, but not limited to, facsimile signature, or (ii) by transmitting or authorizing the transmission of a telegram, cablegram or other means of electronic transmission (a "Transmission") to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such Transmission; provided that any such Transmission must either set forth or be submitted with information from which it can be determined that such Transmission was authorized by such stockholder.

(c)  Any inspector or inspectors appointed shall examine Transmissions to determine if they are valid.  If no inspector or inspectors are so appointed, the Secretary or such other person or persons as shall be appointed from time to time by the Board of Directors shall examine Transmissions to determine if they are valid.  If it is determined that a Transmission is valid, the person or persons making that determination shall specify the information upon which such person or persons relied.  Any copy, facsimile telecommunication or other reliable reproduction of such a writing or Transmission may be substituted or used in lieu of the original writing or Transmission for any and all purposes for which the original writing or Transmission could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or Transmission.

**Section 2.9.**  Fixing Date of Determination of Stockholders of Record.

(a)  In order that the Corporation may determine the stockholders entitled (i) to notice of or to vote at any meeting of stockholders or any adjournment thereof, (ii) to receive payment of any dividend or other distribution or allotment of any rights, (iii) to exercise any rights in respect of any change, conversion or exchange of stock, (iv) to express consent to corporate action in writing without a meeting, or (v) to take, receive or participate in any other action, the Board of Directors may fix a record date, which shall not be earlier than the date

upon which the resolution fixing the record date is adopted by the Board of Directors and which (1) in the case of a determination of stockholders entitled to notice of or to vote at any meeting of stockholders or adjournment thereof, shall, unless otherwise required by law, be not more than 60 nor less than ten days before the date of such meeting; (2) in the case of a determination of stockholders entitled to express consent to corporate action in writing without a meeting, shall be not more than ten days after the date upon which the resolution fixing the record date is adopted by the Board of Directors; and (3) in the case of any other action, shall be not more than 60 days before such action.

(b)  If no record date is fixed, (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; (ii) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting when no prior action of the Board of Directors is required by law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law, or, if prior action by the Board of Directors is required by law, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action; and (iii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c)  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting, but the Board of Directors may fix a new record date for the adjourned meeting.

**Section 2.10.**  <u>List of Stockholders Entitled to Vote</u>.  The Secretary shall prepare, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of at least ten days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, the list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, the list shall be open to the examination of any stockholder during the whole time thereof on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list of stockholders or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

**Section 2.11.**  <u>Action By Consent of Stockholders</u>.

(a)  Unless the power of stockholders to act by consent without a meeting is restricted or eliminated by the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of stockholders may be taken without a meeting, without

prior notice and without a vote, if a consent in writing, setting forth the action so taken, is signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote on such action were present and voted.

(b)  Every written consent shall bear the date of signature of each stockholder (or his, her or its proxy) signing such consent.  Prompt notice of the taking of corporate action without a meeting of stockholders by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that written consents signed by a sufficient number of persons to authorize or take the action were delivered to the Corporation in the manner required by this Section 2.11.  All such written consents shall be delivered to the Corporation at its registered office in the State of Delaware, at its principal place of business or to the Secretary.  Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.

(c)  A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of these Bylaws, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (A) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (B) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. Any consent by means of telegram, cablegram or electronic transmission shall be deemed to have been signed on the date on which it was transmitted.  No consent given by telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, at its principal place of business or to the Secretary.  Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.  Notwithstanding the foregoing limitations on delivery, consents given by telegram, cablegram or other electronic transmission may be otherwise delivered to the principal place of business of the Corporation or to the Secretary if, to the extent and in the manner provided by resolution of the Board of Directors of the Corporation.

(d)  No written consent shall be effective to authorize or take the corporate action referred to therein unless, within 60 days of the earliest dated written consent delivered to the Corporation in the manner required by this Section 2.11, written consents signed by a sufficient number of persons to authorize or take such action are delivered to the Corporation at its registered office in the State of Delaware, at its principal place of business or to the Secretary.  All such written consents shall be filed with the minutes of proceedings of the stockholders, and actions authorized or taken under such written consents shall have the same force and effect as those authorized or taken pursuant to a vote of the stockholders at an annual or special meeting.

### ARTICLE III
Board of Directors

**Section 3.1.**  Number.  The initial Board of Directors shall consist of one director.  Thereafter, the number of directors may be amended from time to time by resolution adopted by affirmative vote of a majority of the whole Board of Directors; provided that no such amendment may shorten the term of any incumbent director.

**Section 3.2.**  Election; Resignation; Vacancies.

(a)  Unless the Certificate of Incorporation or an amendment to these Bylaws adopted by the stockholders provides for a Board of Directors divided into two or three classes, at each annual meeting of stockholders the stockholders shall elect directors each of whom shall hold office until the next annual meeting of stockholders and the election and qualification of his or her successor, or until his or her earlier death, resignation or removal.  If the Board of Directors is divided into classes, at each annual meeting at which the term of office of a class of directors expires, the stockholders shall elect directors of such class each to hold office until the annual meeting at which the terms of office of such class of directors expire and the election and qualification of his or her successor, or until his or her earlier death, resignation or removal.

(b)  Any director may resign at any time by giving written notice to the Chairman of the Board, if any, the President or the Secretary.  Unless otherwise stated in a notice of resignation, it shall take effect when received by the officer to whom it is directed, without any need for its acceptance.

(c)  Any newly created directorship or any vacancy occurring in the Board of Directors for any reason may be filled by a majority of the remaining directors (excluding any director elected by any class or series of preferred stock), although less than a quorum, or by a plurality of the votes cast in the election of directors at a meeting of stockholders.  Each director elected to replace a former director shall hold office until the expiration of the term of office of the director whom he or she has replaced and the election and qualification of his or her successor, or until his or her earlier death, resignation or removal.  A director elected to fill a newly created directorship shall serve until the next annual meeting of stockholders and the election and qualification of his or her successor, or until his or her earlier death, resignation or removal.

**Section 3.3.**  Regular Meetings.  Unless otherwise determined by the Board of Directors, a regular annual meeting of the Board of Directors shall be held, without call or notice, immediately after and, if the annual meeting of stockholders is held at a place, at the same place as the annual meeting of stockholders, for the purpose of organizing the Board of Directors, electing officers and transacting any other business that may properly come before such meeting.  If the stockholders shall elect the directors by written consent of stockholders as permitted by Section 2.11 of these Bylaws, a special meeting of the Board of Directors shall be called as soon as practicable after such election for the purposes described in the preceding sentence.  Additional regular meetings of the Board of Directors may be held without call or notice at such times as shall be fixed by resolution of the Board of Directors.

**Section 3.4.**  Special Meetings.  Special meetings of the Board of Directors may be called by the Chairman of the Board, if any, the President, the Secretary or by any member of the Board of Directors.  Notice of an in-person special meeting of the Board of Directors shall be given by the person or persons calling the meeting at least twenty-four hours before the special meeting.  Notice of a special telephonic meeting of the Board of Directors shall be given by the person or persons

calling the meeting at least two hours before the special meeting.  The purpose or purposes of a special meeting need not be stated in the call or notice.

Section 3.5.  Organization.  Meetings of the Board of Directors shall be presided over by the Chairman of the Board, if any, or if there is none or in his or her absence, by the President, or in his or her absence, by a chairman chosen at the meeting.  The Secretary shall act as secretary of the meeting, but in his or her absence the chairman of the meeting may appoint any person to act as secretary of the meeting.  A majority of the directors present at a meeting, whether or not they constitute a quorum, may adjourn such meeting to any other date, time or place without notice other than announcement at the meeting.

Section 3.6.  Quorum; Vote Required for Action.  At all meetings of the Board of Directors a majority of the whole Board of Directors shall constitute a quorum for the transaction of business.  Unless the Certificate of Incorporation or these Bylaws otherwise provide, the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

Section 3.7.  Committees.  The Board of Directors may, by resolution passed by a majority of the whole Board of Directors, designate one or more committees, each committee to consist of one or more directors of the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of the committee, the member or members present at any meeting and not disqualified from voting, whether or not a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member.  Any such committee, to the extent permitted by law and provided in these Bylaws or in the resolution of the Board of Directors designating such committee, or an amendment to such resolution, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it.

Section 3.8.  Telephonic Meetings.  Directors, or any committee of directors designated by the Board of Directors, may participate in a meeting of the Board of Directors or such committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 3.8 shall constitute presence in person at such meeting.

Section 3.9.  Informal Action by Directors.  Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing (which may be in counterparts) or by electronic transmission, and the written consent or consents or electronic transmission or transmissions are filed with the minutes of proceedings of the Board of Directors or such committee.  Such filing shall be made in paper form if the minutes of the Corporation are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.10.  Committee Rules.  Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may make, alter and repeal rules for the conduct of its business.  In the absence of such rules each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III of these Bylaws.

**Section 3.11.**  Reliance upon Records.  Every director, and every member of any committee of the Board of Directors, shall, in the performance of his or her duties, be fully protected in relying in good faith upon the records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of its officers or employees, or committees of the Board of Directors, or by any other person as to matters the director or member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation, including, but not limited to, such records, information, opinions, reports or statements as to the value and amount of the assets, liabilities and/or net profits of the Corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid, or with which the Corporation's capital stock might properly be purchased or redeemed.

**Section 3.12.**  Interested Directors.  A director who is directly or indirectly a party to a contract or transaction with the Corporation, or is a director or officer of or has a financial interest in any other corporation, partnership, association or other organization which is a party to a contract or transaction with the Corporation, may be counted in determining whether a quorum is present at any meeting of the Board of Directors or a committee thereof at which such contract or transaction is considered or authorized, and such director may participate in such meeting and vote on such authorization to the extent permitted by applicable law, including Section 144 of the General Corporation Law of the State of Delaware.

**Section 3.13.**  Compensation.  Unless otherwise restricted by the Certificate of Incorporation, the Board of Directors shall have the authority to fix the compensation of directors.  The directors shall be paid their reasonable expenses, if any, of attendance at each meeting of the Board of Directors or a committee thereof and may be paid a fixed sum for attendance at each such meeting and an annual retainer or salary for services as a director or committee member.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

## ARTICLE IV
### Officers

**Section 4.1.**  Executive Officers; Election; Qualification; Term of Office.  The Board of Directors shall elect a President and may, if it so determines, elect a Chairman of the Board from among its members.  The Board of Directors shall also elect a Secretary and may elect one or more Vice Presidents, one or more Assistant Secretaries, a Chief Financial Officer and one or more Assistant Treasurers.  Any number of offices may be held by the same person.  Each officer shall hold office until the first meeting of the Board of Directors after the annual meeting of stockholders next succeeding his or her election, and until his or her successor is elected and qualified or until his or her earlier death, resignation or removal.

**Section 4.2.**  Resignation; Removal; Vacancies.  Any officer may resign at any time by giving written notice to the Chairman of the Board, if any, the President or the Secretary.  Unless otherwise stated in a notice of resignation, it shall take effect when received by the officer to whom it is directed, without any need for its acceptance.  The Board of Directors may remove any officer with or without cause at any time, but such removal shall be without prejudice to the contractual rights of such officer, if any, with the Corporation.  A vacancy occurring in any office of the Corporation may be filled for the unexpired portion of the term thereof by the Board of Directors at any regular or special meeting.

**Section 4.3.**  Powers and Duties of Executive Officers.  The officers of the Corporation shall have such powers and duties in the management of the Corporation as may be prescribed by the Board

of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors.  The Board of Directors may require any officer, agent or employee to give security for the faithful performance of his or her duties.

**Section 4.4.**  <u>President</u>.  The President of the Corporation shall be the chief executive officer of the Corporation and shall in general supervise and control all of the business affairs of the Corporation, subject to the direction of the Board of Directors.  The President may execute, in the name and on behalf of the Corporation, any deeds, mortgages, bonds, contracts or other instruments which the Board of Directors or a committee thereof has authorized to be executed, except in cases where the execution shall have been expressly delegated by the Board of Directors or a committee thereof to some other officer or agent of the Corporation.

**Section 4.5.**  <u>Secretary</u>.  In addition to such other duties, if any, as may be assigned to the Secretary by the Board of Directors, the Chairman of the Board, if any, or the President, the Secretary shall (i) keep the minutes of proceedings of the stockholders, the Board of Directors and any committee of the Board of Directors in one or more books provided for that purpose; (ii) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law; (iii) be the custodian of the records and seal of the Corporation; (iv) affix or cause to be affixed the seal of the Corporation or a facsimile thereof, and attest the seal by his or her signature, to all certificates for shares of stock of the Corporation and to all other documents the execution of which under seal is authorized by the Board of Directors; and (v) unless such duties have been delegated by the Board of Directors to a transfer agent of the Corporation, keep or cause to be kept a register of the name and address of each stockholder, as the same shall be furnished to the Secretary by such stockholder, and have general charge of the stock transfer records of the Corporation.

**Section 4.6.**  <u>Chief Financial Officer</u>.  The Chief Financial Officer shall perform the duties designated by the President and shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, surplus and shares.  The Chief Financial Officer shall render to the Board of Directors, whenever requested, an account of the financial condition of the corporation.

**ARTICLE V**
Stock Certificates and Transfers

**Section 5.1.**  <u>Certificate</u>.  Stock of the Corporation may be certificated and every holder of stock shall be entitled to have a certificate signed by or in the name of the Corporation by the Chairman of the Board, if any, or the President or a Vice President, and by the Secretary or an Assistant Secretary, of the Corporation, certifying the number of shares owned by such stockholder in the Corporation.  Any or all of the signatures on the certificate may be facsimile, stamp or other imprint.  In case any officer, transfer agent, or registrar who has signed or whose facsimile, stamp or other imprint signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such officer, transfer agent, or registrar continued to be such at the date of issue.

**Section 5.2.**  <u>Lost, Stolen or Destroyed Certificates; Issuance of New Certificates</u>.  The Corporation may issue a new certificate for stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the

lost, stolen or destroyed certificate, or such stockholder's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 5.3.  Transfers of Stock.  Upon surrender to the Corporation or the transfer agent of the Corporation of a certificate for stock of the Corporation (if such stock is certificated) duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer or, if the relevant stock certificate is claimed to have been lost, stolen or destroyed, upon compliance with the provisions of Section 5.2 of these Bylaws, or, if such stock is not certificated, upon delivery of a duly executed and endorsed stock transfer power, and upon payment of applicable taxes with respect to such transfer, and in compliance with any restrictions on transfer applicable to such stock certificate or the shares represented thereby of which the Corporation shall have notice and subject to such rules and regulations as the Board of Directors may from time to time deem advisable concerning the transfer and registration of stock certificates, the Corporation may issue a new certificate or certificates for such stock to the person entitled thereto, cancel the old certificate and, in each case, record the transaction upon its books.  Transfers of stock shall be made only on the books of the Corporation by the registered holder thereof or by such holder's attorney or successor duly authorized as evidenced by documents filed with the Secretary or transfer agent of the Corporation.  Whenever any transfer of stock shall be made for collateral security, and not absolutely, it shall be so expressed in the entry of transfer if, when the certificate or certificates representing such stock are presented to the Corporation for transfer, both the transferor and transferee request the Corporation to do so.

Section 5.4.  Stockholders of Record.  The Corporation shall be entitled to treat the holder of record of any stock of the Corporation as the holder thereof and shall not be bound to recognize any equitable or other claim to or interest in such stock on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by the laws of the State of Delaware.

## ARTICLE VI
Notices

Section 6.1.  Manner of Notice.

(a)  Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, whenever notice is required to be given to any stockholder, director or member of any committee of the Board of Directors, such notice may be given by (i) personal delivery, (ii) depositing it, in a sealed envelope, in the United States mails, first class, postage prepaid, addressed, (iii) delivering to a company for overnight or second day mail or delivery, (iv) delivering it to a telegraph company, charges prepaid, for transmission, or by transmitting it via telecopier, or (v) any other reliable means permitted by applicable law (including, subject to Section 6.1(b), electronic transmission) to such stockholder, director or member, either at the address of such stockholder, director or member as it appears on the records of the Corporation or, in the case of such a director or member, at his or her business address; and such notice shall be deemed to be given at the time when it is thus personally delivered, deposited, delivered or transmitted, as the case may be.  Such requirement for notice shall also be deemed satisfied, except in the case of stockholder meetings, if actual notice is received orally or by other writing by the person entitled thereto as far in advance of the event with respect to which notice is being given as the minimum notice period required by law or these Bylaws.

(b) Without limiting the foregoing, any notice to stockholders given by the Corporation pursuant to these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given.  Any such consent shall be revocable by the stockholder by written notice to the Corporation and shall also be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary of the Corporation, the transfer agent or other person responsible for the giving of notice; provided, however, that the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.  Notice given by a form of electronic transmission in accordance with these Bylaws shall be deemed given: (i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (ii) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (iii) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of such posting and the giving of such separate notice; and (iv) if by another form of electronic transmission, when directed to the stockholder.

**Section 6.2.**   <u>Dispensation with Notice</u>.

(a)  Whenever notice is required to be given by law, the Certificate of Incorporation or these Bylaws to any stockholder to whom (i) notice of two consecutive annual meetings of stockholders, and all notices of meetings of stockholders or of the taking of action by stockholders by written consent without a meeting to such stockholder during the period between such two consecutive annual meetings, or (ii) all, and at least two, payments (if sent by first class mail) of dividends or interest on securities of the Corporation during a 12-month period, have been mailed addressed to such stockholder at the address of such stockholder as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required.  Any action or meeting which shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given.  If any such stockholder shall deliver to the Corporation a written notice setting forth the then current address of such stockholder, the requirement that notice be given to such stockholder shall be reinstated.

(b)  Whenever notice is required to be given by law, the Certificate of Incorporation or these Bylaws to any person with whom communication is unlawful, the giving of such notice to such person shall not be required, and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.  Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.

**Section 6.3.**   <u>Waiver of Notice</u>.   Any written waiver of notice, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors, or members of a committee or directors need be specified in any written waiver of notice.

## **ARTICLE VII**
Indemnification

**Section 7.1.**  Right to Indemnification.

(a)  The Corporation shall indemnify and hold harmless, to the fullest extent permitted by law as in effect on the date of adoption of these Bylaws or as it may thereafter be amended, any person who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding") by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director, officer, employee or agent of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (including the heirs, executors, administrators or estate of such person), against any and all liability and loss (including judgments, fines, penalties and amounts paid in settlement) suffered or incurred and expenses reasonably incurred by such person; provided that any standard of conduct applicable to whether a director or officer may be indemnified shall be equally applicable to an employee or agent under this Article VII.  The Corporation shall not be required to indemnify a person in connection with a proceeding initiated by such person, including a counterclaim or crossclaim, unless the proceeding was authorized by the Board of Directors.

(b)  For purposes of this Article VII:  (i) any reference to "other enterprise" shall include all plans, programs, policies, agreements, contracts and payroll practices and related trusts for the benefit of or relating to employees of the Corporation and its related entities ("employee benefit plans"); (ii) any reference to "fines", "penalties", "liability" and "expenses" shall include any excise taxes, penalties, claims, liabilities and reasonable expenses (including reasonable legal fees and related expenses) assessed against or incurred by a person with respect to any employee benefit plan; (iii) any reference to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation or trustee or administrator of any employee benefit plan which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants, beneficiaries, fiduciaries, administrators and service providers; (iv) any reference to serving at the request of the Corporation as a director, officer, employee or agent of a partnership or trust shall include service as a partner or trustee; and (v) a person who acted in good faith and in a manner he or she reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" for purposes of this Article VII.

**Section 7.2.**  Prepayment of Expenses.  The Corporation shall pay or reimburse the reasonable expenses incurred in defending any proceeding in advance of its final disposition if the Corporation has received an undertaking by the person receiving such payment or reimbursement to repay all amounts advanced if it should be ultimately determined that he or she is not entitled to be indemnified under this Article VII or otherwise.

**Section 7.3.**  Claims.  If a claim for indemnification or payment of expenses under this Article VII is not paid in full within 60 days after a written claim therefor has been received by the Corporation, the claimant may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim.  In any such

action the Corporation shall have the burden of proving that the claimant was not entitled to the requested indemnification or payment of expenses under applicable law.

Section 7.4.   <u>Non-Exclusivity of Rights</u>.   The rights conferred on any person by this Article VII shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise.

Section 7.5.   <u>Other Indemnification</u>.   The Corporation's obligation, if any, to indemnify any person who was or is serving at its request as a director, officer, employee, partner or agent of another corporation, partnership, joint venture or other enterprise shall be reduced by any amount such person may collect as indemnification from such other corporation, partnership, joint venture or other enterprise.

Section 7.6.   <u>Amendment or Repeal</u>.   Any repeal or modification of the foregoing provisions of this Article VII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

## <u>ARTICLE VIII</u> Transfer Restrictions.

Section 8.1.   Before any holder ("***Stockholder***") of shares of capital of the Corporation ("***Shares***") may Transfer (as such term is defined below) Shares (or any interest therein) to another prospective holder, such Stockholder must obtain the prior written consent of the Corporation upon resolutions duly approved by the Board of Directors, which consent may be withheld in its sole discretion.   "***Transfer***" shall mean with respect to any security, the direct or indirect assignment, sale, transfer, tender, pledge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or the Constructive Sale (as such term is defined below) or other disposition of such security (including transfer by testamentary or intestate succession, merger or otherwise by operation of law) or any right, title or interest therein (including, but not limited to, any right or power to vote to which the holder thereof may be entitled, whether such right or power is granted by proxy or otherwise), or the record or beneficial ownership thereof, the offer to make such a sale, transfer, Constructive Sale or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing. "***Constructive Sale***" shall mean, with respect to any security, a short sale with respect to such security, entering into or acquiring an offsetting derivative contract with respect to such security, entering into or acquiring a futures or forward contract to deliver such security, or entering into any other hedging or other derivative transaction that has the effect of materially changing the economic benefits and risks of ownership. Any purported Transfer of any shares of the corporation's stock effected in violation of this section shall be null and void and shall have no force or effect and the corporation shall not register any such purported Transfer.

Section 8.2.   <u>Exceptions for Certain Transfers</u>.

Notwithstanding the foregoing, the provisions of <u>Section 8.1</u> shall not apply to the following transactions:

(a) in the case of a Stockholder who is an individual, the transfer without consideration of any Shares made for bona fide estate planning purposes, either during a Stockholder's lifetime or on death by will or intestacy to (i) his or her spouse or Spousal

Equivalent, child (natural or adopted), sibling, or any other direct lineal antecedent or descendant of such Stockholder (or his or her spouse or Spousal Equivalent) (all of the foregoing collectively referred to as "**family members**"), or any other relative approved by the Corporation upon resolutions duly approved by the Board of Directors or (ii) any custodian or trustee of any trust, partnership or limited liability company solely for the benefit of, or the ownership interests of which are owned wholly by, such Stockholder or any such family members. "*Spousal Equivalent*" as used herein shall mean an individual who is registered with any state governmental entity as a domestic partner of the relevant person to whom such individual may be a Spousal Equivalent (a "*Registered Domestic Partner")* or who (i) irrespective of whether or not the relevant person to whom such individual may be a Spousal Equivalent and the Spousal Equivalent are the same sex, was the sole spousal equivalent of the other for the last twelve (12) months, (ii) intended to remain so indefinitely, (iii) was not married to anyone else nor a Registered Domestic Partner with anyone else, (iv) was at least 18 years of age and mentally competent to consent to contract, (v) was not related by blood to a degree of closeness that which would prohibit legal marriage in the state in which they legally reside, (vi) was jointly responsible for the other's common welfare and financial obligations, and (vii) resided with the other in the same residence for the last twelve (12) months and intends to do so indefinitely;

(b)  in the case of a Stockholder that is an entity, the transfer without consideration of any Shares by a Stockholder to its stockholders, members, partners, other equity holders, or affiliates;

(c)  the Transfer of Shares held by TokenVault Limited pursuant to that certain Asset Purchase Agreement (the "*Asset Purchase Agreement*") by and between the Corporation and TokenVault Limited to the stockholders of TokenVault Limited prior to the Return Date (as such term is defined in the Asset Purchase Agreement); or

(d)  the Transfer of Shares held by Austin Trombley to FT Fintech Holdings, LLC or any of its affiliates pursuant to that certain Stock Purchase Agreement by and among FT Fintech Holdings, LLC, Austin Trombley and the Corporation.

**Section 8.3.**  Subsequent Transfers.

In the case of any transfer consented to by the Corporation or described in Section 8.2 above or otherwise, the transferee, assignee, or other recipient shall receive and hold the Shares subject to the provisions of this Article VIII, and there shall be no further transfer of such stock except in accordance with this Article VIII.

**Section 8.4.**  Termination of Restriction.

The restrictions in this Article VIII terminate upon the earlier to occur of (i) the closing of a Sale Event (as defined below); or (ii) the first sale of common stock of the Corporation to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "**Securities Act**").  Upon termination of such restrictions, a new certificate or certificates representing the Shares not repurchased shall be issued, on request, without the legend referred to below and delivered to each Stockholder.

For purposes of these bylaws, "**Sale Even**t" means the consummation of (i) the dissolution or liquidation of the corporation, (ii) the sale of all or substantially all of the assets of the corporation on

a consolidated basis to an unrelated person or entity, (iii) a merger, reorganization or consolidation pursuant to which the holders of the corporation's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the surviving or resulting entity (or its ultimate parent, if applicable), (iv) the acquisition of all or a majority of the outstanding voting stock of the corporation in a single transaction or a series of related transactions by a Person or group of Persons, or (v) any other acquisition of the business of the corporation, as determined by the Board of Directors; *provided*, *however*, that the corporation's Initial Public Offering, any subsequent public offering or another capital-raising event, or a merger effected solely to change the corporation's domicile shall not constitute a "**Sale Event**".

"**Person**" shall mean any individual, corporation, partnership (limited or general), limited liability company, limited liability partnership, association, trust, joint venture, unincorporated organization or any similar entity.

"**Initial Public Offering**" means the consummation of the first firm commitment underwritten public offering pursuant to an effective registration statement under the Securities Act covering the offer and sale by the corporation of its equity securities, as a result of or following which the Shares shall be publicly held.

Section 8.5.  Legend.

The certificate or certificates representing the Shares shall bear the following legend (as well as any legends required by applicable state and federal corporate and securities laws):

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN THE BYLAWS OF THE COMPANY.

Section 8.6.  Waiver.

The provisions of Article VIII may be waived, with respect to any transaction subject thereto, by the Corporation upon resolutions duly approved by the Board of Directors; *provided*, *however*, that such restrictions shall continue to apply to the Shares subsequent to such transaction.


## ARTICLE IX
### General

Section 9.1.  Fiscal year.  The fiscal year of the Corporation shall be determined by resolution of the Board of Directors.

Section 9.2.  Seal.  The corporate seal, if any, shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors.

Section 9.3.  Form of Records.  Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or be in the form of, punch cards, magnetic tape, photographs, microphotographs, electronic format or any other information storage device, provided that the records so kept can be converted into clearly legible form within a reasonable time.  The Corporation shall so convert any records so kept upon the request of any person entitled to inspect the same.

Section 9.4.  Definitions.  For purposes of these Bylaws, "electronic transmission" means any form of communication, not directly involving the physical transmission of paper, that creates a

record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 9.5.** <u>Amendment of Bylaws</u>.  These Bylaws may be altered or repealed, and new Bylaws made, by the majority vote of the whole Board of Directors, provided, however, a Bylaw adopted by the holders of stock having a majority of the votes entitled to vote thereon that prescribes the required vote for the election of directors may not be altered by the Board of Directors.  The holders of stock having a majority of the votes entitled to vote thereon may make additional Bylaws and may alter and repeal any Bylaws whether adopted by them or otherwise.

*        *        *

THIS IS TO CERTIFY:  That I am the duly elected, qualif ed and acting Secretary of TokenVault, Inc. and that the f regoing Bylaws were adopted as the Bylaws of said corporation ef ective as of the 10th day of October, 2019.

_____
Alina Jais, Secretary

<u>Exhibit C</u>

Board Resolutions

**Unanimous Written Consent
in Lieu of Meeting
of the
Board of Directors
of
TokenVault, Inc.**

**October 25, 2019**

Pursuant to the provisions of Section 141(f) of the General Corporation Law of Delaware (the "**DGCL**"), the undersigned, being the members of the Board of Directors (the "**Board**") of TokenVault, Inc., a Delaware corporation (the "**Corporation**"), hereby waives notice of and dispenses with the formality of a meeting of the Board and adopts the following resolutions:

**Asset Purchase Agreement**

WHEREAS, a form of Asset Purchase Agreement, in substantially the form attached hereto as Exhibit A (the "**Asset Purchase Agreement**"), by and between TokenVault Limited and the Corporation, pursuant to which the Corporation will purchase certain assets of TokenVault Limited and will issue non-voting stock of the Corporation to TokenVault Limited in connection with such asset purchase, has been presented to the Board (the "**Asset Purchase**");

WHEREAS, it is hereby deemed to be in the best interests of the Corporation and its stockholders to enter into the Asset Purchase Agreement and approve the Asset Purchase;

BE IT RESOLVED, that the Asset Purchase Agreement, in substantially the form attached hereto as Exhibit A, and the Asset Purchase are each hereby approved in all respects;

RESOLVED FURTHER, that the officers of the Corporation are hereby authorized to execute and deliver the Asset Purchase Agreement in accordance with the terms thereof with such modifications and amendments as the officers of the Corporation may, in their discretion, determine to be necessary or desirable, such determination to be conclusively evidenced by the execution and delivery of definitive documents

**Stock Purchase Agreement**

WHEREAS, a form of Stock Purchase Agreement, in substantially the form attached hereto as Exhibit B (the "**Stock Purchase Agreement**"), by and among the Corporation, Austin Dale Trombley, and FT Fintech Holdings, LLC ("**Purchaser**"), has been presented to the Board, whereby Purchaser would purchase shares of voting stock of the Corporation from Austin Trombley, and purchase shares of non-voting stock of the Corporation directly from the Corporation (the "**Financing**");

WHEREAS, it is hereby deemed to be in the best interests of the Corporation and its stockholders to enter into the Stock Purchase Agreement and approve the Financing;

BE IT RESOLVED, that the Stock Purchase Agreement and the Financing are each hereby approved in all respects;

RESOLVED FURTHER, that the officers of the Corporation are hereby authorized to execute and deliver the Stock Purchase Agreement in accordance with the terms thereof, with such modifications and amendments as the officers of the Corporation may, in their discretion, determine to be necessary or desirable, such determination to be conclusively evidenced by the execution and delivery of definitive documents.

**Amended and Restated Certificate of Incorporation**

WHEREAS, a form of Amended and Restated Certificate of Incorporation attached hereto as Exhibit C (the "**Amended Certificate**") has been presented to the Board to, among other things, create two classes of non-voting shares of the Corporation;

WHEREAS, it is hereby deemed to be in the best interests of the Corporation and its stockholders to be approve and file the Amended Certificate with the Delaware Secretary of State;

BE IT RESOLVED, that the Amended Certificate is hereby approved in the form attached hereto as Exhibit C, subject to the approval of the holders of the voting shares of the Corporation;

RESOLVED FURTHER, that the officers of the Corporation be, and each of them hereby is, authorized and directed to solicit the necessary approval of the Amended Certificate from the stockholders of the Corporation ; and

RESOLVED FURTHER, that upon stockholder approval of the Amended Certificate, the officers of the Corporation be, and each of them hereby is, authorized and directed to execute and file for and on behalf of the Corporation such Amended Certificate in the form and manner required by the laws of the State of Delaware, and to execute and deliver any and all certificates, authorizations or other written instruments and in general to do all acts necessary or appropriate to carry out the purposes of the foregoing resolutions.

**Officer Resignations and Appointments**

WHEREAS, the Board acknowledges that (i) Aaron Travis is the current President and Treasurer of the Corporation; (ii) Alina Jais is the current Secretary of the Corporation; and (ii) Mr. Travis and Ms. Jais are the only officers of the Corporation;

WHEREAS, the Board deems it advisable and in the best interests of the Corporation and its stockholders to (i) remove Mr. Travis from his position as the President and Secretary of the Corporation and (ii) remove Ms. Jais from her

position as the Treasurer of the Corporation, in each case, effective as of the Initial Closing (as defined in the Stock Purchase Agreement); and

WHEREAS, the Board deems it advisable and in the best interests of the Corporation and its stockholders to appoint Roger Bayston as the Interim President, Interim Secretary, Interim Treasurer and Interim Chief Executive Officer of the Corporation, effective as of the Initial Closing.

BE IT RESOLVED, that, effective as of the Initial Closing, (i) Mr. Trombley is hereby removed from his position as President and Secretary and (ii) Ms. Jais is hereby removed from her position as Treasurer of the Corporation.

RESOLVED FURTHER, effective as of the Initial Closing, Mr. Bayston is hereby appointed as the Interim President, Interim Secretary, Interim Treasurer and Interim Chief Executive Officer of the Corporation, to service until his successor is duly elected and qualified or until his earlier resignation or removal.

**General**

BE IT RESOLVED, that the proper officers of the Corporation be, and each hereby is, authorized to pay or cause to be paid all fees, charges and expenses, and to take such further action as they shall deem appropriate, in connection with the organization of the Corporation and each of the foregoing resolutions;

RESOLVED FURTHER, that in addition to the specific authorizations set forth in any of the foregoing resolutions, the proper officers of the Corporation be, and they hereby are, authorized to take from time to time any and all such action and to execute and deliver from time to time any and all such instruments, requests, receipts, notes, applications, reports, certificates and other documents as may be necessary or advisable in their opinion, or in the opinion of any of them, to effectuate, consummate and comply with the purpose and intent of any of the foregoing resolutions; and

RESOLVED FURTHER, that any and all actions taken by the officers of the Corporation, and each of them, in furtherance of any of the foregoing resolutions prior to the date hereof are hereby ratified, confirmed and approved.

The original executed copy of this document shall be filed in the minute book of the Corporation and become a part of the records of the Corporation.

*     *     *

ACTIVE 250098434

This Action by Unanimous Written Consent shall be effective as of the date the Corporation receives the unanimous consent of the Corporation's directors. This Action by Unanimous Written Consent may be signed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument and shall be filed with the minutes of the proceedings of the board of directors of the Corporation. Any copy, facsimile or other reliable reproduction of this Action by Unanimous Written Consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.

Austin Dale Trombley, Director

# EXHIBIT A

## **Asset Purchase Agreement**

[See attached]

*Execution Copy*
**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

**by and between**

**TOKENVAULT, INC.**

**and**

**TOKENVAULT LIMITED**

**Dated as of October 28, 2019**

TABLE OF CONTENTS

Article 1        DEFINITIONS; INTERPRETATION ..................................................................1
    1.1      Certain Definitions ............................................................................................1
    1.2      Interpretation ....................................................................................................1

Article 2        PURCHASE AND SALE ..................................................................................2
    2.1      Purchase and Sale of Transferred Assets .........................................................2
    2.2      Transferred Assets ............................................................................................2
    2.3      Excluded Assets ................................................................................................4
    2.4      Assumed Liabilities ..........................................................................................5
    2.5      Retained Liabilities ..........................................................................................5
    2.6      Closing...............................................................................................................5
    2.7      Prorations..........................................................................................................6
    2.8      Title and Risk ...................................................................................................6
    2.9      Remote Transfer ...............................................................................................6
    2.10     Return of Buyer Non-Voting Shares ................................................................6

Article 3        REPRESENTATIONS AND WARRANTIES OF SELLER ...........................7
    3.1      Status of Seller and the Seller Subsidiaries .....................................................7
    3.2      Authorization; No Conflicts .............................................................................7
    3.3      Financial Matters ..............................................................................................8
    3.4      Taxes .................................................................................................................8
    3.5      Real and Personal Property ..............................................................................8
    3.6      Intellectual Property and Technology ..............................................................9
    3.7      Material Contracts ..........................................................................................11
    3.8      General Employee Matters; Benefit Plans and Benefits ................................13
    3.9      Litigation and Other Proceedings ..................................................................16
    3.10     Compliance with Laws ...................................................................................16
    3.11     Data Privacy. ..................................................................................................17
    3.12     FCPA. ..............................................................................................................18
    3.13     Assets Complete; Title ...................................................................................18
    3.14     No Other Representations or Warranties.........................................................18

Article 4        REPRESENTATIONS AND WARRANTIES OF Buyer ...............................19
    4.1      Status of Buyer ...............................................................................................19
    4.2      Authorization; No Conflicts ...........................................................................19
    4.3      Litigation .........................................................................................................20

-i-

| | | | |
|---|---|---|---|
| | 4.4 | Independent Investigation ................................................................. | 20 |
| Article 5 | | COVENANTS ....................................................................................... | 20 |
| | 5.1 | Conduct of Business by Seller ........................................................... | 21 |
| | 5.2 | Affirmative Covenants Relating to Seller .......................................... | 22 |
| | 5.3 | Consents and Closing Conditions ...................................................... | 22 |
| | 5.4 | Maintenance of Books and Records ................................................... | 23 |
| Article 6 | | TAX MATTERS .................................................................................... | 23 |
| | 6.1 | Proration of Taxes .............................................................................. | 23 |
| | 6.2 | Cooperation on Tax Matters ............................................................... | 24 |
| | 6.3 | Tax Proceedings ................................................................................. | 25 |
| | 6.4 | Tax Consequences. ............................................................................. | 25 |
| Article 7 | | EMPLOYEE MATTERS ....................................................................... | 25 |
| | 7.1 | Employment of Transferred Employees .............................................. | 25 |
| | 7.2 | Credit for Service; Welfare Benefits ................................................. | 25 |
| | 7.3 | Third Party Rights; Amendments to Employee Plans .......................... | 26 |
| Article 8 | | BUYER'S CONDITIONS TO CLOSING .............................................. | 26 |
| | 8.1 | Representations and Warranties .......................................................... | 26 |
| | 8.2 | Performance of Covenants ................................................................. | 27 |
| | 8.3 | No Litigation ...................................................................................... | 27 |
| | 8.4 | No Orders ........................................................................................... | 27 |
| | 8.5 | Material Adverse Effect ..................................................................... | 27 |
| | 8.6 | Closing Documents ............................................................................ | 27 |
| | 8.7 | Consents ............................................................................................. | 27 |
| | 8.8 | Frustration of Closing Conditions ...................................................... | 27 |
| | 8.9 | No Injunctions .................................................................................... | 27 |
| | 8.10 | No Laws or Orders ............................................................................. | 27 |
| Article 9 | | SELLER'S CONDITIONS TO CLOSING ............................................. | 27 |
| | 9.1 | Representations and Warranties .......................................................... | 28 |
| | 9.2 | Performance of Covenants ................................................................. | 28 |
| | 9.3 | No Litigation ...................................................................................... | 28 |
| | 9.4 | No Orders ........................................................................................... | 28 |
| | 9.5 | Closing Documents ............................................................................ | 28 |
| | 9.6 | Frustration of Closing Conditions ...................................................... | 28 |

ACTIVE 245910556

Article 10          ITEMS TO BE DELIVERED AT CLOSING ...................................................28
    10.1     Items to be Delivered by Seller ......................................................28
    10.2     Items to be Delivered by Buyer ......................................................29

Article 11          TERMINATION ...................................................................................29
    11.1     Termination by Mutual Consent ......................................................29
    11.2     Termination by either Buyer or Seller............................................29
    11.3     Termination by Buyer .....................................................................30
    11.4     Termination by Seller .....................................................................30
    11.5     Notice of Termination .....................................................................30
    11.6     Effect of Termination and Abandonment.........................................30

Article 12          SURVIVAL; INDEMNIFICATION .......................................................30
    12.1     Survival ..........................................................................................30
    12.2     Indemnification by Seller ...............................................................31
    12.3     Indemnification by Buyer ...............................................................31
    12.4     Notice of Claims .............................................................................31
    12.5     Adjustment to  Indemnified Party's Losses; Limitations..................33
    12.6     Exclusive Remedy ...........................................................................34

Article 13          MISCELLANEOUS ............................................................................34
    13.1     Notices ............................................................................................34
    13.2     Amendment ......................................................................................35
    13.3     Counterparts ...................................................................................35
    13.4     Binding on Successors and Assigns .................................................35
    13.5     Severability .....................................................................................36
    13.6     Waivers ...........................................................................................36
    13.7     Headings .........................................................................................36
    13.8     Entire Agreement ............................................................................36
    13.9     Choice of Law .................................................................................36
    13.10    Venue...............................................................................................36
    13.11    Waiver of Jury Trial Rights.............................................................37
    13.12    No Third-Party Rights.....................................................................37
    13.13    Transfer Taxes ................................................................................37
    13.14    Expenses .........................................................................................37
    13.15    Specific Performance ......................................................................37
    13.16    No Recourse ....................................................................................38

ACTIVE 245910556

## EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of IP Assignments |
| Schedule A | Definitions |
| Schedule B | Business Employees |
| Disclosure Schedule | Disclosure Schedule |

ACTIVE 245910556

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is made as of October 28, 2019, by and between TokenVault Limited, a company incorporated under the laws of Singapore ("Seller"), on the one hand, and TokenVault, Inc., a Delaware corporation ("Buyer"), on the other hand.

## RECITALS

WHEREAS, Seller, directly or indirectly through certain of its wholly owned subsidiaries (collectively, the "Seller Subsidiaries"), engages in the Business;

WHEREAS, Seller wishes to sell and transfer, and cause the Seller Subsidiaries to sell and transfer, to Buyer, and Buyer wishes to purchase and receive from Seller and the Seller Subsidiaries, all of the Transferred Assets, upon the terms and subject to the conditions of this Agreement;

WHEREAS, Buyer has agreed to assume from Seller and the Seller Subsidiaries the Assumed Liabilities, upon the terms and subject to the conditions of this Agreement; and

WHEREAS, each of the parties hereto desires to set forth certain representations, warranties and covenants, and to establish certain closing conditions, made to induce the others to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS; INTERPRETATION

1.1     Certain Definitions.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings set forth in Schedule A attached to this Agreement.

1.2     Interpretation.  The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Terms defined in the singular shall have correlative meanings when used in the plural, and vice versa.  The use of the word "or" shall not be exclusive unless expressly indicated otherwise.  Any reference to "days" means calendar days unless Business Days are expressly specified.  The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's successors and permitted assigns.  The word "will," when referring to an action by a

-1-

party, shall be construed to have the same meaning and effect as the word "shall." Unless otherwise specifically indicated, all references to "dollars" or "$" shall refer to the lawful currency of the United States. The headings herein are for convenience of reference only, do not constitute part of this Agreement, and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Unless otherwise specifically indicated, any agreement or instrument defined or referred to herein or in any agreement or instrument that is referred to herein shall mean such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

## ARTICLE 2
## PURCHASE AND SALE

2.1     Purchase and Sale of Transferred Assets. At the Closing and except as otherwise specifically provided in this Article 2, upon and subject to the terms and conditions of this Agreement:

(a)     Seller agrees to, and agrees to cause the Seller Subsidiaries to, grant, sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to purchase, acquire and accept from Seller and the Seller Subsidiaries, all right, title and interest in the Transferred Assets as of the Closing, free and clear of all Liens other than Permitted Encumbrances; and

(b)     in consideration for the conveyance of the Transferred Assets, Buyer agrees to (i) issue to Seller a number of voting and non-voting shares of the Buyer equal to 7,606,610 non-voting shares of Buyer (the "Buyer Non-Voting Shares") and (ii) assume the Assumed Liabilities. The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "Acquisition."

2.2     Transferred Assets. The term "Transferred Assets" means all of Seller's and the Seller Subsidiaries' right, title and interest in, to and under the following assets, properties and rights, wherever located, whether tangible or intangible, accrued or contingent, as they exist as of the time of Closing, in each case, other than (A) the Excluded Assets, and (B) as otherwise provided in this Section 2.2 (but in each case excluding any tangible embodiment of assets transmitted electronically at or after Closing pursuant to Section 2.9):

(a)     subject to Section 2.3, all contracts, licenses, indentures, agreements, commitments, statements of work and other legally binding written instruments or arrangements (collectively, "Contracts") set forth on Section 2.2(a) of the Disclosure Schedule and all other Contracts to which Seller or any of the Seller Subsidiaries is a party or by which Seller or any of the Seller Subsidiaries is bound that are used or held for use primarily in the operation or conduct of the Business as currently conducted (the "Transferred Contracts");

-2-

(b)      all rights, Claims and causes of action of Seller or any of the Seller Subsidiaries to the extent arising out of, relating to or in respect of any Transferred Asset or any Assumed Liability, other than (i) any such items arising under insurance policies of Seller or any of the Seller Subsidiaries (other than the amount of, and any rights to, any insurance proceeds received by Seller or any of the Seller Subsidiaries after the Closing on account of losses that occurred with respect to the Transferred Assets or the Assumed Liabilities prior to or after the Closing), and (ii) all of Seller's or any of the Seller Subsidiaries' rights to assert Claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, in law or in equity (collectively, "Seller Claims"), that Seller or any of the Seller Subsidiaries, in any capacity, ever had, now has or may or shall have in the future, whether known or unknown, arising out of, relating to or in respect of (A) the Business' purchase or procurement of any good, service or product or (B) Seller's or any of the Seller Subsidiaries' purchase or procurement of any good, service or product for, or on behalf of, the Business, in either case of clauses (A) or (B), at any time up until the Closing and not relating to an Assumed Liability, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Seller Claims;

(c)      to the extent permitted by Law, all personnel and employment records that relate to the Transferred Employees; provided that, Seller shall, to the extent allowed by Law, be permitted to retain copies thereof;

(d)      all Patents, registered Marks, registered Copyrights, domain names, and applications for any of the foregoing that are set forth on Section 2.2(d) of the Disclosure Schedule (the "Transferred Registered IP"), including all rights of Seller and the Seller Subsidiaries to receive payments with respect to such Transferred Registered IP accruing after the Closing;

(e)      all Intellectual Property (other than the Transferred Registered IP) owned by Seller or any Seller Subsidiary that is used or held for use in the operation or conduct of the Business as currently conducted as set forth on Section 2.2(e) of the Disclosure Schedule (collectively, and collectively with the Transferred Registered IP, the "Transferred Intellectual Property"), including all rights of Seller and the Seller Subsidiaries to receive payments with respect to such Transferred Intellectual Property accruing after the Closing, and all Technology owned by Seller or any Seller Subsidiary that is used or held for use primarily in the operation or conduct of the Business as currently conducted, including the items that are set forth on Section 2.2(f) of the Disclosure Schedule (and any source code and tangible embodiments thereof) (collectively, the "Transferred Technology");

(f)      all guarantees, warranties, indemnities and similar rights in favor of Seller or any Seller Subsidiary in respect of any Transferred Asset or any Assumed Liability;

(g)      all goodwill, going concern value and other intangible assets generated by, or primarily related to or primarily associated with the Business;

(h)      certain leaseholds in or leases of real property and other interests in real property of Seller or any of the Seller Subsidiaries to be transferred to Buyer as set forth on Section 2.2(h) of the Disclosure Schedule (collectively, the "Transferred Leases");

-3-

(i)      the assets specifically identified on <u>Section 2.2(i)</u> of the Disclosure Schedule, the delivery of which shall be effectuated by mutual agreement of Seller and Buyer; and

(j)      all outstanding shares or other equity interests of the Seller Subsidiaries identified on <u>Section 2.2(j) of the Disclosure Schedule</u>.

2.3      <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, the Transferred Assets shall not include any assets or rights other than the assets or rights specifically listed or described in <u>Section 2.2</u>.  Without limiting the generality of the foregoing, the Transferred Assets shall not include any of the following (collectively, the "<u>Excluded Assets</u>"):

(a)      all cash, cash equivalents or securities of Seller or any of the Seller Subsidiaries other than as set forth on Section 2.2(i) of the Disclosure Schedule;

(b)      all rights, Claims and causes of action of Seller or any of the Seller Subsidiaries to the extent arising out of, relating to or in respect of any Excluded Asset or any Retained Liability, and any and all other Seller Claims, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Seller Claims;

(c)      all guarantees, warranties, indemnities and similar rights in favor of Seller or any of the Seller Subsidiaries in respect of any Excluded Asset or any Retained Liability;

(d)      personnel and employment records for employees and former employees of the Business who are not Transferred Employees;

(e)      any shares of capital stock or other equity interests of Seller, any Seller Subsidiary or any of their respective Affiliates;

(f)      any Tax refunds or credits, claims for Tax refunds or credits or rights to receive Tax refunds or credits from any Governmental Authority with respect to the Business or the Transferred Assets for, or applicable to, any taxable period (or portion of any Straddle Period) ending on or prior to the Closing Date;

(g)      any records (including accounting records) related to Income Taxes paid or payable by Seller, any of the Seller Subsidiaries or any of their respective Affiliates and all financial and Income Tax records relating to the Business that form part of Seller's, any of the Seller Subsidiaries' or any of their respective Affiliates' general ledger;

(h)      all intracompany accounts (payables and receivables) of Seller and its Affiliates;

(i)      all rights of Seller or any of the Seller Subsidiaries under this Agreement, the Other Agreements and any other agreements, certificates and instruments delivered in connection with this Agreement and the Other Agreements; and

-4-

(j)    all rights with respect to or arising under the Excluded Assets, except as may otherwise be specifically provided in this Agreement.

2.4    <u>Assumed Liabilities</u>.  At the Closing hereunder and except as otherwise specifically provided in this <u>Section 2.4</u>, Buyer shall assume and shall timely pay, perform and discharge when due, all Liabilities, in each case, to the extent such Liabilities arise primarily out of or otherwise primarily relate to the Business or the Transferred Assets as set forth in this <u>Section 2.4</u> (collectively, the "<u>Assumed Liabilities</u>"):

(a)    all Liabilities agreed to be performed by Buyer pursuant to the terms of this Agreement or any of the Other Agreements;

(b)    all Liabilities with respect to a Transferred Employee that arise on or after the time such Transferred Employee becomes an employee of Buyer;

(c)    all Liabilities arising under the Transferred Contracts, Transferred Leases, Transferred Technology, and Transferred Intellectual Property, to the extent arising from or relating to ownership or use, operation and/or performance (as applicable), sale, offer to sell or import/export, of such Transferred Contracts, Transferred Leases, Transferred Technology, and Transferred Intellectual Property after the Closing;

(d)    all Liabilities (including any defense costs, third party legal fees and similar expenses) in respect of any action or Proceeding and Claims to the extent arising out of, relating to or in respect of the Transferred Assets, the Business or the operation or conduct of the Business following the Closing;

(e)    all Taxes to the extent arising out of, relating to or in respect of the Transferred Assets, the Business or the operation or conduct of the Business by Buyer for all taxable periods (or the portion of any Straddle Period) beginning after the Closing Date;

(f)    all Buyer Included Taxes; and

(g)    all liabilities of Seller pursuant to the Convertible Note.

2.5    <u>Retained Liabilities</u>.  Buyer will not assume or be liable for any Retained Liabilities, and Seller will remain responsible for paying, performing and discharging all such Retained Liabilities.  "<u>Retained Liabilities</u>" shall mean any Liabilities which are not Assumed Liabilities.

2.6    <u>Closing</u>.

(a)    At the Closing:

(i)    Seller will deliver or cause to be delivered to Buyer the various items, certificates, instruments, and documents referred to in <u>Section 10.1</u>; and

(ii)    Buyer will deliver or cause to be delivered to Seller the various items, certificates, instruments, and documents referred to in <u>Section 10.2</u>.

-5-

(b)     The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at a location or locations mutually satisfactory to the parties hereto (or remotely via the electronic exchange of executed documents and other closing deliverables) commencing at 9:00 a.m. United States Pacific Time (i) on the first Business Day following the date upon which all of the conditions to Closing set forth in Article 8 and Article 9 have been satisfied or waived, other than those conditions that by their nature are to be satisfied at the Closing (but subject to the fulfillment or waiver of such conditions at the Closing), or (ii) on such other date as the parties may mutually agree in writing (the "Closing Date").

2.7     Prorations.  With respect to accrued utility and similar payments arising from the ownership or use of the Transferred Assets, the Assumed Liabilities and the operation of the Business, the accrued rents and other payments under the Transferred Leases, the Transferred Intellectual Property and the Transferred Contracts and similar accrued items all as relating to a period that includes (but does not end on) the Closing Date, Buyer shall be responsible for the pro rata portion thereof based upon the number of days in such period following (but, for the avoidance of doubt, not including) the Closing Date as a percentage of the total number of days in such period.

2.8     Title and Risk.  Title to the Transferred Assets shall not pass until Closing.  Seller and the Seller Subsidiaries shall continue to carry on the Business for their own benefit and at their own risk up to Closing.  Subject to the Retained Liabilities of Seller and its Affiliates, the Transferred Assets shall be at the risk of Buyer following Closing.

2.9     Remote Transfer.  Notwithstanding anything to the contrary in this Agreement: (a) any of the Transferred Assets (including software and any related documentation) that can be transmitted electronically will be so transmitted to Buyer within three Business Days following the Closing and will not be delivered to Buyer on any tangible medium; and (b) none of the servers, drives or other equipment on which the source code for any such Transferred Asset is being stored or processed are being transferred to Buyer or included in the Transferred Assets.

2.10     Return of Buyer Non-Voting Shares. The Seller intends to distribute the Buyer Non-Voting Shares to certain of its stockholders promptly following the Closing (the "Distribution"). In the event that the Seller continues to hold any Buyer Non-Voting Shares on the date that is one hundred and twenty days following the date of the Closing (such date, the "Return Date"), the Seller agrees and acknowledges that all Buyer Non-Voting Shares held by the Seller as of the Return Date will be automatically forfeited and will not be subject to the Distribution. The Seller shall within three (3) Business Days of the Return Date: (i) notify the Buyer in writing of the number and class of Buyer Non-Voting Shares that are held by the Seller as of the Return Date (the "Return Shares") and (ii) surrender to the Buyer, free and clear of all Encumbrances, any certificates representing the Return Shares, together with a duly executed stock power for the transfer of such Return Shares to the Company or to the Company's assignee(s). Following the forfeiture of the Return Shares hereunder, neither the Seller nor any of its Affiliates will have any right in, to or with respect to any of the Return Shares.

-6-

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows; provided, however, that the representations and warranties of this Article 3 shall be qualified by any exceptions disclosed in the disclosure schedule attached hereto corresponding to an enumerated Section of this Article 3 (collectively, the "Disclosure Schedule"), and to any other Section of this Article 3 to which its relevance is reasonably apparent.

      3.1    Status of Seller and the Seller Subsidiaries.  Seller is a corporation duly incorporated, validly existing and in good standing under the laws of Singapore.  Each of Seller and the Seller Subsidiaries has full corporate, company or partnership power and authority to enable it to own, lease or otherwise hold the Transferred Assets owned, leased or otherwise held by it and to conduct the Business as presently conducted by it.  Each of Seller and each of the Seller Subsidiaries is qualified to do business and is in good standing (to the extent the concept of good standing is applicable in a particular jurisdiction) in all jurisdictions in which the character of the properties owned, leased or operated by it or the nature of the Business makes such qualification necessary, except where such failure would not reasonably be expected to be material to Seller and/or such Seller Subsidiary.  Section 3.1 of the Disclosure Schedule lists each subsidiary of Seller that is a Seller Subsidiary.

      3.2    Authorization; No Conflicts.

      (a)    Seller has full power and authority to enter into this Agreement and the Other Agreements to which it is a party and to carry out the transactions contemplated hereby and thereby.  Seller has taken all action required to authorize the execution and delivery of this Agreement and the Other Agreements executed and delivered by Seller pursuant hereto, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby. No other company proceeding on the part of Seller is necessary to authorize the execution, delivery and performance by Seller of this Agreement and all Other Agreements executed and delivered by Seller pursuant hereto.  This Agreement and all Other Agreements executed and delivered by Seller pursuant hereto are valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. No approvals or consents are required from any governmental authority or third party to execute the Agreement and all Other Agreements and to consummate the transactions contemplated thereby on or prior to the Closing Date.

      (b)    The execution and delivery by Seller of this Agreement do not, the execution and delivery by Seller and each of the Seller Subsidiaries of each Other Agreement to which it is or will be a party will not, and the consummation of the transactions contemplated to be consummated by it by this Agreement and such Other Agreements will not, conflict with, result in any breach of, constitute a default under (or an event that, with notice or lapse of time or both, would become a default under), require any consent of any Person pursuant to, give to others any rights of termination, acceleration or cancellation under, allow the imposition of any fees or penalties under, require the offering or making of any payment or redemption under or result in the creation of any Lien (other than Permitted Encumbrances or Liens caused by Buyer) upon any of the Transferred Assets under any provision of (i) the organizational documents of Seller or any

-7-

of the Seller Subsidiaries, (ii) any material Contract (including any Transferred Contract) to which Seller or any of the Seller Subsidiaries is a party or by which the Business or any of the Transferred Assets or Assumed Liabilities is bound, or (iii) any injunction, judgment, Order or decree or statute, Law, ordinance, legally-binding rule, executive order, code or regulation applicable to Seller or any of the Seller Subsidiaries, the Business or any of the Transferred Assets or Assumed Liabilities, other than, in the case of clauses (ii) and (iii) above, as set forth on Section 3.2(b) of the Disclosure Schedule.

3.3     Financial Matters.  Seller has delivered to Buyer the financial statements of the Seller for the fiscal year ended December 31, 2018 and as of the eight months ended August 31, 2019 (the "Financial Statements").  The Financial Statements (1) present fairly in all material respects the revenue and direct costs, as applicable, of the Business as of the respective dates thereof or for the periods covered thereby, as applicable, and (2) were prepared in good faith from the internal books and records of Seller and the Seller Subsidiaries in a manner consistent with past accounting practices.

3.4     Taxes.

(a)     There are no Liens for Taxes upon any of the Transferred Assets or the Business, other than Permitted Encumbrances.

(b)     There is no currently outstanding dispute, deficiency, claim, audit or other administrative or judicial proceeding relating to any Tax or Tax Return of Seller with respect to the Business or the Transferred Assets, and Seller has not received notice regarding the potential commencement of any such proceeding.

(c)     No claim has ever been made by a Taxing Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction with respect to the Business.  The Transferred Assets are located in the jurisdictions set forth in Section 3.4(c) of the Disclosure Schedule.  The Disclosure Employees have offices only in such jurisdictions.

3.5     Real and Personal Property.

(a)     Real Property; Transferred Leases.  Seller and the Seller Subsidiaries do not own any real property that is used primarily for the operation of the Business.  Seller or the applicable Seller Subsidiary holds a valid, subsisting and enforceable leasehold interest under each of the Transferred Leases, and each such Transferred Lease constitutes a legal, valid and binding obligation, enforceable against Seller or such applicable Seller Subsidiary in accordance with its terms.  Neither Seller nor any of the Seller Subsidiaries subleases or otherwise permits the occupancy by any third party of all or any portion of the Transferred Leases.  Seller has made available to Buyer a true and complete copy of each Transferred Lease (including all amendments, modifications and supplements thereto).

(b)     Personal Property.  All of the assets owned by Seller or the Seller Subsidiaries in the operation of the Business are the sole, absolute property of the Seller or such Seller Subsidiary and there is not now outstanding any Lien (other than Permitted

-8-

Encumbrances) over the whole or any part of the undertaking, property or assets of the Seller or such Seller Subsidiary and none of the assets now owned or used by the Seller or such Seller Subsidiary is the subject of any hire purchase, leasing, lease, purchase or credit sale agreement.

      3.6    <u>Intellectual Property and Technology</u>.

      (a)    Seller is the sole and exclusive owner of each item of Transferred Intellectual Property and Transferred Technology, free and clear of any Encumbrances, other than Permitted Encumbrances.  Seller has the sole and exclusive right to bring any claim or suit against a third Person for infringement or misappropriation of any Transferred Intellectual Property.  The Seller has not transferred to any Person ownership of, or granted any exclusive license with respect to, any Transferred Intellectual Property or Transferred Technology that is or would have been, but for such transfer or grant, Transferred Intellectual Property or Transferred Technology.

      (b)    All Transferred Technology and Transferred Intellectual Property, as of the date hereof, are, and, as of and immediately following Closing, will be fully transferable, alienable and licensable by Buyer, who will be permitted to exercise all of Seller's rights in the Transferred Technology and Transferred Intellectual Property to the same extent Seller would have been able to had the transactions contemplated hereunder not occurred, without restriction and without payment of any kind to any third Person, except as disclosed on <u>Section 3.6(b) of the Disclosure Schedule</u>.

      (c)    No Product that constitutes Transferred Technology violates any license or violates, infringes, or misappropriates or will violate, infringe, or misappropriate any Intellectual Property of any other party.  No Transferred Intellectual Property or Transferred Technology is subject to any claim or Proceeding or outstanding Order, or stipulation or Contract restricting in any material manner, the use, transfer, or licensing thereof by Seller, or which affects the validity, use or enforceability of such Transferred Intellectual Property or Transferred Technology.

      (d)    There are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Transferred Intellectual Property or Transferred Technology (such options, licenses, agreements, claims, encumbrances or shared ownership interests, "<u>Outbound Licenses</u>"), other than non-negotiated agreements granting non-exclusive licenses to third parties for purposes of providing services to or on behalf of Seller entered into in the ordinary course of business and disclosed on <u>Section 2.2(a) of the Disclosure Schedule</u>.  The assignment to Buyer of the Transferred Technology and the Transferred Intellectual Property, will not result in: (i) Buyer granting to any third Person any right to or with respect to any Technology or Intellectual Property owned by, or licensed to, Buyer, other than the rights granted to third Persons with respect to the Transferred Technology or Transferred Intellectual Property that are assumed by Buyer by virtue of assuming any Transferred Contracts that constitute an Outbound License; (ii) the Seller or Buyer granting to any third Person any right to, or with respect to the Transferred Technology or Transferred Intellectual Property owned by, or licensed to the Seller, or Seller or Buyer being required to provide any source code for any Transferred Technology or Transferred Intellectual Property; (iii) Buyer being bound by, or subject to, any non-compete or other restriction on its freedom to engage in, participate in, operate or compete in any line of business; or (iv) Buyer being obligated to pay any royalties or other license fees with

-9-

respect to Intellectual Property Rights of any third Person in excess of those payable by the Seller in the absence of this Agreement or any of the Other Agreements or the transactions contemplated hereunder, except in the case of (i), (ii), (iii) and (iv), to the extent resulting from agreements between Buyer and any third Person.

(e)     The Seller has not received any written or, to the Seller's Knowledge, other communications alleging that the Seller has violated, infringed or misappropriated, or by conducting the Business, would violate, infringe, or misappropriate any of the Patents, Marks, Copyrights, Trade Secrets, mask works or other proprietary rights or processes of any third party.

(f)     The operation of the Business will not require the use of any inventions of any of its employees or consultants made prior to or outside the scope of their employment by the Seller, including prior employees or consultants, with which the Seller may be affiliated now or may have been affiliated in the past.

(g)     Each employee or consultant has assigned or will have assigned by the Closing Date, to the Seller all right, title and interest in and to any Intellectual Property and Technology that he, she or it solely or jointly conceived, reduced to practice, developed or made during the period of his, her or its employment or consulting relationship with the Seller that (i) relates, at the time of conception, reduction to practice, development, or making of such Intellectual Property or Technology, to the Business, (ii) was developed on any amount of the Seller's time or with the use of any of the Seller's equipment, supplies, facilities or information, or (iii) resulted from the performance of services for the Seller, and each such employee or consultant has waived for the benefit of the Seller all moral rights in any such Technology, Intellectual Property, or rights therein.

(h)     The Transferred Registered IP constitutes (i) all Patents, registered Marks, registered Copyrights, domain names, and applications for any of the foregoing, in each case owned by, purported to be owned by, or issued under the name of the Seller and used in the Business, and (ii) Products the constitute Transferred Technology.

(i)     All Transferred Registered IP is registered in the name of the Seller. All Transferred Registered IP is currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, inventor declarations, proofs of working or use, timely post-registration filing of affidavits of use and incontestability, and renewal applications), and all Transferred Registered IP is valid and enforceable.

(j)     None of the Transferred Registered IP is subject to any maintenance fees or taxes or actions falling due within 90 days after the Closing Date.

(k)     With respect to the Transferred Technology, the Seller's use of open source software complies in all material respects with the applicable open source licence agreements. Section 3.6(k) of the Disclosure Schedule lists all Open Source Software currently used by the Seller with respect to the Transferred Technology, including the applicable license for each such item of Open Source Software; and none of the Open Source Software is compiled together with, linked to, called by, distributed with, or otherwise used by or incorporated into, any software that

ACTIVE 245910556

constitutes Transferred Technology that is owned by, purported to be owned by the Seller ("Company Software") in a manner that would: (i) require any portion of the Company Software to be disclosed or distributed in source code form; (ii) require any portion of the Company Software to be licensed for the purpose of making derivative works; or (iii) impose any restriction on the consideration to be charged for the distribution of any Company Software.  Section 3.6(k) of the Disclosure Schedule also lists the Products (if any) to which each such item of Open Source Software relates, and whether each such item is distributed or modified by or on behalf of Seller.

(l)      No funding or facilities of a university, college, other educational institution or research centre, or funding from third parties was used in the development of any Transferred Intellectual Property or Transferred Technology.  No Person who was involved in, or who contributed to, the creation or development of any Transferred Intellectual Property or Transferred Technology, has performed services for the government, university, college, or other educational institution or research centre in a manner that would affect Seller's rights in the Transferred Intellectual Property or Transferred Technology.

(m)      The Seller has taken reasonable security measures to protect the confidentiality and value of all Trade Secrets that constitute Transferred Intellectual Property or are licensed to Seller pursuant to an Inbound License, including, without limitation, requiring each Seller employee and consultant and any other person with access to such Trade Secrets to execute a binding confidentiality agreement, copies or forms of which have been provided to the Buyer and to the Seller's Knowledge, there has not been any breach by any party to such confidentiality agreements.

(n)      The Seller has not provided or disclosed any source code of any Company Software to any third party, except to the Buyer pursuant to the terms of a confidentiality agreement between the Seller and the Buyer.

(o)      Each Product materially performs in accordance with its documented specifications and as the Seller has warranted in writing to its customers.  The Products do not contain any "viruses", "worms", "time-bombs", "key-locks", "backdoor" or any other devices created that could disrupt or interfere with the operation of the Products or equipment upon which the Products operate.  The Products do not include or install any spyware, adware, or other similar software that monitors the use of the Products or contacts any remote computer without the knowledge and express consent of the user(s) of the applicable Product or remote computer, as applicable.

3.7      Material Contracts.

(a)      Section 3.7(a) of the Disclosure Schedule sets forth a true and correct list of all of the following material Contracts primarily related to the Business to which Seller or a Seller Subsidiary is a party or by which Seller or a Seller Subsidiary is bound as of the date hereof (together with Outbound Licenses, each a "Material Contract"):

(i)      all Transferred Contracts involving future payments, expenditures or Liabilities, actual or potential, or future revenues or other payments to Seller or any of its

-11-

Subsidiaries, in each case, in excess of $25,000 individually or $50,000 in the aggregate, after the date hereof ;

(ii)   any Transferred Contract which contains any material bonus, commission, pension, profit sharing, retirement or any other form of deferred compensation or incentive plan or any stock purchase, stock option, hospitalization, insurance or similar employee benefit plan or practice, whether formal or informal;

(iii)   any Transferred Contract for the employment of any officer, individual employee or other Person on a full-time, consulting or independent contractor basis or any severance or change-of-control agreement, or any collective bargaining agreement or Contract with any labor union, other than employment agreements or offer letters that can be terminated by Seller or such Seller Subsidiary following notice of not more than 30 days without any liabilities or obligations on behalf of Seller or such Seller Subsidiary;

(iv)   any Transferred Contract mortgaging, pledging or otherwise placing a Lien on any of its assets, or any guaranty of an obligation of a third party;

(v)   any Transferred Contract which contains royalty, dividend or similar arrangements based on the revenues or profits of Seller or an Seller Subsidiary or any contract or agreement involving fixed price or fixed volume arrangements;

(vi)   any Transferred Contract which contains any provisions requiring Seller or any Seller Subsidiary to indemnify any other party, other than commercial Contracts entered into in the ordinary course of business;

(vii)   any Transferred Contract under which Seller or any Seller Subsidiary is lessee of, or holds or operates, any property, real or personal, owned by any other party calling for payments in excess of $50,000 annually or under which it is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by Seller or any Seller Subsidiary;

(viii)   any Transferred Contract which is not cancelable by Seller or any Seller Subsidiary without penalty on not less than thirty (30) days' notice;

(ix)   any Transferred Contract limiting the freedom of Seller or any Seller Subsidiary to freely engage in any line of business or with any Person anywhere in the world or during any period of time, including any Contract containing an exclusivity obligation, most-favored-nation provision or "best price" obligation enforceable against Seller or such Seller Subsidiary;

(x)   any Transferred Contract relating to the distribution, marketing, advertising or sales of Products;

(xi)   any Transferred Contract pursuant to which it subcontracts work to third parties;

(xii)   any Transferred Contract with any governmental entity;

-12-

(xiii)   any Transferred Contract with a power of attorney;

(xiv)   any Transferred Contract relating to an acquisition agreement, whether by merger, stock or asset sale or otherwise;

(xv)   any Transferred Contract which contains any options, licenses or agreements of any kind with respect to the Intellectual Property of any other Person ("Inbound Licenses");

(xvi)   any Transferred Contract material to the Group Companies or outside the ordinary course of business; or

(xvii)   any Transferred Contract which may not be assigned without the consent of another Person.

(b)   Seller has made available to Buyer a true and complete copy of each written Transferred Contract (including all amendments, modifications and supplements thereto).  Seller has not entered into any oral Transferred Contract.

(c)   Except as set forth on Section 3.7(c) of the Disclosure Schedule: (i) Each of the Material Contracts is in full force and effect and constitutes a valid, binding and enforceable obligation of the Seller or the applicable Seller Subsidiary and, to the Knowledge of Seller, the other parties thereto, (ii) neither Seller nor any Seller Subsidiary is or, to the Knowledge of Seller, is Seller or any Seller Subsidiary alleged to be in breach of or default in any material respect under any Transferred Contract, and (iii) to the Knowledge of Seller, no counterparty is in breach of or default in any Transferred Contract.

3.8   General Employee Matters; Benefit Plans and Benefits.

(a)   Section 3.8(a) of the Disclosure Schedule contains a complete and accurate list of the current employees and officers of Seller and the Seller Subsidiaries as of the date hereof and shows with respect to each such employee (to the extent such information may be disclosed under applicable law): his or her name or employee identification number; direct employing entity (i.e., Seller or a Seller Subsidiary); date of hire; primary location of employment (country, state or province, and city); job position or title; job department; full- or part-time status; overtime exempt or non-exempt status for wage and hour purposes; base compensation rate (for overtime exempt employees, annual base salary rate) (for overtime nonexempt employees, base hourly wage rate); whether eligible for incentive compensation (e.g., commissions, bonuses); target annual incentive compensation; visa status; annualized vacation or paid time off eligibility (or designation of "flexible" if a non-accrual-based vacation or paid time off system is used); eligibility for severance and the amount of such severance; eligibility for change of control benefits (cash or otherwise) to be paid at the Closing or otherwise in connection with the Agreement and the amount of benefits.

(b)   Section 3.8(b) of the Disclosure Schedule lists all individuals who are currently engaged as independent contractors, consultants or advisors to Seller or any Seller Subsidiary, describing for each such independent contractor, consultant, or advisor:  his or her name; primary location from which services are performed (country, state or province, and city);

-13-

estimate of average hours of services performed per week; most recent rate of all regular, bonus or any other compensation; description of services provided; initial date retained to perform services; the expected end date of services (if known); and whether he, she or it is required to work, or in fact works, exclusively for Seller or any Seller Subsidiary.

(c)     (i) Seller and the Seller Subsidiaries are, and for the past two (2) years have been, in compliance in all material respects with all applicable Laws and agreements respecting labor, employment, fair employment practices, workplace safety and health, terms and conditions of employment, wages and hours, the proper classification and treatment of employees as exempt or non-exempt and the proper classification and treatment of any independent contractor; (ii) neither Seller nor any of the Seller Subsidiaries is delinquent in any payments for any wages, salaries, commissions, bonuses, fees or other compensation due with respect to any services performed for it or amounts required to be reimbursed to employees to the date hereof; (iii) none of the employment policies or practices of Seller or any of the Seller Subsidiaries are currently being audited or investigated, or, to the Seller's Knowledge, subject to imminent audit or investigation by any governmental entity; (iv) neither Seller nor any of the Seller Subsidiaries is or within the last three (3) years has been subject to any order, decree, injunction or judgment by any governmental entity or private settlement contract in respect of any labor or employment matters; and (v) all employees of Seller and the Seller Subsidiaries are employed on an at-will basis.

(d)     (i) There are no, and within the last two (2) years there have been no, grievances, complaints or charges with respect to employment or labor matters (including allegations of employment discrimination, retaliation, harassment, wages and hours, wage payment, restrictive covenants, leaves of absence, or unfair labor practices) pending or, to Seller's Knowledge, threatened against Seller or any of the Seller Subsidiaries in any judicial, regulatory or administrative forum, under any private dispute resolution procedure or internally; (ii) none of the employment policies or practices of Seller or any of the Seller Subsidiaries are currently being audited or investigated by any governmental entity or, to Seller's Knowledge, subject to imminent audit or investigation by any governmental entity; and (iii) neither the Seller nor any of the Seller Subsidiaries nor any of their respective officers, is, or within the last two (2) years has been, subject to any order, decree, injunction or judgment by any governmental entity or private settlement contract in respect of any labor or employment matters.

(e)     There is not, and has not been in the past two (2) years, any (i) pending or, to Seller's Knowledge, threatened claim, litigation, proceeding or investigation involving Seller or any Seller Subsidiary with respect to or relating to sex-based discrimination, sexual harassment or sexual misconduct; or (ii) settlement or similar arrangement of, or payment arising out of or related to, any matter referred with respect to sex-based discrimination, sexual harassment or sexual misconduct involving any conduct of an employee of Seller or any Seller Subsidiary that occurred during his or her employment with Seller or any Seller Subsidiary.

(f)     To the Knowledge of Seller, no circumstances have arisen or exist under which Seller may be required to pay damages or compensation or suffer any penalty or be required to take corrective action or be subject to any form of sanction under any applicable employment laws. There are no current, pending or threatened claims of any type against

-14-

Seller by any existing or former employees or directors of Seller or by any existing or former consultants to Seller.

(g)    Each current and former employee and consultant of Seller and the Seller Subsidiaries has executed an agreement with Seller or such Seller Subsidiary regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for Buyer (the "Confidential Information Agreements") and all such Confidential Information Agreements are binding, valid and enforceable.

(h)    No current or former employee or consultant has excluded works or inventions from his or her assignment of inventions pursuant to such employee or consultant's Confidential Information Agreement.

(i)    Seller has no Knowledge that any of its employees or consultants is in violation of any Confidential Information Agreement.

(j)    Schedule 3.8(j) of the Disclosure Schedule sets forth a list of every Employee Plan that is maintained by the Seller or any ERISA Affiliate.

(k)    Each Employee Plan that is intended to qualify under Section 401(a) of the Code is so qualified and has received a favorable determination or approval letter from the IRS with respect to such qualification, or may rely on an opinion letter issued by the IRS with respect to a prototype plan adopted in accordance with the requirements for such reliance, or has time remaining for application to the IRS for a determination of the qualified status of such Employee Plan for any period for which such Employee Plan would not otherwise be covered by an IRS determination and, to the knowledge of the Seller, no event or omission has occurred that would cause any Employee Plan to lose such qualification.

(l)    Each Employee Plan is, and has been operated in material compliance with applicable laws and regulations and is and has been administered in all material respects in accordance with applicable laws, including the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and regulations and with its terms. No litigation or governmental administrative proceeding, audit or other proceeding (other than those relating to routine claims for benefits) is pending or, to the knowledge of the Seller, threatened with respect to any Employee Plan or any fiduciary or service provider thereof, and, to the knowledge of the Seller, there is no reasonable basis for any such litigation or proceeding. All payments and/or contributions required to have been made with respect to all Employee Plans, for all periods prior to the Closing Date, either have been made or have been accrued in accordance with the terms of the applicable Employee Plan and applicable law.

(m)    Each Employee Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in all material respects in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder. No payment to be made under any Employee Plan is, or to the knowledge of the Seller, will be, subject to the penalties of Section 409A(a)(1) of the Code.

-15-

(n)     Neither the execution and delivery of this Agreement, the shareholder approval of this Agreement,  nor the consummation of the transactions contemplated hereby could (either alone or in conjunction with any other event) (i) result in, or cause the accelerated vesting payment, funding or delivery of, or increase the amount or value of, any payment or benefit to any employee, officer, director or other service provider of the Seller or any of its ERISA Affiliates; (ii) result in any "parachute payment" as defined in Section 280G(b)(2) of the Code (whether or not such payment is considered to be reasonable compensation for services rendered); or (iii) result in a requirement to pay any tax "gross-up" or similar "make-whole" payments to any employee, director or consultant of the Seller or an ERISA Affiliate.

(o)     Neither the Seller nor any ERISA Affiliate has ever maintained any Employee Plan that is or was subject to Title IV of ERISA, Section 412 of the Code, Section 302 of ERISA or is a Multiemployer Plan.  None of the Employee Plans provides health care or any other non-pension benefits to any employees after their employment is terminated (other than as required by Part 6 of Subtitle B of Title I of ERISA or similar state law) and the Seller has never promised to provide such post-termination benefits.

(p)     For purposes of this section:

(i)     "Employee Plan" means (A) an employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA; (B) stock option plans, stock purchase plans, bonus or incentive award plans, severance pay plans, programs or arrangements, deferred compensation arrangements or agreements, change in control plans, programs or arrangements, supplemental income arrangements, vacation plans, and all other employee benefit plans, agreements or arrangements not described in (A) above; and (C) plans or arrangements providing compensation to employees and non-employee directors, in each case in which the Seller or any ERISA Affiliate sponsors, contributes to, or provides benefits under or through such plan, or has any obligation to contribute to or provide benefits under or through such plan, or if such plan provides benefits to or otherwise covers any current or former employee, officer or director of the Seller or any ERISA Affiliate (or their spouses, dependents or beneficiaries).

3.9     <u>Litigation and Other Proceedings</u>.  None of the Seller or the Seller Subsidiaries nor any of their assets or properties, including in respect of any property used or occupied by any of the foregoing is engaged, either directly or indirectly, in any suit, action, litigation, arbitration or tribunal proceedings or any governmental investigations.  In addition, no such suit, action, litigation, arbitration or tribunal proceedings or governmental investigations are pending or threatened, by or against the Seller, the Seller Subsidiaries, related corporations or joint ventures or any of their assets or properties, including in respect of any property used or occupied by any of the foregoing, nor does the Seller have Knowledge of any circumstances likely to lead to any such suit, action, litigation, arbitration or tribunal proceeding or governmental investigations.

3.10    <u>Compliance with Laws</u>.

(a)     Where applicable, Seller is in receipt of all material governmental approvals for operation of the Business, including approvals from the Monetary Authority of Singapore (or its equivalent regulatory body in each relevant jurisdiction in which any Seller Subsidiary conducts

-16-

the Business), and in compliance in all material respects with applicable conditions in all such approvals and with all applicable Laws regarding such approvals.

(b)     Seller and the Seller Subsidiaries are in compliance in all material respects with all applicable Laws and regulations in relation to appropriate monitoring, reporting and audit processes for anti-money laundering (AML) and countering the financing of terrorism (CFT) regulations.

(c)     Seller and the Seller Subsidiaries have all Permits necessary for the conduct of the Business, the lack of which could reasonably be expected to have a Material Adverse Effect. Seller is not in default in any material respect under any of such Permit.

(d)     None of the Seller or Seller Subsidiaries is a party to, bound by or affected by, any court order (or agreement entered into in any administrative, judicial or arbitration proceeding with any governmental entity) with respect to any of such Seller or Seller Subsidiary's properties, assets, personnel or business activities.  To the Seller's Knowledge, none of the Seller or Seller Subsidiaries is in violation of, or delinquent in respect to, any court order, applicable Laws or Permits (to which it or its properties, assets, personnel or business activities are subject), arising out of, resulting from or in any way connected with the operation of such Seller or Seller Subsidiary.  Seller and the Seller Subsidiaries has filed with the proper governmental entities all material statements and reports required by all applicable Laws, Permits and court orders to which such Seller or Seller Subsidiary or any of its employees (because of their activities on behalf of such Seller or Seller Subsidiary) are subject.  No claim has been made by any governmental Entity (and, to the Knowledge of Seller, no such claim is anticipated) to the effect that the Business fails to comply, in any material respect, with any applicable Laws or Permits or that a Permit or court order is necessary in respect thereto.  Copies of all notices of violation of any of the foregoing that Seller or any Seller Subsidiary has received in the past three (3) years have previously been furnished to Buyer.

3.11     Data Privacy.

(a)     In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (the "Personal Information"), Seller and the Seller Subsidiaries are, to Seller's Knowledge, in compliance with applicable Law regarding privacy and data protection, including, for the avoidance of doubt, the Singapore Personal Data Protection Act 2012, as amended, its privacy policies and the requirements of any contract to which Seller or Such Seller Subsidiary is a party.

(b)     Seller and each of the Seller Subsidiaries has commercially reasonable physical, technical, organizational and administrative security measures and policies in place that are reasonably designed to protect Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure.

(c)     Seller and each of the Seller Subsidiaries is, to Seller's Knowledge, in compliance in all material respects with all applicable Law relating to data loss, theft and breach

-17-

of security notification obligations, including, for the avoidance of doubt, the Singapore Personal Data Protection Act 2012, as amended.

3.12    FCPA.

(a)    Neither Seller nor any of the Seller Subsidiaries, nor any of their respective officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the FCPA), "foreign public official" (as such term is defined in the UK Bribery Act, foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist Seller or any of its affiliates in obtaining or retaining business for or with, or directing business to, any Person.

(b)    Neither Seller nor any of the Seller Subsidiaries, nor any of their respective directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any applicable Law, rule or regulation.

(c)    Neither Seller nor any of the Seller Subsidiaries, nor to Seller's Knowledge, any of their respective officers, directors or employees are the subject of any written allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA, the UK Bribery Act or any other applicable anti-bribery or anti-corruption law.

3.13    Assets Complete; Title.  The Transferred Assets and the Excluded Assets include all material assets used or held for use by Seller and the Seller Subsidiaries in connection with the operation or conduct of the Business as currently conducted.  Except as set forth on Section 3.13(a) or Section 3.13(b) of the Disclosure Schedule, as applicable, (a) there is no material asset of Seller or the Seller Subsidiaries primarily used or primarily held for use or otherwise required in connection with the operation or conduct of the Business as currently conducted that is not included in the Transferred Assets, and (b) Seller and the Seller Subsidiaries have good and marketable title to all of the Transferred Assets with full power and authority to assign their rights in and to the Transferred Assets to Buyer.

3.14    No Other Representations or Warranties.  Except for the representations and warranties contained in this Article 3 (as modified by the Disclosure Schedule attached hereto), neither Seller, Seller Subsidiaries nor any other Person makes any other express or implied representation or warranty with respect to the Business, the Transferred Assets or the transactions contemplated hereunder or with respect to any other information provided to Buyer, and Seller disclaims any other representations or warranties, whether made by Seller or any of its Affiliates, officers, directors, employees, agents or other Representatives.  Except in respect of the representations and warranties contained in this Article 3 (as modified by the Disclosure Schedule attached hereto) or in the case of fraud or willful misconduct, neither Seller nor any other Person will have or be subject to any liability to Buyer or any other Person.

-18-

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

4.1     Status of Buyer.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer is qualified to do business and is in good standing (to the extent the concept of good standing is applicable in a particular jurisdiction) in all jurisdictions in which the character of the properties owned, leased or operated by it makes such qualification necessary, except in each case for any such failures that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Buyer's ability to consummate the transactions contemplated by this Agreement.

4.2     Authorization; No Conflicts.

(a)     Buyer has the right, power, and authority to enter into this Agreement and the Other Agreements to which it is a party, to consummate the transactions contemplated hereby, and otherwise to comply with and perform its obligations under, this Agreement and the Other Agreements.

(b)     The execution and delivery by Buyer of this Agreement do not, the execution and delivery by Buyer of each Other Agreement to which it is or will be a party will not, and the consummation of the Acquisition and the other transactions contemplated to be consummated by this Agreement and such Other Agreement will not conflict with, result in any breach of, constitute a default under (or an event that, with notice or lapse of time or both, would become a default under), require any consent of any Person pursuant to, give to others any rights of termination, acceleration or cancellation under, allow the imposition of any fees or penalties under, require the offering or making of any payment or redemption under or result in the creation of any Lien (other than Permitted Encumbrances) upon any of the properties or assets of Buyer under any provision of (i) the organizational documents of Buyer, (ii) any Contract to which Buyer is a party or by which any of its properties or assets is bound, or (iii) any injunction, judgment, Order or decree or statute, law, ordinance, legally-binding rule, executive order, code or regulation applicable to Buyer or its properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that have not and would not reasonably be expected to materially delay or materially impede the ability of Buyer to consummate the transactions contemplated by this Agreement.  No consent, permit, authorization or approval of, or registration, declaration, notice or filing with, any Governmental Authority is required to be obtained or made by or with respect to Buyer or any of their Affiliates in connection with the execution, delivery and performance of this Agreement or any of the Other Agreements or the consummation of the Acquisition and the other transactions contemplated hereby and by the Other Agreements, other than (A) those that may be required solely by reason of Seller's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated hereby and by the Other Agreements, and (B) those the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to materially delay or materially impede the ability of Buyer to consummate the transactions contemplated by this Agreement.

-19-

(c)    Buyer has duly executed and delivered this Agreement and on or prior to the Closing will have, or will have caused its Affiliates to have, duly executed and delivered each Other Agreement to which they are or will be a party, and this Agreement constitutes, and each Other Agreement to which they are or will be a party will after the Closing constitute, their legal, valid and binding obligation, enforceable against them in accordance with its terms, except to the extent that such enforceability may be limited by the Equitable Exceptions.

4.3     Litigation.

(a)    There is no Proceeding pending or, to Buyer's Knowledge, threatened in writing against Buyer or involving any of their properties or assets that would reasonably be expected to: (i) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any Other Agreement; or (ii) otherwise prevent, hinder or delay the consummation of the transactions contemplated by this Agreement and the Other Agreements.

(b)    Buyer is not: (i) in default under or in breach of any Order; or (ii) a party or subject to any Order, except, in each case, where such default or breach, or such Order, would not reasonably be expected to: (A) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any Other Agreement or (B) otherwise prevent, hinder or delay the consummation of the transactions contemplated by this Agreement and the Other Agreements.

4.4     Independent Investigation.    Buyer has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its participation in the transactions contemplated by this Agreement and the Other Agreements. Buyer has conducted its own independent review and analysis of, and based thereon have formed an independent judgment concerning, the Transferred Assets, the Assumed Liabilities and the condition, operations and prospects of the Business.  Buyer acknowledges that, except for the representations and warranties expressly set forth in Article 3 or in the case of fraud or willful misconduct, none of Seller, the Seller Subsidiaries, their Affiliates or any of their respective directors, officers, employees, stockholders, Representatives or agents have made or makes, and Buyer has not relied on and is not relying on, any representation, warranty or statement, either express or implied:  (a) as to the accuracy or completeness of any of the information delivered or made available to Buyer, any of its Affiliates or any their respective directors, officers, employees, stockholders, Representatives, agents or lenders; and (b) with respect to any projections, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial condition (or any component thereof) of the Business delivered or made available to Buyer, any of its Affiliates or any of its respective directors, officers, employees, stockholders, Representatives, agents or lenders.

**ARTICLE 5**
**COVENANTS**

-20-

5.1     Conduct of Business by Seller.  From the date hereof to the earlier of the date this Agreement is terminated or the Closing, except for transactions that have been set forth on Section 5.1 of the Disclosure Schedule, as required by applicable Law, that are otherwise contemplated by this Agreement or that are expressly approved in writing by Buyer (such approval not to be unreasonably withheld, delayed or conditioned), Seller shall refrain and shall cause each Seller Subsidiary to refrain from taking the following actions with respect to the Business, the Transferred Assets or the Assumed Liabilities:

(a)     acquiring (including by merger, consolidation or the acquisition of any equity interest or assets) or selling (whether by merger, consolidation or the sale of any equity interest or assets), leasing or disposing of any Transferred Assets, whether in one or more transactions;

(b)     subjecting any of the Transferred Assets to any Lien, exclusive of Liens arising as a matter of Law or arising in the Ordinary Course of Business as to which there is no known default and except for Permitted Encumbrances;

(c)     undertaking any action or failing to take any action that does or could, individually or in the aggregate, reasonably be expected to result in the loss, lapse, expiration, or abandonment of any Transferred Registered IP other than in the Ordinary Course of Business;

(d)     materially changing any method of accounting or accounting practice used by it with respect to the Business and applicable to the preparation of the Financial Statements, except for any change required by GAAP or applicable Law;

(e)     except for terminations of, or failures to renew Employment Agreements with employees in the Ordinary Course of Business (including terminations of employees for cause), materially amending, terminating or failing to use its commercially reasonable efforts to renew any Transferred Contract (provided that, after reasonable prior notice to Buyer, neither Seller nor any Seller Subsidiary shall be required to renew any Transferred Contract on any terms that are less favorable to Seller or the Seller Subsidiary, as applicable), or defaulting in any material respect (or taking or omitting to take any action that, with or without the giving of notice or passage of time, would constitute a material default) under any Transferred Contract;

(f)     entering into any transaction with an Affiliate, except for transactions in the Ordinary Course of Business, on arm's-length terms and not affecting the Transferred Assets or the Assumed Liabilities;

(g)     entering into any Contract that limits or purports to limit the ability of Seller or any Seller Subsidiary to engage in the Business or grants exclusivity with respect to the Business to any Person;

(h)     other than in accordance with the requirements of existing written Employee Plans or Employment Agreements or as may be required by applicable Law, establishing or materially increasing the benefits under, or promising to establish, materially modify or materially increase the benefits under, any Employee Plan or Employment Agreement with respect to Transferred Employees or Non-US Business Employees, or otherwise materially

-21-

increasing the compensation payable to any Transferred Employee or Non-US Business Employee, or materially modifying, renewing, establishing, adopting or entering into any collective bargaining agreement with any labor union in regard to any Transferred Employee;

(i)     authorizing, committing or agreeing to enter into or consummate any transaction relating to the Business which would result in an Assumed Liability of $50,000 or more; and

(j)     authorizing, committing or agreeing to take any action that would reasonably be expected to constitute a breach of any of the foregoing provisions of this Section 5.1.

5.2     Affirmative Covenants Relating to Seller.  From the date hereof to the earlier of the date this Agreement is terminated or the Closing, Seller shall use its commercially reasonable efforts to take and to cause each of the Seller Subsidiaries to take the following actions with respect to the Business, the Transferred Assets and the Assumed Liabilities:

(a)     operate the Business in the Ordinary Course of Business;

(b)     maintain the books, accounts and records of the Business in the Ordinary Course of Business;

(c)     comply in all material respects with all applicable Laws relating to the conduct of the Business as currently conducted; and

(d)     provide Buyer with prompt written notice of events, occurrences or circumstances which have or reasonably would be expected to have (either individually or in the aggregate) a Material Adverse Effect.

5.3     Consents and Closing Conditions.

(a)     Generally.  Each of Buyer and Seller shall use commercially reasonable efforts to: (i) obtain all consents, approvals, authorizations and waivers from third parties required in connection with the transactions contemplated by this Agreement prior to the Closing; and (ii) take such other actions as may be required to fulfill the closing conditions, as set forth in Article 8 and Article 9 that are within their control.  Seller shall use commercially reasonable efforts to cause the representations and warranties of Seller in Article 3 to be true and correct on and as of the Closing Date.  Buyer shall use commercially reasonable efforts to cause the representations and warranties of Buyer in Article 4 to be true and correct on and as of the Closing Date.  No party hereto shall take any action that would reasonably be expected to materially delay the obtaining of or result in not obtaining, any Permit from any Governmental Authority required to be obtained prior to Closing.

(b)     Third Party Consents.  To the extent that any of Seller's or any of the Seller Subsidiaries' rights under any agreement, Contract, commitment, lease, Permit or other Transferred Asset to be assigned to Buyer hereunder may not be assigned without the consent of another Person which has not been obtained prior to or as of Closing, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach

-22-

thereof or be unlawful, and Seller agrees, and Seller shall cause the Seller Subsidiaries, to use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible within thirty (30) days after Closing.  If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Transferred Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller and Buyer shall cooperate in any lawful and commercially reasonable arrangement, as Buyer may reasonably request, under which Buyer would, to the maximum extent permitted by Law and the Transferred Asset, obtain the economic Claims, rights and benefits under and with respect to such Transferred Asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing such Transferred Asset to Buyer.  Seller shall promptly pay to Buyer when received all monies received by Seller under such Transferred Asset or any Claim or right or any benefit arising thereunder and Buyer shall promptly pay Seller for all liabilities of Seller associated with such Transferred Asset that would otherwise constitute "Assumed Liabilities" had such Transferred Asset been assigned to Buyer at the Closing.  Nothing in this Agreement shall be construed as having obligated any party hereto to have paid or committed to pay any amount in order to obtain any consent, waiver, or approval with respect to Contracts with third parties prior to the Closing.

5.4     <u>Maintenance of Books and Records</u>.  After the Closing, Seller shall, and shall cause each of the Seller Subsidiaries to, retain the records that are Excluded Assets in accordance with Seller's and the Seller Subsidiaries' respective document retention policies, and Buyer shall retain the books and records of Seller and the Seller Subsidiaries delivered to Buyer relating to periods prior to the Closing in accordance with Buyer's document retention policies.  During the period during which such books and records are retained, duly authorized Representatives of Seller or Buyer, as applicable, may have reasonable access to such records, during normal business hours and on reasonable prior written notice, at the requesting party's expense, for any reasonable business purpose specified by the requesting party in such notice.

## <u>ARTICLE 6</u>
## <u>TAX MATTERS</u>

6.1     <u>Proration of Taxes</u>.

(a)     Seller shall timely and properly prepare and file (or cause to be timely prepared and filed) all Tax Returns required by applicable Law covering the Business, the Transferred Assets, and the Assumed Liabilities for any period ending on or before the Closing Date that are required to be filed, regardless of when due.  Buyer shall properly and timely prepare and file (or cause to be timely prepared and filed) all Tax Returns required by applicable Law covering the Business and the Transferred Assets relating to any Straddle Period to the extent required by Law.

(b)     Liability for all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Business or the Transferred Assets (individually or in the aggregate) for a taxable period which includes (but does not end on) the Closing Date (a "<u>Straddle Period</u>") shall be apportioned between Seller and Buyer (the "<u>Apportioned Obligations</u>") based on the number of days of such taxable period included in the period ending on and including the Closing Date (the "<u>Pre-Closing Tax Period</u>") and the number of days of such taxable period

-23-

included in the period after the Pre-Closing Tax Period (the "Post-Closing Tax Period"). Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period based on the number of days in the Pre-Closing Tax Period to the total number of days in the Straddle Period. Buyer shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period on the basis of the number of days in the Post-Closing Tax Period to the total number of days in the Straddle Period. Within a reasonable period after the Closing Date, Seller and Buyer shall present a reimbursement to which Seller and Buyer are entitled under this Section 6.1(b) together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the party owing it to the other party within 10 days after delivery of such statement. Thereafter, Seller and Buyer shall promptly notify each other upon receipt of any bill for real or personal property Taxes relating to the Business or the Transferred Assets, part or all of which are attributable to the Post-Closing Tax Period, and shall promptly deliver such bill to the other, and the parties shall true up the amounts owed in accordance with this Section 6.1(b). In the event that either Seller or Buyer make a payment for which they are entitled to reimbursement under this Section 6.1(b), the other party shall make such reimbursement promptly but in no event later than 10 days after the delivery of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement. Any payment required under this Section 6.1(b) and not made within 30 days of delivery of the statement shall bear interest at the rate per annum determined, from time to time, under the provisions of Code Section 6621(a)(2) for each day until paid.

6.2     Cooperation on Tax Matters.

(a)     Buyer and Seller hereby acknowledge and agree that the sale and purchase of the Transferred Assets is intended to be an asset sale for legal and tax purposes. Buyer and Seller agree to furnish, or cause to be furnished to the other upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Transferred Assets, the Business, and the Assumed Liabilities as is reasonably necessary for the filing of any Tax Return, the preparation for any Tax audit, or the prosecution or defense of any Claim or Proceeding relating to any proposed Tax adjustment relating to the Transferred Assets, the Business or the Assumed Liabilities; provided, however, that Seller shall not be obligated to furnish or cause to be furnished to Buyer its income Tax Returns. Buyer and Seller shall keep all such information and documents received by them confidential unless otherwise required by Law. Buyer and Seller shall cooperate with each other as reasonably necessary to effect the foregoing. Buyer and Seller agree, upon request, to use their reasonable best efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the transactions contemplated under this Agreement. Nothing in this Section 6.2(a) shall require a party to disclose information not related specifically to the Transferred Assets, Assumed Liabilities or Business to the extent it reasonably deems such information to be confidential.

(b)     Buyer and Seller agree to retain, or cause to be retained, all books and records pertinent to the Assets until the applicable period for assessment of Taxes under applicable Law (giving effect to any and all extensions or waivers) has expired and such additional period as

-24-

necessary for any administrative or judicial Proceedings relating to any proposed assessment, and to abide with all record retention agreements entered into with any Tax authority.

6.3     Tax Proceedings.

(a)     Buyer shall promptly notify Seller in writing upon receipt by Buyer or any of its Affiliates of any written communication from a Governmental Authority concerning Taxes for which Buyer may be entitled to recovery under this Agreement or that relates to Seller's or any of Seller's Affiliate's Taxes for any taxable year or other period and shall promptly notify Seller in writing of any pending or threatened audit, Claim, demand or administrative or judicial Proceeding (a "Tax Claim") that could give rise to a right of indemnification under this Agreement or that relates to Seller's or any of Seller's Affiliate's Taxes for any taxable year or other period describing in reasonable detail the facts and circumstances with respect to the subject matter of such Tax Claim; provided, however, that any delay in such notice shall not affect Buyer's right to recovery or indemnification hereunder except to the extent of actual material prejudice to Seller.

(b)     Seller shall have the exclusive right to control any Tax Claim to the extent that any such Tax Claim (i) relates to Seller's or any of Seller's Affiliate's Taxes for any taxable year or period, or (ii) could reasonably be expected to result in any Losses for Taxes with respect to which Seller has agreed to provide indemnification under this Agreement.  Upon Seller's request, Buyer shall execute any powers of attorney or similar documents that may be required to effectuate the intent of this Section 6.3(b).

6.4     Tax Consequences. Notwithstanding anything herein to the contrary, each party to this Agreement hereby acknowledges and agrees that such party is relying solely upon its own tax advisors and counsel for advice concerning the Tax consequences of the transactions contemplated by this Agreement, and that no party provides assurances to any other party concerning such Tax consequences.

## ARTICLE 7
## EMPLOYEE MATTERS

7.1     Employment of Transferred Employees.

(a)     As of the Closing Date, Buyer shall, or shall cause its Affiliates to, make offers of employment to each Business Employee set forth on Section 7.1(a) of the Disclosure Schedule (the "Disclosure Employees").  All Disclosure Employees to whom Buyer (or an Affiliate of Buyer) offers employment and who accepts such offers of employment and become employed by Buyer (or an Affiliate of Buyer) are herein referred to herein as the "Transferred Employees" and each Transferred Employee shall cease to be an employee of Seller or any of the Seller Subsidiaries, as applicable, as of the Closing Date (or, with respect to any Transferred Employee who is not actively at work on the Closing Date, upon such individual's return to active employment with Buyer or its Affiliates).

7.2     Credit for Service; Welfare Benefits.

-25-

(a)     Buyer shall be solely responsible for providing benefits under applicable employee benefit plans to any Transferred Employees after the Closing Date (the "New Plans"). For purposes of vesting and eligibility to participate, each Transferred Employee shall be credited with his or her years of service with Seller and the Seller Subsidiaries (and their predecessors) before the Closing Date, to the same extent as such Transferred Employee was provided or entitled, before the Closing Date, to credit for such service under any similar Employee Plan in which such Transferred Employee participated or was eligible to participate immediately prior to the Closing Date, provided that the foregoing shall not apply to the extent that its application would result in a duplication of benefits.

(b)     In addition, and without limiting the generality of Section 7.2(a) above, (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all New Plans to the extent benefits or coverage under such New Plan replaces (or is intended to replace) the same or similar benefits or coverage under an Employee Plan in which such Transferred Employee participated immediately before the Closing Date (such plans, collectively, the "Old Plans").

(c)     Any Claims of Transferred Employees and their eligible beneficiaries and dependents for health and welfare that are incurred on or after the Closing Date shall be the sole responsibility of Buyer and Buyer's New Plans.  With respect to disability benefits, a disability Claim shall be determined in accordance with the disability plans or policies of Buyer and Seller; provided that neither Buyer nor Seller shall amend their plans to specifically exclude Claims of Transferred Employees that would otherwise be recognized under such plan but for the amendment.

7.3     Third Party Rights; Amendments to Employee Plans.   Nothing in this Agreement, express or implied, shall affect the right of Seller (or, following the Closing, Buyer) to terminate the employment of any employee, including any Business Employee.   This Agreement shall not limit the ability or right of Seller or its Affiliates (or Buyer or its Affiliates after the Closing) to amend or terminate any Employee Plan (or employee benefit plan of Buyer, as applicable) or other benefit or compensation plan or program after the Closing and nothing contained herein shall be construed as an amendment to or modification of any such plan. Nothing contained in this Agreement, express or implied, shall constitute an amendment to any Employee Plan.

## ARTICLE 8
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any or all of which may be waived in writing, in whole or in part, by Buyer in its sole discretion:

8.1     Representations and Warranties.  The representations and warranties of Seller shall be true and correct in all material respects on and as of the date of this Agreement and at and as of the Closing (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period) (except for such representations and

-26-

warranties that are qualified by their terms by a reference to materiality, which representations and warranties as so qualified shall be true and correct in all respects).

8.2     <u>Performance of Covenants</u>.  Seller shall have performed and complied with in all material respects all covenants and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

8.3     <u>No Litigation</u>.  There shall not be any litigation or Proceeding brought by any Governmental Authority that is pending and seeking to restrain or invalidate the transactions contemplated by this Agreement.

8.4     <u>No Orders</u>.  No Orders enjoining or preventing the consummation of the transactions contemplated by this Agreement shall be in effect.

8.5     <u>Material Adverse Effect</u>.  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

8.6     <u>Closing Documents</u>.  Seller shall have delivered all documents required to be delivered by it at Closing pursuant to <u>Section 10.1</u> of this Agreement, in each case in form and substance reasonably satisfactory to Buyer.

8.7     <u>Consents</u>.  The parties shall have received all of the consents, approvals, authorizations, clearances, waivers or Licenses of any Governmental Authority or third parties necessary for the consummation of the Transaction as provided in <u>Section 3.2(b) of the Disclosure Schedule</u>.

8.8     <u>Frustration of Closing Conditions</u>.  Buyer may not rely on the failure of any condition set forth in this <u>Article 8</u>, if such failure was caused primarily by Buyer's failure to comply with any provision of this Agreement.

8.9     <u>No Injunctions</u>.  No temporary restraining order, preliminary or permanent injunction or <u>other</u> Order issued by any court of competent jurisdiction or other similar legal restraint shall be in effect that has the effect of prohibiting the consummation of any of the transactions contemplated by this Agreement or that otherwise adversely affects the right or ability of Buyer to own, operate or control the Business or the Transferred Assets or seeks damages in connection therewith.

8.10    <u>No Laws or Orders</u>.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order which is in effect and which has the effect of making any of the transactions contemplated by this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated by this Agreement.

**ARTICLE 9**
**SELLER'S CONDITIONS TO CLOSING**

The obligations of Seller to, or to cause the Seller Subsidiaries, to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of

-27-

the following conditions, any or all of which may be waived in writing, in whole or in part, by Seller in its sole discretion:

9.1    <u>Representations and Warranties</u>.  The representations and warranties of Buyer shall be true and correct in all material respects at and as of the Closing (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

9.2    <u>Performance of Covenants</u>.  Buyer shall have performed and complied with in all material respects all covenants and obligations required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

9.3    <u>No Litigation</u>.  There shall not be any litigation or Proceeding brought by any Governmental Authority that is pending or threatened and seeking to restrain or invalidate the transactions contemplated by this Agreement.

9.4    <u>No Orders</u>.  No Orders enjoining or preventing the consummation of any material portion of the transactions contemplated by this Agreement shall be in effect.

9.5    <u>Closing Documents</u>.  Buyer shall have delivered all documents required to be delivered by them at Closing pursuant to <u>Section 10.2</u> of this Agreement, in each case in form and substance reasonably satisfactory to Seller.

9.6    <u>Frustration of Closing Conditions</u>.  Seller may not rely on the failure of any condition set forth in this <u>Article 9</u>, if such failure was caused by Seller's failure to comply with any provision of this Agreement.

## <u>ARTICLE 10</u>
## <u>ITEMS TO BE DELIVERED AT CLOSING</u>

10.1    <u>Items to be Delivered by Seller</u>.  At the Closing, Seller shall deliver or cause to be delivered by the applicable Seller Subsidiary or other appropriate third Person to Buyer:

(a)    a certificate of Seller, dated as of the Closing Date and executed by an authorized Representative of Seller, to the effect that each of the conditions specified in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.5</u> are satisfied;

(b)    instruments of sale as shall, in the reasonable judgment of Seller and Buyer, be effective to vest in Buyer on the Closing Date all of the rights, title and interest of Seller and Seller Subsidiaries in and to the Transferred Assets, including one or more bills of sale, assignments and other instruments of transfer relating to the Transferred Assets in substantially the form attached hereto as <u>Exhibit A</u> ("<u>Bills of Sale</u>") duly executed;

(c)    instruments of assignment as shall, in the reasonable judgment of Seller and Buyer, be effective to transfer to Buyer on the Closing Date all of the rights of Seller and the Seller Subsidiaries in and to the Transferred Contracts, and to evidence the assumption by Buyer of the Assumed Liabilities of Seller and the Seller Subsidiaries thereunder, including a duly executed

-28-

assignment and assumption agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>");

(d)     duly executed assignment documents for each of the Transferred Intellectual Property, in substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>IP Assignments</u>");

and simultaneously with such delivery, Seller shall take such steps as are reasonably required to put Buyer in actual possession and operating control of the Transferred Assets; it being understood that, in each case, such deeds, bills of sale, assignments and other instruments of transfer shall not require Seller or any of its Affiliates, including any Seller Subsidiary, to make any additional representations, warranties or covenants, expressed or implied, not expressly contemplated by this Agreement.

10.2     <u>Items to be Delivered by Buyer</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller and the Seller Subsidiaries:

(a)     a certificate of each Buyer, dated as of the Closing Date and executed by an authorized Representative of each Buyer, to the effect that each of the conditions specified in <u>Section 9.1</u> and <u>Section 9.2</u> are satisfied ("<u>Buyer Compliance Certificate</u>");

(b)     duly executed Bills of Sale;

(c)     duly executed Assignment and Assumption Agreement; and

(d)     duly executed IP Assignments.

## **ARTICLE 11**
## **TERMINATION**

11.1     <u>Termination by Mutual Consent</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing, by the mutual written consent of Seller and Buyer.

11.2     <u>Termination by either Buyer or Seller</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing by Buyer or Seller if (a) the Closing shall not have occurred prior to December 31, 2019 ("<u>Outside Closing Date</u>"), <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 11.2</u> shall not be available to any party whose failure (or failure by any of its Affiliates) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to the Outside Closing Date; or (b) any court of competent jurisdiction or other Governmental Authority having jurisdiction over Seller, Seller Subsidiaries, Buyer, or the Business has issued an Order or taken any other final action restraining, enjoining, or otherwise prohibiting or materially restricting the consummation of the transactions contemplated in this Agreement, and such Order or other action shall have become final and nonappealable.

-29-

11.3    Termination by Buyer.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing by Buyer if (a)  Seller breached any of its representations or warranties or shall have failed to perform in any material respect any of its covenants or agreements contained in this Agreement in such a manner that the closing conditions set forth in Section 8.1 or Section 8.2, as applicable, shall not be satisfied, which breach or failure is not curable or, if curable, is not cured within 30 days after the receipt of written notice by Buyer to Seller of such breach or failure; or (b) any condition in Article 8 becomes incapable of fulfillment at the Closing.

11.4    Termination by Seller.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing by Seller if (a) Buyer has breached any of its representations or warranties or failed to perform in any material respect any of their covenants or agreements contained in this Agreement in such a manner that the closing conditions set forth in Section 9.1 or Section 9.2, as applicable, shall not be satisfied, which breach or failure is not curable or, if curable, is not cured within 30 days after the receipt of written notice by Seller to Buyer of such breach or failure; or (b) any condition in Article 9 becomes incapable of fulfillment at the Closing.

11.5    Notice of Termination.  The party seeking to terminate this Agreement pursuant to this Article 11 (other than Section 11.1) shall give prompt written notice of such termination to the other party.

11.6    Effect of Termination and Abandonment.  In the event of the termination of this Agreement pursuant to any of the provisions of this Article 11, none of Seller nor Buyer (nor any of their respective directors and officers) shall have any liability or further obligation to the other party to this Agreement; provided, however, that the provisions of Section 13.14 relating to expenses, and this Section 11.6 shall survive any termination of this Agreement pursuant to the terms of this Article 11; provided, further, that nothing herein will relieve any party from liability for the intentional or willful breach of any representation or warranty or any failure to perform any covenant and agreement occurring prior to the termination.  Upon any termination of this Agreement pursuant to the terms and conditions hereof, each party hereto will return or destroy all documents, work papers and all other material of the other party relating to the transactions contemplated hereby and all copies of such materials, whether so obtained before or after the execution hereof, to the party furnishing the same.

### ARTICLE 12
### SURVIVAL; INDEMNIFICATION

12.1    Survival.  All representations and warranties in this Agreement shall expire on the twelve (12) month anniversary of the Closing.  Notwithstanding any provision in this Article 12 to the contrary, none of Seller and Buyer shall be liable for breach of any representation or warranty given by such party unless written notice of entitlement to make a Claim with respect to such Losses is given to such party on or prior to the expiration of the survival period of the particular representation, warranty, covenant or obligation as provided in this Section 12.1.  All covenants contained in this Agreement, including covenants to indemnify, shall survive until fully discharged, until three months after the Closing Date or by such covenant's express survival period, whichever is latest.

-30-

12.2    <u>Indemnification by Seller</u>.

(a)    Subject to the applicable limitations set forth herein, including as set forth in <u>Section 12.5(f)</u>, from and after Closing, Seller will indemnify Buyer, its Affiliates, and their respective directors, officers, employees, stockholders, attorneys, accountants and agents (collectively, "<u>Buyer Indemnified Parties</u>") from and against any and all damage, loss, liability, cost and expense (including any reasonable attorney and accountant fees, legal costs and expenses) (collectively, "<u>Losses</u>" and, with respect to Buyer, "<u>Buyer's Losses</u>") as a result of, arising out of or in connection with: (i) any Retained Liability; (ii) subject to the Disclosure Schedule, any inaccuracy or breach of any representation and warranty by the Seller to Buyer in <u>Article 3</u> as if such representation and warranty was, in each case, made on the date of this Agreement and on the Closing Date (in such case, as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties) (or, for any representation and warranty that expressly relates to a specified date, as of such specified date) or in the Seller Compliance Certificate delivered pursuant to <u>Section 10.1(a)</u>; or (iii) any breach or nonperformance by Seller of any of its respective covenants or agreements contained in this Agreement following the Closing.

12.3    <u>Indemnification by Buyer</u>.  Subject to the applicable limitations set forth herein, Buyer will indemnify Seller, the Seller Subsidiaries and their Affiliates, and their respective directors, officers, employees, stockholders, attorneys, accountants and agents (collectively, "<u>Seller Indemnified Parties</u>") from and against any and all Losses of any Seller Indemnified Party (such Losses, "<u>Seller's Losses</u>") as a result of, arising out of or in connection with: (a) the Assumed Liabilities; (b) any inaccuracy or breach of any representation and warranty by Buyer to the Seller in <u>Article 4</u> as if such representation and warranty was, in each case, made on the date of this Agreement and on the Closing Date (in such case, as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties) (or, for any representation and warranty that expressly relates to a specified date, as of such specified date) or in the Buyer Compliance Certificate delivered pursuant to <u>Section 10.2(a)</u>; and (c) any breach or nonperformance by Buyer of any of its covenants or agreements contained in this Agreement following the Closing.

12.4    <u>Notice of Claims</u>.

(a)    <u>Third Party Claims</u>.

(i)    If any third party shall notify Buyer, Seller or the Seller Subsidiaries (the "<u>Indemnified Party</u>") with respect to any matter (a "<u>Third Party Claim</u>") that may give rise to a Claim for indemnification against the other party (the "<u>Indemnifying Party</u>") under this <u>Article 12</u>, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing; <u>provided</u>, <u>however</u>, that the failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually prejudiced as a result of such failure.

(ii)    Subject to <u>Sections 12.4(a)(iii)</u> and <u>12.4(a)(iv)</u>, the Indemnifying Party will have the right at any time to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice, at the Indemnifying Party's own expense; <u>provided</u>,

-31-

<u>however</u>, that the Indemnifying Party will not enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless (A) the judgment or proposed settlement releases the Indemnified Party completely in connection with such Third Party Claim; (B) there is no finding or admission of any violation of Laws or wrongdoing by or any violation of the rights of any Indemnified Party; and (C) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, which such consent shall not be unreasonably withheld, conditioned or delayed.   The Indemnifying Party shall give the Indemnified Party written notice of the Indemnifying Party's intention to settle any Third Party Claim at least five days prior to the settlement of any such Third Party Claim.

(iii)    In the event that the Indemnifying Party timely defends, contests or otherwise protects the Indemnified Party against a Third Party Claim, the Indemnified Party shall nevertheless have the right to, but shall not be obligated to, participate at its own expense in the defense of the Third Party Claim with counsel of its own choosing.

(iv)    In the event the Indemnifying Party fails to defend, contest or otherwise protect against any Third Party Claim in a timely manner, upon prior written notice to the Indemnifying Party, the Indemnified Party may, but shall not be obligated to, defend, contest or otherwise protect against the same and make any compromise or settlement thereof, and shall be entitled to recover the entire cost thereof from the Indemnifying Party, including reasonable attorneys' fees, disbursements and all amounts paid as a result of such Third Party Claim or suit or the compromise or settlement thereof; <u>provided</u>, <u>however</u>, that if the Indemnifying Party subsequently undertakes the defense of such matter, the Indemnified Party shall not be entitled to recover from the Indemnifying Party its costs thereafter incurred in the defense thereof other than the reasonable cost of investigation undertaken by the Indemnified Party and reasonable cost of providing assistance.   Notwithstanding anything in this <u>Section 12.4(a)</u> to the contrary, the Indemnified Party shall have the right to conduct and control, through counsel of its choosing, the defense, compromise and settlement of any Third Party Claim (A) that seeks as a primary remedy an injunction or other equitable relief against the Indemnified Party, (B) that is in respect of any matter involving potential criminal liability, (C) if the Indemnified Party has been advised by outside counsel that there would be an actual conflict of interest between the Indemnifying Party and the Indemnified Party with respect to such matter or (D) with respect to which the Indemnified Party irrevocably waives any rights it may have to indemnification under this <u>Article 12</u>.

(v)    Regardless of whether the Indemnifying Party has assumed the defense of a Third Party Claim, the Indemnified Party and the Indemnifying Party shall reasonably cooperate in the defense of such Third Party Claim.   Such cooperation shall include the provision and access to the defending party of documents, information, books and records reasonably requested by the defending party and material to such Claim, and making available employees as may be reasonably requested by the defending party and as shall be reasonably required in connection with the defense of such Claim and Proceeding resulting therefrom.

(vi)    To the extent that there is any conflict between <u>Section 6.3</u> and this <u>Section 12.4</u> regarding the procedure applicable to any claim principally involving Taxes, <u>Section 6.3</u> shall govern.

-32-

(b)     <u>Other Claims</u>.  In the event that any Buyer Indemnified Party or Seller Indemnified Party should have a Claim for indemnification under this <u>Article 12</u> against Seller or Buyer, as applicable, that does not involve a Third Party Claim, Buyer (if a Buyer Indemnified Party is seeking indemnification) or Seller (if a Seller Indemnified Party is seeking indemnification) shall promptly deliver to the other written notice of such Claim detailing the basis for such Claim.

12.5     <u>Adjustment to  Indemnified Party's Losses; Limitations; Clarifications</u>.

(a)     The amount of an Indemnified Party's Losses subject to indemnification hereunder or of any Claim therefor shall be calculated net of (i) any amounts actually recovered by the Indemnified Party or any of its Affiliates pursuant to any indemnification by or indemnification agreement with any non-affiliated third party (net of all direct collection expenses) and (ii) any insurance proceeds or other cash receipts or sources of reimbursement actually received by the Indemnified Party or any of its Affiliates as an offset against such party's Loss (net of all direct collection expenses and premium increases).  Each party hereby waives, to the extent permitted under its applicable insurance policies, any subrogation rights that its insurer may have with respect to such Losses.

(b)     Buyer and Seller shall reasonably cooperate with each other with respect to resolving any Claim for indemnification pursuant to this <u>Article 12</u>.  Buyer and Seller shall, or shall cause the applicable Indemnified Party to, use commercially reasonable efforts to seek recovery under all insurance policies covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder.

(c)     No Indemnified Party shall be entitled to double recovery (or recovery more than once) for the amount of any Losses indemnified by the Indemnifying Party under this <u>Article 12</u> suffered by such party to the extent such party (or another Indemnified Party affiliated with such party) has otherwise been compensated for such Losses.

(d)     In the absence of fraud or willful misconduct, no Indemnifying Party shall have any liability under any provision of this Agreement for any punitive damages, except to the extent such damages are a component of damages awarded to a third party against an Indemnified Party in connection with a Third Party Claim.

(e)     No Indemnifying Party shall be required to indemnify any Indemnified Party to the extent of any Losses that a court of competent jurisdiction have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party.

(f)     Buyer shall not have the right to indemnification under this Agreement with respect to, or based on, Taxes to the extent such Taxes (i) are attributable to a Post-Closing Tax Period (or portion thereof) or (ii) result from transactions or actions taken by Buyer or any of their Affiliates after the closing that are neither specifically contemplated by this Agreement or in the Ordinary Course of Business.

-33-

(g)      Notwithstanding any other provision in this Agreement to the contrary, if any representation or warranty contained in this Agreement or any Other Agreement, the Disclosure Schedule or in any Schedule, agreement, certificate or other document delivered in connection herewith is qualified by materiality, "Material Adverse Effect" or a derivative thereof, such qualification will be ignored and deemed not included in such representation or warranty for purposes of (i) determining whether there has been a breach or inaccuracy of such representation or warranty or certificate and (ii) calculating the amount of Losses with respect to any such breach or inaccuracy.

Notwithstanding the foregoing provisions of this Article 12, Seller shall not be liable for any Losses suffered by any Buyer Indemnified Party under Section 12.2(a)(ii) unless the aggregate of all Losses suffered by such Buyer Indemnified Party exceeds, on a cumulative basis, an amount equal to $25,000.  In addition, no equity holder of Seller shall be directly liable for any Losses suffered by any Buyer Indemnified Party under this Agreement in the absence of fraud committed by such equity holder with the specific intent of inducing Buyer to enter into this Agreement and upon which Buyer has reasonably relied.

12.6      Exclusive Remedy.  The parties hereto acknowledge and agree that the foregoing indemnification provisions in this Article 12 shall be their sole and exclusive remedy for money damages (but not for injunctive or other non-monetary equitable relief) with respect to the transactions contemplated by this Agreement, except with respect to fraud, as to which the parties shall have, in addition to the indemnification provisions of this Article 12, all of their rights and remedies at Law.  Nothing contained in this Section 12.6 shall have any effect on any party's rights under Section 13.15.   The parties each hereby waive any provision of any applicable Law to the extent that it would limit or restrict the agreements contained in this Section 12.6.

## ARTICLE 13
## MISCELLANEOUS

13.1      Notices.  Any notices or other communications required or permitted hereunder (including, by way of illustration and not limitation, any notice permitted or required under Article 13 hereof) to any party hereto shall be sufficiently given when delivered in person, or when sent by certified or registered mail, postage prepaid, or one Business Day after dispatch of such notice with an overnight delivery service, or when transmitted by facsimile or other form of electronic communication if an answer back is received by the sender, in each case addressed as follows:

In the case of Buyer:

> TokenVault, Inc.
> 537 Stevenson Street
> San Francisco, California  94103
> Attn:  Interim Chief Executive Officer

-34-

With a copy to (which copy will not constitute notice):

> Latham & Watkins LLP
> 355 South Grand Avenue, Suite 100
> Los Angeles, California  90071
> Attn:  David Ajalat
> Email: david.ajalat@lw.com

In the case of Seller:

> TokenVault Limited
> 537 Stevenson Street
> San Francisco, California  94103
> Attn:  Chief Operating Officer
> Email:  aaron.travis@tokenvault.io

With a copy to (which copy will not constitute notice):

> Sidley Austin LLP
> 1001 Page Mill Road, Building 1
> Palo Alto, California 94304
> Attention:      Rob Carlson
> Email: rob.carlson@sidley.com

or such substituted address or attention as any party shall have given notice to the others in writing in the manner set forth in this Section 13.1.

13.2    Amendment.  This Agreement may be amended or modified in whole or in part only by an agreement in writing executed by Buyer and Seller and making specific reference to this Agreement.

13.3    Counterparts.  This Agreement may be executed in one or more counterparts (including by means of facsimile or other electronic means), each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of an originally executed counterpart to this Agreement.

13.4    Binding on Successors and Assigns.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the parties hereto and their respective successors and assigns in accordance with the terms hereof.  No party may assign its interest under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed; provided that Buyer may assign its rights and interests to any of their controlled Affiliates, but Buyer remains responsible in all respects for any of their obligations and duties under this Agreement.  Any purported assignment or delegation in violation of this Section 13.4 shall be null and void.  For the avoidance of doubt, a change of control of either Buyer or Seller shall not be deemed an assignment.

-35-

13.5   <u>Severability</u>.  In the event that any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement and any other application thereof shall not in any way be affected or impaired thereby; <u>provided, however</u>, that to the extent permitted by applicable Law, any invalid, illegal, or unenforceable provision may be considered for the purpose of determining the intent of the parties in connection with the other provisions of this Agreement.

13.6   <u>Waivers</u>.  Buyer and Seller may, by written agreement, (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations contained in this Agreement or in any document delivered pursuant to this Agreement, (c) waive compliance with, or modify, any of the covenants or conditions contained in this Agreement, and (d) waive or modify performance of any of the obligations of any of the parties hereto; <u>provided that</u> no such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall operate as a waiver of, or an estoppel with respect to, any subsequent insistence upon such strict compliance other than with respect to the matter so waived or modified.

13.7   <u>Headings</u>.  The headings in the Sections and subsections of this Agreement and in the Schedules are inserted for convenience only and in no way alter, amend, modify, limit or restrict the meaning or interpretation of contractual obligations of the parties under this Agreement.

13.8   <u>Entire Agreement</u>.   This Agreement and the Other Agreements and the instruments to be delivered by the parties pursuant to the terms hereof and thereof constitute the entire agreement among the parties with respect to the subject matter hereof.   All prior negotiations and agreements among the parties hereto with respect to the subject matter of this Agreement and the Other Agreements are superseded by this Agreement (except with respect to the Confidentiality Agreement) and the Other Agreements, and there are no representations, warranties, understandings or agreements other than those expressly set forth herein, in an Other Agreement, or in a Schedule delivered pursuant hereto, except as modified in writing concurrently herewith or subsequent hereto.

13.9   <u>Choice of Law</u>.  This Agreement shall be governed, construed, and enforced in accordance with the Laws of the State of Delaware without regard to the conflicts of law principles thereof.

13.10   <u>Venue</u>.  Any and all actions brought in court shall be filed in a state or federal district court located in California and the parties specifically consent and submit to the jurisdiction and venue of each such state or federal court.  Each party further agrees that service of any process, summons, notice or document by United States registered mail to such party's respective address set forth above shall be effective service of process for any action with respect to any matters to which it has submitted to jurisdiction in this <u>Section 13.10</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action arising out of this Agreement, the Other Agreements or the transactions contemplated hereby or thereby in any such court, and hereby further irrevocably and unconditionally waives and

-36-

agrees not to plead or claim in any such court that any such action brought in any such court has been brought in an inconvenient forum.

13.11  <u>Waiver of Jury Trial Rights</u>.    EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT, THE OTHER AGREEMENTS OR THE MATTERS CONTEMPLATED HEREBY OR THEREBY.  EACH OF THE PARTIES ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN FUTURE DEALINGS. EACH OF THE PARTIES HERETO FURTHER REPRESENTS AND WARRANTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS RIGHT TO A TRIAL BY JURY FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

13.12  <u>No Third-Party Rights</u>.  Other than Sections which are specifically for the benefit of Buyer Indemnified Parties or the Seller Indemnified Parties, this Agreement is not intended and shall not be construed to create any rights in any Persons other than Buyer, Seller and Seller Subsidiaries, and no Person shall assert any rights as third-party beneficiary hereunder.

13.13  <u>Transfer Taxes</u>.

(a)    The Seller, on the one hand, and Buyer, on the other hand, each shall be responsible for and pay fifty percent (50%) of all applicable Transfer Taxes.  Seller shall file any applicable Tax Returns related to Transfer Taxes, with the cooperation of Buyer, if necessary.

(b)    This Agreement, together with any technology transfer agreements entered into in conjunction with the Agreement, is intended to constitute a "technology transfer agreement" as such term is defined in California Code of Regulations 18 § 1507(a)(1).

13.14  <u>Expenses</u>.  Except as expressly provided otherwise herein, Seller, on the one hand, and Buyer, on the other, shall pay all costs and expenses incurred by them or on their behalf in connection with this Agreement and the transactions contemplated hereby, including, without limiting the generality of the foregoing, fees and expenses of their own brokers, financial consultants, accountants and counsel.

13.15  <u>Specific Performance</u>.  The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Therefore, in addition to any other right or remedy to which any party may be entitled at law or in equity, the obligations of Seller under this Agreement, including the Seller's obligation to sell and transfer and to cause the sale and transfer of the Transferred Assets to Buyer, and the obligations of Buyer under this Agreement, including Buyer's obligation to purchase and acquire the Transferred Assets and assume the Assumed Liabilities from Seller and Seller Subsidiaries, and Seller's and Buyer's respective obligations, shall be enforceable by a decree of specific performance issued by the Court of Chancery of the State

-37-

of Delaware or, if under applicable Law exclusive jurisdiction over such matter is vested in the federal courts, any court of the United States located in the State of Delaware, and appropriate injunctive relief may be applied for and granted in connection therewith, this being in addition to any other remedy to which such party is entitled at law or in equity.  Each of the parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the party seeking the injunction, specific performance and other equitable relief has an adequate remedy of law.

13.16   No Recourse.

(a)     This Agreement may not be enforced against, and no Claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may be made against, any former, current or future director, officer, agent, Affiliate (other than Seller and its successors and permitted assignees), manager, assignee or employee of Seller (or any of its successors or permitted assignees), any former, current or future stockholder of Seller (or any of their successors or permitted assignees) or any Affiliate thereof (other than Seller and its successors and permitted assignees) or any former, current or future director, officer, agent, employee, Affiliate (other than Seller and its successors and permitted assignees), assignee, or stockholder of any of the foregoing (other than Seller) (the foregoing Persons, other than Seller and its successors and permitted assignees, collectively, the "Seller Protected Parties"), none of the Seller Protected Parties shall have any liability for any obligations or liabilities of Seller or any Affiliate under this Agreement or for any Claims based on, or by reason of, the transactions contemplated by this Agreement and in no event shall Buyer or any of its Affiliates, and Buyer agrees not to and to cause their Affiliates not to, seek to enforce this Agreement against, make any Claims for breach of this Agreement against, or seek to recover monetary damages from any Seller Protected Party.

(b)     This Agreement may not be enforced against, and no Claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may be made against, any former, current or future director, officer, agent, Affiliate (other than Buyer and its successors and permitted assignees), manager, assignee or employee of Buyer (or any of their successors or permitted assignees), any former, current or future general or limited partner, manager, member or stockholder of Buyer (or any of their successors or permitted assignees) or any Affiliate thereof (other than Buyer and its successors and permitted assignees) or any former, current or future director, officer, agent, employee, Affiliate (other than Buyer and its successors and permitted assignees), assignee, general or limited partner, stockholder, manager or member of any of the foregoing (other than Buyer) (the foregoing persons, other than Buyer and its successors and permitted assignees, collectively, the "Buyer Protected Parties"), none of the Buyer Protected Parties shall have any liability for any obligations or liabilities of Buyer or any Affiliate under this Agreement or for any Claims based on, or by reason of, the transactions contemplated by this Agreement and in no event shall Seller or any of its Affiliates, and Seller agrees not to and to cause its Affiliates not to, seek to enforce this Agreement against, make any Claims for breach of this Agreement against, or seek to recover monetary damages from any Buyer Protected Party.

*[The remainder of the page is intentionally left blank.]*

-38-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized Representatives on the day and year first above written.

**SELLER:**

**TOKENVAULT LIMITED**

By: _Austin Trombley_

Name: Austin Trombley

Title: Founder

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized Representatives on the day and year first above written.

**BUYER:**

TokenVault, Inc.

By: _____

Name: Aaron Travis

Title: President

**SCHEDULE A**
**DEFINITIONS**

For purposes of the Agreement (including this Schedule A):

"Affiliate" means with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of more than 50% of voting equity ownership of such Person (or securities convertible or exchangeable into more than 50% of such voting equity ownership interest), by Contract or otherwise.

"Business" means the business of Seller and the Seller Subsidiaries.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks in the State of California, United States of America, are authorized or required by Law to be closed for business.

"Business Employee" means an employee of Seller or any of the Seller Subsidiaries or any of their Affiliates set forth on Schedule B.

"Buyer Included Taxes" means all Taxes allocated to the Post-Closing Tax Period that are the responsibility of Buyer pursuant to Section 6.1(b) and Buyer's share of all Transfer Taxes pursuant to Section 13.13.

"Buyer Subscription Agreement" means the Subscription Agreement between Buyer and FT Fintech Holdings, LLC, or its applicable Affiliate.

"Claim" means any and all claims or other Proceedings for liabilities, losses, damages, deficiencies, demands, fines, penalties, interest, assessments, judgments, Liens, charges, Orders, dues, and assessments, of whatever kind and nature and all costs and expenses relating thereto, including fees and expenses of counsel, accountants and other experts, and other expenses of investigation and litigation.

"Code" means the U.S.  Internal Revenue Code of 1986, as amended.

"Convertible Note" means the Convertible Promissory Note dated June 13, 2019, issued by Seller in favor of FT Fintech Holdings, LLC, in the principal amount of $1,500,000.

"Copyrights" has the meaning set forth in the definition of Intellectual Property.

"Employment Agreement" means a Contract of a Seller or any of its Affiliates (including any Seller Subsidiary) with any Disclosure Employee (other than at-will employees), to which Seller or any of its Affiliates (including a Seller Subsidiary) has any actual or contingent liability or obligation to provide compensation and/or benefits in consideration for past, present or future services.

A-1

"Environment" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, wetlands, groundwater, sediments, drinking water supply, ambient air, species, plants, wildlife, animals and natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any regulations or rules issued pursuant thereto.

"ERISA Affiliate" means any entity that would have ever been considered a single employer with Seller or any Seller Subsidiary under Section 4001(b) of ERISA or part of the same "controlled group" as Seller or any Seller Subsidiary for purposes of Section 302(d)(3) of ERISA.

"GAAP" means accounting principles generally accepted in the United States as in effect from time to time and as consistently applied through the periods involved.

"Governmental Authority" means any federal, national, state, regional, county, municipal, local or foreign court, arbitral tribunal, agency, board, bureau or commission or other governmental, quasi-governmental or other regulatory authority, instrumentality or private body anywhere in the world exercising any executive, legislative, judicial, regulatory, Tax or other governmental or quasi-governmental authority.

"Income Tax" means any Tax measured by or imposed on net income or franchise Tax imposed in lieu thereof.

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world (i) patents and applications therefor (including any continuations, continuations-in-part, divisionals, reissues, renewals, extensions or modifications of any of the foregoing) (collectively, "Patents"); (ii) trademarks, trade names, service marks, service names, brand names, certification marks, trade dress rights, and any other indicia of source or origin together and rights therein, all applications, registrations, and renewals in connection therewith, and all goodwill associated with each of the foregoing (collectively, "Marks"); (iii) copyrights, copyright registrations and applications therefor and all other rights in works of authorship corresponding thereto (collectively, "Copyrights"); (iv) trade secrets rights and all other rights in or to confidential business or technical information that derive economic value from being held in confidence (collectively, "Trade Secrets"); (v) all rights in or to Uniform Resource Locators, website addresses, social media identifiers and domain names; and (vi) any similar, corresponding or equivalent rights to any of the foregoing anywhere in the world.

"Knowledge" or "knowledge" means, with respect to a Person and a given fact or matter, that such Person has actual knowledge of such fact or matter.  With respect to Seller, "Knowledge" means the Knowledge of Trombley, Alina Jais and Aaron Travis.

"Law" means any federal, state, local or foreign law, statute, rule, code, regulation, ordinance, Order, Permit or directive of, or issued by, any Governmental Authority.

"Liabilities" means, with respect to any Person, any and all liabilities of any kind (whether known or unknown, contingent, accrued, due or to become due, secured or unsecured, matured or otherwise), including but not limited to indebtedness, accounts payable, royalties payable, and other reserves, accrued bonuses and commissions, accrued vacation and any other form of leave,

ACTIVE 245910556

termination payment obligations, employee expense obligations and all other liabilities of such Person or any of its Subsidiaries or Affiliates, regardless of whether such liabilities are required to be reflected on a balance sheet in accordance with GAAP.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, security interest, option, restriction on transferability or voting, limitation, easement, title defect or other adverse Claim of ownership or use, or other encumbrance of any kind, character or description, whether or not of record (including any deposit, conditional or installment sale, other title retention Contract or capital lease), any lease in the nature thereof, or any filing of, or agreement to give, any financing statement.

"Marks" has the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" means any change, development, effect, event or state of facts which, individually or in the aggregate, has had or reasonably would be expected to (i) have a material adverse effect on the Transferred Assets, the condition (financial or otherwise) or results of operations of the Business, taken as a whole, or (ii) materially delay or materially impede the ability of Seller or any Seller Subsidiary to consummate the transactions contemplated by this Agreement; provided that with respect to subsection (i) of the term "Material Adverse Effect" none of the following shall be deemed to constitute a Material Adverse Effect, and no changes, circumstances, developments, state of facts, events or effects resulting from or arising out of the following shall be taken into account in determining whether a Material Adverse Effect has occurred, or may, would or could occur: (a) conditions affecting United States or foreign economic, financial, banking, currency or capital markets generally or any changes therein, (b) national or international political, industry or social conditions (including the engagement in hostilities or the occurrence of any national emergency or war or the occurrence of any military or terrorist attack or the disruption of financial, banking or securities markets (including any decline in the price of any security or any market index)), (c) changes in Laws issued by any Governmental Authority or changes in GAAP, (d) the announcement of this Agreement, the transactions contemplated hereby, the Other Agreements, or the identity of the parties hereto, (e) the performance by Buyer or its Affiliates of any action, or the failure to take any action, in each case at the written request of Seller or a Seller Subsidiary or pursuant to this Agreement or the Other Agreements, (f) the performance by Seller or its Affiliates of any action, or the failure to take any action, in each case at Buyer's written request or pursuant to this Agreement or the Other Agreements, and (g) in and of itself, any failure of Seller or the Business to meet any projections or estimates for any period; provided further that with respect to the conditions set forth in clauses (a) through (c), such changes, circumstances, events, conditions or effects do not disproportionately impact the Business relative to other Persons who operate in the same industry as the Business and are of comparable size.

"Multiemployer Plan" has the meaning as provided in Section 3(37) and Section 4001(a)(3) of ERISA.

"Open Source Software" means all software or other Technology that is distributed as "open source software" or "free software" or is otherwise publicly distributed or made generally available in source code or equivalent form under terms that permit the free use, modification and redistribution of such software or Technology.  Open Source Software includes, without limitation,

ACTIVE 245910556

any software distributed under the following licenses: GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards License (SISL) and the Apache License.

"Order" means any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, determination, decree, consent decree or verdict entered, issued, made or rendered by any arbitrator or Governmental Authority (whether temporary, preliminary or permanent).

"Ordinary Course of Business" means the ordinary course of conduct of the Business, which is consistent with past practices of the Business.

"Other Agreements" means the Assignment and Assumption Agreement, Bills of Sale, the IP Assignments and each other agreement, instrument or other document required to be executed by any of Buyer, Seller or any of Seller's Affiliates in connection with the transactions contemplated by this Agreement.

"Patents" has the meaning set forth in the definition of Intellectual Property.

"Permit" means any material permit, authorization, approval, registration, license, franchise, certificate, exemption, waiver or variance issued or granted by or obtained from any Governmental Authority.

"Permitted Encumbrances" means (a) Liens for Taxes not yet due and payable, (b) Liens disclosed in the Financial Statements (solely through the period immediately prior to the Closing Date), (c) inbound software licenses and other restrictions on the use of software and related documents licensed from third parties to the extent disclosed on the Disclosure Schedule, (d) non-exclusive outbound licenses of Intellectual Property or Technology, (e)(i) Liens imposed by Law and incurred in the Ordinary Course of Business for obligations not yet due and payable to landlords, carriers, warehousemen, laborers, materialmen and the like (solely through the period immediately prior to the Closing Date), all of which shall be discharged prior to the Closing, (ii) easements, building restrictions, rights of way, reservations and such similar encumbrances or charges against real property as are of a nature generally existing with respect to properties of a similar character and which do not in any material way affect the use thereof in the Business and (iii) the Liens set forth on Section 1.1 of the Disclosure Schedule (solely through the period immediately prior to the Closing Date); (f) with respect to any Contract, any Lien imposed on such Contract (or any right thereunder) pursuant to the terms and conditions of such Contract which do not individually or in the aggregate, materially impair the continued ownership, use and operation of such Contracts; (g) Liens incurred in the Ordinary Couse of Business in connection with workers' compensation and unemployment insurance or similar laws; and (h) other imperfections of title or other *de minimis* encumbrances, if any, which do not, individually or in the aggregate, materially impair the continued ownership, use and operation of the assets to which they relate in the conduct of the Business as presently conducted.

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a governmental entity or any agency, instrumentality or political subdivision of a Governmental Authority, or any other entity or body.

-4-

"Proceeding" means any claim, assertion, notice of claim or assertion, complaint, action, litigation, suit, proceeding, formal investigation, inquiry, audit or review of any nature, civil, criminal, regulatory, administrative or otherwise, or any grievance, arbitration or arbitration demand.

"Product" means products and/or services, and related documentation, currently or previously researched, designed, developed, manufactured, performed, licensed, sold, distributed and/or otherwise made commercially available by the Seller and used in the Business.

"Representative" means with respect to any Person, (a) any director, officer, partner, executor, trustee, employee, agent, consultant, advisor, or other representative of such Person, (b) any Person with respect to which such Person serves as a general partner or trustee (or in a similar capacity), and (c) legal counsel, accountants and financial advisors of such Person.

"Seller Included Taxes" means all Taxes allocated to the Pre-Closing Tax Period that are the responsibility of Seller pursuant to Section 6.1 and Seller's share of all Transfer Taxes pursuant to Section 13.13.

"Seller Transaction Expenses" means the expenses incurred by, or on behalf of, Seller and its Affiliates in connection with or relating to this Agreement or the Other Agreements or the transactions contemplated hereby or thereby, including, without limitation, attorneys' fees, accountants' fees, investment banking fees, and loan prepayment fees in connection with or relating to this Agreement or the Other Agreements or the transactions contemplated hereby or thereby.

"Subsidiary" of a Person means any other Person, whether incorporated or unincorporated, of which (i) such Person or any other Subsidiary of such Person is a general partner (excluding such partnerships where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership) or (ii) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such Person is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Tax" means all federal, territorial, state, provincial, local or foreign government taxes, levies, assessments, duties, imposts or other like assessments, charges or fees (including estimated taxes, charges and fees), including, without limitation, income, profits, gross receipts, transfer, excise, property, sales, use, value-added, ad valorem, license, excise, capital, wage, employment, payroll, withholding, Social Security, Medicare, severance, occupation, import, custom duties, stamp, documentary, mortgage, registration, alternative, add-on minimum, environmental, franchise or other governmental taxes or charges of any kind whatsoever, whether disputed or not, imposed by any Governmental Authority responsible for the imposition of any such tax, including any interest, penalties, fines or additions to tax applicable or related thereto, and also including all amounts described above payable as a result of having been a member of a consolidated, combined, affiliated or unitary group, or as a result of successor or transferee liability, or by contract.

"Tax Returns" means, collectively, all reports, declarations, filings, estimates, returns, information statements and similar documents filed or required to be filed with any Governmental Authority

in respect of, any Taxes, including, without limitation, any schedule or attachment thereto and any amendments thereof.

"Technology" means software, technology, technical information and know-how, including designs, formulae, specifications, design and manufacturing schematics, manufacturing and other processes, algorithms, data, databases, methods, techniques, ideas, concepts, inventions, discoveries, developments, innovations, computer programs, whether in source code or in executable code form, and other similar subject matter, and all recordings, graphs, drawings, reports, notes, analyses and other writings and recordations, and any other embodiments of the foregoing, in any form, and all related subject matter used in the design, development, reproduction, sale, marketing, maintenance or modification of any of the foregoing.

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property.

"Transfer Taxes" means all applicable sales, transfer, goods and services, excise, stamp, documentary, use, filing and other similar Taxes and fees that may become due or payable (and are not subject to an exemption) as a result of the sale, conveyance, assignment, transfer or delivery of the Transferred Assets, whether levied on Buyer or Seller, including all related interest, penalties and additions to Tax.

"Trombley" means Austin Trombley.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state or local Laws, including, but not limited to, California Labor Code section 1400 et seq.

Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have the meanings set forth in the Sections indicated:

| Term: | Section: |
|---|---|
| Acquisition | 2.1(b) |
| Agreement | Preamble |
| Apportioned Obligations | 6.1(b) |
| Assignment and Assumption Agreement | 10.1(c) |
| Assumed Liabilities | 2.4 |
| Bills of Sale | 10.1(b) |
| Buyer | Preamble |
| Buyer Compliance Certificate | 10.2(a) |
| Buyer Indemnified Parties | 12.2(a) |
| Buyer's Losses | 12.2(a) |
| Buyer Non-Voting Shares | 2.1(b) |
| Buyer Protected Parties | 13.16(b) |
| Closing | 2.6(b) |
| Closing Date | 2.6(b) |
| Company Software | 3.6(l) |
| Confidential Information Agreement | 3.8(g) |
| Contracts | 2.2(a) |

-6-

| | |
|---|---|
| Disclosure Employees | 7.1(a) |
| Disclosure Schedule | Article 3 |
| Distribution | 2.10 |
| Excluded Assets | 2.3 |
| Financial Statements | 3.3 |
| Indemnified Party | 12.4(a)(i) |
| Indemnifying Party | 12.4(a)(i) |
| IP Assignments | 10.1(e) |
| Liabilities | 2.4 |
| Losses | 12.2(a) |
| Material Contract | 3.7(a) |
| New Plans | 7.2(a) |
| Old Plans | 7.2(b) |
| Other Representations | 12.1 |
| Outside Closing Date | 11.2 |
| Owned Intellectual Property | 3.6(c) |
| Personal Information | 3.11(a) |
| Post-Closing Tax Period | 6.1(b) |
| Pre-Closing Tax Period | 6.1(b) |
| Registered Intellectual Property | 3.6(j) |
| Retained Liabilities | 2.4 |
| Return Date | 2.10 |
| Return Shares | 2.10 |
| Seller | Preamble |
| Seller Claims | 2.2(b) |
| Seller Compliance Certificate | 10.1(a) |
| Seller Indemnified Parties | 12.3 |
| Seller's Losses | 12.3 |
| Seller Protected Parties | 13.16(a) |
| Seller Subsidiaries | Recitals |
| Straddle Period | 6.1(b) |
| Tax Claim | 6.4(a) |
| Third Party Claim | 12.4(a)(i) |
| Transferred Assets | 2.2 |
| Transferred Contracts | 2.2(a) |
| Transferred Employees | 7.1(a) |
| Transferred Intellectual Property | 2.2(f) |
| Transferred Leases | 2.2(k) |
| Transferred Registered IP | 2.2(e) |
| Transferred Technology | 2.2(f) |

ACTIVE 245910556

**SCHEDULE B**
**BUSINESS EMPLOYEES**

| US Employees | City | State |
|---|---|---|
| Aaron Travis | San Francisco | CA |
| Alina Jais | San Francisco | CA |
| Sarkees John Nahas | Los Angeles | CA |
| Elizabeth Williams | San Francisco | CA |
| Craig Merchant | San Francisco | CA |

| India Employees | | |
|---|---|---|
| Atul Patil | Bangalore | Karnataka |
| Mohammad Adil | Bangalore | Karnataka |
| Soumya Mohanty | Bangalore | Karnataka |
| Sujitha Vijayakumar | Bangalore | Karnataka |
| Rikki Chouhan | Bangalore | Karnataka |
| *Ritwik Sinha* | Bangalore | *Karnataka* |
| Shubham Shukla | Bangalore | Karnataka |
| Akhil Bharti | Bangalore | Karnataka |
| Abhishek Mahra | Bangalore | Karnataka |
| Abhinav Shukla | Bangalore | Karnataka |
| Priyanka Mohanty | Bangalore | Karnataka |
| Bharti Sharma | Bangalore | Karnataka |
| Neha Prakash | Bangalore | Karnataka |
| Karamvir Kaur | Bangalore | Karnataka |
| Girisha Chennura | Bangalore | Karnataka |
| Tejashri Dilip Swami | Bangalore | Karnataka |
| Viswanath Kapavarapu | Bangalore | Karnataka |
| Mudit Marda | Bangalore | Karnataka |
| Nikhil Borawar | Bangalore | Karnataka |
| Abhinav Korpal | Bangalore | Karnataka |

-8-

**EXHIBIT B**

**<u>Stock Purchase Agreement</u>**

[See attached]

**TOKENVAULT, INC.**

**STOCK PURCHASE AGREEMENT**

***TABLE OF CONTENTS***

Page

| | | |
|---|---|---|
| 1. | Purchase and Sale of Stock. | 1 |
| | 1.1 Sale and Issuance of Stock. | 1 |
| | 1.2 Trombley Right of Repurchase. | 3 |
| | 1.3 Purchaser Put Right. | 4 |
| | 1.4 Agreements Regarding the Note | 5 |
| | 1.5 Defined Terms Used in this Agreement | 5 |
| 2. | Representations and Warranties of the Company | 8 |
| | 2.1 Organization, Good Standing, Corporate Power and Qualification | 8 |
| | 2.2 Capitalization | 8 |
| | 2.3 Subsidiaries | 9 |
| | 2.4 Authorization | 10 |
| | 2.5 Valid Issuance of Shares | 10 |
| | 2.6 Governmental Consents and Filings | 10 |
| | 2.7 Litigation | 10 |
| | 2.8 Intellectual Property | 10 |
| | 2.9 Compliance with Other Instruments | 11 |
| | 2.10 Agreements; Actions. | 12 |
| | 2.11 Certain Transactions | 12 |
| | 2.12 Rights of Registration and Voting Rights | 13 |
| | 2.13 Property. | 13 |
| | 2.14 Material Liabilities | 13 |
| | 2.15 Changes. | 13 |
| | 2.16 Employee Matters | 14 |
| | 2.17 Tax Returns and Payments. | 16 |
| | 2.18 Insurance | 16 |
| | 2.19 Employee Agreements | 16 |
| | 2.20 Permits | 16 |
| | 2.21 Corporate Documents | 16 |
| | 2.22 83(b) Elections | 16 |
| | 2.23 Real Property Holding Corporation | 16 |
| | 2.24 Environmental and Safety Laws | 16 |
| | 2.25 Disclosure | 17 |
| | 2.26 Foreign Corrupt Practices Act | 17 |
| | 2.27 Data Privacy. | 18 |
| | 2.28 Export Control Laws | 18 |
| 3. | Representations and Warranties of the Purchaser | 18 |
| | 3.1 Authorization | 18 |
| | 3.2 Purchase Entirely for Own Account | 19 |
| | 3.3 Disclosure of Information | 19 |
| | 3.4 Restricted Securities | 19 |
| | 3.5 No Public Market | 19 |
| | 3.6 Legends. | 19 |
| | 3.7 Accredited Investor | 19 |
| | 3.8 No General Solicitation | 20 |
| | 3.9 Representations with Respect to the Note. | 20 |

| | | | |
|---|---|---|---|
| 4. | Covenants of Trombley | | 20 |
| 5. | Indemnification. | | 20 |
| | 5.1 | Trombley Indemnification | 20 |
| | 5.2 | Waiver | 20 |
| | 5.3 | Advancement | 20 |
| | 5.4 | Resolution of Conflicts; Arbitration. | 21 |
| | 5.5 | Holdback. | 22 |
| 6. | Company Covenants. | | 22 |
| | 6.1 | Financials | 22 |
| | 6.2 | Anti-Corruption Laws | 22 |
| 7. | Restrictions on Transfer; Right of First Refusal. | | 22 |
| | 7.1 | Restrictions on Transfer. | 22 |
| | 7.2 | Right of First Refusal | 24 |
| 8. | Observer Right | | 24 |
| 9. | Conditions to the Purchaser's Obligations at Closing | | 24 |
| | 9.1 | Representations and Warranties | 24 |
| | 9.2 | Performance | 24 |
| | 9.3 | Compliance Certificate | 25 |
| | 9.4 | Qualifications | 25 |
| | 9.5 | Board of Directors | 25 |
| | 9.6 | Authorized Officers | 25 |
| | 9.7 | Restated Certificate | 25 |
| | 9.8 | Secretary's Certificate | 25 |
| | 9.9 | Proceedings and Documents | 25 |
| 10. | Conditions of the Company's Obligations at Closing | | 25 |
| | 10.1 | Representations and Warranties | 25 |
| | 10.2 | Performance | 25 |
| | 10.3 | Qualifications | 25 |
| 11. | Miscellaneous | | 26 |
| | 11.1 | Survival of Warranties | 26 |
| | 11.2 | Successors and Assigns | 26 |
| | 11.3 | Governing Law | 26 |
| | 11.4 | Counterparts | 26 |
| | 11.5 | Titles and Subtitles | 26 |
| | 11.6 | Notices | 26 |
| | 11.7 | No Finder's Fees | 26 |
| | 11.8 | Fees and Expenses | 27 |
| | 11.9 | Attorneys' Fees | 27 |
| | 11.10 | Amendments and Waivers | 27 |
| | 11.11 | Severability | 27 |
| | 11.12 | Delays or Omissions | 27 |
| | 11.13 | Entire Agreement | 27 |
| | 11.14 | Corporate Securities Law | 27 |

2

11.15   Dispute Resolution.................................................................................................. 27
11.16   No Commitment for Additional Financing................................................................ 28
11.17   Right to Conduct Activities ..................................................................................... 28

Exhibit A -            SCHEDULE OF PURCHASER

Exhibit B -            FORM OF AMENDED AND RESTATED
                       CERTIFICATE OF INCORPORATION

Exhibit C -            DISCLOSURE SCHEDULE

**TOKENVAULT, INC.**
**STOCK PURCHASE AGREEMENT**

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**"), is made as of the [    ] day of October, 2019 by and among TokenVault, Inc., a Delaware corporation (the "**Company**"), Austin Dale Trombley ("**Trombley**"); and FT Fintech Holdings, LLC ("**Purchaser**").

The parties hereby agree as follows:

1.      Purchase and Sale of Stock.

1.1      Sale and Issuance of Stock.

(a)      The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Initial Closing (as defined below) the Amended and Restated Certificate of Incorporation in the form of Exhibit B attached to this Agreement (the "**Restated Certificate**").

(b)      Subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase at the Initial Closing, and each of Trombley and the Company respectively agrees to sell and issue to the Purchaser at the Initial Closing (i) with respect to Trombley, that number of shares of Voting Common Stock (the "**Voting Common Stock**"), $0.001 par value per share (the "**Voting Stock**"), set forth opposite the Purchaser's name on Exhibit A, which shall constitute all of the Voting Common Stock of the Company, at a per share purchase price of $3,000.00 per share, for an aggregate purchase price of $3,000,000 (such aggregate amount, the "**Voting Stock Consideration**"); and (ii) with respect to the Company, (A) that number of shares of Class A Non-Voting Common Stock (the "**Class A Non-Voting Common Stock**" and, together with the Voting Common Stock and the Class B Non-Voting Common Stock (as defined herein), the "**Common Stock**"), par value $0.001 per share, set forth opposite the Purchaser's name on Exhibit A (the "**Non-Voting Stock**"), at a per share purchase price of $2.50 per share, for an aggregate purchase price of $5,500,000 (such aggregate amount, the "**Initial Non-Voting Stock Closing Consideration**"); and (B) that number of shares of Class A Non-Voting Common Stock (the "**Note Stock**") to be issued pursuant to the automatic conversion terms of the Convertible Promissory Note of the Company issued to Purchaser prior to the date hereof (the "**Note**") in accordance with its terms, except as amended hereby and as set forth opposite the Purchaser's name on Exhibit A. The shares of Voting Stock, Non-Voting Stock, Note Stock and any additional shares of Class A Non-Voting Common Stock issued to the Purchaser pursuant to this Agreement shall be referred to in this Agreement as the "**Shares**."

(c)      (a)      As an inducement to the Purchaser to enter into this Agreement, Trombley hereby agrees to indemnify and hold the Company, Purchaser, their respective parents, subsidiaries, Affiliates, and related companies, and each of the foregoing entities' respective successors, principals, board members, trustees, agents, attorneys, employees, officers, and directors, except to the extent that such party is Trombley (each party receiving indemnification, a "**Primary Indemnified Party**" and collectively the "**Primary Indemnified Parties**"), harmless from Losses in any way relating to any claims and litigation matters (both current and potential) caused by or relating to: (i) the ownership of, and third party infringement claims relating to, Company Intellectual Property, including the Company Intellectual Property which was assigned to the Company by Trombley, Alina Jais and Aaron Travis; (ii) any breach of any agreement by TokenVault Limited with the Company pursuant to that certain Asset Purchase Agreement entered into between the parties, dated as of the date of this Agreement; (iii) any current or former holders of interest in TokenVault Limited; (iv) any current or former service providers of TokenVault Limited in their capacity as providers of service to TokenVault Limited; (v) the claims made

1

or actions taken by Mr. Stuart Shelly (the "**Shelly Matter**" and (i)-(v), the "**Key Matters**"); and/or (vi) any other lawsuit arising from the Key Matters ((i) – (vi) the "**Key Litigation**").  Notwithstanding the foregoing, Trombley shall not be liable under this Section 1.1(c) for any (x) Losses which constitute consequential, indirect, incidental, special, exemplary, punitive or other similar Losses, (y) Losses which constitute lost profits or diminution in value, or (z) Losses that would not exist if not for, or to the extent aggravated by, any act or wrongful omission of a Primary Indemnified Party.

(d)     The initial purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures or such other time and place as the Company, Trombley and the Purchaser mutually agree upon, orally or in writing (which time and place are designated as the "**Initial Closing**"). In the event there is more than one closing, the term "**Closing**" shall apply to each such closing unless otherwise specified.

(e)     At the Initial Closing, Trombley shall cause the Company to deliver to the Purchaser a certificate representing all of the Voting Stock of the Company, which is being purchased by the Purchaser, against payment of the Voting Stock Consideration therefor by check payable to Trombley, by wire transfer to a bank account designated by Trombley or by any combination of such methods, which payment will be made in three (3) tranches as set forth below:

(i)     At the Initial Closing, the Purchaser will cause and/or will cause its Affiliates to pay to Trombley, in the aggregate, one-third (1/3rd) of the Voting Stock Consideration ($1,000,000.00), less $250,000 which will be held in escrow by the Purchaser and shall be fully available to indemnify and hold harmless the Purchaser and its Affiliates from and against any and all Losses relating to the Shelly Matter in respect of which the Purchaser and its Affiliates may be indemnified and held harmless under Article V of this Agreement (the "**First Voting Stock Closing**" and such amount to be held in escrow, the "**First Holdback Amount**");

(ii)     Upon the earlier of (A) the completion of the milestones set forth in Schedule A attached hereto, as shall be commercially reasonably determined by Trombley and the Purchaser; and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Second Voting Stock Closing Date, the Purchaser will pay and/or will cause its Affiliates to pay to Trombley, in the aggregate, one-third (1/3rd) of the Voting Stock Consideration ($1,000,000.00), less $500,000 which will be held in escrow by the Purchaser and shall be fully available to indemnify and hold harmless the Purchaser and its Affiliates from and against any and all Losses relating to the Shelly Matter in respect of which the Purchaser and its Affiliates may be indemnified and held harmless under Article V of this Agreement (the "**Second Voting Stock Closing**" and such amount to be held in escrow, the "**Second Holdback Amount**"); and

(iii)     Upon the earlier of (A) the completion of the milestones set forth in Schedule B attached hereto, as shall be commercially reasonably determined by Trombley and the Purchaser; and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Third Voting Stock Closing Date, the Purchaser will pay and/or will cause its Affiliates to pay to Trombley, in the aggregate, one-third (1/3rd) of the Voting Stock Consideration ($1,000,000.00) less $250,000 which will be held in escrow by the Purchaser and shall be fully available to indemnify and hold harmless the Purchaser and its Affiliates from and against any and all Losses relating to the Shelly Matter in respect of which the Purchaser and its Affiliates may be indemnified and held harmless under Article V of this Agreement (the "**Third**

**Voting Stock Closing**" and such amount to be held in escrow, the "**Third Holdback Amount**" and, together with the First Holdback Amount and the Second Holdback Amount, the "**Holdback Amount**").

(f)     At the Initial Closing, the Company shall deliver to the Purchaser a certificate representing the Non-Voting Stock being purchased by the Purchaser against payment of the Initial Non-Voting Stock Closing Consideration therefor by check payable to the Company, by wire transfer to a bank account designated by the Company or by any combination of such methods. Following the Initial Closing, the Purchaser shall, pursuant to the terms set forth in this Section 1.1(f), purchase additional shares of Class A Non-Voting Common Stock:

(i)     Upon the earlier of (A) the completion of the milestones set forth in Schedule A attached hereto, as shall be commercially reasonably determined by the Company, and the Purchaser; and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Second Non-Voting Stock Closing Date, the Purchaser and/or its Affiliates shall purchase 1,000,000 shares of Class A Non-Voting Common Stock (as adjusted for stock splits, dividends, recapitalizations and the like) from the Company and the Company shall deliver to the Purchaser and/or its Affiliates a certificate representing the shares of Class A Non-Voting Common Stock being purchased by the Purchaser and/or its Affiliates against payment of $2,500,000.00 therefor by check payable to the Company, by wire transfer to a bank account designated by the Company or by any combination of such methods (the "**Second Non-Voting Stock Closing**" and such amount, the "**Second Non-Voting Stock Closing Consideration**");

(ii)     Upon the earlier of (A) the completion of the milestones set forth in Schedule B attached hereto, as shall be commercially reasonably determined by the Company, and the Purchaser; and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Third Non-Voting Stock Closing Date, the Purchaser and/or its Affiliates shall purchase 600,000 shares of Class A Non-Voting Common Stock (as adjusted for stock splits, dividends, recapitalizations and the like) from the Company and the Company shall deliver to the Purchaser and/or its Affiliates a certificate representing the shares of Class A Non-Voting Common Stock being purchased by the Purchaser and/or its Affiliates against payment of $1,500,000.00 therefor by check payable to the Company, by wire transfer to a bank account designated by the Company or by any combination of such methods (the "**Third Non-Voting Stock Closing**" and, together with the Second Non-Voting Stock Closing, the Second Voting Stock Closing and the Third Voting Stock Closing, the "**Milestone Closings**" and such amount, the "**Third Non-Voting Stock Closing Consideration**" and, together with the Initial Non-Voting Stock Closing Consideration and the Second Non-Voting Stock Closing Consideration, the "**Non-Voting Stock Consideration**").

1.2     Trombley Right of Repurchase.

(a)     In the event that all of the Milestone Closings have not occurred prior to the Completion Date (the "**Purchaser Termination Event**"), Trombley shall have the right to repurchase the Voting Stock owned by the Purchaser and/or its Affiliates immediately prior to the Purchaser Termination Event pursuant to this Section 1.2.  The purchase and sale arrangements contemplated by the preceding sentence of this Section 1.2(a) are referred to herein as the "**Trombley Repurchase**."

(b)     The aggregate purchase price to be paid by Trombley to the Purchaser

3

and/or its Affiliates pursuant to exercise of the Trombley Repurchase (the "**Trombley Repurchase Price**") shall be equal to (i) the product of (x) the total amount of the Voting Stock Consideration paid (including amounts that would have been paid absent any Holdback Amount) by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event divided by 1,000 and (y) the number of shares of Voting Stock owned by the Purchaser and/or its Affiliates immediately prior to the Purchaser Termination Event, and (ii) minus any Holdback Amount held by the Purchaser that is unused and not reasonably anticipated to be used for future claims.

(c)     Trombley shall effect the Trombley Repurchase (if so elected) by giving the Purchaser written notice (the "**Trombley Repurchase Notice**") specifying the date on which the Trombley Repurchase shall be effected, which date shall be no earlier than sixty (60) days and no later than one hundred twenty (120) days following receipt of the Trombley Repurchase Notice by the Purchaser (the "**Stock Repurchase Date**").  Upon such notification, the Purchaser shall, prior to or on the Stock Repurchase Date, or such later date as may be agreed upon in writing by Trombley and the Purchaser, deliver and/or cause its Affiliates to deliver to Trombley any certificates representing the Voting Stock, together with a duly executed stock power for the transfer of such Voting Stock to Trombley, free and clear of any Encumbrances, and Trombley shall, on the Stock Repurchase Date, pay to the Purchaser and/or its Affiliates the Trombley Repurchase Price by wire transfer of immediately available funds to a bank account designated by the Purchaser and/or its Affiliates (the "**Trombley Repurchase Closing**").

(d)     Trombley's rights to the Trombley Repurchase set forth in this Section 1.2 shall terminate and be of no further force and effect if Trombley does not deliver the Trombley Repurchase Notice to the Purchaser within one (1) month after the Completion Date.

(e)     The Purchaser may not Transfer more than forty-nine percent (49%) of the shares of Voting Stock held by it without Trombley's written consent prior to the earlier of (i) the completion of the Milestone Closings; and (ii) the termination of Trombley's right to the Trombley Repurchase hereunder; provided that the Purchaser may, without Trombley's written consent, Transfer any or all of its shares of Voting Stock to any of its Affiliates at any time.

1.3     Purchaser Put Right.

(a)     Put Right.

(i)     Contingent upon and following the Trombley Repurchase Closing, the Purchaser and/or its Affiliates shall have the right but not the obligation to elect to sell to Trombley, and upon such election, Trombley shall be obligated to purchase, that number of shares of Class A Non-Voting Common Stock that is equal to forty percent (40%) of the total amount owned by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event (the "**First Put Right**" and such shares, the "**First Put Shares**"). The Purchaser and/or its Affiliates may elect to exercise the First Put Right at any time during the one hundred eighty (180) day period following the Stock Repurchase Date (the "**First Put Period**").

(ii)     Contingent upon and following the closing of the sale of the First Put Shares pursuant to Section 1.3(a)(i) (the "**First Put Closing**"), the Purchaser shall have the right but not the obligation to elect to sell to Trombley, and upon such election, Trombley shall be obligated to purchase, that number of shares of Class A Non-Voting Common Stock that is equal to forty percent (40%) of the total amount owned by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event (the "**Second Put Right**" and such shares, the "**Second Put Shares**"). The Purchaser may elect to exercise the Second Put Right at any time

4

during the one hundred eighty (180) day period following First Put Closing (the "**Second Put Period**").

(iii)     Contingent upon and following the closing of the sale of the Second Put Shares pursuant to Section 1.3(a)(ii) (the "**Second Put Closing**"), the Purchaser shall have the right but not the obligation to elect to sell to Trombley, and upon such election, Trombley shall be obligated to purchase, that number of shares of Class A Non-Voting Common Stock that is equal to twenty percent (20%) of the total amount owned by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event (the "**Third Put Right**" and such shares, the "**Third Put Shares**"). The Purchaser may elect to exercise the Third Put Right at any time during the one hundred eighty (180) day period following the Second Put Closing (the "**Third Put Period**").

(b)     The aggregate purchase price to be paid by Trombley to the Purchaser and/or its Affiliates pursuant to the exercise of each applicable Put Right shall be equal to the product obtained by multiplying $2.50 by the applicable number of Put Shares being sold by the Purchaser and/or its Affiliates (the "**Put Price**").

(c)     The Purchaser and/or its Affiliates shall exercise the applicable Put Right by giving Trombley written notice (the "**Put Notice**") of such exercise at any time during the applicable Put Period. Trombley shall, within ninety (90) days of the delivery of the Put Notice, pay to the Purchaser and/or its Affiliates the applicable Put Price by wire transfer of immediately available funds to a bank account designated by the Purchaser and/or its Affiliates and the Purchaser shall deliver and/or cause its Affiliates to deliver to Trombley any certificates representing the applicable Put Shares, together with a duly executed stock power for the transfer of such Put Shares to Trombley, free and clear of any Encumbrances.

1.4     <u>Agreements Regarding the Note</u>

(a)     <u>Consent to Amendment, Conversion and Termination</u>.     The Company and the Purchaser hereby agree and acknowledge that:

(i)     the Note is hereby amended such that the entire principal amount of such Note plus unpaid accrued interest to be converted into Shares pursuant to the terms thereunder, as amended hereby, shall be the outstanding principal and unpaid accrued interest as of October 24, 2019 (such amount, the "**Note Consideration**"); and

(ii)     notwithstanding anything to the contrary herein or in the Note, the Note shall automatically convert at the Initial Closing into the number of Shares as set forth on <u>Exhibit A</u> attached hereto, and the Purchaser agrees that the terms of the Note are hereby superseded to the extent necessary to give effect to the foregoing.

1.5     <u>Defined Terms Used in this Agreement</u>. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a)     "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person,

including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person.

(b)        "**Business**" means the Company's business as a platform that enables the exchange of digital assets and any other business of the Company that may exist as of the Initial Closing.

(c)        "**Business Day**" means a day (other than a Saturday, Sunday or public holiday) on which banks are normally open for business in the State of California, United States.

(d)        "**Code**" means the Internal Revenue Code of 1986, as amended.

(e)        "**Completion Date**" means on the eighteen (18) month anniversary of the Initial Closing, or such other date as the Parties may mutually agree in writing.

(f)        "**Company Intellectual Property**" means all software source code repositories, patents, patent application, registered and unregistered trademarks, trademark applications, registered and unregistered service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases as are necessary to the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted.

(g)        "**Constructive Sale**" means, with respect to any security, a short sale with respect to such security, entering into or acquiring an offsetting derivative contract with respect to such security, entering into or acquiring a futures or forward contract to deliver such security, or entering into any other hedging or other derivative transaction that has the effect of materially changing the economic benefits and risks of ownership.

(h)        "**Encumbrance**" means any mortgage, assignment of receivables, debenture, lien, hypothecation, charge, pledge, title retention, right to acquire, security interest, option, pre-emptive or other similar right, right of first refusal, restriction, third-party right or interest, any other encumbrance, condition or security interest whatsoever or any other type of preferential arrangement (including without limitation, a title transfer or retention arrangement) having similar effect.

(i)        "**Key Employee**" means any executive-level employee (including division director and vice president-level positions) as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

(j)        "**Knowledge**" including the phrase "**to the Company's knowledge**" shall mean the actual knowledge after reasonable investigation of each executive level employee of the Company.

(k)        "**Losses**" means any and all claims, losses, liabilities, damages fees, penalties, awards, costs, interest, taxes, reasonable attorneys fees, and expenses of any kind.

(l)        "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results

6

of operations of the Company.

(m)     "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(n)     "**Restricted Period**" means the period beginning on the date of signing this Agreement and ending on the date that is two (2) years from the Initial Closing.

(o)     "**Restricted Territories**" means the territories where the Company or any of its subsidiaries has physical business operations, including but not limited to the United States, and India.

(p)     "**Sale Event**" means the consummation of (i) the dissolution or liquidation of the Company, (ii) the sale of all or substantially all of the assets of the Company on a consolidated basis to an unrelated Person, (iii) a merger, reorganization or consolidation pursuant to which the holders of the Company's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the surviving or resulting entity (or its ultimate parent, if applicable), (iv) the acquisition of all or a majority of the outstanding voting stock of the Company in a single transaction or a series of related transactions by a Person or group of Persons, or (v) any other acquisition of the business of the Company, as determined by the Board of Directors of the Company; provided, however, that the corporation's initial public offering, any subsequent public offering or another capital-raising event, or a merger effected solely to change the Company's domicile shall not constitute a "Sale Event".

(q)     "**Second Non-Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule A</u>, as shall be commercially reasonably determined by the Company and the Purchaser and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser has elected to proceed with the Second Non-Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(r)     "**Second Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule A</u>, as shall be commercially reasonably determined by the Company, Trombley and the Purchaser and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser has elected to proceed with the Second Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(s)     "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(t)     "**Third Non-Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule B</u>, as shall be commercially reasonably determined by the Company and the Purchaser and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser has elected to proceed with the Third Non-Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(u)     "**Third Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule B</u>, as shall be commercially reasonably determined by the Company, Trombley and the Purchaser and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser has elected to proceed with the Third Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(v)     "**Transfer**" means, with respect to any security, the director or indirect assignment, sale, transfer, tender, pledge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or the Constructive Sale (as defined herein) or other disposition of such security (including transfer by testamentary or intestate succession, merger or otherwise by operation of law) or any right, title or interest therein (including, but not limited to, any right or power to vote to which the holder thereof may be entitled, whether such right or power is granted by proxy or otherwise), or the record or beneficial ownership thereof, the offer to make such a sale, transfer, Constructive Sale or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

2.     <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Purchaser that, except as set forth on the Disclosure Schedule attached as <u>EXHIBIT C</u> to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of each Closing, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this <u>Section 2</u>, and the disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this <u>Section 2</u> only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

For purposes of these representations and warranties (other than those in <u>Sections 2.2</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, and <u>2.6</u>), the term the "**Company**" shall include any subsidiaries of the Company, unless otherwise noted herein.

2.1     <u>Organization, Good Standing, Corporate Power and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted and as presently proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2     <u>Capitalization</u>.

(a)     The authorized capital of the Company consists, immediately prior to the Initial Closing, of:

(i)     1,000 shares of Voting Common Stock, all shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Voting Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws. The Company holds no Class A Voting Common Stock in its treasury.

(ii)     8,385,909 shares of Class A Non-Voting Common Stock, none of which  shares are issued and outstanding immediately prior to the Initial Closing; and 3,914,162 shares of Class B Non-Voting Common Stock of the Company, par value $0.001 per share (the "**Class B Non-Voting Common Stock**"), none of which shares are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Class A Non-Voting Common Stock and Class B Non-Voting Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable securities laws. The Company holds no Class A Non-Voting Common Stock or Class B Non-Voting Common Stock in its treasury.

8

(iii)    The rights, privileges and preferences of the Common Stock are as stated in the Restated Certificate and as provided by the Delaware General Corporation Law.

The Company has reserved 288,324 shares of Class A Non-Voting Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to its 2019 Stock Option Plan duly adopted by the Board of Directors and approved by the Company stockholders (the "**Stock Plan**"). Of such reserved shares of Class A Non-Voting Common Stock, no shares have been issued pursuant to restricted stock purchase agreements, no options to purchase shares have been granted and are currently outstanding, and 288,324  shares of Class A Non-Voting Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The Company has furnished to the Purchaser complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

(b)    Section 2.2(c) of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Initial Closing including the number of shares of the following: (i) issued and outstanding Common Stock, including, with respect to restricted Common Stock, vesting schedule and repurchase price; (ii) granted stock options, including vesting schedule and exercise price; (iii) shares of Class A Non-Voting Common Stock reserved for future award grants under the Stock Plan; and (iv) warrants or stock purchase rights, if any. Except for (A) the conversion privileges of the Shares to be issued under this Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock. All outstanding shares of the Class A Non-Voting Common Stock and Class B Non-Voting Common Stock are subject to (i) a right of first refusal in favor of the Company upon any proposed transfer (other than transfers for estate planning purposes); and (ii) a lock-up or market standoff agreement of not less than one hundred eighty (180) days following the Company's initial public offering pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act.

(c)    None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including without limitation in the case where the Company's Stock Plan is not assumed in an acquisition. The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means. Except as set forth in the Restated Certificate, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

(d)    The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the knowledge of the Company, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(e)    The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement.

2.3    <u>Subsidiaries</u>. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or

similar arrangement.

2.4     Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement, and to issue the Shares at the Initial Closing has been taken or will be taken prior to the Initial Closing. All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of the Initial Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Initial Closing. This Agreement, when executed and delivered by the Company, shall constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally,  or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.5     Valid Issuance of Shares. The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser. Assuming the accuracy of the representations of the Purchaser in Section 3 of this Agreement, the Shares will be issued in compliance with all applicable federal and state securities laws.

2.6     Governmental Consents and Filings. Assuming the accuracy of the representations made by the Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate, which will have been filed as of the Initial Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner.

2.7     Litigation. There is no claim, action, suit, proceeding, arbitration, complaint, charge or, to the Company's knowledge, investigation, pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company; (ii) that questions the validity of this Agreement or the right of the Company to enter into them, or to consummate the transactions contemplated by this Agreement; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Employees, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

2.8     Intellectual Property. The Company owns or possesses sufficient legal rights to all Company Intellectual Property without any known conflict with, or infringement of, the rights of others, including prior employees or consultants, with which any of them may be affiliated now or may have been affiliated in the past. No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any intellectual property rights of

10

any other party. Other than with respect to Standard Licenses (as defined below), there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property owned by or exclusively licensed to the Company, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person. The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person. The Company has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's business. It will not be necessary to use any inventions of any of its current or former employees or consultants (or Persons it currently intends to hire) made prior to their employment by the Company, including prior employees or consultants, with which any of them may be affiliated now or may have been affiliated in the past. Each current and former employee and consultant has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted and all intellectual property rights that he, she or it solely or jointly conceived, reduced to practice, developed or made during the period of his, her or its employment or consulting relationship with the Company that (a) relate, at the time of conception, reduction to practice, development, or making of such intellectual property right, to the Company's business as then conducted or as then proposed to be conducted, (b) were developed on any amount of the Company's time or with the use of any of the Company's equipment, supplies, facilities or information or (c) resulted from the performance of services for the Company. Section 2.8 of the Disclosure Schedule lists all patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, tradenames, domain names, registered copyrights, and licenses to and under any of the foregoing, in each case owned by the Company. To the extent the Company uses any "open source" or "copyleft" software or is a party to "open" or "public source" or similar licenses, the Company is in compliance with the terms of any such licenses, any such software and licenses are listed on the Disclosure Schedule, and the Company is not required under any such license to (a) make or permit any disclosure or to make available any source code for its (or any of its licensors') proprietary software or (b) distribute or make available any of the Company's proprietary software or intellectual property (or to permit any such distribution or availability). For purposes of this Section 2.8, the Company shall be deemed to have knowledge of a patent right if the Company has actual knowledge of the patent right or would be found to be on notice of such patent right as determined by reference to United States patent laws. No government funding, facilities of a university, college, other educational institution or research center, or funding from third parties was used in the development of any Company Intellectual Property. No Person who was involved in, or who contributed to, the creation or development of any Company Intellectual Property, has performed services for the government, university, college, or other educational institution or research center in a manner that would affect Company's rights in the Company Intellectual Property.

        2.9    <u>Compliance with Other Instruments</u>. The Company is not in violation or default (i) of any provisions of its Restated Certificate or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon

any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.10    Agreements; Actions.

(a)    Except for this Agreement, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $25,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company (other than (A) the nonexclusive license of the Company's software and products in object code form or on a software-as-a-service basis in the ordinary course of business pursuant to standard end-user agreements the form of which has been provided to special counsel for the Purchaser or (B) non-negotiated end-user license agreements and terms of service for standard, generally commercially available, "off-the-shelf" third party products that are not and will not to any extent be part of any product, service or intellectual property offering of the Company ((A) and (B), "**Standard Licenses**")), (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(b)    The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $25,000 or in excess of $50,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of (a) and (b) of this Section 2.10, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsection.

(c)    The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

2.11    Certain Transactions.

(a)    Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board of Directors, and (iii) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Common Stock, in each instance, approved in the written minutes of the Board of Directors (previously provided to the Purchaser and its counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)    The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any (i) material commercial, industrial, banking, consulting, legal,

12

accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company except that directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract with the Company.

2.12  <u>Rights of Registration and Voting Rights</u>. The Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's knowledge, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company.

2.13  <u>Property</u>. The property and assets that the Company owns are free and clear of all Encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets. With respect to the property and assets it leases, the Company is in compliance with such leases and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

2.14  <u>Material Liabilities</u>. The Company has no liability or obligation, absolute or contingent (individually or in the aggregate), except (i) obligations and liabilities incurred after the date of incorporation in the ordinary course of business that are not material, individually or in the aggregate, and (ii) obligations under contracts made in the ordinary course of business that would not be required to be reflected in financial statements prepared in accordance with generally accepted accounting principles ("**GAAP**").

2.15  <u>Changes</u>. Since the date of incorporation of the Company, there has not been:

(a)  any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

(b)  any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(c)  any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(d)  any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(e)  any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(f)  any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

13

(g)      any resignation or termination of employment of any officer or Key Employee of the Company;

(h)      any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(i)      any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(j)      any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(k)      any sale, assignment or transfer of any Company Intellectual Property;

(l)      receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)      any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(n)      any arrangement or commitment by the Company to do any of the things described in this <u>Section 2.15</u>.

2.16    <u>Employee Matters</u>.

(a)      As of the date hereof, the Company employs thirty (30) full-time employees and no part-time employees and engages one consultant and no other independent contractors. Section 2.16(a) of the Disclosure Schedule sets forth a detailed description of all compensation, including salary, bonus, severance obligations and deferred compensation paid or payable for each officer, employee, consultant and independent contractor of the Company.

(b)      To the Company's knowledge, none of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the execution or delivery of this Agreement, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(c)      The Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to

14

such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(d)     To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The Company does not have a present intention to terminate the employment of any of the foregoing. The employment of each employee of the Company is terminable at the will of the Company. Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. The Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(e)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Company's board of directors.

(f)     Each former Key Employee whose employment was terminated by the Company has entered into an agreement with the Company providing for the full release of any claims against the Company or any related party arising out of such employment.

(g)     Section 2.16(g) of the Disclosure Schedule sets forth each employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). The Company has made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

(h)     The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, which could have a Material Adverse Effect, nor is the Company aware of any labor organization activity involving its employees.

(i)     To the Company's knowledge, none of the Key Employees or directors of the Company has been (a) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his or her business or property; (b) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (c) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (d) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures

15

Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

2.17    Tax Returns and Payments. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

2.18    Insurance. The Company has in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company, with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed.

2.19    Employee Agreements. Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for the Purchaser (the "**Confidential Information Agreements**"). No current or former Key Employee has excluded works or inventions from his or her assignment of inventions pursuant to such Key Employee's Confidential Information Agreement. Each current and former Key Employee has executed a non-solicitation agreement substantially in the form or forms delivered to counsel for the Purchaser. The Company is not aware that any of its Key Employees is in violation of any agreement covered by this Section 2.19.

2.20    Permits. The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.21    Corporate Documents. The Restated Certificate and Bylaws of the Company are in the form provided to the Purchaser. The copy of the minute books of the Company provided to the Purchaser contains minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders with respect to all transactions referred to in such minutes.

2.22    83(b) Elections. To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been or will be timely filed by all individuals who have acquired unvested shares of the Company's Common Stock.

2.23    Real Property Holding Corporation. The Company is not now and has never been a "United States real property holding corporation" as defined in the Code and any applicable regulations promulgated thereunder. The Company has filed with the Internal Revenue Service all statements, if any, with its United States income tax returns which are required under such regulations.

2.24    Environmental and Safety Laws. Except as could not reasonably be expected to have a Material Adverse Effect to the best of its knowledge (a) the Company is and has been in compliance with all Environmental Laws; (b) there has been no release or to the Company's knowledge threatened release of any pollutant, contaminant or toxic or hazardous material, substance or waste or petroleum or

16

any fraction thereof (each a "**Hazardous Substance**"), on, upon, into or from any site currently or heretofore owned, leased or otherwise used by the Company; (c) there have been no Hazardous Substances generated by the Company that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any governmental authority in the United States; and (d) there are no underground storage tanks located on, no polychlorinated biphenyls ("**PCBs**") or PCB-containing equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act, as amended, stored on, any site owned or operated by the Company, except for the storage of hazardous waste in compliance with Environmental Laws. The Company has made available to the Purchaser true and complete copies of all material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies and environmental studies or assessments.

For purposes of this Section 2.24, "**Environmental Laws**" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance; (b) pollution or protection of employee health or safety, public health or the environment; or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

2.25   Disclosure. The Company has made available to the Purchaser all the information reasonably available to the Company that the Purchaser has requested for deciding whether to acquire the Shares, including certain of the Company's projections describing its proposed business plan (the "**Business Plan**"). No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. The Business Plan was prepared in good faith; however, the Company does not warrant that it will achieve any results projected in the Business Plan. It is understood that this representation is qualified by the fact that the Company has not delivered to the Purchaser, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

2.26   Foreign Corrupt Practices Act.

(a)     The Company, each of its subsidiaries and each of its and their directors, officers, employees, and agents, and, to the Company's knowledge all other Persons acting on behalf of the Company or any of its subsidiaries, is, has been, and will continue to be, in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), any other applicable U.S. or foreign anti-corruption or anti-bribery laws, and any rules and regulations promulgated thereunder (collectively, the "**Anti-Corruption Laws**").

(b)     Neither the Company nor any of its subsidiaries, nor any of its or their directors, officers, employees, or agents, nor to the Company's knowledge any other Person acting on behalf of the Company or any of its subsidiaries has: (i) been charged with or convicted of violating any Anti-Corruption Laws; (ii) received any notice, request, or citation, or been made aware of any allegation, investigation (formal or informal), inquiry, action, charge, or proceeding with regard to a potential violation of any Anti-Corruption Law; or (iii) directly or indirectly, offered, paid, promised, or authorized, or caused to be offered, paid, promised, or authorized, any money, offer, gift, or other thing of value, regardless of form, to any government official, or to any Person while knowing or having reason to know that such Person has or will offer, pay, promise, or authorize, or cause to be offered, paid, promised, or authorized, any money, offer, gift, or other thing of value to any government official, in furtherance of, or with the intent or purpose of, (A) corruptly influencing any act or decision of such government official in his or her official

capacity, (B) inducing such government official to do or omit to do any act in violation of a lawful duty, (C) securing any improper advantage, or (D) inducing such government official to use his or her influence with a governmental entity, or instrumentality thereof, to affect or influence any act or decision of such governmental entity or instrumentality thereof.

(c)     The Company and each of its subsidiaries have established procedures and controls which each reasonably believes to be adequate (and otherwise comply with applicable law) to ensure that the Company and each of its subsidiaries is and will continue to be in compliance with all applicable Anti-Corruption Laws and to ensure that neither the Company nor any of its subsidiaries will cause the Purchaser to violate the Anti-Corruption Laws.

2.27     Data Privacy. In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (collectively "**Personal Information**"), the Company is and has been in compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information and other confidential information collected by it or on its behalf from and against unauthorized access, use and/or disclosure, and the Company is not aware of any such unauthorized access, use and/or disclosure. The Company is and has been, to the Company's knowledge, in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations.

2.28     Export Control Laws. The Company has conducted all export transactions in accordance with applicable provisions of United States export control laws and regulations, including the Export Administration Regulations, the International Traffic in Arms Regulations, the regulations administered by the Office of Foreign Assets Control of the U.S. Treasury Department, and the export control laws and regulations of any other applicable jurisdiction. Without limiting the foregoing: (a) the Company has obtained all export licenses and other approvals, timely filed all required filings and has assigned the appropriate export classifications to all products, in each case as required for its exports of products, software and technologies from the United States and any other applicable jurisdiction; (b) the Company is in compliance with the terms of all applicable export licenses, classifications, filing requirements or other approvals; (c) there are no pending or, to the knowledge of the Company, threatened claims against the Company with respect to such exports, classifications, required filings or other approvals; (d) there are no pending investigations related to the Company's exports; and (e) there are no actions, conditions, or circumstances pertaining to the Company's export transactions that would reasonably be expected to give rise to any material future claims.

3.     Representations and Warranties of the Purchaser. The Purchaser hereby represents and warrants to the Company that:

3.1     Authorization. The Purchaser has full power and authority to enter into this Agreement. This Agreement to which the Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

18

3.2     Purchase Entirely for Own Account. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3     Disclosure of Information. The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management and has had an opportunity to review the Company's facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Purchaser to rely thereon.

3.4     Restricted Securities. The Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy. The Purchaser understands that this offering is not intended to be part of the public offering, and that the Purchaser will not be able to rely on the protection of Section 11 of the Securities Act.

3.5     No Public Market. The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6     Legends. The Purchaser understands that the Shares and any securities issued in respect of or exchange for the Shares, may be notated with one or all of the following legends:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.".

(a)     Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.7     Accredited Investor. The Purchaser is an accredited investor as defined in Rule

19

501(a) of Regulation D promulgated under the Securities Act.

        3.8    <u>No General Solicitation</u>. Neither the Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Shares.

        3.9    <u>Representations with Respect to the Note</u>. Purchaser represents and warrants the following:

        (a)    Purchaser has good title to its Note, free and clear of any Encumbrances, is the sole holder of its Note and has not transferred the Note or any interest thereof to any other Person.

        (b)    No indebtedness or other financial obligation of the Company to the Purchaser exists other than the Note prior to the satisfaction and termination of such Note pursuant to the terms thereunder and hereunder.

        4.    <u>Covenants of Trombley</u>. During the Restricted Period, Trombley shall not, either directly or indirectly (including through Affiliates): (a) engage, be employed or hold any interest in any business similar to or competing with, the Business in any of the Restricted Territories, other than through the Company or its subsidiaries; (b) solicit in the Restricted Territories in competition with the Business, the customer of any person, firm or company, who, is a customer of the Company or its subsidiaries; or (c) solicit or contact with a view to the engagement or employment by any person, any employee or officer of the Company or its subsidiaries.

        5.    <u>Indemnification</u>.

        5.1    <u>Trombley Indemnification</u>. Reference is made herein to the indemnification set forth in <u>Section 1.1(c)</u> of this Agreement. All provisions of this <u>Section 5</u> shall be interpreted in a manner consistent with the provisions of <u>Section 1.1(c)</u> and shall not narrow nor broaden the scope of the indemnification set forth therein.

        5.2    <u>Waiver</u>. Trombley hereby agrees that he irrevocably waives, relinquishes and releases the Company from any and all claims against the Company for indemnification, contribution, subrogation, advancement, or any other recovery of any kind in respect of the Key Litigation.

        5.3    <u>Advancement</u>.  Trombley shall advance to the Primary Indemnified Parties, to the extent not prohibited by law, all costs (including attorneys' fees and expenses) reasonably expected to be incurred by any of the Primary Indemnified Parties in connection with reviewing, presenting, defending, preparing to present or defend, investigating, responding to third party subpoenas or other discovery requests, appearing at or defending depositions, being or preparing to be a witness in, or otherwise participating in or monitoring, the Key Litigation (including any and all documentation relating thereto), (the "**Expenses**") prior to the final disposition of the Key Litigation upon receipt of a written request therefor (together with documentation reasonably evidencing such Expenses). The advances to be made hereunder shall be made as soon as reasonably practicable, but in any event no later than 15 days, after the receipt by Trombley of a written statement or statements requesting such advances from time to time. Advances shall be unsecured and interest free and made without regard to Primary Indemnified Parties' ability to repay such advances. The Primary Indemnified Parties hereby undertake to repay such amounts advanced if it shall be determined ultimately that the Indemnified Parties are not entitled to be indemnified

by Trombley as set forth hereunder.

### 5.4    Resolution of Conflicts; Arbitration.

(a)    If within 30 days after delivery of a written notification of a claim for Losses ("**Notice of Claim**") to Trombley by a Primary Indemnified Party (each such party that initiated the applicable Notice of Claim, the "**Applicable Claimant**"), Trombley objects in writing to any claim or claims made therein to recover Losses, Trombley and the Applicable Claimant shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claims. If Trombley and the Applicable Claimant should so agree, a memorandum setting forth such agreement shall be prepared and signed by all parties.

(b)    In connection with any disagreement under Section 5.4(a) above on any claim or claims made to recover Losses, in the event no agreement can be reached under Section 5.4(a) after good faith negotiation and prior to sixty (60) days after delivery of a Notice of Claim, the Applicable Claimant or Trombley may demand arbitration of the matter unless the amount of the Losses is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration, and in either such event the matter shall be settled by arbitration conducted by one arbitrator mutually agreeable to the Applicable Claimant and Trombley.  In the event that, within thirty (30) days after submission of any dispute to arbitration, the Applicable Claimant and Trombley cannot mutually agree on one arbitrator, then within fifteen (15) days after the end of such thirty (30) day period, the Applicable Claimant and Trombley shall each select one arbitrator.  The two arbitrators so selected shall select a third arbitrator.  If either the Applicable Claimant or Trombley do not select an arbitrator during this fifteen (15) day period, then the parties agree that the arbitration will be conducted by the one arbitrator selected by the party that made such selection within the fifteen (15) day period.

(c)    Any such arbitration shall be held in San Francisco County, California, in accordance with JAMS rules then in effect.  The arbitrator(s) shall determine how all expenses relating to the arbitration shall be paid, including without limitation, the respective expenses of each party, the fees of each arbitrator, and any administrative fee of JAMS.  The arbitrator or arbitrators, as the case may be, shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator or majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the dispute.  The arbitrator or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the extent as a competent court of law or equity, should the arbitrators or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification.  The decision of the arbitrator or a majority of the three arbitrators, as the case may be, as to the validity and amount of any claim in such Notice of Claim shall be final, binding, and conclusive upon the parties to this Agreement.  Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s). Within thirty (30) days of a decision of the arbitrator(s) requiring payment by one party to another, such party shall make the payment to such other party.  Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Such arbitration, all proceedings therein, and the final determination shall be confidential.  The parties further agree that this Agreement is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law.  The parties expressly waive any entitlement to have such controversies decided by a court or a jury.

21

5.5     Holdback.

(a)     By virtue of this Agreement the Purchaser will hold in escrow the Holdback Amount from Trombley in accordance with Section 1.2(b).  The Holdback Amount is not intended to be a cap on the indemnity obligations provided for in this Article V if any Losses suffered or incurred by the Primary Indemnified Parties exceed the Holdback Amount, but rather the Holdback Amount shall serve as partial security for the indemnity obligations provided for in this Article V.  The Holdback Amount shall be available to compensate the Primary Indemnified Parties for any Losses incurred or sustained by them and for which they are entitled to recovery under this Article V in respect of the Shelly Matter and any other lawsuit arising from the Shelly Matter.  Until and unless the Holdback Amount is released to Trombley pursuant to this Section 5.5, Trombley shall, and does hereby, pledge and grant a security interest in the Holdback Amount to the Purchaser (and its Affiliates) on its own behalf.

(b)     Except as set forth below, the period during which claims for Losses to be satisfied through the forfeiture of all or any portion of the Holdback Amount may be made under this Agreement shall commence at the Initial Closing and  continue through and including date upon which the Shelly Matter and any other lawsuit arising from the Shelly Matter is resolved to the reasonable satisfaction of the Purchaser including but not limited to a release of all claims in respect of the Shelly Matter and any lawsuit arising from the Shelly matter (the "**Holdback Period**").  On or before the fifteenth (15th) Business Day following the end of the Holdback Period (the "**Holdback Release Date**"), the Purchaser shall release to Trombley, through wire transfer to a bank account designated by Trombley in writing, an amount equal to the Holdback Amount minus amounts used and/or reasonably anticipated to be used for the Shelly Matter; if and when the Purchaser has reasonably determined that such amounts are no longer reasonably anticipated to be used for the Shelly matter, any amounts remaining will be released with fifteen Business Days of such determination to Trombley through a wire transfer to a bank account designated by Trombley in writing.

6.     Company Covenants.

6.1     Financials. The Company hereby covenants and agrees that it and each of its subsidiaries will make financial records available to the Purchaser and its auditors whenever reasonably requested during normal business hours and upon reasonable advance written notice.

6.2     Anti-Corruption Laws. The Company hereby covenants and agrees that in the event it becomes aware of any facts or circumstances giving it a reasonable, good faith belief or suspicion that any violation of an Anti-Corruption Law has or may occur or that any of these representations or warranties of the Company in Section 2.26, if made by the Company as of such date, have or will become false, it shall promptly notify the Purchaser of such in writing.  On receipt of such a written notice, or upon otherwise learning information giving it a good faith reasonable belief of any potential violation of an Anti-Corruption Law or that any of these representations or warranties of the Company in Section 2.26, if made by the Company as of such date, have become false, the Purchaser may withdraw from, terminate, suspend, or withhold any payments under this Agreement at any time and without liability.  Moreover, the Purchaser shall not be liable for any claims arising from, or related to, the unlawful activity, or claims alleging unlawful activity, of the Company or any of its subsidiaries, regardless of the nature or location of such activity.  The Company shall indemnify the Purchaser for all damages, penalties, and/or costs incurred in relation to claims arising from, or relating to, unlawful activity by the Company.

7.     Restrictions on Transfer; Right of First Refusal.

7.1     Restrictions on Transfer.

22

(a)     Except as permitted herein, Trombley agrees that he will not, directly or indirectly, voluntarily or involuntarily Transfer any of the Class A or Class B Non-Voting Common Stock owned by him.

(b)     The provisions of Section 7.1(a), shall not apply to any Transfer by Trombley without consideration of any shares of Class A or Class B Non-Voting Common Stock made for bona fide estate planning purposes to (i) his spouse, child (natural or adopted), sibling, or any other direct lineal antecedent or descendant of Trombley (or his or her spouse) (all of the foregoing collectively referred to as "family members"), or any other relative approved by the Company upon resolutions duly approved by the Board of Directors or (ii) any custodian or trustee of any trust, partnership or limited liability company solely for the benefit of, or the ownership interests of which are owned wholly by Trombley or any such family members.

(c)     In addition to any legends required by applicable law, each certificate representing the Class A or Class B Non-Voting Common Stock of the Company held by Trombley shall bear a legend substantially in the following form:

***"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN A STOCK PURCHASE AGREEMENT, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."***

(d)     Prior to consummation of any Transfer by Trombley of Class A or Class B Non-Voting Common Stock, Trombley shall cause the transferee thereof to execute and deliver to the Company a Joinder Agreement and agree to be bound by the terms and conditions of this Agreement.  Upon any Transfer by Trombley of any of his Class A or Class B Non-Voting Common Stock, in accordance with the terms of this Agreement, the transferee thereof shall be substituted for, and shall assume all the rights and obligations under this Agreement of, the transferor thereof.

(e)     Notwithstanding any other provision of this Agreement, Trombley agrees that he will not, directly or indirectly, Transfer any of his Class A or Class B Non-Voting Common Stock (i) except as permitted under the Securities Act and other applicable federal or state securities laws, and then, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act, (ii) if it would cause the Company or any of its subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended, or (iii) if it would cause the assets of the Company or any of its subsidiaries to be deemed plan assets as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.  In any event, the Board of Directors of the Company may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any governmental authority.

(f)     Any Transfer or attempted Transfer of any Common Stock in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue be treated) as the owner of such Class A or Class B Non-Voting Common Stock for all purposes of this Agreement.

(g)     The restrictions on transfer set forth in this Section 7.1 shall terminate upon the earlier to occur of (i) the two (2) year anniversary of the Initial Closing; (ii) the closing of a Sale Event; or (iii) the first sale of Common Stock of the Company to the general public pursuant to a registration

23

statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act.

        7.2    <u>Right of First Refusal</u>. Following the termination of the restrictions on transfer set forth in <u>Section 7.1</u>, in the event that Trombley desires at any time following the expiration of the  to Transfer all or any shares of Class A or Class B Non-Voting Common Stock, he shall first shall give written notice to the Purchaser of his intention to make such Transfer.  Such notice shall state the number of shares of Class A or Class B Non-Voting Common Stock that Trombley proposes to sell (the "**Offered Shares**"), the price and the terms at which the proposed sale is to be made and the name and address of the proposed transferee.  At any time within 30 Business Days after the receipt of such notice by the Purchaser, the Purchaser or its assigns may elect to purchase all or any portion of the Offered Shares at the price and on the terms offered by the proposed transferee and specified in the notice.  The Purchaser or its assigns shall exercise this right by mailing or delivering written notice to Trombley within the foregoing 30 Business Day period.  If the Purchaser or its assigns elect to exercise its purchase rights under this <u>Section 7.2</u> the closing for such purchase shall, in any event, take place within 45 Business Days after the receipt by the Purchaser of the initial notice from Trombley.  In the event that the Purchaser or its assigns do not elect to exercise such purchase right, or in the event that the Purchaser or its assigns do not pay the full purchase price within such 45 Business Day period (such later date, the "**Decline Date**"), Trombley may sell the Offered Shares to the proposed transferee and at the same price and on the same terms as specified in Trombley's notice, provided that, in the event that Trombley does not consummate such sale within sixty (60) Business Days from the Decline Date, the Offered Shares will be subject to the Purchaser's right of first refusal set forth herein.

        8.    <u>Observer Right</u>. From the date of this Agreement until the two-year anniversary of the Initial Closing, as long as Trombley owns any shares of Class A or Class B Non-Voting Common Stock (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof), the Company shall invite Trombley (or his authorized representative) to attend all meetings of the Board of Directors of the Company in a non-voting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors; provided, however, that such representative shall agree to sign a non-disclosure agreement with the Company, hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest or if Trombley or his representative is reasonably deemed a competitor of the Company in the good faith judgment of the Board of Directors of the Company.  Such representative shall be bound by the same covenants as Trombley set forth in Section 4.

        9.    <u>Conditions to the Purchaser's Obligations at Closing</u>. The obligations of the Purchaser to purchase the Shares at the Initial Closing or make payments in respect of any subsequent Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

        9.1    <u>Representations and Warranties</u>. The representations and warranties of the Company contained in <u>Section 2</u> shall be true and correct in all respects as of such Closing.

        9.2    <u>Performance</u>. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

9.3     Compliance Certificate. The President of the Company shall deliver to the Purchaser at such Closing a certificate certifying that the conditions specified in Sections 9.1 and 9.2 have been fulfilled.

9.4     Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of such Closing.

9.5     Board of Directors. As of the Initial Closing, the authorized size of the Board shall be one director, and the Board shall be initially comprised only of Roger Bayston.

9.6     Authorized Officers. As of the Initial Closing, the officers of the Company shall consist only of the following individuals, each holding the officer position(s) set forth across such individual's name: Roger Bayston – Interim President, Interim Secretary, Interim Treasurer and Interim Chief Executive Officer.

9.7     Restated Certificate. The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to the Initial Closing, which shall continue to be in full force and effect as of the Initial Closing.

9.8     Secretary's Certificate. The Secretary of the Company shall have delivered to the Purchaser at the Initial Closing a certificate certifying (i) the Bylaws of the Company, (ii) resolutions of the Board of Directors of the Company approving this Agreement and the transactions contemplated under this Agreement, and (iii) resolutions of the stockholders of the Company approving the Restated Certificate.

9.9     Proceedings and Documents. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchaser, and the Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested. Such documents may include good standing certificates.

10.     Conditions of the Company's Obligations at Closing. The obligations of (i) Trombley to sell the Voting Stock; and (ii) the Company to sell the Non-Voting Stock and Note Stock to the Purchaser at the Initial Closing are subject to the fulfillment, on or before the Initial Closing, of each of the following conditions, unless otherwise waived:

10.1     Representations and Warranties. The representations and warranties of the Purchaser contained in Section 3 shall be true and correct in all respects as of the Initial Closing.

10.2     Performance. The Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Initial Closing.

10.3     Qualifications. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Initial Closing.

11. <u>Miscellaneous.</u>

11.1 <u>Survival of Warranties</u>. Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closings and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchaser or the Company.

11.2 <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

11.3 <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

11.4 <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

11.5 <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

11.6 <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page or <u>Exhibit A</u>, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this <u>Section 11.6.</u> If notice is given to the Company, a copy shall also be sent to Latham & Watkins, 10250 Constellation Blvd., Suite 1100, Los Angeles, CA 90067, Attn: David Ajalat, and if notice is given to the Purchaser, a copy shall also be given to Goodwin Procter LLP, 601 Marshall Street Redwood City, CA 94063, Attn: Caine Moss and Mitzi Chang.

11.7 <u>No Finder's Fees</u>. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. The Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold harmless the Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or

26

any of its officers, employees or representatives is responsible.

      11.8    <u>Fees and Expenses</u>. Within thirty (30) days of the Initial Closing, the Company shall pay the then-outstanding fees and expenses of Sidley Austin LLP with respect to its advice on behalf of TokenVault Limited and the Company.

      11.9    <u>Attorneys' Fees</u>. If any action at law or in equity (including, arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

      11.10    <u>Amendments and Waivers</u>. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company, Trombley and the Purchaser.

      11.11    <u>Severability</u>. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

      11.12    <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

      11.13    <u>Entire Agreement</u>. This Agreement (including the Exhibits hereto), the Restated Certificate constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

      11.14    <u>Corporate Securities Law</u>. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM THE QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED UNLESS THE SALE IS SO EXEMPT.

      11.15    <u>Dispute Resolution</u>.  Except as otherwise set forth herein, the parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Delaware and to the jurisdiction of the United States District Court for the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Delaware or the United States District Court for the District of Delaware and (c) hereby waive, and agree not to assert,

by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL

11.16   No Commitment for Additional Financing. Each of the Company and Trombley acknowledges and agrees that the Purchaser has not made any representation, undertaking, commitment or agreement to provide or assist the Company or Trombley in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein. In addition, each of the Company and Trombley acknowledges and agrees that (i) no statements, whether written or oral, made by the Purchaser or its representatives on or after the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company or Trombley in obtaining any financing or investment, (ii) the Company shall not rely on any such statement by the Purchaser or its representatives, and (iii) an obligation, commitment or agreement to provide or assist the Company or Trombley in obtaining any financing or investment may only be created by a written agreement, signed by the Purchaser and the Company or Trombley, as applicable, setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement. The Purchaser shall have the right, in its sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company or Trombley, and shall have no obligation to assist or cooperate with the Company in obtaining any financing, investment or other assistance.

11.17   Right to Conduct Activities. The Company hereby agrees and acknowledges that the Purchaser (together with its Affiliates) is a professional investment organization, and as such reviews the business plans and related proprietary information of many enterprises, some of which may compete directly or indirectly with the Company's business (as currently conducted or as currently propose to be conducted).  The Company hereby agrees that, to the extent permitted under applicable law, the Purchaser and its Affiliates shall not be liable to the Company for any claim arising out of, or based upon, (i) the investment by the Purchaser or any of its Affiliates in any entity competitive with the Company, or (ii) actions taken by any partner, officer, employee or other representative of the Purchaser or its Affiliates to assist any such competitive company, whether or not such action was taken as a member of the board of directors of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; provided, however, that the foregoing shall not relieve the (x) the Purchaser from liability associated with the unauthorized disclosure of the Company's confidential information obtained pursuant to this Agreement or (y) any director or officer of the Company from any liability associated with his or her

fiduciary duties to the Company.

IN WITNESS WHEREOF, the parties have executed this Stock Purchase Agreement as of the date first written above.

COMPANY: TokenVault Inc.

By: _Aaron Travis_

Name: _Aaron Travis_
(print)

Title: _President_

Address: 537 Stevenson St.
         Suite 200
         San Francisco, CA 94103

AUSTIN TROMBLEY

_Austin Trombley_
Signature

Name: _Austin Trombley_
(print)

Address: _537 Stevenson St_

_San Francisco, CA 94103_

[Signature Page to Stock Purchase Agreement]

PURCHASER:

_____
(Print Name of Purchaser)


By:_____


Name:_____
                            (print)


Title:_____


Address:_____


_____

## EXHIBITS

Exhibit A -          **SCHEDULE OF PURCHASER**

Exhibit B -          **FORM OF AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION**

EXHIBIT C -          **DISCLOSURE SCHEDULE**

<u>EXHIBIT A</u>

**SCHEDULE OF PURCHASER**

**Initial Closing: October [  ], 2019**

| Purchaser | Voting Common Stock Purchased | Class A Non-Voting Common Stock Purchased | Cash Consideration at Initial Closing | Note Conversion Balance |
|---|---|---|---|---|
| **FT Fintech Holdings, LLC** | 1,000 shares | | $3,000,000.00 | |
| **FT Fintech Holdings, LLC** | | 2,200,000 shares | $5,500,000.00 | |
| **FT Fintech Holdings, LLC** | | 605,137 shares | | $1,500,000 |
| **Total** | 1,000 shares | 2,805,137 shares | $8,500,000.00 | $1,500,000 |

EXHIBIT B

**FORM OF AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION**

_____

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
TOKENVAULT, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

TokenVault, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

1.      That the name of this corporation is TokenVault, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on September 25, 2019.

2.      That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is TokenVault, Inc. (the "**Corporation**").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801.  The name of its registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:**   The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 1,000 shares of Voting Common Stock, $0.001 par value per share ("**Voting Common Stock**"), (ii) 8,385,909 shares of Class A Non-Voting Common Stock, $0.001 par value per share ("**Class A Non-Voting Common Stock**") and (iii) 3,914,162 shares of Class B Non-Voting Common Stock, $0.001 par value per share ("**Class B Non-Voting Common Stock**", and together with the Class A Non-Voting Common Stock, the "**Non-Voting Common Stock**").  The Voting Common Stock and Non-Voting Common Stock are referred to herein as the "**Common Stock**".

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.   VOTING COMMON STOCK

1.   <u>Voting</u>.  The holders of the Voting Common Stock are entitled to one vote for each share of Voting Common Stock held at all meetings of stockholders (and written actions in lieu of meetings).

2.   <u>Redemption</u>.  Shares of the Voting Common Stock shall not be subject to any redemption by the Corporation.

B.   NON-VOTING COMMON STOCK

1.   <u>Voting</u>.  The holders of the Non-Voting Common Stock shall not be entitled to any vote on any matters of the Corporation, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.   <u>Redemption</u>.

2.1   <u>Redemption of Class A Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall only be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors of the Corporation determines that it is a securities law violation for one or more holders of the Class A Non-Voting Common Stock to hold such shares.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.2   <u>Redemption of Class B Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors so elects, in its sole discretion, to effectuate such redemption.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.3   <u>Redemption Price; Terms of Payment</u>.  Unless prohibited by Delaware law governing distributions to stockholders, any shares of Non-Voting Common Stock to be redeemed in accordance with this Section 2 (such shares, "**Shares Subject to Redemption**") shall be redeemed by the Corporation at a price equal to their original issue price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**").  The date of payment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date.**"  On the Redemption Date, the Corporation shall redeem all outstanding shares of Non-Voting Common Stock constituting Shares Subject to Redemption for cash.  If on any Redemption Date, Delaware law governing distributions to stockholders or other applicable law prevents the Corporation from redeeming all Shares Subject to Redemption, then the Corporation shall redeem the maximum number of shares that it may redeem consistent with such law, which shall be effectuated on a pro rata basis based upon the number of shares held by each holder of Non-Voting

2

Common Stock constituting Shares Subject to Redemption, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

2.4    Redemption Notice.  The Corporation shall send written notice of the mandatory redemption (the "**Redemption Notice**") to each holder of record of Shares Subject to Redemption not less than thirty (30) days prior to the applicable Redemption Date.   Each Redemption Notice shall state:

(a)    the number of shares of Non-Voting Common Stock held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)    the Redemption Date and the Redemption Price; and

(c)    for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Non-Voting Common Stock to be redeemed.

2.5    Surrender of Certificates; Payment.  On or before the applicable Redemption Date, each holder of shares of Non-Voting Preferred Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.  In the event less than all of the shares of Non-Voting Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Non-Voting Common Stock shall promptly be issued to such holder.

2.6    Rights Subsequent to Redemption.  If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Non-Voting Common Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Non-Voting Common Stock so called for redemption shall not have been surrendered, any dividends with respect to such shares of Non-Voting Common Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such  certificate or certificates therefor.

3.    Redeemed or Otherwise Acquired Shares.  Any shares of Non-Voting Common Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued,

sold or transferred. Neither the Corporation nor any of its subsidiaries may exercise any rights granted to the holders of Non-Voting Common Stock following redemption.

        4.   <u>Waiver</u>. Any of the rights, powers, preferences and other terms of the Common Stock set forth herein may be waived on behalf of all holders of Common Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of Voting Common Stock then outstanding.

        5.   <u>Notices</u>. Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Common Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

        6.   <u>Other Rights, Preferences and Privileges</u>. Except as expressly set forth in Section 2 of this Article Fourth, Part B, with respect to redemption, the rights, preferences and privileges of the Class A Non-Voting Common Stock and the Class B Non-Voting Common Stock shall be identical.

        C.    PAYMENTS TO HOLDERS OF COMMON STOCK UPON LIQUIDATION.

        1.   <u>General</u>. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Common Stock shall be distributed upon the holders of Common Stock, pro rata based upon the number of shares held by each such holder.

        2.   <u>Deemed Liquidation Event</u>. For purposes of Section 1 above, each of the following events shall be deemed to be a liquidation, dissolution or winding up of the Corporation: (a) a merger or consolidation in which the Corporation is a constituent party; (b) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation; except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (c) (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

**FIFTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation; provided, that the number of directors shall be no less than one (1) and no greater than three (3). Each director shall be entitled to one vote on each matter presented to the Board of Directors.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

**ELEVENTH:**  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding anything to the contrary contained elsewhere in this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the shares of the Voting Common Stock the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

**TWELFTH:**  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Amended and Restated Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any

other consent required under this Amended and Restated Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code). Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

\* \* \*

3.      That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

4.      That this Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 24th day of October, 2019.


By:   /s/ Aaron Travis
       Aaron Travis, President

7

EXHIBIT C

## DISCLOSURE SCHEDULE

This Schedule of Exceptions is made and given pursuant to Section 2 of the Stock Purchase Agreement, dated as of October [  ], 2019 (the "**Agreement**"), among TokenVault, Inc. (the "**Company**"), Austin Trombley ("**Trombley**")) and the Purchaser listed on Schedule A thereto. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; provided, however, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and such appropriateness is reasonably apparent from the face of such disclosure. Nothing in this Schedule of Exceptions is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Schedule of Exceptions (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item. This Schedule of Exceptions includes brief descriptions or summaries of certain agreements and instruments; such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided to the Purchaser or its counsel.

**Section 2.2(c):  Capitalization of the Company immediately following the Initial Closing.**

See attached capitalization table.

**Section 2.8:  Intellectual Property.**

**Domain Names**:

tokenvault.io
274kelvin.com
thetokenvault.com
blockvault.com
vaultblock.in
vaultbank.io
walletquarentine.com
tokenvault.com
tokevault.us

2

**Patents:**

**PORTFOLIO MANAGEMENT WITH SMART CONTRACTS**

**US Provisional Patent Application Serial Number: 62/874,081**

**US Provisional Patent Application Serial Number 62/788,012**

**Code Base**:

Below is a detailed list of Seller's software applications.

| | | |
|---|---|---|
| Code base for Tokenvault's main Android App. <br><br> 1. Tokens trading interface <br><br> 2. Free Stock trading interface <br><br> 3. P2P (venmo like) and merchant bill payment interface <br><br> 4. Tax and monthly statement reporting interface | | |
| Code base for Tokenvault's main iOS App. <br><br> 1. Tokens trading interface <br><br> 2. Free Stock trading interface <br><br> 3. P2P (venmo like) and merchant bill payment interface <br><br> 4. Tax and monthly statement reporting interface | | |
| Code base for Tokenvault's main backend API. It contains all the main services and integration with third parties <br><br> 1. Integration with SynpaseFi <br><br> 2. Integration with Drivewealth <br><br> 3. Integration with iDVCheck for KYC <br><br> 4. Integration with Franklin Investar <br><br> 5. Integration with Biometrics from AWS <br><br> among others | | |

| | | |
|---|---|---|
| Code base for Tokenvault's tax and reporting backend platform | | |
| Code base for Tokenvault's HSM api using pkcs11 interface. | | |
| Code base for Tokenvault's 3c7 (Tokenization interface for 3c7 funds) Electron app which runs on all platforms (windows, linux and mac) | | |
| Code base for Tokenvault's web based monthly reporting and taxation frontend | | |
| Code base for Tokenvault's Merchant side Poynt app | | |
| Code base for Tokenvault's customer side poynt app | | |
| Code base for Tokenvault's NFC communication for HSM packets. | | |
| Code base for Tokenvault's web based frontend for 3c7. | | |
| Code base for Tokenvault's backend for 3c7 mainly containing the ledger nano s integration | | |
| Code base for reading and writing Flash based storage directly from USB interface rather than OS filesystem. | | |
| EOS multisig wallet for 274 Kelvin | | |
| ETH, ERC20 and ETC multisig wallet for 274 Kelvin | | |
| BTC, BTG, BCH, ZEC, LTC, DOGE multisig wallets for 274 Kelvin | | |
| XRP multisig wallet for 274 Kelvin | | |

**Section 2.16(a):  Compensation Information.**

See attached Excel file.

4

**Section 2.16(g):  Employee Benefit Plans.**

Benefit Plans provided through TriNet:

**PLAN INFORMATION Name of the Plan**

TriNet HR IV, LLC. Employee Benefit Plan

**Plan Number**

501

**Type of Plan**

The Plan is a welfare plan providing fully insured health, dental, vision, life, accidental death and dismemberment and disability benefits, and self-insured dental, vision and health care and dependent day care flexible spending accounts.

**Payment of Plan Expenses**

Plan expenses are paid through the TriNet Employee Benefit Insurance Trust and TriNet's general assets, which is operated for the exclusive benefit of TriNet employees.

**Plan Sponsor and Plan Administrator**

The Plan Sponsor and Plan Administrator is TriNet HR IV, LLC. TriNet HR IV, LLC is responsible for determining Plan eligibility and the day-to-day management of the plans. Some Plan eligibility determinations may be based on information received from you or your Worksite.

TriNet HR IV, LLC One Park Place Suite 600
Dublin, CA 94568 510.352.5000

**Service of Legal Process**

TriNet's agent for service of process is Corporate Creations Network Inc. Corporate Creations Network Inc. has locations across the country.

Corporate Creations Network Inc. 4640 Admiralty Way
5th Floor
Marina Del Rey, CA 90292 800.672.9110

Legal process also may be served properly on the Plan at:

TriNet HR IV, LLC
Attn: Chief Legal Officer One Park Place
Suite 600
Dublin, CA 94568 510.352.5000

**Benefits Plan Year**

The benefits plan year begins on October 1, 2019 and ends on September 30, 2020.

5

<u>SCHEDULE A – MILESTONES I</u>

1. The Company to establish a management team approved by the Purchaser (the "**Management Team**"). The Management Team to include leadership positions in the areas of:

   a. Operations
   b. Technology
   c. Information Security
   d. Legal and Compliance
   e. Product Management
   f. Revenue Generation and Business Development

   The Management Team will oversee:

   a. Day to day operating of the business of the Company
   b. Strategy, prioritization and oversight of development activities
   c. Critical business development milestone management
   d. Coordination of regulatory filings, compliance, and audits
   e. Regular established status reporting and updates to the Purchaser, including financial reporting and agreed upon business milestone progress reporting
   f. Issue and mitigation management

2. DeX (Decentralized Exchange) and P2P Payments live
   a. UI/UX completed and approved by Purchaser. Product management team established.
   b. 3rd party penetration tests completed with no finding or issues
   c. Compliance certification completed for mobile and web apps
   d. Biometric Authentication integrated into mobile and web apps
   e. Customer Service model operational (either by internally developed team or third-party provider)
   f. Engaged and contracted with liquidity providers
   g. P2P, USD and Crypto payments live on DeX

3. "Day 1" Transfer Agent (TA) interface capabilities
   a. Develop and complete interface capabilities with Purchaser's TA system and/or third party provider(s). Complete end to end testing of the workflow to support the foundational efforts to enable the tokenized money fund
   b. Enroll and engaged regulators with proof of concept; obtain approval for the use of the record keeping system in support of tokenized product offerings.
   c. Operational and customer support established for Stellar and incumbent recordkeeping systems prior to launch.

4. Digital Asset Custody Enablement

   a. Obtain or develop cold storage capability and digital wallet insurance prior to public launch
   b. Digital Asset Custody Production ready for public launch
   c. Penetration tests completed with no major issues or findings
   d. Compliance certificate and third-party audits completed for security infrastructure. SOC-2 Type 1 audit successfully completed with no major findings on internal

6

technology developed, internal business processes and any 3rd party dependent service components.

5. Capabilities to enable private tokenized fund vehicle platform and 1940 Act registered investment company/U.S. mutual fund offering on TokenVault Platform
   a. Review of all components required to support mutual fund offering on the platform
   b. Establish a development plan and timeline commitment
   c. Public filing submitted and accepted by the SEC
   d. Full functionality supported across all major architectural components

## SCHEDULE B – MILESTONES II

1. Money Transmitter Licenses (MTL) and virtual currency licenses.
   a. Submitted MTL applications in New York and California.
   b. Remain in good standing for all other state MTL's
   c. Submitted BitLicense application issued by the New York State Department of Financial Services.
   d. Integration with various liquidity providers such as Binance, Gemini and others

2. Security Certifications
   a. Achieve ISO/IEC 27001 certification of complete technology environment (including: Development Environment/Practices, Information Security Management System (ISMS) covering inhouse and outsourced infrastructure, data centers, and associated services including Digital Custody Solution (Cold Storage), Decentralized Exchange (running on AWS) and general operations
   b. Achieve ISO/IEC 27018:2014 – For internally developed secure storage and management of a customer's both general and non-public PII (such as SSN, bank account numbers, etc.) in a Cloud Environment or on 3rd party outsource providers environment.
   c. Successful Completion of SOC 2 Type 2 Audit with no findings.

**EXHIBIT C**

**Amended and Restated Certificate of Incorporation**

[See attached]

Exhibit C

ACTIVE 250098434

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
TOKENVAULT, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

TokenVault, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

1.      That the name of this corporation is TokenVault, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on September 25, 2019.

2.      That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is TokenVault, Inc. (the "**Corporation**").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801.  The name of its registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:**      The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 1,000 shares of Voting Common Stock, $0.001 par value per share ("**Voting Common Stock**"), (ii) 8,385,909 shares of Class A Non-Voting Common Stock, $0.001 par value per share ("**Class A Non-Voting Common Stock**") and (iii) 3,914,162 shares of Class B Non-Voting Common Stock, $0.001 par value per share ("**Class B Non-Voting Common Stock**", and together with the Class A Non-Voting Common Stock, the "**Non-Voting Common Stock**").  The Voting Common Stock and Non-Voting Common Stock are referred to herein as the "**Common Stock**".

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.     VOTING COMMON STOCK

1.     <u>Voting</u>.  The holders of the Voting Common Stock are entitled to one vote for each share of Voting Common Stock held at all meetings of stockholders (and written actions in lieu of meetings).

2.     <u>Redemption</u>.  Shares of the Voting Common Stock shall not be subject to any redemption by the Corporation.

B.     NON-VOTING COMMON STOCK

1.     <u>Voting</u>.  The holders of the Non-Voting Common Stock shall not be entitled to any vote on any matters of the Corporation, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.     <u>Redemption</u>.

2.1     <u>Redemption of Class A Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall only be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors of the Corporation determines that it is a securities law violation for one or more holders of the Class A Non-Voting Common Stock to hold such shares.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.2     <u>Redemption of Class B Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors so elects, in its sole discretion, to effectuate such redemption.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.3     <u>Redemption Price; Terms of Payment</u>.  Unless prohibited by Delaware law governing distributions to stockholders, any shares of Non-Voting Common Stock to be redeemed in accordance with this Section 2 (such shares, "**Shares Subject to Redemption**") shall be redeemed by the Corporation at a price equal to their original issue price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**").  The date of payment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date.**"  On the Redemption Date, the Corporation shall redeem all outstanding shares of Non-Voting Common Stock constituting Shares Subject to Redemption for cash.  If on any Redemption Date, Delaware law governing distributions to stockholders or other applicable law prevents the Corporation from redeeming all Shares Subject to Redemption, then the Corporation shall redeem the maximum number of shares that it may redeem consistent with such law, which shall be effectuated on a pro rata basis based upon the number of shares held by each holder of Non-Voting

2

Common Stock constituting Shares Subject to Redemption, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

2.4     Redemption Notice.  The Corporation shall send written notice of the mandatory redemption (the "**Redemption Notice**") to each holder of record of Shares Subject to Redemption not less than thirty (30) days prior to the applicable Redemption Date.  Each Redemption Notice shall state:

(a)     the number of shares of Non-Voting Common Stock held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)     the Redemption Date and the Redemption Price; and

(c)     for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Non-Voting Common Stock to be redeemed.

2.5     Surrender of Certificates; Payment.  On or before the applicable Redemption Date, each holder of shares of Non-Voting Preferred Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.  In the event less than all of the shares of Non-Voting Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Non-Voting Common Stock shall promptly be issued to such holder.

2.6     Rights Subsequent to Redemption.  If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Non-Voting Common Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Non-Voting Common Stock so called for redemption shall not have been surrendered, any dividends with respect to such shares of Non-Voting Common Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such  certificate or certificates therefor.

3.     Redeemed or Otherwise Acquired Shares.  Any shares of Non-Voting Common Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued,

3

sold or transferred.  Neither the Corporation nor any of its subsidiaries may exercise any rights granted to the holders of Non-Voting Common Stock following redemption.

4.    Waiver.  Any of the rights, powers, preferences and other terms of the Common Stock set forth herein may be waived on behalf of all holders of Common Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of Voting Common Stock then outstanding.

5.    Notices.  Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Common Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

6.    Other Rights, Preferences and Privileges.  Except as expressly set forth in Section 2 of this Article Fourth, Part B, with respect to redemption, the rights, preferences and privileges of the Class A Non-Voting Common Stock and the Class B Non-Voting Common Stock shall be identical.

C.    PAYMENTS TO HOLDERS OF COMMON STOCK UPON LIQUIDATION.

1.    General.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Common Stock shall be distributed upon the holders of Common Stock, pro rata based upon the number of shares held by each such holder.

2.    Deemed Liquidation Event.  For purposes of Section 1 above, each of the following events shall be deemed to be a liquidation, dissolution or winding up of the Corporation: (a) a merger or consolidation in which the Corporation is a constituent party; (b) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation; except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (c) (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

**FIFTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation; provided, that the number of directors shall be no less than one (1) and no greater than three (3). Each director shall be entitled to one vote on each matter presented to the Board of Directors.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

5

**ELEVENTH:**  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding anything to the contrary contained elsewhere in this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the shares of the Voting Common Stock the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

**TWELFTH:**  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Amended and Restated Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any

6

other consent required under this Amended and Restated Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code).  Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

\* \* \*

**3.** That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

**4.** That this Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 24th day of October, 2019.

By:   /s/ Aaron Travis
Aaron Travis, President

7

<u>Exhibit D</u>

Stockholder Resolutions

**Unanimous Written Consent
in Lieu of Meeting
of the
Sole Stockholder
of
TokenVault, Inc.**

**October 25, 2019**

Pursuant to the provisions of Section 228 of the General Corporation Law of Delaware (the "**DGCL**"), the undersigned (the "**Stockholder**"), being the sole holder of all outstanding shares of TokenVault, Inc., a Delaware corporation (the "**Corporation**"), hereby waives notice of and dispenses with the formality of a meeting and adopts the following resolutions:

**Stock Purchase Agreement**

WHEREAS, a form of Stock Purchase Agreement, in substantially the form attached hereto as <u>Exhibit A</u> (the "**Stock Purchase Agreement**"), by and among the Stockholder, the Corporation and FT Fintech Holdings, LLC ("**Purchaser**"), has been presented to the Stockholder, whereby Purchaser would purchase shares of voting stock of the Corporation from the Stockholder, and purchase shares of non-voting stock of the Corporation directly from the Corporation (the "**Financing**"); and

WHEREAS, the Board of Directors of the Corporation has determined that it is in the best interests of the Corporation and its stockholders to enter into the Stock Purchase Agreement and approve the Financing.

BE IT RESOLVED, that the Stock Purchase Agreement in substantially the form attached hereto as <u>Exhibit A</u> and the Financing are hereby consented to and approved in all respects; and

RESOLVED FURTHER, that the officers of the Corporation are hereby authorized to execute and deliver the Stock Purchase Agreement in accordance with the terms thereof with such modifications and amendments as the officers of the Corporation may, in their discretion, determine to be necessary or desirable, such determination to be conclusively evidenced by the execution and delivery of definitive documents.

**Asset Purchase Agreement**

WHEREAS, a form of Asset Purchase Agreement, in substantially the form attached hereto as <u>Exhibit B</u> (the "**Asset Purchase Agreement**"), by and between the Corporation and TokenVault Limited has been presented to the Stockholder, whereby the Corporation would purchase certain assets of TokenVault Limited and issue non-voting stock of the Corporation to TokenVault Limited in consideration of such asset purchase (the "**Asset Purchase**"); and

WHEREAS, the Board of Directors of the Corporation has determined that it is in the best interests of the Corporation and its stockholders to approve the Asset Purchase Agreement in substantially the form attached hereto as <u>Exhibit B</u> and approve the Asset Purchase.

BE IT RESOLVED, that the Asset Purchase Agreement, in substantially the form attached hereto as <u>Exhibit B</u> and the Asset Purchase, is hereby consented to and approved in all respects; and

RESOLVED FURTHER, that the officers of the Corporation are hereby authorized to execute and deliver the Asset Purchase Agreement in accordance with the terms thereof with such modifications and amendments as the officers of the Corporation may, in their discretion, determine to be necessary or desirable, such determination to be conclusively evidenced by the execution and delivery of definitive documents.

**Amended and Restated Certificate of Incorporation**

WHEREAS, a form of Amended and Restated Certificate of Incorporation attached hereto as <u>Exhibit C</u> (the "**Amended Certificate**") has been presented to the Stockholder to, among other things, create two classes of non-voting shares of the Corporation; and

WHEREAS, the Board of Directors of the Corporation has deemed it to be in the best interests of the Corporation to approve the  Amended Certificate and file the Amended Certificate with the Delaware Secretary of State, subject to the approval of the holders of the voting shares of the Corporation.

BE IT RESOLVED, that the Amended Certificate is hereby approved in the form attached hereto as <u>Exhibit C</u> in all respects; and

RESOLVED FURTHER, the officers of the Corporation be, and each of them hereby is, authorized and directed to execute and file for and on behalf of the Corporation such Amended Certificate in the form and manner required by the laws of the State of Delaware, and to execute and deliver any and all certificates, authorizations or other written instruments and in general to do all acts necessary or appropriate to carry out the purposes of the foregoing resolutions.

**Director  Appointment**

WHEREAS, the Board of Directors of the Corporation is currently set at one member and the current director of the Corporation is Austin Trombley; and

WHEREAS, pursuant to the Bylaws of the Company, the undersigned has the authority to elect members of the Board of Directors of the Corporation.

BE IT RESOLVED, that effective as of the Initial Closing (as defined in the Purchase Agreement), Roger Bayston is elected to serve as the director of the Corporation in accordance with the Bylaws of the Company until his successor is duly elected and qualified or until his earlier resignation or removal.

**General**

BE IT RESOLVED, that the proper officers of the Corporation be, and each hereby is, authorized to pay or cause to be paid all fees, charges and expenses, and to take such further action as they shall deem appropriate, in connection with the organization of the Corporation and each of the foregoing resolutions;

RESOLVED FURTHER, that in addition to the specific authorizations set forth in any of the foregoing resolutions, the proper officers of the Corporation be, and they hereby are, authorized to take from time to time any and all such action and to execute and deliver from time to time any and all such instruments, requests, receipts, notes, applications, reports, certificates and other documents as may be necessary or advisable in their opinion, or in the opinion of any of them, to effectuate, consummate and comply with the purpose and intent of any of the foregoing resolutions; and

RESOLVED FURTHER, that any and all actions taken by the officers of the Corporation, and each of them, in furtherance of any of the foregoing resolutions prior to the date hereof are hereby ratified, confirmed and approved.

The original executed copy of this document shall be filed in the minute book of the Corporation and become a part of the records of the Corporation.

\* \* \*

This Action by Unanimous Written Consent shall be effective as of the date hereof. This Action by Unanimous Written Consent may be signed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument and shall be filed with the minutes of the proceedings of the board of directors of the Corporation. Any copy, facsimile or other reliable reproduction of this Action by Unanimous Written Consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.

Austin Dale Trombley, Sole Stockholder

# EXHIBIT A

## Stock Purchase Agreement

[See attached]

ACTIVE 250104720

**TOKENVAULT, INC.**

**STOCK PURCHASE AGREEMENT**

ACTIVE/98672808.19

## *TABLE OF CONTENTS*

Page

| | | | |
|---|---|---|---|
| 1. | | Purchase and Sale of Stock. | 1 |
| | 1.1 | Sale and Issuance of Stock | 1 |
| | 1.2 | Trombley Right of Repurchase. | 3 |
| | 1.3 | Purchaser Put Right. | 4 |
| | 1.4 | Agreements Regarding the Note | 5 |
| | 1.5 | Defined Terms Used in this Agreement | 5 |
| 2. | | Representations and Warranties of the Company | 8 |
| | 2.1 | Organization, Good Standing, Corporate Power and Qualification | 8 |
| | 2.2 | Capitalization | 8 |
| | 2.3 | Subsidiaries | 9 |
| | 2.4 | Authorization | 10 |
| | 2.5 | Valid Issuance of Shares | 10 |
| | 2.6 | Governmental Consents and Filings | 10 |
| | 2.7 | Litigation | 10 |
| | 2.8 | Intellectual Property | 10 |
| | 2.9 | Compliance with Other Instruments | 11 |
| | 2.10 | Agreements; Actions | 12 |
| | 2.11 | Certain Transactions | 12 |
| | 2.12 | Rights of Registration and Voting Rights | 13 |
| | 2.13 | Property | 13 |
| | 2.14 | Material Liabilities | 13 |
| | 2.15 | Changes | 13 |
| | 2.16 | Employee Matters | 14 |
| | 2.17 | Tax Returns and Payments | 16 |
| | 2.18 | Insurance | 16 |
| | 2.19 | Employee Agreements | 16 |
| | 2.20 | Permits | 16 |
| | 2.21 | Corporate Documents | 16 |
| | 2.22 | 83(b) Elections | 16 |
| | 2.23 | Real Property Holding Corporation | 16 |
| | 2.24 | Environmental and Safety Laws | 16 |
| | 2.25 | Disclosure | 17 |
| | 2.26 | Foreign Corrupt Practices Act | 17 |
| | 2.27 | Data Privacy | 18 |
| | 2.28 | Export Control Laws | 18 |
| 3. | | Representations and Warranties of the Purchaser | 18 |
| | 3.1 | Authorization | 18 |
| | 3.2 | Purchase Entirely for Own Account | 19 |
| | 3.3 | Disclosure of Information | 19 |
| | 3.4 | Restricted Securities | 19 |
| | 3.5 | No Public Market | 19 |
| | 3.6 | Legends | 19 |
| | 3.7 | Accredited Investor | 19 |
| | 3.8 | No General Solicitation | 20 |
| | 3.9 | Representations with Respect to the Note | 20 |

4.      Covenants of Trombley ................................................................................................. 20

5.      Indemnification. ............................................................................................................ 20
        5.1     Trombley Indemnification ................................................................................. 20
        5.2     Waiver .............................................................................................................. 20
        5.3     Advancement .................................................................................................... 20
        5.4     Resolution of Conflicts; Arbitration. ................................................................. 21
        5.5     Holdback. .......................................................................................................... 22

6.      Company Covenants. ..................................................................................................... 22
        6.1     Financials ......................................................................................................... 22
        6.2     Anti-Corruption Laws ...................................................................................... 22

7.      Restrictions on Transfer; Right of First Refusal. ........................................................... 22
        7.1     Restrictions on Transfer. .................................................................................. 22
        7.2     Right of First Refusal ...................................................................................... 24

8.      Observer Right .............................................................................................................. 24

9.      Conditions to the Purchaser's Obligations at Closing ..................................................... 24
        9.1     Representations and Warranties ........................................................................ 24
        9.2     Performance ..................................................................................................... 24
        9.3     Compliance Certificate ..................................................................................... 25
        9.4     Qualifications. .................................................................................................. 25
        9.5     Board of Directors ............................................................................................ 25
        9.6     Authorized Officers .......................................................................................... 25
        9.7     Restated Certificate .......................................................................................... 25
        9.8     Secretary's Certificate ...................................................................................... 25
        9.9     Proceedings and Documents .............................................................................. 25

10.     Conditions of the Company's Obligations at Closing ...................................................... 25
        10.1    Representations and Warranties ........................................................................ 25
        10.2    Performance ..................................................................................................... 25
        10.3    Qualifications. .................................................................................................. 25

11.     Miscellaneous ............................................................................................................... 26
        11.1    Survival of Warranties ...................................................................................... 26
        11.2    Successors and Assigns ..................................................................................... 26
        11.3    Governing Law ................................................................................................. 26
        11.4    Counterparts ..................................................................................................... 26
        11.5    Titles and Subtitles ........................................................................................... 26
        11.6    Notices ............................................................................................................. 26
        11.7    No Finder's Fees ............................................................................................... 26
        11.8    Fees and Expenses ............................................................................................ 27
        11.9    Attorneys' Fees ................................................................................................ 27
        11.10   Amendments and Waivers ................................................................................. 27
        11.11   Severability ...................................................................................................... 27
        11.12   Delays or Omissions ......................................................................................... 27
        11.13   Entire Agreement .............................................................................................. 27
        11.14   Corporate Securities Law ................................................................................. 27

11.15   Dispute Resolution.............................................................................................. 27
11.16   No Commitment for Additional Financing................................................................ 28
11.17   Right to Conduct Activities ................................................................................. 28

Exhibit A -          SCHEDULE OF PURCHASER

Exhibit B -          FORM OF AMENDED AND RESTATED
                     CERTIFICATE OF INCORPORATION

Exhibit C -          DISCLOSURE SCHEDULE

**TOKENVAULT, INC.**
**STOCK PURCHASE AGREEMENT**

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**"), is made as of the [    ] day of October, 2019 by and among TokenVault, Inc., a Delaware corporation (the "**Company**"), Austin Dale Trombley ("**Trombley**"); and FT Fintech Holdings, LLC ("**Purchaser**").

The parties hereby agree as follows:

1.      Purchase and Sale of Stock.

      1.1      Sale and Issuance of Stock.

          (a)      The Company shall adopt and file with the Secretary of State of the State of Delaware on or before the Initial Closing (as defined below) the Amended and Restated Certificate of Incorporation in the form of Exhibit B attached to this Agreement (the "**Restated Certificate**").

          (b)      Subject to the terms and conditions of this Agreement, the Purchaser agrees to purchase at the Initial Closing, and each of Trombley and the Company respectively agrees to sell and issue to the Purchaser at the Initial Closing (i) with respect to Trombley, that number of shares of Voting Common Stock (the "**Voting Common Stock**"), $0.001 par value per share (the "**Voting Stock**"), set forth opposite the Purchaser's name on Exhibit A, which shall constitute all of the Voting Common Stock of the Company, at a per share purchase price of $3,000.00 per share, for an aggregate purchase price of $3,000,000 (such aggregate amount, the "**Voting Stock Consideration**"); and (ii) with respect to the Company, (A) that number of shares of Class A Non-Voting Common Stock (the "**Class A Non-Voting Common Stock**" and, together with the Voting Common Stock and the Class B Non-Voting Common Stock (as defined herein), the "**Common Stock**"), par value $0.001 per share, set forth opposite the Purchaser's name on Exhibit A (the "**Non-Voting Stock**"), at a per share purchase price of $2.50 per share, for an aggregate purchase price of $5,500,000 (such aggregate amount, the "**Initial Non-Voting Stock Closing Consideration**"); and (B) that number of shares of Class A Non-Voting Common Stock (the "**Note Stock**") to be issued pursuant to the automatic conversion terms of the Convertible Promissory Note of the Company issued to Purchaser prior to the date hereof (the "**Note**") in accordance with its terms, except as amended hereby and as set forth opposite the Purchaser's name on Exhibit A. The shares of Voting Stock, Non-Voting Stock, Note Stock and any additional shares of Class A Non-Voting Common Stock issued to the Purchaser pursuant to this Agreement shall be referred to in this Agreement as the "**Shares**."

          (c)      (a)      As an inducement to the Purchaser to enter into this Agreement, Trombley hereby agrees to indemnify and hold the Company, Purchaser, their respective parents, subsidiaries, Affiliates, and related companies, and each of the foregoing entities' respective successors, principals, board members, trustees, agents, attorneys, employees, officers, and directors, except to the extent that such party is Trombley (each party receiving indemnification, a "**Primary Indemnified Party**" and collectively the "**Primary Indemnified Parties**"), harmless from Losses in any way relating to any claims and litigation matters (both current and potential) caused by or relating to: (i) the ownership of, and third party infringement claims relating to, Company Intellectual Property, including the Company Intellectual Property which was assigned to the Company by Trombley; (ii) any breach of any agreement by TokenVault Limited with the Company pursuant to that certain Asset Purchase Agreement entered into between the parties, dated as of the date of this Agreement; (iii) any current or former holders of interest in TokenVault Limited; (iv) any current or former service providers of TokenVault Limited in their capacity as providers of service to TokenVault Limited; (v) the claims made or actions taken by Mr. Stuart Shelly

1

(the "**Shelly Matter**" and (i)-(v), the "**Key Matters**"); and/or (vi) any other lawsuit arising from the Key Matters ((i) – (vi) the "**Key Litigation**").  Notwithstanding the foregoing, Trombley shall not be liable under this Section 1.1(c) for any (x) Losses which constitute consequential, indirect, incidental, special, exemplary, punitive or other similar Losses, (y) Losses which constitute lost profits or diminution in value, or (z) Losses that would not exist if not for, or to the extent aggravated by, any act or wrongful omission of a Primary Indemnified Party.

(d)     The initial purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures or such other time and place as the Company, Trombley and the Purchaser mutually agree upon, orally or in writing (which time and place are designated as the "**Initial Closing**"). In the event there is more than one closing, the term "**Closing**" shall apply to each such closing unless otherwise specified.

(e)     At the Initial Closing, Trombley shall cause the Company to deliver to the Purchaser a certificate representing all of the Voting Stock of the Company, which is being purchased by the Purchaser, against payment of the Voting Stock Consideration therefor by check payable to Trombley, by wire transfer to a bank account designated by Trombley or by any combination of such methods, which payment will be made in three (3) tranches as set forth below:

(i)     At the Initial Closing, the Purchaser will cause and/or will cause its Affiliates to pay to Trombley, in the aggregate, one-third (1/3rd) of the Voting Stock Consideration ($1,000,000.00), less $250,000 which will be held in escrow by the Purchaser and shall be fully available to indemnify and hold harmless the Purchaser and its Affiliates from and against any and all Losses relating to the Shelly Matter in respect of which the Purchaser and its Affiliates may be indemnified and held harmless under Article V of this Agreement (the "**First Voting Stock Closing**" and such amount to be held in escrow, the "**First Holdback Amount**");

(ii)     Upon the earlier of (A) the completion of the milestones set forth in Schedule A attached hereto, as shall be commercially reasonably determined by Trombley and the Purchaser; and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Second Voting Stock Closing Date, the Purchaser will pay and/or will cause its Affiliates to pay to Trombley, in the aggregate, one-third (1/3rd) of the Voting Stock Consideration ($1,000,000.00), less $500,000 which will be held in escrow by the Purchaser and shall be fully available to indemnify and hold harmless the Purchaser and its Affiliates from and against any and all Losses relating to the Shelly Matter in respect of which the Purchaser and its Affiliates may be indemnified and held harmless under Article V of this Agreement (the "**Second Voting Stock Closing**" and such amount to be held in escrow, the "**Second Holdback Amount**"); and

(iii)     Upon the earlier of (A) the completion of the milestones set forth in Schedule B attached hereto, as shall be commercially reasonably determined by Trombley and the Purchaser; and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Third Voting Stock Closing Date, the Purchaser will pay and/or will cause its Affiliates to pay to Trombley, in the aggregate, one-third (1/3rd) of the Voting Stock Consideration ($1,000,000.00) less $250,000 which will be held in escrow by the Purchaser and shall be fully available to indemnify and hold harmless the Purchaser and its Affiliates from and against any and all Losses relating to the Shelly Matter in respect of which the Purchaser and its Affiliates may be indemnified and held harmless under Article V of this Agreement (the "**Third**

**Voting Stock Closing**" and such amount to be held in escrow, the "**Third Holdback Amount**" and, together with First Holdback Amount and the Second Holdback Amount, the "**Holdback Amount**").

(f)     At the Initial Closing, the Company shall deliver to the Purchaser a certificate representing the Non-Voting Stock being purchased by the Purchaser against payment of the Initial Non-Voting Stock Closing Consideration therefor by check payable to the Company, by wire transfer to a bank account designated by the Company or by any combination of such methods. Following the Initial Closing, the Purchaser shall, pursuant to the terms set forth in this Section 1.1(f), purchase additional shares of Class A Non-Voting Common Stock:

(i)     Upon the earlier of (A) the completion of the milestones set forth in <u>Schedule A</u> attached hereto, as shall be commercially reasonably determined by the Company, and the Purchaser; and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Second Non-Voting Stock Closing Date, the Purchaser and/or its Affiliates shall purchase 1,000,000 shares of Class A Non-Voting Common Stock (as adjusted for stock splits, dividends, recapitalizations and the like) from the Company and the Company shall deliver to the Purchaser and/or its Affiliates a certificate representing the shares of Class A Non-Voting Common Stock being purchased by the Purchaser and/or its Affiliates against payment of $2,500,000.00 therefor by check payable to the Company, by wire transfer to a bank account designated by the Company or by any combination of such methods (the "**Second Non-Voting Stock Closing**" and such amount, the "**Second Non-Voting Stock Closing Consideration**");

(ii)     Upon the earlier of (A) the completion of the milestones set forth in <u>Schedule B</u> attached hereto, as shall be commercially reasonably determined by the Company, and the Purchaser; and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser and/or its Affiliates has or have elected to proceed with the subsequent closing hereunder, on the Third Non-Voting Stock Closing Date, the Purchaser and/or its Affiliates shall purchase 600,000 shares of Class A Non-Voting Common Stock (as adjusted for stock splits, dividends, recapitalizations and the like) from the Company and the Company shall deliver to the Purchaser and/or its Affiliates a certificate representing the shares of Class A Non-Voting Common Stock being purchased by the Purchaser and/or its Affiliates against payment of  $1,500,000.00 therefor by check payable to the Company, by wire transfer to a bank account designated by the Company or by any combination of such methods (the "**Third Non-Voting Stock Closing**" and, together with the Second Non-Voting Stock Closing, the Second Voting Stock Closing and the Third Voting Stock Closing, the "**Milestone Closings**" and such amount, the "**Third Non-Voting Stock Closing Consideration**" and, together with the Initial Non-Voting Stock Closing Consideration and the Second Non-Voting Stock Closing Consideration, the "**Non-Voting Stock Consideration**").

1.2     <u>Trombley Right of Repurchase</u>.

(a)     In the event that all of the Milestone Closings have not occurred prior to the Completion Date (the "**Purchaser Termination Event**"), Trombley shall have the right to repurchase the Voting Stock owned by the Purchaser and/or its Affiliates immediately prior to the Purchaser Termination Event pursuant to this Section 1.2.  The purchase and sale arrangements contemplated by the preceding sentence of this Section 1.2(a) are referred to herein as the "**Trombley Repurchase**."

(b)     The aggregate purchase price to be paid by Trombley to the Purchaser

3

and/or its Affiliates pursuant to exercise of the Trombley Repurchase (the "**Trombley Repurchase Price**") shall be equal to (i) the product of (x) the total amount of the Voting Stock Consideration paid (including amounts that would have been paid absent any Holdback Amount) by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event divided by 1,000 and (y) the number of shares of Voting Stock owned by the Purchaser and/or its Affiliates immediately prior to the Purchaser Termination Event, and (ii) minus any Holdback Amount held by the Purchaser that is unused and not reasonably anticipated to be used for future claims.

(c)     Trombley shall effect the Trombley Repurchase (if so elected) by giving the Purchaser written notice (the "**Trombley Repurchase Notice**") specifying the date on which the Trombley Repurchase shall be effected, which date shall be no earlier than sixty (60) days and no later than one hundred twenty (120) days following receipt of the Trombley Repurchase Notice by the Purchaser (the "**Stock Repurchase Date**").   Upon such notification, the Purchaser shall, prior to or on the Stock Repurchase Date, or such later date as may be agreed upon in writing by Trombley and the Purchaser, deliver and/or cause its Affiliates to deliver to Trombley any certificates representing the Voting Stock, together with a duly executed stock power for the transfer of such Voting Stock to Trombley, free and clear of any Encumbrances, and Trombley shall, on the Stock Repurchase Date, pay to the Purchaser and/or its Affiliates the Trombley Repurchase Price by wire transfer of immediately available funds to a bank account designated by the Purchaser and/or its Affiliates (the "**Trombley Repurchase Closing**").

(d)     Trombley's rights to the Trombley Repurchase set forth in this Section 1.2 shall terminate and be of no further force and effect if Trombley does not deliver the Trombley Repurchase Notice to the Purchaser within one (1) month after the Completion Date.

(e)     The Purchaser may not Transfer more than forty-nine percent (49%) of the shares of Voting Stock held by it without Trombley's written consent prior to the earlier of (i) the completion of the Milestone Closings; and (ii) the termination of Trombley's right to the Trombley Repurchase hereunder; provided that the Purchaser may, without Trombley's written consent, Transfer any or all of its shares of Voting Stock to any of its Affiliates at any time.

1.3     Purchaser Put Right.

(a)     Put Right.

(i)     Contingent upon and following the Trombley Repurchase Closing, the Purchaser and/or its Affiliates shall have the right but not the obligation to elect to sell to Trombley, and upon such election, Trombley shall be obligated to purchase, that number of shares of Class A Non-Voting Common Stock that is equal to forty percent (40%) of the total amount owned by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event (the "**First Put Right**" and such shares, the "**First Put Shares**"). The Purchaser and/or its Affiliates may elect to exercise the First Put Right at any time during the one hundred eighty (180) day period following the Stock Repurchase Date (the "**First Put Period**").

(ii)     Contingent upon and following the closing of the sale of the First Put Shares pursuant to Section 1.3(a)(i) (the "**First Put Closing**"), the Purchaser shall have the right but not the obligation to elect to sell to Trombley, and upon such election, Trombley shall be obligated to purchase, that number of shares of Class A Non-Voting Common Stock that is equal to forty percent (40%) of the total amount owned by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event (the "**Second Put Right**" and such shares, the "**Second Put Shares**"). The Purchaser may elect to exercise the Second Put Right at any time

4

during the one hundred eighty (180) day period following First Put Closing (the "**Second Put Period**").

(iii) Contingent upon and following the closing of the sale of the Second Put Shares pursuant to Section 1.3(a)(ii) (the "**Second Put Closing**"), the Purchaser shall have the right but not the obligation to elect to sell to Trombley, and upon such election, Trombley shall be obligated to purchase, that number of shares of Class A Non-Voting Common Stock that is equal to twenty percent (20%) of the total amount owned by the Purchaser and/or its Affiliates as of immediately prior to the Purchaser Termination Event (the "**Third Put Right**" and such shares, the "**Third Put Shares**"). The Purchaser may elect to exercise the Third Put Right at any time during the one hundred eighty (180) day period following the Second Put Closing (the "**Third Put Period**").

(b) The aggregate purchase price to be paid by Trombley to the Purchaser and/or its Affiliates pursuant to the exercise of each applicable Put Right shall be equal to the product obtained by multiplying $2.50 by the applicable number of Put Shares being sold by the Purchaser and/or its Affiliates (the "**Put Price**").

(c) The Purchaser and/or its Affiliates shall exercise the applicable Put Right by giving Trombley written notice (the "**Put Notice**") of such exercise at any time during the applicable Put Period. Trombley shall, within ninety (90) days of the delivery of the Put Notice, pay to the Purchaser and/or its Affiliates the applicable Put Price by wire transfer of immediately available funds to a bank account designated by the Purchaser and/or its Affiliates and the Purchaser shall deliver and/or cause its Affiliates to deliver to Trombley any certificates representing the applicable Put Shares, together with a duly executed stock power for the transfer of such Put Shares to Trombley, free and clear of any Encumbrances.

1.4     Agreements Regarding the Note

(a) Consent to Amendment, Conversion and Termination. The Company and the Purchaser hereby agree and acknowledge that:

(i) the Note is hereby amended such that the entire principal amount of such Note plus unpaid accrued interest to be converted into Shares pursuant to the terms thereunder, as amended hereby, shall be the outstanding principal and unpaid accrued interest as of October 24, 2019 (such amount, the "**Note Consideration**"); and

(ii) notwithstanding anything to the contrary herein or in the Note, the Note shall automatically convert at the Initial Closing into the number of Shares as set forth on Exhibit A attached hereto, and the Purchaser agrees that the terms of the Note are hereby superseded to the extent necessary to give effect to the foregoing.

1.5     Defined Terms Used in this Agreement. In addition to the terms defined above, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a) "**Affiliate**" means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person,

including, without limitation, any general partner, managing member, officer, director or trustee of such Person, or any venture capital fund or registered investment company now or hereafter existing that is controlled by one or more general partners, managing members or investment advisers of, or shares the same management company or investment adviser with, such Person.

(b)  **"Business"** means the Company's business as a platform that enables the exchange of digital assets and any other business of the Company that may exist as of the Initial Closing.

(c)  **"Business Day"** means a day (other than a Saturday, Sunday or public holiday) on which banks are normally open for business in the State of California, United States.

(d)  "**Code**" means the Internal Revenue Code of 1986, as amended.

(e)  **"Completion Date"** means on the eighteen (18) month anniversary of the Initial Closing, or such other date as the Parties may mutually agree in writing.

(f)  "**Company Intellectual Property**" means all patents, patent application, registered and unregistered trademarks, trademark applications, registered and unregistered service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, mask works, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and any and all such cases as are necessary to the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted.

(g)  "**Constructive Sale**" means, with respect to any security, a short sale with respect to such security, entering into or acquiring an offsetting derivative contract with respect to such security, entering into or acquiring a futures or forward contract to deliver such security, or entering into any other hedging or other derivative transaction that has the effect of materially changing the economic benefits and risks of ownership.

(h)  **"Encumbrance"** means any mortgage, assignment of receivables, debenture, lien, hypothecation, charge, pledge, title retention, right to acquire, security interest, option, pre-emptive or other similar right, right of first refusal, restriction, third-party right or interest, any other encumbrance, condition or security interest whatsoever or any other type of preferential arrangement (including without limitation, a title transfer or retention arrangement) having similar effect.

(i)  "**Key Employee**" means any executive-level employee (including division director and vice president-level positions) as well as any employee or consultant who either alone or in concert with others develops, invents, programs or designs any Company Intellectual Property.

(j)  "**Knowledge**" including the phrase "**to the Company's knowledge**" shall mean the actual knowledge after reasonable investigation of each executive level employee of the Company.

(k)  "**Losses**" means any and all claims, losses, liabilities, damages fees, penalties, awards, costs, interest, taxes, reasonable attorneys fees, and expenses of any kind.

(l)  "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results

6

of operations of the Company.

(m)    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

(n)    "**Restricted Period**" means the period beginning on the date of signing this Agreement and ending on the date that is two (2) years from the Initial Closing.

(o)    "**Restricted Territories**" means the territories where the Company or any of its subsidiaries has physical business operations, including but not limited to the United States, and India.

(p)    "**Sale Event**" means the consummation of (i) the dissolution or liquidation of the Company, (ii) the sale of all or substantially all of the assets of the Company on a consolidated basis to an unrelated Person, (iii) a merger, reorganization or consolidation pursuant to which the holders of the Company's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the surviving or resulting entity (or its ultimate parent, if applicable), (iv) the acquisition of all or a majority of the outstanding voting stock of the Company in a single transaction or a series of related transactions by a Person or group of Persons, or (v) any other acquisition of the business of the Company, as determined by the Board of Directors of the Company; provided, however, that the corporation's initial public offering, any subsequent public offering or another capital-raising event, or a merger effected solely to change the Company's domicile shall not constitute a "Sale Event".

(q)    "**Second Non-Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule A</u>, as shall be commercially reasonably determined by the Company and the Purchaser and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser has elected to proceed with the Second Non-Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(r)    "**Second Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule A</u>, as shall be commercially reasonably determined by the Company, Trombley and the Purchaser and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser has elected to proceed with the Second Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(s)    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(t)    "**Third Non-Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule B</u>, as shall be commercially reasonably determined by the Company and the Purchaser and (B) the delivery by the Purchaser to the Company of notice in writing indicating that the Purchaser has elected to proceed with the Third Non-Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(u)    "**Third Voting Stock Closing Date**" means (i) the fifth (5th) Business Day from the earlier of (A) the satisfaction of the conditions set forth in <u>Schedule B</u>, as shall be commercially reasonably determined by the Company, Trombley and the Purchaser and (B) the delivery by the Purchaser to the Company and Trombley of notice in writing indicating that the Purchaser has elected to proceed with the Third Voting Stock Closing or (ii) such other date as the Purchaser may agree in writing.

(v)     "**Transfer**" means, with respect to any security, the director or indirect assignment, sale, transfer, tender, pledge, hypothecation, or the grant, creation or suffrage of a lien or encumbrance in or upon, or the gift, placement in trust, or the Constructive Sale (as defined herein) or other disposition of such security (including transfer by testamentary or intestate succession, merger or otherwise by operation of law) or any right, title or interest therein (including, but not limited to, any right or power to vote to which the holder thereof may be entitled, whether such right or power is granted by proxy or otherwise), or the record or beneficial ownership thereof, the offer to make such a sale, transfer, Constructive Sale or other disposition, and each agreement, arrangement or understanding, whether or not in writing, to effect any of the foregoing.

2.     <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to the Purchaser that, except as set forth on the Disclosure Schedule attached as <u>EXHIBIT C</u> to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of each Closing, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections and subsections contained in this <u>Section 2</u>, and the disclosures in any section or subsection of the Disclosure Schedule shall qualify other sections and subsections in this <u>Section 2</u> only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections.

For purposes of these representations and warranties (other than those in <u>Sections 2.2</u>, <u>2.3</u>, <u>2.4</u>, <u>2.5</u>, and <u>2.6</u>), the term the "**Company**" shall include any subsidiaries of the Company, unless otherwise noted herein.

2.1     <u>Organization, Good Standing, Corporate Power and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted and as presently proposed to be conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2     <u>Capitalization</u>.

(a)     The authorized capital of the Company consists, immediately prior to the Initial Closing, of:

(i)     1,000 shares of Voting Common Stock, all shares of which are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Voting Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable federal and state securities laws. The Company holds no Class A Voting Common Stock in its treasury.

(ii)     8,385,909 shares of Class A Non-Voting Common Stock, none of which  shares are issued and outstanding immediately prior to the Initial Closing; and 3,914,162 shares of Class B Non-Voting Common Stock of the Company, par value $0.001 per share (the "**Class B Non-Voting Common Stock**"), none of which shares are issued and outstanding immediately prior to the Initial Closing. All of the outstanding shares of Class A Non-Voting Common Stock and Class B Non-Voting Common Stock have been duly authorized, are fully paid and nonassessable and were issued in compliance with all applicable securities laws. The Company holds no Class A Non-Voting Common Stock or Class B Non-Voting Common Stock in its treasury.

(iii)    The rights, privileges and preferences of the Common Stock are as stated in the Restated Certificate and as provided by the Delaware General Corporation Law.

The Company has reserved 288,324 shares of Class A Non-Voting Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to its 2019 Stock Option Plan duly adopted by the Board of Directors and approved by the Company stockholders (the "**Stock Plan**"). Of such reserved shares of Class A Non-Voting Common Stock, no shares have been issued pursuant to restricted stock purchase agreements, no options to purchase shares have been granted and are currently outstanding, and 288,324  shares of Class A Non-Voting Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The Company has furnished to the Purchaser complete and accurate copies of the Stock Plan and forms of agreements used thereunder.

(b)    Section 2.2(c) of the Disclosure Schedule sets forth the capitalization of the Company immediately following the Initial Closing including the number of shares of the following: (i) issued and outstanding Common Stock, including, with respect to restricted Common Stock, vesting schedule and repurchase price; (ii) granted stock options, including vesting schedule and exercise price; (iii) shares of Class A Non-Voting Common Stock reserved for future award grants under the Stock Plan; and (iv) warrants or stock purchase rights, if any. Except for (A) the conversion privileges of the Shares to be issued under this Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock. All outstanding shares of the Class A Non-Voting Common Stock and Class B Non-Voting Common Stock are subject to (i) a right of first refusal in favor of the Company upon any proposed transfer (other than transfers for estate planning purposes); and (ii) a lock-up or market standoff agreement of not less than one hundred eighty (180) days following the Company's initial public offering pursuant to a registration statement filed with the Securities and Exchange Commission under the Securities Act.

(c)    None of the Company's stock purchase agreements or stock option documents contains a provision for acceleration of vesting (or lapse of a repurchase right) or other changes in the vesting provisions or other terms of such agreement or understanding upon the occurrence of any event or combination of events, including without limitation in the case where the Company's Stock Plan is not assumed in an acquisition. The Company has never adjusted or amended the exercise price of any stock options previously awarded, whether through amendment, cancellation, replacement grant, repricing, or any other means. Except as set forth in the Restated Certificate, the Company has no obligation (contingent or otherwise) to purchase or redeem any of its capital stock.

(d)    The Company believes in good faith that any "nonqualified deferred compensation plan" (as such term is defined under Section 409A(d)(1) of the Code and the guidance thereunder) under which the Company makes, is obligated to make or promises to make, payments (each, a "**409A Plan**") complies in all material respects, in both form and operation, with the requirements of Section 409A of the Code and the guidance thereunder. To the knowledge of the Company, no payment to be made under any 409A Plan is, or will be, subject to the penalties of Section 409A(a)(1) of the Code.

(e)    The Company has obtained valid waivers of any rights by other parties to purchase any of the Shares covered by this Agreement.

2.3    <u>Subsidiaries</u>. The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or

9

similar arrangement.

2.4     Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement, and to issue the Shares at the Initial Closing has been taken or will be taken prior to the Initial Closing. All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of the Initial Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Initial Closing. This Agreement, when executed and delivered by the Company, shall constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally,  or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.5     Valid Issuance of Shares. The Shares, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser. Assuming the accuracy of the representations of the Purchaser in Section 3 of this Agreement, the Shares will be issued in compliance with all applicable federal and state securities laws.

2.6     Governmental Consents and Filings. Assuming the accuracy of the representations made by the Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for (i) the filing of the Restated Certificate, which will have been filed as of the Initial Closing, and (ii) filings pursuant to Regulation D of the Securities Act, and applicable state securities laws, which have been made or will be made in a timely manner.

2.7     Litigation. There is no claim, action, suit, proceeding, arbitration, complaint, charge or, to the Company's knowledge, investigation, pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company; (ii) that questions the validity of this Agreement or the right of the Company to enter into them, or to consummate the transactions contemplated by this Agreement; or (iii) to the Company's knowledge, that would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. Neither the Company nor, to the Company's knowledge, any of its officers, directors or Key Employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or Key Employees, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

2.8     Intellectual Property. The Company owns or possesses sufficient legal rights to all Company Intellectual Property without any known conflict with, or infringement of, the rights of others, including prior employees or consultants, with which any of them may be affiliated now or may have been affiliated in the past. No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any intellectual property rights of

10

any other party. Other than with respect to Standard Licenses (as defined below), there are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Company Intellectual Property owned by or exclusively licensed to the Company, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other Person. The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other Person. The Company has obtained and possesses valid licenses to use all of the software programs present on the computers and other software-enabled electronic devices that it owns or leases or that it has otherwise provided to its employees for their use in connection with the Company's business. It will not be necessary to use any inventions of any of its current or former employees or consultants (or Persons it currently intends to hire) made prior to their employment by the Company, including prior employees or consultants, with which any of them may be affiliated now or may have been affiliated in the past. Each current and former employee and consultant has assigned to the Company all intellectual property rights he or she owns that are related to the Company's business as now conducted and as presently proposed to be conducted and all intellectual property rights that he, she or it solely or jointly conceived, reduced to practice, developed or made during the period of his, her or its employment or consulting relationship with the Company that (a) relate, at the time of conception, reduction to practice, development, or making of such intellectual property right, to the Company's business as then conducted or as then proposed to be conducted, (b) were developed on any amount of the Company's time or with the use of any of the Company's equipment, supplies, facilities or information or (c) resulted from the performance of services for the Company. Section 2.8 of the Disclosure Schedule lists all patents, patent applications, registered trademarks, trademark applications, service marks, service mark applications, tradenames, domain names, registered copyrights, and licenses to and under any of the foregoing, in each case owned by the Company. To the extent the Company uses any "open source" or "copyleft" software or is a party to "open" or "public source" or similar licenses, the Company is in compliance with the terms of any such licenses, any such software and licenses are listed on the Disclosure Schedule, and the Company is not required under any such license to (a) make or permit any disclosure or to make available any source code for its (or any of its licensors') proprietary software or (b) distribute or make available any of the Company's proprietary software or intellectual property (or to permit any such distribution or availability). For purposes of this Section 2.8, the Company shall be deemed to have knowledge of a patent right if the Company has actual knowledge of the patent right or would be found to be on notice of such patent right as determined by reference to United States patent laws. No government funding, facilities of a university, college, other educational institution or research center, or funding from third parties was used in the development of any Company Intellectual Property. No Person who was involved in, or who contributed to, the creation or development of any Company Intellectual Property, has performed services for the government, university, college, or other educational institution or research center in a manner that would affect Company's rights in the Company Intellectual Property.

      2.9    <u>Compliance with Other Instruments</u>. The Company is not in violation or default (i) of any provisions of its Restated Certificate or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound that is required to be listed on the Disclosure Schedule, or (v) to its knowledge, of any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement; or (ii) an event which results in the creation of any lien, charge or encumbrance upon

11

any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

2.10    Agreements; Actions.

(a)    Except for this Agreement, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $25,000, (ii) the license of any patent, copyright, trademark, trade secret or other proprietary right to or from the Company (other than (A) the nonexclusive license of the Company's software and products in object code form or on a software-as-a-service basis in the ordinary course of business pursuant to standard end-user agreements the form of which has been provided to special counsel for the Purchaser or (B) non-negotiated end-user license agreements and terms of service for standard, generally commercially available, "off-the-shelf" third party products that are not and will not to any extent be part of any product, service or intellectual property offering of the Company ((A) and (B), "**Standard Licenses**")), (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (iv) indemnification by the Company with respect to infringements of proprietary rights.

(b)    The Company has not (i) declared or paid any dividends, or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $25,000 or in excess of $50,000 in the aggregate, (iii) made any loans or advances to any Person, other than ordinary advances for travel expenses, or (iv) sold, exchanged or otherwise disposed of any of its assets or rights, other than the sale of its inventory in the ordinary course of business. For the purposes of (a) and (b) of this Section 2.10, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons the Company has reason to believe are affiliated with each other) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsection.

(c)    The Company is not a guarantor or indemnitor of any indebtedness of any other Person.

2.11    Certain Transactions.

(a)    Other than (i) standard employee benefits generally made available to all employees, (ii) standard director and officer indemnification agreements approved by the Board of Directors, and (iii) the purchase of shares of the Company's capital stock and the issuance of options to purchase shares of the Common Stock, in each instance, approved in the written minutes of the Board of Directors (previously provided to the Purchaser and its counsel), there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof.

(b)    The Company is not indebted, directly or indirectly, to any of its directors, officers or employees or to their respective spouses or children or to any Affiliate of any of the foregoing, other than in connection with expenses or advances of expenses incurred in the ordinary course of business or employee relocation expenses and for other customary employee benefits made generally available to all employees. None of the Company's directors, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company or, to the Company's knowledge, have any (i) material commercial, industrial, banking, consulting, legal,

12

accounting, charitable or familial relationship with any of the Company's customers, suppliers, service providers, joint venture partners, licensees and competitors, (ii) direct or indirect ownership interest in any firm or corporation with which the Company is affiliated or with which the Company has a business relationship, or any firm or corporation which competes with the Company except that directors, officers, employees or stockholders of the Company may own stock in (but not exceeding two percent (2%) of the outstanding capital stock of) publicly traded companies that may compete with the Company; or (iii) financial interest in any material contract with the Company.

2.12   Rights of Registration and Voting Rights. The Company is not under any obligation to register under the Securities Act any of its currently outstanding securities or any securities issuable upon exercise or conversion of its currently outstanding securities. To the Company's knowledge, no stockholder of the Company has entered into any agreements with respect to the voting of capital shares of the Company.

2.13   Property. The property and assets that the Company owns are free and clear of all Encumbrances, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets. With respect to the property and assets it leases, the Company is in compliance with such leases and holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets. The Company does not own any real property.

2.14   Material Liabilities. The Company has no liability or obligation, absolute or contingent (individually or in the aggregate), except (i) obligations and liabilities incurred after the date of incorporation in the ordinary course of business that are not material, individually or in the aggregate, and (ii) obligations under contracts made in the ordinary course of business that would not be required to be reflected in financial statements prepared in accordance with generally accepted accounting principles ("**GAAP**").

2.15   Changes. Since the date of incorporation of the Company, there has not been:

(a)   any change in the assets, liabilities, financial condition or operating results of the Company from that reflected in the Financial Statements, except changes in the ordinary course of business that have not caused, in the aggregate, a Material Adverse Effect;

(b)   any damage, destruction or loss, whether or not covered by insurance, that would have a Material Adverse Effect;

(c)   any waiver or compromise by the Company of a valuable right or of a material debt owed to it;

(d)   any satisfaction or discharge of any lien, claim, or encumbrance or payment of any obligation by the Company, except in the ordinary course of business and the satisfaction or discharge of which would not have a Material Adverse Effect;

(e)   any material change to a material contract or agreement by which the Company or any of its assets is bound or subject;

(f)   any material change in any compensation arrangement or agreement with any employee, officer, director or stockholder;

13

(g)     any resignation or termination of employment of any officer or Key Employee of the Company;

(h)     any mortgage, pledge, transfer of a security interest in, or lien, created by the Company, with respect to any of its material properties or assets, except liens for taxes not yet due or payable and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets;

(i)     any loans or guarantees made by the Company to or for the benefit of its employees, officers or directors, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business;

(j)     any declaration, setting aside or payment or other distribution in respect of any of the Company's capital stock, or any direct or indirect redemption, purchase, or other acquisition of any of such stock by the Company;

(k)     any sale, assignment or transfer of any Company Intellectual Property;

(l)     receipt of notice that there has been a loss of, or material order cancellation by, any major customer of the Company;

(m)     any other event or condition of any character, other than events affecting the economy or the Company's industry generally, that could reasonably be expected to result in a Material Adverse Effect; or

(n)     any arrangement or commitment by the Company to do any of the things described in this Section 2.15.

2.16     Employee Matters.

(a)     As of the date hereof, the Company employs thirty (30) full-time employees and no part-time employees and engages one consultant and no other independent contractors. Section 2.16(a) of the Disclosure Schedule sets forth a detailed description of all compensation, including salary, bonus, severance obligations and deferred compensation paid or payable for each officer, employee, consultant and independent contractor of the Company.

(b)     To the Company's knowledge, none of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would materially interfere with such employee's ability to promote the interest of the Company or that would conflict with the Company's business. Neither the execution or delivery of this Agreement, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as now conducted and as presently proposed to be conducted, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.

(c)     The Company is not delinquent in payments to any of its employees, consultants, or independent contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to

14

such employees, consultants or independent contractors. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, worker classification and collective bargaining. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing.

(d)     To the Company's knowledge, no Key Employee intends to terminate employment with the Company or is otherwise likely to become unavailable to continue as a Key Employee. The Company does not have a present intention to terminate the employment of any of the foregoing. The employment of each employee of the Company is terminable at the will of the Company. Except as required by law, upon termination of the employment of any such employees, no severance or other payments will become due. The Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(e)     The Company has not made any representations regarding equity incentives to any officer, employee, director or consultant that are inconsistent with the share amounts and terms set forth in the minutes of meetings of the Company's board of directors.

(f)     Each former Key Employee whose employment was terminated by the Company has entered into an agreement with the Company providing for the full release of any claims against the Company or any related party arising out of such employment.

(g)     Section 2.16(g) of the Disclosure Schedule sets forth each employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). The Company has made all required contributions and has no liability to any such employee benefit plan, other than liability for health plan continuation coverage described in Part 6 of Title I(B) of ERISA, and has complied in all material respects with all applicable laws for any such employee benefit plan.

(h)     The Company is not bound by or subject to (and none of its assets or properties is bound by or subject to) any written or oral, express or implied, contract, commitment or arrangement with any labor union, and no labor union has requested or, to the knowledge of the Company, has sought to represent any of the employees, representatives or agents of the Company. There is no strike or other labor dispute involving the Company pending, or to the Company's knowledge, threatened, which could have a Material Adverse Effect, nor is the Company aware of any labor organization activity involving its employees.

(i)     To the Company's knowledge, none of the Key Employees or directors of the Company has been (a) subject to voluntary or involuntary petition under the federal bankruptcy laws or any state insolvency law or the appointment of a receiver, fiscal agent or similar officer by a court for his or her business or property; (b) convicted in a criminal proceeding or named as a subject of a pending criminal proceeding (excluding traffic violations and other minor offenses); (c) subject to any order, judgment or decree (not subsequently reversed, suspended, or vacated) of any court of competent jurisdiction permanently or temporarily enjoining him or her from engaging, or otherwise imposing limits or conditions on his or her engagement in any securities, investment advisory, banking, insurance, or other type of business or acting as an officer or director of a public company; or (d) found by a court of competent jurisdiction in a civil action or by the Securities and Exchange Commission or the Commodity Futures

15

Trading Commission to have violated any federal or state securities, commodities, or unfair trade practices law, which such judgment or finding has not been subsequently reversed, suspended, or vacated.

2.17    Tax Returns and Payments. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

2.18    Insurance. The Company has in full force and effect insurance policies concerning such casualties as would be reasonable and customary for companies like the Company, with extended coverage, sufficient in amount (subject to reasonable deductions) to allow it to replace any of its properties that might be damaged or destroyed.

2.19    Employee Agreements. Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for the Purchaser (the "**Confidential Information Agreements**"). No current or former Key Employee has excluded works or inventions from his or her assignment of inventions pursuant to such Key Employee's Confidential Information Agreement. Each current and former Key Employee has executed a non-solicitation agreement substantially in the form or forms delivered to counsel for the Purchaser. The Company is not aware that any of its Key Employees is in violation of any agreement covered by this Section 2.19.

2.20    Permits. The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect. The Company is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

2.21    Corporate Documents. The Restated Certificate and Bylaws of the Company are in the form provided to the Purchaser. The copy of the minute books of the Company provided to the Purchaser contains minutes of all meetings of directors and stockholders and all actions by written consent without a meeting by the directors and stockholders since the date of incorporation and accurately reflects in all material respects all actions by the directors (and any committee of directors) and stockholders with respect to all transactions referred to in such minutes.

2.22    83(b) Elections. To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been or will be timely filed by all individuals who have acquired unvested shares of the Company's Common Stock.

2.23    Real Property Holding Corporation. The Company is not now and has never been a "United States real property holding corporation" as defined in the Code and any applicable regulations promulgated thereunder. The Company has filed with the Internal Revenue Service all statements, if any, with its United States income tax returns which are required under such regulations.

2.24    Environmental and Safety Laws. Except as could not reasonably be expected to have a Material Adverse Effect to the best of its knowledge (a) the Company is and has been in compliance with all Environmental Laws; (b) there has been no release or to the Company's knowledge threatened release of any pollutant, contaminant or toxic or hazardous material, substance or waste or petroleum or

16

any fraction thereof (each a "**Hazardous Substance**"), on, upon, into or from any site currently or heretofore owned, leased or otherwise used by the Company; (c) there have been no Hazardous Substances generated by the Company that have been disposed of or come to rest at any site that has been included in any published U.S. federal, state or local "superfund" site list or any other similar list of hazardous or toxic waste sites published by any governmental authority in the United States; and (d) there are no underground storage tanks located on, no polychlorinated biphenyls ("**PCBs**") or PCB-containing equipment used or stored on, and no hazardous waste as defined by the Resource Conservation and Recovery Act, as amended, stored on, any site owned or operated by the Company, except for the storage of hazardous waste in compliance with Environmental Laws. The Company has made available to the Purchaser true and complete copies of all material environmental records, reports, notifications, certificates of need, permits, pending permit applications, correspondence, engineering studies and environmental studies or assessments.

For purposes of this Section 2.24, "**Environmental Laws**" means any law, regulation, or other applicable requirement relating to (a) releases or threatened release of Hazardous Substance; (b) pollution or protection of employee health or safety, public health or the environment; or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

2.25    Disclosure. The Company has made available to the Purchaser all the information reasonably available to the Company that the Purchaser has requested for deciding whether to acquire the Shares, including certain of the Company's projections describing its proposed business plan (the "**Business Plan**"). No representation or warranty of the Company contained in this Agreement, as qualified by the Disclosure Schedule, and no certificate furnished or to be furnished to Purchaser at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made. The Business Plan was prepared in good faith; however, the Company does not warrant that it will achieve any results projected in the Business Plan. It is understood that this representation is qualified by the fact that the Company has not delivered to the Purchaser, and has not been requested to deliver, a private placement or similar memorandum or any written disclosure of the types of information customarily furnished to purchasers of securities.

2.26    Foreign Corrupt Practices Act.

(a)    The Company, each of its subsidiaries and each of its and their directors, officers, employees, and agents, and, to the Company's knowledge all other Persons acting on behalf of the Company or any of its subsidiaries, is, has been, and will continue to be, in compliance with the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), any other applicable U.S. or foreign anti-corruption or anti-bribery laws, and any rules and regulations promulgated thereunder (collectively, the "**Anti-Corruption Laws**").

(b)    Neither the Company nor any of its subsidiaries, nor any of its or their directors, officers, employees, or agents, nor to the Company's knowledge any other Person acting on behalf of the Company or any of its subsidiaries has: (i) been charged with or convicted of violating any Anti-Corruption Laws; (ii) received any notice, request, or citation, or been made aware of any allegation, investigation (formal or informal), inquiry, action, charge, or proceeding with regard to a potential violation of any Anti-Corruption Law; or (iii) directly or indirectly, offered, paid, promised, or authorized, or caused to be offered, paid, promised, or authorized, any money, offer, gift, or other thing of value, regardless of form, to any government official, or to any Person while knowing or having reason to know that such Person has or will offer, pay, promise, or authorize, or cause to be offered, paid, promised, or authorized, any money, offer, gift, or other thing of value to any government official, in furtherance of, or with the intent or purpose of, (A) corruptly influencing any act or decision of such government official in his or her official

capacity, (B) inducing such government official to do or omit to do any act in violation of a lawful duty, (C) securing any improper advantage, or (D) inducing such government official to use his or her influence with a governmental entity, or instrumentality thereof, to affect or influence any act or decision of such governmental entity or instrumentality thereof.

(c)     The Company and each of its subsidiaries have established procedures and controls which each reasonably believes to be adequate (and otherwise comply with applicable law) to ensure that the Company and each of its subsidiaries is and will continue to be in compliance with all applicable Anti-Corruption Laws and to ensure that neither the Company nor any of its subsidiaries will cause the Purchaser to violate the Anti-Corruption Laws.

2.27    Data Privacy. In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (collectively "**Personal Information**"), the Company is and has been in compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information and other confidential information collected by it or on its behalf from and against unauthorized access, use and/or disclosure, and the Company is not aware of any such unauthorized access, use and/or disclosure. The Company is and has been, to the Company's knowledge, in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations.

2.28    Export Control Laws. The Company has conducted all export transactions in accordance with applicable provisions of United States export control laws and regulations, including the Export Administration Regulations, the International Traffic in Arms Regulations, the regulations administered by the Office of Foreign Assets Control of the U.S. Treasury Department, and the export control laws and regulations of any other applicable jurisdiction. Without limiting the foregoing: (a) the Company has obtained all export licenses and other approvals, timely filed all required filings and has assigned the appropriate export classifications to all products, in each case as required for its exports of products, software and technologies from the United States and any other applicable jurisdiction; (b) the Company is in compliance with the terms of all applicable export licenses, classifications, filing requirements or other approvals; (c) there are no pending or, to the knowledge of the Company, threatened claims against the Company with respect to such exports, classifications, required filings or other approvals; (d) there are no pending investigations related to the Company's exports; and (e) there are no actions, conditions, or circumstances pertaining to the Company's export transactions that would reasonably be expected to give rise to any material future claims.

3.      Representations and Warranties of the Purchaser. The Purchaser hereby represents and warrants to the Company that:

3.1     Authorization. The Purchaser has full power and authority to enter into this Agreement. This Agreement to which the Purchaser is a party, when executed and delivered by the Purchaser, will constitute valid and legally binding obligations of the Purchaser, enforceable in accordance with their terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

3.2     Purchase Entirely for Own Account. This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Shares to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Shares. The Purchaser has not been formed for the specific purpose of acquiring the Shares.

3.3     Disclosure of Information. The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the Shares with the Company's management and has had an opportunity to review the Company's facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 2 of this Agreement or the right of the Purchaser to rely thereon.

3.4     Restricted Securities. The Purchaser understands that the Shares have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Shares are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the Shares, or the Common Stock into which it may be converted, for resale. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy. The Purchaser understands that this offering is not intended to be part of the public offering, and that the Purchaser will not be able to rely on the protection of Section 11 of the Securities Act.

3.5     No Public Market. The Purchaser understands that no public market now exists for the Shares, and that the Company has made no assurances that a public market will ever exist for the Shares.

3.6     Legends. The Purchaser understands that the Shares and any securities issued in respect of or exchange for the Shares, may be notated with one or all of the following legends:

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.".

(a)     Any legend required by the securities laws of any state to the extent such laws are applicable to the Shares represented by the certificate, instrument, or book entry so legended.

3.7     Accredited Investor. The Purchaser is an accredited investor as defined in Rule

19

501(a) of Regulation D promulgated under the Securities Act.

        3.8    <u>No General Solicitation</u>. Neither the Purchaser, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (a) engaged in any general solicitation, or (b) published any advertisement in connection with the offer and sale of the Shares.

        3.9    <u>Representations with Respect to the Note</u>. Purchaser represents and warrants the following:

        (a)    Purchaser has good title to its Note, free and clear of any Encumbrances, is the sole holder of its Note and has not transferred the Note or any interest thereof to any other Person.

        (b)    No indebtedness or other financial obligation of the Company to the Purchaser exists other than the Note prior to the satisfaction and termination of such Note pursuant to the terms thereunder and hereunder.

        4.    <u>Covenants of Trombley</u>. During the Restricted Period, Trombley shall not, either directly or indirectly (including through Affiliates): (a) engage, be employed or hold any interest in any business similar to or competing with, the Business in any of the Restricted Territories, other than through the Company or its subsidiaries; (b) solicit in the Restricted Territories in competition with the Business, the customer of any person, firm or company, who, is a customer of the Company or its subsidiaries; or (c) solicit or contact with a view to the engagement or employment by any person, any employee or officer of the Company or its subsidiaries.

        5.    <u>Indemnification</u>.

        5.1    <u>Trombley Indemnification</u>. Reference is made herein to the indemnification set forth in <u>Section 1.1(c)</u> of this Agreement. All provisions of this <u>Section 5</u> shall be interpreted in a manner consistent with the provisions of <u>Section 1.1(c)</u> and shall not narrow nor broaden the scope of the indemnification set forth therein.

        5.2    <u>Waiver</u>. Trombley hereby agrees that he irrevocably waives, relinquishes and releases the Company from any and all claims against the Company for indemnification, contribution, subrogation, advancement, or any other recovery of any kind in respect of the Key Litigation.

        5.3    <u>Advancement</u>.  Trombley shall advance to the Primary Indemnified Parties, to the extent not prohibited by law, all costs (including attorneys' fees and expenses) reasonably expected to be incurred by any of the Primary Indemnified Parties in connection with reviewing, presenting, defending, preparing to present or defend, investigating, responding to third party subpoenas or other discovery requests, appearing at or defending depositions, being or preparing to be a witness in, or otherwise participating in or monitoring, the Key Litigation (including any and all documentation relating thereto), (the "**Expenses**") prior to the final disposition of the Key Litigation upon receipt of a written request therefor (together with documentation reasonably evidencing such Expenses). The advances to be made hereunder shall be made as soon as reasonably practicable, but in any event no later than 15 days, after the receipt by Trombley of a written statement or statements requesting such advances from time to time. Advances shall be unsecured and interest free and made without regard to Primary Indemnified Parties' ability to repay such advances. The Primary Indemnified Parties hereby undertake to repay such amounts advanced if it shall be determined ultimately that the Indemnified Parties are not entitled to be indemnified

by Trombley as set forth hereunder.

4.4    Resolution of Conflicts; Arbitration.

(a)    If within 30 days after delivery of a written notification of a claim for Losses ("**Notice of Claim**") to Trombley by a Primary Indemnified Party (each such party that initiated the applicable Notice of Claim, the "**Applicable Claimant**"), Trombley objects in writing to any claim or claims made therein to recover Losses, Trombley and the Applicable Claimant shall attempt in good faith to agree upon the rights of the respective parties with respect to each of such claims. If Trombley and the Applicable Claimant should so agree, a memorandum setting forth such agreement shall be prepared and signed by all parties.

(b)    In connection with any disagreement under Section 5.4(a) above on any claim or claims made to recover Losses, in the event no agreement can be reached under Section 5.4(a) after good faith negotiation and prior to sixty (60) days after delivery of a Notice of Claim, the Applicable Claimant or Trombley may demand arbitration of the matter unless the amount of the Losses is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration, and in either such event the matter shall be settled by arbitration conducted by one arbitrator mutually agreeable to the Applicable Claimant and Trombley.  In the event that, within thirty (30) days after submission of any dispute to arbitration, the Applicable Claimant and Trombley cannot mutually agree on one arbitrator, then within fifteen (15) days after the end of such thirty (30) day period, the Applicable Claimant and Trombley shall each select one arbitrator.  The two arbitrators so selected shall select a third arbitrator.  If either the Applicable Claimant or Trombley do not select an arbitrator during this fifteen (15) day period, then the parties agree that the arbitration will be conducted by the one arbitrator selected by the party that made such selection within the fifteen (15) day period.

(c)    Any such arbitration shall be held in San Francisco County, California, in accordance with JAMS rules then in effect.  The arbitrator(s) shall determine how all expenses relating to the arbitration shall be paid, including without limitation, the respective expenses of each party, the fees of each arbitrator, and any administrative fee of JAMS.  The arbitrator or arbitrators, as the case may be, shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, adequate in the sole judgment of the arbitrator or majority of the three arbitrators, as the case may be, to discover relevant information from the opposing parties about the subject matter of the dispute.  The arbitrator or a majority of the three arbitrators, as the case may be, shall rule upon motions to compel or limit discovery and shall have the authority to impose sanctions, including attorneys' fees and costs, to the extent as a competent court of law or equity, should the arbitrators or a majority of the three arbitrators, as the case may be, determine that discovery was sought without substantial justification or that discovery was refused or objected to without substantial justification.  The decision of the arbitrator or a majority of the three arbitrators, as the case may be, as to the validity and amount of any claim in such Notice of Claim shall be final, binding, and conclusive upon the parties to this Agreement.  Such decision shall be written and shall be supported by written findings of fact and conclusions which shall set forth the award, judgment, decree or order awarded by the arbitrator(s).  Within thirty (30) days of a decision of the arbitrator(s) requiring payment by one party to another, such party shall make the payment to such other party. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Such arbitration, all proceedings therein, and the final determination shall be confidential.  The parties further agree that this Agreement is intended to be strictly construed to provide for arbitration as the sole and exclusive means for resolution of all disputes hereunder to the fullest extent permitted by law.  The parties expressly waive any entitlement to have such controversies decided by a court or a jury.

21

5.5     Holdback.

(a)     By virtue of this Agreement the Purchaser will hold in escrow the Holdback Amount from Trombley in accordance with Section 1.2(b).  The Holdback Amount is not intended to be a cap on the indemnity obligations provided for in this Article V if any Losses suffered or incurred by the Primary Indemnified Parties exceed the Holdback Amount, but rather the Holdback Amount shall serve as partial security for the indemnity obligations provided for in this Article V.  The Holdback Amount shall be available to compensate the Primary Indemnified Parties for any Losses incurred or sustained by them and for which they are entitled to recovery under this Article V in respect of the Shelly Matter and any other lawsuit arising from the Shelly Matter.  Until and unless the Holdback Amount is released to Trombley pursuant to this Section 5.5, Trombley shall, and does hereby, pledge and grant a security interest in the Holdback Amount to the Purchaser (and its Affiliates) on its own behalf.

(b)     Except as set forth below, the period during which claims for Losses to be satisfied through the forfeiture of all or any portion of the Holdback Amount may be made under this Agreement shall commence at the Initial Closing and  continue through and including date upon which the Shelly Matter and any other lawsuit arising from the Shelly Matter is resolved to the reasonable satisfaction of the Purchaser including but not limited to a release of all claims in respect of the Shelly Matter and any lawsuit arising from the Shelly matter (the "**Holdback Period**").  On or before the fifteenth (15th) Business Day following the end of the Holdback Period (the "**Holdback Release Date**"), the Purchaser shall release to Trombley, through wire transfer to a bank account designated by Trombley in writing, an amount equal to the Holdback Amount minus amounts used and/or reasonably anticipated to be used for the Shelly Matter; if and when the Purchaser has reasonably determined that such amounts are no longer reasonably anticipated to be used for the Shelly matter, any amounts remaining will be released with fifteen Business Days of such determination to Trombley through a wire transfer to a bank account designated by Trombley in writing.

6.     Company Covenants.

6.1     Financials.  The Company hereby covenants and agrees that it and each of its subsidiaries will make financial records available to the Purchaser and its auditors whenever reasonably requested during normal business hours and upon reasonable advance written notice.

6.2     Anti-Corruption Laws.  The Company hereby covenants and agrees that in the event it becomes aware of any facts or circumstances giving it a reasonable, good faith belief or suspicion that any violation of an Anti-Corruption Law has or may occur or that any of these representations or warranties of the Company in Section 2.26, if made by the Company as of such date, have or will become false, it shall promptly notify the Purchaser of such in writing.  On receipt of such a written notice, or upon otherwise learning information giving it a good faith reasonable belief of any potential violation of an Anti-Corruption Law or that any of these representations or warranties of the Company in Section 2.26, if made by the Company as of such date, have become false, the Purchaser may withdraw from, terminate, suspend, or withhold any payments under this Agreement at any time and without liability.  Moreover, the Purchaser shall not be liable for any claims arising from, or related to, the unlawful activity, or claims alleging unlawful activity, of the Company or any of its subsidiaries, regardless of the nature or location of such activity.  The Company shall indemnify the Purchaser for all damages, penalties, and/or costs incurred in relation to claims arising from, or relating to, unlawful activity by the Company.

7.     Restrictions on Transfer; Right of First Refusal.

7.1     Restrictions on Transfer.

22

(a)     Except as permitted herein, Trombley agrees that he will not, directly or indirectly, voluntarily or involuntarily Transfer any of the Class A or Class B Non-Voting Common Stock owned by him.

(b)     The provisions of Section 7.1(a), shall not apply to any Transfer by Trombley without consideration of any shares of Class A or Class B Non-Voting Common Stock made for bona fide estate planning purposes to (i) his spouse, child (natural or adopted), sibling, or any other direct lineal antecedent or descendant of Trombley (or his or her spouse) (all of the foregoing collectively referred to as "family members"), or any other relative approved by the Company upon resolutions duly approved by the Board of Directors or (ii) any custodian or trustee of any trust, partnership or limited liability company solely for the benefit of, or the ownership interests of which are owned wholly by Trombley or any such family members.

(c)     In addition to any legends required by applicable law, each certificate representing the Class A or Class B Non-Voting Common Stock of the Company held by Trombley shall bear a legend substantially in the following form:

*"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER CONTAINED IN A STOCK PURCHASE AGREEMENT, A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE COMPANY."*

(d)     Prior to consummation of any Transfer by Trombley of Class A or Class B Non-Voting Common Stock, Trombley shall cause the transferee thereof to execute and deliver to the Company a Joinder Agreement and agree to be bound by the terms and conditions of this Agreement. Upon any Transfer by Trombley of any of his Class A or Class B Non-Voting Common Stock, in accordance with the terms of this Agreement, the transferee thereof shall be substituted for, and shall assume all the rights and obligations under this Agreement of, the transferor thereof.

(e)     Notwithstanding any other provision of this Agreement, Trombley agrees that he will not, directly or indirectly, Transfer any of his Class A or Class B Non-Voting Common Stock (i) except as permitted under the Securities Act and other applicable federal or state securities laws, and then, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act, (ii) if it would cause the Company or any of its subsidiaries to be required to register as an investment company under the Investment Company Act of 1940, as amended, or (iii) if it would cause the assets of the Company or any of its subsidiaries to be deemed plan assets as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company. In any event, the Board of Directors of the Company may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any governmental authority.

(f)     Any Transfer or attempted Transfer of any Common Stock in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported transferee in any such Transfer shall not be treated (and the purported transferor shall continue be treated) as the owner of such Class A or Class B Non-Voting Common Stock for all purposes of this Agreement.

(g)     The restrictions on transfer set forth in this Section 7.1 shall terminate upon the earlier to occur of (i) the two (2) year anniversary of the Initial Closing; (ii) the closing of a Sale Event; or (iii) the first sale of Common Stock of the Company to the general public pursuant to a registration

23

statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act.

      7.2    <u>Right of First Refusal</u>. Following the termination of the restrictions on transfer set forth in <u>Section 7.1</u>, in the event that Trombley desires at any time following the expiration of the  to Transfer all or any shares of Class A or Class B Non-Voting Common Stock, he shall first shall give written notice to the Purchaser of his intention to make such Transfer.  Such notice shall state the number of shares of Class A or Class B Non-Voting Common Stock that Trombley proposes to sell (the "**Offered Shares**"), the price and the terms at which the proposed sale is to be made and the name and address of the proposed transferee.  At any time within 30 Business Days after the receipt of such notice by the Purchaser, the Purchaser or its assigns may elect to purchase all or any portion of the Offered Shares at the price and on the terms offered by the proposed transferee and specified in the notice.  The Purchaser or its assigns shall exercise this right by mailing or delivering written notice to Trombley within the foregoing 30 Business Day period.  If the Purchaser or its assigns elect to exercise its purchase rights under this <u>Section 7.2</u> the closing for such purchase shall, in any event, take place within 45 Business Days after the receipt by the Purchaser of the initial notice from Trombley.  In the event that the Purchaser or its assigns do not elect to exercise such purchase right, or in the event that the Purchaser or its assigns do not pay the full purchase price within such 45 Business Day period (such later date, the "**Decline Date**"), Trombley may sell the Offered Shares to the proposed transferee and at the same price and on the same terms as specified in Trombley's notice, provided that, in the event that Trombley does not consummate such sale within sixty (60) Business Days from the Decline Date, the Offered Shares will be subject to the Purchaser's right of first refusal set forth herein.

      8.    <u>Observer Right</u>. From the date of this Agreement until the two-year anniversary of the Initial Closing, as long as Trombley owns any shares of Class A or Class B Non-Voting Common Stock (as adjusted for any stock split, stock dividend, combination, or other recapitalization or reclassification effected after the date hereof), the Company shall invite Trombley (or his authorized representative) to attend all meetings of the Board of Directors of the Company in a non-voting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that it provides to its directors; provided, however, that such representative shall agree to sign a non-disclosure agreement with the Company, hold in confidence and trust and to act in a fiduciary manner with respect to all information so provided; and provided further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest or if Trombley or his representative is reasonably deemed a competitor of the Company in the good faith judgment of the Board of Directors of the Company.  Such representative shall be bound by the same covenants as Trombley set forth in Section 4.

      9.    <u>Conditions to the Purchaser's Obligations at Closing</u>. The obligations of the Purchaser to purchase the Shares at the Initial Closing or make payments in respect of any subsequent Closing are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

      9.1    <u>Representations and Warranties</u>. The representations and warranties of the Company contained in <u>Section 2</u> shall be true and correct in all respects as of such Closing.

      9.2    <u>Performance</u>. The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such Closing.

9.3     <u>Compliance Certificate</u>. The President of the Company shall deliver to the Purchaser at such Closing a certificate certifying that the conditions specified in <u>Sections 9.1</u> and <u>9.2</u> have been fulfilled.

9.4     <u>Qualifications</u>. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of such Closing.

9.5     <u>Board of Directors</u>. As of the Initial Closing, the authorized size of the Board shall be one director, and the Board shall be initially comprised only of Roger Bayston.

9.6     <u>Authorized Officers</u>. As of the Initial Closing, the officers of the Company shall consist only of the following individuals, each holding the officer position(s) set forth across such individual's name: Roger Bayston – Interim President, Interim Secretary, Interim Treasurer and Interim Chief Executive Officer.

9.7     <u>Restated Certificate</u>. The Company shall have filed the Restated Certificate with the Secretary of State of Delaware on or prior to the Initial Closing, which shall continue to be in full force and effect as of the Initial Closing.

9.8     <u>Secretary's Certificate</u>. The Secretary of the Company shall have delivered to the Purchaser at the Initial Closing a certificate certifying (i) the Bylaws of the Company, (ii) resolutions of the Board of Directors of the Company approving this Agreement and the transactions contemplated under this Agreement, and (iii) resolutions of the stockholders of the Company approving the Restated Certificate.

9.9     <u>Proceedings and Documents</u>. All corporate and other proceedings in connection with the transactions contemplated at the Closing and all documents incident thereto shall be reasonably satisfactory in form and substance to the Purchaser, and the Purchaser (or its counsel) shall have received all such counterpart original and certified or other copies of such documents as reasonably requested. Such documents may include good standing certificates.

10.     <u>Conditions of the Company's Obligations at Closing</u>. The obligations of (i) Trombley to sell the Voting Stock; and (ii) the Company to sell the Non-Voting Stock and Note Stock to the Purchaser at the Initial Closing are subject to the fulfillment, on or before the Initial Closing, of each of the following conditions, unless otherwise waived:

10.1     <u>Representations and Warranties</u>. The representations and warranties of the Purchaser contained in <u>Section 3</u> shall be true and correct in all respects as of the Initial Closing.

10.2     <u>Performance</u>. The Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by it on or before the Initial Closing.

10.3     <u>Qualifications</u>. All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Shares pursuant to this Agreement shall be obtained and effective as of the Initial Closing.

11.    <u>Miscellaneous.</u>

11.1    <u>Survival of Warranties</u>. Unless otherwise set forth in this Agreement, the representations and warranties of the Company and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closings and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Purchaser or the Company.

11.2    <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

11.3    <u>Governing Law</u>. This Agreement shall be governed by the internal law of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

11.4    <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

11.5    <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

11.6    <u>Notices</u>. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt, or (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page or <u>Exhibit A</u>, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this <u>Section 11.6.</u> If notice is given to the Company, a copy shall also be sent to Latham & Watkins, 10250 Constellation Blvd., Suite 1100, Los Angeles, CA 90067, Attn: David Ajalat, and if notice is given to the Purchaser, a copy shall also be given to Goodwin Procter LLP, 601 Marshall Street Redwood City, CA 94063, Attn: Caine Moss and Mitzi Chang.

11.7    <u>No Finder's Fees</u>. Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. The Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees or representatives is responsible. The Company agrees to indemnify and hold harmless the Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or

any of its officers, employees or representatives is responsible.

11.8   Fees and Expenses. Within thirty (30) days of the Initial Closing, the Company shall pay the then-outstanding fees and expenses of Sidley Austin LLP with respect to its advice on behalf of TokenVault Limited and the Company.

11.9   Attorneys' Fees. If any action at law or in equity (including, arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

11.10   Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company, Trombley and the Purchaser.

11.11   Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

11.12   Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

11.13   Entire Agreement. This Agreement (including the Exhibits hereto), the Restated Certificate constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

11.14   Corporate Securities Law. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM THE QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED UNLESS THE SALE IS SO EXEMPT.

11.15   Dispute Resolution.  Except as otherwise set forth herein, the parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Delaware and to the jurisdiction of the United States District Court for the District of Delaware for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Delaware or the United States District Court for the District of Delaware and (c) hereby waive, and agree not to assert,

27

by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL

11.16   No Commitment for Additional Financing. Each of the Company and Trombley acknowledges and agrees that the Purchaser has not made any representation, undertaking, commitment or agreement to provide or assist the Company or Trombley in obtaining any financing, investment or other assistance, other than the purchase of the Shares as set forth herein and subject to the conditions set forth herein. In addition, each of the Company and Trombley acknowledges and agrees that (i) no statements, whether written or oral, made by the Purchaser or its representatives on or after the date of this Agreement shall create an obligation, commitment or agreement to provide or assist the Company or Trombley in obtaining any financing or investment, (ii) the Company shall not rely on any such statement by the Purchaser or its representatives, and (iii) an obligation, commitment or agreement to provide or assist the Company or Trombley in obtaining any financing or investment may only be created by a written agreement, signed by the Purchaser and the Company or Trombley, as applicable, setting forth the terms and conditions of such financing or investment and stating that the parties intend for such writing to be a binding obligation or agreement. The Purchaser shall have the right, in its sole and absolute discretion, to refuse or decline to participate in any other financing of or investment in the Company or Trombley, and shall have no obligation to assist or cooperate with the Company in obtaining any financing, investment or other assistance.

11.17   Right to Conduct Activities. The Company hereby agrees and acknowledges that the Purchaser (together with its Affiliates) is a professional investment organization, and as such reviews the business plans and related proprietary information of many enterprises, some of which may compete directly or indirectly with the Company's business (as currently conducted or as currently propose to be conducted).  The Company hereby agrees that, to the extent permitted under applicable law, the Purchaser and its Affiliates shall not be liable to the Company for any claim arising out of, or based upon, (i) the investment by the Purchaser or any of its Affiliates in any entity competitive with the Company, or (ii) actions taken by any partner, officer, employee or other representative of the Purchaser or its Affiliates to assist any such competitive company, whether or not such action was taken as a member of the board of directors of such competitive company or otherwise, and whether or not such action has a detrimental effect on the Company; provided, however, that the foregoing shall not relieve (x) the Purchaser from liability associated with the unauthorized disclosure of the Company's confidential information obtained pursuant to this Agreement or (y) any director or officer of the Company from any liability associated with his or her

28

fiduciary duties to the Company.

IN WITNESS WHEREOF, the parties have executed this Stock Purchase Agreement as of the date first written above.

COMPANY: ToKenVault Inc.

By: _Aaron Tran_____

Name: _Aaron Travis_____
        (print)

Title: _President_____

Address: 537 Stevenson St.
         Suite 200
         San Francisco, CA 94103


AUSTIN TROMBLEY

_Austin Trombly_____
Signature

Name: _Austin   Trombly_
        (print)

Address: _537   Stevenson St_

_San Francisco, CA 94103_

[Signature Page to Stock Purchase Agreement]

PURCHASER:

_____

(Print Name of Purchaser)


By:_____


Name:_____

                            (print)


Title:_____


Address:_____


_____

## <u>EXHIBITS</u>

<u>Exhibit A</u> -           **SCHEDULE OF PURCHASER**

<u>Exhibit B</u> -           **FORM OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

<u>EXHIBIT C</u> -          **DISCLOSURE SCHEDULE**

EXHIBIT A

**SCHEDULE OF PURCHASER**

**Initial Closing: October [  ], 2019**

| Purchaser | Voting Common Stock Purchased | Class A Non-Voting Common Stock Purchased | Cash Consideration at Initial Closing | Note Conversion Balance |
|---|---|---|---|---|
| **FT Fintech Holdings, LLC** | 1,000 shares | | $3,000,000.00 | |
| **FT Fintech Holdings, LLC** | | 2,200,000 shares | $5,500,000.00 | |
| **FT Fintech Holdings, LLC** | | 605,137 shares[1] | | $1,500,000 |
| **Total** | 1,000 shares | 2,805,137 shares | $8,500,000.00 | $1,500,000 |

---

[1] NTD: Reflecting interest through Oct 24, 2019.

EXHIBIT B

**FORM OF AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION**

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
TOKENVAULT, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

TokenVault, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

**1.** That the name of this corporation is TokenVault, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on September 25, 2019.

**2.** That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is TokenVault, Inc. (the "**Corporation**").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801. The name of its registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:** The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 1,000 shares of Voting Common Stock, $0.001 par value per share ("**Voting Common Stock**"), (ii) 8,385,909 shares of Class A Non-Voting Common Stock, $0.001 par value per share ("**Class A Non-Voting Common Stock**") and (iii) 3,914,162 shares of Class B Non-Voting Common Stock, $0.001 par value per share ("**Class B Non-Voting Common Stock**", and together with the Class A Non-Voting Common Stock, the "**Non-Voting Common Stock**"). The Voting Common Stock and Non-Voting Common Stock are referred to herein as the "**Common Stock**".

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.    VOTING COMMON STOCK

1.    <u>Voting</u>.  The holders of the Voting Common Stock are entitled to one vote for each share of Voting Common Stock held at all meetings of stockholders (and written actions in lieu of meetings).

2.    <u>Redemption</u>.  Shares of the Voting Common Stock shall not be subject to any redemption by the Corporation.

B.    NON-VOTING COMMON STOCK

1.    <u>Voting</u>.  The holders of the Non-Voting Common Stock shall not be entitled to any vote on any matters of the Corporation, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.    <u>Redemption</u>.

2.1    <u>Redemption of Class A Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall only be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors of the Corporation determines that it is a securities law violation for one or more holders of the Class A Non-Voting Common Stock to hold such shares.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.2    <u>Redemption of Class B Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors so elects, in its sole discretion, to effectuate such redemption.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.3    <u>Redemption Price; Terms of Payment</u>.  Unless prohibited by Delaware law governing distributions to stockholders, any shares of Non-Voting Common Stock to be redeemed in accordance with this Section 2 (such shares, "**Shares Subject to Redemption**") shall be redeemed by the Corporation at a price equal to their original issue price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**").  The date of payment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date.**"  On the Redemption Date, the Corporation shall redeem all outstanding shares of Non-Voting Common Stock constituting Shares Subject to Redemption for cash.  If on any Redemption Date, Delaware law governing distributions to stockholders or other applicable law prevents the Corporation from redeeming all Shares Subject to Redemption, then the Corporation shall redeem the maximum number of shares that it may redeem consistent with such law, which shall be effectuated on a pro rata basis based upon the number of shares held by each holder of Non-Voting

2

Common Stock constituting Shares Subject to Redemption, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

2.4     Redemption Notice.  The Corporation shall send written notice of the mandatory redemption (the "**Redemption Notice**") to each holder of record of Shares Subject to Redemption not less than thirty (30) days prior to the applicable Redemption Date.   Each Redemption Notice shall state:

(a)     the number of shares of Non-Voting Common Stock held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)     the Redemption Date and the Redemption Price; and

(c)     for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Non-Voting Common Stock to be redeemed.

2.5     Surrender of Certificates; Payment.  On or before the applicable Redemption Date, each holder of shares of Non-Voting Preferred Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.  In the event less than all of the shares of Non-Voting Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Non-Voting Common Stock shall promptly be issued to such holder.

2.6     Rights Subsequent to Redemption.  If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Non-Voting Common Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Non-Voting Common Stock so called for redemption shall not have been surrendered, any dividends with respect to such shares of Non-Voting Common Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such  certificate or certificates therefor.

3.     Redeemed or Otherwise Acquired Shares.  Any shares of Non-Voting Common Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued,

sold or transferred.  Neither the Corporation nor any of its subsidiaries may exercise any rights granted to the holders of Non-Voting Common Stock following redemption.

4. <u>Waiver</u>.  Any of the rights, powers, preferences and other terms of the Common Stock set forth herein may be waived on behalf of all holders of Common Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of Voting Common Stock then outstanding.

5. <u>Notices</u>.  Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Common Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

6. <u>Other Rights, Preferences and Privileges</u>.  Except as expressly set forth in Section 2 of this Article Fourth, Part B, with respect to redemption, the rights, preferences and privileges of the Class A Non-Voting Common Stock and the Class B Non-Voting Common Stock shall be identical.

C. PAYMENTS TO HOLDERS OF COMMON STOCK UPON LIQUIDATION.

1. <u>General</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Common Stock shall be distributed upon the holders of Common Stock, pro rata based upon the number of shares held by each such holder.

2. <u>Deemed Liquidation Event</u>.  For purposes of Section 1 above, each of the following events shall be deemed to be a liquidation, dissolution or winding up of the Corporation: (a) a merger or consolidation in which the Corporation is a constituent party; (b) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation; except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (c) (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

4

**FIFTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation; provided, that the number of directors shall be no less than one (1) and no greater than three (3). Each director shall be entitled to one vote on each matter presented to the Board of Directors.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

5

**ELEVENTH:**  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding anything to the contrary contained elsewhere in this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the shares of the Voting Common Stock the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

**TWELFTH:**  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Amended and Restated Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any

other consent required under this Amended and Restated Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code).  Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

\* \* \*

**3.**    That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

**4.**    That this Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

**IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 24th day of October, 2019.

By:   /s/ Aaron Travis
Aaron Travis, President

7

EXHIBIT C

**DISCLOSURE SCHEDULE**[2]

This Schedule of Exceptions is made and given pursuant to Section 2 of the Stock Purchase Agreement, dated as of October [ ], 2019 (the "**Agreement**"), among TokenVault, Inc. (the "**Company**"), Austin Trombley ("**Trombley**")) and the Purchaser listed on Schedule A thereto. All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided. The section numbers below correspond to the section numbers of the representations and warranties in the Agreement; provided, however, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated into any other section number under the Agreement where such disclosure would be appropriate and such appropriateness is reasonably apparent from the face of such disclosure. Nothing in this Schedule of Exceptions is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant. Inclusion of any item in this Schedule of Exceptions (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, and (4) shall not constitute, or be deemed to be, an admission to any third party concerning such item. This Schedule of Exceptions includes brief descriptions or summaries of certain agreements and instruments; such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described, true and complete copies of which have been provided to the Purchaser or its counsel.

**Section 2.2(c):  Capitalization of the Company immediately following the Initial Closing.**

See attached capitalization table.

**Section 2.8:  Intellectual Property.**

**Domain Names**:

tokenvault.io
274kelvin.com
thetokenvault.com
blockvault.com
vaultblock.in
vaultbank.io
walletquarentine.com
tokenvault.com
tokevault.us

---

[2] NTD: Company to update per latest comments to the APA Disclosure Schedule

**Patents:**

**PORTFOLIO MANAGEMENT WITH SMART CONTRACTS**

**US Provisional Patent Application Serial Number: 62/874,081**

**US Provisional Patent Application Serial Number 62/788,012**

**Code Base**:

Below is a detailed list of Seller's software applications.

| | | |
|---|---|---|
| Code base for Tokenvault's main Android App.<br><br>1. Tokens trading interface<br><br>2. Free Stock trading interface<br><br>3. P2P (venmo like) and merchant bill payment interface<br><br>4. Tax and monthly statement reporting interface | | |
| Code base for Tokenvault's main iOS App.<br><br>1. Tokens trading interface<br><br>2. Free Stock trading interface<br><br>3. P2P (venmo like) and merchant bill payment interface<br><br>4. Tax and monthly statement reporting interface | | |
| Code base for Tokenvault's main backend API. It contains all the main services and integration with third parties<br><br>1. Integration with SynpaseFi<br><br>2. Integration with Drivewealth<br><br>3. Integration with iDVCheck for KYC<br><br>4. Integration with Franklin Investar<br><br>5. Integration with Biometrics from AWS<br><br>among others | | |

| | | |
|---|---|---|
| Code base for Tokenvault's tax and reporting backend platform | | |
| Code base for Tokenvault's HSM api using pkcs11 interface. | | |
| Code base for Tokenvault's 3c7 (Tokenization interface for 3c7 funds) Electron app which runs on all platforms (windows, linux and mac) | | |
| Code base for Tokenvault's web based monthly reporting and taxation frontend | | |
| Code base for Tokenvault's Merchant side Poynt app | | |
| Code base for Tokenvault's customer side poynt app | | |
| Code base for Tokenvault's NFC communication for HSM packets. | | |
| Code base for Tokenvault's web based frontend for 3c7. | | |
| Code base for Tokenvault's backend for 3c7 mainly containing the ledger nano s integration | | |
| Code base for reading and writing Flash based storage directly from USB interface rather than OS filesystem. | | |
| EOS multisig wallet for 274 Kelvin | | |
| ETH, ERC20 and ETC multisig wallet for 274 Kelvin | | |
| BTC, BTG, BCH, ZEC, LTC, DOGE multisig wallets for 274 Kelvin | | |
| XRP multisig wallet for 274 Kelvin | | |

**Section 2.16(a):  Compensation Information.**

See attached Excel file.

4

**Section 2.16(g):  Employee Benefit Plans.**

Benefit Plans provided through TriNet:

**PLAN INFORMATION Name of the Plan**

TriNet HR IV, LLC. Employee Benefit Plan

**Plan Number**

501

**Type of Plan**

The Plan is a welfare plan providing fully insured health, dental, vision, life, accidental death and dismemberment and disability benefits, and self-insured dental, vision and health care and dependent day care flexible spending accounts.

**Payment of Plan Expenses**

Plan expenses are paid through the TriNet Employee Benefit Insurance Trust and TriNet's general assets, which is operated for the exclusive benefit of TriNet employees.

**Plan Sponsor and Plan Administrator**

The Plan Sponsor and Plan Administrator is TriNet HR IV, LLC. TriNet HR IV, LLC is responsible for determining Plan eligibility and the day-to-day management of the plans. Some Plan eligibility determinations may be based on information received from you or your Worksite.

TriNet HR IV, LLC One Park Place Suite 600
Dublin, CA 94568 510.352.5000


**Service of Legal Process**

TriNet's agent for service of process is Corporate Creations Network Inc. Corporate Creations Network Inc. has locations across the country.

Corporate Creations Network Inc. 4640 Admiralty Way
5th Floor
Marina Del Rey, CA 90292 800.672.9110

Legal process also may be served properly on the Plan at:

TriNet HR IV, LLC
Attn: Chief Legal Officer One Park Place
Suite 600
Dublin, CA 94568 510.352.5000

**Benefits Plan Year**

The benefits plan year begins on October 1, 2019 and ends on September 30, 2020.

5

<u>SCHEDULE A – MILESTONES I</u>

1. The Company to establish a management team approved by the Purchaser (the "**Management Team**"). The Management Team to include leadership positions in the areas of:

   a. Operations
   b. Technology
   c. Information Security
   d. Legal and Compliance
   e. Product Management
   f. Revenue Generation and Business Development

   The Management Team will oversee:

   a. Day to day operating of the business of the Company
   b. Strategy, prioritization and oversight of development activities
   c. Critical business development milestone management
   d. Coordination of regulatory filings, compliance, and audits
   e. Regular established status reporting and updates to the Purchaser, including financial reporting and agreed upon business milestone progress reporting
   f. Issue and mitigation management

2. DeX (Decentralized Exchange) and P2P Payments live
   a. UI/UX completed and approved by Purchaser. Product management team established.
   b. 3rd party penetration tests completed with no finding or issues
   c. Compliance certification completed for mobile and web apps
   d. Biometric Authentication integrated into mobile and web apps
   e. Customer Service model operational (either by internally developed team or third-party provider)
   f. Engaged and contracted with liquidity providers
   g. P2P, USD and Crypto payments live on DeX

3. "Day 1" Transfer Agent (TA) interface capabilities
   a. Develop and complete interface capabilities with Purchaser's TA system and/or third party provider(s). Complete end to end testing of the workflow to support the foundational efforts to enable the tokenized money fund
   b. Enroll and engaged regulators with proof of concept; obtain approval for the use of the record keeping system in support of tokenized product offerings.
   c. Operational and customer support established for Stellar and incumbent recordkeeping systems prior to launch.

4. Digital Asset Custody Enablement

   a. Obtain or develop cold storage capability and digital wallet insurance prior to public launch
   b. Digital Asset Custody Production ready for public launch
   c. Penetration tests completed with no major issues or findings
   d. Compliance certificate and third-party audits completed for security infrastructure. SOC-2 Type 1 audit successfully completed with no major findings on internal

6

technology developed, internal business processes and any 3rd party dependent service components.

5. Capabilities to enable private tokenized fund vehicle platform and 1940 Act registered investment company/U.S. mutual fund offering on TokenVault Platform
    a. Review of all components required to support mutual fund offering on the platform
    b. Establish a development plan and timeline commitment
    c. Public filing submitted and accepted by the SEC
    d. Full functionality supported across all major architectural components

<u>SCHEDULE B – MILESTONES II</u>

1. Money Transmitter Licenses (MTL) and virtual currency licenses.
    a. Submitted MTL applications in New York and California.
    b. Remain in good standing for all other state MTL's
    c. Submitted BitLicense application issued by the New York State Department of Financial Services.
    d. Integration with various liquidity providers such as Binance, Gemini and others

2. Security Certifications
    a. Achieve ISO/IEC 27001 certification of complete technology environment (including: Development Environment/Practices, Information Security Management System (ISMS) covering inhouse and outsourced infrastructure, data centers, and associated services including Digital Custody Solution (Cold Storage), Decentralized Exchange (running on AWS) and general operations
    b. Achieve ISO/IEC 27018:2014 – For internally developed secure storage and management of a customer's both general and non-public PII (such as SSN, bank account numbers, etc.) in a Cloud Environment or on 3rd party outsource providers environment.
    c. Successful Completion of SOC 2 Type 2 Audit with no findings.

**EXHIBIT B**

**<u>Asset Purchase Agreement</u>**

[See attached]

*Execution Copy*
**CONFIDENTIAL**

**ASSET PURCHASE AGREEMENT**

**by and between**

**TOKENVAULT, INC.**

**and**

**TOKENVAULT LIMITED**

**Dated as of October 28, 2019**

TABLE OF CONTENTS

Article 1          DEFINITIONS; INTERPRETATION ................................................................1
    1.1      Certain Definitions ..........................................................................................1
    1.2      Interpretation ..................................................................................................1

Article 2          PURCHASE AND SALE ..............................................................................2
    2.1      Purchase and Sale of Transferred Assets .......................................................2
    2.2      Transferred Assets ..........................................................................................2
    2.3      Excluded Assets ..............................................................................................4
    2.4      Assumed Liabilities .........................................................................................5
    2.5      Retained Liabilities .........................................................................................5
    2.6      Closing..............................................................................................................5
    2.7      Prorations.........................................................................................................6
    2.8      Title and Risk .................................................................................................6
    2.9      Remote Transfer ..............................................................................................6
    2.10     Return of Buyer Non-Voting Shares ..............................................................6

Article 3          REPRESENTATIONS AND WARRANTIES OF SELLER ...........................7
    3.1      Status of Seller and the Seller Subsidiaries ...................................................7
    3.2      Authorization; No Conflicts ...........................................................................7
    3.3      Financial Matters .............................................................................................8
    3.4      Taxes ................................................................................................................8
    3.5      Real and Personal Property .............................................................................8
    3.6      Intellectual Property and Technology .............................................................9
    3.7      Material Contracts ..........................................................................................11
    3.8      General Employee Matters; Benefit Plans and Benefits ...............................13
    3.9      Litigation and Other Proceedings..................................................................16
    3.10     Compliance with Laws ..................................................................................16
    3.11     Data Privacy. .................................................................................................17
    3.12     FCPA. .............................................................................................................18
    3.13     Assets Complete; Title ..................................................................................18
    3.14     No Other Representations or Warranties........................................................18

Article 4          REPRESENTATIONS AND WARRANTIES OF Buyer ..............................19
    4.1      Status of Buyer ..............................................................................................19
    4.2      Authorization; No Conflicts ..........................................................................19
    4.3      Litigation .......................................................................................................20

ACTIVE 245910556

|  | 4.4 | Independent Investigation | 20 |

| Article 5 | | COVENANTS | 20 |
|  | 5.1 | Conduct of Business by Seller | 21 |
|  | 5.2 | Affirmative Covenants Relating to Seller | 22 |
|  | 5.3 | Consents and Closing Conditions | 22 |
|  | 5.4 | Maintenance of Books and Records | 23 |

| Article 6 | | TAX MATTERS | 23 |
|  | 6.1 | Proration of Taxes | 23 |
|  | 6.2 | Cooperation on Tax Matters | 24 |
|  | 6.3 | Tax Proceedings | 25 |
|  | 6.4 | Tax Consequences. | 25 |

| Article 7 | | EMPLOYEE MATTERS | 25 |
|  | 7.1 | Employment of Transferred Employees | 25 |
|  | 7.2 | Credit for Service; Welfare Benefits | 25 |
|  | 7.3 | Third Party Rights; Amendments to Employee Plans | 26 |

| Article 8 | | BUYER'S CONDITIONS TO CLOSING | 26 |
|  | 8.1 | Representations and Warranties | 26 |
|  | 8.2 | Performance of Covenants | 27 |
|  | 8.3 | No Litigation | 27 |
|  | 8.4 | No Orders | 27 |
|  | 8.5 | Material Adverse Effect | 27 |
|  | 8.6 | Closing Documents | 27 |
|  | 8.7 | Consents | 27 |
|  | 8.8 | Frustration of Closing Conditions | 27 |
|  | 8.9 | No Injunctions | 27 |
|  | 8.10 | No Laws or Orders | 27 |

| Article 9 | | SELLER'S CONDITIONS TO CLOSING | 27 |
|  | 9.1 | Representations and Warranties | 28 |
|  | 9.2 | Performance of Covenants | 28 |
|  | 9.3 | No Litigation | 28 |
|  | 9.4 | No Orders | 28 |
|  | 9.5 | Closing Documents | 28 |
|  | 9.6 | Frustration of Closing Conditions | 28 |

ACTIVE 245910556

| | | |
|---|---|---|
| Article 10 | ITEMS TO BE DELIVERED AT CLOSING | 28 |
| 10.1 | Items to be Delivered by Seller | 28 |
| 10.2 | Items to be Delivered by Buyer | 29 |
| Article 11 | TERMINATION | 29 |
| 11.1 | Termination by Mutual Consent | 29 |
| 11.2 | Termination by either Buyer or Seller | 29 |
| 11.3 | Termination by Buyer | 30 |
| 11.4 | Termination by Seller | 30 |
| 11.5 | Notice of Termination | 30 |
| 11.6 | Effect of Termination and Abandonment | 30 |
| Article 12 | SURVIVAL; INDEMNIFICATION | 30 |
| 12.1 | Survival | 30 |
| 12.2 | Indemnification by Seller | 31 |
| 12.3 | Indemnification by Buyer | 31 |
| 12.4 | Notice of Claims | 31 |
| 12.5 | Adjustment to Indemnified Party's Losses; Limitations | 33 |
| 12.6 | Exclusive Remedy | 34 |
| Article 13 | MISCELLANEOUS | 34 |
| 13.1 | Notices | 34 |
| 13.2 | Amendment | 35 |
| 13.3 | Counterparts | 35 |
| 13.4 | Binding on Successors and Assigns | 35 |
| 13.5 | Severability | 36 |
| 13.6 | Waivers | 36 |
| 13.7 | Headings | 36 |
| 13.8 | Entire Agreement | 36 |
| 13.9 | Choice of Law | 36 |
| 13.10 | Venue | 36 |
| 13.11 | Waiver of Jury Trial Rights | 37 |
| 13.12 | No Third-Party Rights | 37 |
| 13.13 | Transfer Taxes | 37 |
| 13.14 | Expenses | 37 |
| 13.15 | Specific Performance | 37 |
| 13.16 | No Recourse | 38 |

ACTIVE 245910556

<u>EXHIBITS AND SCHEDULES</u>

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of IP Assignments |
| Schedule A | Definitions |
| Schedule B | Business Employees |
| Disclosure Schedule | Disclosure Schedule |

-iv-

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), is made as of October 28, 2019, by and between TokenVault Limited, a company incorporated under the laws of Singapore ("Seller"), on the one hand, and TokenVault, Inc., a Delaware corporation ("Buyer"), on the other hand.

## RECITALS

WHEREAS, Seller, directly or indirectly through certain of its wholly owned subsidiaries (collectively, the "Seller Subsidiaries"), engages in the Business;

WHEREAS, Seller wishes to sell and transfer, and cause the Seller Subsidiaries to sell and transfer, to Buyer, and Buyer wishes to purchase and receive from Seller and the Seller Subsidiaries, all of the Transferred Assets, upon the terms and subject to the conditions of this Agreement;

WHEREAS, Buyer has agreed to assume from Seller and the Seller Subsidiaries the Assumed Liabilities, upon the terms and subject to the conditions of this Agreement; and

WHEREAS, each of the parties hereto desires to set forth certain representations, warranties and covenants, and to establish certain closing conditions, made to induce the others to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS; INTERPRETATION

1.1     Certain Definitions.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings set forth in Schedule A attached to this Agreement.

1.2     Interpretation.  The words "hereof," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Terms defined in the singular shall have correlative meanings when used in the plural, and vice versa.  The use of the word "or" shall not be exclusive unless expressly indicated otherwise.  Any reference to "days" means calendar days unless Business Days are expressly specified.  The word "party" shall, unless the context otherwise requires, be construed to mean a party to this Agreement.  Any reference to a party to this Agreement or any other agreement or document contemplated hereby shall include such party's successors and permitted assigns.  The word "will," when referring to an action by a

-1-

party, shall be construed to have the same meaning and effect as the word "shall." Unless otherwise specifically indicated, all references to "dollars" or "$" shall refer to the lawful currency of the United States. The headings herein are for convenience of reference only, do not constitute part of this Agreement, and shall not be deemed to limit or otherwise affect any of the provisions hereof. Where a reference in this Agreement is made to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized term used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Unless otherwise specifically indicated, any agreement or instrument defined or referred to herein or in any agreement or instrument that is referred to herein shall mean such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

## ARTICLE 2
## PURCHASE AND SALE

2.1     Purchase and Sale of Transferred Assets. At the Closing and except as otherwise specifically provided in this Article 2, upon and subject to the terms and conditions of this Agreement:

(a)     Seller agrees to, and agrees to cause the Seller Subsidiaries to, grant, sell, convey, assign, transfer and deliver to Buyer, and Buyer agrees to purchase, acquire and accept from Seller and the Seller Subsidiaries, all right, title and interest in the Transferred Assets as of the Closing, free and clear of all Liens other than Permitted Encumbrances; and

(b)     in consideration for the conveyance of the Transferred Assets, Buyer agrees to (i) issue to Seller a number of voting and non-voting shares of the Buyer equal to 7,606,610 non-voting shares of Buyer (the "Buyer Non-Voting Shares") and (ii) assume the Assumed Liabilities. The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "Acquisition."

2.2     Transferred Assets. The term "Transferred Assets" means all of Seller's and the Seller Subsidiaries' right, title and interest in, to and under the following assets, properties and rights, wherever located, whether tangible or intangible, accrued or contingent, as they exist as of the time of Closing, in each case, other than (A) the Excluded Assets, and (B) as otherwise provided in this Section 2.2 (but in each case excluding any tangible embodiment of assets transmitted electronically at or after Closing pursuant to Section 2.9):

(a)     subject to Section 2.3, all contracts, licenses, indentures, agreements, commitments, statements of work and other legally binding written instruments or arrangements (collectively, "Contracts") set forth on Section 2.2(a) of the Disclosure Schedule and all other Contracts to which Seller or any of the Seller Subsidiaries is a party or by which Seller or any of the Seller Subsidiaries is bound that are used or held for use primarily in the operation or conduct of the Business as currently conducted (the "Transferred Contracts");

-2-

(b)  all rights, Claims and causes of action of Seller or any of the Seller Subsidiaries to the extent arising out of, relating to or in respect of any Transferred Asset or any Assumed Liability, other than (i) any such items arising under insurance policies of Seller or any of the Seller Subsidiaries (other than the amount of, and any rights to, any insurance proceeds received by Seller or any of the Seller Subsidiaries after the Closing on account of losses that occurred with respect to the Transferred Assets or the Assumed Liabilities prior to or after the Closing), and (ii) all of Seller's or any of the Seller Subsidiaries' rights to assert Claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, in law or in equity (collectively, "Seller Claims"), that Seller or any of the Seller Subsidiaries, in any capacity, ever had, now has or may or shall have in the future, whether known or unknown, arising out of, relating to or in respect of (A) the Business' purchase or procurement of any good, service or product or (B) Seller's or any of the Seller Subsidiaries' purchase or procurement of any good, service or product for, or on behalf of, the Business, in either case of clauses (A) or (B), at any time up until the Closing and not relating to an Assumed Liability, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Seller Claims;

(c)  to the extent permitted by Law, all personnel and employment records that relate to the Transferred Employees; provided that, Seller shall, to the extent allowed by Law, be permitted to retain copies thereof;

(d)  all Patents, registered Marks, registered Copyrights, domain names, and applications for any of the foregoing that are set forth on Section 2.2(d) of the Disclosure Schedule (the "Transferred Registered IP"), including all rights of Seller and the Seller Subsidiaries to receive payments with respect to such Transferred Registered IP accruing after the Closing;

(e)  all Intellectual Property (other than the Transferred Registered IP) owned by Seller or any Seller Subsidiary that is used or held for use in the operation or conduct of the Business as currently conducted as set forth on Section 2.2(e) of the Disclosure Schedule (collectively, and collectively with the Transferred Registered IP, the "Transferred Intellectual Property"), including all rights of Seller and the Seller Subsidiaries to receive payments with respect to such Transferred Intellectual Property accruing after the Closing, and all Technology owned by Seller or any Seller Subsidiary that is used or held for use primarily in the operation or conduct of the Business as currently conducted, including the items that are set forth on Section 2.2(f) of the Disclosure Schedule (and any source code and tangible embodiments thereof) (collectively, the "Transferred Technology");

(f)  all guarantees, warranties, indemnities and similar rights in favor of Seller or any Seller Subsidiary in respect of any Transferred Asset or any Assumed Liability;

(g)  all goodwill, going concern value and other intangible assets generated by, or primarily related to or primarily associated with the Business;

(h)  certain leaseholds in or leases of real property and other interests in real property of Seller or any of the Seller Subsidiaries to be transferred to Buyer as set forth on Section 2.2(h) of the Disclosure Schedule (collectively, the "Transferred Leases");

-3-

(i)     the assets specifically identified on Section 2.2(i) of the Disclosure Schedule, the delivery of which shall be effectuated by mutual agreement of Seller and Buyer; and

(j)     all outstanding shares or other equity interests of the Seller Subsidiaries identified on Section 2.2(j) of the Disclosure Schedule.

2.3     Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Transferred Assets shall not include any assets or rights other than the assets or rights specifically listed or described in Section 2.2.  Without limiting the generality of the foregoing, the Transferred Assets shall not include any of the following (collectively, the "Excluded Assets"):

(a)     all cash, cash equivalents or securities of Seller or any of the Seller Subsidiaries other than as set forth on Section 2.2(i) of the Disclosure Schedule;

(b)     all rights, Claims and causes of action of Seller or any of the Seller Subsidiaries to the extent arising out of, relating to or in respect of any Excluded Asset or any Retained Liability, and any and all other Seller Claims, along with any and all recoveries by settlement, judgment or otherwise in connection with any such Seller Claims;

(c)     all guarantees, warranties, indemnities and similar rights in favor of Seller or any of the Seller Subsidiaries in respect of any Excluded Asset or any Retained Liability;

(d)     personnel and employment records for employees and former employees of the Business who are not Transferred Employees;

(e)     any shares of capital stock or other equity interests of Seller, any Seller Subsidiary or any of their respective Affiliates;

(f)     any Tax refunds or credits, claims for Tax refunds or credits or rights to receive Tax refunds or credits from any Governmental Authority with respect to the Business or the Transferred Assets for, or applicable to, any taxable period (or portion of any Straddle Period) ending on or prior to the Closing Date;

(g)     any records (including accounting records) related to Income Taxes paid or payable by Seller, any of the Seller Subsidiaries or any of their respective Affiliates and all financial and Income Tax records relating to the Business that form part of Seller's, any of the Seller Subsidiaries' or any of their respective Affiliates' general ledger;

(h)     all intracompany accounts (payables and receivables) of Seller and its Affiliates;

(i)     all rights of Seller or any of the Seller Subsidiaries under this Agreement, the Other Agreements and any other agreements, certificates and instruments delivered in connection with this Agreement and the Other Agreements; and

-4-

(j)      all rights with respect to or arising under the Excluded Assets, except as may otherwise be specifically provided in this Agreement.

2.4      <u>Assumed Liabilities</u>.  At the Closing hereunder and except as otherwise specifically provided in this <u>Section 2.4</u>, Buyer shall assume and shall timely pay, perform and discharge when due, all Liabilities, in each case, to the extent such Liabilities arise primarily out of or otherwise primarily relate to the Business or the Transferred Assets as set forth in this <u>Section 2.4</u> (collectively, the "<u>Assumed Liabilities</u>"):

(a)      all Liabilities agreed to be performed by Buyer pursuant to the terms of this Agreement or any of the Other Agreements;

(b)      all Liabilities with respect to a Transferred Employee that arise on or after the time such Transferred Employee becomes an employee of Buyer;

(c)      all Liabilities arising under the Transferred Contracts, Transferred Leases, Transferred Technology, and Transferred Intellectual Property, to the extent arising from or relating to ownership or use, operation and/or performance (as applicable), sale, offer to sell or import/export, of such Transferred Contracts, Transferred Leases, Transferred Technology, and Transferred Intellectual Property after the Closing;

(d)      all Liabilities (including any defense costs, third party legal fees and similar expenses) in respect of any action or Proceeding and Claims to the extent arising out of, relating to or in respect of the Transferred Assets, the Business or the operation or conduct of the Business following the Closing;

(e)      all Taxes to the extent arising out of, relating to or in respect of the Transferred Assets, the Business or the operation or conduct of the Business by Buyer for all taxable periods (or the portion of any Straddle Period) beginning after the Closing Date;

(f)      all Buyer Included Taxes; and

(g)      all liabilities of Seller pursuant to the Convertible Note.

2.5      <u>Retained Liabilities</u>.  Buyer will not assume or be liable for any Retained Liabilities, and Seller will remain responsible for paying, performing and discharging all such Retained Liabilities.  "<u>Retained Liabilities</u>" shall mean any Liabilities which are not Assumed Liabilities.

2.6      <u>Closing</u>.

(a)      At the Closing:

(i)      Seller will deliver or cause to be delivered to Buyer the various items, certificates, instruments, and documents referred to in <u>Section 10.1</u>; and

(ii)      Buyer will deliver or cause to be delivered to Seller the various items, certificates, instruments, and documents referred to in <u>Section 10.2</u>.

-5-

(b)     The closing (the "Closing") of the transactions contemplated by this Agreement shall take place at a location or locations mutually satisfactory to the parties hereto (or remotely via the electronic exchange of executed documents and other closing deliverables) commencing at 9:00 a.m. United States Pacific Time (i) on the first Business Day following the date upon which all of the conditions to Closing set forth in Article 8 and Article 9 have been satisfied or waived, other than those conditions that by their nature are to be satisfied at the Closing (but subject to the fulfillment or waiver of such conditions at the Closing), or (ii) on such other date as the parties may mutually agree in writing (the "Closing Date").

2.7     Prorations.  With respect to accrued utility and similar payments arising from the ownership or use of the Transferred Assets, the Assumed Liabilities and the operation of the Business, the accrued rents and other payments under the Transferred Leases, the Transferred Intellectual Property and the Transferred Contracts and similar accrued items all as relating to a period that includes (but does not end on) the Closing Date, Buyer shall be responsible for the pro rata portion thereof based upon the number of days in such period following (but, for the avoidance of doubt, not including) the Closing Date as a percentage of the total number of days in such period.

2.8     Title and Risk.  Title to the Transferred Assets shall not pass until Closing.  Seller and the Seller Subsidiaries shall continue to carry on the Business for their own benefit and at their own risk up to Closing.  Subject to the Retained Liabilities of Seller and its Affiliates, the Transferred Assets shall be at the risk of Buyer following Closing.

2.9     Remote Transfer.  Notwithstanding anything to the contrary in this Agreement: (a) any of the Transferred Assets (including software and any related documentation) that can be transmitted electronically will be so transmitted to Buyer within three Business Days following the Closing and will not be delivered to Buyer on any tangible medium; and (b) none of the servers, drives or other equipment on which the source code for any such Transferred Asset is being stored or processed are being transferred to Buyer or included in the Transferred Assets.

2.10     Return of Buyer Non-Voting Shares. The Seller intends to distribute the Buyer Non-Voting Shares to certain of its stockholders promptly following the Closing (the "Distribution"). In the event that the Seller continues to hold any Buyer Non-Voting Shares on the date that is one hundred and twenty days following the date of the Closing (such date, the "Return Date"), the Seller agrees and acknowledges that all Buyer Non-Voting Shares held by the Seller as of the Return Date will be automatically forfeited and will not be subject to the Distribution. The Seller shall within three (3) Business Days of the Return Date: (i) notify the Buyer in writing of the number and class of Buyer Non-Voting Shares that are held by the Seller as of the Return Date (the "Return Shares") and (ii) surrender to the Buyer, free and clear of all Encumbrances, any certificates representing the Return Shares, together with a duly executed stock power for the transfer of such Return Shares to the Company or to the Company's assignee(s). Following the forfeiture of the Return Shares hereunder, neither the Seller nor any of its Affiliates will have any right in, to or with respect to any of the Return Shares.

-6-

**ARTICLE 3**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Buyer as follows; provided, however, that the representations and warranties of this Article 3 shall be qualified by any exceptions disclosed in the disclosure schedule attached hereto corresponding to an enumerated Section of this Article 3 (collectively, the "Disclosure Schedule"), and to any other Section of this Article 3 to which its relevance is reasonably apparent.

       3.1    Status of Seller and the Seller Subsidiaries.  Seller is a corporation duly incorporated, validly existing and in good standing under the laws of Singapore.  Each of Seller and the Seller Subsidiaries has full corporate, company or partnership power and authority to enable it to own, lease or otherwise hold the Transferred Assets owned, leased or otherwise held by it and to conduct the Business as presently conducted by it.  Each of Seller and each of the Seller Subsidiaries is qualified to do business and is in good standing (to the extent the concept of good standing is applicable in a particular jurisdiction) in all jurisdictions in which the character of the properties owned, leased or operated by it or the nature of the Business makes such qualification necessary, except where such failure would not reasonably be expected to be material to Seller and/or such Seller Subsidiary.  Section 3.1 of the Disclosure Schedule lists each subsidiary of Seller that is a Seller Subsidiary.

       3.2    Authorization; No Conflicts.

       (a)    Seller has full power and authority to enter into this Agreement and the Other Agreements to which it is a party and to carry out the transactions contemplated hereby and thereby.  Seller has taken all action required to authorize the execution and delivery of this Agreement and the Other Agreements executed and delivered by Seller pursuant hereto, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby. No other company proceeding on the part of Seller is necessary to authorize the execution, delivery and performance by Seller of this Agreement and all Other Agreements executed and delivered by Seller pursuant hereto.  This Agreement and all Other Agreements executed and delivered by Seller pursuant hereto are valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. No approvals or consents are required from any governmental authority or third party to execute the Agreement and all Other Agreements and to consummate the transactions contemplated thereby on or prior to the Closing Date.

       (b)    The execution and delivery by Seller of this Agreement do not, the execution and delivery by Seller and each of the Seller Subsidiaries of each Other Agreement to which it is or will be a party will not, and the consummation of the transactions contemplated to be consummated by it by this Agreement and such Other Agreements will not, conflict with, result in any breach of, constitute a default under (or an event that, with notice or lapse of time or both, would become a default under), require any consent of any Person pursuant to, give to others any rights of termination, acceleration or cancellation under, allow the imposition of any fees or penalties under, require the offering or making of any payment or redemption under or result in the creation of any Lien (other than Permitted Encumbrances or Liens caused by Buyer) upon any of the Transferred Assets under any provision of (i) the organizational documents of Seller or any

-7-

of the Seller Subsidiaries, (ii) any material Contract (including any Transferred Contract) to which Seller or any of the Seller Subsidiaries is a party or by which the Business or any of the Transferred Assets or Assumed Liabilities is bound, or (iii) any injunction, judgment, Order or decree or statute, Law, ordinance, legally-binding rule, executive order, code or regulation applicable to Seller or any of the Seller Subsidiaries, the Business or any of the Transferred Assets or Assumed Liabilities, other than, in the case of clauses (ii) and (iii) above, as set forth on <u>Section 3.2(b) of the Disclosure Schedule</u>.

      3.3    <u>Financial Matters</u>.  Seller has delivered to Buyer the financial statements of the Seller for the fiscal year ended December 31, 2018 and as of the eight months ended August 31, 2019 (the "<u>Financial Statements</u>").  The Financial Statements (1) present fairly in all material respects the revenue and direct costs, as applicable, of the Business as of the respective dates thereof or for the periods covered thereby, as applicable, and (2) were prepared in good faith from the internal books and records of Seller and the Seller Subsidiaries in a manner consistent with past accounting practices.

      3.4    <u>Taxes</u>.

      (a)    There are no Liens for Taxes upon any of the Transferred Assets or the Business, other than Permitted Encumbrances.

      (b)    There is no currently outstanding dispute, deficiency, claim, audit or other administrative or judicial proceeding relating to any Tax or Tax Return of Seller with respect to the Business or the Transferred Assets, and Seller has not received notice regarding the potential commencement of any such proceeding.

      (c)    No claim has ever been made by a Taxing Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction with respect to the Business.  The Transferred Assets are located in the jurisdictions set forth in <u>Section 3.4(c) of the Disclosure Schedule</u>.  The Disclosure Employees have offices only in such jurisdictions.

      3.5    <u>Real and Personal Property</u>.

      (a)    <u>Real Property; Transferred Leases</u>.  Seller and the Seller Subsidiaries do not own any real property that is used primarily for the operation of the Business.  Seller or the applicable Seller Subsidiary holds a valid, subsisting and enforceable leasehold interest under each of the Transferred Leases, and each such Transferred Lease constitutes a legal, valid and binding obligation, enforceable against Seller or such applicable Seller Subsidiary in accordance with its terms.  Neither Seller nor any of the Seller Subsidiaries subleases or otherwise permits the occupancy by any third party of all or any portion of the Transferred Leases.  Seller has made available to Buyer a true and complete copy of each Transferred Lease (including all amendments, modifications and supplements thereto).

      (b)    <u>Personal Property</u>.  All of the assets owned by Seller or the Seller Subsidiaries in the operation of the Business are the sole, absolute property of the Seller or such Seller Subsidiary and there is not now outstanding any Lien (other than Permitted

-8-

Encumbrances) over the whole or any part of the undertaking, property or assets of the Seller or such Seller Subsidiary and none of the assets now owned or used by the Seller or such Seller Subsidiary is the subject of any hire purchase, leasing, lease, purchase or credit sale agreement.

      3.6    <u>Intellectual Property and Technology</u>.

      (a)    Seller is the sole and exclusive owner of each item of Transferred Intellectual Property and Transferred Technology, free and clear of any Encumbrances, other than Permitted Encumbrances.  Seller has the sole and exclusive right to bring any claim or suit against a third Person for infringement or misappropriation of any Transferred Intellectual Property.  The Seller has not transferred to any Person ownership of, or granted any exclusive license with respect to, any Transferred Intellectual Property or Transferred Technology that is or would have been, but for such transfer or grant, Transferred Intellectual Property or Transferred Technology.

      (b)    All Transferred Technology and Transferred Intellectual Property, as of the date hereof, are, and, as of and immediately following Closing, will be fully transferable, alienable and licensable by Buyer, who will be permitted to exercise all of Seller's rights in the Transferred Technology and Transferred Intellectual Property to the same extent Seller would have been able to had the transactions contemplated hereunder not occurred, without restriction and without payment of any kind to any third Person, except as disclosed on <u>Section 3.6(b) of the Disclosure Schedule</u>.

      (c)    No Product that constitutes Transferred Technology violates any license or violates, infringes, or misappropriates or will violate, infringe, or misappropriate any Intellectual Property of any other party.  No Transferred Intellectual Property or Transferred Technology is subject to any claim or Proceeding or outstanding Order, or stipulation or Contract restricting in any material manner, the use, transfer, or licensing thereof by Seller, or which affects the validity, use or enforceability of such Transferred Intellectual Property or Transferred Technology.

      (d)    There are no outstanding options, licenses, agreements, claims, encumbrances or shared ownership interests of any kind relating to the Transferred Intellectual Property or Transferred Technology (such options, licenses, agreements, claims, encumbrances or shared ownership interests, "<u>Outbound Licenses</u>"), other than non-negotiated agreements granting non-exclusive licenses to third parties for purposes of providing services to or on behalf of Seller entered into in the ordinary course of business and disclosed on <u>Section 2.2(a) of the Disclosure Schedule</u>.  The assignment to Buyer of the Transferred Technology and the Transferred Intellectual Property, will not result in: (i) Buyer granting to any third Person any right to or with respect to any Technology or Intellectual Property owned by, or licensed to, Buyer, other than the rights granted to third Persons with respect to the Transferred Technology or Transferred Intellectual Property that are assumed by Buyer by virtue of assuming any Transferred Contracts that constitute an Outbound License; (ii) the Seller or Buyer granting to any third Person any right to, or with respect to the Transferred Technology or Transferred Intellectual Property owned by, or licensed to the Seller, or Seller or Buyer being required to provide any source code for any Transferred Technology or Transferred Intellectual Property; (iii) Buyer being bound by, or subject to, any non-compete or other restriction on its freedom to engage in, participate in, operate or compete in any line of business; or (iv) Buyer being obligated to pay any royalties or other license fees with

-9-

respect to Intellectual Property Rights of any third Person in excess of those payable by the Seller in the absence of this Agreement or any of the Other Agreements or the transactions contemplated hereunder, except in the case of (i), (ii), (iii) and (iv), to the extent resulting from agreements between Buyer and any third Person.

(e)     The Seller has not received any written or, to the Seller's Knowledge, other communications alleging that the Seller has violated, infringed or misappropriated, or by conducting the Business, would violate, infringe, or misappropriate any of the Patents, Marks, Copyrights, Trade Secrets, mask works or other proprietary rights or processes of any third party.

(f)     The operation of the Business will not require the use of any inventions of any of its employees or consultants made prior to or outside the scope of their employment by the Seller, including prior employees or consultants, with which the Seller may be affiliated now or may have been affiliated in the past.

(g)     Each employee or consultant has assigned or will have assigned by the Closing Date, to the Seller all right, title and interest in and to any Intellectual Property and Technology that he, she or it solely or jointly conceived, reduced to practice, developed or made during the period of his, her or its employment or consulting relationship with the Seller that (i) relates, at the time of conception, reduction to practice, development, or making of such Intellectual Property or Technology, to the Business, (ii) was developed on any amount of the Seller's time or with the use of any of the Seller's equipment, supplies, facilities or information, or (iii) resulted from the performance of services for the Seller, and each such employee or consultant has waived for the benefit of the Seller all moral rights in any such Technology, Intellectual Property, or rights therein.

(h)     The Transferred Registered IP constitutes (i) all Patents, registered Marks, registered Copyrights, domain names, and applications for any of the foregoing, in each case owned by, purported to be owned by, or issued under the name of the Seller and used in the Business, and (ii) Products the constitute Transferred Technology.

(i)     All Transferred Registered IP is registered in the name of the Seller. All Transferred Registered IP is currently in compliance with formal legal requirements (including without limitation, as applicable, payment of filing, examination and maintenance fees, inventor declarations, proofs of working or use, timely post-registration filing of affidavits of use and incontestability, and renewal applications), and all Transferred Registered IP is valid and enforceable.

(j)     None of the Transferred Registered IP is subject to any maintenance fees or taxes or actions falling due within 90 days after the Closing Date.

(k)     With respect to the Transferred Technology, the Seller's use of open source software complies in all material respects with the applicable open source licence agreements. Section 3.6(k) of the Disclosure Schedule lists all Open Source Software currently used by the Seller with respect to the Transferred Technology, including the applicable license for each such item of Open Source Software; and none of the Open Source Software is compiled together with, linked to, called by, distributed with, or otherwise used by or incorporated into, any software that

-10-

constitutes Transferred Technology that is owned by, purported to be owned by the Seller ("Company Software") in a manner that would: (i) require any portion of the Company Software to be disclosed or distributed in source code form; (ii) require any portion of the Company Software to be licensed for the purpose of making derivative works; or (iii) impose any restriction on the consideration to be charged for the distribution of any Company Software.  Section 3.6(k) of the Disclosure Schedule also lists the Products (if any) to which each such item of Open Source Software relates, and whether each such item is distributed or modified by or on behalf of Seller.

(l)     No funding or facilities of a university, college, other educational institution or research centre, or funding from third parties was used in the development of any Transferred Intellectual Property or Transferred Technology.  No Person who was involved in, or who contributed to, the creation or development of any Transferred Intellectual Property or Transferred Technology, has performed services for the government, university, college, or other educational institution or research centre in a manner that would affect Seller's rights in the Transferred Intellectual Property or Transferred Technology.

(m)     The Seller has taken reasonable security measures to protect the confidentiality and value of all Trade Secrets that constitute Transferred Intellectual Property or are licensed to Seller pursuant to an Inbound License, including, without limitation, requiring each Seller employee and consultant and any other person with access to such Trade Secrets to execute a binding confidentiality agreement, copies or forms of which have been provided to the Buyer and to the Seller's Knowledge, there has not been any breach by any party to such confidentiality agreements.

(n)     The Seller has not provided or disclosed any source code of any Company Software to any third party, except to the Buyer pursuant to the terms of a confidentiality agreement between the Seller and the Buyer.

(o)     Each Product materially performs in accordance with its documented specifications and as the Seller has warranted in writing to its customers.  The Products do not contain any "viruses", "worms", "time-bombs", "key-locks", "backdoor" or any other devices created that could disrupt or interfere with the operation of the Products or equipment upon which the Products operate.  The Products do not include or install any spyware, adware, or other similar software that monitors the use of the Products or contacts any remote computer without the knowledge and express consent of the user(s) of the applicable Product or remote computer, as applicable.

3.7     Material Contracts.

(a)     Section 3.7(a) of the Disclosure Schedule sets forth a true and correct list of all of the following material Contracts primarily related to the Business to which Seller or a Seller Subsidiary is a party or by which Seller or a Seller Subsidiary is bound as of the date hereof (together with Outbound Licenses, each a "Material Contract"):

(i)     all Transferred Contracts involving future payments, expenditures or Liabilities, actual or potential, or future revenues or other payments to Seller or any of its

-11-

Subsidiaries, in each case, in excess of $25,000 individually or $50,000 in the aggregate, after the date hereof ;

      (ii)    any Transferred Contract which contains any material bonus, commission, pension, profit sharing, retirement or any other form of deferred compensation or incentive plan or any stock purchase, stock option, hospitalization, insurance or similar employee benefit plan or practice, whether formal or informal;

      (iii)    any Transferred Contract for the employment of any officer, individual employee or other Person on a full-time, consulting or independent contractor basis or any severance or change-of-control agreement, or any collective bargaining agreement or Contract with any labor union, other than employment agreements or offer letters that can be terminated by Seller or such Seller Subsidiary following notice of not more than 30 days without any liabilities or obligations on behalf of Seller or such Seller Subsidiary;

      (iv)    any Transferred Contract mortgaging, pledging or otherwise placing a Lien on any of its assets, or any guaranty of an obligation of a third party;

      (v)    any Transferred Contract which contains royalty, dividend or similar arrangements based on the revenues or profits of Seller or an Seller Subsidiary or any contract or agreement involving fixed price or fixed volume arrangements;

      (vi)    any Transferred Contract which contains any provisions requiring Seller or any Seller Subsidiary to indemnify any other party, other than commercial Contracts entered into in the ordinary course of business;

      (vii)    any Transferred Contract under which Seller or any Seller Subsidiary is lessee of, or holds or operates, any property, real or personal, owned by any other party calling for payments in excess of $50,000 annually or under which it is lessor of or permits any third party to hold or operate any property, real or personal, owned or controlled by Seller or any Seller Subsidiary;

      (viii)    any Transferred Contract which is not cancelable by Seller or any Seller Subsidiary without penalty on not less than thirty (30) days' notice;

      (ix)    any Transferred Contract limiting the freedom of Seller or any Seller Subsidiary to freely engage in any line of business or with any Person anywhere in the world or during any period of time, including any Contract containing an exclusivity obligation, most-favored-nation provision or "best price" obligation enforceable against Seller or such Seller Subsidiary;

      (x)    any Transferred Contract relating to the distribution, marketing, advertising or sales of Products;

      (xi)    any Transferred Contract pursuant to which it subcontracts work to third parties;

      (xii)    any Transferred Contract with any governmental entity;

-12-

(xiii)   any Transferred Contract with a power of attorney;

(xiv)   any Transferred Contract relating to an acquisition agreement, whether by merger, stock or asset sale or otherwise;

(xv)   any Transferred Contract which contains any options, licenses or agreements of any kind with respect to the Intellectual Property of any other Person ("Inbound Licenses");

(xvi)   any Transferred Contract material to the Group Companies or outside the ordinary course of business; or

(xvii)   any Transferred Contract which may not be assigned without the consent of another Person.

(b)   Seller has made available to Buyer a true and complete copy of each written Transferred Contract (including all amendments, modifications and supplements thereto).  Seller has not entered into any oral Transferred Contract.

(c)   Except as set forth on Section 3.7(c) of the Disclosure Schedule: (i) Each of the Material Contracts is in full force and effect and constitutes a valid, binding and enforceable obligation of the Seller or the applicable Seller Subsidiary and, to the Knowledge of Seller, the other parties thereto, (ii) neither Seller nor any Seller Subsidiary is or, to the Knowledge of Seller, is Seller or any Seller Subsidiary alleged to be in breach of or default in any material respect under any Transferred Contract, and (iii) to the Knowledge of Seller, no counterparty is in breach of or default in any Transferred Contract.

3.8   General Employee Matters; Benefit Plans and Benefits.

(a)   Section 3.8(a) of the Disclosure Schedule contains a complete and accurate list of the current employees and officers of Seller and the Seller Subsidiaries as of the date hereof and shows with respect to each such employee (to the extent such information may be disclosed under applicable law): his or her name or employee identification number; direct employing entity (i.e., Seller or a Seller Subsidiary); date of hire; primary location of employment (country, state or province, and city); job position or title; job department; full- or part-time status; overtime exempt or non-exempt status for wage and hour purposes; base compensation rate (for overtime exempt employees, annual base salary rate) (for overtime nonexempt employees, base hourly wage rate); whether eligible for incentive compensation (e.g., commissions, bonuses); target annual incentive compensation; visa status; annualized vacation or paid time off eligibility (or designation of "flexible" if a non-accrual-based vacation or paid time off system is used); eligibility for severance and the amount of such severance; eligibility for change of control benefits (cash or otherwise) to be paid at the Closing or otherwise in connection with the Agreement and the amount of benefits.

(b)   Section 3.8(b) of the Disclosure Schedule lists all individuals who are currently engaged as independent contractors, consultants or advisors to Seller or any Seller Subsidiary, describing for each such independent contractor, consultant, or advisor:  his or her name; primary location from which services are performed (country, state or province, and city);

-13-

estimate of average hours of services performed per week; most recent rate of all regular, bonus or any other compensation; description of services provided; initial date retained to perform services; the expected end date of services (if known); and whether he, she or it is required to work, or in fact works, exclusively for Seller or any Seller Subsidiary.

(c)  (i) Seller and the Seller Subsidiaries are, and for the past two (2) years have been, in compliance in all material respects with all applicable Laws and agreements respecting labor, employment, fair employment practices, workplace safety and health, terms and conditions of employment, wages and hours, the proper classification and treatment of employees as exempt or non-exempt and the proper classification and treatment of any independent contractor; (ii) neither Seller nor any of the Seller Subsidiaries is delinquent in any payments for any wages, salaries, commissions, bonuses, fees or other compensation due with respect to any services performed for it or amounts required to be reimbursed to employees to the date hereof; (iii) none of the employment policies or practices of Seller or any of the Seller Subsidiaries are currently being audited or investigated, or, to the Seller's Knowledge, subject to imminent audit or investigation by any governmental entity; (iv) neither Seller nor any of the Seller Subsidiaries is or within the last three (3) years has been subject to any order, decree, injunction or judgment by any governmental entity or private settlement contract in respect of any labor or employment matters; and (v) all employees of Seller and the Seller Subsidiaries are employed on an at-will basis.

(d)  (i) There are no, and within the last two (2) years there have been no, grievances, complaints or charges with respect to employment or labor matters (including allegations of employment discrimination, retaliation, harassment, wages and hours, wage payment, restrictive covenants, leaves of absence, or unfair labor practices) pending or, to Seller's Knowledge, threatened against Seller or any of the Seller Subsidiaries in any judicial, regulatory or administrative forum, under any private dispute resolution procedure or internally; (ii) none of the employment policies or practices of Seller or any of the Seller Subsidiaries are currently being audited or investigated by any governmental entity or, to Seller's Knowledge, subject to imminent audit or investigation by any governmental entity; and (iii) neither the Seller nor any of the Seller Subsidiaries nor any of their respective officers, is, or within the last two (2) years has been, subject to any order, decree, injunction or judgment by any governmental entity or private settlement contract in respect of any labor or employment matters.

(e)  There is not, and has not been in the past two (2) years, any (i) pending or, to Seller's Knowledge, threatened claim, litigation, proceeding or investigation involving Seller or any Seller Subsidiary with respect to or relating to sex-based discrimination, sexual harassment or sexual misconduct; or (ii) settlement or similar arrangement of, or payment arising out of or related to, any matter referred with respect to sex-based discrimination, sexual harassment or sexual misconduct involving any conduct of an employee of Seller or any Seller Subsidiary that occurred during his or her employment with Seller or any Seller Subsidiary.

(f)  To the Knowledge of Seller, no circumstances have arisen or exist under which Seller may be required to pay damages or compensation or suffer any penalty or be required to take corrective action or be subject to any form of sanction under any applicable employment laws. There are no current, pending or threatened claims of any type against

-14-

Seller by any existing or former employees or directors of Seller or by any existing or former consultants to Seller.

(g)    Each current and former employee and consultant of Seller and the Seller Subsidiaries has executed an agreement with Seller or such Seller Subsidiary regarding confidentiality and proprietary information substantially in the form or forms delivered to the counsel for Buyer (the "Confidential Information Agreements") and all such Confidential Information Agreements are binding, valid and enforceable.

(h)    No current or former employee or consultant has excluded works or inventions from his or her assignment of inventions pursuant to such employee or consultant's Confidential Information Agreement.

(i)    Seller has no Knowledge that any of its employees or consultants is in violation of any Confidential Information Agreement.

(j)    Schedule 3.8(j) of the Disclosure Schedule sets forth a list of every Employee Plan that is maintained by the Seller or any ERISA Affiliate.

(k)    Each Employee Plan that is intended to qualify under Section 401(a) of the Code is so qualified and has received a favorable determination or approval letter from the IRS with respect to such qualification, or may rely on an opinion letter issued by the IRS with respect to a prototype plan adopted in accordance with the requirements for such reliance, or has time remaining for application to the IRS for a determination of the qualified status of such Employee Plan for any period for which such Employee Plan would not otherwise be covered by an IRS determination and, to the knowledge of the Seller, no event or omission has occurred that would cause any Employee Plan to lose such qualification.

(l)    Each Employee Plan is, and has been operated in material compliance with applicable laws and regulations and is and has been administered in all material respects in accordance with applicable laws, including the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and regulations and with its terms.  No litigation or governmental administrative proceeding, audit or other proceeding (other than those relating to routine claims for benefits) is pending or, to the knowledge of the Seller, threatened with respect to any Employee Plan or any fiduciary or service provider thereof, and, to the knowledge of the Seller, there is no reasonable basis for any such litigation or proceeding.  All payments and/or contributions required to have been made with respect to all Employee Plans, for all periods prior to the Closing Date, either have been made or have been accrued in accordance with the terms of the applicable Employee Plan and applicable law.

(m)    Each Employee Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in all material respects in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder.  No payment to be made under any Employee Plan is, or to the knowledge of the Seller, will be, subject to the penalties of Section 409A(a)(1) of the Code.

-15-

(n)      Neither the execution and delivery of this Agreement, the shareholder approval of this Agreement,  nor the consummation of the transactions contemplated hereby could (either alone or in conjunction with any other event) (i) result in, or cause the accelerated vesting payment, funding or delivery of, or increase the amount or value of, any payment or benefit to any employee, officer, director or other service provider of the Seller or any of its ERISA Affiliates; (ii) result in any "parachute payment" as defined in Section 280G(b)(2) of the Code (whether or not such payment is considered to be reasonable compensation for services rendered); or (iii) result in a requirement to pay any tax "gross-up" or similar "make-whole" payments to any employee, director or consultant of the Seller or an ERISA Affiliate.

(o)      Neither the Seller nor any ERISA Affiliate has ever maintained any Employee Plan that is or was subject to Title IV of ERISA, Section 412 of the Code, Section 302 of ERISA or is a Multiemployer Plan.  None of the Employee Plans provides health care or any other non-pension benefits to any employees after their employment is terminated (other than as required by Part 6 of Subtitle B of Title I of ERISA or similar state law) and the Seller has never promised to provide such post-termination benefits.

(p)      For purposes of this section:

(i)      "Employee Plan" means (A) an employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA; (B) stock option plans, stock purchase plans, bonus or incentive award plans, severance pay plans, programs or arrangements, deferred compensation arrangements or agreements, change in control plans, programs or arrangements, supplemental income arrangements, vacation plans, and all other employee benefit plans, agreements or arrangements not described in (A) above; and (C) plans or arrangements providing compensation to employees and non-employee directors, in each case in which the Seller or any ERISA Affiliate sponsors, contributes to, or provides benefits under or through such plan, or has any obligation to contribute to or provide benefits under or through such plan, or if such plan provides benefits to or otherwise covers any current or former employee, officer or director of the Seller or any ERISA Affiliate (or their spouses, dependents or beneficiaries).

3.9      Litigation and Other Proceedings.  None of the Seller or the Seller Subsidiaries nor any of their assets or properties, including in respect of any property used or occupied by any of the foregoing is engaged, either directly or indirectly, in any suit, action, litigation, arbitration or tribunal proceedings or any governmental investigations.  In addition, no such suit, action, litigation, arbitration or tribunal proceedings or governmental investigations are pending or threatened, by or against the Seller, the Seller Subsidiaries, related corporations or joint ventures or any of their assets or properties, including in respect of any property used or occupied by any of the foregoing, nor does the Seller have Knowledge of any circumstances likely to lead to any such suit, action, litigation, arbitration or tribunal proceeding or governmental investigations.

3.10     Compliance with Laws.

(a)      Where applicable, Seller is in receipt of all material governmental approvals for operation of the Business, including approvals from the Monetary Authority of Singapore (or its equivalent regulatory body in each relevant jurisdiction in which any Seller Subsidiary conducts

-16-

the Business), and in compliance in all material respects with applicable conditions in all such approvals and with all applicable Laws regarding such approvals.

(b)     Seller and the Seller Subsidiaries are in compliance in all material respects with all applicable Laws and regulations in relation to appropriate monitoring, reporting and audit processes for anti-money laundering (AML) and countering the financing of terrorism (CFT) regulations.

(c)     Seller and the Seller Subsidiaries have all Permits necessary for the conduct of the Business, the lack of which could reasonably be expected to have a Material Adverse Effect. Seller is not in default in any material respect under any of such Permit.

(d)     None of the Seller or Seller Subsidiaries is a party to, bound by or affected by, any court order (or agreement entered into in any administrative, judicial or arbitration proceeding with any governmental entity) with respect to any of such Seller or Seller Subsidiary's properties, assets, personnel or business activities.  To the Seller's Knowledge, none of the Seller or Seller Subsidiaries is in violation of, or delinquent in respect to, any court order, applicable Laws or Permits (to which it or its properties, assets, personnel or business activities are subject), arising out of, resulting from or in any way connected with the operation of such Seller or Seller Subsidiary.  Seller and the Seller Subsidiaries has filed with the proper governmental entities all material statements and reports required by all applicable Laws, Permits and court orders to which such Seller or Seller Subsidiary or any of its employees (because of their activities on behalf of such Seller or Seller Subsidiary) are subject.  No claim has been made by any governmental Entity (and, to the Knowledge of Seller, no such claim is anticipated) to the effect that the Business fails to comply, in any material respect, with any applicable Laws or Permits or that a Permit or court order is necessary in respect thereto.  Copies of all notices of violation of any of the foregoing that Seller or any Seller Subsidiary has received in the past three (3) years have previously been furnished to Buyer.

3.11     Data Privacy.

(a)     In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any individuals, including, without limitation, any customers, prospective customers, employees and/or other third parties (the "Personal Information"), Seller and the Seller Subsidiaries are, to Seller's Knowledge, in compliance with applicable Law regarding privacy and data protection, including, for the avoidance of doubt, the Singapore Personal Data Protection Act 2012, as amended, its privacy policies and the requirements of any contract to which Seller or Such Seller Subsidiary is a party.

(b)     Seller and each of the Seller Subsidiaries has commercially reasonable physical, technical, organizational and administrative security measures and policies in place that are reasonably designed to protect Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure.

(c)     Seller and each of the Seller Subsidiaries is, to Seller's Knowledge, in compliance in all material respects with all applicable Law relating to data loss, theft and breach

-17-

of security notification obligations, including, for the avoidance of doubt, the Singapore Personal Data Protection Act 2012, as amended.

3.12    FCPA.

(a)    Neither Seller nor any of the Seller Subsidiaries, nor any of their respective officers, employees or agents have, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any "foreign official" (as such term is defined in the FCPA), "foreign public official" (as such term is defined in the UK Bribery Act, foreign political party or official thereof or candidate for foreign political office for the purpose of (i) influencing any official act or decision of such official, party or candidate, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a foreign governmental authority, or (iii) securing any improper advantage, in the case of (i), (ii) and (iii) above in order to assist Seller or any of its affiliates in obtaining or retaining business for or with, or directing business to, any Person.

(b)    Neither Seller nor any of the Seller Subsidiaries, nor any of their respective directors, officers, employees or agents have made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any applicable Law, rule or regulation.

(c)    Neither Seller nor any of the Seller Subsidiaries, nor to Seller's Knowledge, any of their respective officers, directors or employees are the subject of any written allegation, voluntary disclosure, investigation, prosecution or other enforcement action related to the FCPA, the UK Bribery Act or any other applicable anti-bribery or anti-corruption law.

3.13    Assets Complete; Title.  The Transferred Assets and the Excluded Assets include all material assets used or held for use by Seller and the Seller Subsidiaries in connection with the operation or conduct of the Business as currently conducted.  Except as set forth on Section 3.13(a) or Section 3.13(b) of the Disclosure Schedule, as applicable, (a) there is no material asset of Seller or the Seller Subsidiaries primarily used or primarily held for use or otherwise required in connection with the operation or conduct of the Business as currently conducted that is not included in the Transferred Assets, and (b) Seller and the Seller Subsidiaries have good and marketable title to all of the Transferred Assets with full power and authority to assign their rights in and to the Transferred Assets to Buyer.

3.14    No Other Representations or Warranties.  Except for the representations and warranties contained in this Article 3 (as modified by the Disclosure Schedule attached hereto), neither Seller, Seller Subsidiaries nor any other Person makes any other express or implied representation or warranty with respect to the Business, the Transferred Assets or the transactions contemplated hereunder or with respect to any other information provided to Buyer, and Seller disclaims any other representations or warranties, whether made by Seller or any of its Affiliates, officers, directors, employees, agents or other Representatives.  Except in respect of the representations and warranties contained in this Article 3 (as modified by the Disclosure Schedule attached hereto) or in the case of fraud or willful misconduct, neither Seller nor any other Person will have or be subject to any liability to Buyer or any other Person.

-18-

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

4.1     <u>Status of Buyer</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer is qualified to do business and is in good standing (to the extent the concept of good standing is applicable in a particular jurisdiction) in all jurisdictions in which the character of the properties owned, leased or operated by it makes such qualification necessary, except in each case for any such failures that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on such Buyer's ability to consummate the transactions contemplated by this Agreement.

4.2     <u>Authorization; No Conflicts</u>.

(a)     Buyer has the right, power, and authority to enter into this Agreement and the Other Agreements to which it is a party, to consummate the transactions contemplated hereby, and otherwise to comply with and perform its obligations under, this Agreement and the Other Agreements.

(b)     The execution and delivery by Buyer of this Agreement do not, the execution and delivery by Buyer of each Other Agreement to which it is or will be a party will not, and the consummation of the Acquisition and the other transactions contemplated to be consummated by this Agreement and such Other Agreement will not conflict with, result in any breach of, constitute a default under (or an event that, with notice or lapse of time or both, would become a default under), require any consent of any Person pursuant to, give to others any rights of termination, acceleration or cancellation under, allow the imposition of any fees or penalties under, require the offering or making of any payment or redemption under or result in the creation of any Lien (other than Permitted Encumbrances) upon any of the properties or assets of Buyer under any provision of (i) the organizational documents of Buyer, (ii) any Contract to which Buyer is a party or by which any of its properties or assets is bound, or (iii) any injunction, judgment, Order or decree or statute, law, ordinance, legally-binding rule, executive order, code or regulation applicable to Buyer or its properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that have not and would not reasonably be expected to materially delay or materially impede the ability of Buyer to consummate the transactions contemplated by this Agreement.  No consent, permit, authorization or approval of, or registration, declaration, notice or filing with, any Governmental Authority is required to be obtained or made by or with respect to Buyer or any of their Affiliates in connection with the execution, delivery and performance of this Agreement or any of the Other Agreements or the consummation of the Acquisition and the other transactions contemplated hereby and by the Other Agreements, other than (A) those that may be required solely by reason of Seller's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated hereby and by the Other Agreements, and (B) those the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to materially delay or materially impede the ability of Buyer to consummate the transactions contemplated by this Agreement.

-19-

(c)     Buyer has duly executed and delivered this Agreement and on or prior to the Closing will have, or will have caused its Affiliates to have, duly executed and delivered each Other Agreement to which they are or will be a party, and this Agreement constitutes, and each Other Agreement to which they are or will be a party will after the Closing constitute, their legal, valid and binding obligation, enforceable against them in accordance with its terms, except to the extent that such enforceability may be limited by the Equitable Exceptions.

4.3     Litigation.

(a)     There is no Proceeding pending or, to Buyer's Knowledge, threatened in writing against Buyer or involving any of their properties or assets that would reasonably be expected to: (i) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any Other Agreement; or (ii) otherwise prevent, hinder or delay the consummation of the transactions contemplated by this Agreement and the Other Agreements.

(b)     Buyer is not: (i) in default under or in breach of any Order; or (ii) a party or subject to any Order, except, in each case, where such default or breach, or such Order, would not reasonably be expected to: (A) have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement or any Other Agreement or (B) otherwise prevent, hinder or delay the consummation of the transactions contemplated by this Agreement and the Other Agreements.

4.4     Independent Investigation.   Buyer has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its participation in the transactions contemplated by this Agreement and the Other Agreements. Buyer has conducted its own independent review and analysis of, and based thereon have formed an independent judgment concerning, the Transferred Assets, the Assumed Liabilities and the condition, operations and prospects of the Business.  Buyer acknowledges that, except for the representations and warranties expressly set forth in Article 3 or in the case of fraud or willful misconduct, none of Seller, the Seller Subsidiaries, their Affiliates or any of their respective directors, officers, employees, stockholders, Representatives or agents have made or makes, and Buyer has not relied on and is not relying on, any representation, warranty or statement, either express or implied:  (a) as to the accuracy or completeness of any of the information delivered or made available to Buyer, any of its Affiliates or any their respective directors, officers, employees, stockholders, Representatives, agents or lenders; and (b) with respect to any projections, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial condition (or any component thereof) of the Business delivered or made available to Buyer, any of its Affiliates or any of its respective directors, officers, employees, stockholders, Representatives, agents or lenders.

**ARTICLE 5**
**COVENANTS**

-20-

5.1   <u>Conduct of Business by Seller</u>.  From the date hereof to the earlier of the date this Agreement is terminated or the Closing, except for transactions that have been set forth on <u>Section 5.1 of the Disclosure Schedule</u>, as required by applicable Law, that are otherwise contemplated by this Agreement or that are expressly approved in writing by Buyer (such approval not to be unreasonably withheld, delayed or conditioned), Seller shall refrain and shall cause each Seller Subsidiary to refrain from taking the following actions with respect to the Business, the Transferred Assets or the Assumed Liabilities:

(a)   acquiring (including by merger, consolidation or the acquisition of any equity interest or assets) or selling (whether by merger, consolidation or the sale of any equity interest or assets), leasing or disposing of any Transferred Assets, whether in one or more transactions;

(b)   subjecting any of the Transferred Assets to any Lien, exclusive of Liens arising as a matter of Law or arising in the Ordinary Course of Business as to which there is no known default and except for Permitted Encumbrances;

(c)   undertaking any action or failing to take any action that does or could, individually or in the aggregate, reasonably be expected to result in the loss, lapse, expiration, or abandonment of any Transferred Registered IP other than in the Ordinary Course of Business;

(d)   materially changing any method of accounting or accounting practice used by it with respect to the Business and applicable to the preparation of the Financial Statements, except for any change required by GAAP or applicable Law;

(e)   except for terminations of, or failures to renew Employment Agreements with employees in the Ordinary Course of Business (including terminations of employees for cause), materially amending, terminating or failing to use its commercially reasonable efforts to renew any Transferred Contract (provided that, after reasonable prior notice to Buyer, neither Seller nor any Seller Subsidiary shall be required to renew any Transferred Contract on any terms that are less favorable to Seller or the Seller Subsidiary, as applicable), or defaulting in any material respect (or taking or omitting to take any action that, with or without the giving of notice or passage of time, would constitute a material default) under any Transferred Contract;

(f)   entering into any transaction with an Affiliate, except for transactions in the Ordinary Course of Business, on arm's-length terms and not affecting the Transferred Assets or the Assumed Liabilities;

(g)   entering into any Contract that limits or purports to limit the ability of Seller or any Seller Subsidiary to engage in the Business or grants exclusivity with respect to the Business to any Person;

(h)   other than in accordance with the requirements of existing written Employee Plans or Employment Agreements or as may be required by applicable Law, establishing or materially increasing the benefits under, or promising to establish, materially modify or materially increase the benefits under, any Employee Plan or Employment Agreement with respect to Transferred Employees or Non-US Business Employees, or otherwise materially

-21-

increasing the compensation payable to any Transferred Employee or Non-US Business Employee, or materially modifying, renewing, establishing, adopting or entering into any collective bargaining agreement with any labor union in regard to any Transferred Employee;

(i)     authorizing, committing or agreeing to enter into or consummate any transaction relating to the Business which would result in an Assumed Liability of $50,000 or more; and

(j)     authorizing, committing or agreeing to take any action that would reasonably be expected to constitute a breach of any of the foregoing provisions of this Section 5.1.

5.2     Affirmative Covenants Relating to Seller.  From the date hereof to the earlier of the date this Agreement is terminated or the Closing, Seller shall use its commercially reasonable efforts to take and to cause each of the Seller Subsidiaries to take the following actions with respect to the Business, the Transferred Assets and the Assumed Liabilities:

(a)     operate the Business in the Ordinary Course of Business;

(b)     maintain the books, accounts and records of the Business in the Ordinary Course of Business;

(c)     comply in all material respects with all applicable Laws relating to the conduct of the Business as currently conducted; and

(d)     provide Buyer with prompt written notice of events, occurrences or circumstances which have or reasonably would be expected to have (either individually or in the aggregate) a Material Adverse Effect.

5.3     Consents and Closing Conditions.

(a)     Generally.  Each of Buyer and Seller shall use commercially reasonable efforts to: (i) obtain all consents, approvals, authorizations and waivers from third parties required in connection with the transactions contemplated by this Agreement prior to the Closing; and (ii) take such other actions as may be required to fulfill the closing conditions, as set forth in Article 8 and Article 9 that are within their control.  Seller shall use commercially reasonable efforts to cause the representations and warranties of Seller in Article 3 to be true and correct on and as of the Closing Date.  Buyer shall use commercially reasonable efforts to cause the representations and warranties of Buyer in Article 4 to be true and correct on and as of the Closing Date.  No party hereto shall take any action that would reasonably be expected to materially delay the obtaining of or result in not obtaining, any Permit from any Governmental Authority required to be obtained prior to Closing.

(b)     Third Party Consents.  To the extent that any of Seller's or any of the Seller Subsidiaries' rights under any agreement, Contract, commitment, lease, Permit or other Transferred Asset to be assigned to Buyer hereunder may not be assigned without the consent of another Person which has not been obtained prior to or as of Closing, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach

-22-

thereof or be unlawful, and Seller agrees, and Seller shall cause the Seller Subsidiaries, to use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible within thirty (30) days after Closing.  If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Transferred Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller and Buyer shall cooperate in any lawful and commercially reasonable arrangement, as Buyer may reasonably request, under which Buyer would, to the maximum extent permitted by Law and the Transferred Asset, obtain the economic Claims, rights and benefits under and with respect to such Transferred Asset and assume the economic burdens and obligations with respect thereto in accordance with this Agreement, including by subcontracting, sublicensing or subleasing such Transferred Asset to Buyer.  Seller shall promptly pay to Buyer when received all monies received by Seller under such Transferred Asset or any Claim or right or any benefit arising thereunder and Buyer shall promptly pay Seller for all liabilities of Seller associated with such Transferred Asset that would otherwise constitute "Assumed Liabilities" had such Transferred Asset been assigned to Buyer at the Closing.  Nothing in this Agreement shall be construed as having obligated any party hereto to have paid or committed to pay any amount in order to obtain any consent, waiver, or approval with respect to Contracts with third parties prior to the Closing.

5.4     <u>Maintenance of Books and Records</u>.  After the Closing, Seller shall, and shall cause each of the Seller Subsidiaries to, retain the records that are Excluded Assets in accordance with Seller's and the Seller Subsidiaries' respective document retention policies, and Buyer shall retain the books and records of Seller and the Seller Subsidiaries delivered to Buyer relating to periods prior to the Closing in accordance with Buyer's document retention policies.  During the period during which such books and records are retained, duly authorized Representatives of Seller or Buyer, as applicable, may have reasonable access to such records, during normal business hours and on reasonable prior written notice, at the requesting party's expense, for any reasonable business purpose specified by the requesting party in such notice.

## <u>ARTICLE 6</u><br><u>TAX MATTERS</u>

6.1     <u>Proration of Taxes</u>.

(a)     Seller shall timely and properly prepare and file (or cause to be timely prepared and filed) all Tax Returns required by applicable Law covering the Business, the Transferred Assets, and the Assumed Liabilities for any period ending on or before the Closing Date that are required to be filed, regardless of when due.  Buyer shall properly and timely prepare and file (or cause to be timely prepared and filed) all Tax Returns required by applicable Law covering the Business and the Transferred Assets relating to any Straddle Period to the extent required by Law.

(b)     Liability for all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Business or the Transferred Assets (individually or in the aggregate) for a taxable period which includes (but does not end on) the Closing Date (a "<u>Straddle Period</u>") shall be apportioned between Seller and Buyer (the "<u>Apportioned Obligations</u>") based on the number of days of such taxable period included in the period ending on and including the Closing Date (the "<u>Pre-Closing Tax Period</u>") and the number of days of such taxable period

-23-

included in the period after the Pre-Closing Tax Period (the "Post-Closing Tax Period").  Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period based on the number of days in the Pre-Closing Tax Period to the total number of days in the Straddle Period.  Buyer shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period on the basis of the number of days in the Post-Closing Tax Period to the total number of days in the Straddle Period.  Within a reasonable period after the Closing Date, Seller and Buyer shall present a reimbursement to which Seller and Buyer are entitled under this Section 6.1(b) together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the party owing it to the other party within 10 days after delivery of such statement.  Thereafter, Seller and Buyer shall promptly notify each other upon receipt of any bill for real or personal property Taxes relating to the Business or the Transferred Assets, part or all of which are attributable to the Post-Closing Tax Period, and shall promptly deliver such bill to the other, and the parties shall true up the amounts owed in accordance with this Section 6.1(b).  In the event that either Seller or Buyer make a payment for which they are entitled to reimbursement under this Section 6.1(b), the other party shall make such reimbursement promptly but in no event later than 10 days after the delivery of a statement setting forth the amount of reimbursement to which the presenting party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.  Any payment required under this Section 6.1(b) and not made within 30 days of delivery of the statement shall bear interest at the rate per annum determined, from time to time, under the provisions of Code Section 6621(a)(2) for each day until paid.

   6.2  Cooperation on Tax Matters.

    (a)  Buyer and Seller hereby acknowledge and agree that the sale and purchase of the Transferred Assets is intended to be an asset sale for legal and tax purposes. Buyer and Seller agree to furnish, or cause to be furnished to the other upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Transferred Assets, the Business, and the Assumed Liabilities as is reasonably necessary for the filing of any Tax Return, the preparation for any Tax audit, or the prosecution or defense of any Claim or Proceeding relating to any proposed Tax adjustment relating to the Transferred Assets, the Business or the Assumed Liabilities; provided, however, that Seller shall not be obligated to furnish or cause to be furnished to Buyer its income Tax Returns.  Buyer and Seller shall keep all such information and documents received by them confidential unless otherwise required by Law. Buyer and Seller shall cooperate with each other as reasonably necessary to effect the foregoing. Buyer and Seller agree, upon request, to use their reasonable best efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the transactions contemplated under this Agreement.  Nothing in this Section 6.2(a) shall require a party to disclose information not related specifically to the Transferred Assets, Assumed Liabilities or Business to the extent it reasonably deems such information to be confidential.

    (b)  Buyer and Seller agree to retain, or cause to be retained, all books and records pertinent to the Assets until the applicable period for assessment of Taxes under applicable Law (giving effect to any and all extensions or waivers) has expired and such additional period as

-24-

necessary for any administrative or judicial Proceedings relating to any proposed assessment, and to abide with all record retention agreements entered into with any Tax authority.

6.3     Tax Proceedings.

(a)     Buyer shall promptly notify Seller in writing upon receipt by Buyer or any of its Affiliates of any written communication from a Governmental Authority concerning Taxes for which Buyer may be entitled to recovery under this Agreement or that relates to Seller's or any of Seller's Affiliate's Taxes for any taxable year or other period and shall promptly notify Seller in writing of any pending or threatened audit, Claim, demand or administrative or judicial Proceeding (a "Tax Claim") that could give rise to a right of indemnification under this Agreement or that relates to Seller's or any of Seller's Affiliate's Taxes for any taxable year or other period describing in reasonable detail the facts and circumstances with respect to the subject matter of such Tax Claim; provided, however, that any delay in such notice shall not affect Buyer's right to recovery or indemnification hereunder except to the extent of actual material prejudice to Seller.

(b)     Seller shall have the exclusive right to control any Tax Claim to the extent that any such Tax Claim (i) relates to Seller's or any of Seller's Affiliate's Taxes for any taxable year or period, or (ii) could reasonably be expected to result in any Losses for Taxes with respect to which Seller has agreed to provide indemnification under this Agreement.  Upon Seller's request, Buyer shall execute any powers of attorney or similar documents that may be required to effectuate the intent of this Section 6.3(b).

6.4     Tax Consequences. Notwithstanding anything herein to the contrary, each party to this Agreement hereby acknowledges and agrees that such party is relying solely upon its own tax advisors and counsel for advice concerning the Tax consequences of the transactions contemplated by this Agreement, and that no party provides assurances to any other party concerning such Tax consequences.

## ARTICLE 7
## EMPLOYEE MATTERS

7.1     Employment of Transferred Employees.

(a)     As of the Closing Date, Buyer shall, or shall cause its Affiliates to, make offers of employment to each Business Employee set forth on Section 7.1(a) of the Disclosure Schedule (the "Disclosure Employees").  All Disclosure Employees to whom Buyer (or an Affiliate of Buyer) offers employment and who accepts such offers of employment and become employed by Buyer (or an Affiliate of Buyer) are herein referred to herein as the "Transferred Employees" and each Transferred Employee shall cease to be an employee of Seller or any of the Seller Subsidiaries, as applicable, as of the Closing Date (or, with respect to any Transferred Employee who is not actively at work on the Closing Date, upon such individual's return to active employment with Buyer or its Affiliates).

7.2     Credit for Service; Welfare Benefits.

-25-

(a)     Buyer shall be solely responsible for providing benefits under applicable employee benefit plans to any Transferred Employees after the Closing Date (the "New Plans"). For purposes of vesting and eligibility to participate, each Transferred Employee shall be credited with his or her years of service with Seller and the Seller Subsidiaries (and their predecessors) before the Closing Date, to the same extent as such Transferred Employee was provided or entitled, before the Closing Date, to credit for such service under any similar Employee Plan in which such Transferred Employee participated or was eligible to participate immediately prior to the Closing Date, provided that the foregoing shall not apply to the extent that its application would result in a duplication of benefits.

(b)     In addition, and without limiting the generality of Section 7.2(a) above, (i) each Transferred Employee shall be immediately eligible to participate, without any waiting time, in any and all New Plans to the extent benefits or coverage under such New Plan replaces (or is intended to replace) the same or similar benefits or coverage under an Employee Plan in which such Transferred Employee participated immediately before the Closing Date (such plans, collectively, the "Old Plans").

(c)     Any Claims of Transferred Employees and their eligible beneficiaries and dependents for health and welfare that are incurred on or after the Closing Date shall be the sole responsibility of Buyer and Buyer's New Plans.  With respect to disability benefits, a disability Claim shall be determined in accordance with the disability plans or policies of Buyer and Seller; provided that neither Buyer nor Seller shall amend their plans to specifically exclude Claims of Transferred Employees that would otherwise be recognized under such plan but for the amendment.

7.3     Third Party Rights; Amendments to Employee Plans.   Nothing in this Agreement, express or implied, shall affect the right of Seller (or, following the Closing, Buyer) to terminate the employment of any employee, including any Business Employee.   This Agreement shall not limit the ability or right of Seller or its Affiliates (or Buyer or its Affiliates after the Closing) to amend or terminate any Employee Plan (or employee benefit plan of Buyer, as applicable) or other benefit or compensation plan or program after the Closing and nothing contained herein shall be construed as an amendment to or modification of any such plan. Nothing contained in this Agreement, express or implied, shall constitute an amendment to any Employee Plan.

## ARTICLE 8
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any or all of which may be waived in writing, in whole or in part, by Buyer in its sole discretion:

8.1     Representations and Warranties.   The representations and warranties of Seller shall be true and correct in all material respects on and as of the date of this Agreement and at and as of the Closing (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period) (except for such representations and

-26-

warranties that are qualified by their terms by a reference to materiality, which representations and warranties as so qualified shall be true and correct in all respects).

8.2     <u>Performance of Covenants</u>.  Seller shall have performed and complied with in all material respects all covenants and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

8.3     <u>No Litigation</u>.  There shall not be any litigation or Proceeding brought by any Governmental Authority that is pending and seeking to restrain or invalidate the transactions contemplated by this Agreement.

8.4     <u>No Orders</u>.  No Orders enjoining or preventing the consummation of the transactions contemplated by this Agreement shall be in effect.

8.5     <u>Material Adverse Effect</u>.  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

8.6     <u>Closing Documents</u>.  Seller shall have delivered all documents required to be delivered by it at Closing pursuant to <u>Section 10.1</u> of this Agreement, in each case in form and substance reasonably satisfactory to Buyer.

8.7     <u>Consents</u>.  The parties shall have received all of the consents, approvals, authorizations, clearances, waivers or Licenses of any Governmental Authority or third parties necessary for the consummation of the Transaction as provided in <u>Section 3.2(b) of the Disclosure Schedule</u>.

8.8     <u>Frustration of Closing Conditions</u>.  Buyer may not rely on the failure of any condition set forth in this <u>Article 8</u>, if such failure was caused primarily by Buyer's failure to comply with any provision of this Agreement.

8.9     <u>No Injunctions</u>.  No temporary restraining order, preliminary or permanent injunction or <u>other</u> Order issued by any court of competent jurisdiction or other similar legal restraint shall be in effect that has the effect of prohibiting the consummation of any of the transactions contemplated by this Agreement or that otherwise adversely affects the right or ability of Buyer to own, operate or control the Business or the Transferred Assets or seeks damages in connection therewith.

8.10     <u>No Laws or Orders</u>.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Order which is in effect and which has the effect of making any of the transactions contemplated by this Agreement illegal or otherwise prohibiting the consummation of any of the transactions contemplated by this Agreement.

## <u>ARTICLE 9</u>
## <u>SELLER'S CONDITIONS TO CLOSING</u>

The obligations of Seller to, or to cause the Seller Subsidiaries, to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of

the following conditions, any or all of which may be waived in writing, in whole or in part, by Seller in its sole discretion:

9.1     <u>Representations and Warranties</u>.  The representations and warranties of Buyer shall be true and correct in all material respects at and as of the Closing (or, in the case of those representations and warranties that are made as of a particular date or period, as of such date or period).

9.2     <u>Performance of Covenants</u>.  Buyer shall have performed and complied with in all material respects all covenants and obligations required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

9.3     <u>No Litigation</u>.  There shall not be any litigation or Proceeding brought by any Governmental Authority that is pending or threatened and seeking to restrain or invalidate the transactions contemplated by this Agreement.

9.4     <u>No Orders</u>.  No Orders enjoining or preventing the consummation of any material portion of the transactions contemplated by this Agreement shall be in effect.

9.5     <u>Closing Documents</u>.  Buyer shall have delivered all documents required to be delivered by them at Closing pursuant to <u>Section 10.2</u> of this Agreement, in each case in form and substance reasonably satisfactory to Seller.

9.6     <u>Frustration of Closing Conditions</u>.  Seller may not rely on the failure of any condition set forth in this <u>Article 9</u>, if such failure was caused by Seller's failure to comply with any provision of this Agreement.

**ARTICLE 10**
**ITEMS TO BE DELIVERED AT CLOSING**

10.1     <u>Items to be Delivered by Seller</u>.  At the Closing, Seller shall deliver or cause to be delivered by the applicable Seller Subsidiary or other appropriate third Person to Buyer:

(a)     a certificate of Seller, dated as of the Closing Date and executed by an authorized Representative of Seller, to the effect that each of the conditions specified in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.5</u> are satisfied;

(b)     instruments of sale as shall, in the reasonable judgment of Seller and Buyer, be effective to vest in Buyer on the Closing Date all of the rights, title and interest of Seller and Seller Subsidiaries in and to the Transferred Assets, including one or more bills of sale, assignments and other instruments of transfer relating to the Transferred Assets in substantially the form attached hereto as <u>Exhibit A</u> ("<u>Bills of Sale</u>") duly executed;

(c)     instruments of assignment as shall, in the reasonable judgment of Seller and Buyer, be effective to transfer to Buyer on the Closing Date all of the rights of Seller and the Seller Subsidiaries in and to the Transferred Contracts, and to evidence the assumption by Buyer of the Assumed Liabilities of Seller and the Seller Subsidiaries thereunder, including a duly executed

-28-

assignment and assumption agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>");

(d)    duly executed assignment documents for each of the Transferred Intellectual Property, in substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>IP Assignments</u>");

and simultaneously with such delivery, Seller shall take such steps as are reasonably required to put Buyer in actual possession and operating control of the Transferred Assets; it being understood that, in each case, such deeds, bills of sale, assignments and other instruments of transfer shall not require Seller or any of its Affiliates, including any Seller Subsidiary, to make any additional representations, warranties or covenants, expressed or implied, not expressly contemplated by this Agreement.

10.2    <u>Items to be Delivered by Buyer</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller and the Seller Subsidiaries:

(a)    a certificate of each Buyer, dated as of the Closing Date and executed by an authorized Representative of each Buyer, to the effect that each of the conditions specified in <u>Section 9.1</u> and <u>Section 9.2</u> are satisfied ("<u>Buyer Compliance Certificate</u>");

(b)    duly executed Bills of Sale;

(c)    duly executed Assignment and Assumption Agreement; and

(d)    duly executed IP Assignments.

## <u>ARTICLE 11</u>
## <u>TERMINATION</u>

11.1    <u>Termination by Mutual Consent</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing, by the mutual written consent of Seller and Buyer.

11.2    <u>Termination by either Buyer or Seller</u>.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing by Buyer or Seller if (a) the Closing shall not have occurred prior to December 31, 2019 ("<u>Outside Closing Date</u>"), <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 11.2</u> shall not be available to any party whose failure (or failure by any of its Affiliates) to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur prior to the Outside Closing Date; or (b) any court of competent jurisdiction or other Governmental Authority having jurisdiction over Seller, Seller Subsidiaries, Buyer, or the Business has issued an Order or taken any other final action restraining, enjoining, or otherwise prohibiting or materially restricting the consummation of the transactions contemplated in this Agreement, and such Order or other action shall have become final and nonappealable.

-29-

11.3     Termination by Buyer.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing by Buyer if (a)  Seller breached any of its representations or warranties or shall have failed to perform in any material respect any of its covenants or agreements contained in this Agreement in such a manner that the closing conditions set forth in Section 8.1 or Section 8.2, as applicable, shall not be satisfied, which breach or failure is not curable or, if curable, is not cured within 30 days after the receipt of written notice by Buyer to Seller of such breach or failure; or (b) any condition in Article 8 becomes incapable of fulfillment at the Closing.

11.4     Termination by Seller.  This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing by Seller if (a) Buyer has breached any of its representations or warranties or failed to perform in any material respect any of their covenants or agreements contained in this Agreement in such a manner that the closing conditions set forth in Section 9.1 or Section 9.2, as applicable, shall not be satisfied, which breach or failure is not curable or, if curable, is not cured within 30 days after the receipt of written notice by Seller to Buyer of such breach or failure; or (b) any condition in Article 9 becomes incapable of fulfillment at the Closing.

11.5     Notice of Termination.  The party seeking to terminate this Agreement pursuant to this Article 11 (other than Section 11.1) shall give prompt written notice of such termination to the other party.

11.6     Effect of Termination and Abandonment.  In the event of the termination of this Agreement pursuant to any of the provisions of this Article 11, none of Seller nor Buyer (nor any of their respective directors and officers) shall have any liability or further obligation to the other party to this Agreement; provided, however, that the provisions of Section 13.14 relating to expenses, and this Section 11.6 shall survive any termination of this Agreement pursuant to the terms of this Article 11; provided, further, that nothing herein will relieve any party from liability for the intentional or willful breach of any representation or warranty or any failure to perform any covenant and agreement occurring prior to the termination.  Upon any termination of this Agreement pursuant to the terms and conditions hereof, each party hereto will return or destroy all documents, work papers and all other material of the other party relating to the transactions contemplated hereby and all copies of such materials, whether so obtained before or after the execution hereof, to the party furnishing the same.

## ARTICLE 12
## SURVIVAL; INDEMNIFICATION

12.1     Survival.  All representations and warranties in this Agreement shall expire on the twelve (12) month anniversary of the Closing.  Notwithstanding any provision in this Article 12 to the contrary, none of Seller and Buyer shall be liable for breach of any representation or warranty given by such party unless written notice of entitlement to make a Claim with respect to such Losses is given to such party on or prior to the expiration of the survival period of the particular representation, warranty, covenant or obligation as provided in this Section 12.1.  All covenants contained in this Agreement, including covenants to indemnify, shall survive until fully discharged, until three months after the Closing Date or by such covenant's express survival period, whichever is latest.

-30-

12.2    Indemnification by Seller.

(a)    Subject to the applicable limitations set forth herein, including as set forth in Section 12.5(f), from and after Closing, Seller will indemnify Buyer, its Affiliates, and their respective directors, officers, employees, stockholders, attorneys, accountants and agents (collectively, "Buyer Indemnified Parties") from and against any and all damage, loss, liability, cost and expense (including any reasonable attorney and accountant fees, legal costs and expenses) (collectively, "Losses" and, with respect to Buyer, "Buyer's Losses") as a result of, arising out of or in connection with: (i) any Retained Liability; (ii) subject to the Disclosure Schedule, any inaccuracy or breach of any representation and warranty by the Seller to Buyer in Article 3 as if such representation and warranty was, in each case, made on the date of this Agreement and on the Closing Date (in such case, as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties) (or, for any representation and warranty that expressly relates to a specified date, as of such specified date) or in the Seller Compliance Certificate delivered pursuant to Section 10.1(a); or (iii) any breach or nonperformance by Seller of any of its respective covenants or agreements contained in this Agreement following the Closing.

12.3    Indemnification by Buyer.  Subject to the applicable limitations set forth herein, Buyer will indemnify Seller, the Seller Subsidiaries and their Affiliates, and their respective directors, officers, employees, stockholders, attorneys, accountants and agents (collectively, "Seller Indemnified Parties") from and against any and all Losses of any Seller Indemnified Party (such Losses, "Seller's Losses") as a result of, arising out of or in connection with: (a) the Assumed Liabilities; (b) any inaccuracy or breach of any representation and warranty by Buyer to the Seller in Article 4 as if such representation and warranty was, in each case, made on the date of this Agreement and on the Closing Date (in such case, as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties) (or, for any representation and warranty that expressly relates to a specified date, as of such specified date) or in the Buyer Compliance Certificate delivered pursuant to Section 10.2(a); and (c) any breach or nonperformance by Buyer of any of its covenants or agreements contained in this Agreement following the Closing.

12.4    Notice of Claims.

(a)    Third Party Claims.

(i)    If any third party shall notify Buyer, Seller or the Seller Subsidiaries (the "Indemnified Party") with respect to any matter (a "Third Party Claim") that may give rise to a Claim for indemnification against the other party (the "Indemnifying Party") under this Article 12, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing; provided, however, that the failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been actually prejudiced as a result of such failure.

(ii)    Subject to Sections 12.4(a)(iii) and 12.4(a)(iv), the Indemnifying Party will have the right at any time to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice, at the Indemnifying Party's own expense; provided,

-31-

however, that the Indemnifying Party will not enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party unless (A) the judgment or proposed settlement releases the Indemnified Party completely in connection with such Third Party Claim; (B) there is no finding or admission of any violation of Laws or wrongdoing by or any violation of the rights of any Indemnified Party; and (C) the sole relief provided is monetary damages that are paid in full by the Indemnifying Party, which such consent shall not be unreasonably withheld, conditioned or delayed.   The Indemnifying Party shall give the Indemnified Party written notice of the Indemnifying Party's intention to settle any Third Party Claim at least five days prior to the settlement of any such Third Party Claim.

(iii)    In the event that the Indemnifying Party timely defends, contests or otherwise protects the Indemnified Party against a Third Party Claim, the Indemnified Party shall nevertheless have the right to, but shall not be obligated to, participate at its own expense in the defense of the Third Party Claim with counsel of its own choosing.

(iv)    In the event the Indemnifying Party fails to defend, contest or otherwise protect against any Third Party Claim in a timely manner, upon prior written notice to the Indemnifying Party, the Indemnified Party may, but shall not be obligated to, defend, contest or otherwise protect against the same and make any compromise or settlement thereof, and shall be entitled to recover the entire cost thereof from the Indemnifying Party, including reasonable attorneys' fees, disbursements and all amounts paid as a result of such Third Party Claim or suit or the compromise or settlement thereof; provided, however, that if the Indemnifying Party subsequently undertakes the defense of such matter, the Indemnified Party shall not be entitled to recover from the Indemnifying Party its costs thereafter incurred in the defense thereof other than the reasonable cost of investigation undertaken by the Indemnified Party and reasonable cost of providing assistance.   Notwithstanding anything in this Section 12.4(a) to the contrary, the Indemnified Party shall have the right to conduct and control, through counsel of its choosing, the defense, compromise and settlement of any Third Party Claim (A) that seeks as a primary remedy an injunction or other equitable relief against the Indemnified Party, (B) that is in respect of any matter involving potential criminal liability, (C) if the Indemnified Party has been advised by outside counsel that there would be an actual conflict of interest between the Indemnifying Party and the Indemnified Party with respect to such matter or (D) with respect to which the Indemnified Party irrevocably waives any rights it may have to indemnification under this Article 12.

(v)    Regardless of whether the Indemnifying Party has assumed the defense of a Third Party Claim, the Indemnified Party and the Indemnifying Party shall reasonably cooperate in the defense of such Third Party Claim.  Such cooperation shall include the provision and access to the defending party of documents, information, books and records reasonably requested by the defending party and material to such Claim, and making available employees as may be reasonably requested by the defending party and as shall be reasonably required in connection with the defense of such Claim and Proceeding resulting therefrom.

(vi)    To the extent that there is any conflict between Section 6.3 and this Section 12.4 regarding the procedure applicable to any claim principally involving Taxes, Section 6.3 shall govern.

-32-

(b)     Other Claims.  In the event that any Buyer Indemnified Party or Seller Indemnified Party should have a Claim for indemnification under this Article 12 against Seller or Buyer, as applicable, that does not involve a Third Party Claim, Buyer (if a Buyer Indemnified Party is seeking indemnification) or Seller (if a Seller Indemnified Party is seeking indemnification) shall promptly deliver to the other written notice of such Claim detailing the basis for such Claim.

12.5     Adjustment to  Indemnified Party's Losses; Limitations; Clarifications.

(a)     The amount of an Indemnified Party's Losses subject to indemnification hereunder or of any Claim therefor shall be calculated net of (i) any amounts actually recovered by the Indemnified Party or any of its Affiliates pursuant to any indemnification by or indemnification agreement with any non-affiliated third party (net of all direct collection expenses) and (ii) any insurance proceeds or other cash receipts or sources of reimbursement actually received by the Indemnified Party or any of its Affiliates as an offset against such party's Loss (net of all direct collection expenses and premium increases).  Each party hereby waives, to the extent permitted under its applicable insurance policies, any subrogation rights that its insurer may have with respect to such Losses.

(b)     Buyer and Seller shall reasonably cooperate with each other with respect to resolving any Claim for indemnification pursuant to this Article 12.  Buyer and Seller shall, or shall cause the applicable Indemnified Party to, use commercially reasonable efforts to seek recovery under all insurance policies covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder.

(c)     No Indemnified Party shall be entitled to double recovery (or recovery more than once) for the amount of any Losses indemnified by the Indemnifying Party under this Article 12 suffered by such party to the extent such party (or another Indemnified Party affiliated with such party) has otherwise been compensated for such Losses.

(d)     In the absence of fraud or willful misconduct, no Indemnifying Party shall have any liability under any provision of this Agreement for any punitive damages, except to the extent such damages are a component of damages awarded to a third party against an Indemnified Party in connection with a Third Party Claim.

(e)     No Indemnifying Party shall be required to indemnify any Indemnified Party to the extent of any Losses that a court of competent jurisdiction have determined by final judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party.

(f)     Buyer shall not have the right to indemnification under this Agreement with respect to, or based on, Taxes to the extent such Taxes (i) are attributable to a Post-Closing Tax Period (or portion thereof) or (ii) result from transactions or actions taken by Buyer or any of their Affiliates after the closing that are neither specifically contemplated by this Agreement or in the Ordinary Course of Business.

-33-

(g)      Notwithstanding any other provision in this Agreement to the contrary, if any representation or warranty contained in this Agreement or any Other Agreement, the Disclosure Schedule or in any Schedule, agreement, certificate or other document delivered in connection herewith is qualified by materiality, "Material Adverse Effect" or a derivative thereof, such qualification will be ignored and deemed not included in such representation or warranty for purposes of (i) determining whether there has been a breach or inaccuracy of such representation or warranty or certificate and (ii) calculating the amount of Losses with respect to any such breach or inaccuracy.

Notwithstanding the foregoing provisions of this Article 12, Seller shall not be liable for any Losses suffered by any Buyer Indemnified Party under Section 12.2(a)(ii) unless the aggregate of all Losses suffered by such Buyer Indemnified Party exceeds, on a cumulative basis, an amount equal to $25,000.  In addition, no equity holder of Seller shall be directly liable for any Losses suffered by any Buyer Indemnified Party under this Agreement in the absence of fraud committed by such equity holder with the specific intent of inducing Buyer to enter into this Agreement and upon which Buyer has reasonably relied.

12.6      Exclusive Remedy.  The parties hereto acknowledge and agree that the foregoing indemnification provisions in this Article 12 shall be their sole and exclusive remedy for money damages (but not for injunctive or other non-monetary equitable relief) with respect to the transactions contemplated by this Agreement, except with respect to fraud, as to which the parties shall have, in addition to the indemnification provisions of this Article 12, all of their rights and remedies at Law.  Nothing contained in this Section 12.6 shall have any effect on any party's rights under Section 13.15.   The parties each hereby waive any provision of any applicable Law to the extent that it would limit or restrict the agreements contained in this Section 12.6.

## ARTICLE 13
## MISCELLANEOUS

13.1      Notices.  Any notices or other communications required or permitted hereunder (including, by way of illustration and not limitation, any notice permitted or required under Article 13 hereof) to any party hereto shall be sufficiently given when delivered in person, or when sent by certified or registered mail, postage prepaid, or one Business Day after dispatch of such notice with an overnight delivery service, or when transmitted by facsimile or other form of electronic communication if an answer back is received by the sender, in each case addressed as follows:

In the case of Buyer:

TokenVault, Inc.
537 Stevenson Street
San Francisco, California  94103
Attn:  Interim Chief Executive Officer

-34-

With a copy to (which copy will not constitute notice):

> Latham & Watkins LLP
> 355 South Grand Avenue, Suite 100
> Los Angeles, California  90071
> Attn:  David Ajalat
> Email: david.ajalat@lw.com

In the case of Seller:

> TokenVault Limited
> 537 Stevenson Street
> San Francisco, California  94103
> Attn:  Chief Operating Officer
> Email:  aaron.travis@tokenvault.io

With a copy to (which copy will not constitute notice):

> Sidley Austin LLP
> 1001 Page Mill Road, Building 1
> Palo Alto, California 94304
> Attention:      Rob Carlson
> Email: rob.carlson@sidley.com

or such substituted address or attention as any party shall have given notice to the others in writing in the manner set forth in this Section 13.1.

13.2    Amendment.  This Agreement may be amended or modified in whole or in part only by an agreement in writing executed by Buyer and Seller and making specific reference to this Agreement.

13.3    Counterparts.  This Agreement may be executed in one or more counterparts (including by means of facsimile or other electronic means), each of which shall be deemed an original but all of which together will constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of an originally executed counterpart to this Agreement.

13.4    Binding on Successors and Assigns.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by and against the parties hereto and their respective successors and assigns in accordance with the terms hereof.  No party may assign its interest under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed; provided that Buyer may assign its rights and interests to any of their controlled Affiliates, but Buyer remains responsible in all respects for any of their obligations and duties under this Agreement.  Any purported assignment or delegation in violation of this Section 13.4 shall be null and void.  For the avoidance of doubt, a change of control of either Buyer or Seller shall not be deemed an assignment.

-35-

13.5   <u>Severability</u>.  In the event that any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions of this Agreement and any other application thereof shall not in any way be affected or impaired thereby; <u>provided</u>, <u>however</u>, that to the extent permitted by applicable Law, any invalid, illegal, or unenforceable provision may be considered for the purpose of determining the intent of the parties in connection with the other provisions of this Agreement.

13.6   <u>Waivers</u>.  Buyer and Seller may, by written agreement, (a) extend the time for the performance of any of the obligations or other acts of the parties hereto, (b) waive any inaccuracies in the representations contained in this Agreement or in any document delivered pursuant to this Agreement, (c) waive compliance with, or modify, any of the covenants or conditions contained in this Agreement, and (d) waive or modify performance of any of the obligations of any of the parties hereto; <u>provided</u> <u>that</u> no such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall operate as a waiver of, or an estoppel with respect to, any subsequent insistence upon such strict compliance other than with respect to the matter so waived or modified.

13.7   <u>Headings</u>.  The headings in the Sections and subsections of this Agreement and in the Schedules are inserted for convenience only and in no way alter, amend, modify, limit or restrict the meaning or interpretation of contractual obligations of the parties under this Agreement.

13.8   <u>Entire Agreement</u>.   This Agreement and the Other Agreements and the instruments to be delivered by the parties pursuant to the terms hereof and thereof constitute the entire agreement among the parties with respect to the subject matter hereof.   All prior negotiations and agreements among the parties hereto with respect to the subject matter of this Agreement and the Other Agreements are superseded by this Agreement (except with respect to the Confidentiality Agreement) and the Other Agreements, and there are no representations, warranties, understandings or agreements other than those expressly set forth herein, in an Other Agreement, or in a Schedule delivered pursuant hereto, except as modified in writing concurrently herewith or subsequent hereto.

13.9   <u>Choice of Law</u>.  This Agreement shall be governed, construed, and enforced in accordance with the Laws of the State of Delaware without regard to the conflicts of law principles thereof.

13.10   <u>Venue</u>.  Any and all actions brought in court shall be filed in a state or federal district court located in California and the parties specifically consent and submit to the jurisdiction and venue of each such state or federal court.  Each party further agrees that service of any process, summons, notice or document by United States registered mail to such party's respective address set forth above shall be effective service of process for any action with respect to any matters to which it has submitted to jurisdiction in this <u>Section 13.10</u>.  Each party irrevocably and unconditionally waives any objection to the laying of venue of any action arising out of this Agreement, the Other Agreements or the transactions contemplated hereby or thereby in any such court, and hereby further irrevocably and unconditionally waives and

-36-

agrees not to plead or claim in any such court that any such action brought in any such court has been brought in an inconvenient forum.

13.11  <u>Waiver of Jury Trial Rights</u>.  EACH OF THE PARTIES HERETO EXPRESSLY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT, THE OTHER AGREEMENTS OR THE MATTERS CONTEMPLATED HEREBY OR THEREBY.  EACH OF THE PARTIES ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN FUTURE DEALINGS. EACH OF THE PARTIES HERETO FURTHER REPRESENTS AND WARRANTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS RIGHT TO A TRIAL BY JURY FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

13.12  <u>No Third-Party Rights</u>.  Other than Sections which are specifically for the benefit of Buyer Indemnified Parties or the Seller Indemnified Parties, this Agreement is not intended and shall not be construed to create any rights in any Persons other than Buyer, Seller and Seller Subsidiaries, and no Person shall assert any rights as third-party beneficiary hereunder.

13.13  <u>Transfer Taxes</u>.

(a)  The Seller, on the one hand, and Buyer, on the other hand, each shall be responsible for and pay fifty percent (50%) of all applicable Transfer Taxes.  Seller shall file any applicable Tax Returns related to Transfer Taxes, with the cooperation of Buyer, if necessary.

(b)  This Agreement, together with any technology transfer agreements entered into in conjunction with the Agreement, is intended to constitute a "technology transfer agreement" as such term is defined in California Code of Regulations 18 § 1507(a)(1).

13.14  <u>Expenses</u>.  Except as expressly provided otherwise herein, Seller, on the one hand, and Buyer, on the other, shall pay all costs and expenses incurred by them or on their behalf in connection with this Agreement and the transactions contemplated hereby, including, without limiting the generality of the foregoing, fees and expenses of their own brokers, financial consultants, accountants and counsel.

13.15  <u>Specific Performance</u>.  The parties agree that irreparable damage would occur and that the parties would not have any adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Therefore, in addition to any other right or remedy to which any party may be entitled at law or in equity, the obligations of Seller under this Agreement, including the Seller's obligation to sell and transfer and to cause the sale and transfer of the Transferred Assets to Buyer, and the obligations of Buyer under this Agreement, including Buyer's obligation to purchase and acquire the Transferred Assets and assume the Assumed Liabilities from Seller and Seller Subsidiaries, and Seller's and Buyer's respective obligations, shall be enforceable by a decree of specific performance issued by the Court of Chancery of the State

of Delaware or, if under applicable Law exclusive jurisdiction over such matter is vested in the federal courts, any court of the United States located in the State of Delaware, and appropriate injunctive relief may be applied for and granted in connection therewith, this being in addition to any other remedy to which such party is entitled at law or in equity. Each of the parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the party seeking the injunction, specific performance and other equitable relief has an adequate remedy of law.

13.16   No Recourse.

(a)     This Agreement may not be enforced against, and no Claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may be made against, any former, current or future director, officer, agent, Affiliate (other than Seller and its successors and permitted assignees), manager, assignee or employee of Seller (or any of its successors or permitted assignees), any former, current or future stockholder of Seller (or any of their successors or permitted assignees) or any Affiliate thereof (other than Seller and its successors and permitted assignees) or any former, current or future director, officer, agent, employee, Affiliate (other than Seller and its successors and permitted assignees), assignee, or stockholder of any of the foregoing (other than Seller) (the foregoing Persons, other than Seller and its successors and permitted assignees, collectively, the "Seller Protected Parties"), none of the Seller Protected Parties shall have any liability for any obligations or liabilities of Seller or any Affiliate under this Agreement or for any Claims based on, or by reason of, the transactions contemplated by this Agreement and in no event shall Buyer or any of its Affiliates, and Buyer agrees not to and to cause their Affiliates not to, seek to enforce this Agreement against, make any Claims for breach of this Agreement against, or seek to recover monetary damages from any Seller Protected Party.

(b)     This Agreement may not be enforced against, and no Claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may be made against, any former, current or future director, officer, agent, Affiliate (other than Buyer and its successors and permitted assignees), manager, assignee or employee of Buyer (or any of their successors or permitted assignees), any former, current or future general or limited partner, manager, member or stockholder of Buyer (or any of their successors or permitted assignees) or any Affiliate thereof (other than Buyer and its successors and permitted assignees) or any former, current or future director, officer, agent, employee, Affiliate (other than Buyer and its successors and permitted assignees), assignee, general or limited partner, stockholder, manager or member of any of the foregoing (other than Buyer) (the foregoing persons, other than Buyer and its successors and permitted assignees, collectively, the "Buyer Protected Parties"), none of the Buyer Protected Parties shall have any liability for any obligations or liabilities of Buyer or any Affiliate under this Agreement or for any Claims based on, or by reason of, the transactions contemplated by this Agreement and in no event shall Seller or any of its Affiliates, and Seller agrees not to and to cause its Affiliates not to, seek to enforce this Agreement against, make any Claims for breach of this Agreement against, or seek to recover monetary damages from any Buyer Protected Party.

*[The remainder of the page is intentionally left blank.]*

-38-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized Representatives on the day and year first above written.

**SELLER:**

**TOKENVAULT LIMITED**

By: _Austin Trambley_
Name: Austin Trambley
Title: Founder

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized Representatives on the day and year first above written.

**BUYER:**

TokenVault, Inc.

By: _____

Name: Aaron Travis

Title: President

**SCHEDULE A**
**DEFINITIONS**

For purposes of the Agreement (including this Schedule A):

"Affiliate" means with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of more than 50% of voting equity ownership of such Person (or securities convertible or exchangeable into more than 50% of such voting equity ownership interest), by Contract or otherwise.

"Business" means the business of Seller and the Seller Subsidiaries.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks in the State of California, United States of America, are authorized or required by Law to be closed for business.

"Business Employee" means an employee of Seller or any of the Seller Subsidiaries or any of their Affiliates set forth on Schedule B.

"Buyer Included Taxes" means all Taxes allocated to the Post-Closing Tax Period that are the responsibility of Buyer pursuant to Section 6.1(b) and Buyer's share of all Transfer Taxes pursuant to Section 13.13.

"Buyer Subscription Agreement" means the Subscription Agreement between Buyer and FT Fintech Holdings, LLC, or its applicable Affiliate.

"Claim" means any and all claims or other Proceedings for liabilities, losses, damages, deficiencies, demands, fines, penalties, interest, assessments, judgments, Liens, charges, Orders, dues, and assessments, of whatever kind and nature and all costs and expenses relating thereto, including fees and expenses of counsel, accountants and other experts, and other expenses of investigation and litigation.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Convertible Note" means the Convertible Promissory Note dated June 13, 2019, issued by Seller in favor of FT Fintech Holdings, LLC, in the principal amount of $1,500,000.

"Copyrights" has the meaning set forth in the definition of Intellectual Property.

"Employment Agreement" means a Contract of a Seller or any of its Affiliates (including any Seller Subsidiary) with any Disclosure Employee (other than at-will employees), to which Seller or any of its Affiliates (including a Seller Subsidiary) has any actual or contingent liability or obligation to provide compensation and/or benefits in consideration for past, present or future services.

A-1

"Environment" means surface or subsurface soil or strata, surface waters and sediments, navigable waters, wetlands, groundwater, sediments, drinking water supply, ambient air, species, plants, wildlife, animals and natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any regulations or rules issued pursuant thereto.

"ERISA Affiliate" means any entity that would have ever been considered a single employer with Seller or any Seller Subsidiary under Section 4001(b) of ERISA or part of the same "controlled group" as Seller or any Seller Subsidiary for purposes of Section 302(d)(3) of ERISA.

"GAAP" means accounting principles generally accepted in the United States as in effect from time to time and as consistently applied through the periods involved.

"Governmental Authority" means any federal, national, state, regional, county, municipal, local or foreign court, arbitral tribunal, agency, board, bureau or commission or other governmental, quasi-governmental or other regulatory authority, instrumentality or private body anywhere in the world exercising any executive, legislative, judicial, regulatory, Tax or other governmental or quasi-governmental authority.

"Income Tax" means any Tax measured by or imposed on net income or franchise Tax imposed in lieu thereof.

"Intellectual Property" means any and all of the following in any jurisdiction throughout the world (i) patents and applications therefor (including any continuations, continuations-in-part, divisionals, reissues, renewals, extensions or modifications of any of the foregoing) (collectively, "Patents"); (ii) trademarks, trade names, service marks, service names, brand names, certification marks, trade dress rights, and any other indicia of source or origin together and rights therein, all applications, registrations, and renewals in connection therewith, and all goodwill associated with each of the foregoing (collectively, "Marks"); (iii) copyrights, copyright registrations and applications therefor and all other rights in works of authorship corresponding thereto (collectively, "Copyrights"); (iv) trade secrets rights and all other rights in or to confidential business or technical information that derive economic value from being held in confidence (collectively, "Trade Secrets"); (v) all rights in or to Uniform Resource Locators, website addresses, social media identifiers and domain names; and (vi) any similar, corresponding or equivalent rights to any of the foregoing anywhere in the world.

"Knowledge" or "knowledge" means, with respect to a Person and a given fact or matter, that such Person has actual knowledge of such fact or matter. With respect to Seller, "Knowledge" means the Knowledge of Trombley, Alina Jais and Aaron Travis.

"Law" means any federal, state, local or foreign law, statute, rule, code, regulation, ordinance, Order, Permit or directive of, or issued by, any Governmental Authority.

"Liabilities" means, with respect to any Person, any and all liabilities of any kind (whether known or unknown, contingent, accrued, due or to become due, secured or unsecured, matured or otherwise), including but not limited to indebtedness, accounts payable, royalties payable, and other reserves, accrued bonuses and commissions, accrued vacation and any other form of leave,

-2-

termination payment obligations, employee expense obligations and all other liabilities of such Person or any of its Subsidiaries or Affiliates, regardless of whether such liabilities are required to be reflected on a balance sheet in accordance with GAAP.

"Lien" means any mortgage, deed of trust, lien, pledge, charge, security interest, option, restriction on transferability or voting, limitation, easement, title defect or other adverse Claim of ownership or use, or other encumbrance of any kind, character or description, whether or not of record (including any deposit, conditional or installment sale, other title retention Contract or capital lease), any lease in the nature thereof, or any filing of, or agreement to give, any financing statement.

"Marks" has the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" means any change, development, effect, event or state of facts which, individually or in the aggregate, has had or reasonably would be expected to (i) have a material adverse effect on the Transferred Assets, the condition (financial or otherwise) or results of operations of the Business, taken as a whole, or (ii) materially delay or materially impede the ability of Seller or any Seller Subsidiary to consummate the transactions contemplated by this Agreement; provided that with respect to subsection (i) of the term "Material Adverse Effect" none of the following shall be deemed to constitute a Material Adverse Effect, and no changes, circumstances, developments, state of facts, events or effects resulting from or arising out of the following shall be taken into account in determining whether a Material Adverse Effect has occurred, or may, would or could occur: (a) conditions affecting United States or foreign economic, financial, banking, currency or capital markets generally or any changes therein, (b) national or international political, industry or social conditions (including the engagement in hostilities or the occurrence of any national emergency or war or the occurrence of any military or terrorist attack or the disruption of financial, banking or securities markets (including any decline in the price of any security or any market index)), (c) changes in Laws issued by any Governmental Authority or changes in GAAP, (d) the announcement of this Agreement, the transactions contemplated hereby, the Other Agreements, or the identity of the parties hereto, (e) the performance by Buyer or its Affiliates of any action, or the failure to take any action, in each case at the written request of Seller or a Seller Subsidiary or pursuant to this Agreement or the Other Agreements, (f) the performance by Seller or its Affiliates of any action, or the failure to take any action, in each case at Buyer's written request or pursuant to this Agreement or the Other Agreements, and (g) in and of itself, any failure of Seller or the Business to meet any projections or estimates for any period; provided further that with respect to the conditions set forth in clauses (a) through (c), such changes, circumstances, events, conditions or effects do not disproportionately impact the Business relative to other Persons who operate in the same industry as the Business and are of comparable size.

"Multiemployer Plan" has the meaning as provided in Section 3(37) and Section 4001(a)(3) of ERISA.

"Open Source Software" means all software or other Technology that is distributed as "open source software" or "free software" or is otherwise publicly distributed or made generally available in source code or equivalent form under terms that permit the free use, modification and redistribution of such software or Technology.  Open Source Software includes, without limitation,

ACTIVE 245910556

any software distributed under the following licenses: GNU General Public License (GPL), GNU Lesser General Public License (LGPL), Mozilla Public License (MPL), BSD licenses, the Artistic License, the Netscape Public License, the Sun Community Source License (SCSL), the Sun Industry Standards License (SISL) and the Apache License.

"Order" means any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, determination, decree, consent decree or verdict entered, issued, made or rendered by any arbitrator or Governmental Authority (whether temporary, preliminary or permanent).

"Ordinary Course of Business" means the ordinary course of conduct of the Business, which is consistent with past practices of the Business.

"Other Agreements" means the Assignment and Assumption Agreement, Bills of Sale, the IP Assignments and each other agreement, instrument or other document required to be executed by any of Buyer, Seller or any of Seller's Affiliates in connection with the transactions contemplated by this Agreement.

"Patents" has the meaning set forth in the definition of Intellectual Property.

"Permit" means any material permit, authorization, approval, registration, license, franchise, certificate, exemption, waiver or variance issued or granted by or obtained from any Governmental Authority.

"Permitted Encumbrances" means (a) Liens for Taxes not yet due and payable, (b) Liens disclosed in the Financial Statements (solely through the period immediately prior to the Closing Date), (c) inbound software licenses and other restrictions on the use of software and related documents licensed from third parties to the extent disclosed on the Disclosure Schedule, (d) non-exclusive outbound licenses of Intellectual Property or Technology, (e)(i) Liens imposed by Law and incurred in the Ordinary Course of Business for obligations not yet due and payable to landlords, carriers, warehousemen, laborers, materialmen and the like (solely through the period immediately prior to the Closing Date), all of which shall be discharged prior to the Closing, (ii) easements, building restrictions, rights of way, reservations and such similar encumbrances or charges against real property as are of a nature generally existing with respect to properties of a similar character and which do not in any material way affect the use thereof in the Business and (iii) the Liens set forth on Section 1.1 of the Disclosure Schedule (solely through the period immediately prior to the Closing Date); (f) with respect to any Contract, any Lien imposed on such Contract (or any right thereunder) pursuant to the terms and conditions of such Contract which do not individually or in the aggregate, materially impair the continued ownership, use and operation of such Contracts; (g) Liens incurred in the Ordinary Couse of Business in connection with workers' compensation and unemployment insurance or similar laws; and (h) other imperfections of title or other *de minimis* encumbrances, if any, which do not, individually or in the aggregate, materially impair the continued ownership, use and operation of the assets to which they relate in the conduct of the Business as presently conducted.

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a governmental entity or any agency, instrumentality or political subdivision of a Governmental Authority, or any other entity or body.

ACTIVE 245910556

"Proceeding" means any claim, assertion, notice of claim or assertion, complaint, action, litigation, suit, proceeding, formal investigation, inquiry, audit or review of any nature, civil, criminal, regulatory, administrative or otherwise, or any grievance, arbitration or arbitration demand.

"Product" means products and/or services, and related documentation, currently or previously researched, designed, developed, manufactured, performed, licensed, sold, distributed and/or otherwise made commercially available by the Seller and used in the Business.

"Representative" means with respect to any Person, (a) any director, officer, partner, executor, trustee, employee, agent, consultant, advisor, or other representative of such Person, (b) any Person with respect to which such Person serves as a general partner or trustee (or in a similar capacity), and (c) legal counsel, accountants and financial advisors of such Person.

"Seller Included Taxes" means all Taxes allocated to the Pre-Closing Tax Period that are the responsibility of Seller pursuant to Section 6.1 and Seller's share of all Transfer Taxes pursuant to Section 13.13.

"Seller Transaction Expenses" means the expenses incurred by, or on behalf of, Seller and its Affiliates in connection with or relating to this Agreement or the Other Agreements or the transactions contemplated hereby or thereby, including, without limitation, attorneys' fees, accountants' fees, investment banking fees, and loan prepayment fees in connection with or relating to this Agreement or the Other Agreements or the transactions contemplated hereby or thereby.

"Subsidiary" of a Person means any other Person, whether incorporated or unincorporated, of which (i) such Person or any other Subsidiary of such Person is a general partner (excluding such partnerships where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership) or (ii) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such Person is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries.

"Tax" means all federal, territorial, state, provincial, local or foreign government taxes, levies, assessments, duties, imposts or other like assessments, charges or fees (including estimated taxes, charges and fees), including, without limitation, income, profits, gross receipts, transfer, excise, property, sales, use, value-added, ad valorem, license, excise, capital, wage, employment, payroll, withholding, Social Security, Medicare, severance, occupation, import, custom duties, stamp, documentary, mortgage, registration, alternative, add-on minimum, environmental, franchise or other governmental taxes or charges of any kind whatsoever, whether disputed or not, imposed by any Governmental Authority responsible for the imposition of any such tax, including any interest, penalties, fines or additions to tax applicable or related thereto, and also including all amounts described above payable as a result of having been a member of a consolidated, combined, affiliated or unitary group, or as a result of successor or transferee liability, or by contract.

"Tax Returns" means, collectively, all reports, declarations, filings, estimates, returns, information statements and similar documents filed or required to be filed with any Governmental Authority

ACTIVE 245910556

in respect of, any Taxes, including, without limitation, any schedule or attachment thereto and any amendments thereof.

"<u>Technology</u>" means software, technology, technical information and know-how, including designs, formulae, specifications, design and manufacturing schematics, manufacturing and other processes, algorithms, data, databases, methods, techniques, ideas, concepts, inventions, discoveries, developments, innovations, computer programs, whether in source code or in executable code form, and other similar subject matter, and all recordings, graphs, drawings, reports, notes, analyses and other writings and recordations, and any other embodiments of the foregoing, in any form, and all related subject matter used in the design, development, reproduction, sale, marketing, maintenance or modification of any of the foregoing.

"<u>Trade Secrets</u>" has the meaning set forth in the definition of Intellectual Property.

"<u>Transfer Taxes</u>" means all applicable sales, transfer, goods and services, excise, stamp, documentary, use, filing and other similar Taxes and fees that may become due or payable (and are not subject to an exemption) as a result of the sale, conveyance, assignment, transfer or delivery of the Transferred Assets, whether levied on Buyer or Seller, including all related interest, penalties and additions to Tax.

"<u>Trombley</u>" means Austin Trombley.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state or local Laws, including, but not limited to, California Labor Code section 1400 et seq.

<u>Terms Defined Elsewhere in this Agreement</u>.  For purposes of this Agreement, the following terms have the meanings set forth in the Sections indicated:

| <u>Term</u>: | <u>Section</u>: |
|---|---|
| Acquisition | 2.1(b) |
| Agreement | Preamble |
| Apportioned Obligations | 6.1(b) |
| Assignment and Assumption Agreement | 10.1(c) |
| Assumed Liabilities | 2.4 |
| Bills of Sale | 10.1(b) |
| Buyer | Preamble |
| Buyer Compliance Certificate | 10.2(a) |
| Buyer Indemnified Parties | 12.2(a) |
| Buyer's Losses | 12.2(a) |
| Buyer Non-Voting Shares | 2.1(b) |
| Buyer Protected Parties | 13.16(b) |
| Closing | 2.6(b) |
| Closing Date | 2.6(b) |
| Company Software | 3.6(l) |
| Confidential Information Agreement | 3.8(g) |
| Contracts | 2.2(a) |

ACTIVE 245910556

| | |
|---|---|
| Disclosure Employees | 7.1(a) |
| Disclosure Schedule | Article 3 |
| Distribution | 2.10 |
| Excluded Assets | 2.3 |
| Financial Statements | 3.3 |
| Indemnified Party | 12.4(a)(i) |
| Indemnifying Party | 12.4(a)(i) |
| IP Assignments | 10.1(e) |
| Liabilities | 2.4 |
| Losses | 12.2(a) |
| Material Contract | 3.7(a) |
| New Plans | 7.2(a) |
| Old Plans | 7.2(b) |
| Other Representations | 12.1 |
| Outside Closing Date | 11.2 |
| Owned Intellectual Property | 3.6(c) |
| Personal Information | 3.11(a) |
| Post-Closing Tax Period | 6.1(b) |
| Pre-Closing Tax Period | 6.1(b) |
| Registered Intellectual Property | 3.6(j) |
| Retained Liabilities | 2.4 |
| Return Date | 2.10 |
| Return Shares | 2.10 |
| Seller | Preamble |
| Seller Claims | 2.2(b) |
| Seller Compliance Certificate | 10.1(a) |
| Seller Indemnified Parties | 12.3 |
| Seller's Losses | 12.3 |
| Seller Protected Parties | 13.16(a) |
| Seller Subsidiaries | Recitals |
| Straddle Period | 6.1(b) |
| Tax Claim | 6.4(a) |
| Third Party Claim | 12.4(a)(i) |
| Transferred Assets | 2.2 |
| Transferred Contracts | 2.2(a) |
| Transferred Employees | 7.1(a) |
| Transferred Intellectual Property | 2.2(f) |
| Transferred Leases | 2.2(k) |
| Transferred Registered IP | 2.2(e) |
| Transferred Technology | 2.2(f) |

-7-

## Schedule B
## Business Employees

| US Employees | City | State |
|---|---|---|
| Aaron Travis | San Francisco | CA |
| Alina Jais | San Francisco | CA |
| Sarkees John Nahas | Los Angeles | CA |
| Elizabeth Williams | San Francisco | CA |
| Craig Merchant | San Francisco | CA |

| India Employees | | |
|---|---|---|
| Atul Patil | Bangalore | Karnataka |
| Mohammad Adil | Bangalore | Karnataka |
| Soumya Mohanty | Bangalore | Karnataka |
| Sujitha Vijayakumar | Bangalore | Karnataka |
| Rikki Chouhan | Bangalore | Karnataka |
| *Ritwik Sinha* | Bangalore | *Karnataka* |
| Shubham Shukla | Bangalore | Karnataka |
| Akhil Bharti | Bangalore | Karnataka |
| Abhishek Mahra | Bangalore | Karnataka |
| Abhinav Shukla | Bangalore | Karnataka |
| Priyanka Mohanty | Bangalore | Karnataka |
| Bharti Sharma | Bangalore | Karnataka |
| Neha Prakash | Bangalore | Karnataka |
| Karamvir Kaur | Bangalore | Karnataka |
| Girisha Chennura | Bangalore | Karnataka |
| Tejashri Dilip Swami | Bangalore | Karnataka |
| Viswanath Kapavarapu | Bangalore | Karnataka |
| Mudit Marda | Bangalore | Karnataka |
| Nikhil Borawar | Bangalore | Karnataka |
| Abhinav Korpal | Bangalore | Karnataka |

ACTIVE 245910556

**EXHIBIT C**

**<u>Amended and Restated Certificate of Incorporation</u>**

[See attached]

Exhibit C

ACTIVE 250104720

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
TOKENVAULT, INC.

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

TokenVault, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "**General Corporation Law**"),

**DOES HEREBY CERTIFY:**

1.      That the name of this corporation is TokenVault, Inc., and that this corporation was originally incorporated pursuant to the General Corporation Law on September 25, 2019.

2.      That the Board of Directors duly adopted resolutions proposing to amend and restate the Certificate of Incorporation of this corporation, declaring said amendment and restatement to be advisable and in the best interests of this corporation and its stockholders, and authorizing the appropriate officers of this corporation to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended and restated in its entirety to read as follows:

**FIRST:** The name of this corporation is TokenVault, Inc. (the "**Corporation**").

**SECOND:** The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801. The name of its registered agent at such address is The Corporation Trust Company.

**THIRD:** The nature of the business or purposes to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law.

**FOURTH:**     The total number of shares of all classes of stock which the Corporation shall have authority to issue is (i) 1,000 shares of Voting Common Stock, $0.001 par value per share ("**Voting Common Stock**"), (ii) 8,385,909 shares of Class A Non-Voting Common Stock, $0.001 par value per share ("**Class A Non-Voting Common Stock**") and (iii) 3,914,162 shares of Class B Non-Voting Common Stock, $0.001 par value per share ("**Class B Non-Voting Common Stock**", and together with the Class A Non-Voting Common Stock, the "**Non-Voting Common Stock**"). The Voting Common Stock and Non-Voting Common Stock are referred to herein as the "**Common Stock**".

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of capital stock of the Corporation.

A.    VOTING COMMON STOCK

1.    <u>Voting</u>.  The holders of the Voting Common Stock are entitled to one vote for each share of Voting Common Stock held at all meetings of stockholders (and written actions in lieu of meetings).

2.    <u>Redemption</u>.  Shares of the Voting Common Stock shall not be subject to any redemption by the Corporation.

B.    NON-VOTING COMMON STOCK

1.    <u>Voting</u>.  The holders of the Non-Voting Common Stock shall not be entitled to any vote on any matters of the Corporation, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

2.    <u>Redemption</u>.

2.1    <u>Redemption of Class A Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall only be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors of the Corporation determines that it is a securities law violation for one or more holders of the Class A Non-Voting Common Stock to hold such shares.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.2    <u>Redemption of Class B Non-Voting Common Stock</u>.  The Class A Non-Voting Common Stock shall be subject to redemption in accordance with this Section 2 if and to the extent that the Board of Directors so elects, in its sole discretion, to effectuate such redemption.  Promptly after the Board of Directors has made such determination, it shall provide a Redemption Notice in accordance with Section 2.4 below to such holder and otherwise comply with the provisions of such Section 2.4.

2.3    <u>Redemption Price; Terms of Payment</u>.  Unless prohibited by Delaware law governing distributions to stockholders, any shares of Non-Voting Common Stock to be redeemed in accordance with this Section 2 (such shares, "**Shares Subject to Redemption**") shall be redeemed by the Corporation at a price equal to their original issue price per share, plus all declared but unpaid dividends thereon (the "**Redemption Price**").  The date of payment provided in the Redemption Notice (as defined below) shall be referred to as a "**Redemption Date.**"  On the Redemption Date, the Corporation shall redeem all outstanding shares of Non-Voting Common Stock constituting Shares Subject to Redemption for cash.  If on any Redemption Date, Delaware law governing distributions to stockholders or other applicable law prevents the Corporation from redeeming all Shares Subject to Redemption, then the Corporation shall redeem the maximum number of shares that it may redeem consistent with such law, which shall be effectuated on a pro rata basis based upon the number of shares held by each holder of Non-Voting

Common Stock constituting Shares Subject to Redemption, and shall redeem the remaining shares as soon as it may lawfully do so under such law.

2.4     Redemption Notice.  The Corporation shall send written notice of the mandatory redemption (the "**Redemption Notice**") to each holder of record of Shares Subject to Redemption not less than thirty (30) days prior to the applicable Redemption Date.  Each Redemption Notice shall state:

(a)     the number of shares of Non-Voting Common Stock held by the holder that the Corporation shall redeem on the Redemption Date specified in the Redemption Notice;

(b)     the Redemption Date and the Redemption Price; and

(c)     for holders of shares in certificated form, that the holder is to surrender to the Corporation, in the manner and at the place designated, his, her or its certificate or certificates representing the shares of Non-Voting Common Stock to be redeemed.

2.5     Surrender of Certificates; Payment.  On or before the applicable Redemption Date, each holder of shares of Non-Voting Preferred Stock to be redeemed on such Redemption Date shall, if a holder of shares in certificated form, surrender the certificate or certificates representing such shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Corporation to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate) to the Corporation, in the manner and at the place designated in the Redemption Notice, and thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.  In the event less than all of the shares of Non-Voting Stock represented by a certificate are redeemed, a new certificate, instrument, or book entry representing the unredeemed shares of Non-Voting Common Stock shall promptly be issued to such holder.

2.6     Rights Subsequent to Redemption.  If the Redemption Notice shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Non-Voting Common Stock to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then notwithstanding that any certificates evidencing any of the shares of Non-Voting Common Stock so called for redemption shall not have been surrendered, any dividends with respect to such shares of Non-Voting Common Stock shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such  certificate or certificates therefor.

3.     Redeemed or Otherwise Acquired Shares.  Any shares of Non-Voting Common Stock that are redeemed or otherwise acquired by the Corporation or any of its subsidiaries shall be automatically and immediately cancelled and retired and shall not be reissued,

ACTIVE 250108714v.2

sold or transferred.  Neither the Corporation nor any of its subsidiaries may exercise any rights granted to the holders of Non-Voting Common Stock following redemption.

4.    <u>Waiver</u>.  Any of the rights, powers, preferences and other terms of the Common Stock set forth herein may be waived on behalf of all holders of Common Stock by the affirmative written consent or vote of the holders of at least a majority of the shares of Voting Common Stock then outstanding.

5.    <u>Notices</u>.  Any notice required or permitted by the provisions of this Article Fourth to be given to a holder of shares of Common Stock shall be mailed, postage prepaid, to the post office address last shown on the records of the Corporation, or given by electronic communication in compliance with the provisions of the General Corporation Law, and shall be deemed sent upon such mailing or electronic transmission.

6.    <u>Other Rights, Preferences and Privileges</u>.  Except as expressly set forth in Section 2 of this Article Fourth, Part B, with respect to redemption, the rights, preferences and privileges of the Class A Non-Voting Common Stock and the Class B Non-Voting Common Stock shall be identical.

C.    PAYMENTS TO HOLDERS OF COMMON STOCK UPON LIQUIDATION.

1.    <u>General</u>.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the holders of shares of Common Stock shall be distributed upon the holders of Common Stock, pro rata based upon the number of shares held by each such holder.

2.    <u>Deemed Liquidation Event</u>.  For purposes of Section 1 above, each of the following events shall be deemed to be a liquidation, dissolution or winding up of the Corporation: (a) a merger or consolidation in which the Corporation is a constituent party; (b) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation; except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; or (c) (1) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or (2) the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

4

**FIFTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation or Bylaws, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

**SIXTH:** Subject to any additional vote required by this Amended and Restated Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation; provided, that the number of directors shall be no less than one (1) and no greater than three (3). Each director shall be entitled to one vote on each matter presented to the Board of Directors.

**SEVENTH:** Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

**EIGHTH:** Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**NINTH:** To the fullest extent permitted by law, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law or any other law of the State of Delaware is amended after approval by the stockholders of this Article Ninth to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law as so amended.

Any repeal or modification of the foregoing provisions of this Article Ninth by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director occurring prior to, such repeal or modification.

**TENTH:** To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Corporation (and any other persons to which General Corporation Law permits the Corporation to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the General Corporation Law.

Any amendment, repeal or modification of the foregoing provisions of this Article Tenth shall not (a) adversely affect any right or protection of any director, officer or other agent of the Corporation existing at the time of such amendment, repeal or modification or (b) increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer or agent occurring prior to, such amendment, repeal or modification.

ACTIVE 250108714v.2

**ELEVENTH:**  The Corporation renounces, to the fullest extent permitted by law, any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of (i) any director of the Corporation who is not an employee of the Corporation or any of its subsidiaries, or (ii) any holder of Series A Preferred Stock or any partner, member, director, stockholder, employee, affiliate or agent of any such holder, other than someone who is an employee of the Corporation or any of its subsidiaries (collectively, the persons referred to in clauses (i) and (ii) are "**Covered Persons**"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Corporation while such Covered Person is performing services in such capacity.  Any repeal or modification of this Article Eleventh will only be prospective and will not affect the rights under this Article Eleventh in effect at the time of the occurrence of any actions or omissions to act giving rise to liability.  Notwithstanding anything to the contrary contained elsewhere in this Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the shares of the Voting Common Stock the outstanding, will be required to amend or repeal, or to adopt any provisions inconsistent with this Article Eleventh.

**TWELFTH:**  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article Twelfth shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article Twelfth (including, without limitation, each portion of any sentence of this Article Twelfth containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

**THIRTEENTH:**  For purposes of Section 500 of the California Corporations Code (to the extent applicable), in connection with any repurchase of shares of Common Stock permitted under this Amended and Restated Certificate of Incorporation from employees, officers, directors or consultants of the Corporation in connection with a termination of employment or services pursuant to agreements or arrangements approved by the Board of Directors (in addition to any

other consent required under this Amended and Restated Certificate of Incorporation), such repurchase may be made without regard to any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined in Section 500 of the California Corporations Code).  Accordingly, for purposes of making any calculation under California Corporations Code Section 500 in connection with such repurchase, the amount of any "preferential dividends arrears amount" or "preferential rights amount" (as those terms are defined therein) shall be deemed to be zero (0).

\* \* \*

     **3.**     That the foregoing amendment and restatement was approved by the holders of the requisite number of shares of this corporation in accordance with Section 228 of the General Corporation Law.

     **4.**     That this Certificate of Incorporation, which restates and integrates and further amends the provisions of this Corporation's Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law.

     **IN WITNESS WHEREOF**, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of this corporation on this 24th day of October, 2019.

By:   /s/ Aaron Travis          
          Aaron Travis, President

7