1  Jeffery D. McFarland
2  California Bar No. 157628
   jmcfarland@mckoolsmithhennigan.com
3  MCKOOL SMITH HENNIGAN P.C.
   300 South Grand Avenue, Suite 2900
4  Los Angeles, California 90071
   Telephone: (213) 694-1010
5  Fax: (213) 694-1234

6  *(additional counsel listed on next page)*
   **Attorneys for Plaintiff**
7  **BLOCKCHAIN INNOVATION, LLC**

8                    **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**
                          **OAKLAND DIVISION**
10

11  BLOCKCHAIN INNOVATION, LLC,          CASE NO. 4:21-cv-8787-HSG

12          *Plaintiff,*                 **PLAINTIFF'S RESPONSE AND**
                                         **OBJECTIONS TO DEFENDANT**
13  v.                                   **ROGER BAYSTON'S MOTION TO**
                                         **DISMISS FIRST AMENDED**
14  FRANKLIN RESOURCES, INC. d/b/a       **COMPLAINT**
    FRANKLIN TEMPLETON, FT FINTECH
15  HOLDINGS, LLC, FRANKLIN TEMPLETON
    COMPANIES, LLC, JENNIFER JOHNSON,    **DEMAND FOR JURY TRIAL**
16  AND ROGER BAYSTON,

17          *Defendants.*

18

19

20

21

22

23

24

25

26

27

28

Gary Cruciani (Admitted *Pro Hac Vice*)
Texas Bar No. 05177300
Lew LeClair
California Bar No. 77136
gcruciani@mckoolsmith.com
lleclair@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000

Brent N. Bumgardner (Admitted *Pro Hac Vice*)
Texas Bar No. 00795272
Christopher G. Granaghan (Admitted *Pro Hac Vice*)
Texas Bar No. 24078585
Carder W. Brooks (Admitted *Pro Hac Vice*)
Texas Bar No. 24105536
brent@nelbum.com
chris@nelbum.com
 carder@nelbum.com
NELSON BUMGARDNER CONROY P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Telephone: (817) 377-9111

Patrick J. Conroy (Admitted *Pro Hac Vice*)
Texas Bar No. 24012448
pat@nelbum.com
NELSON BUMGARDNER CONROY P.C.
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201
Telephone: (214) 446-4954

**Attorneys for Plaintiff BLOCKCHAIN INNOVATION, LLC**

1

2

**<u>TABLE OF CONTENTS</u>**

3

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................3

I.   VENUE IS PROPER IN THE NORTHERN DISTRICT OF CALIFORNIA ............................3

    A.   Plaintiff is not a "stockholder (including a beneficial owner)" of Onsa. ..........................4

    B.   In three different ways, Plaintiff has provided its "written consent" under Onsa's forum selection clause to file this suit in the Northern District of California. ............................6

II.   PLAINTIFF HAS PLEAD EXTENSIVE FACTUAL ALLEGATIONS SETTING FORTH A BREACH OF FIDUCIARY DUTY CLAIM AGAINST BAYSTON (AND FRI AND FINTECH). ........................................................................................................................8

    A.   The duty of care exculpatory clause in the Certificate of Incorporation does not exculpate Plaintiff's breach of fiduciary duty claim because a duty of care breach is not Plaintiff's *exclusive* claim against Bayston.......................................................................................11

    B.   Plaintiff properly alleges that Bayston lacked independence from FinTech and FRI and thus is not entitled to the presumption of the Business Judgment Rule.........................11

        1.   Bayston, a 30-year employee and Senior Executive of a Franklin Templeton Affiliate, lacked independence from the controlling shareholders of Onsa.......12

        2.   The totality of circumstances surrounding Bayston's appointment as the sole director of Onsa demonstrate a lack of independence. .....................................14

III.   THE ALLEGATIONS OF INTENTIONAL MISCONDUCT AND BAD FAITH ARE SUFFICIENT TO ALLEGE A BREACH OF LOYALTY AND TO DEFEAT THE PRESUMPTION OF THE BUSINESS JUDGMENT RULE. ....................................................17

IV.   PLAINTIFF'S ALLEGATIONS ARE NOT IMPERMISSIBLE GROUP PLEADING ...........20

V.   PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND IF ITS PLEADINGS ARE FOUND DEFICIENT. .............................................................................................................21

VI.   OBJECTIONS TO BAYSTON'S DECLARATION AND EXHIBIT D.................................21

CONCLUSION.......................................................................................................................25

1

2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

3

CASES

4

*Akesogenx, Corp. v. Zavala,*
    407 P.3d 246 (Kan. App. 2017) ........................................................................7, 8

5

6

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................................................8

7

8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................8, 20

9

*Berteau v. Glazek,*
    No. CV 2020-0873-PAF, 2021 WL 2711678 (Del. Ch. June 30, 2021) ..........13, 14

10

11

*Brimstone Nat. Res. Co. v. Haight,*
    No. 1:18-CV-01740-CL, 2021 WL 1669594 (D. Or. Apr. 28, 2021)...............23, 24

12

*Circle Click Media LLC v. Regus Mgmt. Grp. LLC,*
    No. 12-04000 SC, 2013 WL 57861 (N.D. Cal. Jan. 3, 2013).................................20

13

14

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb,*
    385 F.Supp.2d 449 (D. Del. 2004)..........................................................................16

15

16

*Desert Equities, Inc.v. Morgan Stanley Leveraged Equity Fund, II, L.P.,*
    624 A.2d 1199 (Del.1993) ......................................................................................19

17

*DiRienzo v. Lichtenstein,*
    No. 7094-VCP, 2013 WL 5503034 (Del. Ch. Sept. 30, 2013)...............................15

18

19

*Ferrara v. Philadelphia Labs., Inc.,*
    272 F. Supp. 1000 (D. Vt. 1967).............................................................................6

20

21

*Friedman v. Dolan,*
    No. 9425-VCN, 2015 WL 4040806 (Del. Ch. June 30, 2015) ...............................16

22

*Gen-Probe, Inc. v. Amoco Corp.,*
    926 F. Supp. 948 (S.D. Cal. 1996)..........................................................................20

23

24

*Hindlin v. Gottwald,*
    No. 2019-0586-JRS, 2020 WL 4206570 (Del. Ch. July 22, 2020)..........................19

25

26

*In re ALH Holdings LLC,*
    675 F. Supp. 2d 462 (D. Del. 2009).......................................................................16

27

28

*In re Camping World Holdings, Inc. S'holder Deriv. Lit.*,
   No. 2019-0179-LWW, 2022 WL 288152 (Del. Ch. Jan. 31, 2022) .................................16, 17

*In re Crimson Expl. Inc. Stockholder Litig.*,
   No. 8541-VCP, 2014 WL 5449419 (Del. Ch. Oct. 24, 2014) .......................................5, 17, 18

*In re Evergreen Energy, Inc.*,
   546 B.R. 549 (Bankr. D. Del. 2016) ...................................................................................11

*In re EZCORP Inc. Consulting Agreement Deriv. Litig.*,
   No. 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016).....................................................14

*In re MFW S'holder Litig.*,
   67 A.3d 496 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635
   (Del. 2014) ..............................................................................................................15

*In re MultiPlan Corp. Stockholders Litigation*,
   268 A.3d 784 (Del. Ch. 2022)................................................................................12, 13

*In re Walt Disney Co. Deriv. Litig.*,
   906 A.2d 27 (Del. 2006) ....................................................................................................19

*In re Walt Disney Co. Derivative Litig.*,
   907 A.2d 693 (Del. Ch. 2005)......................................................................................18, 19

*Leadsinger, Inc. v. BMG Music Publ'g*,
   512 F.3d 522, 532 (9th Cir. 2008) .......................................................................................21

*Malone v. Brincat*,
   722 A.2d 5 (Del. 1998) ....................................................................................................19

*McGowan v. Ferro*,
   859 A.2d 1012 (Del.Ch.2004)..............................................................................................19

*Morrison v. Berry*,
   No. 12808-VCG, 2019 WL 7369431 (Del. Ch. Dec. 31, 2019) ...............................................17

*SA Music LLC v. Apple, Inc.*,
   No. 3:20-CV-02146-WHO, 2022 WL 836304 (N.D. Cal. Mar. 21, 2022).................22, 23, 24

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) ...................................................................................................11

*SunPower Corp. v. SolarCity Corp.*,
   No. 12-CV-00694 LHK, 2012 WL 6160472 (N.D. Cal. Dec. 11, 2012)................................21

*United States ex rel. Lee v. Corinthian Colls.*,
   655 F.3d 984 (9th Cir. 2011) ...............................................................................................22

*Van der Fluit v. Yates*,
    No. 12553-VCMR, 2017 WL 5953514 (Del. Ch. Nov. 30, 2017) ........................................15

**STATUTES**

28 U.S.C. § 1359 ............................................................................................................................6

FRCP 12 ....................................................................................................................................23, 24

FRCP 8 ..........................................................................................................................................20

FRCP 15 ........................................................................................................................................20

**REGULATIONS**

17 C.F.R. § 240.13d-3(a)(i) and (ii) ................................................................................................6

17 C.F.R. § 240.13d-3(b) ................................................................................................................6

17 C.F.R. § 240.13d-1(d) and (g) ....................................................................................................5

**SECONDARY AUTHORITIES**

William T. Allen, *Independent Directors in MBO Transactions: Are They Fact or Fantasy*,
    45 Bus. Law. 2055, 2061 (1990)) ..........................................................................................14

Plaintiff Blockchain Innovation, LLC ("**Plaintiff**" or "**Blockchain**") files this Response ("**Response**") to Roger Bayston's ("**Bayston**") Motion to Dismiss ("**Bayston MTD**" or "**MTD**") the First Amended Complaint ("**FAC**"). As Defendants did with their individual motions to dismiss, Plaintiff incorporates by reference, as if fully set forth herein, (i) Plaintiff's Response to Franklin Resources, Inc.'s ("**FRI**"), FT FinTech Holdings, Inc.'s ("**FinTech**"), and Franklin Templeton Companies, LLC's ("**FTC**") (collectively, "**FT Defendants**") Motion to Dismiss the FAC ("**Response to FT Defendants MTD**"), and (ii) Plaintiff's Response to Jennifer Johnson's ("**Johnson**") Motion to Dismiss the FAC ("**Response to Johnson's MTD**"). Bayston, FT Defendants, and Johnson may hereinafter be collectively referred to as "**Defendants**."

## INTRODUCTION

The gravamen of this case is a series of breaches of fiduciary duties by Defendants that caused the untimely demise of Plaintiff's predecessor, Onsa, Inc ("**Onsa**"). Bayston is at the center of those breaches. Bayston is a thirty-year employee and Executive Vice President of a Franklin Templeton affiliate and served as Onsa's sole director. Bayston was a conflicted director with divided loyalties between the fiduciary duties he owed Onsa as a director and the fiduciary duties he owed his Franklin Templeton employer as a senior officer. As detailed at length in the FAC, Bayston chose to serve the interests of his long-time employer upon whom he depended for his paycheck and livelihood and throw Onsa under the bus. Bayston puts forth three grounds why he should be dismissed from this lawsuit. None have merit.

*First*, Bayston argues that a forum-selection provision in Onsa's certificate of incorporation mandates that Plaintiff's suit be filed in the Delaware Court of Chancery. But the provision is clearly inapplicable. It applies only to lawsuits brought by a "stockholder" of Onsa (now Plaintiff). Here, it is not a stockholder of the company that is suing, it is the company itself (via its assignment of claims to Plaintiff). Moreover, the forum-selection clause contains an express exception from any requirement that Bayston be sued in Delaware Chancery Court; namely, Onsa, and now Plaintiff, has the unfettered right to consent to sue elsewhere. In three different ways, Plaintiff consented in writing to suing Bayston in the District Court for the Northern District of California: the act of filing this lawsuit in California; a written consent

authorizing this California lawsuit; and the provision in the 2021 asset purchase agreement ("**2021 APA**") by which Plaintiff purchased its claim providing that any lawsuits relating to those claims will lie exclusively in the state and federal courts of California.

*Second*, Bayston alleges that Plaintiff's allegations for breaching his duty of care, and duty of loyalty fail to state a claim. As to the duty of care claim, Bayston's sole argument is that Onsa's certificate of incorporation exculpates him from breach of the duty of care. But Plaintiff has sued Bayston for breach of the duty of care *and* the duty of loyalty. Under Delaware law, when a breach of the duty of care is not the *exclusive* claim—and it's not here— then it may not be dismissed.

With respect to the duty of loyalty claim, Bayston glibly argues that Plaintiff's allegations are conclusory and insufficient as a matter of law. But Bayston's motion ignores the cornucopia of breaches of the duty of loyalty detailed in the FAC. The bar to survive a motion to dismiss is low—a plaintiff need merely state a "plausible" claim—and Plaintiff easily satisfies the lenient standard.  Plaintiff has shown that Bayston, the sole and conflicted director of Onsa, lacked independence and owed his true allegiance to his Franklin Templeton employer. Bayston, working with Johnson, the CEO of FRI, and other FRI executives, conducted Onsa's business in secret and improperly excluded—and then fired without notice and without cause—Onsa's independent senior officers, including its CEO and General Counsel. Bayston wrongfully excluded Onsa's co-founder who had Board observer rights from all Onsa Board meetings. Bayston kept Onsa's non-Franklin Templeton shareholders in the dark and lied to them. This secrecy was all done so that Bayston and the other Defendants could implement their scheme to destroy Onsa without any independent voice or prying eyes. And they succeeded.

Bayston and others intentionally put Onsa in a compromised position by discouraging Onsa from raising capital because Franklin Templeton[1] promised it would provide all necessary funding, only for them to pull the plug on funding. Bayston and others were grossly negligent in failing to pursue any alternatives to liquidation, notwithstanding that many such opportunities existed.

The ultimate act of bad faith by Bayston and others was in approving and voting for the Assignment for Benefit of Creditors ("**ABC**") in November 2020. The ABC was the worst possible outcome for Onsa's

[1] "**Franklin Templeton**" is used to refer generally to FRI and one or more of its affiliates.

shareholders since it was intended to completely wipe out the investment of the Onsa shareholders; yet, incredibly, the Unanimous Consent signed by Bayston stated that the ABC was in the "best interests" of Onsa's shareholders. The Unanimous Consent further stated that the ABC was "subject to obtaining the requisite approval" by Onsa's stockholders, but no such approval was sought nor obtained. The ABC was solely designed to kill Onsa for the benefit of Franklin Templeton and to result in a complete release of liability for Bayston and other Defendants for their destruction of Onsa. In short, the series of misconduct leading up to and including the ABC leaves no doubt that Plaintiff has easily met its burden of pleading a breach of the duty of loyalty that deprives Bayston, FRI, and FinTech of the presumption of the business judgment rule.

_Third_, Bayston urges that Plaintiff's claims against him amount to an impermissible group pleading that "everyone did everything" and cites as an example Plaintiff's allegations that the fiduciary duties were breached by "FinTech, FRI, and Bayston." In fact, this is the opposite of a group pleading. Plaintiff's breach of fiduciary duty claims are precisely and clearly asserted against these three Defendants, by name, and expressly exclude Defendants Johnson and FTC. Plaintiff has provided fair notice of the claims against him and the grounds upon which those claims rest, which is all the Federal Rules require. While Bayston may disagree with Plaintiff's claims, it cannot be seriously argued that he does not understand them.

## ARGUMENT

### I.   VENUE IS PROPER IN THE NORTHERN DISTRICT OF CALIFORNIA

Bayston's argument that the forum selection clause in Onsa's Certificate of Incorporation requires that the claims against Bayston be prosecuted in Delaware Chancery Court fails for multiple reasons. The forum selection clause begins by stating "***[u]nless the Corporation [Onsa] consents in writing to the selection of an alternative*** forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any ***stockholder (including a beneficial owner)***" to bring any of four different types of lawsuits. Dkt. 56-2 at 6 (emphasis added).[2] Thus, the clause has two critical jurisdictional carve-outs from Delaware Chancery Court that apply here.

---

[2] Bayston argues that Plaintiff's claims against him fit within three of the four types of claims required to be filed in Delaware Chancery Court. For the reasons expressed herein, the Court need not reach that issue

### A.    Plaintiff is not a "stockholder (including a beneficial owner)" of Onsa.

The forum selection clause applies only to a claim brought by an Onsa "stockholder (including a beneficial owner)." The provision applies to derivative claims[3] by Onsa stockholders and certain direct claims by Onsa stockholders. But whether derivative or direct, for the forum selection clause to apply, the claims must be brought by an Onsa stockholder (or beneficial owner). Here, Plaintiff's claims are not brought by an *Onsa stockholder*, they are brought by *Onsa itself* (technically, Plaintiff, the assignee of Onsa's claims).[4] None of Onsa's stockholders are a plaintiff in this action.

Thus, the claims brought by Plaintiff against Bayston belong to the company (Onsa, now Plaintiff) and not to Onsa's stockholders or beneficial owners. But for the ABC, the breach-of-fiduciary duty claims would have been brought by Onsa against Bayston. As a result of the ABC and the 2021 APA, Plaintiff acquired Onsa's legal claims and brings these company claims against Bayston. Because Plaintiff is litigating Onsa's own causes of action, they are not claims brought by "any stockholder," as required by the forum selection clause to be applicable. Otherwise stated, the forum selection clause doesn't bind Onsa to sue its own directors in Delaware, so it similarly does not bind Plaintiff.

Bayston's complaint that Plaintiff has undermined the purpose of the forum selection clause by deceptively pleading around it is meritless. Dkt. 56 at 11. It is Defendants who decided to liquidate Onsa through an ABC transaction that resulted in Onsa's claims being sold to Plaintiff. Pre-ABC, Onsa indisputably could have sued Bayston in California court, notwithstanding the forum selection clause. Post-

---

because all four types of actions are required to be brought by an Onsa "stockholder" (and Plaintiff is not an Onsa stockholder) and, even if brought by an Onsa stockholder, Onsa can consent to an alternate forum. Plaintiff is the holder of Onsa's right to consent and has in fact consented to this Court.

[3] Bayston falsely suggests that the present lawsuit is a "derivative claim." Dkt. 56 at 8. But it is clearly not. This is not a claim brought by stockholders on behalf of, or in the name of, Onsa. Rather, this is a claim brought by Plaintiff, as assignee of Onsa's own claims against Bayston.

[4] Pursuant to the ABC, Onsa transferred to the liquidator, BLKCHN, LLC ("**BLKCHN**") all its assets, including "[a]ll Claims, rights, Interests, actions, causes of action, and any other Interests of any kind in any legal actions or proceedings." Dkt. 55-2 § 3.1 (r). Pursuant to the 2021 APA, BLKCHN sold to Plaintiff all assets that BLKCHN had acquired from Onsa, including all "Claims against [FRI, Fintech], and any individuals acting on behalf thereof." Dkt. 55-3 § 1(a)(iii).

ABC, Plaintiff, who now holds all the claims Onsa once held, has the exact same right to sue Bayston in California court, notwithstanding the forum selection clause.

Bayston's insinuation that Plaintiff should be treated as an Onsa stockholder lacks any legal support. Dkt. 56 at 8-10. While the auction process that the ABC liquidator ran resulted in the assets and claims being purchased by Plaintiff, an entity comprised of some of Onsa's stockholders—*any* third party could have bought the assets.[5] And if any other third party did (let's say Blackstone), Bayston would not be arguing that Blackstone could not sue Bayston in this forum. That Plaintiff happens to be owned by some of Onsa's stockholders is irrelevant. The Onsa stockholders have not transferred their Onsa shares to Plaintiff—they remain Onsa shareholders to this day. Were these Onsa shareholders to *individually* file a suit against Onsa or Bayston falling within the forum selection clause, they would have to file it in Delaware Chancery Court (absent written consent by Onsa). Given that they remain shareholders, it makes no sense to hold that Plaintiff itself should be treated as a shareholder.

Alternative to his argument that Plaintiff should magically be deemed an Onsa "stockholder" pursuant to the forum selection clause, Bayston argues that Plaintiff should at least be considered a "beneficial owner." Dkt. 56 at 11-12. Bayston acknowledges that "beneficial owner" is undefined in the forum selection clause but states that under the "pertinent SEC definition" (without stating why the SEC definition is the "pertinent" one) "the definition must also embrace Plaintiff, a vehicle 'formed by the majority of Onsa's non-Franklin Templeton shareholders and other parties.'" *Id.* at 12. But this is mere unsupported *ipse dixit* by Bayston, and the SEC definition of "beneficial owner" has nothing to do with how that term is used in the forum selection clause.

The SEC reference to a "beneficial owner" is in the context of identifying who must file a Schedule 13D or 13G because they own more than five percent of the class of an equity security. 17 C.F.R. § 240.13d-1(d) and (g). The regulation states that a "beneficial owner" includes not only the person that owns the

---

[5] *See* Dkt. 55-3 at 1 ("WHEREAS, following execution of the ABC, Seller conducted a marketing process and an auction to sell the Assets (as hereinafter defined), at which Buyer submitted an opening bid" and "upon conclusion of the auction, Seller had not received a higher bid for the Assets than Buyer's opening bid and, as such, shall sell the Assets to the Buyer in accordance with the terms and conditions set forth in this Agreement.")

security directly, but also a person who "indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract … to evade the reporting requirements of section 13(d) or (g) of the [Securities and Exchange] Act." 17 C.F.R. § 240.13d-3(b). This SEC definition requires that the alleged beneficial owner have "voting power" or "investment power" over the securities at issue. 17 C.F.R. § 240.13d-3(a)(i) and (ii). Plaintiff has neither any voting power nor investment power with respect to any Onsa shares held by its members. In sum, Bayston's reliance on the SEC definition to attempt to breathe life into the term "beneficial owner" as used in the forum selection clause is misguided.

Bayston also argues that to reject his interpretation would defeat the purpose of the forum selection clause by permitting "any shareholder or group of shareholders to circumvent the clause by forming an LLC and assigning potential claims" to it. Dkt. 56 at 12. But Bayston's argument addresses an entirely different situation in which a party by "assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction" of a district court. 28 U.S.C. § 1359. In the case of "manufactured jurisdiction" through collusive or improper means, the court may reject jurisdiction.[6] Here, there was no fictitious transfer of the claims from BLKCHN to Plaintiff as Plaintiff paid more than $665,000 to purchase the claims. Dkt. 55-3 § 2. Bayston's implicit suggestion that the decision by Onsa shareholders to form Plaintiff and have Plaintiff pursue Onsa's claims was all a ruse designed solely to circumvent the Delaware forum selection clause is absurd.

### B. In three different ways, Plaintiff has provided its "written consent" under Onsa's forum selection clause to file this suit in the Northern District of California.

Onsa/Plaintiff has also consented in writing to an alternative forum—this Court. The clear intent behind the forum selection clause is to vest sole discretion in Onsa to litigate in a forum other than Delaware Chancery Court if Onsa so chooses. Here, Plaintiff owns the right to consent to file suit in a jurisdiction other than Delaware Chancery Court and has exercised that right in writing through the filing of the

---

[6] *Ferrara v. Philadelphia Labs., Inc.*, 272 F. Supp. 1000, 1007 (D. Vt. 1967) (citing line of Supreme Court cases and noting that the issue of whether the plaintiff was "improperly or collusively" made a party to invoke the jurisdiction of the federal court has often been said to turn on the nature of the transfer. If the transfer is deemed to have been "real," the case is not to be dismissed. Collusion is made out and dismissal follows, however, where the transfer is deemed "fictitious," "feigned," or "merely colorable.")

Original Complaint and FAC. FAC ¶ 63, n.18. Specifically, the ABC transferred to BLKCHN all of Onsa's assets, including "[a]ll Claims, rights, Interests, actions, causes of action, *and any other Interests of any kind in any legal actions or proceedings*." Dkt. 55-2 § 3.1(r) (emphasis added). Under the ABC, "'Interest' means and will be construed broadly to include any *directly or indirectly held right*, title, interest, ownership, …indicia of ownership, … or *other legal, equitable, possessory, or other interest of any kind*, including as defined in the Bankruptcy Code." Dkt. 55-2 at 3 (definition of "Interest") (emphasis added). Thus, ABC § 3.1(r)'s conveyance of the claims asserted in this lawsuit, together with "any other Interests of any kind in any legal actions or proceedings," includes Onsa's "right" or "legal interest" to consent to the forum of its choosing. These same rights were conveyed from BLKCHN to Plaintiff via the 2021 APA. Dkt. 55-3.

In a last-ditch effort, Bayston disputes that the filing of the lawsuit satisfies the "written consent" requirement in the forum selection clause. Notwithstanding that the original complaint and FAC are clearly written instruments evidencing consent to proceed in this Court, this form-over-substance argument is without any supporting authority. To the contrary, the very case that Bayston cites for a different proposition, *Akesogenx, Corp. v. Zavala*, 407 P.3d 246 (Kan. App. 2017), destroys his argument. *See* Dkt. 56 at 11. *Zavala* involved an identical carve-out from the Delaware forum selection clause ("unless the Corporation consents in writing to an alternative forum") and the appellate court held the mere fact that the corporation sued its CEO satisfied the written consent provision and showed the corporation "clearly consented to suing [its CEO] in Kansas." *Id*. at 258-59.[7]

However, to put a nail in the coffin of Bayston's misguided argument, Plaintiff has passed a resolution that expressly provides the written consent to file this lawsuit in the District Court for the Northern District of California, thus satisfying the "written consent" exception contained in Onsa's forum

---

[7] Bayston incorrectly labels, no less than five times, the Onsa provision as a "*mandatory* forum selection clause." Dkt. 56 at 5, 6, 7, 11 (emphasis added). It is not. *See Zavala*, 407 P.3d at 258 ("Because the conditional provision allows AKG to sue parties in forums other than Delaware, AKG's forum selection clause is not a mandatory forum selection clause but a permissive forum selection clause.").

1   selection clause.[8] Notably, in *Zavala*, the appellate court also found that the "written consent" provision

2   was satisfied merely by the Board's adoption of a resolution to retain a local Kansas firm as counsel to

3   prosecute the company's claims. *Id*. at 258.[9]

4       Moreover, the 2021 APA, pursuant to which Plaintiff purchased its claims against Bayston and the

5   other Defendants, has its own venue provision in which Plaintiff agreed that any action that it brought

6   "pursuant to this Agreement shall lie exclusively in the state and federal courts located in California." Dkt.

7   55-3 § 8(d). This is a third example of Onsa/Plaintiff exercising their consent in writing to an alternative

8   forum to Delaware Chancery Court.

9   **II.   PLAINTIFF HAS PLEAD EXTENSIVE FACTUAL ALLEGATIONS SETTING FORTH**
        **A BREACH OF FIDUCIARY DUTY CLAIM AGAINST BAYSTON (AND FRI AND**
10      **FINTECH).**

11      Plaintiff has properly plead extensive factual allegations supporting a breach of fiduciary duty claim

12   against Bayston, FRI, and FinTech for breaches of both the duty of loyalty and the duty of care. Rather

13   than accept the factual allegations as true, the Fiduciary Defendants have chosen to argue the facts with all

14   inferences drawn in their favor, contrary to the governing legal standard. The complaint need only plead

15   "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

16   544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the

17   court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

18   *Iqbal*, 556 U.S. 662, 678 (2009). Here, the motions to dismiss highlight numerous key factual disputes that

19   will need to be resolved at trial, wholly unsuitable for disposition at the preliminary motion stage.

20

21   [8] *See* Ex. 5 to Declaration of Aaron Travis in Supp. of Plaintiff's Response to Mots. to Dismiss ("**Travis**
     **Decl.**").

22

23   [9] In Plaintiff's resolution, Plaintiff expressly consents to the filing of this very lawsuit.  Ex. 5 to Travis
     Decl. Thus, Plaintiff's written consent is far more specific than the one in *Zavala*, which that court
24   nonetheless found sufficed to qualify as written consent. *Zavala*, 407 P.3d at 258 ("Of importance, outside
     of simply stating that there must be written consent, AKG's forum selection clause provides no guidance
25   as to (1) what type of written consent must be obtained and (2) what information must be contained within
     the written consent.  Accordingly, there seems to be countless ways AKG could comply with this
26   conditional provision" and "AKG's minutes as well as various filings with the [Kansas] court constitute
     writings where AKG, as the corporation, clearly consented to suing Zavala in Kansas.").
27

28

Plaintiff carefully lays out an entirely plausible and highly concerning fact pattern demonstrating that Defendants[10] were breaching their fiduciary duties, perhaps even at the outset of their relationships with Onsa. FAC ¶¶ 21-49. Onsa was in the process of developing very valuable blockchain technology in which Franklin Templeton was highly interested and desperately needed, particularly with respect to its antiquated system for clearing trades. *See, e.g.,* FAC ¶¶ 81-86. Defendants promised a number of things that they intentionally failed to deliver and which ended up crippling Onsa's development and ultimate value. *See, e.g.,* FAC ¶¶ 23-25. Included in these key misrepresentations and failures were that Onsa would be compensated for use of its technology (FAC ¶ 25), and that Franklin Templeton would provide necessary funding, and that Onsa need not seek out any third-party funding. FAC ¶ 30 ("Onsa's management recognized that it was in Onsa's best interest to raise additional capital from strategic, third-party investors, who might ultimately become customers of the Onsa platform. However, Defendants shut down these efforts and falsely assured Onsa that Franklin Templeton would fully support it financially.").

The crux of these key allegations is to allege that Bayston—and the controlling entities (FinTech and FRI) from whom Bayston was not remotely independent—were acting to intentionally harm Onsa, and with bad faith. Plaintiff believes that at least one of the reasons that Defendants liquidated Onsa (and breached their fiduciary duties in the process) was to enable and cover up their theft of Onsa's assets. But Plaintiff also believes that there are a host of other reasons, such as to "avoid having to compensate Onsa for its development efforts; to gain the ability to launch the tokenized money market without Onsa's involvement and thereby avoid payment obligations to Onsa under the promised MSA; and to avoid liability for numerous breaches of fiduciary duty (e.g., through a derivative action by the non-Franklin Templeton shareholders) by assignment of Onsa's legal claims to a third party." *See, e.g.,* FAC, ¶ 47; *see also* FAC, ¶ 169. The improper motives further included ensuring that Onsa's valuable technology would be used solely to support Franklin Templeton, as opposed to Onsa functioning as a standalone company that would provide services to Franklin Templeton's competitors in the financial services industry. FAC ¶ 30 ("In retrospect, it is clear that Franklin Templeton and Bayston did not want Franklin Templeton's

---

[10] "Defendants" as used in this section of the brief refers to the Defendants that have been sued for breaching their fiduciary duties: Bayston, FRI, and FinTech.

9

competitors or other third parties involved with Onsa, and did not want Onsa to gain traction as a standalone entity"). The actions alleged were entirely contrary to the best interests of Onsa, which renders them disloyal and in bad faith. Having effectively misappropriated Onsa's valuable technology, and having ensured that Onsa would not be viable because of the absence of revenue and of third party financing, Defendants then orchestrated a liquidation of Onsa, blaming Onsa for the very circumstances that Defendants themselves created and caused. *See, e.g.,* FAC ¶¶ 42-46.

The ABC liquidation of Onsa also raises substantial breaches of fiduciary duty, including Defendants' subjective bad faith. Plaintiff has alleged that the liquidation was the worst option and benefited no one other than Franklin Templeton, to whom Bayston was beholden. *See, e.g.,* FAC ¶ 194. Indeed, the after-the-fact Notice of the ABC ("**ABC Notice**") that was provided to Onsa's creditors and stockholders made clear that the stockholders were expected to receive *nothing* as a result of the ABC, putting the lie to the notion that the ABC was in the stockholders' "best interests."[11]

Defendants would have the Court believe that they orchestrated all these carefully structured steps just for the purpose of avoiding minor claims of a few insignificant creditors whose total claims were likely less than the legal fees expended. It is Defendants' explanation of the purpose of the ABC that is entirely implausible. The allegations in the FAC show a plan and scheme to destroy the ability of Onsa, which had real and very significant claims, to bring their grievances to light in a court of law. While Defendants were successful in destroying Onsa, they did not succeed in wiping out the Onsa's legal claims as intended. That Defendants were only partially successful in their plan and scheme does not detract from their bad-faith motivations in liquidating Onsa through the ABC. The failure of Defendants to consider alternatives and consult with the shareholders, all while actively misleading the shareholders about what was being done, undoubtedly supports the allegations that Defendants were acting contrary to the interests of Onsa and in bad faith. FAC ¶¶ 32, 44-47, 151-158, 166, 175, 186-88.

---

[11] The ABC Notice states that there was "no guarantee regarding distributions, if any, to unsecured creditors," but that BLKCHN was making an effort to provide "some distribution" to unsecured creditors but they "will not be paid in full." Ex. 3 to Travis Decl. It was only as a result of Plaintiff entering into the 2021 APA that Plaintiff paid Onsa's unsecured creditors *in full* and, in return, Plaintiff received an assignment of Onsa's assets including the claims Plaintiff asserts in this lawsuit. FAC ¶¶ 12 and 191.

1

2

**A.      The duty of care exculpatory clause in the Certificate of Incorporation does not exculpate Plaintiff's breach of fiduciary duty claim because a duty of care breach is not Plaintiff's *exclusive* claim against Bayston.**

3       The Court need not spend time on Bayston's first argument, which is entirely theoretical and

4  irrelevant. Dkt. 56 at 14. Bayston argues that Onsa's Certificate of Incorporation includes an exculpatory

5  provision under Delaware law in which a corporation may "exculpate directors from monetary liability for

6  a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty."

7  *Stone v. Ritter*, 911 A.2d 362 (Del. 2006) (citing 8 Del. C. § 102(b)(7); *In re Walt Disney Co. Deriv. Litig.*,

8  906 A.2d 27 (Del. 2006)).  But, Bayston ignores that Plaintiff asserts both lack of good faith and breach of

9  the duty of loyalty—neither of which can be exculpated—and so long as Plaintiff's claim for any breach

10 of the duty of loyalty is sustained, there will be neither dismissal nor exculpation under Delaware law. *See,*

11 *e.g.,* FAC ¶¶ 5, 30, 32, 47-48, 96-97, 128, 131-35, 144-45, 170, 179-189, 193-94.

12      Delaware law provides that "[w]hen a duty of care breach is not the *exclusive* claim, a court may

13 not dismiss [the duty of care claim] based upon an exculpatory provision."  *In re Evergreen Energy, Inc.*,

14 546 B.R. 549, 561 (Bankr. D. Del. 2016) (citing *Bridgeport Holdings, Inc. Liquidating Trust v. Boyer*, 388

15 B.R. 548, 568 (Bankr. D. Del. 2008)) (applying Delaware law) (emphasis in original). Illustrating this

16 point, the Court in *In re Evergreen Energy* held that "the Trustee provide[d] adequate factual allegations

17 to support a plausible claim for a breach of the duty of care and the duty of loyalty. Accordingly, the

18 Trustee's claim for breach of fiduciary duties will not be dismissed." *Id.* Similarly, here, the claims for

19 breach of the duty of care should not be dismissed given the accompanying claims for breach of the duty

20 of loyalty.

21

22

**B.      Plaintiff properly alleges that Bayston lacked independence from FinTech and FRI and thus is not entitled to the presumption of the Business Judgment Rule.**

23      As an initial matter, Bayston ignores that Plaintiff has alleged intentional wrongdoing and bad faith

24 against Bayston, FinTech, and FRI. *See, e.g.,* FAC ¶¶ 5, 30, 32, 47-48, 96-97, 128, 131-35, 144-45, 170,

25 179-189, 193-94. Of course, Defendants dispute these allegations, but that dispute is for another day. All

26 that the Court need consider at this stage is whether Plaintiff has actually made sufficient allegations that

27 are plausible. The Court is not to weigh the merits of the allegations nor Defendants' counter-factual

28

narrative. The FAC alleges that Defendants took actions that had an enormous negative impact on Onsa and significantly reduced its value, with the ABC delivering the *coup de grâce* and destroying Onsa's value. *See, e.g.*, FAC ¶ 11. Disallowing Onsa's founders to raise funds, failing to complete a licensing agreement for Onsa's technology, firing almost all employees without cause (and then having Franklin Templeton rehire many of them), failing to consider appropriate alternatives to liquidation, allowing Onsa's valuable assets to go to waste—all these actions were part of an overarching plan to eliminate Onsa's value and transfer that value to Franklin Templeton. FAC ¶¶ 184-189.

With respect to the ABC transaction, Bayston was the sole director of Onsa whose vote and approval were essential to the implementation of the plan and scheme to deprive the Onsa shareholders of all fair consideration for the assets and business of Onsa. Ignoring the direct allegations of intentional wrongdoing and bad faith, Bayston asks the Court to treat him as an independent director. In fact, Bayston was not independent, but was instead tied to and monetarily beholden to the controlling entities of Onsa. His approval of the ABC transaction not only does not insulate that transaction from enhanced scrutiny, but also constitutes a breach of Bayston's duty of loyalty owed to Onsa, benefiting the controlling entities (FinTech and FRI) to whom Bayston was in fact loyal over Onsa. For that reason, as well as the bad faith actions alleged by Plaintiff, Bayston is not entitled to dismissal of any of the breach of fiduciary duty claims.

### 1. Bayston, a 30-year employee and Senior Executive of a Franklin Templeton Affiliate, lacked independence from the controlling shareholders of Onsa.

Although unnecessary to sustain the allegations that Bayston acted disloyally and in bad faith as the sole director of Onsa, Bayston is incorrect in asserting that he was "independent" from FinTech and FRI as Bayston was a senior executive and lifetime employee of a Franklin Templeton affiliate. The recent holding of the Delaware Chancery Court in *In re MultiPlan Corp. Stockholders Litigation*, 268 A.3d 784, 815 (Del. Ch. 2022) sets forth the appropriate considerations necessary to establish Bayston's lack of independence from Onsa's direct controller (FinTech) and indirect controller (FRI). As the Chancery Court explained:

> Taking those allegations as true, the directors each had a personal or employment relationship with or received lucrative business opportunities from [the controller]. "[O]ur law is not blind to the practical realities of

1
2
3
4

serving as a director of a corporation with a controlling stockholder," and "[a] director may be considered beholden to ... another when the allegedly controlling entity has the unilateral power ... to decide whether the challenged director continues to receive a benefit." "Although the actual extent of these relationships is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss."

5

*Id.*

6

Delaware law is thus not blind to either the practical realities of the early stage of litigation, or the

7

fact-intensive nature of the inquiry related to independence. Here, Plaintiff alleges the close connection

8

between Bayston and Franklin Templeton, including a 30-year employment relationship, compensation,

9

and willingness to help and assist Franklin Templeton achieve its goals (even at the expense of Onsa, the

10

purported beneficiary of Bayston's fiduciary duty). At all relevant times, Bayston was both a full-time

11

senior executive of Franklin Templeton's Fixed Income Group and the sole director of Onsa, but he *only*

12

received compensation from Franklin Templeton for his work as an Onsa director. *See* FAC ¶¶ 98, 128.

13

Additionally, upon becoming Onsa's sole director, Bayston almost immediately started hiring Franklin

14

Templeton employees to fill as many significant roles at Onsa as possible. For example, he hired Sheffield

15

Nolan (a Franklin Templeton Blockchain Technical Head) as Onsa's lead engineer, Kevin Farrelly (a

16

Franklin Templeton Vice President of Data Science) as Onsa's Chief Operating Officer, and Lou Mohn (a

17

Franklin Templeton Senior Financial Analyst) as Onsa's Chief Financial Officer. *See* FAC ¶ 101. The

18

totality of these circumstances demonstrate the tangled web of connections formed over 30 years between

19

Bayston and Franklin Templeton, which unequivocally render him as "lacking independence" from Onsa's

20

controlling entities, FinTech and FRI.

21

Other Delaware cases cast additional light on the significance of the connections between Bayston

22

and Franklin Templeton, and why those connections demonstrate a lack of independence. In *Berteau v.*

23

*Glazek*, No. CV 2020-0873-PAF, 2021 WL 2711678, at *20 (Del. Ch. June 30, 2021), the Chancery Court

24

addressed the importance of the employment relationship between the director and the controller. It is

25

certainly no stretch of logic to assume that a director who derives his paycheck and means of living from

26

a controlling entity will have a strong tendency to do its bidding. As explained in *Berteau*, the majority

27

shareholder ("SDI") of a publicly held corporation ("TPB") controlled the compensation of a TPB director

28

("Wexler"), and the court set forth the following regarding this relationship: "SDI controlled Wexler's compensation . . . Defendants do not contest that Wexler's compensation as the Chief Executive Officer of TPB was material to him. It is therefore a reasonable inference that Wexler 'harbored self-interest adverse to the stockholders' interests,' and that he would act in favor of the controller rather than TPB." *Id.* at \*20 (quoting *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015)).

"Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of a controller." *Berteau*, 2021 WL 2711678, at \*20 (citing *In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, No. 9962-VCL, 2016 WL 301245, at \*35 (Del. Ch. Jan. 25, 2016) (collecting cases)). As noted, Bayston was a thirty-year employee and Executive Vice President of a Franklin Templeton affiliate.

### 2. The totality of circumstances surrounding Bayston's appointment as the sole director of Onsa demonstrate a lack of independence.

In addition to the employment relationship, the overall relationship between Bayston and Franklin Templeton is subject to scrutiny in order to assess Bayston's willingness to serve the interests of Franklin Templeton and his eagerness to please the controllers. In *EZCORP*, 2016 WL 301245, at \*41, the Court addressed other collateral evidence of a director's "eagerness to be of use" and willingness to follow the bidding of the controller.

> Although nomination or election by an interested party, standing alone, is not dispositive, it is not necessarily irrelevant. That is particularly so where, as here, the controller returned the director to the Board under circumstances that suggest the director might be "an easy tool, deferential, glad to be of use."

*Id.* (quoting William T. Allen, *Independent Directors in MBO Transactions: Are They Fact or Fantasy,* 45 Bus. Law. 2055, 2061 (1990)).

The Court in *EZCORP* explained that although a director did not lack independence merely because the controller was responsible for his placement on the Board, under a "totality of the allegations" analysis, facts that supported the director's alleged "eagerness to be of use" to the controller was among other factors properly considered in determining whether the director lacked requisite independence. *Id.* at \*40-41. The same analysis pertains here to the sifting of the "totality of circumstances" surrounding Bayston's

placement on Onsa's Board as the sole director, his employment relationship with Franklin Templeton, and his eagerness to serve Franklin Templeton's interests in approving the ABC transaction. Based upon the allegations here, it is reasonable to infer at the pleading stage that Bayston lacked independence and was put on Onsa's Board to be *solely* a loyal surrogate to Franklin Templeton, and would abide by their commands and ignore his fiduciary obligations to Onsa and its shareholders.

Cases Defendants cite also demonstrate that the assessment of independence requires analysis of the entire relationship, not simply a single connection on its own.  "[T]he simple fact that there are some financial ties between the interested party and the director is not disqualifying. Rather, the question is whether those ties are *material,* in the sense that the alleged ties could have affected the impartiality of the director." *In re MFW S'holder Litig.*, 67 A.3d 496, 509-10 (Del. Ch. 2013), *aff'd sub nom. Kahn  v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) (emphasis in original). Here there are ample pleadings of very material connections, more than sufficient to overcome any challenge in the motion to dismiss. FAC ¶¶ 56, 95, 101, 128, 166, 169, 170, 171, 172, 174,181-189.

Other cases cited by Defendants involve limited challenges and far different circumstances. For example, in *Van der Fluit v. Yates*, No. 12553-VCMR, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017), the Court was addressing a seven-member board and attenuated connections. Three of the directors were unquestionably independent, a fourth was allegedly part of a control group that the Court found did not exist, and another had only a five-year old consulting engagement. These attenuated connections are vastly different from the allegations as to Bayston's lack of independence as discussed further above.

Similarly, in *DiRienzo v. Lichtenstein*, No. 7094-VCP, 2013 WL 5503034, at *12 (Del. Ch. Sept. 30, 2013), the alleged connections were also attenuated. Although the plaintiff there alleged that an investment in another vehicle was significant to the controlling entity, the plaintiff failed to make any allegations pertaining to the materiality of the investment to the interested director. As the court noted: "A director's potentially conflicting financial interest need not be large, but there must be some basis to conclude it is material enough to that director that it could overcome their rational business judgment." *Id.* Contrasting that sparse allegation with the allegations here of Bayston's 30-year relationship and role as a

senior executive of a Franklin Templeton affiliate upon whom he depends for a paycheck reveals the fatal shortcomings of Bayston's arguments.

Further, the facts alleged in *Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, 385 F.Supp. 2d 449, 461-62 (D. Del. 2004) that directors "had a personal interest in the transaction because they had motivations beyond the good of the company when approving the transaction . . . failed to plead any facts that would, even inferentially, support" a claim of breach of duty of loyalty and are bear no relation to Plaintiff's detailed allegations in the FAC. The plaintiff there relied on an "argument that rests on the unsupportable premise that a director who owns a lot of stock cannot cast a disinterested vote" as being a standard never adopted by the Delaware courts. *Id*. at 460-61. That is in contrast with the allegations that Bayston was a thirty-year employee and senior officer of a Franklin Templeton affiliate who was beholden to the controlling entities, FinTech and FRI.[12]

Additionally, the relevant relationships in *Friedman v. Dolan*, No. 9425-VCN, 2015 WL 4040806 (Del. Ch. June 30, 2015) are far more attenuated than Bayston's intimate relationship with Franklin Templeton. Bayston cites *Friedman* in connection with its discussion of the three-member compensation committee that was alleged to have breached its fiduciary duties in approving compensation for the CEO. The committee members included Tese (a retired 70-year old), Reifenheiser (a retired 77-year old), and Ryan (a director for whom no personal information is recited). *Id*., at *2. The court held that "[i]t is not reasonable to infer that age and retirement defeated independence—Plaintiff has not made fact-based allegations suggesting that the Compensation Committee Defendants had infirmities or were dependent on their compensation." *Id*. at *7. By contrast, Bayston is solely dependent upon Franklin Templeton for his livelihood and compensation.

Finally, in *In re Camping World Holdings, Inc. S'holder Deriv. Lit.*, No. 2019-0179-LWW, 2022 WL 288152 (Del. Ch. Jan. 31, 2022), the plaintiff failed to make the crucial allegation of materiality. The

---

[12] The decision of the Delaware federal district court in *In re ALH Holdings LLC*, 675 F. Supp. 2d 462 (D. Del. 2009) that Bayston alleges involved a "substantially similar claim" was not even a decision on a motion to dismiss. Rather, the Court noted that its decision not to disregard the business judgment rule presumption was based upon the Court's previous finding that the directors there had "faithfully discharged the fiduciary duties of care and loyalty." *Id*. at 484.

court noted that the mere fact that a director is appointed by an alleged controller does not, by itself, overcome the presumption of director independence. *Id.* at 18. There, the director at issue (Schickli) was a disinterested outside director who had been on the company's board for five years, and the Court acknowledged plaintiffs' allegation that the controller paid the director compensation of roughly $200,000 per year for his service, but noted that "the plaintiffs make no attempt to argue that compensation is material to him." *Id.* However, payment of director fees to an outside director is distinguishable and far less material than Bayston's thirty years of employment as a senior executive with the controlling entity, and the FAC further alleges that Bayston (unlike the director in *Camping World*) was dependent upon his Franklin Templeton employer for his livelihood. FAC ¶178 ("Bayston was and is beholden to Franklin Templeton for his employment and compensation.").

In short, the relationship between Bayston and Franklin Templeton and the controlling entities is current, long-tenured, material, and involves a senior executive position. These relationships and the totality of circumstances sufficiently plead Bayston's lack of independence.

## III. THE ALLEGATIONS OF INTENTIONAL MISCONDUCT AND BAD FAITH ARE SUFFICIENT TO ALLEGE A BREACH OF LOYALTY AND TO DEFEAT THE PRESUMPTION OF THE BUSINESS JUDGMENT RULE.

Bayston acknowledges, as he must, that Plaintiff can properly allege a breach of the duty of loyalty by alleging facts showing that "the fiduciary intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation . . . or where the fiduciary intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for [their] duties." *In re Crimson Expl. Inc. Stockholder Litig.*, No. 8541-VCP, 2014 WL 5449419, at *23 (Del. Ch. Oct. 24, 2014). *).* In other words, a plaintiff must simply allege facts raising a plausible inference that the fiduciary "acted with scienter, meaning they had actual or constructive knowledge that their conduct was legally improper." *Morrison v. Berry*, No. 12808-VCG, 2019 WL 7369431 (Del. Ch. Dec. 31, 2019).

The FAC alleges that Bayston, FinTech, and FRI acted in bad faith and with no intention of benefiting Onsa, starting when they became Onsa's controlling entities. FAC ¶¶ 181-189. Plaintiff further alleges that Bayston entered into the ABC transaction with no real intention of benefiting Onsa or its shareholders. *Id.* Instead, Bayston was acting for the benefit of the Franklin Templeton entities, including

his employer, and was intentionally impairing the assets of Onsa so that Franklin Templeton could reap the benefit of those valuable assets. *Id*. The actions of Bayston as alleged constitute bad faith and disloyalty to Onsa. For instance, Bayston did not undertake even the most elementary step of consulting Onsa's most senior officers, including its CEO and General Counsel, before making the decision to wind down and liquidate Onsa. *See Id.* ¶¶ 183-84. Even though it would have been to Onsa's benefit to have its senior officers available for discussion and to provide input regarding a mission-critical corporate decision—such as winding down the business—communications show that these officers were intentionally excluded from this decision made by Bayston, FinTech, and FRI. *Id.* And once that decision was made, Bayston fired Onsa's CEO and General Counsel without notice and without cause. *Id.*

Similarly, before making the decision to wind down Onsa, Bayston also failed to inform or consult with more than fifty of Onsa's non-Franklin affiliated shareholders, which constituted a group of prominent individuals in the business community possessing a wealth of resources, expertise, and contacts with respect to startup companies, fundraising, corporate transactions, and the like. *See id.* at ¶ 187. Moreover, there is no evidence that Bayston, FinTech, and FRI made any efforts to inform themselves of alternatives to liquidation or explore any alternatives with third parties. FAC ¶ 186. And given that the sole director of Onsa was a conflicted, thirty-year executive of a Franklin Templeton affiliate who had fired all the non-Franklin Templeton, unaffiliated executives, there was no independent director or officer to provide unbiased opinions or judgment to Onsa. *Id.* Ultimately, the FAC alleges that there were many potential alternatives to liquidation, such as a sale to a third-party, raising additional capital, or providing the non-Franklin Templeton shareholders with an opportunity to purchase FinTech's stock in Onsa and/or replace Bayston with an unaffiliated director. *Id*. ¶ 186. Bayston's failure to explore reasonable alternatives was in bad faith, and was either an intentional wrong, or otherwise a complete abdication of his responsibilities.

The business judgment rule is not a substantive rule of law, but instead it is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, ... and in the honest belief that the action taken was in the best interests of the company [and its shareholders]." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746–47 (Del. Ch. 2005). This presumption applies when there is no evidence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment" on

the part of the directors. *Id*. But Delaware law firmly embraces the breach of duty resulting from intentional misconduct. Where "subjective bad faith" is alleged, that is, fiduciary conduct motivated by an actual intent to do harm, such conduct is quintessential bad faith and a breach of loyalty. "[T]here is no case in which a director can act in subjective bad faith towards the corporation and act loyally." *Id*. at 753 "That such conduct constitutes classic, quintessential bad faith is a proposition so well accepted in the liturgy of fiduciary law that it borders on axiomatic." *In re Walt Disney Co. Derivative Litg*., 906 A.2d at 64. "[A]n action taken with the intent to harm the corporation is a disloyal act in bad faith." *See McGowan v. Ferro*, 859 A.2d 1012, 1036 (Del.Ch.2004) ("Bad faith is 'not simply bad judgment or negligence,' but rather 'implies the conscious doing of a wrong because of dishonest purpose or moral obliquity ... it contemplates a state of mind affirmatively operating with furtive design or ill will.'") (quoting *Desert Equities, Inc.v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208, n. 16 (Del.1993)).

Here, the FAC is replete with allegations of intentional misconduct and bad faith. As such, the presumption supporting the application of the business judgment rule simply does not apply. Bayston attempts to quibble about one aspect of the challenged conduct (i.e. his failure to respond to requests for information), suggesting that a director's failure to respond to a shareholder's informal request for information does not give rise to a breach of his fiduciary duties. *See Hindlin v. Gottwald*, No. 2019-0586-JRS, 2020 WL 4206570, at *4 (Del. Ch. July 22, 2020) (allegation that director ignored requests for information from shareholder "says nothing of how [director] breached fiduciary duties"); *see also Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998). But Bayston's argument assumes away the entire thrust of the FAC and the claims of intentional wrongdoing and bad faith in attempting to hide the destruction of Onsa and bury potential claims arising from that entity. FAC ¶¶ 176-195. Bayston's brief constitutes nothing more than a factual counter-narrative that is wholly unsuitable for a motion to dismiss. Rather, it *assumes* his good faith rather than accepting Plaintiff's factual allegations and reasonable inferences.

Similarly, the half-hearted attempt to argue that the ABC was not successful in killing all of the shareholder claims of Onsa is wholly beside the point. The purpose and effect of the ABC will be a hotly contested factual issue, with Plaintiff's allegations plausibly alleging the disloyal intent behind that transaction and the extensive benefits to Onsa's controlling entities, FinTech and FRI, including the ability

of a Franklin Templeton affiliate to issue a tokenized money market fund with no compensation claimed to be flowing to Onsa or its shareholders. *See* FAC ¶ 29 (Onsa expected to charge a "platform fee" of "assets under management and also anticipated a share of the distribution fees that Franklin Templeton would collect" and "a \$1/account/month fee associated with each user of the platform."). Rather than Onsa receiving these revenues—that likely would have been extremely significant—the Franklin Templeton entities will instead be the undeserved recipients of revenues that should have been Onsa's. *Id*. ¶¶ 216-18.

## IV.    PLAINTIFF'S ALLEGATIONS ARE NOT IMPERMISSIBLE GROUP PLEADING

FRCP 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the ground upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In a complaint involving multiple defendants, the complaint must provide "fair notice [to each defendant] of what plaintiff's claims are" as well as "fair notice of the grounds of the various claims." *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 961 (S.D. Cal. 1996). Notably, "the prohibition against group pleading only applies in cases of fraud," and "Rule 8 pleading standards do not prevent a plaintiff from 'pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant….'" *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, No. 12-04000 SC, 2013 WL 57861, at \*6 (N.D. Cal. Jan. 3, 2013) (citation omitted).

Here, Bayston's "group pleading" allegation is hard to follow.  There is no issue about what claims are and are not being asserted against him. Of the five causes of action, Plaintiff has only sued Bayston under Count I for breach of fiduciary duty. As to Count I, Plaintiff provides a detailed summary of the specific allegations that form the basis of Plaintiff's breach of fiduciary duty claims against Bayston, as well as FinTech and FRI. FAC ¶¶ 177-195. While Bayston complains that Plaintiff alleges breaches by "[FinTech], [FRI], and Bayston," that is not a group pleading complaint. Rather, Plaintiff makes clear that these allegations are directed at each of these three Defendants; in contrast, for example, neither Johnson nor FTC are identified in this section. In short, Plaintiff has provided Bayston with fair notice of the claims asserted against him, which is all the Federal Rules require.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.  PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND IF ITS PLEADINGS ARE FOUND DEFICIENT.

If the Court determines that Plaintiff has failed to state a claim for any of its causes of action, it should grant Plaintiff leave to amend. "Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend 'shall be freely given when justice so requires,' bearing in mind 'the underlying purpose of Rule 15 to facilitate a decision on the merits, rather than on the pleadings or technicalities.'" *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694 LHK, 2012 WL 6160472, at *16 (N.D. Cal. Dec. 11, 2012) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)). "When dismissing a complaint for failure to state a claim, 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Id.* (quoting *Lopez*, 203 F.3d at 1130). "Generally, leave to amend shall be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith." *Id.* at *50 (N.D. Cal. Dec. 11, 2012) (citing *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)). There would be no reason to deny leave to amend here. Defendants would suffer no prejudice, and Plaintiff has not acted in bad faith. Nor would amendment cause undue delay—this case was only filed in November 2021. There are also no indications that amending would be futile.

## VI.  OBJECTIONS TO BAYSTON'S DECLARATION AND EXHIBIT D

Plaintiff objects to, and move to strike, certain evidence submitted by Defendants in support of their motions to dismiss. Specifically, Plaintiff objects to and moves to strike the following:

- Exhibit D to Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39

- ¶ 7 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39

- ¶ 8 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39

- ¶ 9 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39 Plaintiff reserves all objections to the admissibility of testimony and exhibits at trial. The table below details Plaintiff's objections to the material listed above:

| Evidence | Objections |
|---|---|
| **Exhibit D to Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39**<br><br>Email from Aaron Travis to David Ajalat, et al., dated Dec. 4, 2019. | First, courts generally may not consider evidence beyond the pleadings when considering a motion to dismiss. *See United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 998-99 (9th Cir. 2011). In the Ninth Circuit, the court may consider evidence that the complaint relies on if it was not attached thereto only if: (1) the complaint refers to the evidence; (2) the evidence is central to plaintiff's claim; and (3) no party questions the authenticity of the evidence. *Id.* This email was not referenced in the Complaint, and neither is this email "central to plaintiff's claim." As such, it is not properly considered at the motion to dismiss stage.<br><br>Second, this email thread is indisputably not the "best evidence" of Plaintiff's intellectual property or trade secret ownership, which is properly determined by formal documents and instruments. *See SA Music LLC v. Apple, Inc.*, No. 3:20-CV-02146-WHO, 2022 WL 836304, at *15 (N.D. Cal. Mar. 21, 2022) (citing Fed. R. Evid. 1002) ("[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."). |

| ¶ 7 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39 | First, Under Fed. R. Civ. P. 12(f), this statement in the declaration ought to be stricken from the Court's consideration, as it is merely a legal conclusion submitted by a named Defendant in this action. *See, e.g.*, *Brimstone Nat. Res. Co. v. Haight*, No. 1:18-CV-01740-CL, 2021 WL 1669594, at *1 (D. Or. Apr. 28, 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) ("When evaluating a motion to dismiss, the court may first identify and strike allegations that are mere legal conclusions."). |
| "Following execution of the APA and SPA, I learned for the first time that Tokentech was not a subsidiary of TVL Singapore as had been represented, and consequently also, that Onsa did not own the intellectual property of Tokentech." | Second, this biased opinion from an unqualified witness is indisputably not the "best evidence" of Plaintiff's intellectual property or trade secret ownership, which is properly determined by formal documents or instruments. *See SA Music LLC v. Apple, Inc.*, No. 3:20-CV-02146-WHO, 2022 WL 836304, at *15 (N.D. Cal. Mar. 21, 2022) (citing Fed. R. Evid. 1002) ("[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."). |
| ¶ 8 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39 | First, this paragraph is discussing Exhibit D to Bayston's declaration and Bayston's discussion of Exhibit D in paragraph 8 is objectionable for the same reasons as the exhibit itself is objectionable as set forth above, which objections are incorporated by reference. |
| "Attached as Exhibit D is a true and correct copy of an email chain seeking to set up a meeting to discuss Onsa's lack of | Second, Bayston improperly purports to characterize the contents of the exhibit and the exhibit speaks for itself. Bayston's attempted characterization is thereby improper. |

| | |
|---|---|
| ownership of Tokentech. The chain includes an email dated December 4, 2019 authored by Aaron Travis, then Chief Operating Officer of Onsa, wherein he admitted by way of explanation that the meeting would be "about our the (sic) India subsidiary we don't currently own." | |
| **¶ 9 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss, Dkt. No. 39**<br><br>"In the time since learning that Onsa did not own Tokentech as a subsidiary and did not own Tokentech's intellectual property, I have not seen any documents or other evidence that Onsa had ever acquired Tokentech (as a subsidiary or otherwise), or had otherwise acquired rights to Tokentech's intellectual property (including | First, Under Fed. R. Civ. P. 12(f), this statement in the declaration ought to be stricken from the Court's consideration, as it contains multiple legal conclusions submitted by a named Defendant in this action. *See, e.g.*, *Brimstone Nat. Res. Co. v. Haight*, No. 1:18-CV-01740-CL, 2021 WL 1669594, at *1 (D. Or. Apr. 28, 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) ("When evaluating a motion to dismiss, the court may first identify and strike allegations that are mere legal conclusions.").<br><br>Second, the biased statements from an interested witness are indisputably not the "best evidence" of Plaintiff's intellectual property or trade secret ownership, which is properly determined by documents or instruments. *See SA Music LLC v. Apple, Inc.*, No. 3:20-CV-02146-WHO, 2022 WL 836304, at *15 (N.D. Cal. Mar. 21, 2022) (citing Fed. R. Evid. 1002) ("[a]n original writing, |

| any of its source code or trade secrets). To the best of my knowledge, Onsa never acquired Tokentech or its intellectual property assets. Instead, the Chief Executive Officer of Onsa decided to develop new code with a different contractor." | recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."). |
|---|---|

## **CONCLUSION**

For the reasons set forth above, Bayston's Defendants' Motion to Dismiss should be denied. Further, Exhibit D to and ¶¶ 7-9 of Roger Bayston's Declaration in Support of Defendant's Respective Motions to Dismiss should be stricken from the record for the reasons set forth above.

Dated:  April 22, 2022

Respectfully submitted,

/s/ Jeffery D. McFarland
Jeffery D. McFarland
California Bar No. 157628
jmcfarland@mckoolsmithhennigan.com
MCKOOL SMITH HENNIGAN P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone: (213) 694-1010
Fax: (213) 694-1234

Gary Cruciani (Admitted *Pro Hac Vice*)
Texas Bar No. 05177300
Lew LeClair
California Bar No. 77136
gcruciani@mckoolsmith.com
lleclair@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201 Telephone: (214) 978-4000

Brent N. Bumgardner (Admitted *Pro Hac Vice*)
Texas Bar No. 00795272

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Christopher G. Granaghan (Admitted *Pro Hac Vice*)
Texas Bar No. 24078585
Carder W. Brooks (Admitted *Pro Hac Vice*)
Texas Bar No. 24105536
 brent@nelbum.com
chris@nelbum.com
carder@nelbum.com
NELSON BUMGARDNER CONROY P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Telephone: (817) 377-9111

Patrick J. Conroy (Admitted *Pro Hac Vice*)
Texas Bar No. 24012448
pat@nelbum.com
NELSON BUMGARDNER CONROY P.C.
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201 Telephone: (214) 446-4954

**Attorneys for Plaintiff**
**BLOCKCHAIN INNOVATION, LLC**