Patricia L. Peden
California Bar No. 206440
ppeden@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Telephone: 510.273.8780
Facsimile: 510.839.9104

*(additional counsel listed on next page)*

**Attorneys for Plaintiff**
**BLOCKCHAIN INNOVATION, LLC**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| BLOCKCHAIN INNOVATION, LLC, | CASE NO. 3:21-CV-08787-AMO |
| *Plaintiff*, | **SECOND AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| FRANKLIN RESOURCES, INC. d/b/a FRANKLIN TEMPLETON, FT FINTECH HOLDINGS, LLC, FRANKLIN TEMPLETON COMPANIES, LLC, JENNIFER JOHNSON, AND ROGER BAYSTON, | |
| *Defendants*. | |

Gary Cruciani (Admitted *Pro Hac Vice*)
Texas Bar No. 05177300
Lew LeClair
California Bar No. 77136
gcruciani@mckoolsmith.com
lleclair@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000

Michael E. Catapano (Admitted Pro Hac Vice)
New York Bar No. 5933700
mcatapano@mckoolsmith.com
MCKOOL SMITH P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, NY 10001
Telephone: 212.402.9436

Brent N. Bumgardner (Admitted *Pro Hac Vice*)
Texas Bar No. 00795272
Christopher G. Granaghan
Texas Bar No. 24078585
Carder W. Brooks (Admitted *Pro Hac Vice*)
Texas Bar No. 24105536
brent@nelbum.com
chris@nelbum.com
carder@nelbum.com
NELSON BUMGARDNER CONROY P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Telephone: (817) 377-9111

Patrick J. Conroy (Admitted *Pro Hac Vice*)
Texas Bar No. 24012448
pat@nelbum.com
NELSON BUMGARDNER CONROY P.C.
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201
Telephone: (214) 446-4954

**Attorneys for Plaintiff**
**BLOCKCHAIN INNOVATION, LLC**

Plaintiff Blockchain Innovation, LLC, as assignee of the causes of action belonging to Onsa, Inc. ("**Onsa**"), brings this action against Franklin Resources, Inc. d/b/a Franklin Templeton ("**Franklin Resources**"), FT FinTech Holdings, LLC ("**FT FinTech**") (FT Fintech and Franklin Resources are collectively referred to as "**Franklin Templeton**"), Franklin Templeton Companies, LLC ("**Franklin Templeton Companies**"), Jennifer Johnson ("**Johnson**"), and Roger Bayston ("**Bayston**") (collectively, "**Defendants**"), seeking monetary damages and injunctive relief related to Defendants' breaches of fiduciary duties, copyright infringement, trade secret misappropriation, breach of contract, and other wrongful conduct.

## INTRODUCTION

1.    The core of this lawsuit is a series of blatant and egregious breaches of fiduciary duties by Defendants that killed Plaintiff's predecessor, Onsa. Plaintiff's damages are enormous, as Onsa was a uniquely positioned company in a white-hot sector of the economy that has recently seen comparable companies do IPOs that have resulted in market valuations measured in the *billions* of dollars. Plaintiff seeks damages from Defendants for their value-destroying conduct and an injunction to prevent Franklin Templeton from using technology that it misappropriated from Onsa.

2.    Onsa was a promising startup company whose founders, Aaron Travis ("**Travis**") and Austin Trombley ("**Trombley**"), are successful Silicon Valley entrepreneurs. Onsa was a financial technology ("**FinTech**") company that developed breakthrough blockchain technology to tokenize financial assets. The tokenization of financial assets is the unmistakable wave of the future and promises to revolutionize the financial services industry.

3.    Franklin Templeton manages one of the world's largest money market funds but was a lumbering giant with antiquated technology that had fallen far behind its peers in its financial performance. In March 2018, Franklin Templeton acquired another of Travis's and Trombley's highly successful startup companies, Random Forest Capital ("**RFC**"). Through the RFC acquisition, Franklin Templeton learned of Onsa and its technology.

4.    In October 2019, FT FinTech invested in Onsa through a Stock Purchase Agreement (the "**SPA**") and acquired approximately one-quarter of Onsa's stock. Through a series of wholly-owned

1    subsidiaries, FT FinTech's ultimate corporate parent is Franklin Resources, and FT FinTech was at all

2    times owned and controlled by Franklin Resources. Critically, FT FinTech also acquired control of Onsa

3    and appointed Bayston as Onsa's sole director. Bayston is a 30-year executive of Franklin Templeton.

4        5.     Bayston was a clearly conflicted director with divided loyalties to Onsa and Franklin

5    Templeton. As a 30-year employee and senior executive of Franklin Templeton, Bayston lacked

6    independence from Franklin Templeton, and his judgment was severely impaired by his loyalties to

7    Franklin Templeton. As subsequent events would show, Bayston breached his fiduciary duties to Onsa by

8    making decisions in bad faith and for the benefit of Franklin Templeton, not Onsa.

9        6.     From October 2019 through July 2020, Onsa continued to develop its groundbreaking

10    technology with a team of software engineers paid for by Onsa. Onsa had successfully beta tested its

11    technology, which involved creation of the world's first SEC-approved, "tokenized" money market fund

12    for Franklin Templeton. Onsa and Franklin Templeton were seemingly on track to obtain SEC approval

13    for Franklin Templeton's money market token and launch Onsa's platform for trading tokenized financial

14    assets. Onsa had successfully completed milestones, or was on track to do so, thereby triggering additional

15    obligations by FT FinTech under the SPA.

16        7.     All seemed well with the relationship until July 2020. That is when Defendants struck

17    without warning. With Johnson's knowledge and approval, Bayston terminated Onsa's CEO and all other

18    significant employees; Bayston terminated Onsa's software engineers and coders. These terminations were

19    without notice and without cause. In connection with Franklin Templeton and its attorneys, Bayston then

20    explored ways to limit Franklin Templeton's liability for shuttering Onsa.

21        8.     Franklin Templeton would later rehire key Onsa personnel to work on the very technology

22    that Franklin Templeton took from Onsa. This was all done without any notice or explanation to Onsa's

23    non-Franklin Templeton shareholders.

24        9.     Franklin Templeton ~~is~~has now ~~on the precipice of releasing~~released Onsa's technology

25    under the Franklin Templeton banner.

26        10.     On November 19, 2020, Bayston and FT FinTech, in coordination with Franklin Resources

27    and Johnson, summarily put Onsa into liquidation mode by instituting an Assignment for Benefit of

28

Creditors ("**ABC**") under California law. In his capacity as Onsa's sole director, Bayston executed an Action by Unanimous Written Consent of the Sole Director that approved the ABC. *See* Exhibit A.[1] In his capacity as sole director, Bayston also executed the ABC on behalf of Onsa. *See* Exhibit B. The ABC transferred all of Onsa's tangible and intangible assets, including all of Onsa's intellectual property and legal claims, to the liquidator and assignee, BLKCHN, LLC ("**BLKCHN**").

11.     The ABC was initiated without notifying or consulting Onsa's other shareholders, and without seriously considering alternatives that would allow Onsa to continue as a going concern. The ABC was designed to deliver the *coup de grâce* to Onsa as a competitor in the booming FinTech market for blockchain products while insulating Defendants from any exposure for their egregious conduct. At a minimum, the decision to liquidate Onsa was grossly negligent because Franklin Templeton, Johnson, and Bayston failed to seriously consider alternatives to liquidation, and far better alternatives certainly existed. In fact, the ABC was the worst possible alternative for Onsa's creditors and non-Franklin Templeton shareholders. But for Plaintiff's efforts to purchase Onsa's assets, including its causes of action, ~~Ona's~~Onsa's creditors would have received no more than pennies on the dollar for their claims.

12.     Defendants' scheme likely would have succeeded but for one crucial fact: when made aware of potential claims and Defendants' wrongdoing, BLKCHN investigated them. Rather than simply liquidating the company and allowing Defendants to quickly and quietly sweep their misconduct under the rug, BLKCHN conducted a thorough investigation including discussions relating to the allegations in this Second Amended Complaint—both with several of the non-Franklin Templeton shareholders and their representatives and with Franklin Templeton and its representatives. Ultimately, on August 17, 2021, BLKCHN entered into an Asset Purchase Agreement ("**August 2021 APA**") with Plaintiff, a company formed by the majority of Onsa's non-Franklin Templeton shareholders and other parties. *See* Exhibit C. Pursuant to that agreement, BLKCHN transferred all of Onsa's tangible and intangible assets including

---

[1] The Action by Unanimous Written Consent of the Sole Director (Bayston) states that the "ABC with BLKCHN and Transaction Documents shall be presented to the Corporation's stockholders for approval." Contrary to that representation, the Transaction Documents were never presented to the non-Franklin Templeton shareholders.

Onsa's causes of action (which assets and claims BLKCHN owned as a result of the ABC) to Plaintiff and, in return, Plaintiff "stepped up" to pay Onsa's unsecured creditor claims *in full*.

13.     ~~Upon information and belief,~~ Franklin Templeton, itself or through one of its subsidiaries or affiliates, ~~is now on the precipice of launching~~has launched an SEC-approved money market token (and ~~perhaps~~is poised to launch other tokenized financial assets) using trade secrets and copyrights that belonged to Onsa and now belong to Plaintiff.

### SUMMARY OF FACTUAL ALLEGATION

14.     The asset management business has undergone a series of rapid technological changes. Innovations like exchange traded funds (ETFs), the revolution in retail trading capabilities, and most recently, blockchain-based technology have disrupted traditional active asset management businesses.[2] Franklin Templeton—one of the world's largest asset managers—largely failed to capitalize on ETFs and retail trading capabilities and was recently crowned "the worst-selling investment manager" for its history of missteps.[3] And even with respect to blockchain-based technology, Franklin Templeton was again asleep at the innovation wheel.

15.     As Johnson—Franklin Templeton's newly promoted CEO—put it in 2018: "Blockchain will be my grandkids' problem."[4] But as Johnson soon realized, her executive judgment could not have been more wrong. Instead, after a corporate presentation from Citi Business Advisory Services in 2018, Johnson, Bayston, and other Franklin Templeton executives were awakened to blockchain-based technology as the next major innovation in asset management. And, again, Franklin Templeton was already behind.

16.     Blockchain technology was Johnson's clear and present problem, not her "grandkids' problem." Rather than expend the time and resources to develop its own blockchain-based asset

---

[2] As discussed in more detail below, blockchain technology uses a distributed ledger to record and verify financial transactions. Bitcoin is a well-known use of blockchain technology.

[3] *Franklin Templeton named worst-selling fund manager of 2020*, Financial Times (Jan. 28, 2021), https://www.ft.com/content/b1e6078c-bf72-4ef0-ad4b-2970f3b17e36

[4] Johnson is also a Franklin Templeton board member.

management platform by incentivizing the best engineers and industry innovators to join it, Franklin Templeton decided to take a short cut by investing in a promising startup named Onsa.

17.     Onsa was an innovative Silicon Valley FinTech company that developed technology to enable traditional financial assets (*i.e.*, stocks, bonds, funds, etc.) to be traded on a blockchain-based trading platform.[5] Onsa's plan included the creation of the world's first SEC-approved, "tokenized" money market fund. Tokenizing a financial asset involves creating a digital representation of the financial asset's value to enable associated financial transactions to be authenticated and recorded on a blockchain using principles of cryptography.

18.     Johnson, Bayston, and other Franklin Templeton executives decided that Franklin Templeton—and not one of its competitors—should be the first asset management company to unveil an SEC-approved, tokenized money market fund and move its expensive and antiquated transfer agent system to a blockchain-based system of trading, authentication, and recording.

19.     Franklin Templeton and Onsa's founders became acquainted in connection with a previous transaction whereby Franklin Templeton (through one of its subsidiaries) acquired RFC.[6] Leveraging this prior relationship, and under the premise of a good-faith equity investment in Onsa,[7] senior Franklin Templeton executives, including Johnson, Bayston, Sonal Desai ("**Desai**") (Executive Vice President and Chief Investment Officer), and others convinced Onsa's founders to make a deal with Franklin Templeton concerning Onsa.

20.     In hindsight, Defendants did not operate in good faith when the due diligence process began. For example, representatives of Franklin Templeton (including Johnson and Bayston) and Onsa (including Travis and Trombley) had numerous meetings, but in an unusual move, Franklin Templeton, Bayston, and

---

[5] Onsa, Inc. was formerly called TokenVault, Inc. before its name was changed. TokenVault, Inc. acquired all assets of its predecessor TokenVault Limited in connection with an Asset Purchase Agreement dated October 28, 2019 ("**October 2019 APA**"). Unless otherwise specified, "Onsa" refers to Onsa, Inc./TokenVault, Inc., or its predecessor company, TokenVault Limited.

[6] Travis, Trombley, and Kevin Farrelly ("**Farrelly**") founded RFC. Farrelly went to work for Franklin Templeton in connection with the acquisition.

[7] Unlike Franklin Templeton's investment in Onsa, Franklin Templeton acquired 100% of RFC.

other executives demanded that Onsa share its source code for "due diligence" purposes. Such a request was unusual—Franklin Templeton and its executives knew that Onsa's technology included proprietary and confidential computer code (and accompanying know-how) that was designed to enable the blockchain-based assets and associated trading platform that Franklin Templeton so desired.[8] However, Onsa assumed good faith on Franklin Templeton's part and entered into non-disclosure and non-use agreements, pursuant to which Onsa shared portions of its source code.[9] But instead of engaging in a good faith due diligence process, Franklin Templeton dragged out the diligence process for many months, all the while knowing that Onsa's cash reserves were quickly depleting.

21.     During the due diligence process, it became clear that Onsa required additional funds to continue development. Onsa's executives informed Bayston that Onsa intended to seek outside investment in the company, but Franklin Templeton and Bayston threatened to pull the plug on the proposed transaction if Onsa took such steps. Instead, Franklin Templeton offered to purchase $1.5 million of convertible notes from Onsa. Conveniently, this step enabled Franklin Templeton to acquire an even greater percentage of Onsa than the deal terms under discussion because the notes were to convert to additional equity at the deal's closing. Franklin Templeton then used its new leverage to demand that it review *any additional* code that Onsa had written since the due diligence process began. After one of the code reviews, a Franklin Templeton employee, Michael Muir ("**Muir**"), remarked that, having had access to Onsa's

---

[8] As discussed further below, Onsa diligently protected its code throughout development, such as by storing the code in encrypted and password-protected repositories only accessible to Onsa and its developers. Onsa further maintained secrecy regarding material related to its source code, such as know-how, commercialization strategies, confidential business information, and other information. Onsa understood the significant value derived from keeping such material from prying eyes, as access to its secret information would provide a huge advantage to any competitor, for example, attempting to tokenize money market funds using the Stellar blockchain.

[9] For example, Franklin Templeton (through Franklin Templeton Companies) and TokenVault Limited executed a Mutual Confidentiality and Non-Disclosure Agreement on September 11, 2019 (the "**NDA**"), which reflects the parties' agreement regarding confidentiality and non-use of TokenVault's Confidential Information, including TokenVault's Confidential Information disclosed to Franklin Templeton or its affiliates prior to the execution date. *See* Exhibit D. There were other agreements and promises of confidentiality and non-use that pre-date this agreement.

proprietary technology and code, Franklin Templeton had learned enough to build the tokenized money market fund without Onsa. This statement would prove prescient.

22.     Franklin Templeton fully reviewed most, if not all, of Onsa's propriety technology, and it liked what it saw. In October 2019, Franklin Templeton, Onsa, and Trombley closed on the SPA whereby FT FinTech obtained Onsa's control shares and approximately twenty-five percent of Onsa's common stock. Onsa's founders were reluctant to sell Onsa's control shares to FT FinTech, but Franklin Templeton and its executives provided assurances concerning the future relationship between Franklin Templeton and Onsa, assurances that would prove to be false.

23.     For example, Johnson and Bayston repeatedly reassured Onsa that post-investment, Onsa would function as an independent company and have an independent board of directors. However, post-investment, Franklin Templeton replaced Trombley with Bayston (a senior Franklin Templeton executive), who was Franklin Templeton's director nominee. Franklin Templeton never followed through on its promise to add two additional members to Onsa's board—one director affiliated with Onsa's founders and one "independent" director mutually agreeable to Onsa's founders and Franklin Templeton.

24.     Franklin Templeton also promised that Onsa would function as an independent technology company that could maximize the value of its technology by seeking customers other than Franklin Templeton. For example, Onsa envisioned that its platform would trade Franklin Templeton's money market token (and future Franklin Templeton tokenized assets) alongside other financial companies' tokenized offerings, tokenized stocks, cryptocurrencies, and currencies. But after closing the transaction, Franklin Templeton refused to allow Onsa to seek other customers.

25.     Franklin Templeton also promised to finalize and sign a master services agreement ("**MSA**"), whereby Franklin Templeton would compensate Onsa for use of its technology. This promise is reflected in Franklin Templeton's September 3, 2019 filing with the SEC, which references a "blockchain administrator" (i.e., Onsa) that would be compensated via a "Blockchain Administration Agreement" with

Franklin Templeton (i.e., the MSA).[10] Although Franklin Templeton and Bayston repeatedly assured Onsa that it would finalize the MSA, it never did.

26.     Onsa worked hard to keep its end of the bargain. Between October 2019 and July 2020, Onsa worked diligently to continue developing its own technology, focusing specifically on facilitating Franklin Templeton's tokenized money market fund so it could trade, authenticate, and record the fund's financial transactions using the Stellar blockchain.[11] Onsa also diligently worked on development of an "App" capable of trading the Franklin Templeton money market token alongside other tokenized financial assets, such as stocks, currencies, and cryptocurrencies. There were frequent meetings, at times daily, between Onsa and Franklin Templeton concerning Onsa's platform and how to customize that platform for Franklin Templeton's needs.

27.     Illustrating this close, strategic relationship is the fact that several Onsa employees were given Franklin Templeton employee badges, as they regularly met with Franklin Templeton employees at Franklin Templeton offices. The Onsa team spent so much time at Franklin Templeton that certain Franklin Templeton employees mistakenly believed that the Onsa employees worked for Franklin Templeton.

28.     Onsa devoted significant resources to develop its platform, processes, and code, taking special care to ensure that its technology would specifically work with Franklin Templeton's antiquated internal systems. Onsa also assisted Franklin Templeton with filing for regulatory approval with the SEC and European regulators, including drafting much of the necessary disclosure and documentation. To obtain regulatory approval, Onsa proposed that Franklin Templeton run the tokenized money market fund for a period of six months alongside its legacy transfer agent to establish the security and accuracy of the new platform.

---

[10] The September 3, 2019 SEC filing was made shortly before Franklin Templeton's investment in Onsa. Franklin Templeton's next SEC filing on the money market token was made on March 25, 2020, which was after Franklin Templeton's investment in Onsa. This subsequent SEC filing removed any reference to compensating a "blockchain administrator" (i.e., Onsa) for services to Franklin Templeton. Franklin Templeton's false promises were the classic bait and switch.

[11] Stellar is a third-party blockchain provider that offers its blockchain platform to other FinTech companies.

29.     The tokenized money market fund was initially planned to launch in Fall 2020. The Onsa team continued to work on fine-tuning the product through the beginning of Summer 2020. During this time, Onsa also worked to finalize the fee structure with Franklin Templeton. Onsa expected to charge a platform fee of three to five basis points (.03% to .05%) of assets under management and also anticipated a share of the distribution fees and redemption fees that Franklin Templeton would collect. Onsa also anticipated a $1/account/month fee associated with each user of the platform.

30.     In contrast to Onsa's good faith, the hallmark of Franklin Templeton, Johnson, and Bayston's management was bad faith. Franklin Templeton's misconduct in managing Onsa began shortly after its investment. For example, Onsa's management recognized that it was in Onsa's best interest to raise additional capital from strategic, third-party investors, who might ultimately become customers of the Onsa platform. However, Franklin Templeton and Bayston shut down these efforts and falsely assured Onsa that Franklin Templeton would fully support it financially. In retrospect, it is clear that Franklin Templeton and Bayston did not want Franklin Templeton's competitors or other third parties involved with Onsa, and did not want Onsa to gain traction as a standalone entity.

31.     Onsa also made plans to approach other companies to be customers of Onsa's tokenization platform. Some of the world's largest global asset managers expressed interest in learning more about Onsa and trading their financial products on Onsa's platform. Pre-investment, Franklin Templeton, Johnson and Bayston agreed that Onsa would be allowed to seek out customers beyond Franklin Templeton. But post-investment, Franklin Templeton shut down these efforts. In retrospect, Franklin Templeton wanted the Onsa technology for its exclusive use.

32.     As part of their scheme, Franklin Templeton and Bayston deliberately kept Onsa's shareholders in the dark. Evidencing Defendants' bad faith and concern only for Franklin Templeton's interests, post investment Bayston and the Franklin-Templeton-controlled Onsa *never once* updated Onsa's other shareholders. Even worse, Bayston and the Franklin Templeton-controlled Onsa refused to substantively respond to numerous shareholders' *direct requests* for information concerning Onsa's operations and plans.

33.     For example, on July 20, 2020, an Onsa shareholder, PJ Lee, emailed Onsa and complained about its lack of transparency. Onsa's CFO, Lou Mohn ("**Mohn**"),[12] responded three weeks later, on August 14, that "Onsa management is currently conducting a business review in consultation with our Board of Directors" and that an update would be forthcoming. Mohn's response was false, as he knew that Franklin Templeton, FT FinTech, Bayston, and Johnson had already decided to liquidate Onsa. Lee followed up multiple times, most recently on October 5, 2020, but no update was ever provided.

34.     Additionally, although Trombley had Onsa "board observer" rights, Bayston and the Franklin Templeton-controlled Onsa never invited Trombley to attend a single Onsa board meeting.

35.     Further still, the Franklin Templeton-controlled Onsa prioritized technology development that benefited Franklin Templeton, all the while refusing to enter into the promised MSA whereby Onsa would be compensated for its development and Franklin Templeton's use of this technology.

36.     Post-investment, Franklin Templeton publicly misrepresented Onsa's technology as its own. On March 25, 2020, Franklin Templeton made an SEC filing regarding the money market token. Franklin Templeton's SEC filing details Onsa's technology, but unlike its previous SEC filing on September 3, 2019, the March 25, 2020 filing makes no mention of the "blockchain administrator" or Onsa. These references were stripped from Franklin Templeton's post-investment SEC filings. Despite omitting any mention of Onsa, the SEC filing claims Onsa's technology as Franklin Templeton's own. For example, the SEC filing describes a dual recording structure using the Stellar blockchain, a technology developed by Onsa. Franklin Templeton's SEC filing falsely implies that Onsa's strategic vision and technological innovation should be credited to Franklin Templeton.

37.     Notwithstanding Franklin Templeton's deletion of references to the "blockchain administrator," the March 25, 2020 SEC filing continues to reference an "App" that would trade the

---

[12] Mohn fielded many of the shareholders' requests for updates. Prior to formally joining Onsa, Mohn was a financial analyst at Franklin Templeton. After Franklin Templeton's investment in Onsa, Bayston hired Mohn as Onsa's CFO, and for a period of time Mohn worked simultaneously for Onsa and Franklin Templeton. Sometime in early 2020, Mohn became a full-time employee of Onsa. When Franklin Templeton began the process of liquidating Onsa, Bayston appointed Mohn as Onsa's interim CEO. After the winding down of Onsa was complete, Franklin Templeton re-hired Mohn.

Franklin Templeton token. This is a reference to the application that was being developed by Onsa in connection with its platform.[13] Franklin Templeton and Onsa considered naming this app "Benji."

38.     Despite the many roadblocks imposed by Franklin Templeton, Onsa's team raced forward with the creation of the Onsa platform, and its future continued to look very bright in the white-hot FinTech landscape. During this time, Onsa continued to diligently protect its code and other trade secrets, granting access only to its developers and Franklin Templeton (subject to non-disclosure obligations), Onsa's controlling shareholder. By June 2020, Tauseef Bashir ("**Bashir**"), Onsa's new CEO and a highly-regarded former Amazon executive, had Onsa well on its way to developing what he described as a "world changing" technology. Onsa had approximately eight months of cash reserves to operate and the ability to fundraise. It had made substantial progress with respect to its technological development, most notably the tokenized money market fund and asset custody features.

39.     Onsa was ready and waiting for SEC approval to launch the Franklin Templeton tokenized money market fund. Onsa anticipated a public launch of its trading platform in approximately October 2020. Onsa was testing its point-of-sale system for launch in early 2021.

40.     On July 22, 2020, Franklin Templeton filed an updated SEC filing concerning its blockchain-based money market fund using Onsa's technology and app.[14] Like other post-investment SEC filings, this filing omits any reference to a "blockchain administrator" (i.e., Onsa), and the filing once again gives the false impression that Franklin Templeton should be credited with the idea and execution of using blockchain to record and verify money market fund transactions.

41.     As Onsa continued to develop its technology throughout Summer 2020, its future was boundless. Having devoted significant time and resources in developing and maintaining proprietary computer code, business strategies, and necessary infrastructure, Onsa was positioned as a pioneer in the tokenized money market space, aimed at revolutionizing an industry (and a company) ripe for

---

[13]  In later SEC filings, Franklin Templeton misrepresents that Onsa was a Franklin Templeton "acquisition," when in truth Onsa was a company whose cap table included over fifty non-Franklin Templeton shareholders.  Franklin Templeton was just one of many stockholders in Onsa.

[14]  SEC Form N-1A as filed by Franklin Templeton on July 22, 2020, https://www.sec.gov/Archives/edgar/data/1786958/000178695820000018/franklinonchain-pro.htm.

revitalization. Then, without any notice, Franklin Templeton, Johnson, and Bayston decided to abruptly shutter Onsa. Bayston, with full approval from Franklin Templeton and Johnson: (1) terminated Onsa's CEO and General Counsel; (2) fired Onsa's staff and development team; and (3) caused Onsa to withdraw all outstanding offers to individuals that planned to start their employment with Onsa in the second half of 2020. In effect, Franklin Templeton, Johnson, and Bayston shut down Onsa at the pinnacle of its potential.

42.    As part of its secret liquidation plans, Franklin Templeton and its executives were acutely aware that their actions created litigation risk for them but went ahead with their scheme anyway. For example, in August 2020 (three months before actually implementing the ABC) Mohn prepared a presentation to Onsa's board whose sole member was Bayston. The presentation identified "litigation risk," "minority stockholders," and "D&O tail risk" as three of the main risks if they continued with Onsa's liquidation. The presentation further proposed using Onsa's cash to establish a "litigation reserve" in anticipation of the forthcoming legal claims. ████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████ Had the decision to liquidate Onsa been made in good faith and with Onsa's bests interests at heart, Franklin Templeton and its executives would not have been so concerned about claims for breach of fiduciary duty and obtaining insurance to cover these claims.

43.    On November 23, 2020, with Franklin Templeton and Johnson's agreement and approval, Bayston liquidated Onsa by executing the ABC that transferred "all assets of Onsa, Inc. and all assets of Onsa LLC, whether real or personal, and whether tangible or intangible" to BLKCHN.

44.    At the time Franklin Templeton, Johnson, and Bayston initiated the liquidation of Onsa, the company had no significant creditors but did have very valuable infrastructure, trade secrets, and other intellectual property, according to Onsa's own financial statements and recent third-party valuations. When rumors of Franklin Templeton's liquidation reached Onsa's non-Franklin Templeton shareholders, they were utterly shocked.

45.    The ABC was done with no advance notice or input from any of Onsa's other shareholders, who were left in the dark and completely blindsided. To this day, Defendants have never provided *any*

update to Onsa's non-Franklin Templeton shareholders, or even attempted to justify to these shareholders why the ABC was initiated or was allegedly in Onsa's best interest. Furthermore, prior to initiating the ABC, neither Franklin Templeton, Johnson, nor Bayston reached out to any of Onsa's shareholders regarding Franklin Templeton's decision to liquidate Onsa, or to explore alternatives to the ABC.

46.     Notably, Onsa's non-Franklin Templeton shareholders include numerous prominent individuals with significant startup, blockchain, venture capital, financial services, and other relevant expertise. The ABC process was destined—but for Plaintiff's intervention—to be a worst-case scenario for Onsa's creditors and non-Franklin Templeton shareholders in which the creditors would receive pennies on the dollar (if that) and the shareholders would receive nothing and lose their entire investment. Thus, it was clearly in Onsa's best interest (and the interest of its stakeholders) for Franklin Templeton to explore alternatives to liquidation. Franklin Templeton consulting with Onsa's non-Franklin Templeton shareholders would have been an obvious place to start. But neither Franklin Templeton, Johnson, nor Bayston ever approached these shareholders to explore alternatives to liquidation. Indeed, it appears to have been their plan to deliberately keep the non-Franklin Templeton shareholders in the dark and to wind down and liquidate Onsa in secret at a time when, paradoxically, Onsa was far along in its business plan and had an extremely bright future.

47.     Franklin Templeton, Johnson, and Bayston decided to secretly shutter Onsa through the ABC process in bad faith and for reasons that were contrary to Onsa's best interests, including to avoid having to compensate Onsa for its development efforts; to gain the ability to launch the tokenized money market without Onsa's involvement and thereby avoid payment obligations to Onsa under the promised MSA; and to avoid liability for their numerous breaches of fiduciary duty and other decisions (e.g., through a derivative action by the non-Franklin Templeton shareholders) by assignment of Onsa's legal claims to a third party. The decision to wind down Onsa and liquidate it via the ABC without notice to, or input from, Onsa's non-Franklin Templeton shareholders confirms that Defendants' decisions were made in bad faith and in advancement of their own self-interest.

48.     Franklin Templeton's scheme did not go as planned. Instead of burying the company, BLKCHN explored a sale of Onsa's assets, including its intellectual property and legal claims. Ultimately,

1   Plaintiff obtained financing and "stepped up" to pay Onsa's unsecured creditor claims ***in full***, and in return

2   acquired Onsa's assets, so that the legal claims asserted herein could be pursued against Defendants. In

3   connection with the purchase of Onsa's assets, Plaintiff also obtained access to some of Onsa's internal

4   documents and emails, which include correspondence involving Johnson, Bayston, and other high-level

5   Franklin Templeton employees. These documents, some of which are referenced in this Second Amended

6   Complaint, shine a light on what was going on behind the scenes and expose Defendants' egregious

7   breaches of fiduciary duties to Onsa, confirming that the decision to liquidate Onsa was made in bad faith

8   and contrary to Onsa's best interests.

9         49.   Adding insult to injury, Franklin Templeton ~~is~~has now ~~on the cusp of launching~~launched

10   technology it misappropriated from Onsa.[15] In a recent interview, Johnson bragged that Franklin Templeton

11   ~~is in "pilot mode" with the money market token, and that Franklin Templeton~~ will soon "launch other types

12   of similar products."[16] This is the exact technology that Onsa was developing.

13         50.   Plaintiff, as the owner of Onsa's causes of action[17], brings this action against (i) FT FinTech,

14   (ii) Franklin Resources, which is FT FinTech's ultimate parent, (iii) Franklin Templeton Companies, the

15   signatory to the NDA, (iv) Johnson, who at relevant times was the COO or CEO of Franklin Templeton as

16   well as a Franklin Templeton board member, and (v) Bayston, who at relevant times was both Onsa's sole

17   director and a Franklin Templeton senior executive.

18

---

19   [15] *See generally* Franklin Templeton, *Summary Prospectus, Franklin OnChain U.S. Government Money Fund*, April 6, 2021, https://www.sec.gov/Archives/edgar/data/0001786958/

20   000137949121001250/filing222856581.htm; *see also* Banerjee, Devin, *'The power has shifted': Franklin Templeton CEO Jenny Johnson on hybrid work, how to embrace uncertainty, and what's keeping her up

21   *at night*, Human Capital (Aug. 20, 2021), https://www.linkedin.com/pulse/power-has-shifted-franklin-templeton-ceo-jenny-hybrid-banerjee-cfa/ ("We [Franklin Templeton]

22   were the first to launch a regulated stablecoin [e.g., tokenized fund]—a money market fund with a stablecoin. We're in a pilot mode with it right now, working with the SEC. They appreciate it because

23   we've learned together step by step as they try to figure out how to regulate this world. After that, we'll

24   look to launch other types of similar products"—Jenny Johnson).

25   [16] *Supra* at fn. 15.

26   [17] Plaintiff is also the assignee of the majority of Onsa's shareholders' causes of action against
Defendants. However, for sake of clarity, the individual shareholders' direct causes of action are not

27   asserted in this Complaint. Plaintiff is only asserting Onsa's causes of action in this Complaint.

28

1

2

## PARTIES

3        51.     Plaintiff Blockchain Innovation, LLC is a Delaware limited liability company whose

4    registered agent is The Corporation Trust Company, located at 1209 Orange Street, New Castle County,

5    Wilmington, Delaware 19801. Through the ABC, Onsa transferred "all assets of Onsa, Inc. and all assets

6    of Onsa LLC, whether real or personal, and whether tangible or intangible" to BLKCHN LLC

7    ("BLKCHN"). *See* Exhibit B. This assignment includes the causes of action asserted herein. Plaintiff

8    purchased these same assets from BLKCHN, and is now the legal owner of the causes of action that are

9    asserted herein, as well as the associated intellectual property. *See* Exhibit C.

10       52.     Defendant Franklin Resources Inc., doing business as Franklin Templeton, is a Delaware

11    corporation whose registered agent is United Agent Group Inc., located at 4640 Admiralty Way, 5th Floor,

12    Marina del Rey, CA 90292. Franklin Resources is an asset management company incorporated in

13    Delaware. As the controlling shareholder of FT FinTech Holdings, LLC, its control of 100% of Onsa's

14    voting stock, and the only shareholder whose interests have been represented by Onsa's sole conflicted

15    director, Franklin Templeton owed fiduciary duties to Onsa and its shareholders.

16       53.     Defendant FT FinTech Holdings, LLC is a Delaware limited liability company whose

17    registered agent is United Agent Group Inc., located at 4640 Admiralty Way, 5th Floor, Marina del Rey,

18    CA 90292. FT FinTech Holdings, LLC is the nominal owner of 100% of Onsa's issued and outstanding

19    voting common stock and nominal owner of approximately one-quarter of Onsa's issued and outstanding

20    non-voting common stock.

21       54.     Defendant Franklin Templeton Companies, LLC is a Delaware limited liability company

22    whose registered agent is United Agent Group Inc., located at 4640 Admiralty Way, 5th Floor, Marina del

23    Rey, CA 90292. Franklin Templeton Companies, LLC was a party to the NDA and entered into this

24    agreement "on its own behalf, for the benefit of that group of affiliated businesses consisting of Franklin

25    Resources, Inc. ("FRI") and FRI's subsidiaries, partnerships, joint ventures and related and affiliated

26    business entities." *See* Exhibit D.

27

28

55.     Upon information and belief, Defendant Jennifer Johnson is a resident of California and is the President and Chief Executive Officer of Franklin Templeton. Johnson is also a Franklin Templeton board member. As president and CEO, Johnson is responsible for the operation of all aspects of Franklin Templeton's business. Johnson was responsible for catalyzing Franklin Templeton's equity investment in Onsa. Johnson had direct involvement with Franklin Templeton's investment in Onsa. Johnson was also directly involved with operational aspects of Onsa, including direct communications with Onsa's CEO concerning Onsa's operations. And finally, Johnson was directly involved with the decision to liquidate Onsa via the ABC. At all relevant times, Johnson was responsible for aiding and abetting Defendants' breaches of fiduciary duties and other tortious conduct.

56.     Upon information and belief, Defendant Roger Bayston is a resident of California. Bayston has worked at Franklin Templeton for approximately 30 years, including while he was the sole member of Onsa's board of directors. In September 2019, Bayston was retitled at Franklin Templeton as the Executive Vice President – Director of Quantitative & FinTech Strategies. Bayston was at all times a senior Franklin Templeton executive while also serving as Onsa's sole board member. Like Johnson, Bayston was directly involved in Franklin Templeton's investment in Onsa, Franklin Templeton's management of Onsa, and the decision to liquidate Onsa.

## JURISDICTION AND VENUE

57.     This Court has subject matter jurisdiction over the Defend Trade ~~Secret~~Secrets Act claim under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) and over the copyright infringement claims under 28 U.S.C. § 1338(a) and the Federal Copyright Act, 17 U.S.C. §§ 101 *et seq*. This Court has subject matter jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.

58.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1) because all Defendants reside in California and some, if not all, of Defendants reside in this District, as is discussed in the next four paragraphs. As set forth below, venue is also proper with respect to the copyright claims under 28 U.S.C. § 1400(a).

59.     This Court has personal jurisdiction over Defendant Franklin Resources, Inc., in accordance with due process and/or the California Long Arm Statute, because Franklin Resources, Inc.'s principal place of business is located at 1 Franklin Parkway, San Mateo, California 94403. Venue is proper in this District over Franklin Resources, Inc. under 28 U.S.C. § 1391(b)(1), (c), and (d) because it resides in this District due to its principal place of business being located in this District. Venue is proper with respect to the copyright claims under 28 U.S.C. § 1400(a) because Franklin Resources, Inc. is subject to personal jurisdiction in this District.

60.     This Court has personal jurisdiction over FT FinTech Holdings, LLC, in accordance with due process and/or the California Long Arm Statute, because FT FinTech Holdings, LLC's principal place of business is located at 1 Franklin Parkway, San Mateo, California 94403. Venue is proper in this District over FT FinTech Holdings, LLC under 28 U.S.C. § 1391(b)(1), (c), and (d) because it resides in this District due to its principal place of business being located in this District. Venue is proper with respect to the copyright claims under 28 U.S.C. § 1400(a) because FT FinTech Holdings, LLC is subject to personal jurisdiction in this District.

61.     This Court has personal jurisdiction over Franklin Templeton Companies, LLC, in accordance with due process and/or the California Long Arm Statute, because Franklin Templeton Companies, LLC's principal place of business is located at 1 Franklin Parkway, San Mateo, California 94403. Venue is proper in this District over Franklin Templeton Companies, LLC under 28 U.S.C. § 1391(b)(1), (c), and (d) because it resides in this District due to its principal place of business being located in this District. Venue is proper with respect to the copyright claims under 28 U.S.C. § 1400(a) because Franklin Templeton Companies, LLC is subject to personal jurisdiction in this District.

62.     This Court has personal jurisdiction over Defendant Johnson, in accordance with due process and/or the California Long Arm Statute because, because she is a resident of and is domiciled in California. Venue is proper in this District over Johnson under 28 U.S.C. § 1391(b)(1) because all defendants in this case are residents of California and Franklin Resources, Inc., FT FinTech Holdings, LLC, and Franklin Templeton Companies, LLC reside in this District.

63.     This Court has personal jurisdiction over Defendant Bayston, in accordance with due process and/or the California Long Arm Statute, because he is a resident of and is domiciled in California. Venue is proper in this District over Bayston under 28 U.S.C. § 1391(b)(1) because all defendants in this case are residents of California and Franklin Resources, Inc., FT FinTech Holdings, LLC, and Franklin Templeton Companies, LLC reside in this District.[18]

## DETAILED FACTUAL ALLEGATIONS

64.     This case concerns claims for (1) breaches of fiduciary duties by Franklin Resources, FT FinTech, and Bayston; (2) trade secret misappropriation by Franklin Resources, FT FinTech, and Franklin Templeton Companies; (3) breach of contract by Franklin Resources, FT FinTech and Franklin Templeton Companies; (4) copyright infringement by Franklin Resources, FT FinTech, and Franklin Templeton Companies; and (5) Johnson's aiding and abetting the breaches of fiduciary duties by Franklin Resources, FT FinTech, and Bayston.

**I.     Onsa Develops Its Innovative Technology to Tokenize Financial Assets.**

65.     Onsa's predecessor (TokenVault) was founded in 2017 as a FinTech company focused on using blockchain technology to create, issue, and trade tokenized financial instruments.

66.     Blockchain technology uses a distributed ledger to record and verify financial transactions.[19] The conversion of financial assets into digital tokens that can be stored and managed on a distributed ledger platform such as a blockchain is referred to as tokenization. Tokenizing a traditional security (*e.g.*, an ETF) requires creating a security token that represents an ownership interest in the security or underlying assets.

---

[18] While Onsa's Amended and Restated Certificate of Incorporation provides that certain actions are to be brought in Delaware Court of Chancery, the forum selection clause is inapplicable to any claims that Plaintiff has asserted against Bayston. This Court has denied Bayston's motion to dismiss in which he alleged that Plaintiff's claims against him were required to be brought in Delaware Chancery Court.

[19] The Stellar website explains that "blockchain provides a way for people around the world to collectively maintain a database without relying on a central authority." As data comes into the network, it is grouped together in "blocks" of information for verification and recording. Once a block is accepted by the computers connected to the network as valid, the block is appended to the past history of validated blocks. In other words, the blocks are "chained" together. Cryptographic functions protect the integrity of the blockchain.

67.     Onsa developed a platform to tokenize and trade security tokens and other digital assets. Such platform has obvious use in interstate and foreign commerce, facilitating financial asset transactions. The platform utilized a third-party open-source blockchain provider called Stellar. Together, the two technologies enabled Onsa to provide a cutting edge and elegant customer-facing user interface. By Spring 2018, Onsa had developed a beta version of its financial platform that looked substantially like the following:



**Actual screenshots of current Beta version

68.     Onsa diligently protected its trade secrets, including via agreements between Onsa and Franklin Templeton (e.g., the NDA), agreements between Onsa and developers, encrypted code repositories, and limiting access rights to secret information to need-to-know personnel. Onsa's technology was particularly valuable to traditional asset managers like Franklin Templeton. The technology provided an efficient and unified solution to setting up and managing investment funds by tokenizing the assets in a way that allowed all associated financial transactions to be authenticated and recorded on a distributed ledger.

69.     Onsa's technology had tremendous advantages over Franklin Templeton's antiquated and costly approach to running these funds. For example, the cost to set up a single money market fund may

exceed tens of millions of dollars depending on the amount of assets involved. Likewise, the cost of providing consumer access to those funds is substantial. Onsa's technology would decrease these costs dramatically. Onsa's proprietary and confidential code, know-how, and the like derives significant independent economic value from its secrecy, as was acknowledged by Franklin Templeton in writing during its relationship with Onsa. Onsa's trade secrets provide users thereof with a huge competitive advantage, serving as a foundation to realize tokenized financial assets.

70.     Separate and apart from Onsa's intrinsic value, Onsa represented a game-changing opportunity for Franklin Templeton—a bridge from its antiquated business to a new technological frontier, and the profits flowing therefrom.

**II.     Franklin Templeton Fails to Innovate and Its Business Continues to Struggle.**

71.     While Franklin Templeton was trying to reach a deal to invest in Onsa, it was public knowledge that the financial institution was struggling to respond to changes in the asset management industry.

72.     In June 2019, the Financial Times reported that $1.2 billion of hedge fund investments were betting against Franklin Templeton as "the US fund manager grapples with fundamental challenges to the business of asset management."[20] The report highlighted the fact that short sellers constituted "12% of all of Franklin Templeton's freely available stock." The bet against Franklin Templeton reflected "confidence among hedge funds that the stock of [Franklin Templeton] is vulnerable to a drop, given a secular shift away from actively managed products in favor of low-cost funds that passively track indices."

73.     In October 2019, Bloomberg published a story about Franklin Templeton that summarized the state of Franklin Templeton as follows:

> ***Its business model is out of fashion***. Its fund family has suffered six straight years of outflows. Its stock has the lowest Wall Street ratings of any major money manager. ***No wonder Franklin Resources Inc.'s shares are down 48% in the last five years***, and the

---

[20] *Short sellers swarm over outflows – hit Franklin Templeton*, Financial Times (June 28, 2019), https://www.ft.com/content/b92d15f2-9919-11e9-9573-ee5cbb98ed36

firm, which oversaw $693 billion as of Sept. 30, has lost almost a quarter of a trillion dollars in assets since its 2014 peak.[21]

74.     While there are many reasons for the negative sentiment, chief among them appears to be Franklin Templeton's failure to innovate at many of the asset management industry's critical junctures.

75.     Indeed, Franklin Templeton was not perceived in the marketplace as a "forward thinking" financial institution. It missed the boat on the movement towards ETFs, which allowed its competitors to achieve a substantial advantage in this burgeoning segment of the financial services industry. Franklin Templeton also failed to pursue retail trading capabilities, such as those offered by Fidelity and eTrade, but its competitors capitalized on the opportunity to directly interact with customers and grow their business.

76.     Additionally, despite having one of the largest money market funds in the world, Franklin Templeton was behind the times in maintaining and managing these funds. Franklin Templeton used an antiquated and costly transfer agent system for its money market fund. In contrast, its competitors outsourced their transfer agent requirements, which was quicker and more cost effective.

77.     Johnson was appointed Franklin Templeton's CEO in 2020. Her strategy for turning around Franklin Templeton relied significantly on acquiring more innovative companies in order to change the market's perception of Franklin Templeton. In her first earnings call, Johnson was asked to highlight her priorities as Franklin Templeton's newly appointed CEO, and to identify directional changes for her company. Johnson's response underscores the importance and value of Onsa (formerly known as TokenVault) and its technology:

> I think we would all be foolish not to believe that the technology industrial revolutions that's existing today is going to have disruption on our businesses. So making sure that we're investing in things that maybe won't be meaningful or material in even the next five years, but that we think could be very disruptive to the business over the long run. And so that's - - *you see some of the investments that we're doing in things like a token vault [TokenVault]*, and also our innovation lab, which really just enables us to keep an eye on where the industry is evolving.[22]

---

[21] *Franklin Pins Its Hopes for a Turnaround on Technology and Deals*, By John Gittelsohn, Bloomberg (October 11, 2019), https://www.bloomberg.com/news/articles/2019-10-11/franklin-pins-its-hopes-for-a-turnaround-on-technology-and-deals

[22] *Franklin Resources Inc. (BEN) Q1 2020 Earnings Call Transcript*, Motley Fool (January 30, 2020),

1
2
Franklin Templeton promoted to the market and its shareholders the idea that Onsa's technology would

3
provide the much-needed boost to redefine its image and stop the sell-off and shorting of its stock in the

4
public market.[23]

### III.    Franklin Templeton Acquires RFC and Becomes Interested in Onsa.

5
6
78.    Onsa's founders were also the founders of another startup called RFC. RFC is a FinTech

7
company that developed technology related to machine learning for unsecured credit markets.

8
79.    Before Onsa was on Franklin Templeton's radar, Franklin Templeton became interested in

9
acquiring RFC. Franklin Templeton approached its founders concerning a potential acquisition. After

10
performing due diligence, the parties reached a deal in 2018 and Franklin Templeton acquired RFC for a

11
substantial sum. Upon information and belief, the RFC acquisition has yielded substantial financial benefits

12
for Franklin Templeton.

13
80.    In connection with the RFC acquisition, Onsa's founders advised Johnson and others at

14
Franklin Templeton of Onsa and its business plan. At this time, Johnson declined to explore the opportunity

15
because Franklin Templeton was unfamiliar with blockchain technologies. As Johnson put it, "blockchain

16
will be my grandkids' problem."

17
### IV.    Franklin Templeton Wakes up to Blockchain-Based Asset Management as the Future.

18
19
_____

20
https://www.fool.com/earnings/call-transcripts/2020/01/30/franklin-resources-inc-ben-q1-2020-earnings-
call- t.aspx; *see also Jennifer Johnson is the new heiress of Franklin Templeton legacy*, Financial Times

21
(Nov. 25, 2019) https://www.ft.com/content/3e42708e-fa64-400e-8bfb-61d7cf78ba58 ("One of her main

22
priorities when becoming chief executive will be to incorporate disruptive technology across the business
to improve efficiency and meet client needs. 'I will take full advantage of being headquartered near the

23
heart of Silicon Valley, with direct access to some of the top innovators in the fintech space,' she added.

24
The company recently filed an application with the Securities and Exchange Commission to launch a fund
that uses blockchain, an emergent technology that has captured Ms. Johnson's imagination.").

25
[23] *Jennifer Johnson is the new heiress of Franklin Templeton legacy*, Financial Times (Nov. 25, 2019)

26
https://www.ft.com/content/3e42708e-fa64-400e-8bfb-61d7cf78ba58 ("Franklin Templeton was on the
cusp of joining the much-coveted trillion-dollar club with $922bn of assets, but after leading the global

27
worst-seller list for several years, its assets are down by a quarter while its share price has halved.").

28

81.     In June 2018, Trombley and numerous Franklin Templeton executives attended a presentation by Sandy Kaul, Global Head of Business Advisory Services for Citi Bank, concerning technological developments in the financial industry. Citi had just released a detailed survey indicating that blockchain technology was the most significant emerging technology in asset management.

82.     For example, Citi's study laid out how financial technology "could be combined to create a digital token that combines financial rights, ownership rights and utilization rights to create a new type of liquid Ownership Unit or 'Ownit'." Citi's presentation explained that tokens "could allow individuals to build highly diversified portfolios that span not only equities and bonds, but art, infrastructure, wine, intellectual property rights and more."

83.     Citi's presentation on tokenized securities was a theoretical explanation of what Onsa was already developing with tokenization. Johnson and Franklin Templeton realized they were wrong about blockchain and that Franklin Templeton was already behind.

84.     Immediately after the meeting with Citi, Franklin Templeton executives Johnson, Bayston, and Joe Boerio ("**Boerio**") (Franklin Templeton's CTO) pulled Trombley into a meeting to discuss Onsa. These executives expressed interest in partnering with and/or acquiring Onsa just as they had done with RFC.

85.     Franklin Templeton was specifically interested in tokenizing Franklin Templeton's money market fund. Moving the company's transfer agent capabilities to blockchain technology was very appealing to the executives. Among other things, the opportunity would allow Franklin Templeton to significantly reduce substantial expenses associated with Franklin Templeton's Investar system for clearing trades.

86.     Johnson and Franklin Templeton's other executives were enamored with the idea of being at the forefront of the financial industry's embrace of blockchain technologies. Such an embrace was consistent with Franklin Templeton's broader objective of leaving its antiquated technology behind by acquiring other FinTech companies. Franklin Templeton hoped that being the first to market with an SEC-approved, money market token would allow Franklin Templeton to expand this technology to its other financial instruments, and even allow Franklin Templeton to offer these blockchain services to competitors.

Additionally, Onsa's trading platform would allow Franklin Templeton to interface directly with retail investors.

87.     Franklin Templeton now (only after investing in Onsa and seeing its potential) recognizes the immense value of blockchain technology in the financial industry. For example, in December 2022, Franklin Templeton published an article, contributed to by Bayston, stating that it "expect[ed] [blockchain technology] to be a foundational technology in the financial services industry," and that "digital assets are poised to 'grow up' right before our eyes." Similarly, in a speech at the Millken Institute in September 2023, Johnson stated that blockchain is "the greatest disruption to financial services," that "tokenization will ultimately displace ETFs and mutual funds…it's just much more efficient from a cost perspective, and the discovery of information at the time of trading," and that "tokenization = democratization."

## V.   Franklin Templeton Invests In Onsa with False Assurances.

~~87.~~88.   Franklin Templeton quickly decided that it must have what Onsa offered and began serious negotiations with Onsa's founders.

~~88.~~89.   Johnson and Bayston were personally involved in Franklin Templeton's investment in Onsa. Johnson, Bayston, and other Franklin Templeton executives met with Onsa's founders on multiple occasions to discuss Franklin Templeton's plans for Onsa. To assuage Onsa's founders' fears, Johnson and other Franklin Templeton executives represented that post-investment Onsa would have a three-person board that would include someone affiliated with Onsa prior to the acquisition, a Franklin Templeton member, and an independent member approved by both. During these discussions, Johnson and Bayston personally assured Onsa's founders that the company would function as a standalone entity that would be able to seek customers other than Franklin Templeton. This assurance was extremely important to Onsa's founders and several of Onsa's key shareholders. Johnson and Bayston further assured Onsa's founders that Franklin Templeton would provide Onsa with all necessary financing. These assurances were false.

89.90.   Franklin Templeton performed substantial due diligence prior to closing the deal with Onsa. Bayston and Sheffield Nolan ("**Nolan**"), Franklin Templeton's lead engineer and developer, led the due diligence efforts. Many other Franklin Templeton employees were involved, including Muir.

90.91.   Franklin Templeton sent Onsa its first set of due diligence questions in or around July 2018. The due diligence included exhaustive code reviews, whereby Franklin Templeton demanded to have access to Onsa's code. Franklin Templeton's due diligence team, including Nolan and Muir, had access to and reviewed Onsa's technology and code (which was stored in an encrypted and password-protected GitHub repository). Franklin Templeton's due diligence team documented its technology and code review and such documents were provided to Onsa.

91.92.   Franklin Templeton agreed that its review would be solely used for due diligence and that any technology and code copied for the purposes of their due diligence would be treated as confidential.

92.93.   Instead of completing its due diligence in a reasonable amount of time, Franklin Templeton took an alternative approach: It dragged out its due diligence process for many months in order to place Onsa in a financial squeeze.

93.94.   Notably, Franklin Templeton's due diligence and code review was subject to the NDA. Franklin Templeton Companies entered into the NDA on its own behalf, and also for the benefit of that group of businesses consisting of "Franklin Resources, Inc. ('FRI') and FRI's subsidiaries, partnerships, joint ventures and related and affiliated business entities," which would include FT FinTech.[24] This agreement states that "each party shall…use the other party's Confidential Information only to carry out its obligations and exercise its rights under this Agreement directly related to the Purpose," with the "Purpose" defined as "the sole purpose of the evaluation of a potential investment by Franklin in a company

---

[24] The NDA was validly assigned from TokenVault Limited to TokenVault, Inc. / Onsa pursuant to the October 2019 APA. As a startup company focused on the development of technology, TokenVault Limited required the protection and nondisclosure of its valuable technology. The NDA was an agreement used and held for use primarily in the operation and/or conduct of TokenVault Limited's business. Franklin Templeton Companies, LLC entered into the NDA "on its own behalf, for the benefit of that group of affiliated businesses consisting of Franklin Resources, Inc. ("FRI") and FRI's subsidiaries, partnerships, joint ventures and related and affiliated business entities." As such, Franklin Resources and FT FinTech were obligated under the NDA and had knowledge of the NDA. The APA was approved, in writing, by Franklin Resources and FT FinTech.

which would purchase certain Company assets." The agreement also requires, with respect to a party in receipt of source code (and, in some cases, with respect solely to Franklin Templeton): "(iii) any downloaded copies shall be deleted immediately after completion of such source code review and (iv) [the receiving party] shall provide reasonable evidence that such source code has been deleted from the computers of the individuals with access to such source code. Pursuant to clause (iv) of the preceding sentence, Franklin agrees to take the following actions: (1) Franklin shall provide print screens of the file deletion process confirming the deletion of the source code files; (2) Franklin shall provide written confirmation from a witness independent of the operator who downloaded the files, that such files have been deleted; and (3) Franklin shall send to Austin Trombley at the Company the print screens and the written confirmation."[25] Franklin Resources, FT FinTech, and Franklin Templeton Companies failed to comply with these contractual obligations.

94.95. After one of the code reviews, a Franklin employee (Muir) indicated that Franklin Templeton's access to Onsa's technology would allow Franklin Templeton to develop Onsa's technology on its own without Onsa. Onsa's founders and others who witnessed this statement were shocked. Muir's cavalier statement was directly contrary to Franklin Templeton's agreements to keep Onsa's valuable trade secrets confidential and to use them solely for due diligence purposes in connection with a potential transaction. Ultimately, Franklin Templeton proceeded to do just what Muir had suggested— misappropriate Onsa's intellectual property.

95.96. In October 2019, Franklin Templeton's due diligence activities culminated in two agreements: (1) an Asset Purchase Agreement between TokenVault, Inc. (*i.e.*, Onsa's former name) and TokenVault Limited ("**October 2019 APA**")[26] and (2) the SPA between TokenVault, Inc., Trombley, and FT FinTech). The purpose of the October 2019 APA was to transfer assets of TokenVault Limited (a Singapore company) to TokenVault, Inc. (a Delaware corporation), which was ultimately renamed Onsa. The crux of the SPA was as follows: (1) Trombley, who owned 100% of Onsa's voting stock, would sell

---

[25] To this day, Franklin Templeton has never confirmed deletion of Onsa's source code, in explicit violation of the Mutual Confidentiality and Non-Disclosure Agreement in place between the parties.

[26] Franklin Templeton approved of the October 2019 APA in writing.

his voting stock to Franklin Templeton; and (2) Franklin Templeton would buy $5.5 million worth of non-voting common stock from Onsa and control approximately one-quarter of Onsa's total outstanding stock after the deal. Pursuant to the SPA, Franklin Templeton would initially appoint Bayston as Onsa's sole director and "Interim President, Interim Secretary, Interim Treasurer, and Interim Chief Executive Officer."

96.97.  While Onsa's founders and other shareholders were reluctant to give up control of Onsa, Franklin Templeton insisted that a deal could not get done unless Franklin Templeton received full control. To assuage these concerns, Johnson promised that she would create a three-person board that would include someone affiliated with Onsa prior to the acquisition, a Franklin Templeton member, and an independent member approved by both. But Franklin Templeton and Johnson never followed through on this promise. And instead of helping Onsa achieve its potential, Franklin Templeton and Bayston managed Onsa for Franklin Templeton's benefit, secretly shut Onsa down and liquidated it in bad faith, and is now using Onsa's valuable technology as its own.

## VI.   Defendants Breach Their Fiduciary Duties and Manage Onsa For Franklin Templeton's Benefit

97.98.  It is settled law that directors, officers, and controlling shareholders owe fiduciary duties of care and loyalty to the company. Franklin Resources, FT FinTech, and Bayston wholly disregarded these obligations from the get-go. At every step of the way, they managed Onsa for the benefit of Franklin Templeton and to the detriment of Onsa. Johnson knowingly participated in, and directed, these breaches of fiduciary duties. The ultimate breach of fiduciary duty was the decision by Franklin Templeton, Bayston, and Johnson to wind down Onsa and liquidate it via the ABC in secret and without pursuing any alternatives.

98.99.  At all relevant times, Bayston was both a full-time senior executive of Franklin Templeton's Fixed Income Group and the sole director of Onsa. The Fixed Income Group operates money market funds that Franklin Templeton had assured Onsa's founders would be for Onsa to tokenize with Franklin Templeton being one of Onsa's first customers.

99.100.       Johnson continued to stay actively involved in the management of Onsa. After Franklin Templeton's investment in Onsa closed in October 2019, Johnson and her executive team,

including Mohn and Muir, regularly met with Onsa's founders (Trombley and Travis) and other Onsa representatives at Franklin Templeton's offices to discuss various aspects of Onsa's technology and Franklin Templeton's supposed plans to integrate its operations with Onsa's technology.  For example, Johnson and her team were interested in planning out how Franklin Templeton's client funds would be distributed through the blockchain and how Franklin Templeton would manage relationships with providers such as Edward Jones and UBS that Franklin Templeton partnered with to launch new funds.

100.101.    After the close of Franklin Templeton's investment in October 2019, Travis agreed that it would be in Onsa's best interest for a more experienced CEO to step in and continue Onsa's rapid progress. As Johnson's right-hand senior executive, Bayston was under the misimpression that he would be Onsa's new CEO. But in private, Johnson indicated that she lacked confidence in Bayston's abilities and temperament to run Onsa, so Onsa continued to search for a more suitable CEO. Johnson personally interviewed many, if not all, of the proposed CEO candidates. The CEO opening for Onsa drew interest from many notable individuals. In February 2020, the search resulted in Onsa hiring Bashir, a talented former Amazon executive as CEO.

101.102.    Bayston was not happy with the hiring of Bashir. Upon appointment as Onsa's sole director, Bayston almost immediately started hiring Franklin Templeton employees to fill as many significant roles at Onsa as possible. For example, he hired Nolan (a Franklin Templeton Blockchain Technical Head) as Onsa's lead engineer, Farrelly (a Franklin Templeton Vice President of Data Science) as Onsa's Chief Operating Officer, and Mohn (a Franklin Templeton Senior Financial Analyst) as Onsa's Chief Financial Officer. Bayston maintained his role as Onsa's sole director.

102.103.    Bashir was surrounded by Franklin Templeton-affiliated management whose true loyalties were with Franklin Templeton. Although Bashir described Onsa as a "world changing opportunity," he complained that Bayston's involvement with Onsa was "micromanaging" to an extent he had never seen before. Bashir complained that Bayston's management style created a bad sentiment that was detrimental to the company. The real problem all along was that Bayston and Franklin Templeton managed Onsa solely for Franklin Templeton's benefit, and Bayston perceived Bashir as an "outsider."

1       103.104.     For example, Onsa knew it was critical that Onsa raise additional funds from

2  strategic investors to continue to make progress on its vision. Onsa attempted to set up meetings with

3  potential investors interested in investing in Onsa. But Bayston summarily shut down these efforts and

4  falsely assured Onsa that Franklin Templeton would provide all necessary financial support.

5       104.105.     Onsa also knew the importance of Onsa attracting other companies as potential

6  customers of Onsa's tokenization platform. In fact, some of the world's largest global asset managers had

7  expressed interest in learning more about Onsa's technological offerings and using Onsa's platform to trade

8  their financial products.

9       105.106.     In much the same way Visa became the credit card behemoth through alliances with

10  the world's top banks, Onsa's founders believed Onsa could thrive by attracting notable customers in the

11  financial services industry to use Onsa's platform and services. Prior to the SPA, the issue of Onsa seeking

12  customers other than Franklin Templeton was specifically addressed with Johnson and Bayston. Both

13  assured Onsa's founders that Onsa would be allowed to seek customers other than Franklin Templeton.

14  However, after the SPA was executed, Franklin Templeton and Bayston refused to allow Onsa to seek

15  other customers for its tokenization platform. Franklin Templeton wanted the platform for itself. This self-

16  serving decision was not in Onsa's best interest, but rather, Franklin Templeton's.

17       106.107.     Prior to entering into the SPA, Franklin Templeton and Bayston assured Onsa that

18  it would promptly enter into an MSA in order to compensate Onsa for its development, and Franklin

19  Templeton's use, of Onsa's technology. This promise is reflected in Franklin Templeton's September 3,

20  2019 SEC Prospectus filing titled, "Franklin Blockchain Enabled U.S. Government Money Fund." In this

21  *pre-investment SEC filing*, Franklin Templeton described Onsa's compensation and role with respect to

22  the money market token in a section titled "Blockchain Administrator":

23         **Blockchain Administrator**. [ ][27], a Delaware limited liability company, is expected to be

24         retained as the blockchain administrator (Blockchain Administrator) of the Fund, and will
           serve in such role pursuant to a master software as a service ("SAAS") agreement and SAAS

25         statement of work (collectively, the "Blockchain Administration Agreement") to be entered

26         into by and between the Trust on the Fund's behalf and the Blockchain Administrator.

27  [27] Brackets in original.

28

1

2

> The services to be provided by the Blockchain Administrator will include technical and administrative functions in connection with the issuance and "permissioning" of the shares for the Fund on the blockchain (e.g., limiting the parties who can transact on the blockchain), as well as reporting services relating to the Fund and shareholders. The Blockchain Administrator will work with Investor Services to record share issuance and redemption on the Stellar ledger.

> The Blockchain Administrator will also be responsible for the creation and maintenance of the App. The fees payable to the Blockchain Administrator are based on its standard schedule of fees charged by the Blockchain Administrator for similar services, as set forth in the Blockchain Administration Agreement. The Blockchain Administrator will be responsible for any network fees paid to the Stellar network in connection with the issuance and redemption of shares as well as any distributions paid on shares to the extent that such distributions are automatically reinvested in new shares.

But in Franklin Templeton's first **post-investment SEC filing**, Franklin Templeton removed all references to Onsa's role as the "Blockchain Administrator."[28] And indeed, after signing the SPA, Franklin Templeton and Bayston continually stonewalled regarding financial terms and refused to finalize the MSA. In fact, Franklin Templeton and Bayston shuttered Onsa almost immediately after Onsa pressed this issue with Franklin Templeton representatives.

107.108.     Additionally, Onsa required a broker-dealer to operate its business and had an agreement in principle to acquire one. A broker-dealer is an entity in the business of buying and selling securities for its own account, or on behalf of its customers. It is a valuable asset because it must generally register with the SEC, but acquiring registration can be costly and difficult. Johnson and Bayston misrepresented that Onsa's efforts in this regard were not necessary because Franklin Templeton already had a broker-dealer that could be transferred to Onsa. Despite these assurances regarding a mission critical piece of Onsa's business plan, Franklin Templeton never transferred a broker-dealer to Onsa.

108.109.     Onsa also required a transfer agent to execute its business plan. Franklin Templeton representatives initially told Onsa that it could use Franklin Templeton's transfer agent. Later, Franklin Templeton representatives told Onsa that it would not allow Onsa to use its transfer agent but would assist

---

[28] This SEC Prospectus was filed on March 25, 2020.

1    Onsa to obtain transfer agent status. Both representations were false. Upon information and belief, Franklin

2    Templeton instructed Onsa's attorneys to discontinue necessary steps to obtaining transfer agent status.

3    ~~109.~~110.     At every critical juncture after Franklin Templeton's initial investment in Onsa,

4    Franklin Templeton through their representatives (including Johnson and Bayston) repeatedly and

5    misleadingly told Onsa's management and its founders not to worry about tying any loose ends with

6    Franklin Templeton—be they executing the MSA, acquiring a broker-dealer, acquiring a transfer

7    ~~argent~~agent, or acquiring additional customers or financing, or otherwise—because Franklin Templeton

8    would provide all that was needed for Onsa to succeed and the focus should instead be on building Onsa's

9    products and, in particular, the necessary technology that would allow Franklin Templeton to launch its

10   tokenized money market token using the Stellar blockchain.

11   ~~110.~~111.     Documents obtained by Plaintiff in connection with the purchase of Onsa's assets

12   reflect that Franklin Templeton executives that included Johnson (Franklin Templeton's CEO), Desai

13   (Franklin Templeton's Executive Vice President and Chief Investment Officer), Boerio (Franklin

14   Templeton's CTO), as well as Franklin Templeton's legal department were actively involved in Onsa's

15   management. Additionally, Chuck Johnson—former Franklin Templeton CEO and Jennifer Johnson's

16   brother—was actively involved in Onsa's decision making and served as a conduit, and perhaps insulator,

17   between Johnson and Onsa.

18   ~~111.~~112.     Throughout this time, Onsa worked very hard to tokenize Franklin Templeton's

19   money market fund. There were frequent meetings (at times daily) between Onsa and Franklin Templeton

20   concerning Onsa's platform and its integration into Franklin Templeton's antiquated recording system to

21   tokenize Franklin Templeton's money market fund.

22   ~~112.~~113.     Certain Franklin Templeton executives, however, were not happy about the

23   investment in Onsa and were not eager to have Franklin Templeton rely on Onsa for Franklin Templeton's

24   technological needs.

25   ~~113.~~114.     Boerio, for example, did not believe that Franklin Templeton should partner with

26   Onsa and its founders. He maintained the position that Franklin Templeton should have developed Onsa's

27

28

technology in-house at Franklin. And even after Franklin Templeton invested in Onsa, Boerio thought he should be the one to lead Onsa.

114.115.    Bayston, too, would make comments to Onsa's founders about his displeasure with Franklin Templeton's investment in Onsa. For example, Bayston would make comments to Onsa's founders such as "I can't believe I am making you guys rich all over again" (a reference to RFC) and would regularly try to diminish Onsa's technological accomplishments, all the while insisting that he should have a lead management role within Onsa, even as Onsa's next CEO.

115.116.    Franklin Templeton's and Bayston's bait-and-switch approach is illustrated in email correspondence between one of the RFC co-founders and Franklin Templeton's legal department. In such correspondence, the RFC co-founder complained that "I am devoted to multiple causes at Franklin Templeton and I have given both projects every ounce of effort that a person could give while dealing with defensive, territorial people in the fixed income group including my former boss [Bayston] who wanted nothing to do with me from day 1. *[Franklin Templeton] wanted the code and they wanted me gone*…. I sold my company and it was put in the hands of a man [Bayston] who didn't value me." Unfortunately, a similar experience would play out again with respect to Onsa.

116.117.    By April 2020, Onsa had completed a business plan demonstrating that its work with respect to Franklin Templeton's money market fund was on track and that Onsa was making substantial progress as to other aspects of its technology, which was poised to release in a few short months. Onsa's business plan specifically referenced continuing development on Franklin Templeton's dual ledger system in the same manner as Franklin Templeton's SEC prospectus:

| Onsa Business Plan | Franklin's SEC Filing[29] |
|---|---|
| Work with Franklin Templeton to launch tokenized MMF on aTune [Onsa] app,[30] which will be underlined shadowed on Stellar. Continue | Although the Fund's transfer agent will maintain the official record of share ownership in book-entry form, the ownership of the |

---

[29] SEC Form N-1A as filed by Franklin Templeton on September 3, 2019, https://www.sec.gov/Archives/edgar/data/0001786958/000113743919000429/fttn1a092019.htm

[30] When TokenVault was renamed Onsa, aTune was another name under consideration.

| | |
|---|---|
| blockchain with Franklin Templeton's <u>Investar system as the single source of truth</u>. | Fund's shares <u>will also be recorded on the Stellar network's blockchain.</u> The use of blockchain technology is untested for mutual funds. In the event of a conflict between the blockchain record and the record held by the transfer agent, <u>the transfer agent's record will be determinative</u>. |

~~117.~~118.    Onsa's April 2020 business plan contained detailed structural diagrams that expressly referenced the server-side architecture used by Franklin Templeton's tokenized money market fund to integrate the Stellar blockchain and a digital asset custody system called Curv with Franklin



Templeton's internal Investar mainframe system. A high-level overview of this architecture is depicted below:

~~118.~~119.    Notably, the code base for "integration with Franklin Investar" was specifically included in the APA and it was apparent that the knowledge and Onsa work product for integrating Curv,

the Stellar blockchain, and Franklin Templeton's Investar system with Onsa's platform was a highly valuable trade secret belonging to Onsa.

119.120.    This backend integration is just one of the many trade secrets Onsa owned. For example, during Onsa's development of its technology, Onsa maintained an Atlassian Confluence platform to facilitate communications amongst its developers.[31] Many of Onsa's trade secrets were recorded in documents stored on this platform. These documents related to Onsa's proprietary architecture for tokenization of financial assets, exchange of tokenized financial assets, and payment using tokenized assets.[32] At a high level, Onsa's trade-secreted technology includes without limitation, its platform and app, which is exemplified by detailed sequence diagrams, process flowcharts, pseudocode, system architecture schematics, infrastructure designs, messaging protocols, communications framework, stack deployment schemes, source code, testing protocols, systems integration configurations, and other information. A non-exhaustive list of Onsa's trade secrets, commemorated in records obtained by Plaintiff via the ABC, includes:[33]

---

[31] Confluence is a collaboration workspace favored by software developers that allows for intuitive project organization and communication, having several options for creating pages, spaces, page trees, and diagrams essential to collaborative software development.

[32] Onsa's Confluence platform was extremely robust, including entire spaces dedicated to integrating Onsa's trade secrets with respect to its tokenization and exchange technology. In connection with the ABC, Franklin Templeton, Franklin Templeton Companies, Bayston, and Johnson allowed these valuable assets to go to waste. The Franklin-led Onsa represented to the ABC trustee that the Confluence records were not "critical," potentially leading to destruction of numerous Onsa trade secrets and spoliation of highly probative evidence of Franklin Templeton's misappropriation of Onsa's technology. The only material Plaintiff has been able to obtain from Onsa's Confluence account is a handful of PDF printouts. In addition to memorializing several of Onsa's trade secrets, these printouts reveal the depth and breadth of Onsa's development. Plaintiff is conducting discovery to determine if Atlassian or any of Defendants or their agents maintained a copy of Onsa's Confluence material prior to shutting the account down and whether Defendants are liable for having caused the destruction and spoliation of important evidence.

[33] In order to preserve the confidential nature of its trade secrets in this public filing, Plaintiff limits the description of its trade secrets to a high-level summary.  Plaintiff subsequently provided Defendants with a trade-secret disclosure and interrogatory responses that contain detailed descriptions of its trade secrets.

- <u>Software System Architecture for Tokenization and Exchange of Managed Assets</u> – This includes the overarching paradigm defining Onsa's tokenized asset and exchange system, including the key components, key logic, alternative architecture, and third-party dependencies.

- <u>Backend Programming Structure for Tokenization and Exchange of Managed Assets</u> – This includes foundational programming structure to accomplish tokenization of assets on the Stellar blockchain. The structure includes base source code that interfaces with a database. Implementation of this secret is exemplified by certain of Onsa's proprietary software, such as can be found in repositories named api.vaultbank.io, api.onsa.com, etc. This secret was also key to accomplishing integration with Franklin Templeton's Investar platform.

- <u>Frontend Programming Structure for Exchange of Tokenized Managed Assets</u> – This includes consumer-facing native iOS and Android applications with transaction functionality (e.g., for tokens, stocks, and cryptocurrencies) and other functionality to enable participation in tokenized asset exchange.

- <u>Technology Implementation Strategy</u> – This includes segregation and distillation of the overarching, managed financial asset tokenization and exchange system development project into discrete sub-parts to, for example, facilitate modularized development, oversight, and implementation. Each of these sub-parts includes several constituent pieces key to addressing delegation of functions within the overarching system, as well as delegation of resources with respect to the project as a whole.

- <u>Tokenized Asset Platform Infrastructure</u> – This includes an infrastructure plan for implementing the tokenized asset and exchange system, such as enumerating third-party integrations, cluster configurations, jobs, and targeted functionality.

- <u>Money Market Fund Implementation Flow Architecture</u> – This includes the overarching flow of money and/or tokens with respect to a tokenized money market fund. This flow architecture includes articulation of specific flows related to a tokenized money market fund.

- <u>Tokenized Money Market Fund Transactions Architecture</u> – This includes sequence flows for tokenized money market fund transactions, such as particular exceptions and distributions.

- <u>Network and Infrastructure Architecture</u> – This includes an exemplary network architecture that can be used with a tokenized asset and exchange system, which details usage of clouds, gateways, firewalls, and container management services. This also includes methods to support fully qualified domain names properly with a firewall in place.

- <u>Tokenized Asset System Framework</u> – This includes a high-level framework of tokenized asset systems, including systems diagrams exemplifying connections with clients, components, and third-party servers, as well as know-how related to specific component choices and alternatives.

- <u>Investar Workflow Test Scenarios</u> – This includes tests Onsa designed to validate redundancy and/or integration between Investar and the Stellar blockchain in tracking ownership of tokenized assets. Onsa designed at least fourteen discrete tests with associated sequence flows detailing different scenarios each having distinct flow implementations.

- <u>Android UI Design</u> – This includes overall design specification for an Android user interface as it relates to the tokenized asset and exchange platform.

- <u>iOS UI Design</u> – This includes overall design specification for an iOS user interface as it relates to the tokenized asset and exchange platform.

- <u>Mobile Application Collection for Tokenized Asset Testing and Implementation</u> – This includes an assembly of mobile applications implemented to manage, analyze, test, and utilize the tokenized asset and exchange platform.

- <u>Mobile Application Instruction Manual</u> – This includes instructions highlighting particular features, usability, and functionality with respect to the mobile application that served as a user-facing interface to interact with the tokenized asset and exchange platform.

- <u>Technology Rollout Plan</u> – This includes a phased rollout of the tokenized asset and exchange system, including specific system features for the user interface and backend processing, features for specific tokenized assets, and integration plans.

- <u>274 Kelvin Requirements & Specifications</u> – This includes requirements and specifications for Onsa's proprietary cold storage solution to securely store and use cryptographic wallet keys.

- <u>Threat Model Assessment for 274 Kelvin HSM Wallet</u> – This includes key orchestrations, infrastructure diagrams, and architecture for implementing Onsa's proprietary cold storage solution to securely store and use cryptographic wallet keys.

- <u>KYC/AML Compliance Integration</u> – This includes a mechanism integrated into the tokenized asset and exchange system by which transactions with tokenized assets can comply with know-your-customer and anti-money laundering regulations.

- <u>Fiat Provider Integration</u> – This includes mechanisms to integrate payment providers with the tokenized asset and exchange system to facilitate token purchase and redemption.

- <u>Platform Profile Personalization</u> – This includes customization functionality with respect to the tokenized asset and exchange system.

- <u>User Instruction and Prompting System</u> – This includes mechanisms to accomplish the dissemination and presentation of information to user interaction with the tokenized asset and exchange system, and further provides automated prompting solutions with respect to particular information.

- <u>Transaction Security System</u> – This includes integration of security protocols into transactions performed on the tokenized asset and exchange system, including authentication and/or authorization steps.

- <u>Stellar Blockchain User Account Key Management</u> – This includes systems and methods for managing user account Stellar keys with respect to the tokenized asset and exchange system.

120.121.    In addition to these above-listed trade secrets, Onsa and Onsa's predecessor developed a plethora of proprietary code, which itself comprises trade secrets. This code was housed in encrypted repositories. These repositories, designed to generate and realize a tokenized asset and exchange system for managed financial assets, are identified below by name:

| 3c7.electron.app | angular.3C7 | api.3c7 |
| api.hsm | api.tax.vaultbank.io | api.vaultbank.io |
| api.vbtoken.distribution | aws-handler-daily-dividends | bch.multisig.wallet |

| | | |
|---|---|---|
| bitcoin.multisig.wallet | bsv.multisig.wallet | curv-wallet |
| hsm.nfc.handler | hsm.request.batcher | HSM-randomness-validator |
| Investar | io.tokenvault.android | io.tokenvault.ios |
| litecoin.multisig.wallet | reporting-web-vaultbank | ripple.multisig.wallet |
| Stellar.ts | Stellar3C7.ts | usb-io |
| usb-switch | wallet.multisig.ethereum | api.onsa.com |
| api.tax.onsa.com | ios-application | onsa.account.report |
| onsa.com | onsa-account-service | onsa-android |
| onsa-common-lib | onsa-create-auth-challenge | onsa-custom-messages-lambda |
| onsa-daily-dividend-handler | onsa-daily-recon-handler | onsa-deeplink |
| onsa-define-auth-challenge | onsa-ios-app | onsa-monthly-recon-handler |
| onsa-notification-service | onsa-orchestrator-service | onsa-verify-auth-challenge |
| onsa-web | onsa-webhooks-middleware | onsa-web-tv_code |
| 274-admin-panel | 274kelvin.policy.engine | account.report |
| acsccid | admin.vaultbank.io | android-app |
| android-vaultbank | api.urlshortener | api-backend-integration-tests |
| api-server | appsec_overview | aws-handler-daily-recon |
| aws-handler-monthly-recon | aws-lambda-image | bff.onsa.com |
| bitcoinjs-lib | btc-regtest-faucet | bucket-antivirus-function |
| conversion.vaultbank.io | custody.android | customer.wallet.electron |
| deployment | desktop-app | desktop-app-electron |
| dividends-data-gen | docusign_automation | DROID-WLTDO-USER |
| DROID-WLTDO-WALKER | eks-worker-ami | eos.wallet.api |

| | | |
|---|---|---|
| eos_multisig_wallet | erc20-vaultbank | ETF.sol |
| eth_multisig_wallet | ethereum.multisig.wallet | ethereum_integration_tests |
| gas-pos-cron | hsm.qrcode.handler | hsm.setup.script |
| insight | io.tokenvault.android.coldwallet | io.tokenvault.android-biometric |
| ios.biometric | IOS-Coldwallet | ios-vaultbank |
| IOS-WLTDO-USER | IOS-WLTDO-WALKER | iota.msg.wallet |
| iota_multisig_wallet | Jenkins-test-repository | jobs.vaultbank |
| landingpage-vaultbank | legacy_exchange_files | liquidity-bot |
| merchantapp.poynt.vaultbank | monitor-screen | nem_multisig_wallet |
| neo.wallet.api | neo_msig_wallet | nfc.setup.script |
| OLD_sonarqube_tokenvault.jenkins | onsa-local-environment | ont.msig.wallet |
| PCSC | pkcs11_c | pkcs11js |
| pos.customer.android | python-ec-client-sdk | redemptions |
| server-sent-events | service.investar.mock | smart_router |
| sonarqube-tf | stellar.microservice | stellar.multisig.wallet |
| stellar-docker | stellarexplorer | terraform-backup |
| terraform-quorum | tokenvault.devops | tokenvault.kubernetes |
| tron.multisig.wallet | tronweb_modified | vapt |
| vaultbank.github.io | vaultbank.io | vaultbank-wallets |
| vbSmartContracts | wallet_integration_tests | wallet-proxy |
| web.private.equity | web-cold-storage | webhooks-middleware |
| WEB-WLTDO | wltdo.admin.web | wltdo.android.customer.app |
| wltdo.android.walker.app | wltdo.backend | wltdo.ios.customer.app |
| wltdo.ios.walker.app | | |

121.122.    Franklin Templeton accessed and, on information and belief, used and continues to use Onsa's trade secrets to facilitate its money market fund token and related tokenized financial asset technologies.

122.123.    Tellingly, out of the numerous blockchains that Franklin Templeton could have used for its tokenized money market fund, Franklin Templeton chose the Stellar blockchain.[34] As discussed above, many of Onsa's core trade secrets revolved around integration of Onsa's platform with ~~the Stellar~~a blockchain for purposes of trading tokenized financial assets.

123.124.    Onsa also had copyrights in the computer code it used to develop its technology, including the tokenized money market fund, throughout the duration of Franklin Templeton's misappropriation, copying, and false assumption of credit for Onsa's technology.

## VII.    Franklin Templeton Misappropriates Onsa's Technology, Shuts Down Its Operations, and Liquidates Its Assets.

124.125.    In July 2020, Onsa's platform was very close to being ready to "go live." In particular, Onsa's efforts towards launching Onsa's tokenized money market fund were substantially complete. At that same time, without any explanation, Onsa was unceremoniously and unexpectedly shut down.

125.126.    Bayston (as sole director of Onsa) and Franklin Resources and FT FinTech (as controlling shareholders of Onsa) owed Onsa fiduciary duties, but disregarded them.

126.127.    For all practical purposes, Defendants viewed Onsa as part of Franklin Templeton. This is reflected in Franklin Templeton's SEC 10K filing, which improperly refers to Onsa as a Franklin Templeton *acquisition* rather than a Franklin Templeton *investment*. That is, the SEC 10K states: "During the fiscal year 2020, we completed additional *acquisitions* with a total purchase consideration of $94.8 million in cash, *including the acquisitions of* Pennsylvania Trust Company, AdvisorEngine Inc., Athena Capital Advisors, LLC and *Onsa, Inc*." The SEC 10K further states: "Additionally, impairments of

---

[34] *Supra* at fn. 15.

intangible assets and goodwill increased $42.1 million primarily related to assets recognized from ***the acquisitions of*** BSP and ***Onsa, Inc., (formally known as TokenVault, Inc.)***."

~~127.~~128.　　　The above statements from Franklin Templeton's SEC 10K are false. Onsa was not an acquisition of Franklin Templeton. It was an investment. Franklin Templeton owned approximately twenty-five percent of Onsa's common stock, and persons and entities unaffiliated with Franklin Templeton owned the other seventy-five percent.

~~128.~~129.　　　At all relevant times Bayston was a senior executive of Franklin Templeton and was substantially compensated by Franklin Templeton. In contrast, Bayston did not receive compensation from Onsa. Bayston has worked for Franklin Templeton for approximately 30 years. At all relevant times while acting as Onsa's sole board member, Bayston lacked independence from Franklin Templeton and Johnson, his boss and Franklin Templeton's CEO. Bayston consistently made decisions that were in Franklin Templeton's best interest, not Onsa's. Many of Bayston's decisions, including the ultimate betrayal of Onsa by secretly liquidating Onsa when there was no legitimate reason for doing so, were made in bad faith and with a conscious disregard for his duties to Onsa.

~~129.~~130.　　　Johnson's loyalties were indisputably with Franklin Templeton, not Onsa. Johnson's grandfather, Rupert, founded Franklin Templeton in 1947 and his son, Charles, took over as CEO a decade later. Charles Johnson's three children (Jennifer, Gregory, and a son also named Charles, who went by "Chuck") were next in line to lead Franklin Templeton. Jenny Johnson and Gregory Johnson both sit on the Franklin Templeton board of directors. In 2020, Jennifer Johnson was named Franklin Templeton's CEO. Chuck Johnson was a former Franklin Templeton senior executive and board member. It is estimated that the Johnson family owns 44% of outstanding Franklin Templeton shares.[35] As with Bayston, Jennifer Johnson's decisions with respect to Onsa were made to benefit the family business, Franklin Templeton, rather than Onsa. Johnson participated in and approved of the bad faith decision to secretly liquidate Onsa.

~~130.~~131.　　　Prior to his recent death, Chuck Johnson was deeply involved in Onsa. His loyalties were also with Franklin Templeton. Although Franklin Templeton discussed appointment of Chuck

---

[35] *Franklin Templeton scion appointed CEO as brother steps aside*, Portfolio Adviser (Nov. 19, 2021), https://portfolio-adviser.com/franklin-templeton-scion-appointed-ceo-as-brother-steps-aside/

1   Johnson to the Onsa's board of directors, it does not appear that his appointment to the board of directors

2   was ever formalized. Despite uncertainty concerning Chuck Johnson's status as an Onsa board member,

3   Onsa emails reflect that he was held out as an Onsa board member, and Franklin Templeton ran critical

4   decisions concerning Onsa past Chuck Johnson. Chuck Johnson, in turn, would run these decisions by

5   Jennifer Johnson and Franklin Templeton for approval.

6   131.132.    On or about July 29, 2020, Bayston abruptly terminated Bashir's employment as

7   Onsa's CEO. Bayston also terminated most all of Onsa's other employees. Additionally, soon-to-be

8   employees of Onsa were contacted and told that their services were not needed. These terminations were

9   in connection with Franklin Templeton's internal decision to "wind down" and liquidate Onsa. Johnson

10   knowingly participated in and approved this bad faith decision.

11   132.133.    Yet, at the time the winding down process was commenced, Onsa had no significant

12   creditors and very valuable intellectual property that, according to Onsa's own financial statements and

13   recent third-party valuations, left it with many millions of dollars in positive equity—to say nothing of the

14   company's significant intrinsic value and prospective value. Internal Onsa documents indicate that large

15   portions of Onsa's platform were either complete or far along in the development process. Additionally,

16   integral components of its business plan—such as obtaining valuable money transmitter licenses in every

17   state requiring them—were largely complete.

18   133.134.    Simultaneous   with   Bayston   terminating   Onsa's   non-Franklin   Templeton

19   management and beginning to set in motion Onsa's liquidation, Bayston and Mohn directed a third-party

20   company named HTEC Group Inc. ("**HTEC**") to continue development of Onsa's valuable code. On one

21   hand, Franklin Templeton, Johnson, and Bayston approved the mass firings of Onsa employees and the

22   process of liquidating Onsa. On the other hand, they approved and/or directed HTEC to continue to work

23   on and finalize Onsa's technology. Upon information and belief, for many months after the liquidation

24   process began, HTEC continued working on Onsa's valuable technology at the instruction of Franklin

25   Templeton, Bayston, and Johnson. These highly suspicious and inconsistent actions—winding down and

26   eventually liquidating Onsa while at the same time hiring HTEC to continue to develop Onsa's code—

27   evidence that the actions taken by Franklin Templeton, Bayston, and Johnson were in bad faith.  They

28

knew that Onsa's code was extremely valuable and worthy of continued development. They just wanted Onsa's intellectual property for the benefit of Franklin Templeton, not Onsa.

134.135.    In describing the decision to liquidate, Franklin Templeton's SEC 10K states: "The Company recognized $23.7 million of impairment of goodwill directly attributable to the Company's decision to wind-down Onsa, Inc. which was acquired on October 24, 2019 and had not been integrated into the Company." Once again, the SEC 10K incorrectly refers to Onsa as an "acquisition."  It was not.

135.136.    Liquidating Onsa was not in Onsa's best interest. Indeed, the decision to wind down Onsa was made in secret, without any notice to Onsa's non-Franklin Templeton shareholders, and in bad faith. Onsa was never given any opportunity to take Onsa's valuable platform to market.

136.137.    At the time Franklin Templeton began the process of winding down Onsa, the company was fully capable of raising money in the open market, marketing its technology to other customers, and bringing its platform to market. Prior to the bad-faith decision by Franklin Templeton, Johnson, and Bayston to liquidate Onsa, it was an extremely valuable company in the lucrative FinTech marketplace. Similar companies at arguably earlier stages of development raised substantial capital at valuations in the hundreds of millions, and even billions, of dollars.

137.138.    While Franklin Templeton (as Onsa's largest shareholder), Johnson (as Franklin Templeton's CEO and board member), and Bayston (as Onsa's sole director) evaluated how best to get rid of Onsa, others at Franklin Templeton saw this as an opportunity to take control of Onsa's technology. For example, Boerio communicated to Johnson and others at Franklin Templeton that it was in Franklin Templeton's best interest to take Onsa's technology in-house. Upon information and belief, key individuals that worked on Onsa's platform are now part of Franklin Templeton's new blockchain group—indeed, Muir and Nolan are the two individuals at Franklin Templeton that are primarily responsible for Franklin Templeton's tokenization platform. Throughout this time, Boerio refused to communicate with Onsa's shareholders and deliberately kept them in the dark about Franklin Templeton's plans.

138.139.    On September 3, 2020, Franklin Templeton filed an updated SEC prospectus for its tokenized money market fund. The prospectus makes no mention of Onsa but again falsely implies that the strategic vision and technological innovation should be credited to Franklin Templeton.

1       139.140.    On September 4, 2020, Franklin Templeton filed for trademark protection on the

2  mark "Benji" for blockchain- and finance-related software and/or services.[36] Adding insult to injury, the

3  name "Benji" was the very name Franklin Templeton and Onsa intended to use.

4       140.141.    On November 23, 2020, Onsa's shareholders received an email from the law firm

5  Elkins Kalt. The email attached a Notice of Assignment for the Benefit of Creditors ("**Notice**") and a Proof

6  of Claim form. The Notice claimed that, pursuant to California law, Onsa had made a General Assignment

7  for the Benefit of Creditors to BLKCHN. Under California law, a valid ABC would assign all of Onsa's

8  assets that are transferable and not exempt from enforcement of a money judgment to BLKCHN.

9       141.142.    On November 30, 2020, some of Onsa's shareholders received a message from

10  Gregg Yorkison, the managing member of BLKCHN, indicating that Onsa's assets were to be liquidated.

11  Certain of Onsa's shareholders reached out to Yorkison to discuss with him Defendants' misconduct that

12  forms the basis of this lawsuit.

---

[36]    Trademark Electronic Search System (TESS), BENJI, Oct. 5, 2021, https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4804:yiij24.2.1.

142.143.    In connection with the ABC process, certain Onsa documents were made available to prospective purchasers of Onsa's assets. These documents confirm Franklin Templeton's wrongdoing. For example, an August 17, 2020 "Onsa Business Update" board presentation by Mohn confirms that many aspects of Onsa's platform and work for Franklin Templeton's tokenized money market were substantially complete. Other aspects of Onsa's platform were very far along:

## Milestone Update: Schedule A* (Continued)

| Milestone | Deliverables Detail | Progress | Status |
|---|---|---|---|
| Custody Enablement | a) Obtain or develop cold storage capability and digital wallet insurance prior to public launch<br>b) Digital Asset Custody Production ready for public launch<br>c) Penetration tests completed with no major issues or findings<br>d) Compliance certificate and third-party audits completed for security infrastructure.  SOC-2 Type 1 audit successfully completed with no major findings on internal technology developed, internal business processes and any 3rd party dependent service components. | a) Contracted Curv for digital wallet / Curv is adding us onto their $5M policy on June 1st at no additional cost. Curv has presented a cold storage solution that we are evaluating prior to acceptance.<br>b) Curv integration working with BTC/ETH/LTC testnets. Buying real BCH for tests as Curv does not support BCH testnet<br>c) Will be doing pen tests and ethical hacks on mobile apps 09/16/20. Got 25% off from Veracode. Have not signed yet due to terms. Will get security exemption from Mike Muir for Day 1 FT internal launch<br>d) Our  SOC 2 Type 1 audit fieldwork has been completed and the service auditor's report will reflect an unmodified (clean) opinion | a) 100%<br>b) 90%<br>c) 10%<br>d) 95% |
| Tokenized Money Fund | a) Review of all components  required to support mutual fund offering on the platform<br>b) Establish a development plan and timeline commitment<br>c) Public filing submitted and accepted by the SEC<br>d) Full functionality supported across all major architectural components | a) Completed for MMF<br>b) Completed for FT MMF<br>c) Formally filed with SEC on September 3rd, 2019. Response filing with SEC on March 25th, 2020.<br>d) In progress | a) 100%<br>b) 100%<br>c) 90%<br>d) 80% |

Onsa

# Milestone Update: Schedule A*

| Milestone | Deliverables Detail | Progress | Status |
|---|---|---|---|
| DeX (Decentralized Exchange) and P2P Payments live | a) UI/UX completed and approved by Purchaser<br>b) 3rd party penetration tests completed with no finding or issues<br>c) Compliance certification completed for mobile and web apps<br>d) Biometric Authentication integrated into mobile and web apps<br>e) Customer Service model operational (either by internally developed team or third-party provider)<br>f) Engaged and contracted with liquidity providers<br>g) P2P, USD and Crypto payments live on DeX. | a. Design Team final wireframe delivery this month<br>b. Will be doing pen tests and ethical hacks on mobile apps 09/16/20. Got 25% off from Veracode. Have not signed yet due to terms. Will get security exemption from Mike Muir for Day 1 FT internal launch.<br>c. See above.<br>d. Leveraging native device biometric if available (Face ID, Touch ID, Fingerprint)  / no web apps<br>e. Email support via Zendesk. FT reviewing Zendesk MSA.<br>f. Kevin getting us on-boarded with B2C2.<br>g. Completed on test network only / USD live requires banking API. We are working on a direct relationship with Evolve bank so we can possibly go direct (no SynapseFI) and save $30K per month. Will be integrating Plaid for the customers' retail bank authentication. | a) 60%<br>b) 10%<br>c) 10%<br>d) 100%<br>e) 75%<br>f) 50%<br>g) 80% |
| "Day 1" TA | a) Develop and complete interface capabilities with Purchaser's TA system and/or third-party provider(s). Complete end to end testing of the workflow to support the foundational efforts to enable the tokenized money fund<br>b) Enroll and engage regulators with proof of concept; obtain approval for the use of the record keeping system in support of tokenized product offerings.<br>c) Operational and customer support established for Stellar and incumbent recordkeeping systems prior to launch. | a) FT 10 user beta August 11th<br>b) Completed April 2019<br>c) Working with Mike Greene (FT) on support integration and customer handoff to FT for MMF specific support incidents per FT. Email support via Zendesk. FT reviewing Zendesk MSA. | a) 70%<br>b) 100%<br>c) 70% |

onsa

# Milestone Update: Schedule A* (Continued)

| Milestone | Deliverables Detail | Progress | Status |
|---|---|---|---|
| Custody Enablement | a) Obtain or develop cold storage capability and digital wallet insurance prior to public launch<br>b) Digital Asset Custody Production ready for public launch<br>c) Penetration tests completed with no major issues or findings<br>d) Compliance certificate and third-party audits completed for security infrastructure.   SOC-2 Type 1 audit successfully completed with no major findings on internal technology developed, internal business processes and any 3rd party dependent service components. | a) Contracted Curv for digital wallet / Curv is adding us onto their $5M policy on June 1st at no additional cost. Curv has presented a cold storage solution that we are evaluating prior to acceptance.<br>b) Curv integration working with BTC/ETH/LTC testnets. Buying real BCH for tests as Curv does not support BCH testnet<br>c) Will be doing pen tests and ethical hacks on mobile apps 09/16/20. Got 25% off from Veracode. Have not signed yet due to terms. Will get security exemption from Mike Muir for Day 1 FT internal launch<br>d) Our  SOC 2 Type 1 audit fieldwork has been completed and the service auditor's report will reflect an unmodified (clean) opinion | a) 100%<br>b) 90%<br>c) 10%<br>d) 95% |
| Tokenized Money Fund | a) Review of all components required to support mutual fund offering on the platform<br>b) Establish a development plan and timeline commitment<br>c) Public filing submitted and accepted by the SEC<br>d) Full functionality supported across all major architectural components | a) Completed for MMF<br>b) Completed for FT MMF<br>c) Formally filed with SEC on September 3rd, 2019. Response filing with SEC on March 25th, 2020.<br>d) In progress | a) 100%<br>b) 100%<br>c) 90%<br>d) 80% |

onsa

## Milestone Update: Schedule A*

| Milestone | Deliverables Detail | | Progress | | Status |
|---|---|---|---|---|---|
| DeX (Decentralized Exchange) and P2P Payments live | a) | UI/UX completed and approved by Purchaser | a. | Design Team final wireframe delivery this month | a) 60% |
| | b) | 3rd party penetration tests completed with no finding or issues | b. | Will be doing pen tests and ethical hacks on mobile apps 09/16/20. Got 25% off from Veracode. Have not signed yet due to terms. Will get security exemption from Mike Muir for Day 1 FT internal launch. | b) 10% c) 10% d) 100% e) 75% |
| | c) | Compliance certification completed for mobile and web apps | c. | See b. above. | f) 50% g) 80% |
| | d) | Biometric Authentication integrated into mobile and web apps | d. | Leveraging native device biometric if available (Face ID, Touch ID, Fingerprint) / no web apps | |
| | e) | Customer Service model operational (either by internally developed team or third-party provider) | e. | Email support via Zendesk. FT reviewing Zendesk MSA. | |
| | f) | Engaged and contracted with liquidity providers | f. | Kevin getting us on-boarded with B2C2. | |
| | g) | P2P, USD and Crypto payments live on DeX. | g. | Completed on test network only / USD live requires banking API. We are working on a direct relationship with Evolve bank so we can possibly go direct (no SynapseFI) and save $30K per month. Will be integrating Plaid for the customers' retail bank authentication. | |
| "Day 1" TA | a) | Develop and complete interface capabilities with Purchaser's TA system and/or third-party provider(s). Complete end to end testing of the workflow to support the foundational efforts to enable the tokenized money fund | a. | FT 10 user beta August 11th | a) 70% |
| | b) | Enroll and engage regulators with proof of concept; obtain approval for the use of the record keeping system in support of tokenized product offerings. | b. | Completed April 2019 | b) 100% |
| | c) | Operational and customer support established for Stellar and incumbent recordkeeping systems prior to launch. | c. | Working with Mike Greene (FT) on support integration and customer handoff to FT for MMF specific support incidents per FT. Email support via Zendesk. FT reviewing Zendesk MSA. | c) 70% |

onsa

The presentation also confirms that Onsa was ready to beta test the money market token.

~~143.~~144.        Even though the presentation evidenced substantial progress in completing Onsa's platform for launch, the August 17, 2020 Onsa Business Update presentation reflects that Onsa was "paus[ing] [] all business operations" and "eliminat[ing] [] all go-to-market positions."

~~144.~~145.        Despite making the decision to "wind down" Onsa and liquidate Onsa's assets, the August 17, 2020 Onsa Business Update details a "path forward" for Onsa's valuable computer code, ***which involves Franklin Templeton's design team needing to "reengage."*** The presentation makes other highly

1    suspicious references to **"cleaning"** Onsa's code. The presentation makes no mention of preserving

2    valuable company assets, such as Onsa's money transmitter licenses. Whatever Franklin Templeton

3    thought about Onsa's future, Onsa had a number of important assets, including source code, trade secrets,

4    know how, money transmitter licenses, documentation, development records, and internal technical

5    communications. But Franklin Templeton, Bayston, and Johnson simply let these valuable assets waste.

6    Instead of obtaining *any* value for Onsa, they implemented an ABC that was calculated to yield pennies on

7    the dollar to Onsa's creditors (at best) and ensure that Onsa's shareholders would receive nothing. No

8    business person of ordinary, sound judgment could conclude that Onsa would receive adequate

9    consideration for its assets via an ABC (or by allowing assets to lapse, such as the money transmitter

10   licenses). In fact, Franklin Templeton, Bayston, and Johnson wasted all of Onsa's assets, keeping the

11   company from getting funding, launching its technology, or otherwise participating in the marketplace,

12   ultimately and purposefully destroying all of Onsa's value via the ABC.

13        ~~145.~~146.       Despite representing to the SEC and investing public that Onsa was an acquisition,

14   seventy-five percent of Onsa's non-voting, common shareholders were unaffiliated with Franklin

15   Templeton. The August 17, 2020 Business Update presentation identifies "litigation risk," "minority

16   shareholders," and "D&O tail risk" as three of the main risks facing Franklin Templeton, Onsa, and/or

17   management if they continued with Onsa's liquidation. Despite these "risks" (*i.e.*, legal duties and

18   obligations to Onsa), Franklin Templeton, Bayston, and Johnson proceeded with Onsa's bad-faith

19   liquidation.

20        ~~146.~~147.       Pursuant to the ABC, Onsa's tangible and intangible assets were transferred to

21   BLKCHN. These assets include Onsa's causes of action for harms done to the company. *See* Exhibit B

22   (assigning all tangible and intangible assets of Onsa Inc. and Onsa LLC, specifically including without

23   limitation "All Claims, rights, Interests, actions, causes of action, and other Interests of any kind in any

24   legal actions or proceedings …."). As part of its due diligence into the assigned causes of action,

25   BLKCHN's representatives reached out to representatives of Franklin Templeton (specifically including

26   Bayston) to discuss the nature of the allegations of wrongdoing that had been brought to BLKCHN's

27   attention by the non-Franklin Templeton shareholders. After interviewing representatives of both sides of

28

this dispute, BLKCHN conducted an auction of Onsa's assets. The auction resulted in BLKCHN selling to Plaintiff all of Onsa's tangible and intangible assets, including Onsa's intellectual property and causes of action against Defendants. *See* Exhibit C. Plaintiff's members include, without limitation, over fifty of the non-Franklin Templeton shareholders of Onsa. In exchange for acquiring Onsa's legal claims and other assets, Plaintiff paid Onsa's unsecured creditors in full, instead of the mere pennies on the dollar that they would have likely received under the ABC's liquidation process.

147.148.     Moreover, the liquidation process was done in total secrecy by Franklin Templeton, Bayston, and Johnson. In the months preceding the ABC, shareholder requests for information to Onsa's management went unanswered. Trombley, who had Onsa board observer rights, was provided no notice of any post-investment Onsa board meetings and was never invited to attend any such board meetings.  None of the non-Franklin shareholders was provided any advance notice of the ABC.

### VIII.   Franklin Templeton Appears Poised to Launch its Fund Using Onsa's Stolen Technology.

148.149.     On April 6, 2021, Franklin Templeton filed a summary prospectus with the SEC, titled "Franklin OnChain U.S. Government Money Fund." The summary prospectus details Franklin Templeton's FOCGX token that will be traded on the Stellar blockchain, and notes that the token will require use of an "App" named "Benji."[37] On or around April 6 of 2021, Franklin Templeton moved around one million of the FOCGX tokens into circulation on the Stellar blockchain. As of December 2023, there are around 325 million tokens in circulation on the Stellar blockchain.

149.150.     On August 20, 2021, Johnson gave an interview that confirms Franklin Templeton's use of Onsa's intellectual property, as well as the technology's importance to Franklin Templeton:

> In my 30-plus years in this business, I've never experienced the pressure for change as I'm experiencing now…. We're going to need to leverage things like the blockchain and tokenization. We were the first to launch a regulated stablecoin — a money market fund with a stablecoin. We're in pilot mode with it now, working with the SEC. They appreciate

---

[37] *Supra* at fn. 15.

it because we've learned together step by step as they try to figure out how to regulate this world. After that, we'll look to launch other types of similar products.[38]

151.    Review of the limited, publicly available information regarding the FOGCX token on the Stellar blockchain points to Franklin Templeton's misappropriation of Onsa's intellectual property. For example, the FOCGX token utilizes the Stellar blockchain; the FOCGX token's daily dividend reflects Onsa's development and tokenization scheme; asset authorization flags for the FOCGX token mirrors the token setup developed by Onsa; and the FOCGX token's authorization key setup mirrors the setup developed by Onsa. Franklin Templeton's, Bayston's, and Johnson's decision to continue development of Onsa's code with HTEC in view of their decision to liquidate Onsa confirms their plans to misappropriate this technology.

152.    Indeed, internal Franklin Templeton documents reveal that Franklin Templeton leveraged Onsa's work to usurp Onsa's position in the marketplace and its business opportunity. ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████  Clearly, Franklin Templeton used Onsa as a starting point for its Benji platform and token. Franklin Templeton is now pursuing Onsa's business without Onsa. Franklin Templeton's Benji app is live and money market fund tokens are available for purchase.

153.    Defendants continue to grow their tokenized asset business. For example: (a) in April 24, 2023, Franklin Templeton publicly announced that its FOBXX [f/k/a FOCGX] fund has surpassed $270 million in assets under management, and, quoting Bayston, stated that it believes "blockchain technologies have the potential to reshape the investment management industry . . . assets built on blockchain rails, like the [FOBXX] fund, will eventually be interoperable with the rest of the digital asset ecosystem;" (b) Franklin announced on April 26, 2023 that it had expanded the Benji token to be compatible with the

---

[38] *Supra* at fn. 15.

Polygon blockchain network; (c) Johnson gave an interview on April 26, 2023, stating that OnChain US Government Money Market Fund has expanded to Polygon (a blockchain network) and that they are looking to expand to more blockchain networks; (d) Johnson gave another interview on or about April 27, 2023 and stated that "unlocking of Blockchain is going to unlock these revenue streams," "[blockchain] opens up a lot of investment instruments," "we think there is an opportunity for a global Benji," and "because we have this OnChain money market fund, [we have] benefitted from [an exit from traditional banking]"; (e) Johnson gave another interview on May 8, 2023, emphasizing the "astonishing" efficiencies brought by tokenization and it capability to generate new financial services; and (f) in June 2023, Bayston discussed Franklin's "ongoing work with the SEC to harness the vast potential of blockchain technology," he "emphasized that the benefits for mutual funds include efficiency improvements, which could subsequently lead to lower fees," and he claimed that "blockchain technology is poised to be a game-changer for other capital markets, citing his experience with mortgage-backed securities."

150.154. ██████████████████████████

██████████████████████████

## VIII.  Behind the Scenes Defendants Were Always Acting Solely for the Benefit of Franklin Templeton.

151.155.     As mentioned above, Franklin Templeton, Johnson, and Bayston have never attempted to explain or justify the liquidation of Onsa to Onsa's other shareholders.  This silence is telling given that many of the non-Franklin Templeton shareholders directly requested updates, only to be met with stall tactics or outright silence.

152.156.     After acquiring Onsa's control shares in October 2019, and installing Bayston as Onsa's sole director, Franklin Templeton, Bayston, and Johnson ran Onsa solely for the benefit of Franklin Templeton and deliberately kept Onsa's non-Franklin Templeton shareholders in the dark at every critical juncture. Internal documents and other information recently obtained by Plaintiff in connection with the purchase of Onsa's assets in August 2021 indicate that, at least as early as June 2020, Franklin Templeton, Bayston, Johnson, and other Franklin Templeton executives were scheming behind the scenes and plotting Onsa's demise.

153.157.     Documents generated just prior to Defendants' decision to liquidate Onsa reflect that the company was in good shape. For example, on June 26, 2020, a month before Onsa had a mass termination of its employees, Onsa was prepared to send a shareholder update touting Onsa's substantial progress, including: (1) the hiring of Bashir as Onsa's CEO, Norman Reed ("**Reed**") as Onsa's General Counsel, and other "strategic hires"; (2) the name change from TokenVault to Onsa; (3) the passing of the SOC2 Type 1 security and compliance audit; (4) and ***the imminent "beta/internal launch of the Franklin OnChain US Government Money Market Fund in partnership with Franklin Templeton," which would be "the first of its kind to track mutual fund shareholders' records on the Stellar Blockchain."*** But this shareholder update was never sent.

154.158.     Notably, the "Franklin OnChain US Government Money Market Fund" that was referenced in this draft shareholder update has the ***very same name*** as the tokenized fund that Franklin Templeton obtained final SEC approval for on April 6, 2021 (i.e., the money market fund that uses the FOCGX token).[39]

155.159.     Indeed, the internal email circulating this draft shareholder update reflects that Franklin Templeton was up to no good. Farrelly, Onsa's COO and also a Franklin Templeton employee, remarked that: "not sure we want to send [the shareholder update] out until we get Clarity from franklin [sic] on what we are going to do. *These might not be our investors.*" Onsa's new General Counsel chimed in: "That's a good point. Agreed. *Our world might be changing.*" Mohn, Onsa's CFO, also agreed that the shareholder update should not be sent due to uncertainty concerning Franklin Templeton's intentions with respect to Onsa. The update was never sent.

156.160.     While Franklin Templeton, Johnson, and Bayston were plotting behind the scenes, paralyzing Onsa's management as to the direction of the company, shareholder requests for updates went unanswered. For example, on July 6, 2020, one of Onsa's shareholders, Jared Rhodes, emailed the Company for an update. Not knowing Franklin Templeton's intentions, Onsa's in-house counsel replied

---

[39] *Supra* fn. 15.

that it was "currently working hard developing products" and that Onsa would get back to the shareholders in the near future. No substantive update was ever provided.

157.161.    Similarly, on July 20, 2020, another Onsa shareholder, PJ Lee, complained that Onsa was keeping investors in the dark and requested an update. Mohn responded on August 14, 2020 that "Onsa management is currently conducting a business review in consultation with our Board of Directors" and that an update is forthcoming. No update was ever provided.

158.162.    In fact, no update would ever come. By late June, Franklin Templeton's plans to terminate Onsa and take its valuable intellectual property were in full swing. On June 20, 2020, Nolan (a former Franklin Templeton Blockchain Technical Head that Bayston had installed at Onsa) left Onsa and returned to Franklin Templeton.[40] Today, Nolan's LinkedIn page states that he is an "Enterprise Architect" for Franklin Templeton's "FinTech Innovation" group.[41]

159.163.    On June 30, 2020, Franklin Templeton sent an email to Onsa, stating that Bayston requested a list of employees, salary information, and financial projections from Onsa. Internally, this request caused Mohn to write: "This series of requests has me raising my eyebrows."

160.164.    Around this time, there was a scramble to determine whether Bayston (as sole director of Onsa) and other Onsa executives were covered by Franklin Templeton's D&O insurance policy. For example, in July 2020, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

161.165.    On July 8, 2020, Johnson sent a "Privileged & Confidential" email to Franklin Templeton executives, Bayston, Chuck Johnson, Les Kratter (Senior Vice President at Franklin

---

[40] Nolan's Employment Transition and Separation Agreement with Onsa lists his termination date as June 19, 2020.  However, Nolan did not sign this agreement until July 20, 2020.

[41] Nolan's LinkedIn page states that he was "Blockchain Technical Head" for Franklin Templeton from December 2018 through January 2020. This is the time period he performed due diligence on Onsa for Franklin Templeton. Nolan's LinkedIn page does not list employment from January 2020 to August 2020—*the very time period he held himself out as Onsa's lead engineer*. Now, Nolan is apparently working for FT FinTech.

Templeton), Meredith Gibbons (Senior Vice President at Franklin Templeton), and Boerio. The subject of the email was "TokenVault," which was Onsa's name before it was changed. In her email, Johnson asks to set up a conference call to discuss "***issues around TokenVault and coordinating next steps***."

162.166.    By mistake, Johnson also included Bashir, Onsa's CEO, on this email. This was apparently pointed out to Johnson, who then replied to her own email by telling Bashir that "I think it is best that TokenVault [Onsa] is not present on the call. Chuck [Johnson] & Roger [Bayston] can update you on anything relevant to TokenVault following the call." Johnson's exclusion of Onsa's CEO from the call is remarkable given that her original email sought to discuss "***issues around [Onsa] and coordinating next steps***." Apparently, in Johnson's mind, Onsa's CEO was not relevant to a discussion regarding Onsa's future. By this time, there can be no mistake that the highest levels of Franklin Templeton were plotting the demise of Onsa.

163.167.    Around this time, Reed (Onsa's General Counsel) and Bashir (Onsa's CEO) apparently grew suspicious of Franklin Templeton's intentions. Reed complained that "if [Franklin] won't approve our funding we are silly to keep working on ***their project***." Bashir chimed in, "[a]bsolutely, their team wants us to just be ***their support*** for weekly calls" and "[e]veryone is furthering their own agendas." Reed responded that Franklin Templeton was asking Onsa to trust Franklin Templeton to "do the right thing" but that Reed did not "trust [Franklin Templeton] ***to look out for [Onsa]***." Reed's suspicions were well founded.

164.168.    On July 23, 2020, Onsa's outside counsel (Clement Roberts, from the Orrick law firm) wrote an email to Onsa's CEO, providing "some bullets regarding your upcoming conversation with [Chuck Johnson]." Onsa's outside counsel encouraged Onsa's CEO to: (1) insist that Franklin Templeton provide an update; (2) share any concerns; and (3) ***remind Franklin Templeton that Onsa has fiduciary obligations to shareholders other than Franklin Templeton***.

165.169.    On or about July 29, 2020, Bayston abruptly terminated Bashir as CEO and Reed as General Counsel. Internal documents confirm that the terminations were ***without cause***. Bayston also terminated substantially all other Onsa employees except himself and Mohn. Additionally, soon-to-be employees of Onsa were contacted and told that their services were not needed. These terminations were

1  in connection with Franklin Templeton's decision to "wind down" and liquidate Onsa. Shortly thereafter,

2  Mohn was appointed interim CEO. Upon information and belief, Johnson knowingly participated in these

3  decisions.

4  ~~166.~~170.    On July 29, 2020, Mohn met with Bayston and Franklin Templeton's in-house

5  counsel and outside counsel (Goodwin Proctor). The notes from this legal meeting confirm that Franklin

6  Templeton was up to no good. For example, the notes question "what is the end goal?" Apparently, Franklin

7  Templeton had not even shared its intentions with Mohn, Onsa's newly appointed, Interim CEO. The notes

8  question whether the liquidation was legally proper ("confirm entity or officer that *has rights to take these*

9  *actions*."). The notes acknowledge that shareholders were not provided any notice of Franklin Templeton's

10  plans to liquidate Onsa, let alone the opportunity explore other alternatives for Onsa ("Letter to

11  shareholders?"). No letter was ever sent. The notes reflect the obvious "[r]isks around minority shareholder

12  lawsuit[s]." The notes confirm that that Franklin Templeton intended to take Onsa's valuable intellectual

13  property for its own use ("Code since March 1 developed by HTEC [one of Onsa's contracted developers].

14  *Does HTEC stay on for the project with FT?  Will FT be buying this code?*"). And finally, the notes

15  reflect Mohn's concerns with serving as Franklin Templeton's hatchet man: "*What are my liabilities as*

16  *board appointed interim – CEO now? I want indemnification. This isn't a one man show. Where is my*

17  *help/resourcing going to come from to pull this off*?"

18  ~~167.~~171.    Shortly after this meeting, Bayston and Mohn greenlighted an agreement whereby

19  Onsa indemnified Mohn for his role in liquidating Onsa. Obviously, Onsa indemnifying Mohn for his role

20  in liquidating Onsa was not in Onsa's best interest.

21  ~~168.~~172.    Also around this time, upon information and belief, Bayston and Mohn instructed

22  HTEC to continue development of Onsa's technology and code. Upon information and belief, this same

23  technology and code was ultimately misappropriated by Franklin Templeton.

24  ~~169.~~173.    After his appointment as Onsa's Interim CEO, Bayston, Mohn, and Franklin

25  Templeton worked hand-in-hand to liquidate Onsa. This group was particularly concerned with avoiding

26  liability to Onsa and its non-Franklin Templeton shareholders. Notes prepared in advance of an August 17,

27  2020 meeting between Franklin Templeton's attorneys and outside counsel (Goodwin Proctor), Bayston,

28

1   Boerio, Les Kratter (Senior Vice President of Franklin Templeton), and Mohn reflect that this group was

2   slated to discuss "legal aspects of dissolution in Delaware, D&O risk, minority shareholders, litigation risk,

3   [and Onsa's] IP." The notes further reflect that Onsa was "***expected to satisfy substantially all [milestones]***

4   ***by the end of this month if the business was operating normally***" and that these milestones triggered

5   additional payment obligations by Franklin Templeton.

6   ~~170.~~174.   The August 27, 2020 meeting apparently went forward, and shortly thereafter Mohn

7   contacted "the Marsh team" regarding D&O coverage for "Roger [Bayston] and myself," clearly indicating

8   that Bayston and Mohn knew that the bad faith decision to liquidate Onsa was likely to invite litigation

9   against them. Notably, Mohn references an effort by "FT to reduce its own deductible exposure ($10m)

10  and ***offload more risk onto Onsa***," clearly indicating that Franklin Templeton knew that the bad faith

11  decision to liquidate Onsa was likely to invite litigation against it, and that it was hoping to cram down

12  such exposure on Onsa. Mohn and Bayston's pursuit of D&O coverage did not stop there. ███████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████ Franklin Templeton, Johnson, and Bayston were not concerned with

16  Onsa's best interest. Dodging liability for their wrongful acts was their focus.

17  ~~171.~~175.   On August 28, 2020, Bayston and Mohn discussed implementing an ABC with

18  attorneys. Once again, correspondence indicates that Bayston and Mohn were particularly concerned with

19  "mak[ing] sure that current and former Onsa directors and officers would continue to be protected under

20  either the FT D&O policy or under a 'tail' policy … [for] claims which may be made even after service

21  has ended."

22  ~~172.~~176.   Upon information and belief, Franklin Templeton, Johnson, and Bayston decided to

23  liquidate Onsa via an ABC proceeding because this type of proceeding imposed the greatest obstacles for

24  the non-Franklin Templeton shareholders to bring Onsa's claims against Defendants. Had Onsa not been

25  liquidated, the non-Franklin Templeton shareholders could have filed a derivative lawsuit, asking the Court

26  for permission to stand in the shoes of Onsa and bring its claims against Franklin Templeton, Johnson, and

27  Bayston. But by performing the ABC, Franklin Templeton, Johnson and Bayston caused Onsa to transfer

28

1   its claims to the ABC liquidator, arguably blocking the non-Franklin Templeton shareholders from

2   asserting claims on behalf of Onsa. Indeed, in the initial call with the ABC liquidator, the liquidator and its

3   representatives indicated that they did not believe that a derivative action was available to Onsa's non-

4   Franklin Templeton shareholders because Onsa's legal claims had been assigned to the liquidation

5   company (BLKCHN) via the ABC.

6        ~~173.~~177.      Franklin Templeton, Johnson, and Bayston likely did not count on the non-Franklin

7   Templeton shareholders' resolve to have their day in court. As set forth above, the shareholders organized

8   Plaintiff, obtained funding, and purchased Onsa's assets from the ABC liquidator in exchange for satisfying

9   Onsa's unsecured creditors' claims. These assets included Onsa's legal claims and intellectual property.

10       ~~174.~~178.      Upon completing his Interim CEO duties in connection with Onsa's liquidation,

11  Franklin Templeton re-hired Mohn in September 2021. Additionally, Bayston (at all relevant times Onsa's

12  sole board member) continues to work at Franklin Templeton as Executive Vice President—Director of

13  Quantitative & FinTech Strategies. Farrelly (formerly Onsa's COO) continues to work at Franklin

14  Templeton as Vice President and Director of Digital Assets. And as previously mentioned, Nolan (formerly

15  Onsa's lead engineer) was re-hired by Franklin Templeton as Enterprise Architect—FinTech Innovation.

16       ~~175.~~179.      Documents obtained by Plaintiff in connection with the purchase of Onsa's assets

17  are notable for what they do not include. There are no documents explaining why Onsa needed to be

18  liquidated. There is no correspondence to Onsa's non-Franklin Templeton shareholders explaining the

19  decision to liquidate. And there are no documents reflecting any effort to explore alternatives to liquidation.

20  Franklin Templeton wanted Onsa gone.

21                                    **COUNT I**

22  **(Claim for Breaches of Fiduciary Duties Against FT FinTech, Franklin Resources, and Bayston)**

23       ~~176.~~180.      Plaintiff asserts claims for breaches of fiduciary duties against FT FinTech, Franklin

24  Resources, and Bayston.

25       ~~177.~~181.      By virtue of owning 100% of the voting stock of Onsa, FT FinTech and Franklin

26  Resources constituted the controlling shareholders of Onsa and owed fiduciary duties to Onsa.

27

28

178.182.      As Onsa's sole director, Bayston owed fiduciary duties to Onsa. Bayston's tenure as Onsa's sole director was brief as compared to his 30-year career with Franklin Templeton. Bayston was and is beholden to Franklin Templeton for his employment and compensation. Bayston was conflicted in performing his duties for Onsa because he lacked independence from Franklin Templeton, to whom he owed his allegiance, and his judgment was controlled by Franklin Templeton and his boss, CEO Jennifer Johnson.

179.183.      FT FinTech, Franklin Resources, and Bayston breached their fiduciary duties of due care, good faith, and loyalty to Onsa by making decisions that were self-interested, disloyal, and/or made in bad faith and that were contrary to Onsa's best interests. At a minimum, FT FinTech's, Franklin Resources', and Bayston's decisions, including the process undertaken to make decisions, were uninformed and grossly negligent.

180.184.      Indications and evidence of FT FinTech's, Franklin Resources', and Bayston's bad faith and breaches of their fiduciary duties are numerous as discussed throughout this Second Amended Complaint, examples of which are identified below.

181.185.      FT FinTech, Franklin Resources, and Bayston conducted Onsa's business in secret from the non-Franklin Templeton shareholders, from Trombley as an Onsa "board observer," and from Onsa's most senior managers, including its CEO and General Counsel.

182.186.      FT FinTech, Franklin Resources, and Bayston failed to provide any updates to the non-Franklin Templeton shareholders, did not respond to certain shareholder's requests for information regarding Onsa, and even responded to certain shareholder's requests for information in a false and misleading way. This secrecy extended to the most significant of all events—the decision to liquidate Onsa via the ABC—which was sprung on the non-Franklin Templeton shareholders with no notice.

183.187.      FT FinTech, Franklin Resources, and Bayston even kept their plans secret—including their decision to wind down and liquidate Onsa—from Onsa's most senior officers, including its CEO and General Counsel. Unlike Bayston who was a conflicted 30-year Franklin Templeton employee, Onsa's CEO and General Counsel had no prior affiliation with Franklin Templeton and were independent. Internal communications between Onsa's CEO and General Counsel indicate their belief that FT FinTech,

1  Franklin Resources, and Bayston were running Onsa and making decisions solely for Franklin Templeton's

2  benefit, not Onsa's benefit.

3      184.188.      FT FinTech, Franklin Resources, and Bayston did not consult either of these officers

4  regarding the decision to wind down and liquidate Onsa. In fact, communications show that these officers

5  were intentionally excluded from this decision by FT FinTech, Franklin Resources, and Bayston. And once

6  that decision was made, Bayston, acting on behalf of FT FinTech and Franklin Resources, fired Bashir as

7  CEO and Reed as General Counsel, without notice and without cause. The timing and circumstances of

8  these terminations made no legitimate business sense as it would have been to Onsa's benefit to have its

9  senior officers available in winding down the business. However, when viewed through the scheme that

10  FT FinTech, Franklin Resources, and Bayston were implementing, it made all the sense in the world: they

11  did not want any independent executives in place to question and potentially thwart the indefensible

12  decision to liquidate Onsa and thereby destroy its value. That is why Bashir and Reed had to go.

13      185.189.      Both the process undertaken by FT FinTech, Franklin Resources, and Bayston as

14  well as the actual decision to liquidate Onsa were willfully uninformed, grossly negligent, self-interested,

15  and in bad faith.

16      186.190.      With respect to the process that preceded the ABC, there is no evidence that FT

17  FinTech, Franklin Resources, and Bayston made any efforts to inform themselves of alternatives to

18  liquidation or seriously explore any alternatives with third parties. And given that the sole director of Onsa

19  was a conflicted, thirty-year executive of Franklin Templeton who had fired all the unaffiliated executives,

20  there was no independent director or officer to provide unbiased opinions or judgment to Onsa. And there

21  were many potential alternatives to liquidation, such as a sale to a third-party, raising additional capital, or

22  providing the non-Franklin shareholders with an opportunity to purchase Franklin Templeton's stock in

23  Onsa and/or replace the Franklin Templeton appointed sole director with an unaffiliated person. The failure

24  to seriously explore alternatives was in bad faith, or at minimum, an abdication of their responsibilities and

25  gross negligence.

26      187.191.      Moreover, FT FinTech, Franklin Resources, and Bayston never informed or

27  consulted any of the more than fifty non-Franklin Templeton shareholders to explore alternatives with any

28

of them. These shareholders had not only invested substantial sums in Onsa, but they included a number of prominent individuals in the business community who possessed a wealth of resources, expertise, and contacts with respect to startup companies, fundraising, corporate transactions, and the like. But seeking business alternatives from this group of non-Franklin Templeton shareholders would have been at cross purposes to the goal of FT FinTech, Franklin Resources, and Bayston to liquidate Onsa in secret and only inform the non-Franklin Templeton shareholders after the ABC was already a *fait accompli*. In short, the last thing that FT FinTech, Franklin Resources, and Bayston wanted was an actual business solution that would allow Onsa to continue as a going-concern. What they wanted, and what they achieved, was to kill Onsa and to usurp Onsa's position in the marketplace and its business opportunity.

192.    There was no legitimate reason to liquidate Onsa via the ABC. At the time the liquidation process was initiated, Onsa was extremely valuable in the marketplace and fully capable of capitalizing on its business plans and raising funds. Prior to initiating the ABC, FT FinTech, Franklin Resources, and Bayston never allowed Onsa to seek additional funding, notwithstanding that Onsa's founders had previously sought Franklin Templeton's approval but were told it was not necessary because Franklin Templeton would provide all the funding that was needed. Despite this, Onsa succeeded in developing its technology. In August 2020, Stefan Mršić, an employee of HTEC (who Onsa hired to help develop code) wrote to Mohn to confirm the substantial completion of the development of Onsa's technology: "[r]egarding the overall status of the [Onsa's] project, we can safely say that all the points raised by FT were taken care of, and once we reinitiate contact with them and tackle a couple of issues we're experiencing with their Investar system, we can have a demo and provide them with the latest app version to test . . . . all the infrastructure work (servers, logging, monitoring etc.) has been wrapped up and is ready to use, even with a production environment."

188.193.    While FT FinTech and Franklin Resources (through Onsa's attorneys) purported to raise issues with Trombley regarding supposed ownership rights to Onsa's intellectual property, in fact, there were no issues regarding ownership of Onsa's intellectual property rights, at least not any ownership issues that could not be readily resolved. But FT FinTech, Franklin Resources, and Bayston had no interest

in, and made no effort to resolve, any alleged intellectual property ownership issues. Their sole interest was to liquidate Onsa and take Onsa's business plan for itself.

189.194.          In connection with the ABC, FT FinTech, Franklin Resources, and Bayston allowed all the valuable assets of Onsa to be wasted, including source code, trade secrets, know how, money transmitter licenses, documentation, development records, internal technical communications, and the like. This waste was a breach of fiduciary duty because Onsa received no consideration for these valuable assets and simply squandered them away. This waste of assets was in bad faith and was either a breach of the duties of loyalty or care. At a minimum, it was grossly negligent.

190.195.          As a result of certain internal documents that Plaintiff came into possession after purchasing Onsa's assets in August 2021, Plaintiff now has a glimpse into what was taking place behind-the-scenes in connection with the decision to wind down and liquidate Onsa. These documents reveal that FT FinTech, Franklin Resources, and Bayston were aware that their decision to liquidate Onsa created litigation risks for them and they discussed efforts to try to remediate that risk, including purchasing additional D&O insurance and creating a litigation reserve using Onsa's cash. These are not the actions of fiduciaries acting in the best interest of Onsa. Rather, these are the actions of fiduciaries who had actual knowledge and awareness of their wrongdoing and were discussing efforts to mitigate their litigation exposure by offloading those costs to Onsa.

191.196.          FT FinTech, Franklin Resources, and Bayston no doubt hoped that the ABC would run its natural course with the liquidator (BLKCHN) "playing ball," the unsecured creditors getting next to nothing for their claims, the shareholders getting zero for their stock, and FT FinTech, Franklin Resources, and Bayston avoiding any litigation consequences. And the scheme would have worked, but for the fact that (1) BLKCHN actually honored its fiduciary duties and did not prove to be a rubber stamp for FT FinTech, Franklin Resources, and Bayston, and (2) Plaintiff raised substantial funds that allowed BLKCHN to pay the unsecured creditors in full and, in return, allowed Plaintiff to purchase all of Onsa's former assets, including its causes of action.

192.197.          FT FinTech, Franklin Resources, and Bayston generated substantial benefits for Franklin Templeton (and, upon information and belief, for Bayston) at the expense of Onsa.

198.    By liquidating Onsa, Franklin Templeton eliminated a company that was primed to hold a unique position in the marketplace, allowing Franklin Templeton to assume that position instead. As set out above, Onsa was primed to be a pioneer in technology for tokenizing financial assets. Onsa was created for the very purpose of developing technology to tokenize financial assets and to trade those assets using blockchain technology. Franklin Templeton invested in Onsa so that Onsa would continue to develop this technology, both for Franklin Templeton itself and for others. Indeed, Franklin Templeton promised Onsa that it would provide Onsa with all necessary funding, ensuring that Onsa could take advantage of this opportunity. In reliance on those promises, Onsa worked hand-in-hand with Franklin Templeton to develop this technology. When the work was almost complete, FT FinTech, Franklin Resources, and Bayston shut down Onsa and initiated the ABC, ensuring that Onsa could not capitalize on its position in the marketplace. At the time, Onsa was well-positioned. It had no significant creditors but did have very valuable infrastructure, trade secrets, and other intellectual property. It was also due to receive additional capital infusions from Franklin Templeton pursuant to the SPA upon reaching certain milestones. Despite Onsa's success, and despite their fiduciary duties to Onsa, FT FinTech, Franklin Resources, and Bayston reversed course and launched a Franklin Templeton platform for tokenizing and trading financial assets without Onsa. In doing so, FT FinTech, Franklin Resources, and Bayston acted in the interests of Franklin Templeton instead of Onsa. They prevented Onsa from providing its revolutionary tokenized-asset technology to Franklin Templeton and to other customers, usurping that opportunity for themselves.

~~193.~~199.    FT FinTech, Franklin Resources, and Bayston are precluded from asserting a defense based upon the exculpatory language in Onsa's Amended and Restated Certificate of Incorporation, Ninth Provision, because their conduct was grossly negligent, in bad faith, and in breach of their fiduciary duties of loyalty, among other reasons, as this Court has held in denying Defendants' motion to dismiss.

~~194.~~200.    FT FinTech, Franklin Resources, and Bayston are not entitled to a presumption under the business judgment rule because their decisions, particularly with respect to the ABC, were made in secret, deceptive, fraudulent, in bad faith, and in breach of their duty of loyalty. This decision to liquidate Onsa was disloyal and constituted self-dealing. Further still, the ABC was not initiated by FT FinTech,

Franklin Resources, and Bayston on an informed basis or with an honest belief that the ABC was in Onsa's best interests. Alternatively, assuming arguendo that the ABC decision was not in bad faith, FT FinTech, Franklin Resources, and Bayston did not seriously pursue any alternatives to the ABC and, in fact, the ABC was the worst possible alternative for Onsa as Onsa received either no or minimal value as a result of the ABC. For these reasons, FT FinTech, Franklin Resources, and Bayston were grossly negligent.

195.201.      As a result, Onsa has been damaged and Plaintiff is entitled to recover all of Onsa's damages resulting from FT FinTech, Franklin Resources, and Bayston for their breaches of fiduciary duties, including exemplary or punitive damages.

## COUNT II

## (The Federal Defend Trade Secrets Act Against FT FinTech, Franklin Resources, and Franklin Templeton Companies)

196.202.      Plaintiff asserts claims under the Defend Trade Secrets Act ("**DTSA**") against FT FinTech, Franklin Resources, and Franklin Templeton Companies based on misappropriation of Onsa's trade secrets, which trade secrets are now owned by Plaintiff and which have been previously described in this Second Amended Complaint.

197.203.      Beginning in 2017, TokenVault Limited (formerly known as Vaultbanc) developed intellectual property, including trade secrets and computer code. This material was owned by TokenVault Limited. TokenVault Limited employees included individuals located in the United States, such as TokenVault Limited's co-founder, Trombley.[42] TokenVault Limited developers also included individuals located in India, who in 2019 each executed written invention assignment agreements expressly stating that all inventions, including trade secrets and copyrightable works, relating to TokenVault (abbreviated "TV" in the agreements) were the "sole and exclusive property of TV." Specifically, the invention assignment agreements state: "I agree that all inventions, including, but not limited to, new discoveries, concepts, inventions and developments, as well as improvements, modifications, enhancements and derivative

---

[42] Any intellectual property developed by Trombley for TokenVault Limited, or in his capacity as an employee or founder of TokenVault Limited, belonged to TokenVault Limited. Similarly, any intellectual property developed by Trombley for Onsa, or in his capacity as an employee or founder of Onsa, belonged to Onsa.

1   works, and all know-how, processes, techniques, formulas, ideas, circuits, designs, trademarks, trade

2   secrets and copyrightable works ('Inventions') which result from work performed by me: (a) on behalf of

3   TV (whether or not conducted at TV's facilities, during work hours, or using TV's assets); (b) which relate

4   at the time of conception or reduction to practice of the Invention to TV's business, or actual or

5   demonstrably anticipated research or development of TV; or (c) that result in whole or in part from

6   reference or access to TV Confidential Information or property (collectively, the 'TV Inventions') shall be

7   the sole and exclusive property of TV, which shall own all right, title and interest in and to all TV Inventions

8   to the fullest extent possible under applicable law…. I hereby assign and agree to assign to TV or its

9   designee, without further consideration, my entire right and interest in and to all TV Inventions, whether

10  presently existing or created in the future, including all rights to obtain, register, and enforce patents,

11  copyrights, mask work rights, and other intellectual property protection for such TV Inventions."

12   ~~198.~~204.      Additionally, in 2020, Onsa hired HTEC to assist in the development of Onsa's code

13  and technology. Prior to commencing work for Onsa, HTEC signed an agreement assigning to Onsa any

14  and all intellectual property generated pursuant to such development work. HTEC ultimately generated

15  substantial work product for Onsa during its tenure as development contractor. In August 2020, HTEC's

16  Stefan Mršić confirmed that all the infrastructure work (servers, logging, monitoring etc.) has been

17  wrapped up and is ready to use, even with a production environment." All of this work was owned by Onsa.

18   ~~199.~~205.      As set forth herein, any intellectual property generated by Indian developers

19  belonged to TokenVault Limited by virtue of invention assignment agreements. Notwithstanding these

20  agreements, at the time FT FinTech, Franklin Resources, and Bayston were plotting the wind down and

21  liquidation of Onsa, they took the inaccurate position that TokenTech Research and Development India

22  Pvt Ltd ("**TokenTech**") purportedly owned rights to this intellectual property.[43] In an effort to resolve any

23

---

24  [43] Indeed, FT FinTech's, Franklin Resources', Franklin Templeton Companies', and Bayston's primary
25  justification for shuttering Onsa has been that TokenTech was not a subsidiary of Onsa, and thus,
    ownership of IP developed in connection with TokenTech never vested in Onsa. *See, e.g.*, ECF 60-4 at 6-
26  8. But documents received in discovery reveal that these Defendants *knew* that TokenTech was not a
    subsidiary of Onsa at the time of their investment, demonstrating that Defendants themselves had no real
27  concerns about IP ownership.

28

doubt concerning the ownership of this intellectual property, TokenTech assigned any and all intellectual property rights it had (which, for the foregoing reasons, were none) to Barefoot Capital, LLC (now Maven Venture Capital, LLC):

> Tokentech hereby irrevocably grants, conveys and assigns to Barefoot, by execution hereof, all of its worldwide right title and interest in and to the Transferred Software and Transferred Intellectual Property Rights, to be held and enjoyed by Barefoot and its successors and assigns. Tokentech further irrevocably grants, conveys and assigns to Barefoot, by execution hereof, all of its worldwide right, title and interest in and to any and all causes of action and rights of recovery for past infringement or misappropriation of the Transferred Intellectual Property Rights, to be held and enjoyed by Barefoot and its successors and assigns. Barefoot hereby accepts the foregoing grants, conveyances and assignments.

For purposes of this agreement, the Transferred Software purports to include, without limitation, the code written by the Indian developers (e.g., "blockchain based software applications, code for which was written, maintained and improved by employees and agents of Tokentech") and Transferred Intellectual Property Rights includes intellectual property rights in and to the Transferred Software including, without limitation, "trade secrets, proprietary information, know-how, technology and technical data" and "all copyrights, copyright registrations and applications therefor and all other rights corresponding thereto throughout the world.

~~200.~~206.    Plaintiff obtained a Quitclaim Assignment of any intellectual property, including any copyrights or trade secrets, that was conveyed by TokenTech to Maven Capital:

> [Maven Venture Capital, LLC (f/k/a Barefoot Capital, LLC)] does quitclaim, assign, transfer, and set over unto [Plaintiff] any and all right, title, and interest to any assets and rights, tangible or intangible, that Assignor obtained by, through or under the Software Transfer Agreement [i.e., the assignment from TokenTech to Barefoot Capital, LLC], specifically including the IP Rights and any legal claims.

~~201.~~207.    Onsa developed and owned trade secrets including one or more of the following: financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, in tangible and/or intangible forms.

~~202.~~208.    As described above, ~~for example in paragraphs 119 and 120,~~ Onsa developed and owned trade secrets. These trade secrets related to Onsa's blockchain software, systems, and platform;

1    tokenization software, systems, and platform; storage software, systems, and platform; trading software,

2    systems, and platform; and payment software, systems, and platform. Onsa developed applications,

3    programs, code, architecture, workflow, processes, systems, interfaces, routines, and/or modules used in

4    connection with its blockchain software, systems, and platform; tokenization software, systems, and

5    platform; storage software, systems, and platform; trading software, systems, and platform; and payment

6    software, systems, and platform.

7    ~~203.~~209.      The code Onsa developed and owned is a trade secret.

8    ~~204.~~210.      Onsa developed and owned trade secrets in connection with frontend or user-facing

9    applications, programs, architecture, workflow, processes, systems, interfaces, routines, and/or modules

10   for its blockchain software, systems, and platform; tokenization software, systems, and platform; storage

11   software, systems, and platform; trading software, systems, and platform; and payment software, systems,

12   and platform.

13   ~~205.~~211.      Onsa developed and owned trade secrets in connection with its backend or server-

14   side applications, programs, architecture, workflow, processes, systems, interfaces, routines, and/or

15   modules for its blockchain software, systems, and platform; tokenization software, systems, and platform;

16   storage software, systems, and platform; trading software, systems, and platform; and payment software,

17   systems, and platform.

18   ~~206.~~212.      Onsa developed and owned trade secrets in connection with specialized applications,

19   programs, architecture, workflow, processes, systems, interfaces, routines, and/or modules for the Investar

20   system, Curv system for digital asset security, and the Stellar blockchain.

21   ~~207.~~213.      Onsa took reasonable measures to keep its trade secrets secret.

22   ~~208.~~214.      Onsa's employees were subject to confidentiality obligations as a result of their

23   employment with Onsa. Additionally, Onsa protected disclosure of its trade secrets by confidentiality

24   agreements.

25   ~~209.~~215.      Onsa also protected the code, which includes Onsa trade secrets, through encrypted

26   and password-protected repositories on GitHub. Onsa limited the employees that had access to the code

27

28

1  through GitHub. GitHub provides additional security systems and procedures which Onsa reasonably

2  expected would protect the code.[44]

3       ~~210.~~216.      Onsa's trade secrets derive independent economic value from being secret.

4       ~~211.~~217.      Onsa expended significant time, energy, and expense in developing its trade secrets.

5  If discovered by others, they would save the time, energy, and expense Onsa spent developing its trade

6  secrets.

7       ~~212.~~218.      Franklin   Resources,   FT   FinTech,   and   Franklin   Templeton   Companies

8  misappropriated Onsa's trade secrets, knew or had reason to know, that they acquired access to Onsa's

9  trade secrets improperly, and disclosed and used Onsa's trade secrets without Onsa's express or implied

10  consent, causing harm to Onsa.

11      ~~213.~~219.      There was a strict regime of confidentiality that governed the relationship between

12  Onsa and the various Franklin Templeton entities. The NDA had express confidentiality and non-use

13  provisions that allowed Franklin Resources, FT FinTech, and Franklin Templeton Companies to access

14  Onsa's trade secrets only for due diligence purposes. Franklin Resources, FT FinTech, and Franklin

15  Templeton Companies knew that any use of Onsa trade secrets was strictly prohibited (e.g., they knew that

16  they were not permitted to use or benefit from Onsa's trade secrets).  Franklin Resources, FT FinTech, and

17  Franklin Templeton Companies further knew that Onsa's technology derived significant value from

18  remaining secret, such as to maintain competitive advantage, emphasizing that they knew that they had a

19  duty to maintain the secrecy of Onsa's trade secrets when they learned of them. Additionally, all of Onsa's

20  code was kept in encrypted code repositories to which only a limited group of people had access. Extremely

21  robust confidentiality requirements surrounded all discussions/disclosures of Onsa's technology.

22      ~~214.~~220.      Upon   information   and   belief,   Franklin   Resources,   FT   FinTech,   and   Franklin

23  Templeton Companies acquired Onsa's trade secrets by improper means. For example, Franklin Resources,

24  FT FinTech, and Franklin Templeton Companies represented to Onsa that any access to Onsa's trade

25  secrets (such as trade secrets reflected in Onsa's code) would be solely for due diligence purposes.

26

27  [44] GitHub, Inc., Security at GitHub, https://github.com/security

28

Additionally, multiple agreements as to confidentiality existed between Onsa and Franklin Resources, FT FinTech, and Franklin Templeton Companies. The NDA explicitly required that Onsa's source code (which reflect a number of Onsa's trade secrets) be deleted after due diligence was completed, and further required that Onsa be provided evidence of such deletion. Franklin Resources, FT FinTech, and Franklin Templeton Companies never provided Onsa notice that its source code was deleted, and upon information and belief, Franklin Resources, FT FinTech, and Franklin Templeton Companies thereby acquired Onsa's trade secrets on false pretenses. Such acquisition was accomplished through improper means, either by misrepresentations and/or breach of a duty to maintain secrecy as set forth in the confidentiality agreements between the parties.

215.221.    Bayston, on behalf of Franklin Resources, FT FinTech, and Franklin Templeton Companies, terminated Onsa's executive team in connection with winding down the company and, upon information and belief, used Onsa to engage HTEC to continue developing Onsa's trade secret technology for the benefit of Franklin Resources, FT FinTech, and/or Franklin Templeton Companies. Upon information and belief, Franklin Resources, FT FinTech, and/or Franklin Templeton Companies ultimately acquired or used these trade secrets to enable their own tokenized financial assets.

216.222.    Franklin Templeton's original SEC filings used to obtain approval for the FOCGX token reference Onsa (e.g., a "blockchain administrator"), and these filings and the information contained therein relied on technology developed by Onsa. Upon information and belief, Franklin Templeton has continued to rely on these same SEC filings in launching its FOCGX token, emphasizing the connection between the FOCGX token and Onsa's trade secret technology.

217.223.    Review of the limited, publicly available information regarding the FOCGX token on the Stellar blockchain points to such improper use and/or disclosure by Franklin Resources, FT FinTech, and Franklin Templeton Companies, or some other Franklin Templeton affiliate. For example, the FOCGX token utilizes the Stellar blockchain (as opposed to any of the dozens or hundreds of available blockchains); the FOCGX token's daily dividend reflects Onsa's development and tokenization scheme; asset authorization flags for the FOCGX token mirrors the token setup developed by Onsa; and the FOCGX token's authorization key setup mirrors the setup developed by Onsa. Additionally, the app used to trade

the FOCGX token is named "Benji," which is the same name that Onsa intended to use for its app. Further, internal Onsa documents indicate that, as of June ~~of~~ 2020, the tokenized money market fund was referred to as the "Franklin OnChain US Government Money Market Fund." This is the very name that Franklin Templeton used in the prospectus that was approved by the SEC. It is extremely unlikely that, but for the improper acquisition, use, and disclosure of Onsa's trade secrets, all of these same features that Onsa developed would "coincidentally" be found in Franklin Templeton's FOCGX token.

~~218.~~224.    Plaintiff seeks all damages and remedies available under the DTSA for the misappropriation of its trade secrets by Franklin Resources, FT Fintech, and Franklin Templeton Companies, including the actual loss caused by the misappropriation of its trade secrets, injunctive relief to prevent Franklin Resources, FT FinTech, Franklin Templeton Companies, and those in active concert with them including any of the Franklin Templeton affiliated companies from accessing, distributing, or using Onsa's trade secrets in any way and, specifically, from proceeding with the tokenized money market fund and other tokenized assets and/or blockchain-related financial assets using the technology developed by Onsa.

~~219.~~225.    In addition to monetary damages, Plaintiff seeks exemplary or punitive damages and attorney's fees for the willful and malicious misappropriation of Onsa's trade secrets by Franklin Resources, FT FinTech, and Franklin Templeton Companies.

~~220.~~226.    Additionally, Plaintiff seeks damages for any unjust enrichment of Franklin Resources, FT FinTech, and Franklin Templeton Companies from which they benefitted as a result of their misappropriation of Onsa's trade secrets that is not addressed in computing damages for actual loss, or in the alternative, the imposition of liability for a reasonable royalty for the unauthorized acquisition, disclosure, or use of Onsa's trade secrets by Franklin Resources, FT FinTech, and Franklin Templeton Companies.

## COUNT III

**(Copyright Infringement Against FT FinTech, Franklin Resources,**

**and Franklin Templeton Companies)**

221.227.     Plaintiff owns valid and enforceable copyrights in particular software previously owned by Onsa, and this software constitutes creative works of original authorship.

222.228.     Plaintiff has complied in all respects with the copyright laws and is the exclusive owner of the copyrights in the aforementioned software. Plaintiff has obtained the following Certificates of Registration from the Register of Copyrights, depositing redacted versions of the works to maintain secrecy of the trade secrets therein:

| Title of Work | Date of Registration | Registration Number |
|---|---|---|
| 3c7.electron.app | January 20, 2022 | TXu 2-296-253 |
| angular.3C7 | January 21, 2022 | TXu 2-296-170 |
| api.3c7 | January 21, 2022 | TXu 2-296-351 |
| api.hsm | January 24, 2022 | TXu 2-296-843 |
| api.tax.valutbank.io | January 21, 2022 | TXu 2-296-526 |
| api.vaultbank.io | January 21, 2022 | TXu 2-296-400 |
| api.vbtoken.distribution | January 24, 2022 | TXu 2-296-769 |
| aws-handler-daily-dividends | January 21, 2022 | TXu 2-296-404 |
| bch.multisig.wallet | January 24, 2022 | TXu 2-296-858 |
| bitcoin.multisig.wallet | January 21, 2022 | TXu 2-296-412 |
| bsv.multisig.wallet | January 21, 2022 | TXu 2-297-513 |
| curv-wallet | January 21, 2022 | TXu 2-297-234 |
| hsm.nfc.handler | January 24, 2022 | TXu 2-296-836 |
| hsm.request.batcher | January 24, 2022 | TXu 2-296-771 |
| HSM-randomness-validator | January 24, 2022 | TXu 2-296-536 |

| | | |
|---|---|---|
| Investar | January 25, 2022 | TXu 2-296-846 |
| io.tokenvault.android | January 25, 2022 | TXu 2-296-734 |
| io.tokenvault.ios | January 21, 2022 | TXu 2-296-547 |
| litecoin.multisig.wallet | January 24, 2022 | TXu 2-296-825 |
| reporting-web-vaultbank | January 24, 2022 | TXu 2-297-008 |
| ripple_multisig_wallet | January 24, 2022 | TXu 2-297-056 |
| Stellar.ts | January 25, 2022 | TXu 2-296-848 |
| Stellar3C7.ts | January 25, 2022 | TXu 2-296-850 |
| usb-io | January 24, 2022 | TXu 2-297-032 |
| usb-switch | January 24, 2022 | TXu 2-296-819 |
| wallet.multisig.ethereum | January 24, 2022 | TXu 2-297-447 |
| api.onsa.com | February 7, 2022 | TXu 2-299-442 |
| api.tax.onsa.com | February 7, 2022 | TXu 2-299-447 |
| ios-application | February 7, 2022 | TXu 2-299-323 |
| onsa.account.report | February 7, 2022 | TXu 2-299-387 |
| onsa.com | February 7, 2022 | TXu 2-299-454 |
| onsa-account-service | February 7, 2022 | TXu 2-299-907 |
| onsa-android | February 7, 2022 | TXu 2-299-546 |
| onsa-common-lib | February 7, 2022 | TXu 2-299-399 |
| onsa-create-auth-challenge | February 7, 2022 | TXu 2-299-610 |
| onsa-custom-messages-lambda | February 7, 2022 | TXu 2-299-609 |
| onsa-daily-dividend-handler | February 7, 2022 | TXu 2-299-912 |
| onsa-daily-recon-handler | February 7, 2022 | TXu 2-299-394 |
| onsa-deeplink | February 7, 2022 | TXu 2-299-443 |
| onsa-define-auth-challenge | February 7, 2022 | TXu 2-299-766 |
| onsa-ios-app | February 7, 2022 | TXu 2-299-446 |

| | | |
|---|---|---|
| onsa-monthly-recon-handler | February 7, 2022 | TXu 2-299-780 |
| onsa-notification-service | February 7, 2022 | TXu 2-299-765 |
| onsa-orchestrator-service | February 7, 2022 | TXu 2-299-784 |
| onsa-verify-auth-challenge | February 7, 2022 | TXu 2-299-920 |
| onsa-web | February 7, 2022 | TXu 2-299-448 |
| onsa-webhooks-middleware | February 7, 2022 | TXu 2-299-917 |
| onsa-web-tv_code | February 7, 2022 | TXu 2-299-330 |

223.229.     These registrations generally relate to Onsa's platform for transacting tokenized financial assets via the Stellar blockchain.

224.230.     Franklin Resources, FT FinTech, and Franklin Templeton Companies had access to Plaintiff's original works as described in detail above, such as during due diligence prior to acquiring the controlling shares in Onsa. Reflecting this access, in September of 2019, Franklin Templeton created a "TokenVault Technical Review and Recommendations Sept 2019" document[45] detailing Franklin Templeton's review of key Onsa technology, addressing by name several of the code repositories listed in the table above, including io.tokenvault.android, 3c7.electron.app, api.3c7, api.hsm, and api.vaultbank.io. Additionally, on August 17, 2020, after all of Onsa's executive team was fired and the decision was made to wind down and liquidate Onsa, Mohn (interim CEO at the time) presented a business update with a slide entitled "HTEC and IP segregation/custody." The slide noted that code related to a tokenized money market fund that Onsa had engaged HTEC to write (covered in the above-referenced registrations) was ready for beta testing. The slide further addressed a "path forward," stating that "FT[Franklin Templeton]/HTEC" needed to reengage with a design team, indicating that, upon information and belief, Franklin Resources, FT FinTech, and Franklin Templeton Companies had continued access to Onsa's code.

225.231.     Franklin Resources, FT FinTech, and Franklin Templeton Companies have violated Plaintiff's exclusive right to reproduce and make copies of its copyrighted software by, upon information

---

[45] The document metadata indicates that it was authored by Franklin Templeton employee, Michael Muir.

and belief, copying and/or downloading copies of Plaintiff's software onto its computers or those of affiliated Franklin Templeton entities in violation of 17 U.S.C. § 106. In addition, Franklin Resources, FT FinTech, and Franklin Templeton Companies have also violated Plaintiff's right to control the distribution, creation of derivative works, and public display of its copyrighted works by, upon information and belief, downloading, copying, creating derivative works from, and/or distributing Plaintiff's software and/or derivative works of Plaintiff's software, such as to facilitate the proliferation of, for example, the FOCGX token.

226.232.    Upon information and belief, there are substantial similarities between the software utilized by Franklin Resources, FT FinTech, and Franklin Templeton Companies (or one of their affiliates) for proliferation of their tokenized financial assets and Plaintiff's copyrighted software. Franklin Resources', FT FinTech's, and Franklin Templeton Companies' software and Plaintiff's original works implement similar functionalities that likely would not exist absent copying of Plaintiff's software. For example, in Onsa's platform, a holder of a token would receive a daily dividend via the Stellar blockchain. This functionality was implemented via the aws-handler-daily-dividends repository, for which Plaintiff has obtained a copyright registration. Holders of FOCGX tokens also receive a daily dividend via Stellar. As another example, the asset authorization flags of the FOCGX token[46] imitate that found in Onsa's framework, e.g., the same flags are set to true and false. In yet another example, the FOCGX token includes several controlling keys with different weights assigned for different types of operations, and the original master key has a weight of zero—this again follows Onsa's architecture.[47]

227.233.    Upon information and belief, Franklin Resources, FT FinTech, and Franklin Templeton Companies have infringed both the literal elements (such as the code itself) as well as the non-literal elements (such as the structure, sequence, organization, operational modules, user interface, etc.) of Plaintiff's copyrighted works.

---

[46] *See https://lumenscan.io/assets/FOCGX-GBHNGLLIE3KWGKCHIKMHJ5HVZHYIK7WTBE4QF5PLAKL4CJGSEU7HZIW5*

[47] *See* https://lumenscan.io/account/GBHNGLLIE3KWGKCHIKMHJ5HVZHYIK7WTBE4QF5PLAKL4CJGSEU7HZIW5#signer

228.234.     Franklin Resources, FT FinTech, and Franklin Templeton Companies were not authorized to copy, download, reproduce, create derivative works from, distribute, or publicly display Plaintiff's copyrighted software except in connection with Franklin Templeton's due diligence prior to investment in Onsa as specified above. Franklin Resources', FT FinTech's, and Franklin Templeton Companies' copying and/or use of Plaintiff's copyrighted works exceeds this authorization.

229.235.     For example, the NDA expressly required Franklin Resources, FT FinTech, and Franklin Templeton Companies to only view Onsa's code for due diligence purposes and to further give written notice that such code was thereafter deleted—no such notice was ever provided. Upon information and belief, Franklin Resources, FT FinTech, and Franklin Templeton Companies maintained and continue to maintain unauthorized copies of Plaintiff's copyrighted works on their computers or computers of affiliated Franklin Templeton entities, thereby infringing Plaintiff's copyrights.

230.236.     Upon information and belief, Franklin Resources, FT FinTech, and Franklin Templeton Companies, or one of their affiliates, further used and/or continue to use copies of Plaintiff's copyrighted works in the development of derivative computer code related to tokenized financial assets. For example, the GitHub repositories housing Onsa's code reflect activity by HTEC into September 2020, nearly three months after Onsa was already on the path of winding down. Upon information and belief, such activity was at the ultimate behest of Franklin Resources, FT FinTech, and Franklin Templeton Companies.

231.237.     Franklin Resources, FT FinTech, and Franklin Templeton Companies knew or should have known that their copying, distributing, publicly displaying, and creating derivative works from Plaintiff's copyrighted software infringed Plaintiff's copyrights in those materials.

232.238.     Plaintiff is entitled to damages in an amount to be proven at trial, including profits attributable to the infringement not taken into account in computing actual damages under 17 U.S.C. § 504.

233.239.     Franklin Resources', FT FinTech's, and Franklin Templeton Companies' infringement of Plaintiff's copyrights has also caused Plaintiff irreparable injury. Unless restrained and enjoined, they will continue to commit such acts. Plaintiff's remedy at law is not adequate to compensate it for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief as

1   provided by 17 U.S.C. § 502, and an order impounding or destroying any and all infringing materials

2   pursuant to 17 U.S.C. § 503.

3   ## COUNT IV

4   **(Aiding and Abetting Breaches of Fiduciary Duty Against Jennifer Johnson)**

5   ~~234.~~240.      FT FinTech, Franklin Resources, and Bayston all owed fiduciary duties to Onsa.

6   ~~235.~~241.      Johnson is the CEO of Franklin Templeton who was intimately involved from the

7   beginning with matters relating to Onsa and aided and abetted the breaches of fiduciary duty committed by

8   FT FinTech, Franklin Resources, and Bayston, which fiduciary breaches are described above and

9   incorporated herein by reference.

10   ~~236.~~242.      Based upon her personal involvement in matters pertaining to Franklin Templeton's

11   tokenization efforts, in general, and her personal involvement in matters pertaining to Onsa, in particular,

12   Johnson was aware of or had knowledge of the breaches of fiduciary duty committed by FT FinTech,

13   Franklin Resources, and Bayston.

14   ~~237.~~243.      Johnson knowingly participated in and provided substantial assistance to FT

15   FinTech, Franklin Resources, and Bayston in their breaches of fiduciary duties, which assistance was a

16   substantial factor in the harm suffered by Onsa.

17   ~~238.~~244.      Johnson knew Trombley from other business dealings, including Franklin

18   Templeton's 2018 acquisition of RFC that Trombley had co-founded. In a short span of time, Johnson had

19   a sea change in thinking from her expressed belief in 2018 that "Blockchain will be my grandkids'

20   problem" to a sudden realization that blockchain technology was an immediate and significant problem for

21   Franklin Templeton and that Franklin Templeton once again found itself lagging far behind its competitors

22   in this new technology.

23   ~~239.~~245.      Thus, Johnson decided that the best way for Franklin Templeton to play catch up

24   was to do a deal with Trombley and invest in Onsa. From the outset, Johnson was involved in numerous

25   meetings with Trombley and others relating to Onsa and was integral to putting together the original

26   transaction in which Trombley, who controlled 100 percent of Onsa's voting stock, sold that stock to FT

27   FinTech.

28

240.246.	Johnson personally assured Trombley and others that Onsa would function as an independent company and have an independent board of directors, including at least one director affiliated with Onsa's founders. But that never happened. Had there been an independent Onsa board, as Johnson had promised, that would have prevented Franklin Templeton from committing the wrongdoing alleged herein, culminating in the ultimate act of wrongdoing in destroying Onsa via the ABC liquidation process.

241.247.	While Onsa required a broker-dealer to operate its business and had an agreement in principle to acquire one, Johnson misrepresented that Onsa's efforts to acquire a broker-dealer were not necessary because Franklin Templeton already had a broker-dealer that could be transferred to Onsa. But despite Johnson's assurances, Franklin Templeton failed to transfer a broker-dealer to Onsa.

242.248.	Pre-investment, Johnson also assured Trombley and others that Onsa would be allowed to seek out customers beyond Franklin Templeton. But post-investment, Franklin Templeton shut down these efforts.

243.249.	Post-investment, Johnson continued to stay actively involved in the management of Onsa and met regularly with Trombley and other Onsa representatives to discuss various aspects of Onsa's technology and Franklin Templeton's supposed plans to integrate its operations with Onsa's technology. She also had regular and direct communications with Onsa's CEO concerning Onsa's operations.

244.250.	Finally, Johnson not only approved, but was directly involved with, the decision to liquidate Onsa via the ABC—the ultimate breach of fiduciary duty. For example, on July 8, 2020, Johnson sent a "Privileged & Confidential" email to various Franklin Templeton executives, including Bayston, to set up a conference call to discuss "*issues around TokenVault and coordinating next steps*." After realizing that she mistakenly included Bashir, Onsa's CEO, on this email, she replied to Bashir by telling him that "it is best that" Onsa not be present on the call notwithstanding that the very purpose of the call was to discuss "issues around [Onsa] and coordinating next steps." Of course, unbeknownst to Bashir, or anyone not affiliated with Franklin Templeton, is that Johnson did not want Onsa's senior management to know that Johnson and other Franklin Templeton executives were plotting Onsa's demise.

245.251.    As a result, Onsa has been damaged and Plaintiff is entitled to recover all of Onsa's damages resulting from Johnson having aided and abetted the breaches of fiduciary duties of FT FinTech, Franklin Resources, and Bayston, including exemplary or punitive damages.

**COUNT V**

**(Breach of Contract against Franklin Resources, FT FinTech, and Franklin Templeton Companies)**

246.252.    The NDA was entered into between TokenVault Limited, together with its affiliates and their respective successors, which includes Onsa and Plaintiff, on the one hand, and Franklin Templeton Companies, for itself and on behalf of a group of affiliated businesses including Franklin Resources and its subsidiaries, partnerships, joint ventures and related and affiliated business entities (which includes FT FinTech) on the other hand. The NDA is a valid and enforceable contract that imposes non-disclosure and non-use obligations on Franklin Resources, FT FinTech, Franklin Templeton Companies, and their subsidiaries and affiliates regarding confidential information of TokenVault Limited and its affiliates and respective successors, which include Onsa and Plaintiff.  *See* Exhibit D.

247.253.    Franklin Resources, FT FinTech, Franklin Templeton Companies and/or their subsidiaries and affiliates, including their counsel, had knowledge of, and approved, the terms of the NDA. These terms expressly state that the NDA was entered into on their behalf, and bound them, to the NDA's non-disclosure and non-use obligations.

248.254.    The NDA was validly assigned from TokenVault Limited to Onsa pursuant to the August 2019 APA, from Onsa to BLKCHN pursuant to the ABC, and from BLKCHN to Plaintiff pursuant to an assignment agreement. *See* Exhibits B, C, and D.

249.255.    These assignments were in accordance with the NDA. Franklin Resources, FT FinTech, Franklin Templeton Companies, and their subsidiaries and affiliates consented to these assignments. Franklin Resources, FT FinTech, Franklin Templeton Companies, and their subsidiaries and affiliates, including their counsel, assisted in the preparation of the August 2019 APA, and consented to its terms. Franklin Resources, FT FinTech, Franklin Templeton Companies, and their subsidiaries and affiliates also consented to the ABC assignment from Onsa to BLKCHN. The ABC assignment expressly,

1    or implicitly, contemplates subsequent assignments by BLKCHN, including the assignment from

2    BLKCHN to Plaintiff.

3        250.256.        Franklin Resources, FT FinTech, Franklin Templeton Companies, and their

4    subsidiaries and affiliates are bound by the terms of the NDA. The NDA states that "[a]ll of the terms of

5    and provisions contained [in the NDA] shall inure to the benefit of and shall be binding upon the parties

6    hereto and their respective heirs, successors and assigns."  Plaintiff is a successor of TokenVault Limited.

7        251.257.        Plaintiff is assignee of the NDA and confidential information that is subject to the

8    NDA.

9        252.258.        Franklin Resources, FT FinTech, Franklin Templeton Companies, and/or their

10   subsidiaries and affiliates are bound by the terms of the NDA, including its obligations regarding the

11   nondisclosure and nonuse of confidential information of TokenVault Limited and Onsa, regardless of

12   whether the NDA's provision concerning its assignment was strictly complied with.  A lack of written

13   approval regarding assignment of the NDA does not relieve Franklin Resources, FT FinTech, Franklin

14   Templeton Companies, and/or their subsidiaries and affiliates from their obligations under the NDA,

15   including limitations on the non-use of confidential information.

16       253.259.        Franklin Resources, FT FinTech, Franklin Templeton Companies, and/or their

17   subsidiaries and affiliates represented to TokenVault Limited and Onsa that they would treat TokenVault

18   Limited and Onsa's information confidential in a manner consistent with the NDA, and made similar

19   representations through their representatives and agents. TokenVault Limited and Onsa relied on these

20   representations in sharing their confidential information with Franklin Resources, FT FinTech, and

21   Franklin Templeton Companies.

22       254.260.        Plaintiff is the assignee of TokenVault Limited's and Onsa's legal claims, including

23   claims for breach of the NDA, by virtue of assignment of said claims from TokenVault Limited to

24   TokenVault, Inc. / Onsa via the October 2019 APA, assignment of said claims from Onsa to BLKCHN via

25   the ABC assignment, and assignment of said claims from BLKCHN to Plaintiff.  *See* Exhibits B, C, and

26   D.

27

28

255.261.    TokenVault Limited, Onsa, and Plaintiff performed their duties and met their obligations with respect to the NDA.

256.262.    Franklin Resources, FT FinTech, Franklin Templeton Companies, and/or their subsidiaries and affiliates failed to perform their duties and meet their obligations with respect to the NDA and materially breached the contract.

257.263.    TokenVault Limited, Onsa, and Plaintiff were damaged by Franklin Resources', FT FinTech's, Franklin Templeton Companies' and/or their subsidiaries' and affiliates' breach of the NDA.

258.264.    Upon information and belief, Franklin Resources, FT FinTech, Franklin Templeton Companies, and/or their subsidiaries and affiliates continue to retain, access, and use TokenVault and Onsa confidential information in violation of the NDA. Additionally, Franklin Resources, FT FinTech, Franklin Templeton Companies, and/or their subsidiaries and affiliates have failed to provide Plaintiff with confirmation of deletion of Plaintiff's source code in violation of the agreement.

## COUNT V

### (Injunctive Relief Against Franklin Resources and FT FinTech and Those in Active Concert with Them)

259.265.    Plaintiff seeks injunctive relief to prevent Franklin Resources, FT FinTech, Franklin Templeton Companies, and all those in active concert with them from accessing, distributing, and/or using Onsa's copyrighted code, trade secrets, and/or confidential information precluding Franklin Resources, FT FinTech, Franklin Templeton Companies, and all those in active concert with them from proceeding with the tokenized money market fund and other tokenized assets and/or blockchain-related financial assets using the technology developed by Onsa. On information and belief, Franklin Resources, FT FinTech, Franklin Templeton Companies, or other Franklin Templeton affiliates intend to make imminent and/or continued use of Plaintiff's copyrighted works, trade secrets, and/or confidential information, such that Plaintiff will suffer irreparable harm in the absence of injunctive relief precluding Franklin Resources, FT FinTech, Franklin Templeton Companies, and all those in active concert with them from proceeding with the tokenized money market fund and other tokenized assets and/or blockchain-related financial assets using the technology developed by Onsa.

260.266.    Additionally, Franklin Resources, FT FinTech, Franklin Templeton Companies, and all those in active concert with them should be enjoined from proceeding with the tokenized money market fund and other tokenized assets and/or blockchain-related financial assets using the technology developed by Onsa due to the aforementioned breaches of fiduciary duties by Franklin Resources, FT FinTech, and Bayston, including their ultimate breach and act of betrayal in winding down and liquidating Onsa via the ABC proceeding, which was aided and abetted by Johnson.

261.267.    The balance of equities favors such an injunction, as a comparison of the interests of the parties reveals irreparable harm to Plaintiff, and it would be inequitable to allow while Franklin Resources, FT FinTech, Franklin Templeton Companies, and any other Franklin Templeton affiliate to use Onsa's trade secrets, copyrights, and/or confidential information in the conduct of their business. As such, enjoining Franklin Resources, FT FinTech, and Franklin Templeton Companies is also in the public interest.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby requests a trial by jury on all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief in its favor, and against Defendants, as follows:

A.    Awarding Plaintiff damages against all Defendants, jointly and severally, including the value that Onsa would have been worth but for Defendants' willful destruction of Onsa which is likely in the *billions* of dollars based upon the market value of other comparable companies to Onsa or other metrics;

B.    Awarding Plaintiff damages including the profits generated by Defendants and their fiduciaries, aiders and abettors, and their affiliates as a result of the breaches of fiduciary duty and the lost opportunities to monetize Onsa's value due to Defendants' wrongdoing;

C.    Awarding Plaintiff restitution and ordering disgorgement of all illicit profits, benefits, unjust enrichment, and other compensation wrongfully obtained as a result of Defendants' actions alleged herein;

D.    Awarding Plaintiff exemplary or punitive damages against Defendants;

1    E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

2  attorneys' and experts' fees and expenses;

3    F.    Awarding Plaintiff pre-judgment and post-judgment interest;

4    G.    Enjoining Franklin Resources, FT FinTech, Franklin Templeton Companies, and all those

5  in active concert with them from accessing, distributing, and/or using Onsa's confidential information,

6  trade secrets, and copyrights and precluding them from proceeding with the tokenized money market fund

7  (which, on information and belief, involves the FOCGX token) and other tokenized assets and/or

8  blockchain-related financial assets using the technology developed by Onsa;

9    H.    Enjoining Franklin Resources, FT FinTech, Franklin Templeton Companies, and all those

10  in active concert with them from distributing, trading, creating, or otherwise commercializing its "Benji"

11  mobile application and/or web platform;

12    I.    Enjoining Franklin Resources, FT FinTech, Franklin Templeton Companies and all those

13  in active concert with them from accessing, distributing, or using Onsa's confidential information, trade

14  secrets and copyrights in any other manner; and

15    J.    Granting such other and further relief as this Court deems just and proper.

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: ~~February 14,2022~~December 29, 2023                    Respectfully submitted,

~~/s/ Jeffrey D. McFarland~~
~~Jeffery D. McFarland~~

/s/_____
Patricia L. Peden
California Bar No. ~~157628~~206440
~~jmcfarland@mckoolsmithhennigan.com~~
~~MCKOOL SMITH HENNIGAN P.C.~~
~~300 South Grand Avenue~~ppeden@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite ~~2900~~900
~~Los Angeles, California 90071~~
Oakland, CA 94612-3501
Telephone: ~~(213) 694-1010~~ 510.273.8780
~~Fax: (213) 694-1234~~
Facsimile: 510.839.9104

Gary Cruciani (Admitted *Pro Hac Vice*)
Texas Bar No. 05177300
Lew LeClair
California Bar No. 77136
gcruciani@mckoolsmith.com
lleclair@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000

Brent N. Bumgardner (Admitted *Pro Hac Vice*)
Texas Bar No. 00795272
Christopher G. Granaghan (Admitted *Pro Hac Vice*)
Texas Bar No. 24078585
Carder W. Brooks (Admitted *Pro Hac Vice*)
Texas Bar No. 24105536
brent@nelbum.com
chris@nelbum.com
carder@nelbum.com
NELSON BUMGARDNER CONROY P.C.
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Telephone: (817) 377-9111

Patrick J. Conroy (Admitted *Pro Hac Vice*)
Texas Bar No. 24012448
pat@nelbum.com
NELSON BUMGARDNER CONROY P.C.
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201
Telephone: (214) 446-4954

**Attorneys for Plaintiff**

**BLOCKCHAIN INNOVATION, LLC**