UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLOCKCHAIN INNOVATION, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FRANKLIN RESOURCES, INC., et al.,<br><br>Defendants. | Case No. 21-cv-08787-TSH<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (PUBLIC VERSION OF ECF NO. 391)**<br><br>Re: Dkt. Nos. 275, 307 |

## I.    INTRODUCTION

Pending before the Court is a motion for summary judgment brought by Defendants Franklin Resources, Inc. d/b/a Franklin Templeton ("FRI"), FT FinTech Holdings, LLC ("FT FinTech"), Franklin Templeton Companies, LLC ("FT Companies"), Jennifer Johnson and Roger Bayston. ECF Nos. 275; 276-2.[1]  Plaintiff Blockchain Innovation, LLC ("Plaintiff" or "Blockchain") filed an Opposition and Cross-Motion for Partial Summary Judgment (ECF Nos. 307; 311-9) ("Opp'n & Cross-Mot.").  Defendants filed a Reply In Support of Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion (ECF Nos. 334, 335-2) ("Defs.' Opp'n & Reply") and Plaintiff filed a Reply in support of its cross-motion (ECF Nos. 352; 357-2) ("Pl.'s Reply").  The Court held a hearing on November 4, 2024 and now issues this order.  For

---

[1] For precision's sake, citations herein are to the unredacted versions of Defendants' motion, Plaintiff's opposition and cross-motion, Defendants' opposition and reply, and Plaintiff's reply (ECF Nos. 276-2; 311-9; 335-2; and 357-2) and the parties' declarations and exhibits in support of their respective motions, which were filed under seal.  Most sections of these documents cited within this order can be found in redacted versions the parties filed on the public docket.  *See* ECF Nos. 275 (Defendants' redacted Mot. for Summ. J.); 307 (Plaintiff's opposition and cross-motion); 334 (Defendants' reply and opposition); 352 (Plaintiff's reply).

1   the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Defendants'

2   Motion and **GRANTS IN PART AND DENIES IN PART** Plaintiff's Cross-Motion.[2]

3                               **II.    BACKGROUND**

4           Blockchain is a Delaware limited liability company.  Third Amended Complaint ("TAC")

5   ¶ 51, ECF No. 246.  Defendant FRI is an asset management company incorporated in Delaware

6   and is the controlling shareholder of Defendant FT FinTech.  TAC ¶ 52.  Defendants FT FinTech

7   and FT Companies are Delaware limited liability companies.  TAC ¶¶ 53, 54.  Defendant Jennifer

8   Johnson is the President and Chief Executive Officer (CEO) of FRI.  TAC ¶ 55.  Defendant Roger

9   Bayston is a longstanding executive at FRI.  TAC ¶ 56.

10          Onsa was a startup company that "developed . . . blockchain technology to tokenize

11  financial assets."  TAC ¶ 2.  On October 28, 2019, Defendant FT FinTech invested in Onsa – then

12  called TokenVault, Inc. – through a stock purchase agreement ("SPA").  TAC ¶ 4; *see* Defs.' Ex.

13  39 (SPA).  Under the terms of the SPA, FT FinTech paid $5.5 million to Onsa and $1 million to its

14  founder, Austin Trombley, in exchange for 100% of Onsa's voting shares and roughly a quarter of

15  Onsa's non-voting shares.  SPA §§ 1.1(b), 1.1(e)(i); TAC ¶ 96.  The SPA provided that Onsa's

16  board would be "initially comprised" of Bayston as Onsa's sole board member.  SPA § 9.5; *see*

17  TAC ¶ 4.  Under the terms of the SPA, Bayston was appointed as interim president, interim

18  secretary, interim treasurer, and interim Chief Executive Officer.  SPA § 9.6.  The SPA established

19  certain milestones for Onsa to reach, upon which FT FinTech would make additional payments of

20  $1 million to Mr. Trombley and $2.5 million to Onsa and purchase additional shares of non-voting

21  Onsa stock (Schedule A milestones), plus additional payments if Onsa met the Schedule B

22  milestones.  TAC ¶ 198; SPA §§ 1.1(e)(ii), 1.1(e)(iii), 1.1(f).

23          In July 2020, Bayston allegedly terminated Onsa's then-CEO and "all other significant

24  employees" and ceased all Onsa business operations with Johnson's knowledge and approval.

25  TAC ¶ 7.  Plaintiff alleges that at the time, Onsa was on its way to reaching the first milestone,

26  which would trigger a $1 million payment to Mr. Trombley and a capital infusion of $2.5 million

27

28  ───────────────
    [2] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos.
    322, 323, 324.

United States District Court
Northern District of California

by FT FinTech to Onsa.  TAC ¶¶ 173, 198; SPA §§ 1.1(e)(ii), 1.1(f)(1).  In November 2020, Onsa's board of directors, which consisted solely of Bayston, voted to approve an assignment for the benefit of creditors ("ABC"), which transferred all of Onsa's assets to a liquidator called BLKCHN, LLC.  Onsa's assets included its intellectual property and legal claims.  TAC ¶ 10.

In October 2020, Franklin Templeton "began a multi-phase development effort including code development, internal product launch and review, scale testing and benchmarking, internal usage testing, and expansion" to develop its own blockchain technology.  Defs.' Mot. at 11; *see generally* Defs.' Ex. No. 78 (October 2, 2020 email and attached presentation of development plan).  In April 2021, FT FinTech launched the "Benji" app and Franklin OnChain U.S. Government Money Fund.  Defs.' Ex. 80.  The Franklin OnChain U.S. Government Money Fund was "the first U.S.-registered mutual fund to use a public blockchain to process transactions and record share ownership."  Defs.' Ex. 95.

In August 2021, Plaintiff Blockchain purchased all of Onsa's assets, including any causes of action Onsa had, from BLKCHN through an asset purchase agreement ("August 2021 APA"). TAC ¶ 12; Defs.' Ex. 40.

Blockchain filed this case in this Court on November 12, 2021, and filed the operative TAC on July 22, 2024.  ECF Nos. 1, 246.  In its TAC, Plaintiff alleges claims against FT Defendants for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b), and for breach of contract; against Roger Bayston, FT FinTech, and FRI for breach of fiduciary duty; and against Defendant Johnson for aiding and abetting the other defendants' alleged breaches of fiduciary duty.  TAC ¶ 64.  Defendants filed answers to the TAC on August 5, 2024.  ECF Nos. 250, 253.  None of the Defendants have asserted any counterclaims or crossclaims.  *See generally* ECF Nos. 250, 253.  Fact discovery closed on May 31, 2024, and expert discovery closed on August 2, 2024.  ECF No. 210.

On August 19, 2024, Defendants brought the instant motion, seeking summary judgment on all of Plaintiff's claims.  *See* Mot. at ii.  On September 9, Plaintiff filed its Opposition and Cross-Motion for Partial Summary Judgment.  In its cross-motion, Plaintiff asks the Court to grant partial summary judgment in favor of Blockchain on three issues: (1) that Defendant Bayston is

1  not entitled to the presumption of the business judgment rule, (2) that Defendants do not own any

2  of the alleged trade secrets that are the subject of Plaintiff's DTSA claim, and (3) that Defendants

3  are not entitled to several affirmative defenses provided in their answers to the TAC.  Opp'n &

4  Cross-Mot. at ii.

5              ## III.   LEGAL STANDARD

6              Summary judgment is proper where there is "no genuine dispute as to any material fact and

7  the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving

8  for summary judgment bears the initial burden of identifying those portions of the pleadings,

9  discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

10 *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome

11 of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a

12 reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477

13 U.S. 242, 248 (1986).

14             If the moving party meets its initial burden, the opposing party must then set forth specific

15 facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S.

16 at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving

17 party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the

18 task of the Court "'to scour the record in search of a genuine issue of triable fact.'  *Keenan v.*

19 *Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to identify with

20 reasonable particularity the evidence that precludes summary judgment."  *Id.*; *Cafasso, U.S. ex rel.*

21 *v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (The nonmoving party "must

22 set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.")

23 (citations omitted).  Thus, "[t]he district court need not examine the entire file for evidence

24 establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with

25 adequate references so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*,

26 237 F.3d 1026, 1031 (9th Cir. 2001); *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626

27 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.")

28 (citations omitted).

United States District Court
Northern District of California

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")).  If the nonmoving party fails to identify such evidence, or if it offers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted).

## IV.    DISCUSSION

**A.    Defendants' Motion for Summary Judgment**

**1.    FT Defendants – Defend Trade Secrets Act Claims**

FRI, FT FinTech, and FT Companies (the "FT Defendants") seek summary judgment on Plaintiff's claim for violations of the Federal Defend Trade Secrets Act ("DTSA").  Mot. at 12–17.

### a.    Whether the ATS Qualify As Trade Secrets

The DTSA defines a trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3).  "[A] plaintiff[] must identify the trade secrets and carry the burden of showing they exist."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020) (quotation omitted).  "The plaintiff 'should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'"  *Id.* (quoting *Imax Corp. v. Cinema Techs.*, Inc., 152 F.3d 1161, 1164 (9th Cir. 1998)).

United States District Court
Northern District of California

Defendants maintain Plaintiff cannot demonstrate that the alleged trade secrets ("ATS") qualify as legally protectable trade secrets because Plaintiff has no evidence that the ATS were not generally known or that the ATS derived value from not being generally known. Mot. at 12–15.

### i.      Declaration of Austin Trombley

Plaintiff submitted a declaration from Austin Trombley (ECF No. 312-2) in support of its opposition to Defendants' Motion. Plaintiff relies on Mr. Trombley's declaration to support its assertion that the ATS were not generally known and derived value from not being generally known. Mr. Trombley's declaration expands upon Plaintiff's disclosures in discovery, describing the work that went into creating the ATS. Trombley Decl. ¶¶ 25–56, ECF No. 312-2. The Trombley declaration also includes a table that explains in broad strokes the function of each ATS and sets forth how a person with knowledge of each ATS could use that knowledge. Trombley Decl. ¶ 57.

Defendants object to Mr. Trombley's declaration, arguing that it should be struck as an untimely supplemental expert report. Defs.' Reply at 2. In ECF No. 369, the Court found Plaintiff had failed to establish Mr. Trombley's qualifications to testify as an expert and excluded Mr. Trombley from testifying as an expert. ECF No. 369 at 21. However, the Court finds Mr. Trombley's instant declaration is based on his personal knowledge and experience as a percipient witness who helped to develop the ATS, rather than on any purported qualifications as an expert. *See, e.g.*, Trombley Decl. ¶¶ 19, 20, 33, 35, 37, 40. *See* Defs.' Ex. 31 at 117–34. The Court thus finds Mr. Trombley's declaration offers fact, rather than expert, testimony. Therefore, his declaration did not need to comply with the deadline for an expert report. Accordingly, the Court **OVERRULES** Defendants' objection to his testimony.

### ii.      Whether the ATS were "not generally known"

Plaintiff has produced evidence that the ATS were not generally known. Mr. Trombley's declaration establishes that at least some of the ATS were not generally known within the industry or readily ascertainable. *See, e.g.*, Trombley Decl. ¶¶ 28, 31, 33 ("I am not aware of any other company in the industry at the time that had put together such a key configuration . . . [T]o this day, I have not seen any SEC-compliant tokenized financial asset that uses a similar key

6

configuration, apart from Franklin."), 35 ("I am not aware of any other company in the industry at the time that had put together such an approach for handling lost wallet keys"), 37. The Court finds these elements of Mr. Trombley's declaration go beyond mere "conclusory statements of uniqueness." *See* Defs.' Reply at 4. Mr. Trombley's declaration also discusses the efforts taken to maintain secrecy of the ATS. *See* Trombley Decl. ¶¶ 38, 46, 51.

Defendants contend that expert testimony is required to establish that the ATS were not generally known, and Plaintiff has not provided any expert testimony that speaks directly to that issue. But while the burden is on the plaintiff to establish that an alleged trade secret is in fact a trade secret, expert testimony is not necessarily required to create a triable issue. *See InteliClear*, 978 F.3d at 658-60 (relying on declaration from company officer and software system architect submitted in opposition to motion for summary judgment "expand[ing] upon the initial definition [of its ATS] and describ[ing] specific features of the InteliClear System as trade secrets.").

Viewing the facts in the light most favorable to Plaintiff, the Court finds a reasonable jury could find that [the ATS] are not "generally known" or "readily ascertainable" to others. 18 U.S.C. § 1839(3).

### iii.    Whether the ATS Derive Economic Value from their Secrecy

"To have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (quoting *Calendar Research LLC v. StubHub, Inc.*, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017)). "A plaintiff may show independent economic value 'by circumstantial evidence of the resources invested in producing the information, the precautions taken to protect its secrecy, and the willingness of others to pay for its access.'" *Cisco Sys., Inc.*, 462 F. Supp. 3d at 1052 (quoting *Calendar Rsch. LLC*, 2017 WL 10378336, at *3). "The standard to show that trade secrets derive [independent] economic value is not a high standard." *Id.* (quoting *Calendar Rsch. LLC*, 2017 WL 10378336, at *4).

Plaintiff has shown that the ATS derived value from not being generally known. Plaintiff has produced evidence of the time and resources invested in creating the ATS and of the steps Onsa took to maintain their secrecy. *See, e.g.*, Pl.'s Exs. 137 at 263:14–264:8 (deposition

United States District Court
Northern District of California

testimony estimating expenditures on research and development related to the ATS); 183 ¶¶ 452–61 (expert declaration describing timeline of ATS creation and noting maintenance of ATS on Git repositories that were managed on private account); Trombley Decl. ¶¶ 38, 46, 51 (describing steps to maintain confidentiality of the ATS), ¶ 57 (describing how a person with knowledge of each ATS could use that knowledge). Defendants maintain that Plaintiff's description of these efforts fails to create a triable issue because the ATS were generally known to begin with. Reply at 5. As discussed above, the Court finds Plaintiff has satisfied its burden of demonstrating that the ATS were not generally known. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could thus find that [the ATS] derive value from "not being generally known" or "readily ascertainable[.]" 18 U.S.C. § 1839(3).[3] Accordingly, the Court finds Plaintiff has satisfied its burden at the summary judgment stage to show that the ATS are protectable trade secrets.

### b.   Ownership of the ATS

Defendants contend that Plaintiff cannot prove it owns any ATS and that Franklin owns all ATS through Austin Trombley. Defs.' Mot. at 15–17. Plaintiff cross-moves that Defendants do not own any of the ATS. Opp'n & Cross-Mot. at 35.

Plaintiff asserts that all ATS were conceived between March 2018 and April 2020. Defs.' Ex. 31 at 117–34. Plaintiff attributes the conception of each of these ATS at least in part to Austin Trombley. *Id.* Defendants argue that during that period in which the ATS were created, Mr. Trombley was employed exclusively by Franklin. Defendants contend Franklin therefore owns all ATS because Mr. Trombley entered into an intellectual property agreement with Franklin in March 2018, which Defendants contend automatically assigned Franklin all IP Mr. Trombley created. Defendants further contend Franklin owns all the ATS because Atul Patil, who Plaintiff identifies as having helped to create the ATS, did not have any ownership rights in the ATS and

---

[3] Defendants also argue that Plaintiff has not produced any evidence contradicting Defendants' expert opinions that the ATS did not derive value from being secret. However, the Court granted Plaintiff's motion to exclude these expert opinions. ECF Nos. 364, 369 (excluding testimony of Dr. Seoyoung Kim in its entirety and of Dr. Stephen Melvin to the extent Dr. Melvin's testimony expresses opinions regarding the existence of trade secrets).

did not transfer any ownership rights that may have existed to Plaintiff.  Defs.' Mot. at 16–17.

### i.     Waiver of Ownership Argument

Plaintiff argues that FT Defendants waived the argument that Franklin owns the ATS by failing to timely disclose this theory during discovery.  The Court agrees.  Federal Rule of Civil Procedure 26(e) requires a party to supplement or correct its response to an interrogatory or disclosure under Rule 26(a) "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]"  Fed. R. Civ. P. 26(e)(1)(A).

Plaintiff served its first set of interrogatories on FT Defendants on May 5, 2023.  Pl.'s Ex. 175.  There, Plaintiff asked FT Defendants to "Describe in detail Your contention that Onsa did not own Onsa's Technology (including . . . Onsa's Trade Secrets . . .), including in Your description an explanation of who You contend owns Onsa's Technology and why" and to "Describe in detail Your contention, if any, that Franklin has any rights with respect to . . . Onsa's Trade Secrets . . ."  Pl.'s Ex. 175, Rogs 7 and 8.  FT Defendants did not claim ownership of the ATS in their responses to these interrogatories.  *See* Pl.'s Ex. 177 at 19–22.

Plaintiff served its second set of interrogatories on FT Defendants on March 19, 2024.  Pl.'s Ex. 176.  There, Plaintiff asked:

> For each trade secret Plaintiff identified in response to the FT Defendants' Interrogatory No. 1 (i.e., on a trade-secret-by-trade-secret basis), describe Your contention, if any, that Plaintiff does not own or have the right to assert misappropriation of such trade secret, including in Your response an Identification of any Documents supporting Your responses.

Pl.'s Ex. 176 at 5, Interrogatory 19.  On May 31, 2024, in their first set of supplemental responses to this interrogatory, FT Defendants responded: "Because Plaintiff has failed to sufficiently identify or explain its ownership of the alleged trade secrets, the FT Defendants cannot respond to this interrogatory."  Pl.'s Ex. 178 at 16–17.  On July 1, 2024, FT Defendants provided their second supplemental response to this interrogatory, asserting for the first time that all the trade secrets were owned by Franklin because Mr. Trombley was a Franklin employee when he allegedly

conceived the ATS.  Pl.'s Ex. 179 at 16–22.

Fact discovery closed on May 31, 2024, and expert discovery closed on August 2.  ECF No. 210.  The deadline for initial expert disclosures and reports was June 14, 2024, and the deadline for rebuttal expert disclosures and reports was July 12, 2024.  *Id.*  Trombley was deposed as a corporate representative of Blockchain on May 9, 2024, and Patil was deposed on May 23, 2024.  *See* Defs.' Exs. 1 at 1; 16 at 1.  FT Defendants contend that they timely raised their ownership theory in response to new information gleaned from the Trombley and Patil depositions.  However, Defendants did not raise the argument that FT asserted ownership over the ATS in their May 31 response to Interrogatory No. 19 and instead disclosed the theory on July 1, 2024.  Defs.' Reply at 5–6; *see* Pl.'s Ex. 179 at 17–18 (Defs.' Second Supp. Responses to Plaintiff's Second Set of Interrogatories).  Nor do Defendants show that the contention that FT owned the ATS was "otherwise . . . made known to the other parties during the discovery process or in writing[.]"  Fed. R. Civ. P. 26(e)(1)(A).

The Court thus finds Defendants' disclosure of its theory that FT owned the ATS is untimely.  This belated supplementation was neither substantially justified nor harmless.  *See* Fed. R. Civ. Proc. 37(c)(1).  Defendants offer no legitimate reason for this belated supplementation.  Further, it was harmful, as it prevented Plaintiff from being able to pursue the issue in discovery.  In their reply, FT Defendants assert that they first argued that Plaintiff does not own the ATS in 2022 in their motion to dismiss.  Reply at 5.  But the fact that Defendants previously raised a different challenge to Plaintiff's ownership of the ATS does not save their new theory.  FT Defendants did not assert ownership over the ATS in their motion to dismiss; rather, they argued that Plaintiff lacked standing to bring "trade secrets . . . claims premised on the work of Tokentech India[.]"  Defs.' Mot. to Dismiss at 6, ECF No. 57 (unredacted version at ECF 60-3).  Defendants' previous ownership argument was one of standing.  In contrast, the theory they now advance – that any work created by Austin Trombley for Onsa automatically belongs to FT Defendants – would absolve Defendants of any misappropriation claims regardless of whether Franklin used the ATS in creating its "Benji" application.

FT Defendants' failure to disclose this argument until over a month after fact discovery

had closed is thus highly prejudicial to Plaintiff.  Accordingly, the Court finds that Rule 37(c)(1) bars FT Defendants from asserting ownership over the ATS.

### ii.    Genuine Dispute as to Material Facts Regarding Ownership

Even if Defendants' ownership argument were not waived, there is genuine dispute as to multiple facts that underpin FT Defendants' ownership argument.  First, Defendants conclude that all ATS were exclusively created by Mr. Trombley and that Plaintiff does not own any ATS through Atul Patil, whom Plaintiff credits as a co-creator of the ATS and who transferred certain software "artifacts" to Barefoot Capital, LLC, pursuant to a September 2020 software transfer agreement ("STA").[4]  Defs.' Exs. 31 at 117–34 (trade secret disclosures); 41 (STA).  In support of this argument, Defendants point to Patil's deposition testimony that he never claimed ownership of the ATS and argue that in any event, the artifacts transferred pursuant to the September 2020 STA and subsequently assigned to Plaintiff would not have included any ATS.  Mot. at 16-17. The Court declines to find as a matter of law that the STA did not transfer ownership of the ATS or that that Patil's deposition extinguishes any interest Patil may have had in the ATS.

Second, there is a genuine dispute as to whether Mr. Trombley was both an Onsa and Franklin employee during the period the ATS were created.  FT Defendants offer evidence to support their contention that Mr. Trombley was a full-time Franklin employee and was not employed by Onsa.  *See* Defs.' Exs. 1 at 34:24–35:10 (confirming Mr. Trombley did not receive a salary at Onsa, left both Franklin and Onsa at the same time, and did not have a separate separation agreement for Onsa), 72:8-14 (confirming Mr. Trombley started working at Franklin in March 2018 and held a title), 74:6-8 (confirming Mr. Trombley "was a W-2 employee" at Franklin).  Plaintiff offers evidence in return to support its assertions that Mr. Trombley was employed by Onsa when the ATS were created and that the IP agreement did not apply to Mr. Trombley's work for Onsa.  *See* Pl.'s Exs. 62 (FT Outside Business Form dated 9/30/2019 reporting Mr. Trombley worked 15-20 hours/day for Onsa and received stock compensation for

---

[4]  Barefoot Capital, LLC (later renamed Maven Venture Capital, LLC) granted any rights in IP it had obtained from Patil to Plaintiff via quitclaim assignment.  *See* Defs.' Ex. 31 at 137–40 (Pl.'s Response to Interrogatory No. 9, Pl.'s Fifth Supp. Responses to FT Defs.' First Set of Interrogatories).

United States District Court
Northern District of California

that work); 137 at 81:5-14 (deposition testimony that Mr. Trombley was working 70-80 hours a week for Onsa in 2019); 142 at 136:23–137:5 (deposition testimony from Mr. Bayston in his capacity as Franklin Templeton's corporate designee that he never told Mr. Trombley "that any work that he did on Onsa's intellectual property would be owned by Franklin Templeton[.]").

Accordingly, Defendants' motion for summary judgment as to Plaintiff's DTSA claim is **DENIED**.

### 2.    FT Defendants – Breach of Contract

The FT Defendants move for summary judgment on Plaintiff's claim for breach of contract.  In Count V of Plaintiff's TAC, Plaintiff alleges Defendants FRI, FT FinTech, and FT Companies breached a nondisclosure agreement ("NDA"), which Franklin Companies, LLC and Token Vault Limited entered into on September 11, 2019.  TAC ¶¶ 239–51; *see* Pl.'s Ex. 5 (NDA).  Defendants assert Plaintiff lacks standing to bring a claim for breach of the NDA.  Mot. at 17–18.

TokenVault Limited was a Singapore business entity led by Austin Trombley that transferred substantially all its assets to TokenVault, Inc. (a Delaware corporation) via an Asset Purchase Agreement ("APA") on October 28, 2019.  Pl.'s Ex. 6 (October 2019 APA).  The October 2019 APA includes in the list of transferred assets "all . . . Contracts to which Seller or any of the Seller Subsidiaries is a party or by which Seller or any of the Seller Subsidiaries is bound that are used or held for use primarily in the operation or conduct of the Business as currently conducted[.]"  October 2019 APA § 2.2(a).  The NDA states that Franklin Templeton Companies, LLC "enter[s] into this Agreement for the benefit of that group of affiliated businesses consisting of Franklin Resources, Inc. ('FRI') and FRI's subsidiaries, partnerships, joint ventures and related and affiliated business entities (collectively, 'Franklin')."  Franklin and Company are sometimes referred to therein as a "party" and collectively as the "parties."  NDA at BLOCKCHAIN-00000233.  The NDA provides: "[The NDA] may not be assigned by either party . . . without the prior written consent of the other party.  All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, successors and assigns."  NDA at BLOCKCHAIN-00000234.  California state law governs

the terms of the NDA. *Id.*

Defendants do not dispute that any rights TokenVault, Inc. – which was later renamed Onsa – might have had under the NDA would have been transferred to BLKCHN via the ABC (ABC §§ 1.1, 3.1, Defs.' Ex. 100 & Pl.'s Ex. 44), and subsequently from BLKCHN to Plaintiff. Instead, Defendants contend that TokenVault Limited's rights under the NDA could not have been assigned to TokenVault, Inc. because FT Defendants did not consent to its assignment. Plaintiff maintains it has standing to bring a claim for breach of the NDA because TokenVault, Inc. was an assignee and successor of TokenVault Limited.

The Court finds Plaintiff has demonstrated that TokenVault Inc. was a successor entity to TokenVault Limited. California courts impose successor liability where "the purchasing corporation is a mere continuation of the seller." *Cleveland v. Johnson*, 209 Cal. App. 4th 1315, 1327 (2012). "[A] corporation acquiring the assets of another corporation is the latter's mere continuation . . . upon a showing of *one or both* of the following factual elements: (1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; (2) one or more persons were officers, directors, or stockholders of both corporations." *Id.* (emphasis in original, citation omitted). "[A] mere change of name or a shift of assets" cannot defeat successor liability "when and where it is shown that the new corporation is, in reality, but a continuation of the old." *Id.* (quoting *Blank v. Olcovich Shoe Corp.*, 20 Cal. App. 2d 456, 461 (1937)). Such is the case here. Following the October 28, 2019 APA, TokenVault, Inc.'s officers, directors, and stockholders were comprised of TokenVault Limited's former leadership. The October 2019 APA, which transferred TokenVault Limited's assets to TokenVault, Inc., names Austin Trombley as the seller of TokenVault Limited, and Aaron Travis as Token Vault Limited's Chief Operating Officer. October 2019 APA at BLOCKCHAIN-00000319, 00000323. The October 2019 SPA between TokenVault, Inc. and FT FinTech, which was executed that same day, indicates that Austin Trombley held 100% of TokenVault, Inc.'s voting stock prior to the SPA's execution, names Aaron Travis and Austin Trombley as representatives of TokenVault, Inc., and lists Aaron Travis as Token Vault, Inc.'s president. SPA §§ 1.1(b)-(e) (provisions regarding sale and issuance of stock), 1.2 (Trombley's

United States District Court
Northern District of California

right to repurchase stock); Defs.' Ex. 39 at BLOCKCHAIN_000004000 (SPA signature page). And although the October 2019 Asset Purchase Agreement purports to be made "in consideration of . . . good and valuable consideration," the APA does not indicate that TokenVault, Inc. paid any money for the assets of TokenVault, Limited.  Pl.'s Ex. 6 at 1.  *See also* Pl.'s Ex. 132 ¶ 5 (June 28, 2024 declaration of Austin Travis stating that FT indicated that to invest in Onsa, "TV Singapore would need to convert from a Singapore entity to a United States entity.").  Accordingly, the Court finds that TokenVault, Inc. was a successor of TokenVault Limited.  Plaintiff has thus satisfied its burden of demonstrating standing to bring its claim for breach of contract at this juncture.

Because the Court finds a successor relationship exists between TokenVault, Inc. and TokenVault Limited, the Court need not consider whether the NDA was validly assigned.

Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiff's breach of contract claim.

### 3.    Defendants FT FinTech, FRI and Bayston – Breach of Fiduciary Duty

Defendants FT FinTech, FRI, and Roger Bayston seek summary judgment on Plaintiff's claim for breach of fiduciary duty.  In its cross-motion, Plaintiff asks this Court to grant partial summary judgment in favor of Blockchain that Defendant Roger Bayston is not entitled to the presumption of the business judgment rule.

#### a.    Roger Bayston

Under Delaware law, "[c]orporate directors and officers owe fiduciary duties of care and loyalty to the corporation and its stockholders."  *In re Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d 393, 453–54 (Del. Ch. 2023).  The duty of loyalty requires a director or officer to act in good faith.  *Id.* (citing *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."  *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).  The applicable standard of review "depends initially on whether the board members":

> (i) were disinterested and independent (the business judgment rule),
> (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations

14

1

2

3

4

> (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both.

5

6

*Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1045–46 (Del. Ch. 2020) (quoting *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013)).

7

### i.    Claims Based on Bayston's Authorization of the ABC

8

9

10

11

12

13

14

Defendant Bayston was Onsa's sole director from FT FinTech's October 2019 APA until November 2020, when Onsa's board of directors – consisting solely of Bayston – voted to approve an ABC liquidating Onsa and transferring its assets to BLKCHN, LLC. SPA §§ 9.5, 9.6; Defs.' Ex. 51. Defendants argue that Bayston did not breach his fiduciary duties in authorizing the November 2020 ABC because Bayston's decision to implement the ABC falls within the protections of the business judgment rule and because Bayston relied on the advice of counsel in authorizing the ABC. Mot. at 19–21.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Delaware Courts apply the business judgment rule when a director is disinterested and independent. *See Stream TV Networks, Inc.*, 250 A.3d at 1045–46. In contrast, Delaware courts "appl[y] enhanced scrutiny when directors face subtle conflicts and situational pressures that could undermine the integrity of their decisions, and when they take action that invades space traditionally reserved for the stockholders." *In re Sears Hometown & Outlet Stores, Inc. Shareholder Litig.*, 309 A.3d 474, 484 (Del. Ch.), *modified on reargument*, (Del. Ch. 2024). The Court finds there are genuine disputes as to whether Bayston was disinterested and independent such that the business judgment rule should apply. It is undisputed that Bayston was a longtime executive at Franklin Templeton and remained in that role throughout his time as Onsa's sole director. Bayston did not receive any compensation for his role as Onsa's sole director, was not an Onsa shareholder, and received his salary and bonuses from Franklin Templeton. *See* Pl.'s Ex. 141 at 149:21-24, 150:11-14, 151:11-23; Defs.' Exs. 45, 46 (Onsa capitalization tables including list of Onsa shareholders). Plaintiff also offers evidence that Bayston's employment with Franklin Templeton affected his decision-making in Onsa business matters. *See, e.g.*, Pl.'s Ex. 145 at

United States District Court
Northern District of California

188:3-19 (testimony of FRI executive Joe Boerio that Bayston "would be representing both" Franklin Templeton and Onsa in discussions involving Onsa's milestones). This evidence creates a triable issue of fact as to whether Bayston was disinterested and independent. Accordingly, the Court declines to apply the business judgment rule to Bayston's actions on summary judgment.

More fundamentally, Plaintiff's breach of fiduciary duty claim against Bayston is not limited to his authorization of the ABC. Plaintiff alleges that Bayston breached his fiduciary duties in part by deciding to wind down Onsa and cease all business operations in July 2020. *See* TAC ¶¶ 47, 98, 187, 188, 195. Plaintiff alleges that at that time, Onsa had no significant creditors, had valuable trade secrets and other IP, and was on track to achieve the first set of milestones that would trigger further capital investment from FT FinTech. TAC ¶¶ 173, 198. These actions together make up Plaintiff's breach of fiduciary claim against Bayston. The Court declines to carve out Bayston's actions in authorizing the ABC months after work at Onsa had stopped from Bayston's decision to shutter business operations in the first instance.

Moreover, the evidence Defendants offer to demonstrate Bayston's reliance on the advice of counsel is from *after* Bayston initiated Onsa's wind-down. *See* Defs.' Exs. 52, 53, 84, 90. Defendants offer no evidence to indicate that Bayston relied on counsel when he decided to wind down Onsa in July 2020, and Plaintiff offers evidence to the contrary. *See* Pl.'s Ex. 84 (email from Meredith Gibbons to Defendant Jennifer Johnson dated July 26, 2020, writing: "the Board of Onsa has determined that it makes sense to begin the wind down of Onsa" and that "Onsa's prior legal counsel . . . informed the board Friday that they were declining legal representation so the Onsa Board has been working to find new counsel over the weekend.").

Accordingly, the Court **DENIES** Bayston summary judgment on Plaintiff's claims for breach of fiduciary duty based on Bayston's authorization of the ABC.

### ii.    Breach of Duty of Loyalty

Defendants seek summary judgment for Bayston to the extent Plaintiff's breach of fiduciary duty claim is based on an alleged breach of the duty of loyalty. "Acting loyally requires acting in good faith, and acting in good faith requires that the fiduciary subjectively believe that the course of action is in the best interests of the corporation and its stockholders." *In re*

*Columbia Pipeline Grp., Inc. Merger Litig.*, 299 A.3d at 455.  "[A] corporate fiduciary acts in bad faith when the fiduciary 'intentionally acts with a purpose other than that of advancing the best interests of the corporation[,]'" regardless of the fiduciary's reasons for intentionally failing to advance the corporation's best interests.  *Id.*  Defendants contend Plaintiff cannot offer any evidence that Bayston breached the duty of loyalty and maintain that Bayston "prioritized his duties to Onsa as sole director over any supposed allegiance to FT FinTech."  Mot. at 22.  The Court finds there are triable issues of fact as to whether Bayston breached the duty of loyalty.

Plaintiff offers evidence that Bayston intentionally failed to act in the best interest of Onsa and its shareholders.  For example, Plaintiff offers a July 7 email chain from Bayston to FRI employee Hilary Coral asking for confirmation that Franklin would have to make forward payments to Austin Trombley and Onsa "as long a[s] the Onsa entity exists" and stating that "it's not really a question of if [Onsa] hit[s] the milestones, but when."  Pl.'s Ex. 173 at 1.  The next day, Bayston messaged FT Director Monica Fonseca that he "never liked the idea [O]nsa would own the customer and FT wouldn't be a majority owner of the economics."  Pl.'s Ex. 125 (BAYSTON 000886).  Three weeks later, Bayston fired Bashir and ceased Onsa's business operations.  By July 28, "any work . . . to complete the milestones had stopped."  Pl.'s Ex. 148 at 111:21-25.  Plaintiff also provides evidence to support its assertions that Onsa was not in dire straits when Bayston decided to wind down the company, and that Bayston did not act in the best interest of non-FT FinTech Onsa shareholders in the months between the wind-down and the ABC.  *See, e.g.*, Pl.'s Exs. 26 (July 2020 Onsa Inc. balance sheet); 82 (June 17, 2020 email from Bayston to FT FinTech officer Joe Boerio stating: "you will see from [then-Onsa CEO] Tauseef [Bashir]'s deck that the new operating team has pushed the platform quite quickly toward the first set of milestones."); 147 at 71:16–72:20; 209:25–210:14 (deposition testimony of Gregg Yorkison, liquidator leading up to the ABC, discussing Bayston's strong negative reaction to his proposal to explore whether Onsa could use director's and officers insurance deductible to settle Onsa shareholder claims).

Viewing the facts in the light most favorable to Plaintiff, the Court finds a reasonable jury could find that Bayston did not act in good faith and breached his duty of loyalty.  Accordingly,

1    Defendants' motion for summary judgment is **DENIED** as to Plaintiff's breach of fiduciary duty

2    claim against Roger Bayston.

3                         **iii.        Breach of Duty of Care**

4           TokenVault's Amended and Restated Certificate of Incorporation provides:  "To the fullest

5    extent permitted by law, a director of the Corporation shall not be personally liable to the

6    Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."

7    Defs.' Ex. 70, ¶ 9.  Under Delaware law, exculpatory provisions are enforceable as to duty of care

8    claims only when there is no other outstanding claim for breach of fiduciary duty.  *See, e.g.*, *In re*

9    *Evergreen Energy, Inc.*, 546 B.R. 549, 561 (Bankr. D. Del. 2016).  Because the Court finds there

10   are triable issues of fact as to whether Bayston breached the duty of loyalty, summary judgment is

11   **DENIED** as to Defendants' exculpation argument.

12                         **b.        FT FinTech**

13          "Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority

14   interest in or exercises control over the business affairs of the corporation."  *Ivanhoe Partners v.*

15   *Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987).  Unlike a corporation's directors, a

16   controlling shareholder typically has no affirmative obligation to promote the best interests of the

17   corporation.  *Sears Hometown & Outlet Stores*, 309 A.3d at 483–84.  "[W]hen exercising

18   stockholder-level voting power, a controller owes a duty of good faith that demands the controller

19   not harm the corporation or its minority stockholders intentionally."  *Id.* at 483.  However, a

20   controller owes the same fiduciary duties as a director "when the controller exercises general or

21   transaction-specific control over the board, takes over the corporate machinery, and effectively

22   substitutes its wishes for those of the directors."  *Firefighters' Pension Sys. of City of Kansas City*

23   *v. Found. Bldg. Materials, Inc.*, 318 A.3d 1105, 1138 (Del. Ch. 2024).

24          Following the October 2019 SPA, FT FinTech owned 100% of Onsa's voting shares and

25   roughly a quarter of Onsa's non-voting shares.  SPA § 1.1(b).  Accordingly, FT FinTech was a

26   controlling shareholder.

27

28

United States District Court
Northern District of California

                                    18

United States District Court
Northern District of California

### i.      "Pre-SPA Conduct"

Defendants ask the Court to grant FT FinTech summary judgment on Plaintiff's breach of fiduciary duty claim to the extent Plaintiff's claim is based on conduct that predates FT FinTech's investment in Onsa.

Defendants claim that Plaintiff alleges that FT FinTech violated its fiduciary duties "in part, by:

> (i) failing to follow through on promises to create a three-person board of directors; (ii) precluding Onsa from raising other money; (iii) precluding Onsa from seeking other customers; (iv) failing to follow through on promises to create an MSA; (v) failing to transfer a broker-dealer to Onsa; (vi) failing to allow Onsa to use Franklin's transfer agent; and (vii) failing to follow through on promises to assist Onsa with finding a transfer agent.

Defendants assert this alleged conduct was based on conversations that purportedly took place prior to the SPA. Plaintiff does not dispute that these alleged promises were made prior to the SPA, but maintains it does not assert pre-SPA conduct as a basis for its breach of fiduciary duty claims. Opp'n & Cross-Mot. at 18 n.10.

FT FinTech did not owe Onsa and its shareholders any fiduciary duties prior to the October 28, 2019 SPA, pursuant to which FT FinTech invested in Onsa. *See In re Walt Disney Co.*, No. CIV.A. 15452, 2004 WL 2050138, at *4 (Del. Ch. Sept. 10, 2004). Count I of Plaintiff's TAC, which makes up Plaintiff's breach of fiduciary duty claim, only mentions one alleged pre-SPA promise—that FT told Onsa's founders it "would provide all the funding that was needed." TAC ¶ 192; *see* TAC ¶¶ 180–201. Plaintiff does not allege, however, that FT FinTech breached its fiduciary duties by breaking that promise, nor does it allege that FT FinTech breached its fiduciary duties by failing to follow through on any other alleged pre-SPA promises. *See* TAC ¶¶ 180–201.

As Plaintiff's breach of fiduciary duty claim is not based on conduct that predates FT FinTech's investment in Onsa, the Court declines to grant summary judgment to FT FinTech on that basis.

### ii.      Responsibility for Bayston

Defendants assert FT FinTech cannot be held liable for Bayston's alleged breaches of fiduciary duty because there is no evidence that FT FinTech controlled or directed Bayston's

United States District Court
Northern District of California

1   alleged actions.  Mot. at 30.  The Court finds Plaintiff has, however, presented evidence to create a

2   genuine issue of triable fact regarding whether and to what extent FT FinTech exercised control

3   over Bayston.  *See, e.g.*, Pl.'s Exs. 153 at 181:13-21, 182:1-13, 183:6-23 (deposition testimony of

4   Les Kratter, one of two FT FinTech officers who approved the November 2020 ABC (*see* Pl.'s Ex.

5   145 at 182:9-19), that he understood Bayston to be representing Franklin and not Onsa when

6   dealing with Bayston on Onsa-related matters); 138 at 203 (deposition testimony of FRI CEO

7   Jennifer Johnson stating that "FT FinTech had great influence" over Onsa); 171 at 3 (August 2020

8   email from outside counsel advising that FT FinTech may be required "to advance costs and

9   indemnification . . . to Roger [Bayston] as FT FinTech's agent.").  The Court thus declines to

10   conclude as a matter of law that FT FinTech cannot be held liable for Bayston's alleged breach of

11   fiduciary duty.

12           **iii.**       **Breach for Wind-Down and Duties Owed Outside of Voting**

13         FT FinTech asserts that it breached no duties during the wind down because it did not

14   exercise its voting power and did not assume special fiduciary duties by exercising control over

15   Onsa.  Mot. at 26, 28–29.  As discussed above, a reasonable jury could find that Bayston breached

16   his fiduciary duty as Onsa's sole board member in deciding to wind down Onsa.  As discussed

17   above, the Court also finds there are triable issues of fact as to whether FT FinTech exercised

18   control over Onsa's board such that FT FinTech would assume the fiduciary duties of a director.

19   Accordingly, the Court declines to conclude on summary judgment that FT FinTech owed no

20   duties outside of voting or that FT FinTech breached no duty for wind-down related decisions.

21           **iv.**       **Voting to Approve ABC**

22         Defendants argue that FT FinTech did not breach its fiduciary duties in voting to approve

23   the November 2020 ABC.  Defendants contend that FT FinTech's vote was a reasonable exercise

24   of its voting power and consistent with its limited duties as a shareholder.  A controlling

25   shareholder "can refuse to vote in favor of, or affirmatively vote against, a transaction that would

26   alter the status quo, even if a board of directors might conclude that the transaction was in the best

27   interests of all stockholders."  *Sears Hometown & Outlet Stores*, 309 A.3d at 511–12.  A

28   controlling shareholder still "owes a fiduciary duty of loyalty . . . not [to] intentionally harm the

corporation or its minority stockholders, plus a fiduciary duty of care . . . not [to] harm the corporation or its minority stockholders through grossly negligent action." *Id.* at 512.  However, as discussed above, a controlling shareholder owes the same fiduciary duties as a director when the shareholder exercises control over the board.  *See Firefighters' Pension Sys. of City of Kansas City*, 318 A.3d at 1138.

It is undisputed that Bayston was Onsa's sole board member from the 2019 SPA until Onsa's liquidation via the November 2020 ABC.  Because the Court finds there is a genuine dispute as to FT FinTech's exercise of control over Onsa's sole board member, the Court declines to separate FT FinTech's actions in voting to approve the November 2020 ABC from its other actions.  Accordingly, the Court declines to grant FT FinTech summary judgment for its decision to approve the November 2020 ABC.

### v.    Duty of Loyalty

Defendants argue that none of FT FinTech's alleged conduct supports a claim for the breach of duty of loyalty.  As discussed above, the Court finds there is a genuine dispute of material facts as to whether Bayston's actions constituted a breach of the duty of loyalty, and a genuine dispute about whether and the extent to which FT FinTech exercised control over Onsa through its sole board member.  The Court therefore declines to grant FT FinTech summary judgment for breach of duty of loyalty. Accordingly, the Court **DENIES** Defendant FT FinTech summary judgment on Plaintiff's breach of fiduciary duty claim.

### c.    FRI

Plaintiff contends that FRI executives exercised control over Onsa and that Delaware case law regarding "controller" actions gives rise to a fiduciary duty. Opp'n & Cross-Mot. at 21.  The authorities Plaintiff cites in support of this argument concern duties owed by *shareholders* that exercise control over a business.  Although Plaintiff describes FRI as a controlling shareholder in the operative complaint (TAC ¶¶ 126, 181), Plaintiff has introduced no evidence that FRI itself was a shareholder in Onsa.  *See* ECF No. 275-1 (Decl. of Darin Snyder in support of Defs.' Mot.) ¶¶ 51–52 & Defs.' Exs. 45; 46 (Onsa capitalization tables dated October 28, 2019 and June 30, 2020 including lists of Onsa shareholders); *see generally* SPA.  Plaintiff offers no authority

extending fiduciary duties to the parent company of a controlling shareholder and offers no other theory to support the imposition of a fiduciary duty on FRI. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could not find that FRI owed a fiduciary duty to Onsa or its shareholders.

Accordingly, the Court **GRANTS** Defendant FRI summary judgment on Plaintiff's breach of fiduciary duty claim.

### d.    Damages from Alleged Breach of Fiduciary Duty

To obtain a "meaningful remedy" for a breach of fiduciary duty, a plaintiff must demonstrate both harm to the beneficiary and "that a sufficiently convincing causal linkage exists between the breach of duty and the remedy sought that makes the remedy an apt means of addressing the breach." *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, No. 11802-cv-VCL, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019). "Delaware law does not demand certainty in awarding damages so long as the plaintiff has proven the defendant committed a wrong and demonstrated that an injury occurred. With that said, 'a plaintiff must demonstrate that the defendant caused the injury and present a reasonable and factually supported basis for determining damages.'" *Macrophage Therapeutics, Inc. v. Goldberg*, No. 2019-cv-0137-JRS, 2021 WL 2582967, at *17 (Del. Ch. June 23, 2021) (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009)); *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *39 (Del. Ch. Apr. 29, 2005 ("A prevailing party must prove its damages by preponderance of the evidence; absolute precision is not required but the proof may not be speculative either.").

Defendants seek summary judgment as to Plaintiff's prayer for compensatory damages (TAC Prayer for Relief, ¶¶ A-B) because Plaintiff cannot prove that an alleged breach caused damages. Defs.' Mot. at 31–32. Defendants contend Plaintiff has "no evidence that Onsa's fate would have changed" if Defendants had acted differently. Defs.' Mot. at 32. But Plaintiff alleges Defendants breached their fiduciary duties not simply by approving the November 2020 ABC, but by deciding to wind down the company and cease all business operations in order to liquidate the company. *See* TAC ¶¶ 47, 98, 179, 187–89, 195. Plaintiff argues that the wind-down culminated

in Onsa's liquidation via ABC and in "Onsa's shareholders being wiped out."  Opp'n & Cross-Mot. at 22.  Viewing the facts in the light most favorable to Plaintiff, the Court finds a reasonable jury could find that the alleged breaches of fiduciary duty triggered Onsa's decline in value.  The Court finds genuine issues of material fact therefore exist as to whether Defendants' alleged breaches of duty caused damage to Plaintiff.

Accordingly, the Court **DENIES** summary judgment as to Plaintiff's prayer for compensatory damages.

### 4.    Defendant Johnson – Aiding and Abetting Breaches of Fiduciary Duty

"A third party may be liable for aiding and abetting a breach of a corporate fiduciary's duty to the stockholders if the third party 'knowingly participates' in the breach."  *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).  "Knowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."  *Id.* at 1097.  To satisfy the element of knowing participation, the third party must "have provided substantial assistance to the primary violator."  *Buttonwood Tree Value Partners, L.P. v. R. L. Polk & Co.*, No. 9250-VCG, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017) (quotation omitted).

Defendants seek summary judgment on Plaintiff's claim against Jennifer Johnson for aiding and abetting breaches of fiduciary duty.  Defendants assert that summary judgment is required because Plaintiff cannot prove that Johnson knowingly participated in the alleged breaches of fiduciary duty and because there is no evidence that Johnson's "knowing participation" proximately caused the alleged breaches of fiduciary duty.

The Court finds there are genuine issues of material fact as to Johnson's knowing participation in the alleged breaches of fiduciary duty.  As discussed above, the Court finds there are triable issues of fact as to whether Bayston and FT FinTech breached their fiduciary duties to Onsa.  As to Johnson, Plaintiff offers evidence that Johnson at least tacitly approved the Onsa board's plans to wind down Onsa before they went into effect (Pl.'s Exs. 114; 154 at 262:25-264:3) and that Bayston sought Johnson's "general blessing of [his] plan."  Pl.'s Ex. 89 (FRANKLIN_291854).  Plaintiff offers evidence that three weeks before Bayston initiated the

1    wind-down of Onsa's operations, Johnson emailed Bayston and other Franklin Templeton

2    executives, along with her brother Chuck and Onsa's then-CEO Tauseef Bashir, to schedule a call

3    "to discuss issues around Token Vault[5] and coordinating our next steps."  Pl.'s Ex. 112

4    (FRANKLIN_00325410) (sent at 1:16 PM).  Johnson then excused Bashir from the call.  *Id.*  This

5    email came less than an hour after Bayston expressed to FT Director Monica Fonseca that he

6    "never liked the idea [O]nsa would own the customer and FT wouldn't be a majority owner of the

7    economics," (Pl.'s Ex. 125 (BAYSTON 000886) and one day after Bayston inquired about FT

8    FinTech's obligation to make payments to Onsa and Austin Trombley if Onsa met certain

9    milestones.  Pl.'s Ex. 173 at 1.  The Court finds this evidence is sufficient to create a triable issue

10   of fact as to whether Johnson provided substantial assistance to Bayston and FT FinTech in their

11   alleged breaches.

12        Plaintiff also offers evidence that Johnson received oral updates regarding Onsa's

13   milestones, including in June and July 2020.  Pl.'s Ex. 145 at 173:25-175:4, 176:14-24.  The Court

14   finds this is sufficient to create a genuine dispute as to whether Johnson acted with the knowledge

15   that the conduct assisted would constitute a breach of fiduciary duty.  As discussed above, a

16   reasonable jury could also find that the alleged breaches of fiduciary duty triggered Onsa's decline

17   in value.  The Court thus finds there is a genuine factual dispute as to whether the alleged breaches

18   of fiduciary duty would have occurred but for Johnson's alleged participation.

19        Accordingly, the Court **DENIES** Johnson's motion for summary judgment on Plaintiff's

20   claim for aiding and abetting breaches of fiduciary duty.

21   **B.    Plaintiff's Cross-Motion for Partial Summary Judgment**

22        **1.    Defendant Bayston – Business Judgment Rule**

23        Plaintiff asks this Court to grant partial summary judgment in favor of Blockchain that

24   Defendant Roger Bayston is not entitled to the presumption of the business judgment rule.  As

25   discussed above, the Court finds there is a genuine factual dispute as to whether Bayston is

26   entitled to the business judgment rule.  Accordingly, the Court **DENIES** Plaintiff's motion for

27

28   _____
     [5] TokenVault, Inc., later renamed Onsa.

United States District Court
Northern District of California

1  partial summary judgment that Defendant Bayston is not entitled to the presumption of the

2  business judgment rule.

3      **2.    Defendants' Ownership of Alleged Trade Secrets**

4      Plaintiff asks this Court to grant partial summary judgment in favor of Blockchain that

5  Defendants do not own any of the ATS.  Plaintiff asserts that Defendants waived this argument by

6  failing to timely disclose this theory during discovery and asserts that there is no genuine issue of

7  material fact that the ATS are not owned by Defendants.  As discussed above, the Court finds FT

8  Defendants have waived the argument that they own the ATS and this contention is barred by

9  Rule 37(c)(1).  Accordingly, the Court **GRANTS** Plaintiff's motion for partial summary judgment

10  that Defendants do not own any of the ATS.

11      **3.    Affirmative Defenses**

12      Plaintiff seeks partial summary judgment in favor of Blockchain on several of the

13  affirmative defenses Defendants assert in their answers to the operative complaint.  "[A]n

14  affirmative defense, under the meaning of Federal Rule of Civil Procedure 8(c), is a defense that

15  does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of

16  the elements of the plaintiff's claim are proven."  *Barnes v. AT & T Pension Ben. Plan-*

17  *Nonbargained Program*, 718 F. Supp. 2d 1167, 1173–74 (N.D. Cal. 2010) (quoting *Roberge v.*

18  *Hannah Marine Corp.,* No. 96–1691, 1997 WL 468330, at *3 (6th Cir. 1997)).  The defendant has

19  the burden of proof as to an affirmative defense.  *See, e.g., Kanne v. Connecticut General Life Ins.*

20  *Co.,* 867 F.2d 489, 492 n.4 (9th Cir. 1988).  "A defense which demonstrates that plaintiff has not

21  met its burden of proof is not an affirmative defense."  *Zivkovic v. S. California Edison Co.,* 302

22  F.3d 1080, 1088 (9th Cir. 2002).  Plaintiff seeks partial summary judgment in favor of Blockchain

23  on the basis that several of the affirmative defenses Defendants have pled are not actual

24  affirmative defenses.

25      In Defendant Roger Bayston's answer to Plaintiff's TAC, Bayston lists among his

26  affirmative defenses: (1) failure to state a claim, (7) good faith, (8) lack of fiduciary duty, (9) lack

27  of standing, (10) legitimate business purposes, (11) absence of causation, (12) lack of actual

28  damages (13) failure to allege facts to support claim for punitive damages, (14) damages are

speculative, (15) failure to allege facts to support attorneys' fees.  ECF No. 250 at 18–19.  FT Defendants and Jennifer Johnson include among their affirmative defenses (1) failure to state a claim, (2) lack of fiduciary duty, (4) lack of standing, (5) legitimate business purposes, (8) unjust enrichment, (10) no attorneys' fees, (11) lack of intent, (13) lack of causation, (14) lack of actual damages, (15) bad faith, (17) lack of facts to support punitive damages, and (19) speculative damages.  ECF No. 253 at 37–41.  Plaintiff contends these "affirmative defenses" are not affirmative defenses at all, but merely attack the sufficiency of Plaintiff's case.  Defendants assert that Plaintiff's cross-motion is conclusory and should be denied on that basis but provide no response on the merits.  Defendants do not contend that any of these affirmative defenses are actually affirmative defenses.  Defs.' Reply and Opp'n & Cross Mot. at 20.  While Defendants are correct that "denials that are improperly pled as defenses should not be stricken on that basis alone," *Weddle v. Bayer AG Corp.*, 2012 WL 10197824, *4 (S.D. Cal. March 26, 2012), Plaintiff did not file a motion to strike.  Plaintiff has moved for summary judgment, and the purpose of a summary judgment motion is to determine which claims and defenses will go to trial.  In the context of summary judgment, it is entirely appropriate to move on the ground that purported affirmative defenses are not actually affirmative defenses at all.  This aids the Court and efficient case administration by helping to determine which defenses will go to trial.  On the merits, the Court finds these purported affirmative defenses attack Plaintiff's prima facie case and are not properly asserted as affirmative defenses.

Plaintiff likewise contends that several of Defendants' affirmative defenses are not supported by any evidence.  Bayston lists among his affirmative defenses: (2) laches, waiver, and equitable estoppel, (4) unclean hands, (5) claim preclusion, (6) release of breach of duty.  ECF No. 250 at 18.  FT Defendants and Defendant Johnson list among their affirmative defenses: (3) release, (6) unclean hands, (7) waiver, (9) license/consent/acquiescence, (12) superseding cause, (15) bad faith, (16) Plaintiff's breach of contract, (18) set-off.   ECF No. 253 at 38–40.  Defendants contend Plaintiff's cross-motion on these affirmative defenses should be denied because Plaintiff fails to provide supporting evidence.  However, "[w]hen the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of

evidence to support the nonmoving party's case." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quotations omitted). "Once the moving party carries its initial burden, the adverse party may not rest upon the mere allegations of denials of the adverse party's pleading, but must provide affidavits or other sources of evidence that set forth specific facts showing that there is a genuine issue for trial." *Id*. (cleaned up). Here, Plaintiff carried its initial burden by pointing out that there is an absence of evidence to support these affirmative defenses. In response, Defendants do not argue that there is any such evidence and do not cite to any evidence. The Court therefore finds no evidence to support these affirmative defenses, and thus summary judgment is proper.

Accordingly, the Court **GRANTS** summary judgment in favor of Plaintiff on Defendant Roger Bayston's first, second, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth affirmative defenses, and on FT Defendants' and Jennifer Johnson's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth and nineteenth affirmative defenses.

## V.    CONCLUSION

Based on the analysis above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Cross-Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**


Dated: November 27, 2024

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California